# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| JESSICA KRAFT, individually and as parent to minors L.K., S.K., and O.K.; SHELLI SCHNEIDER, individually and as parent of minors A.S and W.S.; individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 3:20-cv-00121-PDW-ARS |
| v. | ) ) | |
| ESSENTIA HEALTH, JOHN DOE MANUFACTURERS, JOHN DOE DISTRIBUTOR, | ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     SUMMARY OF FACTS ..................................................................................... 2

        A.      Background on regulations ...................................................................... 2

        B.      Essentia's distribution, administration, and sale of vaccines subject
        to temperature excursions occurred over three years.......................................... 4

        C.      Plaintiffs paid for the misbranded vaccines and suffered out-of-
        pocket losses. .................................................................................................... 6

III.    ARGUMENT...................................................................................................... 6

        A.      Legal Standard ....................................................................................... 6

        B.      Plaintiffs have Article III standing because they paid for vaccines
        that were not effective and thus Plaintiffs did not receive the benefit of
        their bargain. .................................................................................................... 8

        C.      Plaintiffs have stated plausible claims for breach of warranty. ........... 14

                1.   Vaccines are "goods" under the North Dakota Uniform
                Commercial Code. ................................................................................. 14

                2.   The administration of a vaccine is incidental to its sale, making
                the North Dakota Uniform Commercial Code's warranty
                provisions applicable. .......................................................................... 16

        D.      Plaintiffs have satisfied Rule 9(b) for their consumer protection act
        claims where they allege the vaccines were misbranded and not effective –
        and that information was withheld by Defendant. ............................................. 19

                1.   Rule 9(b) is satisfied where Plaintiffs' allegations plausibly
                demonstrate Defendant omitted material facts. ..................................... 19

                2.   Plaintiffs have stated a claim under the North Dakota Unlawful
                Sales or Advertising Practices Act because the omission of a
                material fact is deceptive and unconscionable..................................... 20

                3.   Plaintiffs have stated a claim under the Minnesota Consumer
                Fraud Act because Defendant had a duty to disclose material
                information regarding the vaccines to Plaintiffs and omitted such
                information.......................................................................................... 23

        E.      Essentia did not move to dismiss Count IV for unjust enrichment
        for failure to state a claim. .............................................................................. 26

IV.    CONCLUSION .................................................................................................. 26

iii

## TABLE OF AUTHORITIES

**Cases**

*Air Heaters v. Johnson Elec.*,
258 N.W.2d 649 (N.D. 1977) ................................................................................. 16

*Amburgey v. CaremarkPCS Health, L.L.C.*,
2017 U.S. Dist. LEXIS 219019 (C.D. Cal. Sept. 21, 2017) ................................. 13

*Arista Records, LLC v. Doe 3,*
604 F.3d 110 (2d Cir. 2010) ................................................................................. 10

*Asleson v. W. Branch Land Co.*,
311 N.W.2d 533 (N.D. 1981) ......................................................................... 11, 12

*Belville v. Ford Motor Co.*,
60 F. Supp. 3d 690 (S.D.W. Va. 2014) ................................................... 7, 19, 20

*Berry v. G. D. Searle & Co.*,
309 N.E.2d 550 (Ill. 1974) .............................................................................. 17, 18

*Bonebrake v. Cox*,
499 F.2d 951 (8th Cir. 1974) ................................................................................ 16

*Brandt v. Bos. Sci. Corp.*,
792 N.E.2d 296 (Ill. 2003) .................................................................................... 18

*Burns v. Toyota Motor Sales, U.S.A., Inc.*,
2015 U.S. Dist. LEXIS 180160 (W.D. Ark. Apr. 23, 2015) ............................. 8, 19

*City of Kennett v. EPA*,
887 F.3d 424 (8th Cir. 2018) ................................................................................ 11

*City of Wyo. v. P&G*,
210 F. Supp. 3d 1137 (D. Minn. 2016) ........................................................... 12, 13

*Delmar Fin. Co. v. Ocwen Loan Servicing, L.L.C.*,
2019 U.S. Dist. LEXIS 79279 (E.D. Mo. May 10, 2019) .................................... 7

*DJ Coleman, Inc. v. Nufarm Ams., Inc.*,
693 F. Supp. 2d 1055 (D.N.D. Mar. 12, 2010) ................................................... 20

*Donaldson v. YWCA*,
539 N.W.2d 789 (Minn. 1995) ............................................................................. 25

*Doe v. Univ. of Ark. - Doe v. Univ. of Ark. - Fayetteville*,
2020 U.S. App. LEXIS 28193 (8th Cir. Sept. 4, 2020) ..................................... 6-7

*Fayne v. Vincent*,
301 S.W.3d 162 (Tenn. 2009) ............................................................................... 22

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ............................................................................... 14

*Ford Motor Credit Co. v. Majors*,
   2005 Minn. App. LEXIS 448 (Minn. May 3, 2005) ............................................................... 24

*FTC v. Equinox Int'l Corp.*,
   1999 U.S. Dist. LEXIS 19866 (D. Nev. Sept. 14, 1999)........................................................ 14

*FTC v. Gill*,
   265 F.3d 944 (9th Cir. 2001) ................................................................................................ 22

*Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*,
   850 N.W.2d 682 (Minn. 2014) .............................................................................................. 24

*Holmes v. Merck & Co.*,
   2008 WL 11348410 (D. Nev. June 16, 2008) ....................................................................... 15

*In re Bayer Corp. Combination Aspirin Products Mktg. and Sales Practices Litig.*,
   701 F. Supp. 2d 356 (E.D.N.Y. 2010) ........................................................................ 10, 11, 12

*In re Celexa and Lexapro Mktg. and Sales Practices Litig.*,
   751 F. Supp. 2d 277 (D. Mass. Nov. 10, 2010) .................................................................... 12

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
   801 F. Supp. 2d 993 (S.D. Cal. 2011) ............................................................................. 10, 11

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
   2009 U.S. Dist. LEXIS 58900 (D.N.J. July 10, 2009) .......................................................... 12

*In re Target Corp. Customer Data Sec. Breach Litig.*,
   64 F. Supp. 3d 1304 (D. Minn. 2014) ................................................................................... 19

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   684 F. Supp. 2d 942 (N.D. Ohio 2009) ......................................................................... 7-8, 19

*K.L. v. Riverside Medical Ctr.*,
   524 N.W.2d 300 (Minn. App. 1994) ..................................................................................... 25

*Klein v. First Edina Nat'l Bank*,
   196 N.W.2d 619 (Minn. 1972) .............................................................................................. 25

*Krebsbach v. Trinity Hosps., Inc.*,
   938 N.W.2d 133 (N.D. Jan. 27, 2020) .................................................................................. 21

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................................... 8

*Ly v. Nystrom*,
   615 N.W.2d 302 (Minn. 2000) .............................................................................................. 24

*McConnell v. Fed. Election Comm'n*,
   540 U.S. 93 (2003) ................................................................................................................. 8

*Minn. v. Hoeven*,
   331 F. Supp. 2d 1074 (D.N.D. 2004) ...................................................................................... 9

*Morton v. Becker*,
   793 F.2d 185 (8th Cir. 1986) ................................................................................................ 16

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,
  647 N.E.2d 741 (N.Y. App. 1995) ................................................................................ 22

*Payne v. United States*,
  247 F.2d 481 (8th Cir. 1957) .......................................................................................... 7

*Pearson v. Franklin Lab'ys, Inc.*,
  254 N.W.2d 133 (S.D. 1977) ........................................................................................ 15

*People Bank & Tr. v. Reiff*,
  256 N.W.2d 336 (N.D. 1977) ...................................................................................... 23

*Perlmutter v. Beth David Hosp.*,
  123 N.E.2d 792 (N.Y. 1954) ........................................................................................ 17

*Rabe v. Merck & Co.*,
  2005 WL 2094741 (S.D. Ill. Aug. 25, 2005) ............................................................... 18

*Riddle v. Merck & Co.*,
  2006 WL 1064070 (S.D. Ill. Apr. 21, 2006) ............................................................... 18

*Rikos v. P&G*,
  782 F. Supp. 2d 522 (S.D. Ohio 2011) ........................................................................ 12

*Rink Constr., Inc. v. Mid-Continent Cas. Co.*,
  2020 U.S. Dist. LEXIS 124939 (D.N.D. July 16, 2020) ................................................. 7

*Roberts v. Francis*,
  128 F.3d 647 (8th Cir. 1997) .......................................................................................... 7

*Robertson Companies, Inc. v. Kenner*,
  311 N.W.2d 194 (N.D. 1981) ...................................................................................... 14

*Rohrbough v. Wyeth Lab'ys, Inc.*,
  719 F. Supp. 470 (N.D. W.Va. 1989) ........................................................................... 15

*Smith v. Merck & Co.*,
  472 F. Supp. 2d 1096 (S.D. Ill. 2007) .......................................................................... 18

*State ex rel. Spaeth v. Eddy Furniture Co.*,
  386 N.W.2d 901 (N.D. 1986)......................................................................................... 21

*Van Wyk v. Norden Lab'ys, Inc.*,
  345 N.W.2d 81 (Iowa 1984) ........................................................................................ 15

*Wallace v. ConAgra Foods, Inc.*,
  747 F.3d 1025 (8th Cir. 2014) ...................................................................................... 13

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ........................................................................................................ 1

**Statutes**

21 U.S.C. § 331 ................................................................................................................... 4

21 U.S.C. § 351 ........................................................................................................... 3, 4, 6

21 U.S.C.§ 352 ............................................................................................................... 4

N.D. Cent. Code § 41-02-05 ................................................................................... 1, 14, 15

N.D. Cent. Code § 41-02-94 ............................................................................................ 16

N.D. Cent. Code, § 51-15-02 .......................................................................................... 21

N.D. Cent. Code § 51-15-09 ........................................................................................... 21

**Rules**

Fed. R. Civ. P. 9 ............................................................................................ 7, 8, 9, 14, 20

Fed. R. Civ P. 8 ......................................................................................................... 6, 7

Fed. R. Civ. P. 12 ......................................................................................................... 25

**Other**

21 C.F.R. § 211.142 ........................................................................................................ 3

## I.   INTRODUCTION

As the Supreme Court has explained, Congress did not create a federal remedy for consumers harmed by unsafe or ineffective drugs because it "determined that widely available state rights of action provided appropriate relief for injured consumers," and "recognized that state-law remedies further consumer protection by motivating manufacturers to produce safe and effective drugs and to give adequate warnings." *Wyeth v. Levine*, 555 U.S. 555, 574 (2009). Plaintiffs seek to exercise those state law rights here to recover their out-of-pocket losses incurred when they paid Essentia Health for vaccines that were not properly stored,[1] were considered adulterated or misbranded, and were ineffective as a result.

First, Plaintiffs have Article III standing because they paid for vaccines that were not effective. Out of pocket losses incurred in the purchase of medicines that are not effective are a quintessential injury recognized by courts nationwide as a basis for Article III standing.

Second, Plaintiffs have stated plausible claims for breach of express and implied warranties.  Vaccines are "goods" under N.D. Cent. Code § 41-02-05, which defines the term as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ."  And, the predominant purpose of a contract or agreement for a vaccine is obtaining the vaccine itself—the administration of the vaccine is merely ancillary.

Third, Plaintiffs have satisfied Fed. R. Civ. P. 9(b) in alleging claims for fraudulent, deceptive, and unconscionable *omissions* as violations of the North Dakota and Minnesota state consumer protection acts. Rule 9(b) is satisfied where the omitted information is identified and

---

[1] Vaccines administered to Plaintiffs and their children were stored outside the proper temperature – called a temperature excursion. ¶ 2.  Citations to "¶__" are to the Class Action Complaint (ECF 1).

1

the complaint states how or when the concealment occurred.  Here, Plaintiffs have alleged that

Essentia (*who*), at its locations in Minnesota and North Dakota, including at Essentia's South

University Clinic (*where*), on multiple occasions (including January 31, 2017; October 26 and

November 27, 2017; February 26, May 25, August 24, and October 26, 2018; and October 12,

2019) (*when*), failed to notify Plaintiffs of (i) the temperature excursion, (ii) the fact that the

vaccines' potency or efficacy was affected, and (iii) that the vaccines were considered

adulterated or misbranded, and the CDC, Minnesota Department of Health, and North Dakota

Department of Health recommend that any vaccine subject to a temperature excursion not be

used or administered to a patient (*what*), and Plaintiffs were injured by paying for their visits,

and the vaccines, in reliance on Essentia's failure to disclose these material facts (*how*).  Because

omissions of material fact are recognized as actionable under both Minnesota and North Dakota

law, Plaintiffs have stated plausible claims.  Defendant's motion to dismiss should be denied.

## II.    SUMMARY OF FACTS

Plaintiffs allege that Essentia distributed and sold vaccines that were not properly stored

and handled, and thus were ineffective.

### A.  Background on regulations

According to the Centers for Disease Control (CDC), vaccines must be stored properly

from the time they are manufactured until they are administered to ensure potency and

protection.  Vaccines must be continuously stored at the proper temperature. Frozen vaccines

(Varicella, MMRV, and Zoster) must be stored in a freezer between -58°F and +5°F (-50°C and -

15°C), and all other routine vaccines should be stored in a refrigerator between 35°F and 46°F

(2°C and 8°C). ¶ 18.

Ensuring that vaccine quality is maintained at proper temperatures "is a shared

responsibility among manufacturers, distributors, public health staff, and health-care providers."

The CDC explains that: "[a] proper cold chain is a temperature-controlled supply chain that includes all equipment and procedures used in the transport and storage and handling of vaccines from the time of manufacture to administration of the vaccine." ¶ 19.

The CDC has explained that "[e]xposure to temperatures outside these ranges may result in reduced vaccine potency and increased risk of vaccine-preventable diseases." The CDC thus recommends: "It is better to not vaccinate than to administer a dose of vaccine that has been mishandled." ¶ 20.

The World Health Organization has defined a "temperature excursion" as "[a]n excursion event in which a TTSPP [time- and temperature-sensitive pharmaceutical product] is exposed to temperatures outside the range(s) prescribed for storage and/or transport." The CDC, Minnesota Department of Health, and North Dakota Department of Health recommend that any vaccine subject to a temperature excursion be segregated and marked "Do Not Use." ¶ 23.

Under federal law, a manufacturer must manufacture, store, warehouse, and distribute pharmaceutical drugs in accordance with "Current Good Manufacturing Practices" ("CGMPs") to ensure they meet safety, quality, purity, identity, and strength standards. 21 U.S.C. § 351(a)(2)(B). 21 C.F.R. § 210.1(a) states that the CGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." *See also* 21 C.F.R. § 211.142(b) (the warehousing of drug products shall provide for "[s]torage of drug products under appropriate conditions of temperature, humidity, and light so that the identity, strength, quality, and purity of the drug products are not affected.") Any drug not manufactured in accordance

3

with CGMPs is deemed "adulterated and/or misbranded" and may not be distributed or sold in the United States. 21 U.S.C. §§ 331(a), 351(a)(2)(B).  Entities at all phases of the design, manufacture, and distribution chain are bound by these requirements. ¶ 35.

Moreover, the U.S. Pharmacopeia Convention (hereinafter "USP") sets forth industry standards applicable—in relevant part—to distributors. Chapter 1079, entitled "Good Storage and Shipping Practices," specifies that: "Good storage and distribution practices apply to all organizations and individuals involved in any aspect of the storage and distribution of all drug products, including but not limited to the following: . . . Wholesale distributors; distribution companies involved in automobile, rail, sea, and air services." USP 1079 further provides that "all organizations along the supply chain bear responsibility for ensuring that they handle drug products within adequate storage and distribution parameters that will not affect the drug product identity, strength, quality, purity, or safety." ¶ 39.

Drugs are considered misbranded or adulterated (and may not be received or sold, 21 U.S.C. § 331(a), (c)) where, *inter alia*: the distribution facilities do not conform to CGMPs, 21 U.S.C.§ 351(a)(2)(B); the drug's quality or purity falls below the standards, 21 U.S.C.§ 351(b); the advertising or label for the drug is false or misleading in a number of ways, *e.g.,* 21 U.S.C.§ 352(a)(1), (c), (e)(1)(A)(ii), (f), (g), (n), (p). ¶ 47.

### B. Essentia's distribution, administration, and sale of vaccines subject to temperature excursions occurred over three years.

In or about February 2020, Essentia allegedly took over the management, storage and distribution process for medications from John Doe Distributor.  It was at that time that Essentia purportedly learned that John Doe Distributor had stored certain vaccines and medications outside of the recommended temperature range, potentially impacting their effectiveness. The temperatures of those vaccines and medicines were stored outside precise temperatures –

4

generally between 35-46 degrees Fahrenheit. ¶ 25.

On or about April 6, 2020, Essentia Health notified nearly 50,000 patients that medication or vaccines they received might have been compromised by improper temperature storage by a wholesale drug distributor. Essentia has written to patients to inform them of the possibility that injectable medications or vaccines they received might have been rendered less effective by improper storage. ¶ 27.

According to an alert on Essentia's website, more than 100 refrigerated injectable medications could have been compromised. Essentia has also stated on its website that the medications affected may date back to September 2017. ¶ 29. "**However, other Essentia Health employees have advised Plaintiffs that medications they or their children received as early as January 2017 *were affected*.**" ¶ 29. (emphasis supplied).

Essentia explained that the affected medications and vaccines were likely sent to Essentia Health clinics in Minnesota and North Dakota. Essentia Health has refused to disclose the identity of John Doe Distributor or the steps it has implemented to ensure that proper storage and handling of the vaccines and medications is now in place. ¶ 32.

Essentia had an obligation to take – and nothing prevented any Defendant from taking – actions to protect the efficacy and potency of the Affected Medications by ensuring cooled storage and transport. Such actions would not have required FDA approval, nor would they have violated any regulatory decisions or laws. ¶ 41.

Each Defendant breached their duty to provide proper storage, shipping, and temperature specifications as set forth above. The Affected Medications were misbranded and adulterated because they did not maintain the efficacy or potency represented. The Affected Medications were adulterated or misbranded as the facilities where they were held did not conform to or were

not operated or administered in conformity with current good manufacturing practice.

### C. Plaintiffs paid for the misbranded vaccines and suffered out-of-pocket losses.

Plaintiff Schneider alleges that she received an email from a nurse, who specifically reviewed her children's medical charts and itemized the immunizations that "were affected by the temperature excursion" for each child. ¶ 13.  Ms. Schneider also received three letters from Essentia: an April 7, 2020 letter, advising that "one or more flu vaccinations" administered to A.S. were affected by the temperature exclusion; an April 7, 2020 letter, advising that "one or more flu vaccinations" administered to W.S. were affected by the temperature exclusion; and a May 5, 2020 letter, advising that "one or more flu vaccinations" administered to A.S. were affected by the temperature exclusion.  *Id.*  Plaintiff Kraft alleges, on information and belief, that vaccines she and her children received on January 31, 2017 at Essentia's South University Clinic were subject to the Temperature Excursion. ¶ 12.

While Essentia Health has offered to revaccinate free of charge, Plaintiffs are entitled to refunds for visits for which they did not receive proper care. Moreover, free vaccines are worthless to Plaintiffs and their children who received vaccines that cannot be re-administered, such as annual flu vaccines for the 2017, 2018 and 2019 flu seasons. ¶ 7.

### III.   ARGUMENT

### A. Legal Standard

Rule 8(a) of the Federal Rules of Civil Procedure provides that pleadings must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* . "'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Doe v. Univ. of Ark. - Fayetteville*, No. 19-1842, 2020 U.S. App. LEXIS 28193, at *12 (8th Cir. Sept. 4, 2020) (quoting *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (internal quotation marks omitted)).  To assess plausibility of the claims, the court should look to the allegations as a whole and draw on judicial experience and common sense. *Doe,* 2020 U.S. App. LEXIS 28193, *13, *16; *Rink Constr., Inc. v. Mid-Continent Cas. Co.,* 2020 U.S. Dist. LEXIS 124939, *7 (D.N.D. July 16, 2020) ("The determination of whether a complaint states a claim upon which relief can be granted is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (quoting *Iqbal*, 556 U.S. at 679)).  Counts I (breach of express warranty), II (breach of implied warranty), and IV (unjust enrichment) satisfy Rule 8.

Rule 9(b) requires that averments of fraud be pleaded with particularity. "When pleading fraud, a plaintiff cannot simply make conclusory allegations." *Roberts v. Francis*, 128 F.3d 647, 651 (8th Cir. 1997). "The special nature of fraud does not necessitate anything other than notice of the claim; it simply necessitates a higher degree of notice, enabling the defendant to respond specifically, at an early stage in the case, to potentially damaging allegations." *Delmar Fin. Co. v. Ocwen Loan Servicing, L.L.C.*, No. 4:18CV00208 AGF, 2019 U.S. Dist. LEXIS 79279, at *7-8 (E.D. Mo. May 10, 2019) (citing *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)). "The level of particularity required depends on, inter alia, the nature of the case and the relationship between the parties." *Payne v. United States*, 247 F.2d 481, 486 (8th Cir. 1957).

Even where Rule 9(b) applies, a more lenient standard is permitted when Plaintiffs allege misrepresentation by omission. *Belville v. Ford Motor Co.*, 60 F. Supp. 3d 690, 697 (S.D. W.Va. 2014). In non-disclosure cases, courts recognize that plaintiffs do not have to "'specify the time, place, and specific content of an omission as precisely as would a . . . false representation claim'" under Rule 9(b). *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009) (quoting *Falk v. GMC*, 496 F. Supp. 2d 1088, 1098-99

7

(N.D. Cal. 2007) (holding the plaintiffs did not have to precisely set forth the time and place of the alleged fraudulent omission in their claim that the manufacturer had a duty to disclose a known safety defect)). *See also Burns v. Toyota Motor Sales, U.S.A., Inc.*, 2015 U.S. Dist. LEXIS 180160, *11 (W.D. Ark. April 23, 2015) (finding "that a strict 9(b) analysis should not apply to allegations of omissions because a plaintiff cannot be required to specifically identify the precise time, place, and content of an event that did not occur.") (internal quotations omitted). As discussed more fully below, Count IV (for violations of state consumer protection acts) satisfies Rule 9(b).

> **B. Plaintiffs have Article III standing because they paid for vaccines that were not effective and thus Plaintiffs did not receive the benefit of their bargain.**

To establish Article III standing, "[f]irst, a plaintiff must demonstrate an 'injury in fact,' which is 'concrete,' 'distinct and palpable,' and actual or imminent.'" *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 124 S. Ct. 619, 707 (2003) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). "Second, a plaintiff must establish 'a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly traceable to the challenged action of the defendant, and not . . . the result [of] some third party not before the court.'"" *McConnell*, 124 S. Ct. at 707 (2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976))). "Third, a plaintiff must show the 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *McConnell*, 124 S. at 707 (quoting *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal

8

quotations omitted). "It is important to note that an inquiry into standing is not a review of the merits of the plaintiff's claims." *Minn. v. Hoeven*, 331 F. Supp. 2d 1074, 1078-1079 (D.N.D. 2004) (citing *Oti Kaga, Inc. v. South Dakota Housing Development Auth.*, 342 F.3d 871, 878 (8th Cir. 2003)).

Essentia seeks to take advantage of its own misinformation it placed into the marketplace, arguing that Plaintiffs' injuries are speculative because they plead that *Essentia's* notice to patients and *Essentia's* website use the words "may" or "might." MTD, at 5.  *See Compl.* ¶ 29, fn. 5 (citing https://www.essentiahealth.org/alerts/medication-storage-issue/?utm_source=direct-mail&utm_campaign=medical-storage-issue-fy20 (Essentia's website states: "Essentia Health recently became aware of an issue … that ***may have*** resulted in certain vaccines and medications being stored at temperatures outside of the range recommended by manufacturers. *** Storage temperatures outside the recommended range … ***may*** reduce their effectiveness.")).

However, Plaintiffs allege that the medications they received ***were affected*** by the temperature excursion, and that they were not effective.  ¶ 13. First, Plaintiff Schneider alleges that she received an email from a nurse, who specifically reviewed her children's medical charts and itemized the immunizations that "were affected by the temperature excursion" for each child. ¶ 13.  Ms. Schneider also received three letters from Essentia, advising that the flu vaccinations she and her children received were affected by the temperature excursion. *Id.*

Plaintiff Kraft alleges, on information and belief, that vaccines she and her children received on January 31, 2017 at Essentia's South University Clinic were subject to the temperature excursion. ¶ 12. "…Rule 8's pleading standard does not prevent a plaintiff from 'pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that

makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 517 (7th Cir. 2015)).

Plaintiffs further allege that drugs subject to temperature excursions are considered misbranded or adulterated under federal law. ¶ 43-51. All entities in the distribution chain – from the manufacturer to the healthcare provider – are responsible if an adulterated or misbranded drug is sold in the United States. ¶ 1.  Plaintiffs allege that the vaccines administered to them and their children were adulterated or misbranded, (i) as the facilities where they were held did not conform to or were not operated or administered in conformity with current good manufacturing practice; and (ii) as to safety, because they did not have the strength, quality and/or purity characteristics, which they were purported or represented to possess.  ¶ 35.  Finally, Plaintiffs allege that they paid for the visits at which these misbranded drugs were administered (which includes the cost of the drug). Thus, Plaintiffs have clearly alleged that they paid for vaccines that were not effective and thus did not receive the benefit of the bargain.

The courts' analyses of Article III standing in *In re Hydroxycut Mktg. & Sales Practices Litig.*, 801 F. Supp. 2d 993, 1002-1003 (S.D. Cal. 2011), and *In re Bayer Corp. Combination Aspirin Products Mktg. and Sales Practices Litig.*, 701 F. Supp. 2d 356 (E.D.N.Y. 2010), are instructive. In *Hydroxycut,* plaintiffs brought a class action, alleging that certain weight loss products were unsafe or were never clinically proven to be effective for weight loss. Moving to dismiss, defendants argued that plaintiffs failed to plead any injury because the plaintiffs did not allege they were physically harmed by the Hydroxycut products. *Hydroxycut*, 801 F. Supp. 2d at 1000. Denying the motion to dismiss, the district court explained:

> …the injury to Plaintiffs occurred at the time they purchased the
> Hydroxycut products and did not receive the benefit of their

> bargain. Plaintiffs sought to purchase a safe and effective weight
> loss product but did not receive the product as promised. As a
> result, they have lost the money they paid for the product and have
> alleged an economic injury.

*Id. See also id.* (stating "'Monetary harm is a classic form of injury-in-fact.'") (*quoting Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3rd Cir. 2005)). *City of Kennett v. EPA,* 887 F.3d 424, 431 (8th Cir. April 9, 2018) (citing Third Circuit law for the proposition that out of pocket costs are a classic injury-in-fact).

The court further stated:

> Courts have held that a plaintiff is injured and has suffered a
> cognizable and ascertainable loss when he receives less than what
> he was promised. As long as plaintiffs allege a legally cognizable
> loss under the 'benefit of the bargain' or some other legal theory,
> they have standing.

*In re Hydroxycut*, 801 F. Supp. 2d at 1000 (internal citations and quotations omitted). Here, North Dakota expressly recognizes both the benefit of the bargain and out of pocket loss measures of damages. *Asleson v. W. Branch Land Co.*, 311 N.W.2d 533 (N.D. 1981). Because Plaintiffs in this case have alleged a legally cognizable loss, they have standing.

Similarly, in *In re Bayer Corp. Combination Aspirin Products Mktg. and Sales Practices Litig.*, the plaintiffs filed a class action complaint, alleging that the drug manufacturer misrepresented the virtues of certain combination low-dose aspirin products. The plaintiffs alleged that they were injured in that they paid for a product that could not provide the health benefits touted on their labels. Defendants moved to dismiss the claims for lack of standing, arguing that they had failed to allege the cognizable harm required for Article III standing. 701 F. Supp. 2d at 377. The court disagreed, explaining:

> Economic injuries are sufficient for standing. Moreover, courts
> have long held that a plaintiff is injured, suffering an ascertainable
> loss, when he receives less than what he was promised. Thus,
> plaintiffs' allegations that they were misled into purchasing a

11

> product that was less than what they bargained for are sufficient
> for Article III standing.

*Id.* at 377-78 (internal citations and parenthetical omitted). *See also Rikos v. P&G*, 782 F. Supp. 2d 522, 531 (S.D. Ohio 2011) (denying challenge to Article III standing of the plaintiff who alleged that a daily food supplement did not provide the digestive benefits promised, where the injury in fact was the purchase or economic injury); *In re Celexa and Lexapro Mktg. and Sales Practices Litig.*, 751 F. Supp. 2d 277 (D. Mass. Nov. 10, 2010) (holding that the plaintiff sufficiently alleged injury-in-fact where he alleged that the product, an anti-depression drug, was unsatisfactory because it was "inappropriate" and "not efficacious" for his son). *Cf. In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 U.S. Dist. LEXIS 58900, *47-48 (D.N.J. July 10, 2009) ("By way of a hypothetical, consider a case in which a pharmaceutical manufacturer markets snake oil pills, labeled as 'Drug X,' for certain conditions when the manufacturer knows it is merely hocking snake oil. Under this example, a purchaser of Drug X could plead RICO injury because the pills [] have no efficacy whatsoever for the uses for which they are marketed.").

Like these cases, Plaintiffs allege that the vaccines administered to them and their children were subject to a temperature excursion, that the vaccines were ineffective as a result, and that they suffered out of pocket losses as a result. The economic injury suffered is the classic injury-in-fact required for Article III standing.

In another analogous case, *City of Wyo. v. P&G,* 210 F. Supp. 3d 1137 (D. Minn. 2016) ("P&G"), the court denied a motion to dismiss based on standing where the plaintiff cities alleged that their residents were buying and using defendant's "flushable" wipes that were clogging their sewer systems. Like Defendant Essentia in this case, the P&G defendant's argument for dismissal relied heavily on the Eighth Circuit's decision in *Wallace v. ConAgra*

12

*Foods, Inc.*, 747 F.3d 1025 (8th Cir. 2014), "— but Wallace was a very different case than this one." *P&G*, 210 F. Supp. 3d at 1150. Summarizing the facts in *Wallace*, the *P&G* court explained that the *Wallace* plaintiffs alleged that not all Hebrew National hot dogs were 100% kosher, as ConAgra had advertised. *Id. (citing Wallace,* 747 F.3d at 1030). Affirming the dismissal of the *Wallace* complaint for lack of standing, "the Eighth Circuit found that ***because plaintiffs had not alleged that they themselves had actually purchased or consumed any defective non-kosher hot dogs,*** plaintiffs had not pleaded an injury for standing purposes." *P&G*, 210 F. Supp. 3d at 1150-1151 (citing *Wallace,* 747 F.3d at 1030) (emphasis supplied).

Distinguishing *Wallace,* the court in *P&G* explained:

> The key difference between Wallace and this case is that the Wallace plaintiffs' claims failed because they lacked an injury in that they never claimed to have actually come into contact with the offending non-kosher hot dogs, while Plaintiffs here have repeatedly alleged that not-actually-flushable 'flushable' wipes are clogging their water treatment facilities. Wallace is not controlling.

*P&G*, 210 F. Supp. 3d at 1151. Like with *P&G, Wallace* does not apply to this case. Here, Plaintiffs expressly allege that they and their children were administered the vaccines subject to the temperature excursion, that Plaintiffs paid for the vaccines, and that they did not receive the benefit of the bargain. Because they came into contact with the offending products, Plaintiffs have Article III standing.

Defendant's reliance on *Amburgey v. CaremarkPCS Health, L.L.C.*, 2017 U.S. Dist. LEXIS 219019, *8 (C.D. Cal. Sept. 21, 2017), is also misplaced.  There, the plaintiffs alleged injury "premised on the conjecture that the drugs 'may' have been maintained at improper temperatures." *Id.* at *8. Here, on the other hand, Plaintiffs have alleged that they paid for vaccines that actually were maintained at improper temperatures, and that affected their efficacy. Defendant's attempt to use the "may have" wording in its own patient notice and its own website

13

as a shield should be rejected. *FTC v. Equinox Int'l Corp.*, 1999 U.S. Dist. LEXIS 19866, \*25 (D. Nev. Sept. 24, 1999) (stating defendant "cannot therefore shield itself from liability itself from liability" for misrepresentations it taught its distributors to make).  To the extent that Defendant's failure to be specific in its own announcement of the temperature excursion raises a question of fact, plaintiffs should be entitled to discovery and an opportunity to amend.[2]  Thus, this Court should find that Plaintiffs have Article III standing.

### C.  Plaintiffs have stated plausible claims for breach of warranty.

#### 1.  Vaccines are "goods" under the North Dakota Uniform Commercial Code.

Defendant first argues that the provisions of North Dakota's Uniform Commercial Code regarding express and implied warranties do not apply because vaccines and medications are not "goods."  N.D. Cent. Code § 41-02-05 defines "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." "Generally, in the UCC, 'goods' has a very extensive meaning and embraces every species of property." *Robertson Companies, Inc. v. Kenner*, 311 N.W.2d 194, 200 (N.D. 1981).  Vaccines (which the CDC defines as "*product[s]* that stimulate[] a person's immune system to produce immunity to a specific disease, protecting the person from that disease[3]) are moveable and are therefore "goods" under N.D. Cent. Code § 41-02-05.

Plaintiffs have not found any legal authority suggesting that vaccines are not "goods"

---

[2] When the facts constituting the fraud are peculiarly within the opposing party's knowledge, such allegations may be pleaded on information  and belief. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 668 (8th Cir. 2001). *See also* Moore's Federal Practice § 9.03[1][g] (Rule 9(b) may be satisfied "if the pleader identifies the available information on which the allegation of fraud is founded, as well as the efforts made to obtain additional information.").

[3] https://www.cdc.gov/vaccines/vac-gen/imz-basics.htm (last accessed Sept. 24, 2020) (emphasis added).

14

under the UCC.  Presumably neither did Defendant, given that it neglected to cite any such authority. Courts in various jurisdictions *have* had opportunity, however, to consider whether UCC warranties were breached in connection with the sale of vaccines.  Evidently, these courts considered the fact that vaccines are goods so obvious as to not warrant any discussion—they leap right to analyzing whether the sale of the allegedly-defective vaccines breached the UCC warranties.  *See, e.g., Pearson v. Franklin Lab'ys, Inc.,* 254 N.W.2d 133 (S.D. 1977) (affirming judgment of trial court in plaintiffs' favor, finding that defendant's cattle vaccine was defective, not for its purpose, and breached the implied warranty);  *Van Wyk v. Norden Lab'ys, Inc.*, 345 N.W.2d 81 (Iowa 1984) (applying Iowa UCC to cattle vaccine); *Rohrbough v. Wyeth Lab'ys, Inc.*, 719 F. Supp. 470, 478 (N.D. W.Va. 1989) (applying West Virginia UCC to a "vial of DTP vaccine administered to" minor); *Holmes v. Merck & Co.*, 2008 WL 11348410 (D. Nev. June 16, 2008) (applying Nevada UCC to the MMR vaccine and finding that it was fit for its ordinary purpose).

Defendant's contention that vaccines are not "analogous to a pair of shoes or pots and pans, items understood by be 'goods' under the common definition of the word" is completely unsupported.[4]  *See* Def. Mem., at 15.  On the contrary, courts regularly treat vaccines as goods when considering claims for breach of express and implied warranties.

---

[4] In any event, whether vaccines are "goods" does not depend on the common definition of the word, but on N.D. Cent. Code § 41-02-05's definition.

15

### 2. The administration of a vaccine is incidental to its sale, making the North Dakota Uniform Commercial Code's warranty provisions applicable.

Next, Defendant argues that because the administration of the purchased vaccine required a service, the UCC does not apply. However, North Dakota has adopted the "predominant factor" test for determining whether the UCC applies to a mixed contract for both goods and services. The North Dakota Supreme Court explained:

> The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom).

*Air Heaters v. Johnson Elec.*, 258 N.W.2d 649, 652 (N.D. 1977) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)).  Merely because a service is require to inject a product does not take it outside the purview of the U.C.C.:

> Services . . . always play an important role in the use of goods, whether it is the service of transforming the raw materials into some usable product or the service of distributing the usable product to a point where it can easily be obtained by the consumer. The [definition of "goods"] should not be used to deny Code application **simply because an added service is required to inject or apply the product**.

*Bonebrake v. Cox*, 499 F.2d 951, 958–59 (8th Cir. 1974) (quoting R. Nordstrom, *Handbook of the Law of Sales* 40, 44 (1970)) (emphasis added).

Here, "assum[ing] all facts in the complaint to be true and draw[ing] all reasonable inferences from those facts in the light most favorable to the plaintiff," *Morton v. Becker*, 793 F.2d 185, 197 (8th Cir. 1986), the predominant purpose of the contract for the vaccines was the procurement of the vaccines.  The administration of the vaccines[5] was merely incidental.  At the

---

[5] The fact that Plaintiffs alleged economic injury as a result of paying for the vaccines

16

very least, there is a factual question regarding the "thrust" and "purpose" of the agreement that cannot be resolved at this stage in the litigation.

The two cases on which Defendant relies are easily distinguishable, because they involve general hospital services to restore a patient's health. In *Perlmutter v. Beth David Hosp.*, 123 N.E.2d 792 (N.Y. 1954), the court held that the transfusion of allegedly-tainted blood into a patient by a hospital, as a part of its general hospital services, did not constitute a sale of goods. In so holding, the court stated:

> The supplying of blood by the hospital was entirely subordinate to its paramount function of furnishing trained personnel and specialized facilities in an endeavor to restore plaintiff's health. It was not for blood or iodine or bandages for which plaintiff bargained, but the wherewithal of the hospital staff and the availability of hospital facilities to provide whatever medical treatment was considered advisable.

*Id.* at 795. In other words, the court reasoned, when a person enters a hospital as a patient, "he goes there, not to buy medicines or pills, not to purchase bandages or iodine or serum or blood, but to obtain a course of treatment in the hope of being cured of what ails him." *Id.* at 796.

A vaccine, unlike a blood transfusion, is not administered as part of a greater course of medical treatment for an ailing patient. Plaintiffs did not bargain for "the wherewithal of the hospital staff and the availability to hospital facilities to provide whatever medical treatment was considered advisable"—they bargained for specific vaccines intended for specific purposes. Obtaining a vaccine is much more akin to obtaining a prescription medication, which has been held to constitute the sale of goods subject to the UCC. *Berry v. G. D. Searle & Co.*, 309 N.E.2d

---

"and associated medical visits" and claim they are entitled to "refunds for visits for which they did not receive proper care" is not the gotcha Defendant pretends it is. (*See* Def. Mem. P. 18). It simply illustrates that Plaintiffs' damages exceed the cost of the vaccines themselves. *See* N.D. Cent. Code § 41-02-94 (incidental and consequential damages).

17

550, 554 (Ill. 1974).

In *Berry*, the court held that dispensing birth-control pills constituted the sale of goods, rejecting the defendant clinic's argument that it was primarily engaged in giving contraceptive advice and that the dispensing of pills was merely an ancillary function. *Id.* Likewise, here, the primary purpose of the transaction was not for Plaintiffs to obtain general "medical treatment," but rather for them to obtain the specific vaccines at issue. *Perlmutter* does not support Defendant's argument.

*Brandt v. Bos. Sci. Corp.*, 792 N.E.2d 296, 298 (Ill. 2003), is also distinguishable. While the court held that the hospital's provision and implantation of a defective surgical device was primarily a transaction for services rather than goods, subsequent court decisions have held that *Brandt* does *not* preclude breach-of-warranty cases involving the sale of prescription medication by a pharmacy (which is analogous to the facts here):

> The Court also disagrees with Merck that the Illinois Supreme Court's decision in [*Brandt*] eliminates any argument that the sale of drugs is a "sale of goods" within Article 2 of the Illinois Commercial Code. *Brandt* involved the surgical implantation of a medical device during medical treatment at a hospital. Such facts are quite removed from the sale of a prescription by a pharmacy.

*Rabe v. Merck & Co.*, 2005 WL 2094741, at *2 (S.D. Ill. Aug. 25, 2005); *see Riddle v. Merck & Co.*, 2006 WL 1064070, at *6 (S.D. Ill. Apr. 21, 2006); *Smith v. Merck & Co.,* 472 F. Supp. 2d 1096, 1100 (S.D. Ill. 2007). Obtaining a vaccine is much more akin to obtaining a prescription medication than undergoing "the surgical implantation of a medical device during medical treatment at a hospital." *Brandt* does not help Defendant here.

For these reasons, the Court should deny Defendant's motion to dismiss Counts 1 and 2 of Plaintiff's Complaint.

18

**D. Plaintiffs have satisfied Rule 9(b) for their consumer protection act claims where they allege the vaccines were misbranded and not effective – and that information was withheld by Defendant.**

    **1. Rule 9(b) is satisfied where Plaintiffs' allegations plausibly demonstrate Defendant omitted material facts.**

As discussed *supra,* a more lenient Rule 9(b) standard is permitted when Plaintiffs allege misrepresentation by omission. *Belville*, 60 F. Supp. 3d at 697. In non-disclosure cases, courts recognize that plaintiffs do not have to specify the time, place, and specific content of an omission under Rule 9(b). *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 961 (N.D. Ohio 2009). *See also In re Target Corp. Customer Data Sec. Breach Litig.*, 64 F. Supp. 3d 1304, 1311 (D. Minn. 2014) (evaluating a claim of negligent misrepresentation by omission under Rule 9(b) and noting that Rule 9(b) is satisfied "if the omitted information is identified" and the complaint states "'how or when' the concealment occurred.").

By way of example, in *Burns v. Toyota Motor Sales, U.S.A., Inc.,* 2015 U.S. Dist. LEXIS 180160, *11 (W.D. Ark. April 23, 2015), the court applied Rule 9(b) more leniently to allegations of omissions, stating:

> Here, Burns sufficiently notifies Toyota in his complaint that Toyota (who) at no place (where) or time (when) supplied Burns with material facts, the content of which should have been notification of an existing defect in Tacoma rust protection (what), and in so doing intended for Burns to rely on the omissions in choosing to purchase his Tacoma (how).

*Id.* Like in *Burns,* here, Plaintiffs have placed Essentia on notice of:

    *Who:* Essentia (and John Does) (¶ 14-16);

    *Where:* in Minnesota and North Dakota, including at Essentia's South University Clinic (¶ 12);

    *When:* when vaccines were administered, including on January 31,

19

2017 (¶ 12); October 26, November 27, 2017 (¶ 13); February 26, May 25, August 24, and October 26, 2018 (¶ 13); and October 12, 2019 (¶ 13);

***What:*** failure to notify of the temperature excursion, the fact that the vaccines' potency or efficacy was affected, and the fact that CDC, Minnesota Department of Health, and North Dakota Department of Health recommend that any vaccine subject to a temperature excursion not be used or administered to a patient (¶ 17-23); and

***How:*** Plaintiffs paid for their visits, and the vaccines, in reliance on Essentia's failure to disclose these material facts (¶ 90).

*Cf. Belville*, 60 F. Supp. 3d at 697 ("….a plaintiff cannot be required to specifically identify the precise time, place, and content of an event that did not occur. Here, Plaintiffs satisfy their burden under the same analysis conducted in In re Whirlpool, that is: 'Plaintiffs' fraud-by-omission claims notify . . . [Ford] of the time (never), place (nowhere), and content (nothing) of the alleged misrepresentations, the Plaintiffs' alleged reliance (materiality), the fraudulent scheme ( . . . [Ford's] knowledge of the supposed defects and problems), its fraudulent intent (failure to disclose them), and the resulting injury (overpayment). Rule 9(b) does not require more.' *In re Whirlpool*, 684 F. Supp. 2d at 961 (citation omitted).") Accordingly, this Court should find that Plaintiffs have satisfied Rule 9(b).

> **2.  Plaintiffs have stated a claim under the North Dakota Unlawful Sales or Advertising Practices Act because the omission of a material fact is deceptive and unconscionable.**

"It is well-established that consumer protection statutes are remedial in nature and must be liberally construed in favor of the consumer." *DJ Coleman, Inc. v. Nufarm Ams., Inc.*, 693 F. Supp. 2d 1055, 1074 (D.N.D. Mar. 12, 2010) (citing *State ex rel. Spaeth v. Eddy Furniture Co.*, 386 N.W.2d 901, 903 (N.D. 1986)).  To that end, the North Dakota Supreme Court agreed that the analysis of an Arizona appellate court in *Dunlap v. Jimmy GMC of Tucson, Inc.* should be

20

applied to the North Dakota Unlawful Sales or Advertising Practices Act, and quoted:

> The purpose of legislation such as Arizona's Consumer Fraud Act is to provide a remedy for injured consumers who need such protection to counteract the disproportionate bargaining power which is typically present in consumer transactions. The legislative intent behind the Consumer Fraud Act is to provide consumers with a claim for relief that is easier to establish than is common law fraud. To require the higher degree of proof would frustrate the legislative intent.

*Eddy Furniture Co.*, 386 N.W.2d at 903 (quoting *Dunlap v. Jimmy GMC of Tucson, Inc.*, 666 P.2d 83, 88-89 (Ariz. App. 1983).

Section 51-15-02 of the Act prohibits deceptive or fraudulent conduct in the sale or advertising of merchandise or services in either of two ways:

> [1] The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice. [2] The act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice.

N.D. Cent. Code, § 51-15-02. The Act authorizes a private cause of action "by any person against any person who has acquired any moneys or property by means of any practice declared to be unlawful in this chapter." N.D.C.C. § 51-15-09. As set forth below, Plaintiffs have stated a plausible claim under either prong.

First, omissions are recognized as actionable under the Act. *Krebsbach v. Trinity Hosps., Inc.*, 938 N.W.2d 133, 141 (N.D. Jan. 27, 2020). That is because omissions constitute "deceptive acts" under N.D. Cent. Code, § 51-15-02. This approach is consistent with that of the Federal

21

Trade Commission and other state courts' interpretation of "deceptive acts" under consumer protection acts nationwide. *See, e.g.,* F*TC v. Gill,* 265 F.3d 944, 950 (9th Cir. 2001) ("An act or practice is deceptive if 'first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material.'"); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A*., 647 N.E.2d 741, 745 (N.Y. App. 1995) (holding that an omission can constitute a deceptive act or practice for purposes of GBL § 349 "where the business alone possesses material information that is relevant to the consumer and fails to provide this information."); *Fayne v. Vincent*, 301 S.W.3d 162, 177 (Tenn. 2009) ("A deceptive act or practice is 'a material representation, practice or omission likely to mislead . . . reasonable consumer[s]' to their detriment.") (quoting *Ganzevoort v. Russell*, 949 S.W.2d 293, 299 (Tenn. 1997); and stating: "For the purposes of the TCPA . . . the essence of deception is misleading consumers by a merchant's statements, silence, or actions.").

Here, Essentia's failure to disclose that the vaccines were subject to a temperature excursion – affecting the vaccines' efficacy – was deceptive. Essentia had a duty to ensure that the vaccines were properly handled and stored, and thus had a duty to know of the temperature excursion. Whether or not a drug is effective is a material fact. Moreover, consumers had no way of knowing whether or not the vaccines were properly handled and stored – but relied to their detriment on Essentia to properly do its job as a healthcare system. Under the circumstances, the omissions of material fact were deceptive.

Second, conduct that is unconscionable is an unlawful practice under the Act. Because the legislature did not define the term "unconscionable" in the Act, the term is "to be understood" in its "ordinary sense." N.D.C.C. Ch. 1-02-02. Dictionaries define

22

"unconscionable" as "referring to a contract or bargain which is so unfair to a party that no reasonable or informed person would agree to it"[6] and "shockingly unfair or unjust."[7] The term has also been defined by the North Dakota Supreme Court in the UCC context. *See, e.g.,* P*eople Bank & Tr. v. Reiff,* 256 N.W.2d 336, 344 (N.D. 1977) (in the context of N.D. Cent. Code, § 41-02-19 (U.C.C. § 3-202), the court held that the test of unconscionability "is whether or not, in the particular commercial setting, the terms of the agreement are so one-sided as to be unconscionable."). *See also id.* ("U.C.C. § 2-302, Comment 1. Comment 1 goes on to say that the underlying principle of unconscionability is the prevention of 'oppression and unfair surprise.'").

Applying these plain meanings to the allegations of Plaintiffs' Complaint demonstrates that they have stated a claim. Administering ineffective vaccines – and charging Plaintiffs and putative class members for those vaccines is shockingly unfair and unjust. Patients must be able to rely on their healthcare providers to be aware of where they obtain their medications from, and to ensure that those medications have been properly handled and are not misbranded or adulterated. Allowing a healthcare system and provider like Essentia to ignore or omit material facts about the vaccines it administers is unconscionable.

Accordingly, Count III under the North Dakota Unlawful Sales or Advertising Practices Act should not be dismissed for failure to state a claim.

> **3. Plaintiffs have stated a claim under the Minnesota Consumer Fraud Act because Defendant had a duty to disclose material information regarding the vaccines to Plaintiffs and omitted such information.**

The Minnesota Supreme Court has "observed that the CFA [Minnesota Consumer Fraud

---

[6] https://dictionary.law.com/Default.aspx?selected=2183
[7] https://www.merriam-webster.com/dictionary/unconscionable

Act] 'reflects a clear legislative policy encouraging aggressive prosecution of statutory violations' and thus should be 'generally very broadly construed to enhance consumer protection.'" *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000) (quoting *Philip Morris, Inc.*, 551 N.W.2d at 495-96) (holding that Blue Cross and Blue Shield of Minnesota, a health care provider, had standing to pursue claims under the CFA for increased costs incurred in medical and hospital care of insureds with tobacco-related illnesses)).  The Minnesota Supreme Court has "also noted that the CFA is remedial and should be liberally construed in favor of protecting consumers." *Ly*, 615 N.W.2d at 308 (citations omitted).

The MCFA prohibits "any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice." Minn. Stat. § 325F.69, subd. 1. "An omission or misrepresentation through silence is actionable under the MCFA if the information is material and there is a duty to disclose based on a relationship of trust or confidence or an unequal access to information." *Ford Motor Credit Co. v. Majors*, 2005 Minn. App. LEXIS 448, *10-11 (Minn. App. May 3, 2005) (citing *Cashman v. Allied Prods. Corp.*, 761 F.2d 1250, 1255 (8th Cir. 1985) (approving jury instruction stating that "silence . . . may be a misrepresentation if it relates to a material fact and there is a duty to disclose the matter" and that duty to disclose "may arise out of a relationship of trust or confidence, an inequality of bargaining position, an awareness that the undisclosed fact would prevent a previous representation from being misleading or an unequal access to information")).

Thus, a plaintiff must plead "not only an omission of material fact, but also special circumstances that trigger a duty to disclose." *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 695-96 (Minn. 2014). The Minnesota Supreme Court has set out examples of special circumstances that trigger a duty to disclose:

24

For example:

(a) One who speaks must say enough to prevent his words from misleading the other party. *Newell v. Randall*, 32 Minn. 171, 19 N.W. 972 (1884).

(b) One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party. *March v. Webber*, 13 Minn. 99 (109) (1868).

(c) One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. *See, e.g., Wells-Dickey Tr. Co. v. Lien,* 164 Minn. 307, 204 N.W. 950 (1925).

The main question for us is whether defendant's relationship to plaintiff was such as to impose on defendant a duty to inform plaintiff of all the details of the transaction.

*Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 622 (Minn. 1972) (commonly called the Klein factors). Here, Essentia qualifies as having a duty under any of these subparagraphs.

It is generally undisputable that a hospital or medical system has a special relationship with a patient regarding the services it provides to patients. *See, e.g., K.L. v. Riverside Medical Ctr.*, 524 N.W.2d 300, 302 (Minn. App. 1994) (medical center "concedes it had a special relationship with K.L."). This holds true with the Minnesota Supreme Court's directive that, "[t]o reach the conclusion that a special relationship exists, it must be assumed that the harm to be prevented by the defendant is one that the defendant is in a position to protect against and should be expected to protect against." *Donaldson v. YWCA*, 539 N.W.2d 789, 792 (Minn. 1995).

Here, Essentia had a duty to be aware of the way in which the vaccines it used were stored. It clearly failed to do so. Essentia was in a position to protect against administering vaccines that were not properly stored, but did not do so. Accordingly, Count III under the Minnesota Consumer Fraud Act should not be dismissed for failure to state a claim.

25

**E. Essentia did not move to dismiss Count IV for unjust enrichment for failure to state a claim.**

Defendant did not move to dismiss Count IV pursuant to Fed. R. Civ. P. 12(b)(6) and thus has waived that issue. The motion to dismiss as to Count IV should be denied.

## IV.    CONCLUSION

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendant's motion to dismiss, and grant such other and further relief as this Court deems appropriate.


Dated: October 2, 2020

JESSICA KRAFT AND SHELLI SCHNEIDER

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Greg T. Kinskey
FEGAN SCOTT LLC
100 Congress Avenue, Suite 2000
Austin, TX 78703
Ph: 512.229.0655
Fax: 312.264.0100
greg@feganscott.com

Mac Schneider
SCHNEIDER LAW FIRM
815 3rd Ave. S.
Fargo, ND 58103
Ph: 701-235-4481
Fax: 701-235-1107
mac@schneiderlawfirm.com

J. Barton Goplerud
Brian Marty
SHINDLER, ANDERSON,
GOPLERUD & WEESE, PC

26

5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Ph: (515) 223-4567
Fax: (515) 223-8887
Email: goplerud@sagwlaw.com

*Counsel for Plaintiffs*

27