**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| JESSICA KRAFT, INDIVIDUALLY AND AS PARENT OF MINORS L.K., S.K., and O.K.; SHELLI SCHNEIDER, INDIVIDUALLY AND AS PARENT OF MINORS A.S. and W.S.; ANNE BAILEY, AS PARENT OF MINOR D.B.; AMY LAVELLE, AS PARENT OF MINORS Em.L. and El.L.; ELIZABETH BEATON, INDIVIDUALLY AND AS PARENT OF MINOR M.B.; AMANDA AND TYRELL FAUSKE, INDIVIDUALLY AND AS PARENTS OF MINORS C.R.F. and C.J.F.; JENNIFER REIN, INDIVIDUALLY; and JESSICA BERG, AS PARENT OF MINORS A.B. and S.B., individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:20-CV-121<br><br>Hon. Peter D. Welte |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ESSENTIA HEALTH, INNOVIS HEALTH, LLC d/b/a ESSENTIA HEALTH, DAKOTA CLINIC PHARMACY, LLC, JOHN DOE MANUFACTURERS, and JOHN DOE DISTRIBUTOR, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT DAKOTA CLINIC PHARMACY, LLC'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................................. 1

II.   SUMMARY OF FACTS ................................................................................................. 2

III.   LEGAL STANDARD ..................................................................................................... 6

IV.   ARGUMENT .................................................................................................................. 6

    A.   Plaintiffs have stated a plausible claim for breach of express warranty against Dakota Clinic. ........................................................................................................... 6

        1.   Dakota Clinic is a "seller," though it need not be to face liability ...................... 6

            a.   Dakota Clinic is a "seller" under the North Dakota and Minnesota commercial statutes...................................................................................... 7

            b.   Minnesota's consumer protection statute creates a cause of action for breach of warranty even against non-sellers ................................................ 9

        2.   Dakota Clinic made express warranties through the distribution of pharmaceuticals, as well as through their labeling and packaging .................... 10

        3.   Dakota Clinic is also liable for its warranties to Essentia because Plaintiffs are third-party beneficiaries. Neither direct statements to Plaintiffs nor privity is required ..................................................................................................................... 12

    B.   Plaintiffs have stated a plausible claim for breach of implied warranties. ................. 15

    C.   Plaintiffs have plausibly alleged consumer protection act claims ............................. 16

        1.   Consumer protection claims may be brought against any wrongdoer, not just sellers. ........................................................................................................... 16

        2.   Plaintiffs have satisfied Rule 9(b) by pleading the who, what, when, where, and how of the alleged fraud. ................................................................................. 18

            a.   Rule 9(b) is context-dependent and is applied with flexibility in omissions cases where the facts are peculiarly within the opposing party's knowledge ....................................................................................................... 18

            b.   The Second Amended Complaint adds the detail the Court previously found absent ........................................................................................................... 19

    D.   Plaintiffs have stated a plausible claim for unjust enrichment. ................................. 24

    E.   Plaintiffs have pled a plausible claim for negligence. ............................................... 26

V.   CONCLUSION ............................................................................................................. 27

## TABLE OF AUTHORITIES

**Cases**

*Abels v. Farmers Commodities Corp.,*
259 F.3d 910 (8th Cir. 2001) ........................................................................................ 18, 22

*AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,*
276 F. Supp. 2d 999 (D.N.D. 2003), *aff'd*, 420 F.3d 751 (8th Cir. 2005) ............................. 13

*Ash Grove Cement Co. v. MMR Constructors, Inc.,*
No. 10-CV-4069, 2011 U.S. Dist. LEXIS 10794 (W.D. Ark. Feb. 3, 2011) ........................ 18

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................ 6

*Bakken Residential, LLC v. Cahoon Enters., LLC,*
154 F. Supp. 3d 812 (D.N.D. 2015) ................................................................................. 24

*Beck v. Spindler,*
256 Minn. 543, 99 N.W.2d 670 (1959) ............................................................................. 15

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................................ 6

*Belville v. Ford Motor Co.,*
60 F. Supp. 3d 690 (S.D. W. Va. 2014) ............................................................................ 24

*Benz Farm, LLP v. Cavendish Farms, Inc.,*
2011 ND 184, 803 N.W.2d 818 ........................................................................................ 17

*City of Wyo. v. P&G,*
210 F. Supp. 3d 1137 (D. Minn. 2016) ............................................................................. 16

*Clarys v. Ford Motor Co.,*
1999 ND 72, 592 N.W.2d 573 .......................................................................................... 26

*Colby Ctr. v. Conagra Foods, Inc.,*
No. 5:14-CV-05248, 2015 U.S. Dist. LEXIS 89711, 2015 WL 4106473 (W.D. Ark. Jul. 6, 2015) ................................................................................................................................. 25

*Drobnak v. Andersen Corp.,*
561 F.3d 778 (8th Cir. 2009) ....................................................................................... 18, 19

*Durfee v. Rod Baxter Imps., Inc.*,

  262 N.W.2d 349 (Minn. 1977) ................................................................................. 8

*Falcon for Import & Trade Co. v. North Central Commodities, Inc.*,

  Civil No. A2-01-138, 2004 U.S. Dist. LEXIS 1292, 2004 WL 224676 (D.N.D. Jan. 30, 2004)
  ........................................................................................................................... 13, 14

*Fenner v. GM, LLC (In re Duramax Diesel Litig.)*,

  298 F. Supp. 3d 1037 (E.D. Mich. 2018) ............................................................... 18

*Fode v. Capital RV Ctr.*,

  575 N.W.2d 682 (N.D. 1998) ................................................................................. 9

*Gremo v. Bayer Corp.*,

  469 F. Supp. 3d 240 (D.N.J. 2020) ........................................................................ 12

*Hughes v. Wheeler*,

  364 F.3d 920 (8th Cir. 2004) ................................................................................. 24

*In re Syngenta AG MIR 162 Corn Litig.*,

  131 F. Supp. 3d 1177 (D. Kan. 2015) .................................................................... 26

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,

  MDL No. 2875 (RBK-JS), 2021 U.S. Dist. LEXIS 15400 (D.N.J. Jan. 22, 2021) .......... 11, 12

*Industrial Graphics, Inc. v. Asahi Corp.*,

  485 F. Supp. 793 (D. Minn. 1980) ......................................................................... 13

*Lang v. Gen. Motors Corp.*,

  136 N.W.2d 805 (N.D. 1965) ................................................................................. 15

*Lewey v. Vi-Jon, Inc.*,

  No. 4:11CV1341 JAR, 2012 U.S. Dist. LEXIS 71237, 2012 WL 1859031 (E.D. Mo. May 22, 2012) ................................................................................................................ 23, 24

*Northern Bottling Co. v. Henry's Foods, Inc.*,

  474 F. Supp. 3d 1016 (D.N.D. 2020) ..................................................................... 22, 23

*Olin v. Dakota Access, LLC*,

  No. 1:17-cv-007, 2017 WL 4532581, 2017 U.S. Dist. LEXIS 166924 (D.N.D. Oct. 10, 2017), *aff'd*, 910 F.3d 1072 (8th Cir. 2018) ...................................................................... 23

*Opp v. Matzke*,

  1997 ND 32, 559 N.W.2d 837 ................................................................................ 25

*S & W Mobile Home & Rv Park, LLC v. B&D Excavating & Underground, LLC*,
  No. 17-cv-9, 2017 U.S. Dist. LEXIS 113924, at *25 n.4 (D.N.D. July 21, 2017) ................ 26

*Scanio v. Zale Delaware, Inc.*,
  No. 4:12CV37 CDP, 2012 U.S. Dist. LEXIS 13140, 2012 WL 368741 (E.D. Mo. Feb. 3,
  2012) ................................................................................................................................ 23

*Sci. Application, Inc. v. Delkamp*,
  303 N.W.2d 71 (N.D. 1981) ................................................................................................ 10

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*,
  No. 15 Civ. 6549 (CM), 2018 U.S. Dist. LEXIS 220574 (S.D.N.Y. Dec. 26, 2018) ............ 25

*Spieker v. Westgo, Inc.*,
  479 N.W.2d 837 (N.D. 1992) .............................................................................................. 12

*State v. Minnesota School of Business, Inc.*,
  935 N.W.2d 124 (Minn. 2019) ............................................................................................ 17

*Superior Homes, LLC v. Comardelle, Civ.*
  No. 12-4126, 2013 U.S. Dist. LEXIS 165578, 2013 WL 6146051 (D.S.D. Nov. 21, 2013) ...25

*Thimjon Farms Partnership v. First Int'l Bank & Trust*,
  837 N.W.2d 327 (N.D. 2013) .............................................................................................. 24

*Transport Corp. of Am. v. IBM Corp.*,
  30 F.3d 953 (8th Cir. 1994) ................................................................................................ 13

*United States ex rel. Hirt v. Walgreen Co.*,
  846 F.3d 879 (6th Cir. 2017) .............................................................................................. 18

*Wilson v. Ark. Dep't Human Servs.*,
  850 F.3d 368 (8th Cir. 2017) ................................................................................................ 6

**Statutes**

Minn. Stat. § 325F.68 ...................................................................................................... 16, 17
Minn. Stat. § 325F.69 ...................................................................................................... 16, 17
Minn. Stat. § 325G.17 ............................................................................................................ 10
Minn. Stat. § 325G.18 ............................................................................................................ 15
Minn. Stat. § 325G.19 ............................................................................................................ 10
Minn. Stat. § 336.1-106 ........................................................................................................... 8
Minn. Stat. § 336.1-305 ........................................................................................................... 8

Minn. Stat. § 336.2-313 ................................................................................ 7, 10

Minn. Stat. § 336.2-314 ..................................................................................... 15

Minn. Stat. § 336.2-318 ................................................................................ 12, 15

Minn. Stat. § 604.101............................................................................................ 26

N.D. Cent. Code § 9-02-04 ....................................................................................14

N.D. Cent. Code § 41-02-03 .............................................................................. 7, 8

N.D. Cent. Code § 41-02-18 ................................................................................... 7

N.D. Cent. Code § 41-02-30 ........................................................................... 7, 10

N.D. Cent. Code § 41-02-31 ................................................................................. 15

N.D. Cent. Code § 41-02-35 ................................................................. 12, 13, 14, 15

N.D. Cent. Code § 51-15-01 ........................................................................... 16, 17

N.D. Cent. Code § 51-15-02 ................................................................................ 16

## Rules

Fed. R. Civ. P. 8 .................................................................................................... 6

Fed. R. Civ. P. 9 ..................................................................... 16, 18, 22, 23, 24

Fed. R. Civ. P. 12 .................................................................................................. 6

## Other

N.D. Admin. Code § 61-04-06-01 ........................................................................ 11

N.D. Admin. Code § 61-07-01-07 ........................................................................ 11

Plaintiffs respectfully submit this opposition to defendant Dakota Clinic Pharmacy, LLC's ("Dakota Clinic") Motion to Dismiss the Second Amended Complaint ("Motion," ECF 123).

## I.    INTRODUCTION

Over a three-year period, Dakota Clinic failed to safely and properly store, monitor, and handle more than 100 different types of temperature-sensitive medications. Instead, it allowed the medications to get too cold, risking the medications' safety and efficacy. Often, Dakota Clinic ignored the medications' temperatures altogether—failing to meet requirements to monitor and record temperatures at least twice daily. Worse, of the temperatures Dakota Clinic did record during that roughly three-year period, more than 145 fell below the minimum for safekeeping.

Each departure from safe temperature ranges—called an "excursion"—should have prompted Dakota Clinic to act immediately. Dakota Clinic was required to mark the affected pharmaceuticals "DO NOT USE," isolate them from other medications, and contact manufacturers. Instead, Dakota Clinic quietly distributed them for administration to more than 50,000 patients, concealing that they were defective and warranting to patients that they were effective to treat and/or prevent disease.

Dakota Clinic previously prevailed on a motion to dismiss at a time when Plaintiffs knew little more about Dakota Clinic's role in the excursion than that Essentia had pointed the blame at Dakota Clinic's Fargo-based "storage facility." Since then, Plaintiffs have received in discovery years of deficient temperature logs maintained by Dakota Clinic; a Shared Services Agreement specifying Dakota Clinic's responsibilities for clinical pharmaceutical services; lease agreements showing that Dakota Clinic operated as a pharmacy, not a mere warehouse; and sworn interrogatory responses claiming that the excursion was linked to temperature issues in two Dakota Clinic refrigerators that were kept in Dakota Clinic's pharmacy space.

Dakota Clinic's Motion simply restates its prior arguments, largely ignoring the new

1

allegations. It argues, for example, that it is not a "seller"—ignoring that we now know Dakota Clinic contracted with Essentia for clinical pharmaceutical services, i.e., drug sales to patients, and ignoring that Minnesota's consumer warranty statutes have no "seller" requirement at all. Dakota Clinic argues that it did not make an express warranty, ignoring that drug labels are warranties and ignoring the warranties in the newly discovered Shared Services Agreement, which extend to Plaintiffs. Dakota Clinic argues that Plaintiffs did not plead fraud with particularity, ignoring that Plaintiffs now know (and allege) that the excursion happened in connection with two Dakota Clinic refrigerators at its 1702 South University Drive location; that it stemmed from Dakota Clinic's deficient temperature monitoring and failure to fulfill its express legal, regulatory, and contractual obligations; and that it affected medications that Dakota Clinic distributed for patient administration.

This time, on these new allegations, Dakota Clinic's motion to dismiss should be denied.

## II.    SUMMARY OF FACTS[1]

In April 2020, defendant Essentia[2]—a health system that serves patients in Minnesota, Wisconsin, and North Dakota—publicly revealed that it had administered improperly stored pharmaceuticals to over 50,000 of its patients. *E.g.,* ¶¶ 5, 188.[3] Essentia disclosed that "[c]ertain

---

[1] Plaintiffs presume the Court's familiarity with the facts alleged in their original complaint, ECF 1 (which the Court upheld in denying Essentia's motion to dismiss, ECF 13), and Plaintiffs' First Amended Class Action Complaint, ECF 28 (for which the Court dismissed allegations against Dakota Clinic in its May 13, 2021 order, ECF 56).

On September 20, 2021, Plaintiffs filed their Second Amended Class Action Complaint. ECF 119 ("Second Amended Complaint"). The amendments are summarized here. An unredacted redlined version was submitted under seal as ECF 89-3.

[2] Essentia Health is the sole member of Innovis Health, LLC d/b/a Essentia Health. Throughout this brief, the two entities are collectively referred to as "Essentia."

[3] Citations to ¶__ refer to paragraphs in the Second Amended Complaint.

vaccines and medications appear to have been stored outside of the recommended temperature range, potentially impacting their effectiveness"[4]—an incident referred to in the medical industry as a "temperature excursion." ¶¶ 2, 157.

According to Essentia's public disclosures, "a little more than 100 different [types of] refrigerated injectable medications [were] involved" and improper administrations "dat[ed] back to September 2017."[5] The affected medications fall into several pharmaceutical categories, including vaccines provided to children to prevent dangerous illnesses, chemotherapy drugs administered to cancer patients (some of which are so highly toxic they cannot ever be repeated, despite the efficacy concerns raised by the excursion), and others. ¶¶ 8, 13.

In its public disclosure, Essentia blamed "an issue at a former distribution partner's medication storage location in Fargo, North Dakota."[6] That "former distribution partner" turned out to be Dakota Clinic. ¶ 311.

Through discovery, Plaintiffs learned that Dakota Clinic and Essentia have a "Shared Services Agreement" through which the two entities shared responsibility for one another's services. ¶¶ 146-54. Pursuant to that agreement, Essentia provided staffing, accounting, and administrative services to Dakota Clinic (employing all pharmacy staff, maintaining books and records, and providing accounting, finance, and human resources services) and Dakota Clinic provided clinical pharmaceutical management services (managing Essentia's pharmaceutical inventory and ensuring legal and regulatory compliance). *Id.* The temperature excursion occurred

---

[4] https://www.essentiahealth.org/alerts/medication-storage-issue/?utm_source=directmail&utm_campaign=medical-storage-issue-fy20 (cited in Second Amended Complaint, n. 34); *See also, e.g.,* ¶ 157.

[5] *Id. See also* ¶¶ 3, 8, 190-91.

[6] *Id. See also* ¶ 311.

for the duration of Dakota Clinic's services under the Shared Services Agreement, i.e., from the commencement of that agreement on August 1, 2017, until February 21, 2020, when two refrigerators were relocated in connection with the agreement's February 28, 2020 termination. *E.g.,* ¶¶ 146-96.

According to Essentia, in anticipation of that agreement's termination, two Dakota Clinic refrigerators were moved within the Essentia Health-South University Clinic (from Dakota Clinic's leased space to the basement in the same building). ¶ 163. When the temperatures were monitored in connection with the relocation of the refrigerators and the pharmaceuticals within them, both refrigerators fell below the required 36°F minimum. ¶ 164. Essentia's Pharmacy Operations Senior Manager then met with one of Dakota Clinic's pharmacist owners to review previous temperature logs maintained by Dakota Clinic. ¶¶ 166-67. Those logs, recorded on a form issued by the North Dakota Department of Health (NDDoH), should have been filled out twice per day with temperature readings and/or daily with maximum and minimum temperature recordings. ¶¶ 124, 128, 141.

In discovery, Essentia and Dakota Clinic produced certain of Dakota Clinic's logs for December 2016 through February 2020.[7] ¶¶ 168-87. The logs indicate Dakota Clinic failed to follow the express instructions on the form, manufacturers' storage requirements, or the numerous federal and state guidelines, best practices, and laws which require regular temperature monitoring and the removal and reporting of drugs kept at out-of-range temperatures. *See id*.

The logs reveal that Dakota Clinic failed to record temperatures daily, let alone twice per

---

[7] Temperature logs must be kept for a minimum of three years, but neither Essentia nor Dakota Clinic have produced logs for February through August 2017, November 2017, October 2018, November 2018, April 2019, or July 2019. ¶¶ 173-74.

day (nor were maximum and minimum temperatures recorded). *See id*. The logs further reflect that when temperatures were recorded, they were often out of range. *See id*. For example: The January 2017 log shows only three recordings. ¶ 177. The August 2018 log shows only 19 daily recordings. ¶ 178. Fourteen readings were below 36°F—falling as low as 29°F. *Id*. Only five readings that month reflect in-range temperatures. *Id.* The February 2019 log shows only six recordings, two of which were out of range. ¶ 179. On the February 2020 log, reflecting the days before the refrigerators' relocation on or about February 20, 2020, only five temperatures were recorded, and two were out of range. ¶ 180.

Numerous recorded temperatures over the years are below 32°F, risking that the affected pharmaceuticals could have frozen. *See, e.g.,* ¶¶ 178, 181. Indeed, the logs produced show at least 145 below-range recordings, with the lowest recorded temperature of 28°F recorded on July 30, 2018—well below the 35°F minimum on the logs Dakota Clinic Pharmacy used.[8] ¶¶ 181, 187.

Each and every out-of-range temperature recording requires immediate action. With regard to vaccines, for example, the medication holder must (1) notify the vaccine coordinator or supervisor, (2) notify staff, (3) label affected vaccines "DO NOT USE," (4) isolate affected vaccines from other vaccines, (5) document the details of the temperature excursion, and (6) contact the immunization program, state department of health, and/or manufacturers for guidance and to determine whether the vaccine is viable. *E.g.,* ¶¶ 115-16, 125-26, 129, 143. Dakota Clinic failed to take these steps; instead, it distributed the improperly stored medications for

---

[8] It appears Dakota Clinic used a long-outdated temperature log form that the NDDoH issued in 2013. ¶ 184. The form appears to have been updated by the NDDoH in 2016 and again in 2019. ¶ 185. The newer forms—in effect since at least 2016—set forth 36°F (rather than 35°F) as the minimum temperature. ¶ 186. In addition to the 115-plus readings below 35°F, Dakota Clinic's temperature logs reflect more than 30 readings at an also out-of-range (i.e., below manufacturers' requirements) 35°F. ¶ 187.

administration to patients without disclosing that they were subject to a temperature excursion. *E.g.,* ¶¶ 168-96, 248-50.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure ("Rule") 8(a) only requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Nevertheless, a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). A complaint does not need detailed factual allegations, but it must contain more than labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Court must accept all allegations in the complaint as true, except for legal conclusions or "formulaic recitation of the elements of a cause of action." *Iqbal,* 556 U.S. at 678 (citation omitted). The determination of whether a complaint states a claim upon which relief can be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679 (citation omitted). "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Wilson v. Ark. Dep't Human Servs*., 850 F.3d 368, 371-72 (8th Cir. 2017) (citation omitted).

### IV.  ARGUMENT

**A. Plaintiffs have stated a plausible claim for breach of express warranty against Dakota Clinic.**

**1.  Dakota Clinic is a "seller," though it need not be to face liability.**

Dakota Clinic claims it cannot be held liable for its breach of warranty because it is not a "seller." That argument reads North Dakota's and Minnesota's commercial statutes too narrowly

and ignores Minnesota's consumer warranty statute entirely.

### a. Dakota Clinic is a "seller" under the North Dakota and Minnesota commercial statutes.

Both Minnesota and North Dakota have commercial express warranty statutes.[9] Under those laws, express warranties include any "affirmation of fact or promise" or any "description of the goods" that becomes part of the basis of the bargain. Minn. Stat. § 336.2-313(1)(a)-(b); N.D. Cent. Code § 41-02-30(1)(a)-(b).

A "[s]eller" is anyone "who sells **or contracts to sell** goods." N.D. Cent. Code § 41-02-03(1)(d) (emphasis added). North Dakota expressly allows the interpretation of who constitutes a seller to be based on "context." N.D. Cent. Code § 41-02-03(1). *See also* N.D. Cent. Code § 41-02-18 ("The obligation of the seller is to transfer and deliver . . . .").

Plaintiffs allege that, through the Shared Services Agreement, Dakota Clinic contracted with Essentia to sell pharmaceuticals to Essentia's patients, that Dakota Clinic was responsible for ordering and purchasing the affected medications, that Dakota clinic distributed the affected medications for patient administration, and that patients and third-party payors paid for those affected medications. *E.g.,* ¶¶ 144-154, 188-96, 248-50, 257-60, 267. Dakota Clinic is therefore a "seller."

In its Motion, Dakota Clinic addresses two cases regarding "seller" status in the context of revocation of acceptance. Motion, pp. 6-8. Each of those cases reflects the liberal construction of a "seller" in determining liability to consumers—even when the transaction and/or profit is

---

[9] While Dakota Clinic addresses only North Dakota law, Minnesota law is relevant as well. Dakota Clinic's largest owner is Innovis, which is wholly owned by Minnesota-based Essentia. ¶¶ 75, 89. This case involves Minnesota plaintiffs (¶¶ 40, 58), the distribution of pharmaceuticals to Minnesota clinics and other Minnesota class members (¶¶ 193, 312), and Minnesota claims.

indirect. While these cases arose outside of the warranty statutes at issue here, they nevertheless reflect the import of "context" in the determination of liability. *See* N.D. Cent. Code § 41-02-03(1).

In *Durfee v. Rod Baxter Imps., Inc*., 262 N.W.2d 349, 357 (Minn. 1977), the court held a dealer liable for breach of warranty even though the sale was made by an intermediary distributor, in part because the dealer "profit[ed] indirectly from retail sales." The court noted that "[t]he remedies of the Code are to be liberally administered." *Id.* (citing Minn. Stat. § 336.1-106(1)); *see also* Minn. Stat. § 336.1-305.

In attempting to distinguish *Durfee*, Dakota Clinic claims it was merely "a middleman storage facility that stored the [affected medications]." Motion, p. 8. But Dakota Clinic did not merely act as a warehouse.[10] It was responsible for ordering and purchasing the affected medications. ¶ 152. It managed the inventory of the affected medications. *Id*. It was responsible for proper storage of the medications, and it filled out temperature logs (albeit deficiently) as part of that duty. *Id*. It was responsible for legal and regulatory compliance. *Id.* It operated a retail customer-facing pharmacy and outpatient pharmacy from Essentia facilities. ¶¶ 90, 305. It was responsible for providing clinical pharmaceutical services for Essentia, i.e., to its patients. ¶¶ 94, 144-55. And in connection with that role, it distributed the affected medications to be administered to Plaintiffs and other patients. ¶¶ 196, 310-13. Discovery will determine Dakota Clinic's exact role in billing those patients and third-party payors (or otherwise receiving payment for those medications)—but Dakota Clinic was paid for its services and profited, at the least indirectly, for

---

[10] Even if it had acted only as a warehouse, it was still responsible for properly storing and distributing the Affected Medications and is liable for failing to do so. *E.g.*, ¶¶ 207-09 (addressing requirements for warehousing and their application to "all organizations and individuals involved in any aspect of the storage and distribution of all drug products") (citation omitted).

its pharmaceutical services to Essentia's patients. ¶ 153.

In *Fode v. Capital RV Ctr.*, 575 N.W.2d 682 (N.D. 1998), the court considered whether a manufacturer (instead of the retailer) was a "seller" for plaintiffs' revocation of acceptance claim. The court found that the manufacturer's warranty and the sales contract are "so closely linked both in time of delivery and subject matter, that they blended into a single unit at the time of sale." *Id.* at 687 (citation omitted). Dakota Clinic argues it is "not a manufacturer" and there is no "sales contract" or "warranty document." Motion, p. 8. But the underlying reasoning in *Fode* nevertheless applies. Dakota Clinic is 49% owned by Essentia (through Innovis), it operated out of Essentia's clinic, it provided Essentia's pharmaceutical services, it was staffed by Essentia-hired employees, and it distributed medications to Essentia providers for administration to Essentia patients. *E.g.,* ¶¶ 82, 87, 89, 146-55, 196, 304, 310-13. Dakota Clinic cannot now escape liability for providing those affected medications by claiming that it did so through Essentia's hands.

Because Dakota Clinic contracted with Essentia to sell pharmaceuticals to Plaintiffs, Dakota Clinic is a "seller."

### b. Minnesota's consumer protection statute creates a cause of action for breach of warranty even against non-sellers.

Even if Dakota Clinic were not a "seller" under the commercial statutes, Minnesota's consumer protection statute sets forth its own express warranty provision. That statute defines an "[e]xpress warranty" to include a "written statement arising out of a consumer sale pursuant to which the manufacturer, distributor, or retailer undertakes . . . to preserve or maintain the utility or performance of the goods." Minn. Stat. § 325G.17, Subd. 5.

That consumer statute has no "seller" requirement at all. It refers to the "**maker** of an express warranty arising out of a consumer sale." Minn. Stat. § 325G.19, Subd. 2 (emphasis added). Minnesota explicitly contemplates that a warrantor may not necessarily be a direct-to-

consumer "seller": "In a consumer sale, the manufacturer shall honor an express warranty made by the manufacturer; the distributor shall honor an express warranty made by the distributor; and the retail seller shall honor an express warranty made by the retail seller." *Id.*

Thus, even if Dakota Clinic were not a "seller," it would still be liable as the "maker" of a warranty.

### 2. Dakota Clinic made express warranties through the distribution of pharmaceuticals, as well as through their labeling and packaging.

Defendant additionally argues that Plaintiffs have not alleged what express warranties were made by Dakota Clinic. Motion, p. 5. To establish a breach of warranty claim, the warrantor need not have explicitly used formal words like "warrant" or have had any "specific intention to make a warranty." Minn. Stat. § 336.2-313(2); N.D. Cent. Code § 41-02-30(2). Express warranties can arise through affirmations of fact, promises, or mere descriptions. Minn. Stat. § 336.2-313(1); N.D. Cent. Code § 41-02-30(1). Moreover, "[t]he question whether or not an express warranty is given is a question of fact for the jury." *Sci. Application, Inc. v. Delkamp*, 303 N.W.2d 71, 74 (N.D. 1981) (citation omitted).

Here, Plaintiffs allege, for example, that Dakota Clinic functioned as Essentia's in-house pharmacy; its duties included managing pharmaceutical inventory, maintaining the pharmaceutical formulary, ordering and purchasing, and compliance with laws and regulations. ¶ 152. Dakota Clinic expressly warranted, though labels, publications, package inserts, and other written materials, and by placing the affected medications into the stream of commerce (for administration to Plaintiffs and other Essentia patients), that the affected medications were effective and proper for their intended use. ¶¶ 240, 242-46. Dakota Clinic distributed the affected medications to numerous Essentia clinics in Minnesota and North Dakota for administration to patients, which was an express warranty that the medications were safe and effective for their intended use and

10

would conform to the representations on their labeling and packaging. ¶¶ 250-51. Moreover, the Second Amended Complaint alleges that the labeling and packaging reflects the intended purpose of the medication (e.g., to prevent or treat a specific illness). ¶¶ 252-54. In addition, as a pharmacy, North Dakota regulations charge Dakota Clinic with its own labeling duties.[11] Plaintiffs have thus adequately alleged that Dakota Clinic made express warranties to the patients who received the affected medications Dakota Clinic distributed.

Indeed, distributing a medication to a patient for a specific purpose—i.e., the prevention and/or treatment of a particular disease—is enough to establish an express warranty. "Plaintiffs did not have to 'perceive' the package labelling or insert in order to create a benefit of the bargain." *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL No. 2875 (RBK-JS), 2021 U.S. Dist. LEXIS 15400, at *62 (D.N.J. Jan. 22, 2021). In *Valsartan*, plaintiffs alleged that express warranties arose simply by naming the product by the active ingredient, and that those express warranties were breached when the product contained a contaminate. *Id.* at *58-59. The court agreed.

"All [plaintiffs] had to know was they were buying a . . . drug that contained [the active ingredient] because the very name [of the active ingredient] constituted itself an express warranty that what plaintiffs were purchasing was the chemical equivalent of [an FDA-approved]

---

[11] *E.g.*, N.D. Admin. Code § 61-04-06-01 ("[D]rugs . . . dispensed pursuant to a prescription must bear a label . . . which must include . . . [e.g.,] . . . The directions for use, including precautions . . . The drug name and strength and quantity . . . ."); *Id.* at § 61-07-01-07(3)(a) ("All drugs dispensed by a hospital pharmacy . . . intended for use within the hospital, must be . . . adequately labeled so as to identify, at a minimum, brand name or generic name, strength, quantity, source, and expiration date . . . .").

11

pharmaceutical." *Id.* at \*62 (citations omitted).[12]

"A statement can amount to a warranty, even if unintended to be such by the seller, if it could fairly be understood . . . to constitute an affirmation or representation that the [product] possesse[s] a certain quality or capacity relating to future performance." *Gremo v. Bayer Corp.*, 469 F. Supp. 3d 240, 258 (D.N.J. 2020) (citations omitted). In labeling and distributing chemotherapy to treat cancer and vaccines to prevent influenza (for example), Dakota Clinic warranted that those pharmaceuticals had the quality and capacity to fulfill that purpose. Because of the temperature excursions, those warranties were breached. Dakota Clinic's motion to dismiss Count I should therefore be denied.

### 3. Dakota Clinic is also liable for its warranties to Essentia because Plaintiffs are third-party beneficiaries. Neither direct statements to Plaintiffs nor privity is required.

Even setting aside the above, Plaintiffs need not have alleged that *any* express warranties were made to them directly. Dakota Clinic's warranties to Essentia through the Shared Services Agreement (*e.g.*, ¶ 261) extend to the patients as third-party beneficiaries.

"A seller's warranty, whether express or implied, extends to any person who may reasonably be expected to use, consume, or be affected by the goods and who is injured by breach of the warranty." N.D. Cent. Code § 41-02-35; Minn. Stat. § 336.2-318 (same). This provision "appl[ies] regardless of privity." *Spieker v. Westgo, Inc.*, 479 N.W.2d 837, 847 (N.D. 1992); *see*

---

[12] In *Valsartan*, because the pharmaceutical defect arose at the manufacturer-level, through the drugs' formulation, claims were sustained only against the manufacturer. 2021 U.S. Dist. LEXIS 15400, at \*67-68 (finding that plaintiffs' allegations related to the manufacturers' "statements and behavior, and not to specific statements, conduct, or communications made by . . . [the] Pharmacies"). Here, the defects arose through the conduct of Defendants, i.e., through post-manufacture storage, patient distribution, and administration, which were the responsibilities and communications of Defendants, including Dakota Clinic. Thus, the claims here are appropriately maintained against the pharmacy.

*AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 276 F. Supp. 2d 999, 1014 (D.N.D. 2003), *aff'd*, 420 F.3d 751 (8th Cir. 2005) (N.D. Cent. Code § 41-02-35 "relax[es] the strict privity requirements for breach of warranty claims."); *Transport Corp. of Am. v. IBM Corp.*, 30 F.3d 953, 958 (8th Cir. 1994) ("Minnesota has a privity provision that operates to extend all warranties, express or implied, to third parties who may reasonably be expected to use the warranted goods." (citation omitted)); *Industrial Graphics, Inc. v. Asahi Corp.*, 485 F. Supp. 793, 800 (D. Minn. 1980) ("Under the law of Minnesota, the implied warranty of a seller extends . . . irrespective of privity of contract." (citations omitted)).

Plaintiffs and class members were "reasonably expected" to use and/or be affected by the medications that were provided to patients in connection with the Shared Services Agreement; the express warranties in that agreement (e.g., regarding proper management, proper storage, and legal and regulatory compliance) therefore extend to them.

In disregard of this plain statutory language and well-settled case law, Dakota Clinic contends that "Plaintiffs lack privity with Dakota [Clinic]," claiming that "North Dakota recognizes the necessity of vertical privity. . . ." Motion, p. 6. In support, Defendant relies on *Falcon for Import & Trade Co. v. North Central Commodities, Inc.*, Civil No. A2-01-138, 2004 U.S. Dist. LEXIS 1292, at *6, 2004 WL 224676, at *2 (D.N.D. Jan. 30, 2004). *Id.* However, the decision in *Falcon* expressly recognized that privity is *not* required in claims brought by third-party consumer beneficiaries, like Plaintiffs here. 2004 U.S. Dist. LEXIS 1292, at *7-8, 2004 WL 224676, at *3.

Indeed, *Falcon*—a case about defective beans—shares similarities with this matter—a case about defective medications. In *Falcon*, beans passed from Company A to Company B to

13

Company C before landing in the hands of the plaintiff. *Id.* at *2.[13] Parallels can be drawn here to the pharmaceutical manufacturer (Company A), Dakota Clinic (Company B), and Essentia (Company C), before administration to Plaintiffs. Companies B and C had contracted with one another to deliver beans of a certain quality, *id.* at *2—not unlike the Shared Service Agreement's requirements that Dakota Clinic properly store and manage the pharmaceutical inventory and comply with all applicable laws and regulations. Upon discovering the beans were defective, the plaintiff sued Company B for breach of express warranty, *id.* at *3, just as Plaintiffs have sued Dakota Clinic here.

Company B sought summary judgment, arguing, as Dakota Clinic does here, that the plaintiff was neither a party to the contract between the sellers nor a third-party beneficiary. *Id.* at *3. But the court rejected that argument, finding that, at the least, a genuine issue of material fact existed. *Id.* at *9-10. And it made that finding on the narrower third-party beneficiary statute for commercial purchasers (which extends warranties when a contract is "made expressly for the benefit of a third person"), as opposed to the broader consumer statute applicable here (which extends the warranty to anyone "who may reasonably be expected to . . . be affected by the goods"). *Id.* at *7-9 (discussing N.D. Cent. Code §§ 41-02-35, 9-02-04).

Thus, even if Dakota Clinic had not made any express warranties directly to Plaintiffs through labeling, Plaintiffs have adequately alleged their claim as third-party beneficiaries to the Shared Services Agreement (and, more generally, the relationship between Essentia and Dakota Clinic). This provides its own, distinct basis to deny Dakota Clinic's motion to dismiss Count I.

---

[13] The actual companies in *Falcon* are: (A) Maple River Bean Company, (B) North Central Commodities, Inc., and (C) Gedco.

14

**B.  Plaintiffs have stated a plausible claim for breach of implied warranties.**

Minnesota and North Dakota provide statutory causes of action when a good does not meet consumer expectations, i.e., implied warranties that goods will "pass without objection in the trade," "are of fair average quality," "are fit for the ordinary purposes," "are adequately contained, packaged, and labeled," and "conform to the promises or affirmations of fact made on the container or label." Minn. Stat. § 336.2-314(2)(a)-(c), (e)-(f); N.D. Cent. Code § 41-02-31(2)(a)-(c), (e)-(f).

"The doctrine of implied warranty is favored," "[t]he rule is an equitable one," implied warranties "should be given effect when it is possible to do so," and they are "to be liberally construed." *Beck v. Spindler*, 256 Minn. 543, 558, 99 N.W.2d 670, 680 (1959) (citations omitted).

Defendant Dakota Clinic argues, as it did regarding express warranties, that it cannot be liable for breaching any implied warranties because it is not a "seller." Motion, pp. 9-10. As discussed above, Dakota Clinic is a "seller."

And as with express warranties, implied warranties extend to third-party beneficiaries, like Plaintiffs. N.D. Cent. Code § 41-02-35 ("A seller's warranty, whether express *or implied*, extends to any person who may reasonably be expected to use, consume, or be affected by the goods . . . ." (emphasis added)); Minn. Stat. § 336.2-318 (same); *Lang v. Gen. Motors Corp.*, 136 N.W.2d 805, 810 (N.D. 1965) (manufacturer can be liable to ultimate buyer for breach of implied warranty even though it did not sell the goods directly to the buyer).

In addition, separate from implied warranties under Minnesota's (and North Dakota's) commercial statute, Minnesota's consumer protection statute states that "every consumer sale in this state shall be accompanied by an implied warranty that the goods are merchantable, and, in a consumer sale where the seller has reason to know that the goods are required for a particular purpose and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, an implied warranty of fitness." Minn. Stat. § 325G.18, Subd. 1. The warranty that goods

15

are merchantable attaches throughout the chain of distribution without any direct "buyer" and "seller" relationship required. *See, e.g., City of Wyo. v. P&G*, 210 F. Supp. 3d 1137, 1159 (D. Minn. 2016) (upholding implied warranty of merchantability claims brought by municipalities against the manufacturer of purportedly "flushable" wipes for damages to municipal water treatment facilities, based on *consumer* purchases and *consumer* expectations).

Accordingly, and for the reasons discussed above in addressing Dakota Clinic's identical arguments regarding breach of express warranty, Dakota Clinic's motion to dismiss Count II should be denied.

### C.  Plaintiffs have plausibly alleged consumer protection act claims.

Plaintiffs allege Dakota Clinic violated the Minnesota Consumer Fraud Act ("Minnesota Consumer Act"), Minn. Stat. §§ 325F.68, *et seq.*, and the North Dakota Consumer Protection Law ("North Dakota Consumer Law"), N.D. Cent. Code §§ 51-15-01, *et seq*.

Dakota Clinic claims that Plaintiffs' consumer protection claims should be dismissed because Dakota Clinic is not a seller and Plaintiffs have not pled fraud with particularity. Motion, pp. 10-16. Those arguments cannot succeed. As discussed below, the consumer protection statutes are not limited to claims against a "seller"—they arise from conduct "by any person" so long as that conduct was "in connection with" a sale. Minn. Stat. § 325F.69, Subd. 1; N.D. Cent. Code § 51-15-02. Regarding particularity, Plaintiffs' new allegations in the Second Amended Complaint meet the requirements of Rule 9(b).

### 1.  Consumer protection claims may be brought against any wrongdoer, not just sellers.

Defendant's argument that it cannot be held liable under the consumer protection statutes because it is not a "seller" is spurious. Both states' statutes prohibit deceptive or fraudulent acts "by any person" "in connection with" a sale or advertisement. N.D. Cent. Code § 51-15-02; Minn.

16

Stat. § 325F.69, Subd. 1. The claims are in no way limited to sellers.

Far broader than "seller," the North Dakota Law defines "[p]erson" as "any natural person or the person's legal representative, partnership, corporation, limited liability company, company, trust, business entity, or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee, or cestui que trust thereof." N.D. Cent. Code § 51-15-01. The Minnesota Act is substantially similar in that regard.[14]

The cases cited by Defendant are inapposite. *Benz Farm, LLP v. Cavendish Farms, Inc.*, 2011 ND 184, 803 N.W.2d 818, considered whether the law applied to deceptive and fraudulent conduct of *purchasers* of merchandise.[15] *State v. Minnesota School of Business, Inc.*, 935 N.W.2d 124, 136 (Minn. 2019), concerned whether proof of individual reliance is needed to prevail under the Minnesota Act. Neither situation is at issue here.

Because Dakota Clinic is a "person" within the meaning of the consumer protection statutes, it may be held liable for its violations of the statutes.

---

[14] Similarly, the Minnesota Act prohibits "[t]he act, use, or employment by *any person* of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70." Minn. Stat. § 325F.69, Subd. 1 (emphasis added). The Minnesota Act defines "person" consistent with the North Dakota Law. *See* Minn. Stat. § 325F.68.

[15] Dakota Clinic quotes an excerpt of the decision in *Benz Farm* in which the court notes that the North Dakota Law "focuses upon the conduct of the seller." Motion, pp. 12-13. Dakota Clinic omits the sentence that follows, however, which makes clear the term "seller" was used only as shorthand to distinguish from the conduct of "purchasers," not to create a common law limitation on the meaning of "any person." *Benz Farm,* 2011 ND 184, ¶ 20, 803 N.W.2d 818 ("We conclude the Act does not apply to, or create a cause of action against, a purchaser of merchandise.").

17

**2. Plaintiffs have satisfied Rule 9(b) by pleading the who, what, when, where, and how of the alleged fraud.**

**a. Rule 9(b) is context-dependent and is applied with flexibility in omissions cases where the facts are peculiarly within the opposing party's knowledge.**

Rule 9(b) requires that allegations of fraud "state with particularity the circumstances constituting fraud." "[T]he Eighth Circuit has held that Rule 9(b) does not require a complaint to include highly specific allegations with respect to facts that would be known to the defendants but not to the plaintiffs before the plaintiffs have had some opportunity to conduct discovery." *Ash Grove Cement Co. v. MMR Constructors, Inc.*, No. 10-CV-4069, 2011 U.S. Dist. LEXIS 10794, at *2 (W.D. Ark. Feb. 3, 2011) (citing *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783-84 (8th Cir. 2009); *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 921 (8th Cir. 2001)).

Particularity "may demand different things in different contexts." *United States ex rel. Hirt v. Walgreen Co.*, 846 F.3d 879, 881 (6th Cir. 2017). Allegations in omissions cases may—like the misconduct on which they are based—be more amorphous:

> The specificity required for allegations of affirmative misrepresentations is necessarily different than the specificity required for allegations of fraudulent omissions. . . . The reasons for the disparate burden are straightforward. Fraudulent acts occur at a specific time, fraudulent omissions occur over a period of time. Fraudulent acts can be specifically described, but omissions are, by very definition, more amorphous.

*Fenner v. GM, LLC (In re Duramax Diesel Litig.)*, 298 F. Supp. 3d 1037, 1055 (E.D. Mich. 2018).

Moreover, Rule 9(b) is applied with particular flexibility where, as here, "the facts constituting the fraud are peculiarly within the opposing party's knowledge," in which case, "such allegations may be pleaded on information and belief." *Drobnak*, 561 F.3d at 783-84 (citation omitted).

Thus, in denying Essentia's motion to dismiss on this same argument, this Court explained:

> The Court has reviewed the Complaint comprising more than 100 detailed paragraphs and concludes Plaintiffs have adequately stated claims under both North Dakota and Minnesota consumer protection and deceptive trade practices laws. Plaintiffs allege they and their children received influenza and other childhood vaccinations that were subject to temperature excursions. Several of those Affected Medications were specifically identified, including influenza vaccinations, DTaP, and Hep A. Doc. No. 1, ¶ 13. Others were identified upon information and belief, including Hep B, IPV, Rotavirus, and Pneumococcal. Id. ¶ 12. The Complaint states that some of these vaccinations were obtained at the Essentia Clinic on South University Drive in Fargo, North Dakota. Id. The vaccinations were received by the Krafts on January 31, 2017, and by the Schneiders on specified dates from October 2017 to October 2019. Id. ¶¶ 12-13. They allege they were not informed the Affected Medications were tainted by improper temperature handling. Id. ¶¶ 53-55. Plaintiffs allege this was unfair and deceptive because Essentia represented that the goods (vaccines) had characteristics, uses, benefits, or qualities that they did not have, and the Affected Medications were represented to be of a particular standard, quality, and grade when they were not. Id. ¶ 100. Plaintiffs further allege that Defendants had actual knowledge of the defective condition of the Affected Medications and intentionally concealed that information from them. Id. ¶ 109. Based on these allegations, the Court is satisfied Plaintiffs have identified the who, what, where, when, and how of the alleged deceptive acts with sufficient particularity to satisfy Rule 9(b).

ECF 13, pp. 14-15. The Court's prior analysis is equally applicable here.

### b. The Second Amended Complaint adds the detail the Court previously found absent.

In an earlier order, the Court granted Dakota Clinic's motion to dismiss the previous complaint, finding the prior complaint lacked "specific factual allegations . . . as to what Dakota Clinic did or how any of its conduct was fraudulent." ECF 56, p. 9. The Court held that it was not enough to allege that "Dakota Clinic had some involvement in the storage and distribution of the Affected Medications." *Id.* at 10.

19

At the time, Plaintiffs knew only that Essentia had blamed the temperature excursion on "a former distribution partner's medication storage location"—and that the "partner" was Dakota Clinic. The Second Amended Complaint, however, includes information gleaned in discovery that explains more precisely how Dakota Clinic was involved and why it is liable.

Regarding the "what" and "how" of the alleged fraud, we now know that Dakota Clinic was responsible for Essentia's clinical pharmaceutical management, including ordering, purchasing, storing, and legal and regulatory compliance. ¶ 152. As part of those obligations, Dakota Clinic was required to maintain the affected medications between 36- and 46-degrees Fahrenheit and monitor and record those temperatures at least twice daily. *E.g.,* ¶¶ 97, 119, 142, 164, 171. If temperatures fell outside of that range, Dakota Clinic was required to take immediate steps to mark them "DO NOT USE," isolate them, and contact, among others, the manufacturer. *E.g.,* ¶¶ 115-17, 126, 129, 143.

However, the parties produced temperature logs reflecting that Dakota Clinic regularly failed to record <u>any</u> daily temperature at all. ¶¶ 172-80. Dakota Clinic's actions were not merely negligent. Plaintiffs now know that Dakota Clinic had actual knowledge that the medications were subject to temperature excursions and concealed that information from Plaintiffs and the class. Indeed, of the temperature recordings Dakota Clinic did make, more than 145 were out of range. ¶¶ 181, 187. Temperatures regularly fell below the 36°F minimum, falling as low as 28°F. ¶ 181.

Even ignoring Dakota Clinic's legal and regulatory obligations as a licensed pharmacy, and its duties pursuant to the Shared Services Agreement, the actions Dakota Clinic was required to take are written directly on the temperature logs themselves, including a warning reading: "DANGER! Fridge temperatures below 35°F are too cold! Record temperature to the right and take action immediately!" ¶¶ 169-71. Instead, Dakota Clinic fraudulently and deceptively

20

distributed those affected medications for administration to patients without disclosing that they had been subject to temperature excursions that risked the medications' safety and efficacy. ¶¶ 3, 310-13. The products were deceptively labeled to suggest they were fit to treat and/or prevent disease as originally intended had they been properly stored. ¶¶ 246, 272.

As to the "where" of the alleged fraud, Plaintiffs now allege that the undisclosed, concealed excursions and the distribution of the affected medications occurred at and from the pharmacy space Dakota Clinic leased from Essentia Health at 1702 South University Drive, Fargo, North Dakota. ¶¶ 144, 154, 163. The allegations are so detailed that they now note the excursions happened in connection with two specific refrigerators—one with double doors, the other with triple doors. ¶¶ 163-64. Plaintiffs allege that Essentia disclosed that "affected medications and vaccines were likely sent to Essentia Health clinics in Fargo, Casselton, Detroit Lakes-Hwy 10, Hankinson, Jamestown, Lisbon, Moorhead and Moorhead Downtown, Valley City and Wahpeton. Some Essentia Health clinics may have only received affected flu vaccinations, including our clinics in Ada, Bagley, Fosston, Graceville, and Oklee." ¶ 312. And Plaintiffs allege the clinics as which they received affected medications. ¶¶ 19, 21, 22, 34, 35, 44, 46, 59, 64.

Regarding "when" the fraudulent and deceptive acts occurred, Plaintiffs allege that the failure to safely store the affected medications and the resultant excursions (and concealment of those excursions) occurred for the duration of Dakota Clinic's services to Essentia, i.e., from the commencement of the Shared Services Agreement, which was entered into on August 1, 2017 (¶¶ 146, 159) until Essentia claims to have first discovered the temperature issue on February 21, 2020 (¶ 164). Plaintiffs also allege numerous dates on which they were administered affected medications (additional dates are in Defendants' possession). ¶¶ 19, 21, 29, 40, 46, 49, 51, 54, 64-65, 69.

21

These allegations put Dakota Clinic well on notice of the alleged fraud and meet the requirements of Rule 9(b).

In support of its argument that Plaintiffs' allegations fall short, Dakota Clinic cites *Northern Bottling Co. v. Henry's Foods, Inc.*, 474 F. Supp. 3d 1016, 1024 (D.N.D. 2020). Motion, p. 14. In *Northern Bottling*, the court found that plaintiffs failed to adequately allege who the defendant deceived, having only referred to the deceived parties as unnamed "customers" or "various gas station and convenience stores." 474 F. Supp. 3d at 1022-23. Here, Plaintiffs identify 22 deceived plaintiffs by name (and specify with particularity the category of absent class members also impacted—those who paid for affected medications). ¶¶ 18, 28, 33-34, 40, 43, 48, 50-51, 54, 58, 63, 229. The complaint in *Northern Bottling* also did not identify any date that deceptive representations were made or that the defendant even spoke with the deceived parties. 474 F. Supp. 3d at 1023. Here, Plaintiffs allege with particularity the timeframe of the temperature excursion, that they received affected medications distributed by Dakota Clinic, and dates on which they received the affected medications. ¶¶ 3-6, 18-74, 144-54, 191-93, 196.

The complaint in *Northern Bottling* was riddled with other overly vague and conclusory allegations regarding alleged misrepresentations, how they were made, and how the conduct was linked to the defendant. 474 F. Supp. 3d at 1024. The court noted that 9(b)'s particularity "requirement is designed to enable defendants to respond 'specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct.'" *Id.* at 1020 (quoting *Abels*, 259 F.3d at 920). Here, however, there is no confusion about what Plaintiffs allege to have happened. The Second Amended Complaint well enables Dakota Clinic to respond regarding its role in the temperature excursion and its sale and distribution of affected medications to Plaintiffs and class members.

22

Defendant relies on *Olin v. Dakota Access, LLC*, No. 1:17-cv-007, 2017 WL 4532581, at *4, 2017 U.S. Dist. LEXIS 166924 (D.N.D. Oct. 10, 2017), *aff'd*, 910 F.3d 1072 (8th Cir. 2018), for the idea that Plaintiffs need to identify the specific names of individuals who deceived them to meet the applicable pleading standard. Motion, pp. 14-15. But allegations, "even without the names of the specific individuals responsible for the fraud, can be sufficient to satisfy the requirements of Rule 9(b)." *Scanio v. Zale Delaware, Inc.*, No. 4:12CV37 CDP, 2012 U.S. Dist. LEXIS 13140, 2012 WL 368741, at *3 (E.D. Mo. Feb. 3, 2012) ("The specific names of the employees involved can be ascertained through discovery.") (citation omitted).

Indeed, while the court in *Olin* recognized the lack of specific names there—a case involving allegations of direct misrepresentations—the court recognized that "Plaintiffs do not need to state every factor with specificity"; they must merely "provide enough factual background so the allegations of fraud are more than conclusory." *Olin,* 2017 WL 4532581, at *4 (citation omitted).

Dakota Clinic's suggestion that, prior to discovery, Plaintiffs are required to plead, by name, which pharmacy staff members fraudulently and deceptively stored and/or distributed the affected medications in connection with a course of conduct that occurred over three years and affected over 50,000 patients is unreasonable and unsupported by law.

Moreover, *Olin* and *Northern Bottling* involved affirmative misrepresentations. Although the distribution of the affected medications carried with it certain express warranties, the underlying fraud and deception in this case largely arose through Defendants' omissions and concealment. In cases like this one where defendants are alleged to have concealed or omitted material information, Rule 9(b) standards are more lenient. *See Lewey v. Vi-Jon, Inc.*, No. 4:11CV1341 JAR, 2012 U.S. Dist. LEXIS 71237, at *7, 2012 WL 1859031, at *3 (E.D. Mo. May

23

22, 2012) ("Plaintiff's allegation identifies the particularities of the fraud that are known to Plaintiff. Plaintiff states the approximate time frame and the material information that was not provided to her. But because Plaintiff alleges an omission and not a representation, the Court will not require [plaintiff] to plead with the particularity demanded by [the defendant.]"); *Belville v. Ford Motor Co.*, 60 F. Supp. 3d 690, 697 (S.D. W. Va. 2014) ("[A] plaintiff cannot be required to specifically identify the precise time, place, and content of an event that did not occur.").

Plaintiffs have met Rule 9(b)'s requirements, particularly for a claim based on fraud and concealment, the details of which lie in discovery that remains in the hands of defendants. Accordingly, Dakota Clinic's motion to dismiss Count III should be denied.

### D.  Plaintiffs have stated a plausible claim for unjust enrichment.

Unjust enrichment requires a plaintiff to show "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of a justification for the enrichment and impoverishment; and (5) an absence of a remedy provided by law." *Thimjon Farms Partnership v. First Int'l Bank & Trust*, 837 N.W.2d 327, 336 (N.D. 2013) (citation omitted). Courts have widely recognized that unjust enrichment is a "broad, equitable doctrine." *Bakken Residential, LLC v. Cahoon Enters., LLC*, 154 F. Supp. 3d 812, 835 (D.N.D. 2015) (citation omitted); *see also Hughes v. Wheeler*, 364 F.3d 920, 924 (8th Cir. 2004) ("Rather than looking solely to the intentions of the parties, [unjust enrichment] applies objective standards of fairness to insure that people do not profit from their own wrongs.").

Plaintiffs allege that they conferred a benefit on Dakota Clinic—as a contracting party and in the chain of distribution with Essentia—in the form of payment for the affected medications without receiving the benefit of the bargain. ¶¶ 338-43. Plaintiffs additionally allege that it would be inequitable, unconscionable, and unjust to allow Dakota Clinic to retain the benefits provided to it under the circumstances. ¶ 345. Further, Plaintiffs allege that Dakota Clinic appreciated,

24

recognized, and chose to accept the monetary benefits Plaintiffs conferred onto Dakota Clinic. ¶ 344.

Moreover, contrary to Defendant's argument, the money paid by Plaintiffs need not have been paid directly to Dakota Clinic. *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, PLC*, No. 15 Civ. 6549 (CM), 2018 U.S. Dist. LEXIS 220574, at *174-75 (S.D.N.Y. Dec. 26, 2018) (denying motion to dismiss claim for unjust enrichment: "North Dakota courts have upheld unjust enrichment claims even where no direct benefit was alleged.") (citation omitted). Rather, there need only be "[a] connection between the enrichment and the impoverishment." *Opp v. Matzke*, 1997 ND 32, ¶ 8, 559 N.W.2d 837, 839-40.[16]

In previously dismissing Plaintiffs' unjust enrichment claim, the Court recognized Plaintiffs' argument that Plaintiffs "conferred a benefit on Dakota – as a contracting party . . . in the chain of distribution" with Essentia, but noted that the argument was made only in the brief, not the pleading. ECF 56, p. 12 (quoting ECF 51, p. 13). Now, the Second Amended Complaint alleges plainly that Dakota Clinic was unjustly enriched through the Shared Services Agreement and Plaintiffs' payment for medications that Dakota Clinic provided through its clinical pharmaceutical services. ¶¶ 338-39. Dakota Clinic was compensated for those services. ¶ 341. That Essentia wrote the check, so to speak (which is yet to be determined), is of no moment; Plaintiffs

---

[16] Even if the benefit needed to have been direct, the question of whether Plaintiffs paid Essentia as Dakota Clinic's agent—or Essentia reimbursed Dakota Clinic upon receiving payment from Plaintiffs—is a question of fact subject to discovery. *Colby Ctr. v. Conagra Foods, Inc.*, No. 5:14-CV-05248, 2015 U.S. Dist. LEXIS 89711, at *16, 2015 WL 4106473, at *5 (W.D. Ark. Jul. 6, 2015). Plaintiffs have "pleaded sufficient facts to state a facially plausible claim" for unjust enrichment because they do not "have access to the information about which party [received payment in a case involving multiple contracted parties] without discovery into the financial information from [defendants and other contracted parties]." *Superior Homes, LLC v. Comardelle*, Civ. No. 12-4126, 2013 U.S. Dist. LEXIS 165578, at *16, 2013 WL 6146051, at *6 (D.S.D. Nov. 21, 2013).

purchased the pharmaceuticals that Dakota Clinic purchased and distributed and Dakota Clinic was compensated. For these reasons, Defendant's motion to dismiss Count IV should be denied.

### E. Plaintiffs have pled a plausible claim for negligence.

Dakota Clinic does not dispute that Plaintiffs allege the substantive elements of a negligence claim. *See* Motion, pp. 18-21.[17] Rather, Dakota Clinic contends the claim is barred by the economic loss doctrine. *Id.*

But the economic loss doctrine applies only to certain claims by "buyers" against "sellers." Minn. Stat. § 604.101, Subd. 2; *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1197 (D. Kan. 2015) (Minnesota's economic loss doctrine "is entirely statutory. . . . [T]he rule applies only to claims by buyers against sellers of products . . . . [The] statute expressly provides that '[t]he economic loss doctrine applies to claims only as stated in this section.'") (Citing and quoting Minn. Stat. § 604.101). *See also Leno v. K & L Homes, Inc.*, 2011 ND 171, ¶ 17, 803 N.W.2d 543, 550 (economic loss doctrine applies in products liability actions which are those "brought against a manufacturer or seller" (citations omitted)).[18]

Throughout its motion, Dakota Clinic vigorously contends that it is *not* a seller. Should Dakota Clinic prevail on that argument, its motion to dismiss Count V should be denied.

---

[17] Arguments not raised in an opening brief are waived. *S & W Mobile Home & Rv Park, LLC v. B&D Excavating & Underground, LLC*, No. 17-cv-9, 2017 U.S. Dist. LEXIS 113924, at *25 n.4 (D.N.D. July 21, 2017).

[18] The economic loss doctrine bars certain buyer-seller claims because such claims give rise to alternative causes of action under the Uniform Commercial Code (UCC) and state commercial statutes, like the breach of warranty claims that Dakota Clinic contradictorily argues do not apply to it. *See Clarys v. Ford Motor Co.*, 1999 ND 72, ¶ 19, 592 N.W.2d 573 (the economic loss doctrine recognizes the distinction between the UCC's "vast array of remedies" for benefit-of-the-bargain damages against a seller and tort claims "allow[ing] recovery by injured plaintiffs against a seller"). Dakota Clinic cannot deny that it is a seller in an attempt to escape Plaintiffs' commercial warranty claims and make the opposite contention in attempt to escape the negligence claim.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant Dakota Clinic's motion to dismiss.

Dated: October 19, 2021                    Respectfully submitted,

By:   /s/ Melissa Ryan Clark
Melissa Ryan Clark
Brooke A. Achua
FEGAN SCOTT LLC
140 Broadway, 46th Fl.
New York, NY 10005
Ph: 646.502.7910
Fax: 312.264.0100
melissa@feganscott.com
brooke@feganscott.com

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Mac Schneider
SCHNEIDER LAW FIRM
815 3rd Ave. S.
Fargo, ND 58103
Ph: 701-235-4481
Fax: 701-235-1107
mac@schneiderlawfirm.com

J. Barton Goplerud
Brian Marty
SHINDLER, ANDERSON, GOPLERUD &
WEESE, PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Ph: (515) 223-4567
Fax: (515) 223-8887
goplerud@sagwlaw.com
marty@sagwlaw.com

*Counsel for Plaintiffs*

27