## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Jessica Kraft, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:20-cv-121 |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| Essentia Health, et al., | ) | |
| | ) | |
| Defendants. | ) | |

In this putative class action, plaintiffs allege defendants Essentia Health and Innovis Health, LLC, (collectively Essentia) sold and administered injectable pharmaceuticals—time and temperature sensitive pharmaceutical products (TTSPPs)—that had been stored outside the proper temperature range. Plaintiffs contend the improper storage of TTSPPs resulted in "reduced vaccine potency and the increased risk of vaccine-preventable diseases." (Doc. 28, p. 2). Essentia admits that in April 2020, it advised patients who had received certain TTSPPs that the TTSPPs may have been subjected to a temperature excursion, potentially rendering them less effective. (Doc. 30, p. 2). Essentia offered revaccination at no cost to the affected patients. Id. at 3.

Plaintiffs bring five claims: breach of express warranties, breach of implied warranties, violation of consumer protection laws of both North Dakota and Minnesota, unjust enrichment, and negligence. They seek to recover for economic loss, including their payments for the affected TTSPPs and for appointments at which the TTSPPs were

administered. Jurisdiction is based on diversity of citizenship under the Class Action Fairness Act of 2005[1] and 28 U.S.C. § 1367(a), which governs supplemental jurisdiction.

Plaintiffs requested production of various documents, and Essentia responded by claiming many of those documents are protected under the peer review privilege,[2] the physician-patient privilege, the attorney-client privilege, and the work product doctrine. Under Federal Rule of Civil Procedure 26(b)(5)(A)(ii), a party withholding documents on the basis of privilege must describe the withheld documents with enough detail to "enable other parties to assess the claim" but, at the same time, need not reveal "information itself privileged or protected."

Striking this balance has proved difficult. Plaintiffs and Essentia have been engaged in a dispute about the level of detail required in Essentia's privilege log for many months, and the court has issued two orders addressing the dispute. An August 2, 2021 order addressed Essentia's privilege log and supplemental privilege log, which at the time contained a combined total of nine entries. The logs' entries described the dates of the documents as "Various; February 2020-Present" and described the documents' subject matter as only "Investigation" or "Investigation; lawsuit." (Doc. 79, p. 2). The August 2 order directed Essentia to produce a more specific privilege log that included

> (1) the date on which [each document] was created, (2) identity of the
> person who created it and the position held by that person at the time the

---

[1] The Class Action Fairness Act of 2005, codified at 28 U.S.C. § 1332(d), provides for diversity jurisdiction "where, among other things, (1) there is minimal diversity; (2) the proposed class contains at least 100 members; and (3) the amount in controversy is at least $5 million in the aggregate." Plubell v. Merck & Co., 434 F.3d 1070, 1071 (8th Cir. 2006).

[2] The peer review privilege typically protects "the process by which doctors, hospitals, and other health care providers review the performance of other doctors and health care providers." See Charles Alan Wright et al., 23A Federal Practice and Procedure § 5431 (1st ed. Apr. 2022 update).

document was created, (3) identity of persons who received the document and their positions, (4) a description of the subject matter of the document, (5) inclusive document identification numbers, and (6) specific reference to the portion of the North Dakota or Minnesota privilege the document is asserted to meet.

Id. Essentia appealed the August 2 order to the district judge, who affirmed it. (Doc. 109). Essentia then filed an interlocutory appeal and later sought a writ of mandamus in the United States Court of Appeals for the Eighth Circuit, but that court dismissed the appeal and denied Essentia's request for a writ of mandamus. (Doc. 113).

Following the Eighth Circuit's orders, during a status conference with the court, plaintiffs raised a question of sufficiency of detail in the subject matter descriptions in Essentia's privilege log. At that time, the subject matter of almost every document for which the peer review privilege was claimed was described only as "investigation and quality assurance." (Doc. 129, p. 1). Recognizing the court's August 2 order did not include a specific directive regarding detail of subject matter descriptions, an October 14, 2021 order directed Essentia to provide "additional detail, specific to each document over which it claims the privilege." Id. at 2. "In the absence of additional detail," the court stated, "plaintiffs might be forced to challenge the privilege claim as to every document." The court stated its desire to avoid in camera review of every document. Id.

Essentia has now produced logs claiming privilege over 8,147 documents. (Doc. 161-1). Plaintiffs move to compel Essentia to disclose all the documents on its privilege log and for sanctions, arguing Essentia has failed to establish any of the documents are privileged and should be found to have waived any privilege because of its failure to more fully describe the documents. (Doc. 160). Plaintiffs contend it is apparent from the privilege log that some documents are not covered by any privilege. Id. In its response, Essentia asserted there is no basis to require disclosure of the subject documents.

3

Alternatively to denying plaintiffs' motion, Essentia contends the court should conduct in camera review. (Doc. 169, p. 3). Following a decision of the North Dakota Supreme Court regarding the state's peer review privilege statute, the parties filed supplemental briefs. (Doc. 178; Doc. 180).

**Law and Discussion**

**1.     Peer Review Privilege**

Both Minnesota and North Dakota law include peer review statutes, but the parties dispute which state's statute applies. The statutes share key terms, though they differ in how those terms are defined. The court next summarizes both states' statutes and cases interpreting them.

**A.     North Dakota Peer Review Privilege**

Much of North Dakota's peer review privilege statute was amended following the North Dakota Supreme Court's decision in Trinity Medical Center, Inc. v. Holum, 544 N.W.2d 148 (N.D. 1996). At the time Trinity was decided, North Dakota's peer review privilege statute protected only records made available to a "mandatory hospital committee" or an "internal quality assurance review committee."[3] Id. at 152. In Trinity,

---

[3] At the time Trinity was decided, the North Dakota statute stated in relevant part

> Any information, data, reports, or records made available to a mandatory hospital committee or extended care facility committee as required by state or federal law or by the joint commission on accreditation of hospitals by a hospital or extended care facility or any physician or surgeon or group of physicians or surgeons operating a clinic or outpatient care facility in this state or to an internal quality assurance review committee of any hospital or extended care facility in this state are confidential and may be used by such committees and the members thereof only in the exercise of the proper functions of the committees.

Trinity, 544 N.W.2d at 152 (quoting N.D. Cent. Code § 23-01-02.1 (repealed by S.B. 2301, 55th Leg., (N.D. 1997)).

the North Dakota Supreme Court described North Dakota's peer review privilege as "much narrower than those in most other states" because it covered "only certain enumerated committees and only proceedings and records of those committees." Id. at 153.

In 1997, the North Dakota legislature substantially amended the peer review privilege statute to broaden its scope. See Murray G. Sagsveen & Jennifer L. Thomson, The Evolution of Medical Peer Review in North Dakota, 73 N.D. L. Rev. 477, 483-89 (1997) (recounting history of North Dakota's peer review privilege). The North Dakota legislature amended the peer review privilege statute again in 2009, changing references to "peer review committee" to "peer review organization" throughout the statute. See S.B. 2403, 61st Leg., (N.D. 2009) (emphasis added). Along with this change, the definition of "peer review organization" was amended to include "a health care organization," which, in turn, was expanded to include "[a]n association or organization, whether domestic or foreign, of medical institutions or medical professionals" and "[a] nonprofit corporation, whether domestic or foreign, that owns, operates, or is established by any entity set forth in subdivisions a through i." Id. § 1-2.

Under North Dakota's current peer review statute, privileged records must relate to a peer review organization or to a privileged communication that involves a peer review organization member. North Dakota Century Code section 23-34-01(4)(a) defines "peer review record" to mean

> (1)    Data, information, reports, documents, findings, compilations and summaries, testimony and any other records generated by, acquired by, or given to a peer review organization as part of any professional peer review, regardless of when the record was created; and

(2) Communications relating to a professional peer review, whether written or oral, between:

a. Peer review organization members;

b. Peer review organization members and the peer review organization's staff; or

c. Peer review organization members and other individuals participating in a professional peer review, including the individual who is the subject of the professional peer review.

Under section 23-34-01(3), a peer review organization is

(1) A health care organization; or

(2) A committee of a health care organization which:

a. Is composed of health care providers, employees, administrators, consultants, agents, or members of the health care organization's governing body; and

b. Conducts professional peer review.

"Health care organization" is defined to encompass a wide range of entities, including "a physician," "a hospital," and "an association or organization, whether domestic or foreign, of medical institutions or medical professionals." Id. § 23-34-01(1). "Professional peer review," is also defined broadly and includes "all procedures a peer review organization uses or functions it performs to monitor, evaluate, and take action to review the medical care provided to patients by health care organizations or health care providers" for certain purposes, which include to "evaluate and improve the quality of health care" and "provide quality assurance." Id. § 23-34-01(5).

A record or communication that meets the definition of a "peer review record" is "not subject to subpoena or discovery or introduction into evidence in any civil or administrative action," with three exceptions:

6

(1)     Records gathered from an original source that is not a peer review organization;

(2)     Testimony from any person as to matters within that person's knowledge, provided the information was not obtained by the person as a result of the person's participation in a professional peer review; or

(3)     Peer review records subpoenaed in an investigation conducted by an investigative panel of the North Dakota board of medicine pursuant to chapter 43-17.1 or subpoenaed in a disciplinary action before the North Dakota board of medicine pursuant to section 43-17-30.1.

Id. § 23-34-03(1).

The North Dakota Supreme Court has interpreted the scope of the current peer review privilege statute in only one case, St. Alexius Medical Center v. McKibbage, 971 N.W.2d 878 (N.D. 2022). McKibbage was a medical negligence case. In response to certain discovery requests, the defendant St. Alexius Medical Center, doing business as CHI St. Alexius Health Bismarck (CHI), asserted the peer review privilege. The plaintiff moved to compel a more detailed privilege log. CHI then provided an amended privilege log which "describe[d] the pertinent documents as 'Peer Review Committee correspondences,' 'Peer Review Committee regular monthly meeting minutes,' 'Credentials Committee correspondences,' 'Credentials Committee regular monthly meeting minutes,' 'Medical Executive Committee correspondences,' 'Medical Executive Committee meeting minutes,' and 'Peer Review Committee documents.'" Id. at 880. The district court ordered disclosure of additional information: dates the documents were created, identity of the person who created each document and their position at the

time of creation, identity of the person who received each document and their position for peer review.4 Id. CHI moved for a supervisory writ.

The North Dakota Supreme Court vacated the district court's order, determining CHI had adequately described the privileged documents because "the identities of the authors and recipients of the documents and their respective positions fall under the definition of peer review records" and the information CHI had provided about "the committees that generated the documents [was] sufficient to assess the claim of privilege," since the subject matter descriptions CHI provided "place[d] the documents in the hands of peer review organizations."5 Id. at 882-83 (citations and internal quotation marks omitted).

In their supplemental briefing, the parties dispute the impact of McKibbage on this motion. Essentia argues the North Dakota Supreme Court held the date of a record's creation, the record's author, the author's position on the peer review committee, and the recipient of the record are "protected from disclosure by the peer review . . . privilege under North Dakota law." (Doc. 178, p. 4). Plaintiffs contend the North Dakota Supreme

4 The district court did not require, as the plaintiff had requested, disclosure of detailed subject matter descriptions. See McKibbage v. Daniel Dixon, M.D. et. al., No. 08-2019-CV-00640, Index #322, at ¶ 6 (Burleigh Cty. Nov. 8, 2021).

5 CHI had requested in camera review by the district court, but the district court did not address that request in its order. The North Dakota Supreme Court therefore deemed the request for in camera review denied but noted that district courts generally have discretion to conduct in camera review if there is a challenge to sufficiency of a privilege log. McKibbage, 971 N.W.2d at 883-84.

The North Dakota Supreme Court described this court's analysis as having relied on Rule 26 rather than on "the substance of the underlying state-based peer review privileges" and described its approach as "looking first to the words of the peer review statute, and then determining how they apply to the procedure established by [North Dakota Rule of Civil Procedure] 26." Id. at 882.

8

Court undertook a "fact-specific relevance analysis to balance the disclosure requirements of the North Dakota Rules of Civil Procedure with the protections of the North Dakota peer review privilege."[6] (Doc. 180, p. 3). The North Dakota Supreme Court's fact-specific analysis, plaintiffs argue, determined only that "more detail was not required" on the facts presented, not whether certain information is always protected by North Dakota's peer review privilege. Id. at 8.

As discussed below, this court does not view McKibbage as controlling this motion for two reasons: application of the Minnesota peer review privilege rather than the North Dakota privilege, and facts which distinguish McKibbage from this case.

### B.    Minnesota Peer Review Privilege Law

Minnesota's peer review privilege statute has a structure similar to North Dakota's. Under Minnesota Statutes section 145.61(5), a review organization is, among other things, "a committee whose membership is limited to professionals, administrative staff, and consumer directors, except where otherwise provided for by state or federal law, and which is established by one or more of the following: a hospital, a clinic, a nursing home, an ambulance service or first responder service."

Under certain circumstances, data and information acquired by a review organization is privileged. As stated in section 145.64(1)(a)

> [D]ata and information acquired by a review organization, in the exercise of its duties and functions, or by an individual or other entity acting at the direction of a review organization, shall be held in confidence, shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization, and shall not be subject to subpoena or discovery. No person described in section 145.63 shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of a review organization.

---

[6] As to describing documents withheld pursuant to assertion of privilege, North Dakota Rule of Civil Procedure 26 is identical to its federal counterpart.

> The proceedings and records of a review organization shall not be subject to discovery or introduction into evidence in any civil action against a professional arising out of the matter or matters which are the subject of consideration by the review organization.

Like North Dakota, Minnesota provides exemptions from the privilege's protections, though the Minnesota exemptions differ from those of the North Dakota statute:

> Information, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization, nor shall any person who testified before a review organization or who is a member of it be prevented from testifying as to matters within the person's knowledge, but a witness cannot be asked about the witness' testimony before a review organization or opinions formed by the witness as a result of its hearings.

Id.

There are few Minnesota cases discussing the peer review privilege. In Kalish v. Mount Sinai Hospital, the plaintiff brought a medical malpractice claim against a hospital alleging its employees were negligent in monitoring the plaintiff's catheter. 270 N.W.2d 783 (Minn. 1978). During discovery, the plaintiff sought guidelines for catheter insertion that had been prepared by a committee comprised of the hospital's assistant director of nursing and three other registered nurses. The Minnesota Supreme Court first found the "guidelines were prepared by a protected 'review committee.'" Id. at 786. Since the guidelines had been prepared by a review organization, the next inquiry concerned the degree of protection afforded to them under Minnesota's peer review privilege statute. The court looked to section 145.65, which provides "[n]o guideline established by a review organization shall be admissible in evidence in any proceeding brought by or against a professional by a person to whom such professional has rendered professional services." Though section 145.65 barred admission of guidelines into evidence, it was silent as to any privilege barring their discovery, and the court

10

found that distinction "clearly implie[d] that in making a separate and different provision for 'guidelines' under [section] 145.65 the legislature intended to allow their discovery" and held the hospital must produce them. Id.

In McKee v. St. Paul Eye Clinic, a doctor sued a hospital for, among other things, breaching the confidentiality provision of Minnesota's peer review statute by disclosing contents of an incident report, which concerned the doctor's treatment of patients, to other clinic shareholders. No. A14–0681, 2015 WL 1757833, at *1 (Minn. Ct. App. Apr. 20, 2015) (review denied July 21, 2015). The Minnesota Court of Appeals held the incident report was not protected by the peer review privilege because there was no evidence "the nurses who drafted the report did so at the direction of a review organization" and thus "it was an original source that was exempt from the restrictions of the peer review statute." Id. at *7.

In Amaral v. Saint Cloud Hospital, two physicians sought access to peer review documents including meeting minutes of a peer review committee, records and documents that related to the physicians' staff privileges, and any complaints or criticisms regarding their performance. 598 N.W.2d 379 (Minn. 1999). The Minnesota Supreme Court denied their request for the documents, noting "courts are ill-equipped to pass judgment on the specialized expertise required of a physician, particularly when such a decision is likely to have a direct impact on human life." Id. at 387.

### C.  Conflict Between North Dakota and Minnesota Peer Review Privilege Laws

In previous disputes, the parties agreed the two statutes did not present a conflict on the "discrete issue" of the adequacy of Essentia's privilege log. (Doc. 68, p. 8 n.5). Accordingly, the court's previous orders discussed the law of both states and held

either statute required a greater level of detail in Essentia's privilege log but did not address which statute governs. (Doc. 79; Doc. 129). In earlier briefs, however, plaintiffs noted "a choice of law analysis will be appropriate if and when Essentia's substantive privilege assertions are in dispute." (Doc. 68, p. 8 n.5).

Essentia's substantive privilege assertions are now in dispute, and a choice of law analysis is therefore necessary. Because this court has jurisdiction based on the parties' diversity of citizenship, "state law governs privilege regarding a claim or defense." See Fed. R. Evid. 501. Courts have interpreted this phrase to leave unanswered which state's law governs a privilege claim, instead committing the matter to the forum's choice of law rules. See Wellin v. Wellin, 211 F. Supp. 3d 793, 800 (D.S.C. 2016). The first step in a choice of law analysis is to determine whether there is an actual conflict between the states' statutes. If so, the court then resolves the conflict. But how states resolve conflict of law issues has changed over time.

Courts employ one of two main approaches when deciding choice of law questions involving evidentiary privileges. While there is some variation, courts generally apply either the First Restatement of the Conflict of Laws' territorial approach or the Second Restatement of the Conflict of Laws' most significant relationship test.

Written in 1934, the First Restatement's territorial approach applied categorical rules to determine when and where a plaintiff's rights came into existence. For torts, the place of injury determined the governing law. For contracts, depending on the issue, the place of execution or performance of the contract was dispositive. But as to privileges, the First Restatement included no specific provision. Rather, privileges were treated as procedural rules, and procedural rules were governed by the law of the forum. See e.g., Restatement (First) of Conflict of Laws § 597 (1934); see also In re Yasmin & Yaz

12

(Drospirenone) Mktg., Sales Pracs. & Prod. Liab. Litig., No. 3:09-MD-02100-DRH, 2011 WL 1375011, at *8 (S.D. Ill. Apr. 12, 2011) (providing overview of the First Restatement's treatment of evidentiary privileges).

By the 1960's, courts and scholars had come to criticize the territorial approach for failing to "take account of underlying policy considerations." See Babcock v. Jackson, 191 N.E.2d 279, 281 (N.Y. 1963); see also Abraham v. WPX Energy Prod., LLC, 20 F. Supp. 3d 1244, 1260 (D.N.M. 2014) (summarizing scholarly criticism of the First Restatement). In response, the Second Restatement dispensed with categorical rules based on geography and instead adopted an interest-based analysis. Under the Second Restatement, the law of the state with the "most significant relationship" to the issue governs and privileges are presumed to be governed by the law of the state which has the "most significant relationship with the communication at issue." See Restatement (Second) of Conflict of Laws § 139 (1971).

Today, the Second Restatement's interest-based test has largely displaced the First Restatement's territorial approach. Only eleven states continue to apply the territorial approach in some form while a majority now apply an interest-based test with or without other choice-influencing considerations. See Symeon C. Symeonides, Choice of Law in the American Courts in 2020: Thirty-Fourth Annual Survey, 69 Am. J. Comp. L. 177, 195 (2021) (surveying all fifty states, Puerto Rico, and the District of Columbia).

With that background, the court begins its choice of law analysis. A choice of law analysis involves many steps—and the parties here disagree about each one: (1) whether Minnesota and North Dakota's peer review privilege statutes conflict; (2) if there is a conflict, whether the North Dakota Supreme Court would employ a territorial or an

interest-based choice of law rule for privileges;[7] (3) depending on the choice of law rule, whether Minnesota or North Dakota's peer review privilege statutes applies to Essentia's privilege claims; and (4) whether Essentia has satisfied its burden of establishing the privilege under the governing state's peer review statute.

**D.     Whether Minnesota and North Dakota peer review privilege statutes conflict**

A choice of law analysis is necessary only if the laws of two states conflict. To determine what level of conflict must exist before a choice of law analysis is undertaken when jurisdiction is based on diversity of citizenship, the court looks to the law of the forum state. See Axline v. 3M Co., 8 F.4th 667, 673 (8th Cir. 2021). Because this court sits in North Dakota, it applies North Dakota law to resolve that initial question. See Fischer v. U.S. Life Ins. Co., No. 1:19-CV-00152, 2021 WL 6278442, at *4 (D.N.D. Aug. 3, 2021). The Supreme Court of North Dakota has not articulated the necessary level of conflict required to trigger a choice of law analysis. Looking to other states, a common approach is to ask if "a legal issue is resolved differently under the law of two states," that is, whether the choice of law would be outcome-determinative.[8] Johnson v. U.S. Fid. & Guar. Co., 696 N.W.2d 431, 436 (2005). The court is satisfied the Supreme Court of North Dakota would adopt this approach or a substantially similar one. See e.g., Daley v. Am. States Preferred Ins. Co., 587 N.W.2d 159, 160 (N.D. 1998). Though not

---

[7] Essentia does not cite the First Restatement's territorial approach but, as discussed later, its argument that the "law of the forum" should govern whether certain documents are privileged is rooted in the First Restatement.

[8] The same principle is given different expression in other states. For example, Minnesota holds there is an actual conflict of law when "the choice of one forum's law over the other will determine the outcome of the case." Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co., 604 N.W.2d 91, 94 (Minn. 2000).

explicitly articulating the necessary level of conflict in that opinion, the court determined a choice of law analysis necessary because Minnesota and North Dakota law differed as to which insurance company was obligated to pay the plaintiff's benefits. Id. at 160.

Plaintiffs identify substantial differences between the peer review privilege statutes of Minnesota and North Dakota and argue the two states' definitions of peer review organization differ in scope. (Doc. 161, p. 11). Minnesota limits "review organization" to a specific committee or entity established for a limited purpose. See Minn. Stat. § 145.61(5). North Dakota expands "peer review organization" to include "health care organizations," which in turn is given a broad definition. See N.D. Cent. Code § 23-34-01(1). Essentia disputes the materiality of these differences, arguing there is no conflict "on these facts" because "both states' laws support Essentia's claims of privilege." (Doc. 169, p. 7).

Under both states' peer review privilege statutes, documents are privileged only if they relate to a peer review organization and the court finds the two statutes' divergent definitions of "peer review organization" sufficient to generate a conflict.[9] North Dakota defines "peer review organization" to include "a health care organization." N.D. Cent. Code § 23-34-01(3). "Health care organization" is defined to encompass a wide range of entities, including "a physician," "a hospital," and "an association or organization,

---

[9] Under North Dakota's statute, protected documents must be "generated by, acquired by, or given to" a peer review organization. The statute also protects certain communications involving a peer review organization's members. See N.D. Cent. Code § 23-34-01. Under Minnesota's statute, protected documents must be "acquired by a review organization, in the exercise of its duties and functions, or by an individual or entity acting at the direction of a review organization." See Minn. Stat. § 145.64.

whether domestic or foreign, of medical institutions or medical professionals." Id. § 23-34-01(1). This expansive definition of peer review organization in combination with the statute's protection of "communications relating to a professional peer review . . . between peer review organization members" is indeed very broad. See id. § 23-34-01(4)(a). By contrast, Minnesota defines a review organization more narrowly as an identifiable "committee whose membership is limited to professionals, administrative staff, and consumer directors." Minn. Stat. § 145.61(5). Only "data and information" acquired by that committee is protected by Minnesota's privilege. Id.

Some of Essentia's privilege claims would almost certainly be decided differently under North Dakota's definition of "peer review organization" than under Minnesota's definition of "review organization." Essentia claims the peer review privilege over a wide array of documents and claims Essentia, as a whole, qualifies as a peer review organization under either Minnesota or North Dakota law.[10] (See Doc. 169, pp. 11, 13).

Some of the documents Essentia currently claims as privileged—for example, documents sent to over 450 recipients—might fall within the scope of North Dakota's peer review privilege but outside the scope of Minnesota's privilege. The court finds a conflict sufficient to require a choice of law analysis. [11]

___

[10] During its discussion of the peer review privilege statues in the August 2, 2021 order, the court stated "plaintiffs do not contest Essentia's inclusion" under North Dakota's definition of "peer review organization." (Doc. 79, p. 6). Plaintiffs now contest Essentia's qualification as a peer review organization under either the North Dakota or Minnesota peer review statute. (Doc. 172, p. 7 n.4).

[11] Essentia cites two cases for the proposition that the law of the forum controls privilege issues. See Bartholomew v. Avalon Cap. Grp., Inc., 278 F.R.D. 441, 448 (D. Minn. 2011) ("While the statutes differ in their form, neither party directed this Court to any conflict in the substance of the statutes or their applications by the courts of Minnesota and California, respectively. Therefore, this Court will apply the law of both states, but will cite California law for ease of analysis."); see also Filz v. Mayo Found, 136

**E.    Whether North Dakota would adopt a territorial or an interest-based choice of law rule for privileges**

Concluding the two state statutes conflict, the court must next determine which state statute applies. Under Federal Rule of Evidence of 501 "state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." In other words, because this court has jurisdiction based on the parties' diversity of citizenship, state law governs the parties' privilege claims. "Federal courts have interpreted [Rule 501] to require the court to determine the availability of an evidentiary privilege based on the choice of law rules of the forum state." Wellin, 211 F. Supp. 3d at 800 (internal quotation marks omitted). Thus, this court applies North Dakota's choice of law rules.

North Dakota case law has not specifically addressed the choice of law rule for privileges, and the parties disagree about how the North Dakota Supreme Court would decide that issue. Plaintiffs argue North Dakota would apply a two prong "significant interest" test, where the court determines "all of the relevant contacts which might

---

F.R.D. 165, 167 n.3 (D. Minn. 1991) (stating the same). These cases are distinguishable because this court, unlike courts in the cited cases, finds a conflict between North Dakota and Minnesota law, thus requiring a choice of law analysis.

Further, in a footnote in its supplemental brief, Essentia argues "it is possible both privileges are applicable, particularly given the fact that they are intended to apply interstate, in which case it is the most restrictive of the states' privileges which controls what level of detail need and may be included in a privilege log asserting the same." (Doc. 178, p. 6 n.2). Essentia points to legislative history regarding a 2009 amendment to North Dakota Century Code section 23-34-01, the purpose of which was to allow release of cumulative peer review data comparing performance of hospitals on specific patient procedures. See Hearing on SB 2403 Before S. Standing Comm., 2009 Leg., 61st Sess. (N.D. 2009) (testimony of John Kapsner, attorney, Vogel Law Firm). The court does not view the amendment as implying North Dakota's peer review privilege is "intended to apply interstate," as Essentia asserts. (Doc. 178, p. 6 n.2).  Nothing in the cited legislative history touches on the questions presented in this motion. Because Minnesota and North Dakota peer review privileges would result in different outcomes for some of Essentia's privilege claims, the court must choose to apply one or the other.

logically influence the decision of which law to apply" and then turns to "choice-influencing considerations."[12] See Nodak Mut. Ins. Co. v. Wamsley, 687 N.W.2d 226, 231 (N.D. 2004). Essentia notes that "no North Dakota case law has articulated the choice-of-law rule for privileges." (Doc. 169, p. 7). Asserting "serious conceptual flaws" with the most significant relationship rule for privileges,[13] Essentia argues that North Dakota would "follow the general rule that the forum controls the admissibility of evidence." Id. at 7-8.

Because North Dakota has not articulated a choice of law rule for privileges, this court must predict what rule the North Dakota Supreme Court would adopt. The two rules advocated by the parties are those most often used in other states—a territorial based rule or an interest-based rule.

Essentia's proposal for a "general rule that the forum controls the admissibility of evidence" finds its roots in the First Restatement. See Restatement (First) of Conflict of Laws § 597 (1934) ("The law of the forum determines the admissibility of a particular piece of evidence."). The First Restatement followed the territorial approach, which applied categorical rules to substantive matters and applied the law of the forum to procedural issues. In states that applied the First Restatement, privileges were

---

[12] Those choice influencing considerations include the "predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law." Wamsley, 687 N.W.2d at 231.

[13] Essentia asserts the most significant relationship test for privileges, as set out in the Second Restatement, is flawed because it "incorrectly assumes that communications occurs in only one state" and overlooks a conflict "between two states that both honor the privilege but differ in scope." (Doc. 169, pp. 7-8) (citing Charles Alan Wright et al., 23A Federal Practice and Procedure § 5435 (1st ed. Apr. 2022 update)).

characterized as procedural and thus the court applied the law of the forum in determining matters of privilege.[14]

Virginia continues to follow the territorial approach. In Hatfill v. New York Times Co., a case cited by Essentia, (Doc. 169, p. 8), the federal court explained that "Virginia courts are to determine whether an issue is procedural . . . according to its own conflict rules. If the issue is deemed procedural under the conflict of law rules, the court shall apply its rules and procedure." 459 F.Supp. 2d 462, 465 (E.D. Va. 2006). The court found the privilege at issue was procedural and so applied the privilege law of Virginia.

Another case cited by Essentia, (Doc. 169, p. 8), Union Planters National Bank of Memphis v. ABC Records Inc., followed a similar method. 82 F.R.D. 472 (W.D. Tenn. 1979). The court held that "where there is a conflict, questions of evidence are governed by the law of the forum." Id. at 474. Because the privilege at issue was a question of evidence, Tennessee law applied. Id.

Tennessee, however, no longer follows the approach employed in Union Planters. In Hataway v. McKinley, Tennessee's Supreme Court, following the general nationwide trend, moved away from the First Restatement's territorial approach and adopted the

---

[14] The First Restatement's principle that the law of the forum controls procedural issues was drafted before the Supreme Court held that federal courts sitting in diversity apply state substantive law and federal rules of procedure. See Hanna v. Plumer, 380 U.S. 460, 473 (1965). Recently, a court surveying choice of law rules for privileges noted that classifying a state privilege as procedural would result in federal law governing. See In re Yasmin, 2011 WL 1375011, at *8. In any event, Rule 501 is interpreted as holding that privileges are substantive or quasi-substantive. See Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551, 555 (2d Cir. 1967); Wellin, 211 F. Supp. 3d at 804; In re Yasmin, 2011 WL 1375011, at *8 n.10.

Second Restatement's interest-based analysis. 830 S.W.2d 53, 57 (Tenn. 1992). The Tennessee Supreme Court recognized an "ever shrinking number of states . . . continue to follow" the First Restatement and it is "no longer the majority rule." Id. at 56. Instead, the Tennessee Supreme Court noted most states have adopted the Second Restatement's most significant relationship test or combined the most significant relationship test with other choice-influencing considerations.

Though not yet addressing choice of law in the context of a privileges, the North Dakota Supreme Court, in Issendorf v. Olson, abandoned the First Restatement and adopted an interest-based approach to choice of law for tort liability. 194 N.W.2d 750, 756 (N.D. 1972). Subsequently, in a variety of other contexts, the North Dakota Supreme Court has first determined "all of the relevant contacts which might logically influence the decision of which law to apply" and then turned to "choice-influencing considerations." See Daley, 587 N.W.2d at 165; Wamsley, 687 N.W.2d at 231; Am. Fam. Mut. Ins. Co. v. Farmers Ins. Exch., 504 N.W.2d 307, 309 (N.D. 1993). In other words, the North Dakota Supreme Court has abandoned the First Restatement's territorial approach to choice of law with respect to a number of substantive issues.

This court predicts North Dakota's Supreme Court would apply the test articulated in Wamsley to choice of law issues involving privileges. Application of the Second Restatement with or without other factors is now the majority approach for choice of law involving privileges. See In re Yasmin, 2011 WL 1375011, at *8 (surveying law of all 50 states). There is little reason to think the North Dakota Supreme Court would reverse course and apply a choice of law rule for privileges that it no longer applies in other contexts.

20

**F.    Whether Minnesota or North Dakota peer review statutes should apply**

Because the court predicts the North Dakota Supreme Court would adopt an interest-based choice of law rule for privileges, the court will apply the interest-based test as articulated in Wamsley to determine whether North Dakota or Minnesota peer review privilege law applies. Under that test, the court first determines "all of the relevant contacts which might logically influence the decision of which law to apply." Wamsley, 687 N.W.2d at 231. Second, it looks to the "choice-influencing considerations," which include the "predictability of results, maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interests, and application of the better rule of law."[15] Id.

Plaintiffs argue Minnesota has the most relevant contacts because Essentia is incorporated in and has its headquarters in Minnesota. Innovis Health, a Delaware LLC, while headquartered in North Dakota, is controlled by its parent Minnesota-based Essentia, and Essentia "has possession, custody, and control over the documents at issue." (Doc. 161, p. 15). Plaintiffs also assert that review of the senders and recipients of the first 125 documents on Essentia's privilege log found "a majority of those individuals appear to be employees of Minnesota-based Essentia; likewise, a majority appear to be

---

[15] The North Dakota Supreme Court refers to its choice of law rule as the "significant contacts test," though it also considers choice-influencing considerations. As the North Dakota Supreme Court stated, "[a]t its core, the significant contacts test authorizes a court 'to look at all of the significant factors which might logically influence it in deciding which law to apply, and to choose the law of the state that has the greatest contacts with the case.'" Daley, 587 N.W.2d at 161 (quoting Gregory E. Smith, Choice of Law in the United States, 38 Hastings L. J. 1041, 1046 (1987)). Indeed, the significant contacts test—also called the center of gravity test—is "[c]losely related to the most significant relationship test" found in the Second Restatement of the Conflict of Laws. Smith, Choice of Law in the United States, 38 Hastings L. J. at 1046.

based in Minnesota." Id. For example, plaintiffs note, "Essentia's Minnesota-based Associate General Counsel was a party to nearly 80 of the first 125 entries." Id. at 11 n.9. Essentia responds that "the bulk of plaintiffs' claims are brought under North Dakota substantive law, and many of the putative class members are North Dakota residents." (Doc. 169, p. 9). Essentia also argues any alleged temperature excursion occurred in North Dakota and "many of the communications at issue span across more than one state, including North Dakota." Id.

To determine which state has the most relevant contacts with particular communications, the court looks to "where the communication took place" or, if there is an established relationship between the parties, "where the relationship was centered." See Restatement (Second) of Conflict of Laws § 139 (1971).[16]

"Parties," when used in this context, refers to the parties to the communication claimed to be privileged. See id. As to the peer review privilege, the parties to any privileged communication would typically be members of the entity conducting the peer review. Thus, the location of the peer review entity would determine what law applies because it is within the peer review entity that communication between its members takes place and where their relationship is centered. See id. Indeed, there should be no dispute what state's law should apply, and thus no necessary choice of law analysis, in cases that concern an identifiable, hospital-level peer review committee located in a single state. See Trinity, 544 N.W.2d at 151 (applying North Dakota law to a North Dakota hospital's "in-hospital review" of a physician); see also McKee, 2015 WL

---

[16] The North Dakota Supreme Court has acknowledged that "[o]ur significant contacts method of analysis mirrors the Second Restatement's," though it is not limited to specific contacts included in the Second Restatement. Daley, 587 N.W.2d at 162.

1757833, at *7 (applying Minnesota law to documents acquired by a peer review committee established by a Minnesota clinic). The fact that the parties do not cite, and this court has not identified, any courts undertaking a choice of law analysis regarding the peer review privilege may reflect that most cases involve an identifiable committee established in a single state.

Here, however, Essentia has not identified the existence of a specific committee—instead contending that Essentia, and not a more limited committee or entity within Essentia, is the relevant peer review organization under either North Dakota or Minnesota law. (See Doc. 169, pp. 11, 13) (arguing Essentia meets the definition of "peer review organization" and "review organization" under North Dakota and Minnesota law). That expansive interpretation is reflected in Essentia's privilege log, which includes 8,147 documents and claims the peer review privilege to some documents which were sent to over 450 recipients. (Doc. 161-1).

As Essentia recognizes, (Doc. 169, p. 9), a large number of documents identified on its privilege log are communications that span more than one state—including communication with senders and recipients in both North Dakota and Minnesota. Under Essentia's theory, all senders and recipients of those documents were engaged in a peer review process for a peer review organization and that peer review organization was Essentia.

To determine which state has the most relevant contacts with the documents claimed to be privileged, the court looks to the state where the claimed peer review organization is established. Essentia is a large organization headquartered and incorporated in Minnesota. It is, in other words, a Minnesota company. Regardless of where a particular sender or recipient of a document was located, if the review

23

organization is Essentia as a whole, any peer review conducted by the senders and recipients was for a peer review organization based in Minnesota. It is Minnesota, then, where the relationship between the parties was centered. See Restatement (Second) of Conflict of Laws § 139 (1971); See also Kramer v. Ford Motor Co., No. 12-1149, 2016 WL 7163084, at *3 (D. Minn. Feb. 3, 2016) (holding Michigan law applied because documents were controlled by a Michigan corporation, among other reasons). Additionally, many of the senders and recipients identified in Essentia's privilege log appear to have been based in Minnesota. (Doc. 161-1).

As Essentia argues, however, relevant contacts are not limited to location of the peer review organization. (Doc. 169, p. 9). The named plaintiffs include both Minnesota and North Dakota residents, though a majority are North Dakota residents. The plaintiffs' claims are brought under both North Dakota law and Minnesota law, though North Dakota claims dominate. (Doc. 1). Apart from location of the peer review organization, contacts predominate in North Dakota but are present in both states. On balance, giving significant weight to the location of the peer review organization, the state with the most relevant contacts is Minnesota.

Turning to the choice-influencing considerations, the first factor, predictability of results, weighs in favor of applying Minnesota law. "The objective of the predictability factor is to fulfill the parties' justified expectations." Wamsley, 687 N.W.2d at 232. A peer review organization should expect to be subject to the laws of the state where it is established. Here, that state is Minnesota. To the extent Essentia anticipated claiming the peer review privilege with respect to its organization as a whole, it should have anticipated being subject to Minnesota's peer review statute.

24

The second choice-influencing factor, maintenance of interstate and international order, does not weigh in favor of either Minnesota or North Dakota law because applying Minnesota's peer review privilege statute would not "manifest[ly] disrespect" North Dakota's sovereignty. Daley, 587 N.W.2d at 165. Nor does the third factor, simplification of the judicial task, weigh in favor of either Minnesota or North Dakota's peer review privilege because "the law of either state could be applied without difficulty." Id.

The fourth choice-influencing factor is advancement of the forum's governmental interest. "A state's governmental interest in a choice-of-law case is discoverable by (a) identifying the factual contacts which the litigated transaction had with that state, then (b) determining whether those contacts give rise to real reasons (socioeconomic or political justifications) for applying the state's law to litigated issues in the case." Wamsley, 687 N.W.2d at 234. Both North Dakota and Minnesota have a "strong public interest in improving health care by granting certain protections to medical review organizations." Larson v. Wasemiller, 738 N.W.2d 300, 312 (Minn. 2007); see also Trinity, 544 N.W.2d at 154. North Dakota, as Essentia argues, has recognized robust protections for peer review organizations. That said, North Dakota has a lesser interest in applying its broad peer review protections to a peer review entity centered in another state. See e.g., Daley, 587 N.W.2d at 165. The fifth factor, application of the better rule of law, weighs in neither statutes' favor because "[s]ometimes different laws are neither better nor worse in an objective way, just different." Id.

Considering all the relevant factors, this court concludes Minnesota's peer review privilege should be applied. A peer review entity is typically subject to the law of the state where it is established, and Essentia's privilege log reflects a premise that Essentia

25

as a whole, and not a more limited committee or entity within Essentia, is the peer review organization. Essentia is headquartered and incorporated in Minnesota. Thus, Minnesota has the most significant contacts with, and interest in, documents Essentia claims are protected by the peer review privilege.

Under Minnesota's peer review privilege, "data and information acquired by a review organization, in the exercise of its duties and functions, or by an individual or other entity acting at the direction of a review organization . . . shall not be subject to subpoena or discovery." Minn. Stat. § 145.64(1)(a). A review organization is, among other things, "a committee whose membership is limited to professionals, administrative staff, and consumer directors" for purposes including "evaluating and improving the quality of health care." Id. § 145.61(5). "Information, documents, and records otherwise available from original sources" are not immune from discovery under Minnesota law. Id. § 145.64(1)(a). The court will apply Minnesota's peer review privilege in determining whether Essentia has properly claimed the privilege.

### G.    The August 2, 2021 and October 14, 2021 orders

As stated above, Rule 26(b)(5)(A)(ii) requires a party withholding documents on the basis of privilege to describe the withheld documents with enough detail to "enable other parties to assess the claim" but, at the same time, not reveal "information itself privileged or protected." In striking this balance, the August 2, 2021 order directed Essentia to produce a privilege log that included

> (1) the date on which [each document] was created, (2) identity of the person who created it and the position held by that person at the time the document was created, (3) identity of persons who received the document and their positions, (4) a description of the subject matter of the document, (5) inclusive document identification numbers, and (6) specific reference to the portion of the North Dakota or Minnesota privilege the document is asserted to meet.

(Doc. 79, p. 12). The October 14, 2021 order directed Essentia to provide "additional detail, specific to each document over which it claims the privilege." (Doc. 129, p. 2). The August 2 and October 14 orders applied Rule 26(b)(5)(A)(ii) with respect to both Minnesota and North Dakota peer review privileges because, at that time, neither party had asserted a conflict between the statutes. (Doc. 68, p. 8 n.5). Thus, the orders determined a greater level of detail was required under both Minnesota and North Dakota peer review privileges.

Essentia argues the McKibbage decision requires that the August 2 and October 14 orders be vacated and requests that plaintiffs be ordered to destroy the supplemental privilege logs Essentia has produced to date, that plaintiffs not be allowed to use any information contained in those logs, that any references to the privileged information from those logs that is now in the record be sealed, and that the August 2 and October 14 orders be stayed insofar as they require Essentia to produce additional supplemental privilege logs. (Doc. 178, p. 2). It is Essentia's position that McKibbage holds authors and recipients of peer review documents—as well as the titles of those authors and recipients—are protected from disclosure under North Dakota law. Further, Essentia argues dates of creation of peer review documents are irrelevant to assertion of the peer review privilege under the McKibbage decision. Id. at 4. Finally, Essentia contends that if documents' dates, authors, and recipients are privileged, it follows that detailed description of the documents' subject matter are also privileged. Id. at 10.

Consistent with their assertion that Minnesota law governs, plaintiffs contend McKibbage has no relevance to this dispute. Alternatively, if North Dakota law were applied, plaintiffs argue McKibbage is factually distinguishable from this case.

27

McKibbage differs from this case in two primary respects. First, in McKibbage, the peer review organization of the defendant health care entity was limited to defined committees. Second, CHI had identified the committees that generated the documents and described those documents. Thus, the state supreme court found the information CHI had provided established that the documents were peer review records used for purposes of peer review. Based on the information it had previously provided, the court found CHI was not required to identify the documents' dates, authors, or recipients. Indeed, if Essentia's privilege log had identified subject matter similarly to CHI's McKibbage privilege log, this court might not have required a more detailed description.

### H.    Law of the Case

Law-of-the-case "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Gander Mountain Co. v. Cabela's, Inc., 540 F.3d 827, 830 (8th Cir. 2008) (quoting United States v. Carter, 490 F.3d 641, 644 (8th Cir. 2007)). Even if McKibbage conflicts with the court's determination regarding North Dakota law, "persuasive authority teaches that the law-of-the-case applies to alternative holdings[.]" Stafford v. Dollar Tree Stores, Inc., No. 2:13-CV-01187-KJM, 2014 WL 1330675, at *5 (E.D. Cal. Mar. 28, 2014) (affirming order based on alternative holding after intervening circuit court decision). Because, in this court's opinion, Minnesota law applies to Essentia's privilege claims, the court's determinations in the August 2 and October 14 orders remain the law-of-the-case. This is reinforced by the fact that a record's author and recipient may be relevant to the applicability of Minnesota's peer review privilege because the statute defines a review organization to be "a committee whose membership is limited to professionals, administrative staff, and consumer directors." See Minn.

28

Stat. § 145.61(5). Further, Minnesota's statute does not explicitly provide a record is privileged regardless of the date it is created. For those reasons, the court will not vacate the orders of August 2, 2021, and October 14, 2021, order destruction of Essentia's privilege logs, or limit use of Essentia's privilege logs.

**2.      Other Privileges**

The peer review privilege is not the only privilege Essentia claimed on its logs. But the parties do not "envision [an] outcome-determinative conflict with other state-law privileges." (Doc. 161, p. 17; see also Doc. 169, p. 7 n.3). Nor has the court identified any such conflict. Thus, whether North Dakota or Minnesota law governs the physician-patient privilege and the attorney-client privilege need not be addressed. The work product doctrine is governed by the Federal Rules of Civil Procedure. For the sake of uniformity, the court will cite to Minnesota's law governing the physician-patient privilege and attorney-client privilege.

**A.      Physician-patient privilege**

By statute, Minnesota provides a physician-patient privilege and prohibits release of patient medical records without a signed authorization or "specific authorization in law." Minn. Stat. § 144.293(2). In a July 16, 2021 order, this court held the federal Health Insurance Portability and Accountability Act (HIPAA) permitted Essentia to disclose patient-specific information under the governing qualified protective order. (Doc. 76). After the July 16 order was entered, Essentia argued Minnesota's physician-patient privilege required signed authorization to disclose records of the named plaintiffs and HIPAA did not preempt Minnesota's privilege because the latter was more stringent. (Doc. 122). In a September 21, 2021 order, the court disagreed and held Minnesota's physician-patient privilege was not more stringent than HIPAA and

29

required Essentia to disclose certain patient-specific information to plaintiffs under the governing qualified protective order. Id. The court will follow the same principles in considering Essentia's physician-patient privilege claims.

### B.    Attorney-client Privilege

Minnesota applies an eight-part test to determine existence of the attorney-client privilege. Those elements are

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in [their] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at [the client's] instance permanently protected (7) from disclosure by [the client] or by the legal adviser, (8) except the protection be waived.

In re Lawrence, 954 N.W.2d 597, 602 (Minn. Ct. App. 2020) (citing Kobluk v. Univ. of Minn., 574 N.W.2d 436, 440 (Minn. 1998)). The privilege is codified in Minn. Stat. § 595.02(b). "The purpose of the privilege is to encourage the client to confide openly and fully in [the] attorney without fear that the communications will be divulged and to enable the attorney to act more effectively on behalf of [the] client." Kobluk, 574 N.W.2d at 440. But "no privilege attaches when a lawyer has acted as a mere scrivener in drafting a document, as opposed to an instance in which the lawyer's advice is sought as to the document's legal terms and effects." Id. (internal quotation marks omitted). The court will follow the same principles in considering Essentia's claims of attorney-client privilege.

### C.    Work Product Doctrine

The work product doctrine is codified in Federal Rule of Civil Procedure 26(b)(3). Because the court is sitting in diversity, the work product doctrine is governed by federal law. See Hanna, 380 U.S. at 473. Rule 26(b)(3) states

(A) <u>Documents and Tangible Things</u>. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

    i.    they are otherwise discoverable under Rule 26(b)(1); and

    ii.    the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B) <u>Protection Against Disclosure</u>. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

The test of whether a document was prepared in anticipation of litigation is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." <u>Diversified Indus., Inc. v. Meredith</u>, 572 F.2d 596, 604 (8th Cir. 1977). Further, even if litigation is already a prospect "there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation." <u>Id.</u> The court will follow those principles in considering Essentia's claims under the work product doctrine.

## Conclusion

To the extent plaintiffs request that Essentia be ordered to disclose all documents over which it has claimed privilege, the motion is **DENIED**. Essentia raised legitimate issues as to application of the peer review privilege, and its supplemental privilege logs provide significantly more information than was provided in its initial privilege logs. For the same reason, plaintiffs' request for an award of fees and costs incurred in connection with this dispute is **DENIED**.

As Essentia suggested, the court finds it necessary to conduct in camera review to determine whether documents Essentia has withheld are privileged under Minnesota's peer review privilege or under any other asserted privilege. But the court will not review all withheld documents. Rather, by **May 23, 2022**, plaintiffs may select up to fifty documents listed on Essentia's supplemental privilege logs for the court's review. Essentia must send those documents to the court for its in camera review by **May 30, 2022**. By **June 13, 2022**, Essentia may select up to fifty documents, not including any selected by plaintiffs, and send those documents to the court for in camera review. Both parties are directed to select documents that are representative of larger numbers of documents so that the court's determinations can be applied to other withheld documents. Each party may submit a brief of up to fifteen pages addressing its position on the documents selected for in camera review. Neither the selected documents nor the briefs are to be filed or served on other parties; rather, they are to be submitted to the court at NDD_J-Senechal@ndd.uscourts.gov.

Under an order governing discovery of electronically stored information, the parties are required to produce a privilege log within sixty days of production of documents over which a privilege is asserted. (Doc. 46, p. 8). Essentia states it produced documents on March 28, 2022, and would be required to produce a privilege log as to that document production by May 27, 2022. Notwithstanding the ESI order, Essentia will not be required to produce additional supplemental privilege logs until the court's in camera review process has been completed. Essentia's motion for a stay is **GRANTED** to that extent.

Plaintiffs' motion, as to all matters not addressed in this Conclusion, is held in abeyance pending completion of the in camera review process.

**IT IS SO ORDERED**.

Dated this 9th day of May, 2022.

/s/ Alice R. Senechal

Alice R. Senechal
United States Magistrate Judge
