**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Jessica Kraft, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:20-cv-121 |
| vs. | ) | |
| | ) | **ORDER REGARDING** |
| Essentia Health, et al., | ) | **IN CAMERA REVIEW** |
| | ) | |
| Defendants. | ) | |

In this putative class action, plaintiffs allege defendants Essentia Health and

Innovis Health, LLC, (collectively Essentia) sold and administered injectable

pharmaceuticals—time and temperature sensitive pharmaceutical products (TTSPPs)—

that had been stored outside the proper temperature range. Plaintiffs contend the

improper storage of TTSPPs resulted in "reduced vaccine potency and the increased risk

of vaccine-preventable diseases." (Doc. 28, p. 2). Essentia admits that in April 2020, it

advised patients who had received certain TTSPPs that the TTSPPs may have been

subjected to a temperature excursion, potentially rendering them less effective. (Doc.

30, p. 2). Essentia offered revaccination at no cost to the affected patients. Id. at 3.

The court has issued a series of orders addressing the parties' disputes regarding

application of various privileges and the sufficiency of Essentia's search for documents

responsive to plaintiffs' requests for production of documents.[1] As determined in

---

[1] An August 2, 2021 order addressed Essentia's privilege log and supplemental privilege log, which at the time contained a combined total of nine entries. The logs' entries described the dates of documents as "Various; February 2020-Present" and described the documents' subject matter only as "Investigation" or "Investigation; lawsuit." (Doc. 79, p. 2). The August 2 order directed Essentia to produce a more specific privilege log that included certain information. See id. Essentia appealed the August 2 order to the presiding district judge, who affirmed it. (Doc. 109). Essentia then filed an interlocutory appeal and later sought a writ of mandamus in the United States Court of

previous orders, Minnesota law applies to the privileges at issue, but the parties have widely differing interpretations of Minnesota's privilege law.

Plaintiffs seek an order compelling production of documents that Essentia withheld on the basis of one or more privileges. A May 9, 2022 order directed each side to select fifty of the withheld documents for in camera review and further permitted the parties to submit in camera briefs explaining their positions on the selected documents.

---

Appeals for the Eighth Circuit, but that court dismissed the appeal and denied Essentia's request for a writ of mandamus. (Doc. 113).

Following the Eighth Circuit's orders, Essentia provided more detailed privilege logs, but plaintiffs again raised a question of sufficiency of the detail of Essentia's subject matter descriptions. At that time, the subject matter of almost every document over which Essentia claimed the peer review privilege was described only as "investigation and quality assurance." (Doc. 129, p. 1). The court then entered an October 14, 2021 order directing Essentia to provide "additional detail, specific to each document over which it claims the privilege." Id. at 2. "In the absence of additional detail," the court stated, "plaintiffs might be forced to challenge the privilege claim as to every document." The court stated its desire to avoid in camera review of every document. Id.

Claiming Essentia had made little effort to comply with the October 14 order, plaintiffs moved to compel Essentia to disclose all 8,147 documents on its privilege logs and for sanctions. Plaintiffs argued Essentia had failed to establish any of the documents were privileged and Essentia should consequently be found to have waived any privilege because of its failure to more fully describe the documents. (Doc. 161, p. 8). In opposing that motion, as an alternative to denial, Essentia asserted the court should conduct in camera review. (Doc. 169, p. 3). Following a decision of the North Dakota Supreme Court regarding that state's peer review statute, the parties filed supplemental briefs. (Doc. 178; Doc. 180).

On May 9, 2022, after considering the original and supplemental briefing, the court determined Minnesota's privilege law applied and ordered in camera review of up to fifty documents selected by each side. (Doc. 181). Essentia appealed that order to the presiding district judge, who denied the appeal in a July 8, 2022 order. (Doc. 200). Essentia then sought a writ of mandamus from the Eighth Circuit, which denied the writ and denied Essentia's motion to certify a question to the North Dakota Supreme Court. In re Essentia Health; Innovis Health LLC, No. 22-2583 (8th Cir. Aug. 25, 2022). This order addresses the in camera review ordered on May 9, 2022.

(Doc. 181, p. 32). The parties complied with that order, (Doc. 194; Doc. 195; Doc 197; Doc. 207), but in camera briefing proved unworkable because of the parties' differing interpretations of the Minnesota medical peer review privilege. (Doc. 209). After a status conference with the court, plaintiffs agreed the brief they had submitted in camera could be publicly filed, (Doc. 194), and Essentia was allowed to publicly file another brief addressing the issues, (Doc. 210). Plaintiffs responded to Essentia's publicly filed brief, (Doc. 212), and Essentia filed a "sur-response," (Doc. 213). The court has thoroughly reviewed all of the briefing as well as all documents submitted for in camera review.[2]

Plaintiffs now argue none of the disputed documents are protected under Minnesota's peer review privilege and Essentia misapplied the other privileges it asserts. (Doc. 194). Essentia maintains all its privilege claims were proper. Essentia suggests that, alternatively to denying the motion to compel, the court order a "more comprehensive review" of the disputed documents by a special master or certify questions regarding the peer review privilege to the Minnesota Supreme Court. (Doc. 210; Doc. 213). Plaintiffs respond that retention of a special master would be premature and would result in unnecessary delay, that they should not be required to bear the cost of engaging a special master, and that the matter does not warrant certification to the state supreme court. (Doc. 212, p. 19 nn.19-20). Essentia asserts that if the court adopts "any of the Plaintiffs' narrow interpretations of Minnesota's peer review/quality

---

[2] The documents selected for in camera review are docketed at 195 and 207 with access limited to court employees.

assurance privilege," the court should revisit its decision applying Minnesota law rather than the North Dakota law to that privilege. (Doc. 210, p. 11).

## Law and Discussion

The court first discusses applicable standards and then addresses each of the privileges in dispute—medical peer review, attorney-client, and physician-patient—and the work product doctrine.

Federal Rule of Civil Procedure 26(b)(1) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." For documents withheld on the basis of privilege or under the work product doctrine, the withholding party must "expressly make the claim" and "describe the nature of the documents." Fed. R. Civ. Pro. 26(b)(5)(A). The withholding party—here, Essentia—bears the burden of establishing privilege. Corkrean v. Drake Univ., No. 421CV00336, 2022 WL 18632, at *2 (S.D. Iowa Jan. 3, 2022).

Under Rule 37(a)(1), a party may move to compel discovery, and a motion must include a certification the parties conferred in good faith to strive to resolve their dispute without court action. Fed. R. Civ. Pro. 37(a)(1). A local rule similarly provides that "[t]he parties may not file a discovery motion . . . until the parties have conferred . . . to resolve the dispute without involving the court." D.N.D. Civ. L.R. 37.1. If conferral does not resolve the issue, the parties "must participate[ ] in a telephonic conference with the assigned magistrate judge" before filing a motion to compel. Id. Plaintiffs satisfied Rule 37.1 before filing their motion.

The court has discretion to resolve discovery disputes. See Corkrean, 2022 WL 18632, at *2. In resolving this dispute, the court is guided by general principles applying

4

to claims of privilege. First, the federal rules favor discovery of all relevant, non-privileged information. See St. Paul Reinsurance Co. v. Com. Fin. Corp., 198 F.R.D. 508, 511 (N.D. Iowa 2000). Second, privileges are designed to protect interests and relationships that are considered sufficiently important to justify limitations on discovery. See Muller v. Rogers, 534 N.W.2d 724, 727 (Minn. Ct. App. 1995). Third, statutory privileges are to be construed according to their fair meanings but need not be broadly construed. See Larson v. Montpetit, 147 N.W.2d 580, 586 (Minn. 1966).

## 1.   Minnesota Peer Review Privilege

Of the one hundred documents submitted for in camera review, Essentia asserted a peer review privilege over ninety-seven. Analysis of Essentia's claims of medical peer review privilege begins with the language of the Minnesota statutes governing that privilege:

> **Subdivision 1. Scope.** As used in sections 145.61 to 145.67, the terms defined in this section have the meanings given them.
>
> **Subd. 2. Professional.** "Professional" means a person licensed or registered to practice a healing art under chapter 147 or 148, to practice dentistry under chapter 150A, to practice as a pharmacist under chapter 151, or to practice podiatry under chapter 153.
>
> **Subd. 3. Professional service.** "Professional service" means service rendered by a professional of the type such professional is licensed to perform.
>
> **Subd. 4. Health care.** "Health care" means professional services rendered by a professional or an employee of a professional and services furnished by a hospital, sanitarium, nursing home or other institution for the hospitalization or care of human beings.
>
> **Subd. 4a. Administrative staff.** "Administrative staff" means the staff of a hospital, clinic, nursing home, nonprofit health service plan corporation, or health maintenance organization.
>
> . . . .

**Subd. 5. Review organization.** "Review organization" means . . . a committee whose membership is limited to professionals, administrative staff, and consumer directors, except where otherwise provided for by state or federal law, and which is <u>established by</u> one or more of the following: a hospital, a clinic, a nursing home, an ambulance service or first responder service regulated under chapter 144E, one or more state or local associations of professionals, an organization of professionals from a particular area or medical institution, a health maintenance organization as defined in chapter 62D, a community integrated service network as defined in chapter 62N, a nonprofit health service plan corporation as defined in chapter 62C, a preferred provider organization, a professional standards review organization established pursuant to United States Code, title 42, section 1320c-1 et seq., a medical review agent established to meet the requirements of section 256B.04, subdivision 15, the Department of Human Services, or a nonprofit corporation that owns, operates, or is established by one or more of the above referenced entities, to <u>gather and review information relating to the care and treatment of patients</u> for the purposes of:

 (a) evaluating and improving the quality of health care;

 (b) reducing morbidity or mortality;

 (c) obtaining and disseminating statistics and information relative to the treatment and prevention of diseases, illness and injuries;

 (d) developing and publishing guidelines showing the norms of health care in the area or medical institution or in the entity or organization that established the review organization;

 (e) developing and publishing guidelines designed to keep within reasonable bounds the cost of health care;

 (f) developing and publishing guidelines designed to improve the safety of care provided to individuals;

 . . . .

 (j) reviewing, ruling on, or advising on controversies, disputes or questions between:

  (1) health insurance carriers, nonprofit health service plan corporations, health maintenance organizations, community integrated service networks, self-insurers

6

and their insureds, subscribers, enrollees, or other covered persons;

(2)    professional licensing boards and health providers licensed by them;

(3)    professionals and their patients concerning diagnosis, treatment or care, or the charges or fees therefor;

(4)    professionals and health insurance carriers, nonprofit health service plan corporations, health maintenance organizations, community integrated service networks, or self-insurers concerning a charge or fee for health care services provided to an insured, subscriber, enrollee, or other covered person;

(5)    professionals or their patients and the federal, state, or local government, or agencies thereof;

. . . .

(m)    providing recommendations on the medical necessity of a health service, or the relevant prevailing community standard for a health service;

. . . .

(p)    providing information to other, affiliated or nonaffiliated review organizations, when that information was originally generated within the review organization for a purpose specified by this subdivision, and as long as that information will further the purposes of a review organization as specified by this subdivision; or

(q)    participating in a standardized incident reporting system, including Internet-based applications, to share information for the purpose of identifying and analyzing trends in medical error and iatrogenic injury.

Minn. Stat. § 145.61 (emphasis added). Another section of the peer review statutes

provides:

**Subdivision 1. Data and information.** (a) Except as provided in subdivision 4, data and information acquired by a review organization, in the exercise of its duties and functions, or by an individual or other entity acting at the direction of a review organization, shall be held in confidence,

7

shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization, and shall not be subject to subpoena or discovery. No person described in section 145.63 shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of a review organization. The proceedings and records of a review organization shall not be subject to discovery or introduction into evidence in any civil action against a professional arising out of the matter or matters which are the subject of consideration by the review organization. Information, documents or records <u>otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization</u>, nor shall any person who testified before a review organization or who is a member of it be prevented from testifying as to matters within the person's knowledge, but a witness cannot be asked about the witness' testimony before a review organization or opinions formed by the witness as a result of its hearings. For purposes of this subdivision, records of a review organization include Internet-based data derived from data shared for the purposes of the standardized incident reporting system described in section 145.61, subdivision 5, clause (q), and reports submitted electronically in compliance with sections 144.706 to 144.7069.

. . . .

(c) The confidentiality protection and protection from discovery or introduction into evidence provided in this subdivision shall also apply to <u>the governing body of the review organization</u> and shall not be waived as a result of referral of a matter from the review organization to the governing body or consideration by the governing body of decisions, recommendations, or documentation of the review organization.

. . . .

<u>Id.</u> § 145.64 (emphasis added). Another statute addresses admissibility of guidelines established by a review organization:

No guideline established by a review organization shall be admissible in evidence in any proceeding brought by or against a professional by a person to whom such professional has rendered professional services.

<u>Id.</u> § 145.65.

The parties' views on interpretation of those statutes differ greatly. They disagree about (1) whether Essentia has sufficiently identified a "review organization" within the

meaning of the statute; (2) application of the statute's definition of "professional"; (3) the scope of the statute's references to "data and information," "proceedings and records," "original source documents," and "guidelines"; (4) whether what transpires at a peer review meeting is confidential rather than privileged; and (5) whether "guidelines" are ever protected by the peer review privilege.

Both sides argue their interpretations of the privilege are consistent with the purposes of the peer review privilege. Opinions of Minnesota courts describe the purpose of the peer review privilege as fostering the public interest in improving quality of health care without fear of defamation or malpractice claims. E.g., In re Fairview-Univ. Med. Ctr., 590 N.W.2d 150, 153 (Minn. Ct. App. 1999). Larson v. Wasemiller recognizes the privilege's purpose as allowing medical professionals to police their own activities with minimal judicial interference. 738 N.W.2d 300, 312 (Minn. 2007). Kalish v. Mount Sinai Hospital describes the privilege's purpose more broadly as improving the quality of health care. 270 N.W.2d 783, 786 (Minn. 1978).

### A. Existence of a Review Organization

Plaintiffs contend Essentia has not shown existence of an entity meeting the statutory definition of a review organization. Essentia responds that it "outlined, at length, in its in-camera briefing the groups that constitute review organizations/committees" but that it "cannot repeat that information and detail [in its publicly filed briefing] without disclosing information that [is] itself privileged." (Doc. 210, p. 10). Further, Essentia contends that because of its production of "voluminous privilege logs," plaintiffs are "not entirely unaware" of the groups Essentia alleges satisfy the definition of review organization. Id.

Section 145.61, subdivision 5, defines a review organization as one "established by" a health care entity, not as the entity itself. Section 145.64, subdivision 1(c), refers to a review organization's governing body, suggesting a review organization is part of a larger entity.

Essentia previously took the position that Essentia itself met the statutory definition of a review organization. (Doc. 169, pp. 11, 13). In its in camera briefing, Essentia for the first time described the structure of a purported review organization, at least portions of which appear to specifically involve only the alleged temperature excursion. No documentation, affidavit, or declaration confirms the asserted review organization's structure. In response to plaintiffs' request that Essentia be required to describe its asserted review organization's structure via affidavit, Essentia offered to provide an affidavit for in camera review. In camera review, however, would not allow plaintiffs to meaningfully challenge Essentia's assertion of the privilege and would not further the purpose of Rule 26(b)(5)(A).

Essentia cites no authority for its position that the structure of its asserted review organization is itself privileged. To reach that conclusion would require an extraordinarily expansive definition of the "data and information" protected under section 145.64, subdivision 1. As the party asserting the privilege, Essentia has the burden to prove its application.

Requiring proof of a review organization's structure is consistent with the Minnesota Supreme Court's decision in <u>Kalish</u>, where the court considered an affidavit in determining a certain hospital committee—apparently established to address a single issue—qualified as a review organization under section 145.61, subdivision 5. 270

10

NW.2d at 786. And in <u>Damgaard v. Avera Health</u>, the defendant was ordered to provide evidence supporting its assertion of the peer review privilege. Civ. No. 13-2192, 2014 WL 12599853, at*5 (D. Minn. June 9, 2014). Courts in other states have similarly required or considered evidence demonstrating an entity meets a statutory definition of a peer review organization. <u>See, e.g.</u>, <u>Chavez v. Lovelace Sandia Health Sys., Inc.</u>, 189 P.3d 711 (N.M. 2008); <u>Powers v. Mem'l Sloan Ketterling Cancer Ctr.</u>, No. 20 Civ. 2625, 2020 WL 5968126, at *3 (S.D.N.Y. Oct. 8, 2020). Requiring evidence an entity meets the statutory definition of a review organization is consistent with the principle that a party claiming a privilege has the burden to establish application of the privilege. <u>See</u> <u>Elkharwily v. Mayo Holding Co.</u>, Civ. No. 12-3062, 2014 WL 3573674 (D. Minn. July 21, 2014).

Essentia has not met the burden of proving the structure of its asserted review organization is itself privileged. In the absence of authority that the review organization's structure itself is privileged, Essentia must disclose that structure and identify the positions within the asserted structure of those who created and received the documents over which Essentia claims peer review privilege.

### B.   Documents to Which the Peer Review Privilege Might Apply

Should Essentia establish existence of a review organization meeting the definition of section 145.61, subdivision 5, the court considers the contours of documents that might be protected by Minnesota's peer review privilege. Plaintiffs assert the peer review privilege must be separately analyzed as to (1) proceedings and records, (2) data and information, (3) original source documents, (4) what transpired at a meeting, and (5) guidelines. (Doc. 194, pp. 4-8). Additionally, plaintiffs contend many of the documents Essentia claims as privileged were prepared in the ordinary course of

11

business rather than for a peer review purpose recognized in section 145.61, subdivision 5. Id. at 4.

Essentia describes plaintiffs' position as parsing out the privilege "sentence by sentence until it is meaningless." (Doc. 213, p. 2). In Essentia's view, section 145.64, subdivision 1, begins with the broad principle that any data or information acquired by a review organization shall not be disclosed, and the remainder of that subdivision "provides certain clarifications" to that broad principle. Id. at 3. Essentia asserts only two exceptions to the broad privilege—information or documents available from original sources and a peer review participant's personal knowledge insofar as that knowledge was not gained through the peer review process. (Doc. 169, pp. 12-13).

### i.     Original Source Documents

Plaintiffs contend some of the documents over which Essentia claims the privilege are "original source" documents within the meaning of section 145.64, subdivision 1. Though Essentia recognizes the statute excepts original source documents from the privilege, it is Essentia's position that none of the documents over which it claims the peer review privilege are in fact original source documents. (Doc. 210, p. 7).

Plaintiffs argue that documents a review organization obtains from an original source are, in fact, discoverable from the review organization itself. In support of that position, plaintiffs cite a concurring opinion in Wasemiller. In recognizing a tort of negligent credentialing of a physician under Minnesota law, Wasemiller addressed an argument that recognizing the tort would conflict with section 145.64, subdivision 1's confidentiality requirement:

> [The hospital] argues that the prohibition on disclosing what information a credentialing committee relied upon precludes a claim of

negligent credentialing because the precise fact question to be tried in a negligent-credentialing case is whether the hospital was negligent in making the decision on the basis of what it *actually knew* at the time of the credentialing decision. It argues that the confidentiality provision therefore makes it impossible for a hospital to defend against such a claim.

[The hospital's] interpretation of the common law claim is too narrow because negligence could be shown on the basis of what was actually known or what *should have been known* at the time of the credentialing decision. And Minnesota's confidentiality provision recognizes this broader concept, and addresses the problems of proof, by providing that

> [i]nformation, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization, nor shall any person who testified before a review organization or who is a member of it be prevented from testifying as to matters within the person's knowledge, but a witness cannot be asked about the witness' testimony before a review organization or opinions formed by the witness as a result of its hearings.

Minn. Stat. § 145.64, subd. 1.

Thus, although section 145.64, subdivision 1 would prevent hospitals from disclosing the fact that certain information was considered by the credentials committee, it would not prevent hospitals from introducing the same information, <u>as long as it could be obtained from original sources</u>. In this respect, the confidentiality provision may provide a greater advantage to hospitals than to patients because a hospital knows what information it actually considered and why it granted privileges and it may emphasize the information that most strongly supports its decision. The difficulty of proof may fall most heavily on the patients because the effect of the statute is to preclude the discovery of what evidence was actually obtained by the hospital in the credentialing process, and the patients bear the burden of proof on negligence.

738 N.W.2d at 309-10 (emphasis added and citations omitted).[3]

---

[3] The trial court found Minnesota law recognized a claim for negligent credentialing but went on to certify that question to the state's court of appeals. The court of appeals reversed, holding Minnesota did not recognize a common law cause of action for negligent credentialing. The Minnesota Supreme Court reversed the decision of the court of appeals.

The <u>Wasemiller</u> concurring opinion, on which plaintiffs rely, described the peer review statutes as protecting "<u>the work product of a [peer review] organization</u> with privilege and confidentiality." <u>Id.</u> at 314 (emphasis added). As to discoverability of original source documents, the concurrence stated:

> Whatever the theoretical merits of Minn. Stat. § 145.64's confidentiality and privilege protections, they may ultimately be of little consequence because the statute allows disclosure and discovery of any information—such as incident reports, patient charts, records, billing information, and general medical error and safety information—available from an original source. Minn. Stat. § 145.64, subd. 1 ("Information, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization * * *."). Thus, it is <u>only documents originally created by the peer review organization that are truly off-limits</u>. "[D]espite current immunity and confidentiality legislation, it is not uncommon for a large portion of the peer review documents to be considered discoverable in a medical malpractice action." Therefore, "denial of the privileged documents should have little impact on any patient's ability to maintain a cause of action for medical malpractice." Of course, limiting the privilege in this manner prevents hospitals faced with a malpractice suit from hiding incriminating information by funneling it through the peer review committee. But the discoverability of incident reports and similar quality assurance measures "constitutes a significant impediment to the peer review process. Physicians will be reluctant to create such records if parties to lawsuits can subsequently discover them."

<u>Id.</u> at 315 (emphasis added and citations omitted).

Section 145.64, subdivision 1, refers to information and documents "available from original sources." This court does not read the <u>Wasemiller</u> concurrence as opining original source documents may be discovered from the review organization, since that would reveal information the review organization considered. Rather, the court reads the <u>Wasemiller</u> concurrence as confirming that those documents may be obtained through their "original sources," thus protecting the review organization's exercise of its duties and functions.

14

Essentia argues Damgaard, 2014 WL 12599853, at *8, supports the proposition that a document otherwise privileged under the peer review statutes does not lose protection because it can be obtained from an independent source. Plaintiffs counter that Damgaard is distinguishable from this case in that the documents at issue in Damgaard, which were generated by a review organization, had been provided to an insurance company and the opinion did not address discoverability of documents generated by an original source. The court agrees with plaintiffs' interpretation. Essentia's interpretation would appear to make the "original source" exception to the privilege virtually meaningless.

In McKee v. St. Paul Eye Clinic, a doctor sued a hospital for, among other things, breaching the confidentiality provision of Minnesota's peer review statute by disclosing contents of an incident report about the doctor's treatment of patients to other clinic shareholders. No. A14-0681, 2015 WL 1757833, at *1 (Minn. Ct. App. Apr. 20, 2015) (review denied July 21, 2015). The Minnesota Court of Appeals held the incident report was not protected by the peer review privilege because there was no evidence "the nurses who drafted the report did so at the direction of a review organization" and thus "it was an original source document that was exempt from the restrictions of the peer review statute." Id. at *7.

Essentia also cites Fairview-University in support of its interpretation. In that case, the state medical board sought information about a physician who was under investigation by the Board. 590 N.W.2d 150. The court notes that Fairview-University preceded Wasemiller, and Wasemiller was decided by the Minnesota Supreme Court

15

rather than by the intermediate court of appeals. The <u>Wasemiller</u> majority confirmed availability of original source documents from those original sources.

To state the obvious, in order to apply the original source exception to the privilege, the original source of a document must be identified. Plaintiffs argue Essentia itself, rather than any review organization, is the original source of many of the disputed documents. (Doc. 212, p. 14). If the original source is a person or entity not part of a review organization, an exception to the privilege applies. Until the existence and membership of Essentia's purported review organization is determined, it is not possible to determine whether any of the documents over which Essentia claims peer review privilege are in fact excepted from the privilege as original source documents.

### ii.     Proceedings and Records of Action Against a Professional

Plaintiffs acknowledge the Minnesota peer review statutes provide some degree of protection in actions against <u>individual</u> medical professionals but argue the statutes do not extend all protections to cases brought against health care <u>entities</u> such as Essentia. (Doc. 194, pp. 4-5). The "professional provision" on which plaintiffs rely is found only in the third sentence of section 145.64, subdivision 1(a):

> Except as provided in subdivision 4, data and information acquired by a review organization, in the exercise of its duties and functions, or by an individual or other entity acting at the direction of a review organization, shall be held in confidence, shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization, and shall not be subject to subpoena or discovery. No person described in section 145.63 shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of a review organization. <u>The proceedings and records of a review organization shall not be subject to discovery or introduction into evidence in any civil action against a professional arising out of the matter or matters which are the subject of consideration by the review organization.</u>

(Emphasis added).

Plaintiffs argue the statute does not provide a "blanket privilege" but rather provides distinct protections to certain categories of documents. In plaintiffs' view, the first sentence of section 145.64, subdivision 1(a), which references "data and information" is "not absolute and all-encompassing" but protects only a limited category of documents distinct from a review committee's "proceedings and records.'" (Doc. 212, p. 10).

Plaintiffs contend the statute's grant of privilege to the "proceedings and records of a review organization" in "any civil action against a professional" implies a review organization's proceedings and records are <u>not</u> privileged in a civil action against a health care entity. <u>Id.</u> at 8-9. Plaintiffs contend the peer review privilege has little force in a civil action against a health care entity because "'data and information' acquired by a peer review committee become its 'proceedings and records'" and thus "it is difficult to conceive of any withheld document that would be privileged in this case." (Doc. 194, p. 8). Plaintiffs would distinguish between "proceedings and records" and "data and information," suggesting:

> Theoretically, a review committee could acquire information from a third party, and that information might be privileged. But once a review committee incorporated third-party information into its own records, that information would lose protection in cases against non-professionals. Plaintiffs acknowledge that this renders the privilege weak in cases like this one. But again, that is consistent with the privilege's purpose—to foster open communication about physicians without threats of defamation and malpractice claims.

(Doc. 212, p. 12).

Essentia responds that the interpretation plaintiffs would give the professional provision "would render meaningless the broad protections afforded to 'data and

information'" and would effectively destroy the privilege even in cases alleging vicarious liability of a professional's employer. (Doc. 210, p. 5). Essentia identifies cases in which courts applied the statute when a health care entity, rather than an individual health care professional, was the sole defendant. See Damgaard v. Avera Health, 108 F. Supp. 3d 689 (D. Minn. 2015); Hennen v. Select Med. Corp., No. 27-CV-18-18206, 2019 WL 4885567 (Minn. Dist. Ct. Sept. 9, 2019); Shellum v. Fairview Health Servs., No. 27-CV-16-267, 2018 WL 5792170 (Minn. Dist. Ct. Aug. 24, 2018). And Essentia contends the Minnesota Court of Appeals in Fairview-University rejected plaintiffs' position that "the professional provision consumes the whole confidentiality section." (Doc. 210, p. 5).

In Fairview-University, an investigative committee of the Minnesota Board of Medical Practice subpoenaed several hospitals' employment, privileging, claim, and settlement information concerning a physician who was the subject of a board investigation. 590 N.W.2d at 152-53. The hospitals moved to quash the subpoenas. The investigative committee argued the peer review privilege applied only in "civil actions" and did not apply to subpoenas issued in an administrative action by the Board. The court of appeals rejected that argument, reasoning:

> The first sentence of the confidentiality provision states that all data and information acquired by a review organization "shall not be subject to subpoena or discovery." Minn. Stat[.] § 145.64, subd. 1. This language is broader than the subsequent provision against discovery in a civil action. Construing the privilege to apply only to subpoenas in civil actions is less plausible than reading the privilege to plainly apply to all subpoenas.

Id. at 153-54.

Based on that language, Essentia urges the court to conclude the first sentence of section 145.64, subdivision 1(a), is not limited by the "professional provision" of the third sentence. In plaintiffs' view, Fairview-University is not applicable because the

18

investigative committee did not subpoena a review organization's proceedings and records but rather "sought information acquired by the review organization." (Doc. 212, p. 9). Though Fairview-University did not address the same issue raised here, its reasoning supports the interpretation Essentia posits rather than the narrower application of the privilege that plaintiffs assert.

Recognizing they are advocating a rather limited application of the peer review privilege, plaintiffs cite Wasemiller, where the Minnesota Supreme Court discussed the peer review statutes in the course of determining Minnesota common law recognized a claim of negligent credentialing. 738 N.W. 2d at 302-13.[4] But Wasemiller does not support plaintiffs' narrow position. Wasemiller precludes inquiries into "the basis for the peer review organization's decision" and therefore protects the review organization's exercise of its duties and functions. Id. at 315. Plaintiffs' asserted narrow interpretation of the professional provision would make discoverable the information the statute is designed to protect.

Several of the documents reviewed in camera are identified as "meeting notes." If Essentia sufficiently establishes existence of a review organization under section 145.61, subdivision 5, those documents—and others similar to them—appear to constitute protected "proceedings and records" of a review organization. Other documents over which Essentia claims privilege might also be protected as proceedings and records.

---

[4] A concurring opinion discussed the policy behind the peer review statutes, expressed concern that the statute "may not be fulfilling the intended purpose," and "encourage[d] the legislature to revisit this important issue." Wasemiller, 738 N.W.2d at 313. The court notes, in the fifteen years since Wasemiller was decided, the Minnesota legislature has not acted on the concurring judges' encouragement to consider revision of the peer review statutes.

### iii.   Data and Information

Plaintiffs argue section 145.64, subdivision 1(a)'s reference to "data and information" is a reference to "a limited category of material, distinct from, e.g., 'proceedings and records,' 'guidelines,' 'what transpired at a meeting,' and 'original source' materials.'" (Doc. 212, p. 10). In plaintiffs' view, the statute protects only "materials generated by a peer review [organization] in actions against professionals." Id. at 11. Plaintiffs acknowledge difficulty in distinguishing between "proceedings and records" and "data and information." See id. at 12. Like plaintiffs' argument regarding "proceedings and records," this question is also closely related to the contention that the peer review privilege applies primarily only in civil actions against an individual health care professional.

In Essentia's view, section 145.64, subdivision 1(a)'s reference to "data and information" is a "broad starting point" for the peer review privilege rather than a category of information and documents. None of the cases cited by the parties or identified through the court's research address this precise issue. The court views Fairview-University's reasoning as supporting Essentia's position more so than plaintiffs' position.

### iv.   What Transpired at a Meeting

Stressing the difference between confidentiality and privilege, plaintiffs argue section 145.64, subdivision 1(a), requires that "what transpired at a meeting of a review organization" be kept confidential but contend the peer review privilege does not apply to "what transpires at a meeting." Id. at 15-16. Plaintiffs rely on a portion of section 145.64, subdivision 1(a), which states, "No person described in section 145.63 shall

20

<u>disclose what transpired at a meeting</u> of a review organization except to the extent

necessary to carry out one or more of the purposes of a review organization." (Emphasis

added). Because that sentence refers only to disclosure, plaintiffs argue the statute does

not establish a privilege for "what transpires at a meeting." They point to an Illinois case

recognizing confidentiality, discoverability, and admissibility as distinct concepts.

<u>Klaine v. S. Ill. Hosp. Servs.</u>, 47 N.E.3d 966, 970 (Ill. 2016).

The court recognizes, of course, that confidentiality and privilege are distinct

from each other. But, in this court's opinion, the statute does not establish the

distinction plaintiffs advocate. Additionally, it would appear difficult to distinguish

between "what transpired at a meeting" of a review organization and "proceedings and

records" of that organization.

### v.    Guidelines

Plaintiffs question whether documents described on Essentia's privilege logs as

"regarding guidance" or "SBAR with guidance" are in fact "guidelines" within the

meaning of the peer review statute. A total of twenty of the one hundred documents

submitted for in camera review include the word "guidance" within the subject matter

description.[5]

Plaintiffs correctly assert that the peer review privilege does not apply to

"guidelines" since section 145.65 bars admissibility but not discoverability of guidelines.

---

[5] EHPRIV 000277, EHPRIV 004174, EHPRIV 004372, EHPRIV 5469, EHPRIV 005661, EHPRIV 007455 (Row 7446), and EHPRIV 007589 (Row 7075). (Doc. 194, pp. 22-37). EHPRIV000270, EHPRIV000680, EHPRIV01194, EHPRIV002601, EHPRIV002602, EHPRIV003760, EHPRIV005662, EHPRIV005771, EHPRIV 005772, EHPRIV 006565, EHPRIV007116, EHPRIV007475, and EHPRIV007970. (Doc. 197-2, pp. 3-9).

Though its privilege logs describe the subject matter of various documents as providing "guidance," (see Doc. 194, pp. 22, 29), Essentia argues none of the documents over which it claims privilege are "guidelines" within the meaning of the statute. Rather, Essentia argues the documents described as providing guidance are not "hospital policies or guidelines established by a review organization" but are instead "communication materials created in reaction to the potential temperature excursion and that are necessary for patient care." (Doc. 197, p. 11).

The parties cite several cases discussing section 145.65, which specifically addresses guidelines. In Kalish, the plaintiff brought a medical malpractice claim against a hospital, alleging its employees were negligent in monitoring the plaintiff's catheter. During discovery, the plaintiff sought guidelines for catheter insertion that had been prepared by a committee comprised of the hospital's assistant director of nursing and three other registered nurses. After finding the guidelines were prepared by a protected review committee, the Minnesota Supreme Court considered the degree of protection afforded to the guidelines under the peer review statutes. 270 N.W.2d at 786. The court looked to section 145.65, which bars admission of guidelines into evidence but is silent as to any privilege barring their discovery, and found that distinction "clearly implie[d] that in making a separate and different provision for 'guidelines' under [section] 145.65 the legislature intended to allow their discovery." Id. The court held the hospital was required to produce the documents. Id.

Shellum applied Kalish when a defendant challenged admission of testimony asserted to be subject to the peer review privilege. 2018 WL 5792170, at *7. The court noted section 145.65 prohibits admission of written guidelines and section 145.64

22

prohibits inquiry about a witness's "testimony before a review organization or opinions formed by him as a result of [a review organization's] hearings." Id. But the court stated the plaintiff had not solicited testimony concerning written guidelines or about testimony before a review organization. Rather the plaintiff had questioned witnesses about matters within their own knowledge. Id.

In Damgaard, a medical negligence case governed by Minnesota law, the court addressed whether a plaintiff could rely on a hospital's own policies to establish the applicable standard of care. 108 F. Supp. 3d at 698. There, a magistrate judge had ordered production of the hospital's policies, but the presiding district judge cited the peer review statutes in concluding the policies were inadmissible to establish the standard of care. Though production of the policies had been ordered, the district judge noted that "discoverability and admissibility, of course, are entirely separate issues, with the former far broader than the latter." Id. at 699; see also Shellum v. Fairview Health Servs., A18-1516, 2019 WL 2262246, at *7 (Minn. Ct. App. May 28, 2019) (determining that although section 145.65 precludes use of written hospital policies to establish standards of care in medical malpractice cases, the court did not err in allowing questioning about a prior inconsistent statement about hospital policies).

Essentia argues no established policies are at issue, so Kalish is irrelevant since it involved "established" policies. (Doc. 197, p. 11). Having reviewed each of the twenty documents whose subject matter description includes the word "guidance," the court identifies one of those documents—EHPRIV003760—which details a record-keeping procedure—as a guideline. Even if that document (and documents similar to it) was

"established by a review organization," it is discoverable, though it may not be admissible in evidence.

### vi.    Ordinary Course of Business

Plaintiffs contend Essentia improperly asserted peer review privilege over documents prepared in the ordinary course of business and not for any of the peer review purposes set out in section 145.61, subdivision 5. Plaintiffs argue documents such as financial reports, call center scripts, public communication plans, social media documents, statements to patients and to the media, and training videos are not within the scope of the peer review privilege. (Doc. 161, pp. 22-23). Essentia characterizes plaintiffs' assertions regarding the ordinary course of business as attempting to create "nonexistent exceptions to the broad statutory privilege, without any support under Minnesota law." (Doc. 210, p. 9). Further, Essentia points to section 145.61, subdivision 5, as including "improving the quality of health care," "reviewing healthcare costs," and "resolving disputes with insurers" as purposes of review organizations. (Doc. 210, p. 9; Doc. 213, p. 6).

Neither side cites, nor has this court's research revealed, any case law addressing application of Minnesota's peer review privilege to documents created in the ordinary course of business. Plaintiffs cite cases from other jurisdictions that address the issue. The court recognizes, of course, that interpretations of other state's peer review statutes are not binding. They do, however, provide useful guidance. In <u>Cornejo v. Mercy Hospital & Medical Center</u>, the court considered a hospital's assertion of Illinois' peer review statutes:

> The Act does not protect all information used for internal quality control. <u>Grandi v. Shah</u>, 633 N.E.2d 894, 899 (2d Dist. 1994). Rather, it

> protects documents "generated specifically for the use of a peer-review committee." <u>Chicago Trust Co. v. Cook Cnty. Hosp.</u>, 698 N.E.2d 641, 646 (4th Dist. 1998). <u>See also</u> <u>Roach v. Springfield Clinic</u>, 623 N.E.2d 246, 250 (Ill. 1993) ("What the law actually protects is not information of a hospital's medical staff, but information of '*committees* of licensed or accredited hospitals or their medical staffs, including Patient Care Audit Committees, Medical Care Evaluation Committees, Utilization Review Committees, Credential Committees, and Executive Committees . . . '") (emphasis original). <u>Documents created in the ordinary course of business, to weigh potential liability risk, or for later corrective action by hospital staff are not privileged, even if they are later used by a committee in a peer-review process.</u> <u>Chicago Trust Co.</u>, 698 N.E.2d at 649. As the Illinois Supreme Court explained, "If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually contained in a patient's records." <u>Roach</u>, 623 N.E.2d at 251.

No. 12 C 1675, 2014 WL 4817806, at *3 (N.D. Ill. Sept. 15, 2014) (emphasis added and citations altered). The court further stated:

> Defendant attempts to assert the privilege by stating repeatedly, in a mantra-like fashion, that the withheld documents were "used in the course of internal quality control and used for granting, limiting or revoking staff privileges." This is a purely conclusory assertion, unverified and bereft of any particularized facts. Further, a document "used in the course of internal quality control and used for granting, limiting or revoking staff privileges" is not automatically privileged under the Act. Rather, documents used for such purposes still must have been generated in a manner protected by the Act in the first place. <u>See, e.g.</u>, <u>Roach</u>, 623 N.E.2d at 251 (emphasizing that simply furnishing a committee with non-privileged documents does not then render those documents privileged). The quoted language is used in the Act to describe how otherwise privileged documents may be used, not to describe what documents are covered by the Act in the first place. <u>As discussed above, documents generated in the ordinary course of business and not as part of a peer review or other similar committee process, though incidentally "used in the course of internal quality control and used for granting, limiting or revoking staff privileges," are not necessarily privileged under the Act.</u>

<u>Id.</u> at *5 (emphasis added and citation altered).

New Mexico's peer review statutes include a provision similar to Minnesota Statute section 145.61, subdivision 5. In applying that statute, New Mexico's Court of Appeals described a process to be used to balance the peer review purpose of "promoting health and welfare of society against an overbroad implementation of confidentiality to the extent it might impinge on the right of litigants to obtain and present relevant and material evidence." Chavez v. Lovelace Sandia Health Sys., Inc., 189 P.3d 711, 715 (Ct. App. N.M. 2008) (citing Sw. Cmty. Health Servs. v. Smith, 755 P.2d 40, 44 (N.M. 1988)). Under New Mexico's process, a party invoking peer review privilege must

> prove that the data or information was generated exclusively for peer review and for no other purpose, and that opinions were formed exclusively as a result of peer review deliberations. If the evidence was neither generated nor formed exclusively for or as a result of peer review, it shall not be immune from discovery unless it is shown to be otherwise available by the exercise of reasonable diligence.

Smith, 755 P.2d at 44; see also Quimbey v. Cmty. Health Sys. Pro. Servs. Corp., CIV 14-0559, 2017 WL 5634111 (D.N.M. Nov. 22, 2017).

Plaintiffs do not assert an ordinary course of business exception to the peer review privilege. Rather, plaintiffs argue that documents created in the ordinary course of business were not created in furtherance of one of the statutorily recognized purposes of a review organization and so do not come within the ambit of the privilege. Based on the limited information Essentia has provided, the court cannot determine whether Essentia has limited its claims of peer review privilege to documents that were indeed created in furtherance of a purpose encompassed by the statute. Determination of that question will be related to determining whether Essentia establishes a review organization within the meaning of section 145.61. The court, however, questions

whether, for example, documents dealing with fiscal impact to Essentia of the alleged temperature excursion come within the purpose of any peer review privilege.

### vii.   Distribution of Documents to Persons Outside Review Organization

A principle permeating privilege law is that, to maintain the privilege, privileged documents or information not be disseminated outside those persons who are part of the privilege group. See, e.g., State v. Gore, 451 N.W.2d 313, 319 (Minn. 1990). In review of the documents submitted in camera, the court noted several documents sent to STAT@EssentiaHealth.org that appear to be periodic newsletters widely distributed to Essentia medical providers. The court also noted several documents addressed to "Essentia Health West Market Colleagues" and to "All Essentia Health Colleagues." If any of those documents might have been protected by the peer review privilege, the court questions whether any claim to privilege was forfeited by distributing them to persons outside the review organization.

### viii.   Summary Regarding Peer Review Privilege

Based on information currently in the record, the court cannot determine what documents might be subject to the peer review privilege. Essentia may file declarations and/or documentation supporting its asserted review organization structure and membership. If plaintiffs so request, Essentia must produce a witness or witnesses qualified to testify on that topic pursuant to Federal Rule of Civil Procedure 30(b)(6). If plaintiffs request a Rule 30(b)(6) deposition on that topic, that deposition will not be included in the number of fact depositions plaintiffs are allowed under the scheduling order.

**2.    Physician-Patient Privilege**

By statute, Minnesota provides a physician-patient privilege and prohibits release of patient medical records without a signed authorization or a "specific authorization in law." Minn. Stat. § 144.293(2). In a July 16, 2021 order, this court held the federal Health Insurance Portability and Accountability Act (HIPAA) permitted Essentia to disclose patient-specific information under the governing qualified protective order. (Doc. 76). After the July 16 order was entered, Essentia argued Minnesota's physician-patient privilege required signed authorizations to disclose records of the named plaintiffs and HIPAA did not preempt Minnesota's privilege because the latter was more stringent. (Doc. 122). In a September 21, 2021 order, this court disagreed and held Minnesota's physician-patient privilege was not more stringent than HIPAA and required Essentia to disclose certain patient-specific information to plaintiffs under the governing qualified protective order. Id. The court will follow the same principles in considering the physician-patient privilege claims asserted in Essentia's privilege logs.

The court has reviewed the fifty documents plaintiffs identified for in camera review and the fifty documents Essentia identified for in camera review. Essentia's privilege log claims, inter alia, a physician-patient privilege as to seven of its fifty documents. None of the seven documents identifies patients other than by medical record number, and only three of the seven identify patients by medical record number.[6]

---

[6] The seven document over which Essentia asserted a physician-patient privilege are EHPRIV001992, EHPRIV003760, EHPRIV004390, EHPRIV004391, EHPRIV006117, EHPRIV006464, and EHPRIV006465. Of those seven documents, only EHPRIV004391, EHPRIV006117, and EHPRIV006465 identify patients by medical record number.

As to those three documents, only portions of each are relevant to this case. The physician-patient privilege is properly asserted as to those three documents, though the HIPAA-compliant protective order governing this case would allow disclosure of those documents and information not relevant to this case could be redacted.

Only one of the fifty documents plaintiffs identified for in camera review—Document 195-47—involved Essentia's claim of physician-patient privilege. The document is identified on Essentia's privilege log as "Spreadsheet regarding patient data relative to investigation and quality assurance." The document is very lengthy and includes identifying information concerning thousands of individuals. The purposes for which it was created and for which it was used are not clear. The physician-patient privilege is properly asserted as to that document, though the HIPAA-compliant protective order governing this case may well allow its disclosure.

### 3. Attorney-Client Privilege

Of the one hundred documents submitted for in camera review, Essentia claimed attorney-client privilege—along with other privileges—over eighty-nine documents. Plaintiffs argue many of those eighty-nine documents are not protected by the attorney-client privilege because their primary purpose was not to seek or receive legal advice. (Doc. 194, p. 16).

As codified in Minnesota Statute section 595.02, subdivision 1(b):

An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent.

29

Minnesota applies an eight-part test to determine existence of the attorney-client privilege. Under that test:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in [their] capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at [the client's] instance permanently protected (7) from disclosure by [the client] or by the legal adviser, (8) except the protection be waived.

In re Lawrence, 954 N.W.2d 597, 602 (Minn. Ct. App. 2020) (citing Kobluk v. Univ. of Minn., 574 N.W.2d 436, 440 (Minn. 1998)). "The purpose of the privilege is to encourage the client to confide openly and fully in [the] attorney without fear that the communications will be divulged and to enable the attorney to act more effectively on behalf of [the] client." Kobluk, 574 N.W.2d at 440. The attorney-client privilege applies "only where necessary to achieve its purpose." Fisher v. United States, 425 U.S. 391, 403 (1976). But "no privilege attaches when a lawyer has acted as a mere scrivener in drafting a document, as opposed to an instance in which the lawyer's advice is sought as to the document's legal terms and effects." Id. (internal quotation marks omitted).

The privilege protects both "the giving of professional advice to those who can act on it" and "the clients giving of information to the lawyer to enable [the lawyer] to give sound and informed service." Corkrean, 2022 WL 18632, at *2 (quoting Upjohn Co. v. United States, 449 U.S. 383, 386 (1981)). For a communication to be protected, it must be (1) between an attorney and client, (2) confidential, and (3) for the purposes of obtaining legal services or advice. See Inline Packaging, LLC v. Graphic Packaging Int'l, Inc., No. 15-CV-3183, 2017 WL 9325027, at *4 (D. Minn. May 5, 2017).

An important principle is that a communication is privileged only if its disclosure would "directly or inferentially" reveal the content of a confidential attorney-client

communication. See Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 611 (8th Cir. 1977) (determining corporate minutes would reveal contents of privileged communications). Thus, neither the "fact a legal consultation took place" nor its "broad subject matter" are protected by the attorney-client privilege. Oasis Int'l Waters, Inc. v. United States, 110 Fed. Cl. 87, 100 (2013). When such general information is disclosed and does not reveal—directly or inferentially—the actual content of a confidential communication, it is not protected by privilege. See 1 Paul Rice, Attorney-Client Privilege in the United States § 6:22 (2021) ("The general nature of the services performed must be identified with sufficient particularity to permit an assessment of the substantive nature of the activity, but not so specific that the substance of confidential communications are directly or indirectly revealed.").

Communications not between an attorney and client, like a client's notes or a corporation's meeting minutes, may be protected to the extent they "reflect the substance" of an attorney-client communication. Bailey v. Oakwood Healthcare, Inc., No. 15-11799, 2017 WL 427714, at *1 (E.D. Mich. Feb. 1, 2017). Similarly, a communication among non-attorneys that demonstrates an "intent to seek legal advice about a particular issue" may be privileged because it directly or inferentially reveals the content of a later client to attorney communication. United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1077 (N.D. Cal. 2002). But a mere "passing reference to the possibility of speaking with an attorney" would not be privileged because it does not directly or inferentially reveal the content of a confidential communication. Id. For example, a cursory request that an attorney review a document neither establishes that the purpose of the communication was to secure legal advice nor reveals the content of a

confidential communication. See Sanimax USA, LLC, v. S. St. Paul, No. 20-cv-1210, 2021 WL 4846364, at *10 (D. Minn. Oct. 18, 2021) ("While legal counsel is copied on the email, and the email invites questions or comments, [the sender] was not seeking advice regarding any legal issue.").

The same principles apply to the repetition of legal advice. Information that directly or inferentially reveals the content of a confidential communication is privileged. Thus, agents of a client "may discuss legal advice sought and given without losing the privilege, even when an attorney is not an author or recipient of the communication." In re 3M Combat Arms Earplug Prod. Liab. Litig., No. 3:19-MD-2885, 2020 WL 1321522, at *5 (N.D. Fla. Mar. 20, 2020).

Documents prepared at an attorney's direction, to be provided to an attorney, may be privileged even if not actually provided to the attorney. For example, In re the Investigation of the Death of Dirk VanSlooten, which Essentia cites, involved a criminal suspect's claim of attorney-client privilege over certain items that had been seized pursuant to a search warrant. 424 N.W.2d 576 (Minn. Ct. App. 1988). The seized items included communications the client had prepared at his attorney's request and which the client had labeled as privileged, though the client had not yet delivered the communications to his attorney. The court found the communications were privileged because the client had prepared them at the attorney's request. Id. at 579.

## A. Attorney as Sender or Recipient of Communication

Of the eighty-nine documents over which Essentia claimed attorney-client privilege, the privilege log identifies no attorney as sender or recipient of fifty-nine of

32

those documents.[7] That fact alone does not negate applicability of the privilege but is a factor to be considered in determining whether a communication is properly considered privileged.

### B.    Purpose of a Communication

Plaintiffs contend Essentia improperly claimed attorney-client privilege over documents whose primary purpose was business advice rather than legal advice and those communications are therefore not protected under cases such as Mission National Insurance Co. v. Lilly, 112 F.R.D. 160, 163 (D. Minn. 1986).

Essentia cites Kobluk for the principle that any communication with a legal advisor is presumed to have been made for the purpose of legal advice, absent a clear showing otherwise. 574 N.W.2d at 444. Though Kobluk held draft documents exchanged with an attorney could be privileged, the court explained, "[T]he party who asserts that a preliminary draft is privileged retains the burden of proving . . . that the particular draft was created as an implicit request for, or as a means of rendering, legal advice." Id. The

---

[7] EHPRIV 000037, EHPRIV 000150, EHPRIV 000279, EHPRIV 000285, EHPRIV 000609, EHPRIV 000611, EHPRIV 000729, EHPRIV 000991, EHPRIV 001538, EHPRIV 001740, EHPRIV 001777, EHPRIV 002536, EHPRIV 003528, EHPRIV 004174, EHPRIV 004346, EHPRIV 005469, EHPRIV 005599, EHPRIV 05661, EHPRIV 05801, EHPRIV 005905 , EHPRIV 005906, EHPRIV 006322, EHPRIV 006364, Row 6883, Row 7006, Row 7075, Row 7182, Row 7187, Row 7234, Row 7400, Row 7446, Row 7974, Row 8083, and Row 8088. (Doc. 194, pp. 20-40). EHPRIV 001194, EHPRIV 001210, EHPRIV 001893, EHPRIV 001992, EHPRIV 002372, EHPRIV 002601, EHPRIV 002602, EHPRIV 003527, EHPRIV 003760, EHPRIV 004296, EHPRIV 004390, EHPRIV 004391, EHPRIV 005374, EHPRIV 005401, EHPRIV 005662, EHPRIV 005771, EHPRIV 005772, EHPRIV 0086464, EHPRIV 006465, EHPRIV 006562, EHPRIV 006572, EHPRIV 007116, EHPRIV 007475, EHPRIV 007970, and EHPRIV 008215. (Doc. 197-2).

<u>Kobluk</u> presumption alone is not sufficient to determine whether the purpose of a communication was to seek or obtain legal advice.[8]

The Minnesota Supreme Court recently discussed determination of whether a communication was made for the purpose of seeking or receiving legal advice in <u>In re Polaris, Inc.</u>, 967 N.W.2d 397 (Minn. 2021). There, certain privilege issues had been referred to a special master and the special master found the predominant purpose of an audit report was to seek business advice rather than legal advice. The state supreme court agreed:

> Determining the predominant purpose of a document is "a highly fact-specific" inquiry, which requires courts to consider "the 'totality of the circumstances' surrounding each document." <u>In re Grand Jury Procs.</u>, 220 F.3d 568, 571-72 (7th Cir. 2000). Relevant factors include (1) the purpose of the communication, (2) the content of the communication, (3) the context of the communication, (4) the recipients of the communication, and (5) whether legal advice permeates the document or whether any privileged matters can be redacted. <u>See generally</u> 2 Andrew J. Levander & Hector Gonzalez, <u>Successful Partnering Between Inside and Outside Counsel</u> § 33:8 (2021) (citing cases). Although the line between legal advice and business advice in the corporate setting is "not always clear," as a general matter, attorneys provide legal advice when they draw on their legal training and apply legal principles to the specific circumstances of their client. <u>Harrington v. Freedom of Info. Comm'n</u>, 144 A.3d 405, 415 (Conn. 2016); <u>see</u> 1 Paul R. Rice, <u>Attorney-Client Privilege in the United States</u> § 7:10 (2020 ed.). We acknowledge that determining the predominant

---

[8] A presumption of privilege is often utilized when a communication contains an apparent mix of legal and non-legal advice. <u>See</u> <u>In re Bieter Co.</u>, 16 F.3d 929, 939 n.9 (8th Cir. 1994) (presumption applied to communications involving political, business, and land use topics, as well as legal matters); <u>see also</u> <u>Williams v. Herron</u>, No. 8:09CV201, 2011 WL 555127, at *6 (D. Neb. Feb. 8, 2011) (applying presumption to communications involving facts relating to both an internal investigation and legal advice). That said, attorney-client communications devoid of any purpose to secure legal advice are not privileged. <u>See</u> <u>Bartholomew v. Avalon Cap. Grp., Inc.</u>, 278 F.R.D. 441, 448 (D. Minn. 2011) ("It is well established that a party cannot make a communication privileged simply by including an attorney in the communication."); <u>see also</u> <u>Johnson v. Bd. of Pensions of Evangelical Lutheran Church in Am.</u>, No. 11-23, 2012 WL 5985600, at *4 (D. Minn. Sept. 5, 2012).

purpose of a document may not be a simple task, but this determination is the type of fact-finding and analysis that "fall[s] within the district court's expertise." Valero Energy Corp. v. United States, 569 F.3d 626, 630 (7th Cir. 2009) (explaining that "[f]indings regarding privilege are fact-intensive, case-specific questions").

Although we had not formally adopted the predominant purpose test when [the] dispute [in this case] arose, both parties, as well as the special master, analyzed the privilege issue in terms of the predominant purpose of the report. The special master found that the predominant purpose of the report was business advice. Polaris challenges this finding, asserting that the report focuses on legal compliance issues, which are "inextricably intertwined" with business advice. Polaris further argues that "safety is the subject of extensive federal regulation" and that failure to comply with safety regulations subjects its business to legal penalties. See Upjohn Co., 449 U.S. at 392 (observing that, "[i]n light of the vast and complicated array of regulatory legislation," corporations "'constantly go to lawyers to find out how to obey the law'" (quoting Bryson P. Burnham, The Attorney-Client Privilege in the Corporate Arena, 24 Bus. Law. 901, 913 (1969))). Thompson responds that the primary purpose of the report was business advice, claiming that the "[t]he audit relates to a series of facts about Polaris's 'corporate culture,'" and the report provided "business recommendations," which Polaris used to make business and operational improvements.

The special master found that the predominant purpose of the audit report was "giving business advice," reasoning that the report was distributed to Polaris management and the board of directors to "implement operational changes." The report addresses the organizational culture of Polaris and discusses the areas of product design, engineering, and manufacturing practices, with the express goal of "improv[ing] the process Polaris uses to assess safety risks." The special master essentially determined that the primary purpose of the report was setting corporate policy. We conclude that the special master did not clearly err in finding that these aspects of the report address business matters. See Marceau v. IBEW Local 1269, 246 F.R.D. 610, 613-14 (D. Ariz. 2007) (concluding that an audit report prepared by outside attorneys was not privileged where "the general nature of the audit" was a "tool for improving the business operations" of the company). See generally Terry E. Hunt & Timothy A. Wilkins, Environmental Audits & Enforcement Policy, 16 Harv. Envtl. L. Rev. 365, 381 (1992) (explaining that "management audits generally are not entitled to the protections of the attorney-client privilege," even when attorneys conduct the audits, because the attorneys are not "predominantly" acting as attorneys).

In re Polaris, Inc., 967 N.W.2d at 409-11 (footnotes omitted and citations altered).

Some courts have recognized a document may qualify as privileged if it consists of information sent to corporate counsel to keep corporate counsel apprised of ongoing business developments, with the implicit expectation counsel will respond if a matter raises important legal issues. In re Buspirone Antitrust Litig., 211 F.R.D. 249, 254 (S.D.N.Y. 2002). See also In re Johnson & Johnson Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig., MDL No. 2738, 2021 WL 3144945, at *5 (D.N.J. 2021).

Since Essentia has provided no declarations or other evidence supporting the purpose of the communications over which it claims attorney-client privilege, the court cannot determine whether those communications were for the purpose of seeking or receiving legal advice.

### C.      Communications with Public Relations Consultants

Plaintiffs question application of the attorney-client privilege to communications between Essentia and its public relations consultants. (Doc. 161, pp. 29-31). Essentia responds that the privilege may be extended to communications involving a third-party consultant, arguing third-party consultants should be considered to be in the same position as Essentia's employees for purposes of applying the privilege.

Important here, the "client" in the attorney-client relationship may be an organization. United States v. Jicarilla Apache Nation, 564 U.S. 162, 169 (2011). But to remain privileged, attorney-client communications must be kept confidential. When the client is an organization, the communications may be distributed to multiple individuals within the organization. To maintain confidentiality, distribution must be limited to those employees whose duties encompass a need to know the content and subject matter of a communication. See Diversified Indus., 572 F.2d at 609; see also Upjohn Co., 449

36

U.S. at 394-95 (stating in context of organizational client, privilege applies when (1) communication was provided by agents of the organizational client to counsel, acting as counsel, at the direction of their organizational superiors; (2) the communication was necessary for the provision of legal advice; (3) the agents were aware their communication was made for the purpose of obtaining legal advice for the organization; and (4) the communication was treated as confidential).

Minnesota's statutory attorney-client privilege includes no mention of communications between an attorney and a client's employee or agent. In Brown v. Saint Paul City Ry. Co., however, the court described the privilege as extending to "communication prepared by an agent or employee whether it is transmitted directly to the attorney by the client or his agent or employee," though the court went on to explain that the party claiming the privilege has the burden to establish its existence. 62 N.W.2d 688, 700 (Minn. 1954); see also Fagen, Inc. v. Exergy Dev. Grp. of Idaho, L.L.C., Civ. No. 12-2703, 2015 WL 12977507, at *4 (D. Minn. June 1, 2015).

Essentia cites several cases in which federal courts have viewed a third-party consultant as a client's agent for purposes of the attorney-client privilege. (Doc. 169, pp. 23-25). In Federal Trade Commission v. GlaxoSmithKline, for example, the court extended the attorney-client privilege to communications the defendant had shared with its public relations and government affairs consultants, reasoning the consultants became integral members of a team assigned to deal with issues that were "completely intertwined" with the defendant's litigation and legal strategies. 294 F.3d 141, 148 (D.D.C. 2002).

In general, the attorney-client privilege is waived if third parties are involved in a communication. Energy Pol'y Advocs. v. Ellison, 980 N.W.2d 146, 152 (Minn. 2022). An exception to this rule is the "functional equivalency" doctrine, which deems third party consultants to be equivalent to employees of the client and thus possible representatives of the client.

A recent decision in the District of Minnesota addressed application of Minnesota's attorney-client privilege to a consultant a company had hired to audit workers compensation insurance policies to determine if the company had been overcharged for the policies. Citing federal court decisions from this circuit, the court recognized that a third-party consultant can be considered the "functional equivalent" of an organization's employee for purposes of application of the attorney-client privilege. But because the consultant had been retained by the company's risk manager rather than by counsel and because the retention had been for the business purpose of determining whether the company had been overcharged rather than to assist in obtaining legal advice, the company had not met its burden to prove communications with the consultant were covered by the attorney-client privilege. Stan Koch & Sons Trucking, Inc. v. Am. Interstate Ins. Co., No. 18-CV-2945, 2020 WL 2111349, at *4-7 (D. Minn. May 4, 2020).

The Eighth Circuit in In re Bieter Co. held a third-party contractor who worked with a company prior to the litigation, represented the company at public meetings, and communicated directly with the company's attorney was functionally equivalent to a company employee. 16 F.3d 929, 938 (8th Cir. 1994). Having determined the third party

38

was the "functional equivalent" of an employee, the Eighth Circuit applied its attorney-client privilege test for corporate employees.

The In re Bieter Co. court did not describe a test for determining when a third party is to be viewed as the "functional equivalent" of an employee beyond noting the close business relationship between the third party and the company. Somewhat similarly, in Trustees of the Electrical Workers Local No. 26 Pension Trust Fund v. Trust Fund Advisors, Inc., 266 F.R.D. 1 (D.D.C. 2010), the court considered the long-standing relationship between consultants and the board that managed a pension fund and found the consultants were functionally equivalent to employees of the pension fund.

The Southern District of New York, in Export-Import Bank of the United States v. Asia Pulp & Paper Co., stated courts applying the functional equivalence doctrine should consider (1) "whether the consultant had primary responsibility for a key corporate job," (2) "whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation," and (3) "whether the consultant is likely to possess information possessed by no one else at the company." 232 F.R.D. 103, 113 (S.D.N.Y. 2005). More recently, the Tennessee Supreme Court in Dialysis Clinic, Inc. v. Medley, identified the following "non-exhaustive" factors to be considered in addressing a claim of functional equivalence:

> whether the nonemployee performs a specific role on behalf of the entity; whether the nonemployee acts as a representative of the entity in interactions with other people or other entities; whether, as a result of performing its role, the nonemployee possesses information no one else has; whether the nonemployee is authorized by the entity to communicate with its attorneys on matters within the nonemployee's scope of work to facilitate the attorney's representation of the entity; and whether the

nonemployee's communications with the entity's attorneys are treated as confidential.

567 S.W.3d 314, 324 (Tenn. 2019).

Plaintiffs assert some of Essentia's privilege claims "plainly concern [public relations] issues, not legal ones." (Doc. 161, p. 29). In general, courts have been reluctant to find communications about public relation matters relate to securing legal advice. See In re N.Y. Renu with Moistureloc Prod. Liab. Litig., MDL No. CA 2:06-MN-77777-DCN, 2008 WL 2338552, at *7 (D.S.C. May 8, 2008) ("Most courts agree, however, that basic public relations advice, from a consultant hired by the corporate client, is not within the privilege."). In Calvin Klein Trademark Trust. v. Wachner, the court categorically rejected the contention that public relations work falls within the attorney-client privilege. 198 F.R.D. 53 (S.D.N.Y. 2000). The court held "ordinary public relations advice" did not relate "to obtaining legal advice." Id. at 54; see also Haugh v. Schroder Inv. Mgmt. N. Am. Inc., No. 02 CIV.7955 DLC, 2003 WL 21998674, at *3 (S.D.N.Y. Aug. 25, 2003) ("A media campaign is not a litigation strategy. Some attorneys may feel it is desirable at times to conduct a media campaign, but that decision does not transform their coordination of a campaign into legal advice.").

In some cases, however, courts have applied the functional equivalence doctrine and extended the attorney-client privilege to communications involving public relations firms. In Grand Jury Subpoenas Dated March 24, 2003 Directed to (A) Grand Jury Witness Form and (B) Grand Jury Witness, the court extended the attorney-client privilege to a public relations firm retained by the client's lawyers after concern that "intense press interest" in the client's potential indictment created "a clear risk that the prosecutors and regulators . . . would feel public pressure to bring some kind of charge"

40

against the client. 265 F. Supp. 2d 321, 323 (S.D.N.Y. 2003). In those circumstances, the court recognized that "the advocacy of a client's case in the public forum will be important to the client's ability to achieve a fair and just result in pending or threatened litigation." Id. at 330. In In re Copper Market Antitrust Litigation, a scandal-hit Japanese corporation, faced with possible litigation in the United States, hired a public relations firm based in the United States to deal with English-speaking media. The public relations firm independently communicated with counsel based in the United States, possessed authority to represent the Japanese corporation for public relations matters, and was otherwise treated as a part of the corporation's staff. The court, citing In re Bieter Co., held the public relations firm was the "functional equivalent" of an employee and communications between the third-party public relations firm and corporate counsel could be protected by the attorney-client privilege. 200 F.R.D. 213, 219 (S.D.N.Y. 2001).

Grand Canyon Skywalk Development LLC v. Cieslak was a defamation claim against a public relations firm that had been hired by a Native American tribe to manage media contacts in connection with a long-running dispute about construction of a skywalk over the Grand Canyon. No. 2:15-cv-1189, 2015 WL 4773585 (D. Nev. Aug. 13, 2015). The public relations firm asserted an affirmative defense of reliance on advice of the law firm that represented the tribe in the litigation. Id. at *8. Considering the unique facts of the case, the court found the public relations firm was functionally equivalent to a tribal employee and that the legal advice appeared to have been given with respect to the firm's actions on behalf of the tribe. The court further found, however, that the record was insufficient to determine whether the tribe had waived attorney-client

41

privilege and work product protection by not timely asserting those protections. Id. at *15-17.

A retired magistrate judge, acting as special master to review claims of privilege in a multidistrict litigation products liability matter, addressed claims of privilege over draft press releases prepared by a public relations firm. See In re Johnson & Johnson 2021 WL 3144945. Plaintiffs had argued any privilege or work product protection was waived when the defendant shared documents with the public relations firm. The special master disagreed, relying on declarations of Johnson & Johnson executives and on affidavits of in-house counsel who had worked on the litigation:

> J&J's attorneys needed to consult and communicate with J&J's outside public relations firms so that they could provide informed legal advice about talc matters that could impact J&J's defense. Given the stakes at issue and the ongoing publicity regarding talc/asbestos/[Johnson's Baby Powder] litigation, the [special master] credits [a J&J's executive's] statement that it was essential that J&J's P.R. consultants "communicate with J&J's lawyers-and provide [the] lawyers with drafts to review-in order to ensure that [their] documents were consistent with J&J's litigation position in pending lawsuits and did not raise any other legal concerns."

Id. at *9.

Essentia points out that counsel is included on each of the documents plaintiffs question as being for public relations purposes, (Doc. 169, p. 23), but inclusion of counsel as a recipient of documents is not alone sufficient to establish a communication was made for a legal purpose. If Essentia's public relations consultants are to be considered the functional equivalent of Essentia's employees, communications in which they were included would be privileged only if they were made for the "predominate purpose" of seeking legal advice. See In re Polaris, 967 N.W.2d at 408. Though under some circumstances a third-party consultant, including a public relations consultant,

42

can be considered the functional equivalent of an organization's employee for purposes of application of the attorney-client privilege, courts have applied the functional equivalent doctrine only after a party has established retention of the consultant was in fact in furtherance of a legal purpose rather than a business purpose. This court will apply that same standard.

Essentia has not supported its attorney-client privilege claims with declarations or other evidence establishing it engaged a public relations consultant for a legal purpose rather than for the purpose of protecting its business reputation. Neither the limited information Essentia included in its privilege logs nor the assertions of counsel in briefing are sufficient to determine whether the attorney-client privilege extends to communications with Essentia's public relations firm.

**4.     Work Product Doctrine**

Work product protection was one of several privileges Essentia claimed over ninety-six of the one hundred documents submitted for in camera review. Plaintiffs contend Essentia claimed the protection over documents that do not come within the definition of work product.

The work product doctrine is governed by federal law, as codified in Federal Rule of Civil Procedure 26(b)(3). See Hanna v. Plumer, 380 U.S. 460, 473 (1965). Rule 26(b)(3) protects two types of work product—ordinary work product and opinion work product. Ordinary work product "includes raw factual information" gathered in anticipation of litigation. Baker v. Gen. Motors Corp., 209 F.3d 1051, 1054 (8th Cir. 2000). Ordinary work product is discoverable only upon a showing of "substantial need for the materials" and inability to obtain a substantial equivalent without "undue

hardship." Fed. R. Civ. Pro. 26(b)(3). Opinion work product is defined as the "mental impressions, conclusions, opinions, or legal theories of a party's attorney." Id. Opinion work product "enjoys almost absolute immunity and can be discovered only in very rare and extraordinary circumstances."[9] Baker, 209 F.3d at 1054. The court will follow those principles in considering Essentia's claims under the work product doctrine.

The test of whether a document was prepared in anticipation of litigation is whether "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." Diversified Indus., 572 F.2d at 604. But, even if litigation is a prospect, "there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation." Id. And attorney involvement in an investigation is not necessarily sufficient by itself to protect an entire investigation under the work product doctrine. Id. at 603-04; Nodak Mut. Ins. Co. v. Case New Holland, LLC, No. 3:14-cv-86, 2015 WL 11438181 (D.N.D. June 16, 2015).

Of the ninety-six documents submitted for in camera review over which Essentia asserts work product privilege, three are identified as having been created well prior to Essentia having learned of the alleged temperature excursion. (Doc. 194, pp. 27, 31, 36). Plaintiffs argue those documents cannot have been prepared in anticipation of litigation. Id. at 17. Essentia responds that a document may be protected as work product if it was prepared in anticipation of "some litigation," even if not in anticipation of the present

---

[9] Those rare circumstances, such as an "attorney engaged in illegal conduct or fraud," are not relevant here. See Baker, 209 F.3d at 1054.

litigation. (Doc. 210, pp. 12-13). While that is a correct statement of the law, it is not determinative of whether Essentia's claims of work product protection were proper.

On review of the documents, it appears dates of two of the three documents were incorrectly identified on Essentia's privilege log; it appears a document identified as created on January 4, 2018, was actually created in March 2020 and a document identified as created on September 9, 2019, was actually created in September 2020. (See Doc. 194, pp. 27, 31). Thus, the documents' dates alone are not sufficient to determine whether they qualify for work product protection. As to the document identified as created on November 14, 2017, the court conceives no basis under which it could be considered as having been prepared in anticipation of litigation, regardless of its date.[10]

Many of the documents over which Essentia claims work product protection are identified as drafts, and plaintiffs assert Essentia "improperly extended the work product doctrine to general business discussions." Id. at 17. Essentia responds that Minnesota law protects documents prepared at the direction of a party's attorney and preliminary draft documents exchanged between a client and the client's lawyer. While those principles are indeed recognized by Minnesota law, they do not extend so broadly as to shield every document over which Essentia has claimed work product protection.

Under the approach Essentia took in preparing its privilege log, one would need to assume that Essentia anticipated litigation immediately after learning of the alleged

---

[10] The document itself identifies January 5, 2017, as the date it was revised and nowhere includes the November 14, 2017 date listed on Essentia's privilege log. Regardless of the date of its creation, it cannot be considered to have been created—or revised—in anticipation of litigation.

temperature excursion and that all work of the purported review organization(s) was conducted in anticipation of litigation. It is, however, well established that "[t]he mere possibility that litigation may result is not sufficient to trigger the protection of the work product doctrine." Gillespie v. Charter Commc'ns, 133 F. Supp. 1195, 1201 (E.D. Mo. 2015) (citing Diversified Indus., 572 F.2d at 604). And nothing suggests that the work product doctrine should be applied more broadly in the context of medical peer review than in other contexts. Of the ninety-six documents submitted for in camera review over which Essentia claims work product protection, the privilege log identifies twenty-eight as created after July 10, 2020, the date on which this case was filed. As of that date, litigation was a certainty. But the privilege log does not suggest Essentia claimed work product protection any differently for documents created after litigation began than for documents created prior to July 10, 2020.

Essentia claims work product protection over sixty-three documents as to which no attorney is identified as either creator or recipient.[11] Though work product protection

_____

[11] EHPRIV 000004, EHPRIV 000037, EHPRIV 000061, EHPRIV 000133, EHPRIV 000145, EHPRIV 000150, EHPRIV 000279, EHPRIV 000285, EHPRIV 000609, EHPRIV 000611, EHPRIV 000729, EHPRIV 000991, EHPRIV 001538, EHPRIV 001740, EHPRIV 001777, EHPRIV 002536, EHPRIV 003528, EHPRIV 004174, EHPRIV 004346, EHPRIV 005469, EHPRIV 005599, EHPRIV 05661, EHPRIV 05801, EHPRIV 005905 , EHPRIV 005906, EHPRIV 006322, EHPRIV 006364, Row 6883, Row 7006, Row 7075, Row 7182, Row 7187, Row 7234, Row 7400, Row 7446, Row 7974, Row 8083, and Row 8088. (Doc. 194, pp. 20-40). EHPRIV 001194, EHPRIV 001210, EHPRIV 001893, EHPRIV 001992, EHPRIV 002372, EHPRIV 002601, EHPRIV 002602, EHPRIV 003527, EHPRIV 003760, EHPRIV 004296, EHPRIV 004390, EHPRIV 004391, EHPRIV 005374, EHPRIV 005401, EHPRIV 005662, EHPRIV 005771, EHPRIV 005772, EHPRIV 0086464, EHPRIV 006465, EHPRIV 006562, EHPRIV 006572, EHPRIV 007116, EHPRIV 007475, EHPRIV 007970, and EHPRIV 008215. (Doc. 197-2).

Though the privilege log does not identify any attorney as a recipient of document EHPRIV 001777, review of the document shows that an attorney was in fact a recipient.

is not limited to documents prepared by or requested by an attorney, the court finds no basis for extending work product protection to documents neither created by nor reviewed by an attorney. Indeed, Essentia has cited no case law applying work product protection to documents neither created by nor received by an attorney. Essentia has not established any of the sixty-three documents not created by or received by an attorney would properly be protected under the work product doctrine.

The court has thoroughly reviewed each of the ninety-six documents submitted for in camera review over which Essentia claimed work product protection, together with the privilege log excerpts corresponding to each of those documents. Based on the information Essentia has provided, the court identifies only one of those documents— EHPRVI 4846—as protected under the work product doctrine. Of the reviewed documents, that is the only one that clearly contains opinions or mental impressions of counsel. One of the documents over which Essentia asserted work product protection and attorney-client privilege is actually a screenshot of a social media post prepared by plaintiffs' counsel. The court conceives no circumstances under which that document would be protected as work product or attorney-client communication. (Doc. 195-21).

**5.    Sufficiency of Essentia's Privilege Logs**

Rule 26(b)(5)(A) requires a party withholding documents on the basis of privilege to "expressly make the claim" and "describe the nature of the documents." To comply with that rule, parties often agree to serve privilege logs. See Bartholomew, 278 F.R.D. at 447 ("The privilege log is a convention of modern legal practice designed to conform with the requirements" of Rule 26(b)(5)(A)). There is no rule governing the particular details required on a privilege log, though a court may direct a party to add

detail in order to bring a privilege log into compliance with the general mandate of Rule 26(b)(5)(A). See Fams. Advoc., LLC v. Sanford Clinic N., No. 3:16-CV-114, 2019 WL 10910868, at *5 (D.N.D. Jan. 9, 2019).

An August 2, 2021 order required Essentia to provide more detailed privilege logs than it had done previously. Specifically, Essentia was ordered to identify:

> (1) the date on which [each document] was created, (2) identity of the person who created it and the position held by that person at the time the document was created, (3) identity of persons who received the document and their positions, (4) a description of the subject matter of the document, (5) inclusive document identification numbers, and (6) specific reference to the portion of the North Dakota or Minnesota privilege the document is asserted to meet.

(Doc. 79, p. 2). Though inclusive document identification numbers were not provided, Essentia otherwise technically complied with the August 2 order by providing additional information about each of the documents over which it claimed any privilege. As to the identities and positions of persons who created and received the documents, along with names of individuals, Essentia included the person's position within Essentia. Maintaining its stance that the structure and composition of its purported review organization is privileged, Essentia did not identify the positions of any of those persons within the purported review organization.

In short, Essentia's privilege logs are inadequate to support its claims of privilege.[12] When a privilege log is found to be inadequate, a court can order several

---

[12] In addition to the inadequacies discussed throughout this order, review of the documents submitted for in camera review and of the corresponding entries on Essentia's privilege log identified several discrepancies. As noted above, it appears two documents were incorrectly dated on the privilege log and an attorney-recipient of one document was not identified on the privilege log. Additionally, the court noted two documents plaintiffs selected for in camera review—EHPRIV 008134 and EHPRIV 006373—are duplicates of each other, though described differently on Essentia's

48

remedies—(1) require that an adequate log be submitted, (2) find the inadequate log to be a waiver of the privilege, or (3) conduct in camera review of some or all of the documents that were withheld. Nat'l Lab. Rels. Bd. v. Jackson Hosp. Corp., 257 F.R.D. 302, 307 (D.D.C. 2009). Waiver is generally appropriate if the court finds "unjustified delay, inexcusable conduct, or bad faith are present." Johnson v. Ford Motor Co., 309 F.R.D. 226, 235 (S.D.W. Va. 2015) (citing Westfield Ins. Co. v. Carpenter Reclamation, Inc., 301 F.R.D. 235, 247-48 (S.D.W. Va. 2014)).

Plaintiffs advocate for finding Essentia has waived the asserted privileges by its failure to produce adequate privilege logs. There is no question that Essentia's assertions of very broad privileges, its reluctance to provide factual support for its assertions, and its repeated appeals of discovery orders have delayed discovery very significantly. But, as discussed in earlier orders, the court considers some of the issues Essentia has raised to have been genuinely debatable. In these circumstances, the court will not yet find Essentia has waived its claims of privilege. Rather, the court orders the steps outlined below.

## 6.    Appointment of a Special Master

Describing the one hundred documents submitted for in camera review as "only scratch[ing] the surface of those documents included on the supplemental privilege logs," if the court does not "fully sustain Essentia's privilege assertions based on this sample review, Essentia respectfully requests that a Special Master be retained to more

---

privilege log. (See Doc. 195-39; Doc. 195-42). Two other documents, EHPRIV 007589 (identified on plaintiffs' log as Row 7075) and EHPRIV007475, both dated May 6, 2020, are also identical, though one is described as a draft and the other is not.

thoroughly review and analyze all of the documents at issue." (Doc. 210, p. 13). Plaintiffs agree that the documents reviewed in camera are the "tip of the iceberg" over which Essentia claims privilege but assert retention of a special master would be premature. (Doc. 212, p. 19 n.19). Further, plaintiffs view retention of a special master as creating additional litigation, additional cost, and unnecessary delay. And plaintiffs contend they should not be required to bear costs of retention of a special master.

Under Federal Rule of Civil Procedure 53, a court may appoint a special master to perform tasks to which the parties consent, to make recommended findings of fact under certain circumstances, or to address pretrial and posttrial matters that cannot be effectively and timely addressed by an available judge. In addition to authority pursuant to that rule, the court has inherent authority to appoint an agent or special master to assist in managing litigation. See Jenkins by Agyei v. Missouri, 890 F.2d 65, 66 (8th Cir. 1989); see also In re Peterson, 253 U.S. 300, 312 (1920) (stating that, in the absence of legislation to the contrary, courts have "inherent power to provide themselves with appropriate instruments required for the performance of their duties," including the power "to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause").

Under the authority of Rule 53 and its inherent authority, the court will appoint a special master to further review documents over which Essentia has claimed one or more privileges. Prior to appointment of a special master, however, the court will make a determination of whether the review organization Essentia asserts meets the statutory definition of section 145.61, subdivision 5. Once that determination is made, the special

50

master will be tasked with recommending to the court whether Essentia should be found to have appropriately asserted privileges, applying the principles described in this order.

The court's task, at this juncture, is not to determine relevance of any document. Yet, having reviewed the one hundred documents submitted in camera, the court questions whether many—perhaps most—are relevant to determination of Essentia's liability or to determination of the amount of plaintiffs' potential damages. For example, a number of the documents address possible modifications to Essentia's medical record system to document revaccinations and to exclude revaccinations from its patient billing system. Others address plans for implementing the revaccination process. The court directs the parties to confer to determine whether the scope of documents requiring special master review might be narrowed to eliminate documents having little or no relevance to the specific matters at issue.

Essentia, as the party asserting the privileges, will be required to bear all fees and costs for engagement of a special master. In requiring Essentia to bear all fees and costs, the court also considers the lack of factual support for the claimed privileges Essentia has provided to date.

### 7.   Request for Certification to State Supreme Court

If the court does not adopt its interpretation of the Minnesota peer review statutes, Essentia repeats its prior requests for certification of questions regarding the peer review privilege to the Minnesota Supreme Court, arguing plaintiffs raise novel arguments that implicate important policy aims.[13] (Doc. 210, p. 13). Plaintiffs contend

---

[13] Essentia made similar requests for certification of questions to a state supreme court in its opposition to this court's orders of August 2, 2021, and May 9, 2022. (Doc. 87; Doc. 188).

certification to the state supreme court is not warranted under Minnesota law. (Doc. 212, p. 19 n.20).

By statute, the Minnesota Supreme Court "may answer a question of law certified to it by a court of the United States . . . if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling [state] appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065, subd. 3; see also Phillips v. Messerli & Kramer, P.A., Civ. No. 08-4419, 2009 WL 1046685 (D. Minn. Apr. 20, 2009).

At this time, the primary issues remain sufficiency of Essentia's privilege logs and evidentiary support for its privilege claims. Those are matters of federal procedural law. The court does not view the issues presented in the current motion as satisfying requirements for certification to the state supreme court.

## 8. Sanctions

Plaintiffs' motion to compel production of documents requested sanctions. The court has not ordered sanctions in any of the previous orders dealing with Essentia's production of documents and will not do so at this time. Failure to fully comply with this order may well, however, result in imposition of sanctions.

## Conclusion

Within **ten days** of the date of this order, Essentia may submit evidence supporting its position that its asserted peer review organization meets the statutory definition and may file a brief of up to ten pages explaining why the organization should be considered to meet that definition. Within **ten days** of Essentia's filing of its evidence and brief, plaintiffs may file a responsive brief or request deposition testimony

under Rule 30(b)(6) concerning structure of Essentia's asserted review organization. If plaintiffs exercise the option of taking Rule 30(b)(6) testimony, they may file a responsive brief within **ten days** of receipt of the deposition transcript. Plaintiffs' responsive brief may not exceed ten pages.

As to its assertions of attorney-client privilege and work product protection, within **twenty days** of today's date, Essentia may submit evidence supporting the privileges claimed in its privilege logs.

The parties are directed to confer in good faith to select an individual acceptable to both sides who is qualified and willing to serve as special master. In the event the parties are unable to agree on selection of a special master, **within twenty days of today's date**, each side may nominate two individuals qualified and willing to accept that role, and the court will select the special master from among those nominated. Within **twenty days** of today's date, the parties must also confer to discuss whether the scope of documents requiring special master review can be narrowed.

The court recognizes that implementation of the special master review process will likely require significant extensions of the deadlines that have been established. The parties are directed to confer within **twenty days of the date of this order** to discuss necessary adjustments to those deadlines. Proposals for extension of deadlines should be submitted to the court within **thirty days** of the date of this order.

Plaintiffs' motion to compel, (Doc. 160), is **GRANTED TO THE EXTENT DESCRIBED ABOVE** but otherwise **DENIED** at this time.

**IT IS SO ORDERED**.

Dated this 13th day of January, 2023.

/s/ Alice R. Senechal
Alice R. Senechal
United States Magistrate Judge