**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| JESSICA KRAFT, INDIVIDUALLY AND AS PARENT OF MINORS L.K., S.K., and O.K.; SHELLI SCHNEIDER, INDIVIDUALLY AND AS PARENT OF MINORS A.S and W.S.; ANNE BAILEY, AS PARENT OF MINOR D.B.; AMY LAVELLE, AS PARENT OF MINORS Em.L. and El.L; ELIZABETH BEATON, INDIVIDUALLY AND AS PARENT OF MINOR M.B.; AMANDA AND TYRELL FAUSKE, INDIVIDUALLY AND AS PARENTS OF MINORS C.R.F and C.J.F.; JENNIFER REIN, INDIVIDUALLY; and JESSICA BERG, AS PARENT OF MINORS A.B. and S.B., individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 3:20-CV-121  Hon. Peter D. Welte  Mag. Alice R. Senechal |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| ESSENTIA HEALTH, INNOVIS HEALTH, LLC d/b/a ESSENTIA HEALTH, DAKOTA CLINIC PHARMACY, LLC, JOHN DOE MANUFACTURERS, and JOHN DOE DISTRIBUTOR, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' RESPONSE BRIEF REGARDING ESSENTIA'S PEER REVIEW
ORGANIZATION STRUCTURE**

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................ 1

II. DISCUSSION............................................................................................................. 1

 A. The boundaries of Essentia's purported peer review committees were drawn with its outside counsel for the purposes of this litigation, not for peer review. ................ 1

 B. Essentia's claims about its typical committee-related practices are not true............ 3

 C. Essentia's counsel instructed it not to answer questions about the purpose and function of the committees, which is key to determining whether they are peer review committees at all, and which documents are privileged. ........................................ 4

 D. The privilege is unsupported by the committees' scope........................................... 5

III. CONCLUSION......................................................................................................... 10

## I.    INTRODUCTION

Essentia asserts peer review privilege over most of its responsive documents. First, it insisted that its entire clinical system was a peer review organization in a perpetual state of peer review. Once the Court rejected that argument, Essentia claimed that its peer review had been conducted by statutorily "established" peer review committees all along. Now, it is clear that those "committees" were manufactured in hindsight to shield documents in this litigation.

In doing so, Essentia crafted committees of individuals who communicated broadly and for ordinary business purposes, not peer review ones. Essentia has deemed clinic operations, the provision of vaccinations, temperature monitoring, updating patient charts, management of pharmacy projects, and answering patient and provider questions as "peer review"; they are not. Essentia acknowledges that all of the committees received information from other sources – but has yet to produce that original source material. Despite the Court's direction, Essentia continues to construe its entire multi-hospital system and its "peer review organization" as one in the same, bending only so far as to categorize the thousands of employees and third parties who sent or received withheld communications as having been "delegated" peer review work.

If a peer review did occur, Essentia's inability or unwillingness to establish it despite two years and countless opportunities to do so should result in waiver.

## II.    DISCUSSION

### A.    The boundaries of Essentia's purported peer review committees were drawn with its outside counsel for the purposes of this litigation, not for peer review.

At its Deposition,[1] Essentia testified that it had no policies or standards for the creation, conduct, or oversight of peer review committees. 19:10-19; 20:15-21; 22:14-23; 25:9-26:5.

---

[1] All transcript citations are "e.g." cites to the transcript of Plaintiff's February 22, 2023 deposition of Essentia pursuant to Fed. R. Civ. P. 30(b)(6) (the "Deposition"), attached as **Ex. A.**

Essentia did not track or maintain lists of its peer review committees, 20:22-21:5; 193:16-18; track or keep rosters of committee membership, 21:6-10; 23:6-9; 193:19-194:2; or know how many committees it has, 31:16-23. Essentia did not have a process for informing people when they were being added to a committee, 22:14-23; who other committee members were, 23:10-15; or of their confidentiality obligations, 25:4-25:8, 136:18-24. It did not have a process for maintaining meeting minutes, 21:11-18; or for terminating a committee when its work was completed, 24:14-18.

Essentia does not know when or how the committees were created, who initiated their creation (beyond "leadership"), when or why members were added, what members' roles were, what skillset the members offered to their committees, why committees expanded to add certain skillets, how members were informed of peer review confidentiality obligations, how members were informed of who other committee members were, if or when the committees had meetings, whether the committees had agendas or kept minutes, who the committees delegated work to, where committees stored their documents, or whether and to whom the committees disseminated information outside of the committees. *See generally* Transcript. *See also, e.g., infra*, n. 6 (regarding storage committee, for example). Essentia could not identify other individuals who would be able to testify as to this information. 199:20-211:6.

Essentia claims its committees delegated peer review work to individuals whose "identities are reflected" in its privilege log. *E.g.*, ¶¶ 11, 17, 23, 28, 32, 48.[2]  For example, the Olive Committee delegated to "teams of nurses." ¶ 23. But Essentia does not know if there is a record of who those teams were, and referred Plaintiff to the "privilege log, if anything existed." 94:7-14. Essentia itself could not identify committee members, committees, or delegates from the privilege log. 100:3-7; 100:16-19; 109:18-110:8; 152:7-20; 178:2-7. *See also* 100:8-14 (instructing Essentia

---

[2] All ¶ __ citations refer to paragraphs of Essentia's declaration, ECF No. 227 (the "Declaration").

not to answer whether it could identify *any* privilege log entry that was sent by *any* peer review committee).

Essentia could not explain why thousands of employees received purportedly privileged information, let alone whether those people were instructed of any confidentiality duty. 102:17-24; 104:18-105:8. It could not identify numerous listserv email addresses that sent and received withheld communications. 110:16-114:3. It could not explain why individuals in print production, MRI/CT, janitorial services, nutrition services, physical therapy, or fitness operations received purportedly privileged communications about the excursion. 106:21-109:14. Essentia did not know the peer review work performed by third-party consultants on the privilege log or whether those consultants were aware of any peer review-related obligations. 114:18-115:24.

Rather, Essentia testified that the Declaration was drafted "with the assistance of counsel," the Vogel Law Firm. 79:9-10. Essentia determined who to name as committee members by working with the Vogel Law Firm. 167:10-21; 184:12-22. Essentia did not vet those committees or committee rosters when signing the Declaration or preparing for the Deposition. 184:23-185:2. Essentia did not review documents (other than the Declaration), speak to committee members, or otherwise investigate committee membership in connection with the Declaration or Deposition. 15:1-11; 33:18-34:5; 34:13-18. The Declaration says that matters outside of the declarant's knowledge were "assembled or relayed by authorized agents or employees of [Essentia]," ¶ 2, but Essentia did not know who those agents were. 196:3-7. Even as to the committees on which Essentia's designee personally sat, the witness knew very little. *Infra*.

The weight of the evidence suggests that these were not committees at all. And if they were, they did not operate for peer review purposes and with the requisite confidentiality.

**B. Essentia's claims about its typical committee-related practices are not true.**

Unable to provide any concrete testimony regarding whether and how committees and

3

delegates were informed about their peer review role or obligations, Essentia instead testified as to what it *thinks* occurs based on typical practices, e.g., a "common theme" of informing committees about confidentiality, or "common knowledge" that the work is intended to be confidential. 49:19-50:8; 198:2-6. But that does not hold true.

Plaintiff Jessica Berg is a registered nurse who worked at Essentia when it learned of the excursion. *See* **Ex. E** (Declaration of Jessica Berg). She received communications related to the excursion and her name appears on several privilege log entries. *Id.* Until reading the Declaration, she had never heard of any of the committees it names. *Id.* She was never told she was receiving peer review communications, working as part of a peer review, being delegated work by a peer review committee, or that she had any peer review-related confidentiality obligations. *Id.* She was simply working in her role as a nurse. *Id.*

Essentia did not "know if there was ever anything specifically stated" to delegates of the Storage Committee, for example, about the work they were purportedly given at "the express direction" of that committee. 62:13-20; ¶ 17. Consistent with Ms. Berg's experience, "[i]t was, essentially, we need this done or something of that nature." 62:13-20. There is no evidence that Essentia's committee members (or their delegates) acted within a confidential peer review.

C. **Essentia's counsel instructed it not to answer questions about the purpose and function of the committees, which is key to determining whether they are peer review committees at all, and which documents are privileged.**

Essentia's counsel prevented Plaintiffs from obtaining even superficial information about the committees' purpose and function to determine whether they were in, fact, peer review committees. For example, it instructed Essentia not to answer whether the committees ever drafted guidelines, or any Word documents, 194:5-23; whether they assessed the financial impact of the excursion or reviewed financial records, 58:18-59:1; 139:5-10; whether they reviewed legal filings, 137:12-17; what kind of recommendations they developed and who they made

recommendations to, 149:20-150:9; 172:22-173:4; whether they made policy recommendations, 74:3-11; how updating patient charts regarding impacted medications served to improve the quality of healthcare, 86:24-87:11; what committees do with the results of their analyses, 131:23-132:12; how committees worked to help reduce the risk of patient harm if they didn't share information with others at Essentia, 133:7-15; and whether Essentia did anything to investigate the excursion that was *not* peer review work, 191:15-24; *see also* 192:2-193:19. Counsel claimed these questions were outside the scope of the Deposition, which is untrue[3] and is not a basis for the instruction not to answer, anyway, *see* Fed. R. Civ. P. 30(c)(2). Counsel also claimed the sought-after information is privileged, but it is not.[4]

A peer review committee is not simply a group of individuals cobbled together by a hospital (let alone by its outside counsel) to do work – it must be established for a specific peer review *purpose*. Minn. Stat. § 145.61, Subd. 5.[5] Documents are only shielded when acquired in the exercise of the committees' "duties and functions." *Id.* at § 146.64, Subd. 1. And the Declaration spoke about, e.g., delegation to others, information gathered from others, and non-privileged work like the development of recommendations, patient relations, practice management, and identification of people and medications affected by the excursion. Whether the withheld documents are privileged turns on the purpose and function of the committees and the documents.

### D. The privilege is unsupported by the committees' scope.

Essentia admitted that all of its employees had job responsibilities beyond peer review.

---

[3] *See* **Ex. B** (Notice), **Ex. C** (Objection to Topic 1), and **Ex. D** (response).

[4] *E.g.,* 74:3-76:15 (instructing witness not to answer whether "the storage committee ma[d]e policy recommendations to improve the quality of patient care" despite clarification that Plaintiffs sought only non-substantive "yes" or "no" answers to help ascertain the boundary between peer-review and non-peer review work).

[5] Given space limitations and the parties' extensive prior briefing, Plaintiffs cite limited authority and incorporate their prior briefs. *E.g.,* ECF Nos. 68, 96, 161, 172, 180, 189, 193, 212.

64:17-20. But Essentia does not know enough about its "committees" to support their existence, let alone draw the line between peer review and non-peer review work. Even ignoring how these committees were concocted, the evidence reflects that they did not operate for peer review.

(1) Essentia named 35 employees in legal, pharmacy, nursing, marketing, communications, patient relations, quality, medicine, finance, operations, enterprise analytics, and risk to the **West Market Storage Committee** ("Storage Committee") and claims it (like all other committees in the Declaration) delegated work to unnamed others. ¶¶ 12; 14-17.

Although Essentia was required to prepare and educate its designee for the Deposition, and that designee claimed to be a member of the Storage Committee in his individual capacity, Essentia could not support that the committee existed at all, let alone for peer review purposes.[6] Essentia

---

[6] Essentia did not know when the storage committee first met (200:6-7); how long ago it last met (44:1-4); if it was still active (43:19-23); who defined the committee's purpose (40:22-41:2); how committee members were informed of their role on the committee (46:19-47:2); members' skillsets or roles (63:2-11, 65:3-9); why additional members and skillsets were added (67:8-18; 67:22-68:15); when committee members were added (67:19-21); whether new additions were informed they were being added to a peer review committee (68:16-69:4); if the committee exchanged written materials (45:11-13); where written materials would have been saved (45:19-46:1); if the committee drafted any documents, reports, or guidelines or whether it shared any reports with all Essentia employees (52:7-20, 53:7-19); who it received documents from (53:20-54:2); where it gathered data from (54:3-6); whether or where meeting agendas were saved or how access to them was restricted (72:7-73:5); what kind of work the committee delegated (49:11-18); how delegates knew they were working for the committee (62:13-20; 69-5:11); whether members told delegates which committee they were receiving work from or how delegates would know who they could discuss their work with (69:5-22); who the committee shared information with (37:21-38:7); who it gave guidance to or delegated work to (37:3-20;49:5-10); whether it worked with other peer review committees (41:12-17); whether communications issues were brought to the committee (65:10-23); whether the committee reported its findings to leadership (73:6-12); any privilege log entry that is a record of the committee (99:3-10); any individual on the privilege log who was delegated work by the committee (100:16-19); who would have greater knowledge than the witness about the committee (96:6-10); and, anyone who would know the role of each committee member, why committee members were added, about committee communications, or whether the committee relayed information to leadership or medical providers or the public (200:24-202:3).

The Deposition revealed this same lack of knowledge about and support for the other committees. Given space limitations, Plaintiffs do not rehash the transcript for each committee.

says the committee was created to "oversee the response to the" excursion. ¶ 12; 58:2-3. That work was broad:

> Essentially, what was [Essentia] going to do as a result of [the excursion]. . . . It was . . . broader than [identifying medications]. . . . [I]t can be anything as a result of the potential temperature excursion. . . . It was there to evaluate what happened and determine a course of action.

57:1-58:17. It included "the overall oversight, review, and response" to the excursion.  92:11-14. It involved identifying affected medications and evaluating revaccination; reviewing information related to impacted medications, impacted patients, relevant medical providers, and governmental agencies; and communications with patients, governmental entities, providers, and the public. ¶ 16; 55:1-15; 58:2-14. That is not peer review.

(2) The **Olive Committee** oversaw "the management and collection of data for the potentially impacted patient population." ¶ 18. It used artificial intelligence software (Olive) and nurses to identify impacted patients and update patient charts. ¶¶ 18, 22; 77:18-78:3. It delegated work to unnamed individuals. ¶ 23. Neither the Declaration nor Deposition offered any support for why employees in legal, operations, revenue, business intelligence, and business services suited this committee's claimed purpose. ¶¶ 20-21; 82:5-24. Patient chart updates and medical care are not peer review activities.

(3) The **Patient Relations and Risk Management Committee** is a standing committee and has been for more than a decade. 119:6-120:4. Thirty members are identified, including employees in patient relations, insurance claims, risk management, operations, and leadership, ¶ 26, but Essentia claims the committee "includes all Essentia facilities, departments, services, and health care professionals," ¶ 25. The Court has rejected Essentia's attempt to claim the privilege so broadly.

Despite personally serving on the committee, Essentia's designee could not say whether it

had a roster, reviewed pharmacy records, communicated with governmental agencies, shared the results of any investigation, drafted policies, drafted guidelines, communicated about committee work with any other committee, drafted public relations communications, where or how its agendas were shared, or how responses are provided to patients. *See* 130:3-142:12.

According to Essentia, operations employees were "there for the day-to-day function of [Essentia's] healthcare organization, so that was probably the value they added" to the committee, 123:23-124:13, and the committee dealt with, *inter alia,* "interaction between our group via Essentia and patients." 125:21-126:2. As to its risk-related responsibilities: "Risk has a very, very broad umbrella, but everybody's definitions or opinions are going to be different." 127:5-17.

The committee deals with, e.g., "regular event reports," which are "patient [or provider] questions or concerns" and "feedback about care," which can, e.g., come through calls, emails, or provider discussions, and can include, e.g., billing disputes and "anything . . . where the patient believes that . . . something didn't go as they envisioned." ¶ 27; 25:2-14; 131:1-22; 141:14-142:1. These are not peer review purposes. Likewise, the committee subgroup "review[ed] information relative to the potential temperature excursion" and managed patient communications. ¶¶ 29-31. This group addressed active patient care and communications, not peer review.

(4) The **Essentia System Quality Committee** is a standing committee that works to "improve the quality and reliability of patient care.. . . ." 119:6-17; ¶¶ 33, 35. But it reviews "any information about patient care"; "it can be patient-specific or it can be population specific." 162:23-163:18. It is "just another committee," like the Risk Management Committee, and Essentia cannot identify any differences between the two committees' work and does not know why there were two committees with the same function. 153:11-20; 154:4-16. Essentia does not know whether it could identify work performed by this committee, 153:21-24, why members were

8

selected for that committee, 154:21-155:5, who selected them, 154:17-20, or whether they were informed they were members of this committee or of any confidentiality obligation, 155:23-156:9. The review of "any" information about care and work akin to the Patient Relations and Risk Management Committee is not peer review.

(5) The **Essentia Clinical Practice Committee** is a standing committee, 119:6-17, that oversees clinical care. It "asses[es] the quality of clinical care to improve [its] quality, affordability, and reliability. . . ." ¶ 37. It includes, e.g., executives, doctors, nurses, communications employees, and an editor. ¶ 38. Essentia could not explain these members' roles or contributions to the committee (or even what an editor generally does at Essentia). 157:24-158:16. The committee handles clinical changes, like if "a provider wants to change treatment regiments" or "change a policy on the way they provide care." 160:15-161:16. This is not peer review.

(6) The **Clinical Alerts Subgroup** was part of a "information services" (i.e., information technology) steering group. 166:7-18. It oversees "the monitoring of patient care in the clinical setting." ¶ 41. Essentia knew little about what this committee does. 166:7-170:1. It is a standing committee, 119:6-17, made up of medical providers and applications employees, ¶ 42, that works with "alerts within [Essentia's] electronic medical record," 168:12-17. This committee serves a general business purpose, not a peer review one.

(7) The **One Essentia Fridge Project committee** analyzed and made recommendations regarding Essentia's temperature-monitoring system. ¶ 45. This team was in place (or intended to be) before the excursion was discovered and is a standing committee now. 170:2-16; 207:6-11. Temperature monitoring is a regular and required aspect of any healthcare entity's business. There is no evidence this committee existed for a peer review purpose. *See also* 170:17-172:21.

(8) The **Immunization Clinic Transition team** oversaw "immunization in the clinical

9

setting, including for revaccination following the potential temperature excursion," ¶ 49, "[which] sites they were going be provided at, things of that nature," 178:8-17. This team made Essentia's clinics available to provide revaccinations. 178:22-179:6. Essentia could not explain the roles of this team's members, including the Marketing Planner on the team. 180:3-181:23. Providing immunizations and revaccination is medical care, not peer review work.

(9) The **IM Pharmacy Prioritization & Project Partnering committee** oversees "pharmacy projects" and "evaluates pharmaceutical patterns and prioritizes resources." ¶¶ 53, 55. It is a standing committee, 210:5-8, staffed by operations, pharmacy, and business intelligence employees, ¶ 54. Essentia could not explain what this committee does. 182:14-184:11. Business management of pharmaceutical services is not peer review.

## III.    CONCLUSION

Essentia again fails to establish the application or scope of the privilege. While the Court has indicated that some documents suggest the possibility of peer review – it appears far more likely that Essentia assessed the excursion to determine how to respond legally, medically, and publicly – but never established a committee to confidentially self-reflect and improve the quality of patient care. (Indeed, Essentia blamed a third party for the excursion, and that business relationship ended before the excursion was discovered). The documents should be produced.[7]

Dated: March 20, 2023                    Respectfully submitted,

    /s/ Melissa Ryan Clark
Melissa Ryan Clark
FEGAN SCOTT LLC
140 Broadway, 46th Fl.
New York, NY 10005
Ph: 646.502.7910

---

[7] The statute is designed to encourage candid, internal "review" of and by "peers." Any legitimate policy concern could be assuaged by the redaction of the names of peer-reviewing physicians (barring a good faith showing of need for that information).

Fax: 312.264.0100
melissa@feganscott.com

Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Ph: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

J. Barton Goplerud
Brian Marty
SHINDLER, ANDERSON, GOPLERUD &
WEESE, PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Ph: (515) 223-4567
Fax: (515) 223-8887
goplerud@sagwlaw.com

Scott Haider (#07533)
SCHNEIDER LAW FIRM
815 3rd Ave. S. Fargo, ND 58103
Ph: 701-235-4481
Fax: 701-235-1107
scott@schneiderlawfirm.com

*Counsel for Plaintiffs*

11