**PLAINTIFFS' RESPONSE BRIEF REGARDING ESSENTIA'S PEER REVIEW ORGANIZATION STRUCTURE**

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

- - -

JESSICA KRAFT,                     :
INDIVIDUALLY AND AS PARENT :
OF MINORS L.K., S.K. AND    :
O.K.; SHELLI SCHNEIDER,     :
INDIVIDUALLY AND AS PARENT :
OF MINORS A.S AND W.S.;     :
ANNE BAILEY AS PARENT OF    :
MINOR D.B.; AMY LAVELLE AS :
PARENT OF MINORS EM.L AND   :
EL.L; ELIZABETH             :
BEATON,INDIVIDUALLY AND AS :
PARENT OF MINOR M.B.;       :
AMANDA AND TYRELL FAUSKE,   :
INDIVIDUALLY AND AS PARENTS:
OF C.R.F. AND C.J.F.;       :
JENNIFER REIN INDIVIDUALLY;:
AND JESSICA BERG AS PARENT :
OF MINOR A.B. AND S.B.,     :
INDIVIDUALLY AND ON BEHALF :
OF OTHER SIMILARLY          :
SITUATED,                   :
                            : CASE NO.:
          Plaintiffs,       :
                            : 3:20-cv-121
          vs.               :
                            :
ESSENTIA HEALTH, INNOVIS    :
HEALTH, LLC, D/B/A ESSENTIA:
HEALTH, DAKOTA CLINIC       :
PHARMACY, LLC, JOHN DOE     :
MANUFACTURERS AND JOHN DOE :
DISTRIBUTOR,                :
                            :
          Defendants.       :

- - -

Wednesday, February 22, 2023

- - -

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

Remote videotaped deposition of FRANK MODICH, taken remotely at the location of the witness in Hibbing, Minnesota, commencing at 9:00 a m., and recorded stenographically by Theresa F. Franco, a Court Reporter and Notary Public.

- - -

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, Pennsylvania 19103

Page 4

- - -
I N D E X
- - -

Witness: FRANK MODICH            PAGE
By Ms. Clark . . . . . . . . . . . .   7
- - -
E X H I B I T S
- - -

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| Exhibit-1 | Plaintiffs' Amended Notice of Deposition Pursuant to Rule 30(b)6, dated 2/15/2023 | 11 |
| Exhibit-2 | Declaration of Frank M. Modich regarding review organization structure pursuant to the Court's order, filed as ECF No 227 on January 23rd, 2023 | 56 |
| Exhibit-3 | Essentia's supplemental privilege log | 95 |
| Exhibit-4 | Exhibit A Recipient Supplement, Listserv as of May 5th, 2021 | 103 |

- - -

Page 3

- - -
APPEARANCES:  (Remotely via teleconference)

FEGAN SCOTT, LLC
By:  MELISSA RYAN CLARK, ESQUIRE
140 Broadway
46th Floor
New York, New York  10005
646-502-7910
melissa@feganscott com
Representing the Plaintiffs


SHINDLER, ANDERSON, GOPLERUD & WEESE, PC
By:  J  BARTON GOPLERUD, ESQUIRE
5015 Grand Ridge Drive
Suite 100
West Des Moines, Iowa  50265
515-223-4567
goplerud@sagwlaw com
Representing the Plaintiffs


VOGEL LAW FIRM
By:  ROBERT B  STOCK, ESQUIRE
    BRIANNA RUMMEL, ESQUIRE
218 NP Avenue
P O  Box 1389
Fargo, North Dakota  58107
701-237-6983
rstock@vogellaw com
Representing the Defendants, Essentia Health
and Innovis Health


ALSO PRESENT:

JERAME LEIPFINGER - Videographer
MARY DUGAN - Paralegal for Fegan Scott
IRA LIVINGSTON - Concierge/Technician

- - -

Page 5

- - -

VIDEOGRAPHER:  Good morning.  We are on the video record at 8:55 a m. Central time on February 22nd, 2023. Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit one of the video deposition of Frank Modich, taken in the matter of Jessica Kraft, et al. versus Essentia Health, et al., filed in the United States District Court for the District of North Dakota, Case Number 3:20-CV-121.

My name is Jerame Leipfinger representing Veritext, and I am the videographer.  The court reporter is Terri Franco of the same firm.  I'm not

2 (Pages 2 - 5)

FRANK MODICH

Page 6

authorized to administer an oath. I'm not related to any party in this action, nor am I financially interested in the outcome.

At this time will all counsel present please announce their appearance for the record, and then the court reporter will swear in the witness.

MS. CLARK: Good morning, Melissa Clark with Fegan Scott here on behalf of Plaintiffs.

MR. STOCK: Robert Scott on behalf of Defendants.

THE COURT REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, I will administer the oath remotely. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Page 7

If anyone has an objection, please indicate that now on the record.

(No response.)

THE COURT REPORTER: Hearing none, Mr. Modich, please raise your right hand.

- - -

FRANK MODICH, having been first remotely duly sworn pursuant to agreement of counsel, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY MS. CLARK:

Q. Good morning, Mr. Modich. We met just before we went on video. My name is Melissa Clark. I am one of the attorneys for Plaintiffs in this case. It's nice to meet you.

Can you please state and spell your name for us?

A. Frank Modich, F-R-A-N-K, M-O-D-I-C-H.

Q. Are you currently employed?

A. Yes.

Page 8

Q. And who is your employer?

A. Essentia Health.

Q. What is your job tile?

A. I am the associate general counsel.

Q. What are your job responsibilities as associate general counsel?

A. I provide in-house legal advice to Essentia and its affiliated entities.

Q. Do you understand that you're under oath today and must tell the truth?

A. I do.

Q. Have you ever had your deposition taken in the past?

A. Yes. I have.

Q. And when have you had your deposition taken?

A. Twice: Once in a personal family estates matter, and in another as it related to an Essentia Health intellectual property matter.

Q. Have you ever taken a deposition?

A. Previously in private practice.

Q. So I'm going to go over some deposition rules and logistics that you are, I'm

Page 9

sure, very familiar with, so I appreciate your patience as we walk through them anyway because I know that you've been down this road.

Please make sure you answer audibly so the court reporter can hear your answers and the transcript will be clear. She can't record nods or head shakes, although she may try.

Will you let me know if you don't understand any of my questions?

A. Yes.

Q. And we can take a break at any time except when a question is pending. Will you let me know if you need a break?

A. I will.

Q. This deposition is being taken remotely, so we're not in the same room together. Is your counsel in the room with you today?

A. No. He is separate.

Q. Is anybody else in the room with you today?

A. No.

Q. Do you understand that if you need to communicate with anyone while we're on the

3 (Pages 6 - 9)

FRANK MODICH

Page 10

record today that you need to do so verbally and audibly so that everyone attending the deposition can hear?

A. Yes.

Q. Do you understand that you should not exchange notes, text messages, emails or other nonverbal communications while we're on the record today?

A. I do.

Q. Okay. Are you using a laptop to appear at this deposition?

A. Yes, into a docking station.

Q. Do you have any email accounts open on your laptop right now?

A. Yeah, probably so. I can try and close those if that's helpful.

Q. Will you be using those email accounts --

A. No.

Q. -- to communicate while we're on the record?

A. I won't be using anything, other than I may reference -- refer back to my declaration.

Page 11

Q. Do you have any instant message tools open on your computer right now?

A. No.

Q. Do you have your cell phone with you?

A. It's in the room, but I'm not using it.

Q. Thank you. Is there anything that would impact your ability to testify truthfully today?

A. No.

Q. Is there anything that would affect your memory or your recollection today?

A. No.

Q. Great. So I'm going to introduce our first exhibit. That should be in your introduced exhibits folder now. This is Exhibit-1, and it's Plaintiffs' Amended Notice of Deposition Pursuant to Rule 30(b)6. It is dated February 15th, 2023.

- - -

(Whereupon the document was marked, for identification purposes, as Exhibit-1.)

Page 12

- - -

THE WITNESS: I see it.

BY MS. CLARK:

Q. And do you have that exhibit open?

A. I do.

Q. Have you seen this document before?

A. Yes. I glanced at it.

Q. All right. What is this document?

A. This is a notice, your amended notice of deposition pursuant to the 30(b)6.

Q. Are you here today as a result of this notice of Deposition?

A. Yes, I am.

Q. And do you understand that you are testifying as a representative of an entity today?

A. Yes, I do.

Q. What entity are you testifying on behalf of?

A. Essentia Health.

Q. When you say Essentia Health, are you including any subsidiaries, parent companies or affiliates of Essentia?

A. Yes, Essentia Health, Innovis

Page 13

Health, on behalf of Essentia and its affiliated entities.

Q. So today when I refer to Essentia, I will mean all of those Essentia and Innovis entities; do you understand?

A. I do.

Q. If your answer pertains to only one set of -- one entity or a limited set of entities, will you specify that?

A. I will do so.

Q. You're here to testify today in Kraft versus Essentia litigation. Are you familiar with this lawsuit?

A. Yes, I am.

Q. Can you tell me in just a few sentences what your understanding of this lawsuit is?

A. Essentially, claims related to a -- on behalf of Plaintiffs related to a potential temperature excursion.

Q. If I use the phrase temperature excursion today, I'll be talking about the potential temperature excursion that was -- that is the subject of this lawsuit. Will you

4 (Pages 10 - 13)

FRANK MODICH

Page 14

understand what I mean if I say temperature excursion?

A. Yes.

Q. Thank you. Are you aware that Essentia has asserted the peer review privilege as a basis to withhold documents in this case?

A. I am aware.

Q. Are you familiar with the documents that have been withheld?

A. Can you please clarify?

Q. Sure. Have you reviewed any of the documents that have been withheld on the basis of the peer review privilege?

A. I've seen documents in the past. I can't state with any specificity which documents.

Q. Have you reviewed the privilege log produced to Plaintiffs in this case?

A. I have previously seen that supplemental privilege log.

Q. How did you prepare for today's deposition?

A. Essentially reviewed my declaration.

Page 15

Q. How much time did you spend preparing?

A. I'm going to say maybe over the course of an hour or so.

Q. Did you do anything else besides review your declaration to prepare for today's deposition?

A. Just conversations with counsel.

Q. Did you speak with anyone besides your outside counsel about this deposition?

A. No.

Q. Did you bring any documents with you to your deposition today?

A. My declaration.

Q. I'm going to ask that you don't review your declaration, although at some point we'll probably introduce it as an exhibit.

A. Yes.

Q. It's not a memory test today. Thank you.

And you recall authoring a declaration for this case regarding Essentia's peer review organizations?

A. I do.

Page 16

Q. So today when I refer to your declaration, I'll be referring to that peer review-related declaration. Do you understand that?

A. I do.

Q. Thank you. Do you know what a peer review organization is?

A. I have my understanding of a review organization or peer review organization.

Q. What is your understanding of a peer review organization?

A. Peer review organization under, specifically, state law is, you know, essentially an organization, authorizes committees to conduct what I would call peer review activities for the purpose of peer review.

Q. What is a peer review activity?

A. It's an activity where it's -- individuals who are authorized on behalf of the review organization will gather and review information to, essentially, enhance or improve the quality of care and treatment provided to patients.

Page 17

Q. Do you use the term peer review organization and peer review committee interchangeably?

A. I think it's -- I think it can be, and I have used that interchangeably, yes.

Q. I may use those terms interchangeably, organization and committee, and if there's a distinction, will you specify which you're referring to or ask me for clarification?

A. I will do that, yes.

Q. Are you on any peer review committees at Essentia?

A. I do sit on various peer review organization, peer review committees.

Q. How many peer review committees are you currently on?

A. I would probably look to the declaration. I think that identifies most of the, what I would call, current standing peer review committees, such as, I'll say, Essentia Clinical Practice Committee. We refer to it as ECPC. The Patient Relations and Risk Management Committee. I think those are some of the ones that are -- that stand out, but I

5 (Pages 14 - 17)

FRANK MODICH

Page 18

would refer back to the declaration for other things that I participated in. The West Market Management Storage Committee, for instance.

Q.    What is your role on the ECPC, the Essentia Clinical Practice Committee?

A.    Administrative staff.

Q.    What does administrative staff mean?

A.    Just an employee of the hospital clinic, the Essentia Health entity.

Q.    Do you have any specific responsibilities as a result of your membership on that committee?

A.    I'm an attorney, and so I may provide legal advice, things of that nature.

Q.    Is there a chair of that committee?

A.    Currently there is. Dr. Kevin Casey is the chair currently. Yes.

Q.    Is there an -- are there any other members of leadership for that committee?

A.    I want to say for ECPC, Sheila, and I'm blanking on her last name. She is the dyad to -- what I call the dyad to Dr. Henry, but otherwise, no.

Q.    What is a dyad?

Page 19

A.    Just the administrative person that is a dyad, essentially supports that physician leader, if you will.

Q.    Do all of the peer review committees at Essentia have a leadership structure?

A.    No.

Q.    Do all of them have a committee chair?

A.    No.

Q.    Does Essentia have any policies regarding the creation of a pier review committee?

A.    Not to my knowledge.

Q.    If a peer review committee needs to be created, what steps does Essentia take to put at committee in place?

A.    Usually, it's a directive, if you will, not formal or informal, from Essentia Health leadership. If it's an issue that may be continuous in nature, it may be what I would call a standing committee, but it's not uncommon if an issue arises for a committee to be formed to, essentially, evaluate and address and improve the, you know, be focused on

Page 20

improving the quality of care for our patients.

Q.    When you say Essentia leadership, who among Essentia leadership would be responsible for initiating the establishment of a pier review committee?

A.    It could be any Essentia leader, starting with our CEO, Dave Herman, to our CE -- COO, Jody Mansfield. It can be in the market perspective, such as Innovis Health CEO or leader. It's a broad term. It is essentially when a leader decides, or leadership team decides that a committee is necessary, they will gather that group for that committee.

Q.    What steps would an Essentia leadership member take to establish a peer review committee?

A.    Just more of a directive. It could be as much as a phone call, an email. It doesn't -- there's not, I'm going to say, a formalized process it.

Q.    Does Essentia keep track of the peer review committees it creates?

A.    I don't -- I think not necessarily

Page 21

track of all of them, because I, like I said, a lot of them can be informal. There's no essential, like, holding place or -- where all of these document or documents are kept or anything of that nature. So I want to say no.

Q.    Does Essentia keep track of members of peer review committees?

A.    Only if they're going to be in the sense of, like, meeting minutes or things of that nature.

Q.    How are meeting minutes maintained when the minutes are related to peer review committee work?

A.    I don't believe there's any one set process or anything like that. It could be an executive assistant or administrative assistant will keep them on behalf of the committee. But there's no -- again, no formal process to that.

Q.    How does someone who's creating a committee decide who should be a member of the committee?

A.    You know, dialogue, relationships, everybody at Essentia is going to have a very -- a different subject matter expertise.

6 (Pages 18 - 21)

FRANK MODICH

Page 22

And so based on what the issue is, it's probably going to be based on finding those professionals or administrative staff that are going to be best situated to staff that committee and, essentially, address that issue.

Q.    Are committee members ever removed or terminated from a committee?

A.    I have never seen anyone terminated. You know, people leave the organization and another person may fill that role or that place, but that's, you know, other than that, I'm not aware of any other process for that.

Q.    Are committee members informed when they are being asked to join a committee?

A.    Yes.

Q.    How would they be informed about their -- about the request for them to join a peer review committee?

A.    It's hard to say. I mean there's, again, no one set process for that. And for me to speculate on an answer that was going to address every situation, I just can't do that.

Q.    Are peer -- are peer review

Page 23

committee members informed about the other members of the peer review committee?

A.    Well, if they're sitting on the committee, they're going to know others that are on those committees, yes.

Q.    Would there be a roster for a committee membership?

A.    No. I'm not -- I'm not aware of any, like, roster or formal document.

Q.    If an individual was asked to join a committee, would they be informed in some way of who the other committee members are?

A.    Just as, I would assume, as -- from participating in that committee, that's how they're going to know.

Q.    You mentioned earlier that there are some standing committees, and it sounds like there are some committees that are not permanent standing committees; is that right?

A.    As referenced in my declaration for this specific potential temperature excursion, yes. Essentia has a lot of different committees. Some more formal, such as physician and nursing committees. Again,

Page 24

others more informal that are just raised to address a specific purpose.

Q.    Are any of the committees that were tasked with addressing the excursion more informal committees?

A.    I wouldn't say informal, but they were not standing committees. So I should clarify. There are standing committees that would have existed prior to the potential temperature excursion that continue to this day. There are others that were in response to the potential temperature excursion, and my declaration contains both.

Q.    When a committee's work is completed, is there a process for terminating the committee?

A.    No. It's just basically disbanded, if you will, but no formal process for that.

Q.    Are committee members informed of any ethical obligations that are specifically associated with membership on a peer review committee?

A.    I don't know about ethical. I mean one thing that's always really driven home is

Page 25

to keep the information confidential and privileged. So those conversations take place. So other than that, probably not.

Q.    Are committee members informed of their confidentiality obligations in writing?

A.    I wouldn't say -- I don't think there's going to be a hard and fast rule. A lot of it's just conversations.

Q.    Do committee members receive any code of conduct related to their service on a peer review committee?

A.    Not specifically to their service on a committee, no.

Q.    Do peer review committees receive any other guidelines or written policies and procedures related to their service on a peer review committee?

A.    I don't think there's one fast, hard and fast rule for every committee.

Q.    Do you know if any of the committees in your declaration received written guidance about their role on a committee?

A.    Not to my knowledge, no.

Q.    Do you know if anybody on a

7 (Pages 22 - 25)

FRANK MODICH

Page 26

committee in your declaration received written instruction to maintain confidentiality for their work on the committee?

A.   No.  It's -- again, it's more verbal than anything.

Q.   Have you performed any work at Essentia that relates to the excursion?

A.   Sat on committees.  I guess what do you mean by work?  I'm not entirely sure what you mean by work.

Q.   That's my question to you.  So were you involved in the legal response to the temperature excursion?

A.   I provide internal legal guidance relative to this, yes.

Q.   Were you involved in identifying any patients who were affected by the excursion?

A.   I sat on committees where that was a role, but I didn't specifically go in and identify patients, no.

Q.   Did you communicate with any patients about the temperature excursion?

A.   No.

Q.   Did you do any work to identify the

Page 27

medications that were affected by the temperature excursion?

A.   Not personally.

Q.   Did you do any work to evaluate whether to give refunds for visits that were affected by the temperature excursion?

A.   No.

Q.   Did you do any work evaluating whether to offer revaccination to patients who were affected by the temperature excursion?

A.   Can you restate that question, please?

Q.   Sure.  Did you do any work to evaluate whether to provide free revaccination to individuals affected by the temperature excursion?

A.   Not personally, but, again, those issues come up in committee meetings.

Q.   Were you involved in the public relations response to the excursion?

A.   I was part of the committee or groups that addressed that, yes.

Q.   Were you involved in drafting any internal disclosures or communications regarding

Page 28

the excursion?  And when I say internal, I mean within Essentia.

A.   Yes.  I had a role.

Q.   Were you involved in assessing the financial impact to Essentia of the excursion?

A.   I participated in those discussions.

Q.   Did you participate in any discussions with Dakota Clinic Pharmacy regarding the excursion?

A.   I have never -- I have not had any one-on-one conversations with anyone from Dakota Clinic Pharmacy.

Q.   Did you have any conversations that were not one-on-one with Dakota Clinic Pharmacy?

A.   Not to my knowledge.

Q.   Did you speak with any drug manufacturers about the excursion?

A.   I did not --

MR. STOCK:  Also, we're getting outside of the scope of the purpose of this deposition.  I've let it go so far, but I'm not going to let it go any farther.  So...

Page 29

MS. CLARK:  Are you instructing your witness not to answer whether he communicated with any drug manufacturers?

THE WITNESS:  I am.  It's outside the scope of the Rule 30(b)6 deposition and the limitations ordered by the Court, specifically.  That limitation is a structure of Essentia Health's peer review organization and the members of that structure.  That's what this deposition is for, and so I am instructing the witness not to answer pursuant to Rule 30(c)2.

MS. CLARK:  I will say that Mr. Modich is listed as a member of several of the peer review committees in this declaration regarding peer review structure.  My questions are aimed at determining what work was peer review work and the boundary between peer review and ordinary course of business.

I'll continue to ask my questions, and if you stand on your objection, I understand.

8 (Pages 26 - 29)

FRANK MODICH

Page 30

BY MS. CLARK:

Q.   Did you speak with any governmental agencies regarding the excursion?

MR. STOCK:  Counsel, objection; beyond the scope of the allowed 30(b)6 topics.  I'll instruct to witness not to answer.

BY MS. CLARK:

Q.   Did anyone on any of the peer review committees in your declaration speak with any governmental agencies regarding the excursion?

A.   There were -- there were committee members that did have conversations with governmental entities.

Q.   And was that part of their peer review work?

A.   Yes, it was.

Q.   Did any of the individuals identified in your declaration speak with governmental agencies outside of their peer review work regarding the excursion?

A.   Not to my knowledge.

Q.   Was any of the excursion-related work you performed outside of a peer review?

Page 31

A.   Other than, potentially, attorney-client privileged work product, but all the work I did as part of those committees was related to that peer review activity.

Q.   Is all of your work at Essentia either attorney-client work or peer review work?

A.   I think more often than not I am providing -- when I'm asked to provide input, it's relative to, they're seeking legal guidance relative to an issue, whether it relates to patient care or lawsuits or claims or anything of that nature.  So in that respect, I'm going to say that more often than not, what I'm thinking of is going to be often, more often than not, attorney-client privilege.

Q.   Do you know how many peer review committees Essentia currently has?

A.   Not a total.  There are a lot.

Q.   Do you know how many peer review committees Essentia created as a result of the temperature excursion?

A.   I think that's likely contained within my declaration.

Q.   Do you recall the names of the

Page 32

committees that worked on issues related to the excursion?

A.   I would refer back to my declaration, but I can -- I can list some for you from memory, but, again, I think it's -- the more extensive list will be on my declaration.

Q.   Sure.  We'll look to your declaration later.  Could you tell me any of the peer review committees that you recall right now that worked on issues related to the excursion?

A.   The West Market Storage Medication Committee, the Patient Relations and Risk Management Committee.  There was a Clinical Sub-Alert Committee.  There was Immunization Clinic Committees.  There were Pharmacy Prioritization Committee.  I think I mentioned the Quality Committee.  I think those are the committees that are coming right to mind right now as it relates to the potential temperature excursion.  And let me not for least -- not forget is the Essentia Clinical Practice Committee.

Q.   You have a very good memory.  You

Page 33

didn't need your declaration for that one.  Let's talk about the West Market Storage Committee.  You're familiar with the West Market Medication Storage Committee; is that correct?

A.   Yes.

Q.   I'm going to refer to the West Market Medication Storage Committee as just the storage committee, will you understand what I'm referring to if I say storage committee?

A.   Yes.

Q.   How are you familiar with the storage committee?

A.   It was formed shortly after identifying the potential temperature excursion.

Q.   Are you on that committee?

A.   Yes.

Q.   Did you do anything in preparation for your deposition to learn more about that committee?

A.   Just, again, looked solely at my declaration.

Q.   Did you do anything to learn more about that committee to prepare your

9 (Pages 30 - 33)

Page 34

declaration?

A. Just personal, you know, I sat on the committee. Personal recollections, memories, and then, you know, worked with counsel.

Q. Did you review any documents about the storage committee to prepare your declaration?

A. Again, I've seen meeting minutes in the past. I don't -- there were -- there were documents. I just don't have a, you know, firm recollection on exactly what everything was.

Q. Did you talk to anyone else on the committee to prepare your declaration?

A. No.

Q. Did you talk to anyone besides outside counsel to prepare your declaration?

A. No.

Q. When was the storage committee established?

A. Like I said, it was shortly after identifying the potential temperature excursion. So going back on memory, it was around spring of 2020.

Page 35

Q. Who established the storage committee?

A. It was a directive from Essentia leadership that this was going to be formed. I don't remember if it came directly down from Dave Herman or if it came from Al Hurley, but ultimately, when I use that term Essentia leadership, as we're saying Essentia and its affiliated entities, that was the directive to review and gather information relative to the -- what our response was going to be for the potential temperature excursion.

Q. I think you touched on this a moment ago, so forgive me, but just to make sure I'm clear and the transcript is clear, why was the storage committee established? What was its purpose?

A. Like most peer review committees within Essentia, you need to gather and evaluate information so that you can evaluate the care provided and, ultimately, quality assurance and improve upon the quality of care provided to your patients.

Q. How would the storage committee help

Page 36

improve upon the quality of care provided to patients?

A. To evaluate care -- or to improve upon the care, you have to understand the care that was provided. So there were potentially impacted medications. There was a potentially impacted patient population. You had to gather that information, review that and make sure that -- you know, and ultimately, based on Essentia's practice, process here was we were going to offer free revaccination. So you had to evaluate all of that information and provide guidance, evaluate the care that you were going to provide.

Q. What type of guidance did the storage committee provide?

MR. STOCK: Object to the extent it calls for privileged information, peer review privileged information specifically.

MS. CLARK: To clarify, is it your position that guidance given by the storage committee is protected by the privilege?

Page 37

MR. STOCK: Yes.

BY MS. CLARK:

Q. Who did the storage committee give guidance to?

A. I think anything that would be identified in the supplemental privilege log. I can't -- I'm not going to -- I don't know. I can't just tell you anyone and everyone where that guidance was given.

Q. Did the storage committee give any guidance to the hospital generally?

A. I want to say that, you know, a lot of this was focused on evaluating the patients and potential -- potentially medicated -- or temperature -- we'll just call it the pharmaceutical products. I can't say whether -- who it was given to, or whatever, without -- you know, that's all -- all that's identified to who created and received on the supplemental privilege log.

Q. Was any of the information learned by the storage committee shared outside of the storage committee?

A. Not unless it met one of the

10 (Pages 34 - 37)

FRANK MODICH

Page 38

purposes of the -- you know, a committee can, you know, delegate or have others do work on behalf of the committee or for one of its purposes of sharing that information. It can do that. I can't tell you who it was given to or, you know, or when or anything of that nature.

Q. Did the storage committee help identify the medications that were affected by the temperature excursion?

A. I think they played a role or would have delegated it to the subject matter expertise to do it for them on their behalf.

Q. Was the list of medications affected by the temperature excursion ever shared outside of a peer review?

A. I think it would have all stayed within the structure of the peer review committee.

Q. Did the storage committee help identify patients who were affected by the temperature excursion?

A. I believe that they may have done some of that, as well. Again, I don't -- I'm

Page 39

not going to -- I know their -- they had a role in identifying patients and temperature, whether it was done by the committee member or was done by somebody else that was delegated that authority or responsibility. I know they had a role.

Q. Were -- was a list of patients affected by the temperature excursion disclosed outside of the peer review process?

A. I am not aware of that ever happening.

Q. The full name of the committee is West Market Medication Storage Committee. What does West Market mean in the name?

A. Sure. So Essentia is formed of, we always used to refer, as "markets." So you have Essentia, the parent. The West was considered Innovis Health LLC. It covered North Dakota and Western Minnesota. And so that was our West Market or is our West Market.

Q. Were there any committees -- and when I say committees, I mean peer review committees. Were there any peer review committees that did work related to the

Page 40

excursion outside of the West Market?

A. I think a lot -- the committee -- so that was called West Market Storage Committee, but it wasn't just exclusively to West Market. Committees within the Essentia Health family may serve West Market, East Market, which was firmly also Central Market, so it's within the Essentia family.

Q. Was the storage committee ever referred to by any other name?

A. Please note that terminology is not always consistent. That's how I've generally used it or referenced it, but it can be, maybe, depending on the committee members, somebody can use a different name. But that's how I've always identified it as.

Q. Do you know any other names that have been used to refer to this committee?

A. Storage Committee, Medication Storage Committee. I think there's just so many variations possible.

Q. Who defined the purpose of the storage committee?

A. I would -- I don't remember. I

Page 41

think it was more of Essentia leadership as a whole, what their purposes was going to be.

Q. Does the storage committee have any leadership structure within the committee?

A. No. It's -- it's kind of a committee upon equals. I remember that there -- various people would, like, convene the meeting or be responsible for convening the meeting. Dianne Witten and Al Hurley are two names that came to mind. But, again, this is a committee among equals.

Q. Did the storage committee work with any peer review organizations?

A. Or other committees within the Essentia Health family, I'm sure there were some of those communications or work. I can't describe anything for you specifically.

Q. I just want to make sure we're talking about the same thing. So did the storage committee work with any other peer review committees?

A. I -- there's common membership on some of these other committees, so there could have been work between those various

11 (Pages 38 - 41)

FRANK MODICH

Page 42

committees.

Q.   You and I are both using the word "committee" a lot today --

A.   Yes.

Q.   -- and I just want to make sure we distinguish between a peer review committee and maybe another type of committee at Essentia that's not a peer review committee.  If you're ever talking about a committee that's not doing peer review work, will you make that clear for me?

A.   I will do so.

Q.   Thank you.

A.   Yes.

Q.   Did the storage committee have in-person meetings?

A.   More -- more than likely not.  A lot of this would have been remote just because COVID-19 was really in full force.  And we went remote, or most of us went remote where possible, so a lot of this would have been remote meetings.

Q.   When you had remote meetings, do you remember the tool that was used to host the

Page 43

meetings?

A.   Oh, boy, I do -- I do not.  I am not technologically savvy.  Sorry.

Q.   Was there a regular schedule for storage committee meetings?

A.   I don't remember.  You know, I -- I, honestly, I don't remember if there was a schedule or they were called when needed.

Q.   Do you recall about how often there were remote meetings?

A.   I want to say, early on, there were more frequent meetings.  Later on it probably slowed down.

Q.   When the meetings were more frequent, about how often did the storage committee meet remotely?

A.   It could have been once a -- once a day or once every couple days.

Q.   Is the storage committee still active now?

A.   I think it still exists.  I'm not aware of, you know, it functioning on a regular basis.  I think if there's any necessary need, that same group committee can be reconvened.

Page 44

Q.   How long ago was the last storage committee meeting?

A.   It's been a while now.  I don't remember the last date.

Q.   Do you know if the last storage committee was more than six months ago?

A.   I want to say it's probably around that time.

Q.   Did the storage committee have any conference calls?

A.   Again, it's hard to say exactly how every meeting was convened.  More often than not, we used a remote tool, and I'm just trying to think is it Teams or whatever to use that to have the meeting.

Q.   When the storage committee had meetings, were all members of the storage committee invited?

A.   Yeah.  If you were -- if you were a committee member, you were invited.  Not saying that they were always able to attend, but yes.  Or -- or if somebody else was invited to do the work, essentially, needed by the committee member, they may be included as well.

Page 45

Q.   Did the storage committee ever have any meetings or calls that were open to the public?

A.   No.  No.

Q.   Did the storage committee have any calls or meetings that were open to people who were not members of the storage committee?

A.   Only, again, if they were -- I'm going to use that term, delegated authority to be there on behalf of the committee.

Q.   Did the storage committee exchange any written materials?

A.   I don't -- I don't remember.

Q.   Did the storage committee members email with one another about storage committee work?

A.   I'm sure there were email communications.

Q.   If the storage committee created a written work product, where would that be saved?

A.   I was not -- I don't know.  I'm sorry, I don't know where it would be saved if there was anything.  It could be in emails.  There could have been a Teams site.  I'm just,

12 (Pages 42 - 45)

Page 46

I'm not entirely sure.

Q.   Who were the members of the storage committee?

A.   Oh, there were so many.  I -- again, a lot of those are listed in my declaration.  I would have -- have to refer back to the declaration.  I remember people like Dianne Witten and Al Hurley, but there were a lot of members.

Q.   Are there any members of the storage committee who are not listed in your declaration?

A.   Unless, you know, perhaps if they were -- somebody was delegated work on the committee, for the committee, but the essential, what I believe the essential committee members, they were identified in my declaration.

Q.   How were members of the storage committee notified that they were going to be members of that committee?

A.   Probably it could be a phone call. It could be an email.  It could be a face-to-face depending if there was

Page 47

face-to-face at that point.  Again, no formal structure to it.

Q.   Were members of the storage committee notified of the purpose of the committee?

A.   They knew why they were there, yes.

Q.   How did they know?

A.   Just, there was this potential temperature excursion.  We're evaluating the care provided, and, you know, the purpose that was identified in my declaration for the West storage committee, so that they knew, as being a member of the organization and being invited, what their purpose was.  Yes.

Q.   Were members of the storage committee ever informed of the name of that committee?

A.   Maybe in a title heading.  Again, I can't say for every committee member who was told what in terms of, you know, name-age (sic) or terminology or anything of that nature.

Q.   Were you, as a member of the storage committee, ever informed of the title of the committee?

Page 48

A.   Yeah.  I've seen the title of the committee.  I don't know when I first learned of it.  Yes.

Q.   Did anyone on the storage committee ever leave that committee?

A.   I'm sure folks have retired and left the organization, or, yeah, I don't -- again, the list is so long.  I can't say with specificity for each and every member.

Q.   Do you know if any members of the storage committee ever left that committee but remained at Essentia as an employee?

A.   Nothing -- no one -- again, no one is coming to mind.

Q.   Did you, as a member of the storage committee, ever receive anything writing -- in writing about your roles or responsibilities on the committee?

A.   No.

Q.   Did members of the storage committee delegate committee work to people outside of the storage committee?

A.   I'm sure there were when a specific skill set or subject matter expertise was

Page 49

needed, that somebody was delegated authority to do that work.  Again, I can't say specific instances or anything of that nature, but that happens in peer review committees.

Q.   Who was delegated work by the storage committee?

A.   I'm going to defer back to the privilege log.  I mean, I think that's ultimately where a lot of those names and information on individuals is housed.

Q.   What kind of work was delegated by the peer review committee --

A.   I don't -- I'm sorry.

Q.   -- I'm sorry, by the storage committee?

A.   There's just -- there's too much, and it was so long ago.  So many activities, I can't say with specificity.

Q.   Were storage committee members informed of any obligation to keep committee work confidential?

A.   They were, by me and others.  It's a common theme in these committees that they know that the work that they're being do --

13 (Pages 46 - 49)

FRANK MODICH

Page 50

they're doing, essentially, is confidential. And I've heard others -- I don't remember names, but just reference, yep, this is confidential. We know that the committee work is confidential. So it's -- it's just an understanding, if you will, when you serve on these committees that it's intended to be confidential.

Q.    Did members of the storage committee sign any documents regarding their membership on the committee?

A.    No, not to my knowledge. Not to my knowledge.

Q.    Were storage committee members asked to sign any confidentiality agreements that were specific to their role on a peer review committee?

A.    No, not to my knowledge.

Q.    Did the members of the storage committee keep their work confidential?

A.    To my knowledge, they did.

Q.    Were individuals who were delegated work by the storage committee asked to keep that work confidential?

Page 51

A.    Like I said, at those meetings, it was not uncommon to say, hey, this is privileged and confidential. So from that perspective, that's, again, how I believe most were notified.

Q.    Was work delegated to people by the storage committee outside of meetings?

A.    Depending -- you know, a lot of this would have resulted from the committee meeting, so a committee member may have emailed another person that was authorized, essentially delegated to do that work. So there could have been those communications, if that answers your question.

Q.    What is the scope of the confidentiality obligation for a peer review committee member?

A.    That they keep that confidential within the scope of, or within the confines of that peer review committee.

Q.    Can one peer review committee share confidential information with another peer review committee?

A.    If it's -- if, ultimately, it's one

Page 52

of the -- and I don't know what they are -- the permitted purposes of that committee, or if another committee is doing work that is necessary by the -- by the requesting or disclosing committee, that information can -- can be shared.

Q.    Did the storage committee draft any documents?

A.    I'm sure there were, but none are coming to mind immediately.

Q.    Did the storage committee develop any reports?

A.    I'm sure they did.

Q.    What kind of reports?

A.    Again, I don't -- I don't remember. Again, it's been so long, and there's -- there was so much work done, I can't say with certainty. But I'm sure they would be on the privilege log or supplemental privilege log if something existed.

Q.    Did the storage committee share any reports outside of the committee?

A.    Only if it was for one of those purpose -- you know, what would be defined as a

Page 53

permitted purpose, but not -- so it's hard when you say "outside," because we talk about committee to committee or, you know, those sort of things. Not -- they didn't go to external third-parties inappropriately or anything of that nature.

Q.    Did the storage committee develop any reports that were shared with all Essentia employees?

A.    I don't -- I don't know. I don't remember.

Q.    Did the storage committee draft any guidelines for the hospital, for Essentia?

A.    Again, I don't -- I don't remember specifically. You have to understand, I understand the structure, kind of the 30(b)6 why I'm here today. When we get into specifics on certain documents or things of that nature, it's -- I'm not prepared to answer that.

Q.    Did the storage committee ever receive documents from outside of the storage committee?

A.    I'm sure when you -- when we say we gather information and all of that, I'm sure

14 (Pages 50 - 53)

FRANK MODICH

Page 54

information came in. Again, from what specific sources, I can't answer that question.

Q. Where did the storage committee gather data and information from?

A. It could be from anywhere. I don't -- I can't give you any specific answer.

Q. Did the storage committee review patient medical records?

MR. STOCK: Counsel, I'm going to object and instruct the witness not to answer. It's outside the scope of the 30(b)6 deposition and the limitations ordered by the Court.

BY MS. CLARK:

Q. Did the storage committee create any information that was used for non-peer review purposes?

A. Not to my knowledge.

Q. Did the storage committee review any legal filings in connection with their role on that committee?

A. I don't think so. That just doesn't seem like that would be something that the committee would have been reviewing.

Page 55

Q. Did members of the storage committee review any draft public relations documents in connection with their role on the committee?

A. You know, ultimately there was work done relative to communications with patients and, you know, governmental entities and things like that, but I can't say with any specificity what was reviewed or what wasn't reviewed.

Q. Did the storage committee do any work related to public communications?

A. I'm sure they did, but, again, no specific reference.

Q. Did the storage committee communicate with the press?

A. I don't know.

Q. Did the storage committee have any responsibilities related to marketing?

A. Marketing? Not -- I don't know. I don't know.

Q. Did anyone on the storage committee have information about the excursion that they learned before joining the committee?

A. I don't know --

MR. STOCK: Object to the extent

Page 56

that the question calls for -- this witness lacks foundation to answer that question. Go ahead.

THE WITNESS: Yeah, I don't -- I really don't know what each individual knew or learned coming in before the meeting or before the committee.

BY MS. CLARK:

Q. Did you have knowledge, personal knowledge, about the excursion that you learned outside of your role as a peer review committee member?

A. I mean, I knew of it. I don't -- again, I don't remember back in terms of -- I'm an attorney within the organization. So I may have learned something, but nothing specifically comes to mind.

MS. CLARK: Let's go ahead and mark your declaration as an exhibit so we can talk about that.

- - -

(Whereupon the document was marked, for identification purposes, as Exhibit-2.)

Page 57

- - -

BY MS. CLARK:

Q. Let's see here. So I'm going to introduce as an exhibit Plaintiffs' Exhibit Number 2. This is the declaration of Frank M. Modich regarding review organization structure pursuant to the Court's order. It was filed on the docket as ECF Number 227 on January 23rd, 2023.

You should have that in your marked exhibits folder. Do you have that document?

A. It just opened, yes.

Q. Okay. It should be the same one as you have -- as you brought with you. I just saved this from the docket, so if you prefer to look at your hard copy, that's fine.

A. Okay. It would be the same document, yes.

Q. I'm going to point you to paragraph 12. So on paragraph 12, your declaration says that the storage committee was created to, quote, review and oversee the response to the potential temperature excursion, end quote.

What do you mean by "response" in

15 (Pages 54 - 57)

Page 58

that sentence?
A.    Essentially, what was the organization going to do as a result of it.
Q.    When you say response to the excursion, do you mean how Essentia was going to identify affected medications?
A.    I think it's -- it was -- my intent is broader than that. I mean, it can be anything as a result of the potential temperature excursion. It could be revaccination or potentially temp -- you know, the potential medications or what -- ultimately, it was there to evaluate what happened and determine a course of action. Again, the whole purposes of these is to improve the quality of care provided to our patients.
Q.    Did the response to the potential temperature excursion include an analysis of the financial impact of the temperature excursion?
MR. STOCK: Again, Counsel, I'll instruct the witness not to answer. It's outside the scope of the structure of the peer review organization, and he's

Page 59

answered your question, as well, already.
BY MS. CLARK:
Q.    At paragraph 15, your declaration says that members were added to the storage committee because, quote, additional members and skill sets were needed, end quote.
What additional skill sets were needed on the committee over time?
A.    And say with specificity, it's -- what I would say is, as with all these committees, depending on the question or issue being addressed, there may be others within the organization that possess that skill set. And so, based on these individuals, they would have offered some additional subject matter expertise, if you will, to that committee.
Q.    Can you tell me what skill sets the storage committee needed?
A.    I can't. I can't tell you. I don't know.
Q.    Did anyone at Essentia work to identify potentially impacted medications besides the storage committee?
A.    There were other committees, I

Page 60

think, too, that were working and looking at the potentially impacted medications.
Q.    Other peer review committees?
A.    Yes.
Q.    Did anyone who was not on the peer review committee have responsibilities related to identifying potentially impacted medications?
A.    No. And to be honest, individuals within the organization just wouldn't on their own go and say, oh, what are these affected medications. It would be within this committee structure.
Q.    Does Essentia have any committees that are not peer review committees?
A.    I don't -- nothing is coming to mind. They could have other committees, but I think for this purpose here, everything that's been identified is a peer review committee.
Q.    In paragraph 16, you note that the storage committee worked to gather and review information and data regarding, quote, pertinent providers and agencies, end quote.
What did you mean by pertinent providers?

Page 61

A.    You know, our patients see various providers. We need to know the providers that these patients are seeing. So if you identify potentially impacted medications, potentially impacted patients, you need to now know the providers that are going to see and treat them. That's what I meant by pertinent providers.
Q.    And does that mean medical providers like a nurse --
A.    Yes.
Q.    -- a doctor, a medical --
A.    Yes. Sorry, I should have let you finish. My apologies.
Q.    No, that's okay. And what about agencies? What do you mean by information and data regarding, quote, agencies, end quote, or pertinent agencies?
A.    So in my mind, governmental agencies, departments of health, things of that nature.
Q.    At paragraph 17, your declaration says that, quote, other individuals also worked at the express direction of this committee to fulfill its goals, end quote.

16 (Pages 58 - 61)

FRANK MODICH

Page 62

What do you mean by express direction?

A. Well, again, it gets back to an individual is not going to do something relative to this work without the direction coming from the committee. So the committee is going to decide, we need -- and I'm just going to make up a name -- John Doe because of that skill set or subject matter expertise, and they authorize that individual to delegate that responsibility to perform work on behalf of the committee.

Q. How were members who worked at the direction of the storage committee informed that they were working at the, quote, express direction, end quote, of the committee?

A. I don't know if there was ever anything specifically stated. It was, essentially, we need this done or something of that nature.

Q. At paragraph 14, you list some of the committee members of the storage committee. One of those members is Michael Watters, W-A-T-T-E-R-S.

Page 63

A. Yes.

Q. What was Mr. Watters' role on the storage committee?

A. He's the chief legal officer, so he's a legal representative.

Q. What skill set did he provide to the storage committee?

A. Legal officer.

Q. How did Mr. Watters' work help advance the purpose of the storage committee?

A. I couldn't speak for Mr. Watters.

Q. Another name on this list is Anthony Kaufenberg, K-A-U-F-E-N-B-E-R-G. What was his role on the storage committee?

A. Well, he was a pharmacy director at the time. Now he's a vice president of pharmacy leading our pharmacy group. So relative to pharmaceutical science or whatever you want to call it, I'm sure he brings that subject matter expertise.

Q. Did he have job duties that were outside of his role on the storage committee?

A. Not -- well, he has job duties employed at Essentia, but, as it related to the

Page 64

potential temperature excursion, you know, his work on those commit- -- on these committees was peer review protected, or I should say for the purposes of peer review.

Q. Was all of Mr. Kaufenberg's work related to the excursion protected by the peer review?

A. I believe if it was -- if it was -- I can't speak for Tony, but if it was at the direction of the committee or form of function, then it was at the -- it was at the request of the committee, so it was for the committee.

Q. But he had -- he did have different job duties that were outside of his committee role?

A. He's a pharmacy leader.

Q. Are there any Essentia employees whose sole responsibility was to work on peer review committees?

A. Not to my knowledge.

Q. Maari Loy or Maari, M-A-A-R-I Loy --

A. Yes.

Q. -- is another committee member. What was their role on the committee?

Page 65

A. Again, she's another pharmacy person.

Q. And Kim Deiss or Deiss, D-E-I-S-S, listed as a senior director of marketing and communications with Essentia Health, what was their role on the committee?

A. I don't remember. She's an administrative person, and she's one of the communications marketing directors.

Q. Did the storage committee handle any communications response to the excursion?

A. I know communications issues were brought to the committee. I don't -- can't say specifically what was done.

Q. Were internal communications issues brought to the storage committee?

A. I would assume so, but, again, you know, anything like that would be on the supplemental privilege log.

Q. Were public communications issues brought to the storage committee?

A. Probably so, but, again, no specific circumstance.

Q. And were patient communications

17 (Pages 62 - 65)

FRANK MODICH

Page 66

brought to the attention of the storage committee?

A. Probably.

Q. Shannon Dahnke, Dahnke, D-A-H-N-K-E --

A. Dahnke.

Q. Thank you. What was her role on the committee?

A. Very similar to Kim. Again, she's an administrative staff member, communications focused.

Q. Kailee Kofal, K-A-I-L-E-E, and last name K-O-F-A-L, letter Q on this paragraph, what was their role on the storage committee?

A. She's a quality person.

Q. What is a quality person?

A. Works in the quality department.

Q. What does the quality department do?

A. Just, you know, another one of those departments that are focused on quality assurance, if you will.

Q. Is quality assurance patient safety? Is that the same thing?

A. I think the quality department

Page 67

looks as a whole at the quality of care provided to -- provided to patients.

Q. Does the quality assurance department look at patient satisfaction?

A. I -- I don't know. I can't answer yes or no. I don't work in quality, the quality department.

Q. At paragraph 15 you talk about additional members and skill sets being added. Were all of these individuals added to the storage committee at the same time or were they added at various times?

A. Again, I don't know. All I would do is speculate that oftentimes, based on the need for the committee, these people would be brought onto the committee. I doubt if they were all brought on at once, but, again, I don't know.

Q. When was Suzanne Zeltinger brought onto the storage committee?

A. I can't answer that.

Q. Why was Traci, T-R-A-C-I, Morris brought onto the storage committee?

A. I can't answer that. She's our

Page 68

chief financial officer.

Q. There's an individual, Krister, K-R-I-S-T-E-R, Mattson, M-A-T-T-S-O-N, who's listed as a former enterprise analytics director. What is a former enterprise analytics director?

A. I think they're really responsible for business intelligence, our IS applications, things of that nature.

Q. Do you know why Krister Mattson was added to the storage committee?

A. Must have had some necessary skill set or subject matter expertise that the committee needed. I can't say specifically what.

Q. When these individuals were added to the storage committee, were they informed that they were being added to a peer review committee?

A. They were invited that they were being added to this committee. I don't know if it was specifically, you are -- you are being asked to enter or join this committee, like peer review committee. I don't know that.

Page 69

Again, when we talked about confidentiality, it came up during meetings, things were put on documents, and just the conversation having with them that things were confidential.

Q. When a member of the storage committee delegated work to someone outside the committee, did they specify which committee was delegating the work?

A. I don't know. I don't know. I don't know. I don't have an answer to that question.

Q. How would someone who was receiving work or being delegated work from an Essentia peer review committee know who they could and could not share the information with?

A. Probably just, you know, conversations with the person that was assigning it or from that committee, here's what we need you to do. If they needed assistance from someone else, that would be disclosed to the committee and they would be granted that authority.

Q. So anyone who was delegated work by an Essentia committee would know that they're

18 (Pages 66 - 69)

FRANK MODICH

Page 70

doing committee work?

A. I mean, that's generally the idea, yes.

Q. And anyone who was being delegated peer review work by an Essentia committee would know that they have a duty of confidentiality to not disclose their peer review work outside of the assigning committee; is that right?

A. That would be my understanding.

Q. Did any committee other than the storage committee oversee the response to the temperature excursion?

A. Save the -- that market committee was one of the main committees, but there were other committees that had roles with regard to the potential temperature excursion.

Q. How would Essentia distinguish between its excursion-related work performed by the storage committee and any excursion-related work in its ordinary course of business?

A. I don't know what work would have been done in the ordinary course of business. If it was relative -- if these things were coming from one of the committees, it would be

Page 71

for the purposes of the committee. It wouldn't be within the ordinary course of business.

Q. Did Essentia perform any excursion-related work in the ordinary course of its business?

A. I can't answer that. I don't know.

MS. CLARK: Okay. We've been on record for about an hour, so maybe we can just take a little 10 or 15-minute break. Does that work for everyone? Let's go off the record, please.

MR. STOCK: Do you want to come back at 10:15, then?

MS. CLARK: Let's do that.

MR. STOCK: Central.

VIDEOGRAPHER: We're off the video at 10:02. This ends media unit one.

- - -

(A short recess was taken.)

- - -

VIDEOGRAPHER: Back on the video at 10:17. This begins media unit two. Counsel, you may proceed.

MS. CLARK: Thank you.

Page 72

BY MS. CLARK:

Q. Welcome back. When we left off, we were talking about the storage committee. Before we move on to another committee, I just wanted to ask a couple more questions about that.

You mentioned meeting agendas for the storage committee. Where would meeting agendas be saved for storage committee meetings?

A. I can't say where. They would have been stored electronically, so presumably they would be in the -- you know, identified in the supplemental privilege log.

Q. Are meeting agendas stored in a shared folder that can be accessed by multiple people?

A. I don't know.

Q. Do you know if any meeting agendas would have had any access protections? Like, were they password protected or limited in the number of people who could view meeting agendas for the storage committee?

A. Only based on how I've seen things

Page 73

like this, only committee members or those that are participating in those committees have access to those materials. So they do have some form of security. I just can't speak to what that is.

Q. Did the storage committee report any of its findings to Essentia leadership?

A. I don't -- I'm sure there were disclosures if they were permitted or they met the purpose of the committee. I don't -- I don't know. I can't reference any specific disclosure.

Q. How did the storage committee use the information it obtained to improve the quality of care to then improve the quality of care?

MR. STOCK: Objection, calls for -- objection; I'm going to instruct the witness not to answer. It's outside the scope and limitation of this 30(b)6 as ordered by the Court.

BY MS. CLARK:

Q. The storage committee worked to improve the quality of patient care; is that

19 (Pages 70 - 73)

FRANK MODICH

Page 74

right?

A.    That was the purpose, yes.

Q.    Would the storage committee make policy recommendations to improve the quality of patient care?

A.    I don't --

MR. STOCK:  Go ahead.  I mean, same objection, Counsel.  Again, this is trying to get around the limitation that's ordered by the Court.  I'll instruct the witness not to answer.

MS. CLARK:  Just, I'm more than happy to take any testimony you want to give me, but just to be really transparent, when I'm asking some of these yes or no questions, they truly are yes or no questions.  I don't have a follow-up coming about the substance of work that's privileged or the substance of work that's non-peer review.  I'm just trying to identify the boundary between the peer review and the ordinary course of business.

There are, you know, thousands of

Page 75

people on the privilege log that Essentia claims either were working on a committee or at the direction of a committee, and I think we can all agree that these individuals also had other job responsibilities at Essentia outside of peer review.  And so, I'm just trying to find out where the peer review starts and stops, if that helps inform your objections.

Or, you know, if your witness gives a yes or no and you want to object to my follow-up, that I would understand, but, again, just to be fully transparent, I'm just trying to figure out who was operating within the meaning of the peer review statute and when that work stopped such that they're now just working as an Essentia employee under their regular job duties.

MR. STOCK:  I appreciate the comments, Counsel.  We'll make our objections on the record.  You know, as indicated, I think your use of the term

Page 76

ordinary course of business is a term that Plaintiffs have tried to make up as an exclusion to the peer review process and/or purposes.

It's not a statutory term, nor is it an exclusion to the statutory term.  So we'll make our objections, and I appreciate the comments to inform our objections.

MS. CLARK:  Okay.  And I'll try to be more clear that when I say ordinary course of business, I just mean non-peer review, whatever that means to Essentia, you know, peer review versus non-peer review.  It's just a mouthful.

Okay.  So we will move along.  I guess just to make sure -- and, again, I can't remember exactly my last question, but if it's the same and you object, I understand.

BY MS. CLARK:

Q.    Does the storage committee make recommendations about ways that Essentia can improve the quality of patient care?

Page 77

MR. STOCK:  That's fine, Frank.  You can answer.

THE WITNESS:  I don't specifically recall any specific recommendations.

BY MS. CLARK:

Q.    Did the storage committee create any policies that were used outside of the storage committee?

A.    I'm not aware of any specific policies.

Q.    Are you familiar with the Olive Committee?

A.    I am.

Q.    Are you a member of the Olive Committee?

A.    I'm a member of the Olive Committee, yes.

Q.    Can you tell me what -- what does the Olive Committee do?

A.    Well, the Olive Committee was really focused -- and I'm going to refer back, just to be clear, to my declaration.  Again, it's -- you know, it collected data to identify potentially impacted medications using both

20 (Pages 74 - 77)

FRANK MODICH

Page 78

artificial intelligence and manual chart updates. It was really identifying that patient population.

Q.    You mentioned a program called Olive. What does Olive do?

A.    Olive was just a -- it was the name of an artificial AI program that would do manual -- instead of nurses manually doing charts, for instance, for revaccination -- all of that needs to be documented -- this AI program could remove a lot of the error, just human error, relative to these chart updates. So that was Olive.

Q.    Do you know if Olive is a general software or if it's Essentia specific?

A.    It's not Essentia proprietary software. It's a -- yeah, it's generic.

Q.    At paragraph 18, your declaration says, "The committee used artificial intelligence, primarily a program called Olive." Were there other types of artificial intelligence that the Olive Committee used?

A.    Not to my recollection.

Page 79

Q.    Did you review any documents to help draft your declaration as it relates to the Olive Committee?

A.    I don't believe so.

Q.    Did you talk to anyone other than your outside counsel about the Olive Committee before drafting your declaration?

A.    No.

Q.    Did you draft your declaration?

A.    With the assistance of counsel.

Q.    Did anybody besides counsel assist you in drafting your declaration?

A.    No.

Q.    Did you review your declaration?

A.    Yes.

Q.    When was the Olive Committee established?

A.    I don't -- again, I don't have a firm date on that. I don't know.

Q.    Was the Olive Committee established in response to the excursion?

A.    That was the purpose.

Q.    Did the Olive Committee exist before the excursion?

Page 80

A.    No.

Q.    In your declaration you use the phrase "potential temperature excursion." Why do you call it the potential temperature excursion?

A.    Because that was the term that we had always used. We never had really defined that there was an actual temperature excursion.

Q.    Was the Olive Committee ever referred to by any other name?

A.    Again, terminology can be loose, but that was the only term that I used or remember using.

Q.    Is the Olive Committee still active?

A.    There are activities relative to -- yes, I believe they are, but it's been some time. Again, these committees will function when an issue arises that needs to be addressed.

Q.    What does the Olive Committee do now in 2023?

A.    Again, nothing currently to my knowledge.

Q.    Did the Olive Committee perform any

Page 81

work in 2022?

A.    I can't remember.

Q.    Your declaration says the Olive Committee oversaw the management and collection of data for the potentially impacted patient population.

A.    Can you cite to the paragraph that you --

Q.    Paragraph 18.

A.    Eighteen, okay.

Q.    What kind of data for the potentially impacted patient population did the Olive Committee review and oversee?

MR. STOCK:  Object to the extent that it's outside the scope of the limitations ordered by the Court and instruct the witness not to answer.

BY MS. CLARK:

Q.    In paragraph 20 you list the members of the committee. It says, "For example, in early stages the members of the committee included," and then includes a list. And at paragraph 21 you note some additional members that were added.

21 (Pages 78 - 81)

Page 82

Are there any members of the Olive Committee that are not in paragraphs 20 and 21?

A. Not to my knowledge of specific committee members.

Q. Why was Megan Pfannenstein, P-F-A-N-N-E-N-S-T-E-I-N, on the Olive Committee?

A. It must have been determined that -- I don't know, but she must have served a purpose that was needed for that committee.

Q. Do you know what purpose that was?

A. No.

Q. Her title is listed as program manager process excellence. What is process excellence?

A. They help -- and I don't say process excellence. How do I best describe? For projects, they provide that oversight, if you will, to make sure that meetings are held in a timely manner, help estab- -- help work with the individuals to do whatever needs to be done. So she's kind of just a process excellence performance manager, something of that nature.

Q. Is that like project management?

Page 83

A. Sort of like that, I think. Again, I don't really work closely with them.

Q. At H there's Jennifer Schlauderaff, S-C-H-L-A-U-D-E-R-A-F-F. What was her role on the Olive Committee?

A. She was a clinical -- she has some expertise or she works in clinical applications. So relative to our EMR, I'm sure she had a -- and when I say EMR, our electronic medical record, had a specific skill set that was needed for Olive.

Q. Are clinical applications like computer and software applications?

A. I think, yes, but I think for her, it was more focused on the EMR.

Q. Okay. Melanie Wilson, vice president revenue services, what was their role on the Olive Committee?

A. She is a finance person.

Q. And what finance-related work did the Olive Committee do?

A. Just had a role on there. I don't know. I can't identify specific acts or activities of those individuals.

Page 84

Q. At paragraph 18 you mention that the committee was involved in manual chart updates by nurses. Is that referring to patient electronic medical records when you say chart?

A. Yes.

Q. And what kind of chart updates did nurses do as part of the Olive Committee's work?

MR. STOCK: I'll instruct the witness not to answer.

MS. CLARK: What's the basis for the objection?

MR. STOCK: It's outside the scope of the limitations ordered by the Court. It also calls for peer review privileged information.

MS. CLARK: Thank you.

BY MS. CLARK:

Q. Paragraph 20, letter R, Ryan Ferrell, F-E-R-R-E-L-L, business intelligence analyst 2. What is a business intelligence analyst?

A. I don't have a definition for his role. I know he works on the business and finance side.

Page 85

Q. What was his role on the Olive Committee?

A. I can't specifically say. I don't know.

Q. Letter S is Tonya, T-O-N-Y-A, Van Dyke, D-Y-K-E, RN ambulatory care. What's ambulatory care?

A. Non-hospital, more ambulatory acute care, outpatient clinics, things of that nature.

Q. What was Tonya Van Dyke's role on the Olive Committee?

A. She was a nurse.

Q. Was Tonya Van Dyke responsible for updating patient charts as part of her role on the Olive Committee?

A. I don't know.

Q. Did any nurses update patient charts for reasons related to the excursion but outside of peer review work?

A. No. I mean, I think any responsibility they had as it related to the temperature excursion would have been authorized by the committee.

22 (Pages 82 - 85)

FRANK MODICH

Page 86

Q.    When you say authorized by the committee, do you mean delegated by the committee as part of a peer review?

A.    That's correct.  Delegated, authorized, yes.

Q.    In paragraph 21, you list additional members that were added to the Olive Committee.  Why was Trista Anderson, revenue integrity senior manager, added to the Olive Committee?

A.    I cannot state with any certainty.

Q.    When was Paul Persons, senior clinical applications analyst, added to the Olive Committee?

A.    I don't know when he was added.

Q.    Do you know approximately how soon after the excursion was discovered that the Olive Committee was created?

A.    No, I don't.

Q.    Do you know how long after the Olive Committee was created that any of the additional members identified in paragraph 21 were added to the Olive Committee?

A.    I do not.

Q.    How did updating patient charts

Page 87

regarding potentially impacted TTSPPs -- I'm taking that from paragraph 2020 -- sorry, from paragraph 22.  How did updating patient charts regarding potentially impacted TTSPPs improve the quality of healthcare?

MR. STOCK:  I'm going to object and instruct the witness not to answer as calling for information outside the scope of the limitations ordered by the Court, as well as requesting peer review privileged information itself.

BY MS. CLARK:

Q.    Did updating patient charts with information about potentially impacted TTSPPs serve a peer review purpose?

MR. STOCK:  If you can answer, Frank, go ahead.

THE WITNESS:  The updating of charts, not saying necessarily the update -- I don't know.  I don't think that necessarily updating of charts, but the process or reasons why, I think that is peer review, or that was under the peer review protections or for the purposes of

Page 88

peer review.

BY MS. CLARK:

Q.    Did the Olive Committee have any in-person meetings?

A.    What I remember, they were all remote.

Q.    How often did the Olive Committee have meetings, whether in person or remote?

A.    Very infrequently early on; less frequently as time went by.

Q.    When you say early on, when do you mean?

A.    When the committee was first formed to oversee this function for this purpose, it met more regularly.  I don't have frequency or any of that information, but over time the number of meetings decreased.

Q.    Did the Olive Committee exchange any written materials?

A.    I don't remember.

Q.    Did the Olive Committee exchange instant messages within the committee?

A.    I don't remember.

Q.    Did the Olive Committee have any

Page 89

calls that were open to Essentia employees that were outside of the Olive Committee?

A.    Not unless they were those individuals who were brought in by the committee to do some sort of function of the committee.

Q.    Are there any members of the Olive Committee that are not named in your declaration at paragraphs 20 and 21?

A.    No.

Q.    Did all of the individuals named in your declaration at paragraphs 20 and 21 know that they were members of the Olive Committee?

A.    I believe so.

Q.    How did they know that?

A.    Just through communication, verbal, email, or otherwise.

Q.    I'm looking at both paragraph 16 regarding the storage committee and paragraph 22 regarding the Olive Committee.  It looks like both committees worked to gather information about potentially impacted TTSPPs; is that right?

A.    There's similarity between, but

23 (Pages 86 - 89)

Page 90

the, you know, overall purpose and function may have differed slightly.

Q.   And, likewise, looking at those same paragraphs, 16 and 22, it looks like both committees had some responsibility related to data and information about potentially impacted patient populations; is that right?

A.   That is correct.

Q.   Are there individuals who are members of both the storage committee and the Olive Committee?

A.   I'd have to refer, but, yes, I'm sure there is similarity between committee members.

Q.   Were you a member of both committees?

A.   Yes, I was.

Q.   Was Richard Vetter, chief medical officer, a member of both committees?  Oh, I'm sorry.  I'm looking at the wrong page.

A.   I know he's been on a lot of these committees.  He's been central there.  I don't see him on the Olive Committee.

Q.   Let's look at 14(D).  I see Al

Page 91

Hurley is a member of the storage committee.

A.   Uh-huh.

Q.   And 20(C), Al Hurley was a member of the Olive Committee.

A.   Yes.

Q.   Is it correct that he was a member of both committees?

A.   He was a member of both, yes.

Q.   Was Anthony Kaufenberg a member of both committees?  He's at 14(H).

A.   14(H)?

Q.   And --

A.   Yes.  He's on Q, 20(Q), yes.  So, yes, he was a member of both committees.

Q.   How would an individual who was working on both the storage committee and the Olive Committee know whether they were performing work related to one committee or the other?

A.   Well, I mean, ultimately, whatever their -- the directive from the -- so it's hard to explain this, but if the West Market Committee had a directive that he was to do something, he'd be -- he would know he'd be

Page 92

doing it for that committee.  If there was something relative to the chart updates through the Olive Committee, he would know that he was doing work for that committee.

Q.   How did the work for the storage committee differ from the work for the Olive Committee?

A.   The Olive Committee was more focused on the chart updates and relative to the potentially impacted medications and patients there.  The managed -- medication storage committee was more focused on the overall oversight, review, and response to the potential temperature excursion.

Q.   Could Anthony Kaufenberg share information he learned from the storage committee with the Olive committee?

A.   Not unless it was, you know, appropriate, if you will.

Q.   Were all of the individuals in your declaration at paragraphs 20 and 21 informed that they had to keep Olive committee work confidential and restricted to the Olive committee and those working at the express

Page 93

delegation of the Olive Committee?

A.   That was my understanding.

Q.   How were they informed of their confidentiality obligations?

A.   Verbal as part of the committee meeting.

Q.   Did any members of the Olive Committee break their duty of confidentiality?

A.   Not to my knowledge.

Q.   Are any -- did any members of the Olive committee leave the committee but remain employed at Essentia?

A.   I can't -- I don't know.

Q.   Did any members of the Olive committee communicate with third parties outside of Essentia?

A.   Not to my knowledge unless it was an authorized -- you know, it was authorized as per the committee's purpose, but I'm not aware of anything.

Q.   Did the Olive committee report any information to Essentia leadership?

A.   Again, I can't -- I don't know.

Q.   Did Olive Committee draft any

24 (Pages 90 - 93)

Page 94

guidance for Essentia?

A. I don't know.

Q. Did Olive -- did the Olive Committee draft any guidelines for Essentia physicians, nurses, or other medical providers?

A. I don't know.

Q. Paragraph 23 says, quote, teams of nurses worked at the direction of the Olive committee to review patient data, end quote.

Is there a record of who the teams of nurses were?

A. I'm not sure. I would refer back to the supplemental privilege log, if anything existed.

Q. At 21(F) there's an individual Amy Pocrnich, P-O-C-R-N-I-C-H, listed as a business services director. What was her role on the Olive committee?

A. She was just administrative staff. I don't know specifically her role.

Q. And at 21(D), Tracy Hansmeier, H-A-N-S-M-E-I-E-R, senior revenue integrity analyst. What is a senior revenue integrity analyst?

Page 95

A. Just in the -- he's in the finance department. I don't know his specific role.

Q. Do you know what revenue integrity is?

A. No, not really.

MS. CLARK: So I'm going to introduce another exhibit. This will be Plaintiffs Exhibit Number 3. It is Essentia's supplemental privilege log.

- - -

(Whereupon the document was marked, for identification purposes, as Exhibit-3.)

- - -

MS. CLARK: This will not be stamped until after the deposition because it's an Excel spreadsheet, but it should be in the folder now.

BY MS. CLARK:

Q. This is Essentia's Supplemental Privilege Log. It was sent to me by email on May 31st, 2022, by MacKenzie Hertz, an attorney with the Vogel Law Firm. There's a number in the file name and it is 4769706.

Page 96

Do you have that in your marked exhibits?

A. It's generating the file here, trying to open.

Q. Okay. It's a large one.

While we are waiting on that to load, is there anyone at Essentia who would have greater knowledge than you do today about the function of the storage committee?

A. I don't know.

Q. Is there anybody at Essentia who would have greater knowledge than you do today about the function of the Olive committee?

A. I don't know.

Q. Looking back at paragraph 21 with the additional members of the Olive committee and, for example, E, Trista Anderson, the revenue integrity senior manager, do you know what skill set that individual would have brought to the Olive committee?

A. Revenue integrity, I assume, is in the finance department. So she would have financial skills, but I can't say specifically what.

Page 97

Q. Why did the Olive Committee need someone with financial skills on the committee?

A. Can't say. They just determined that that was a necessary skill set and that she should be included on the committee.

Q. Who would have determined to include them on the committee?

A. The committee as a whole.

Q. Were you involved in the determination to add anybody in paragraph 21 to the committee?

A. I don't remember.

Q. What work did you do for the Olive committee?

A. Legal services, legal guidance.

Q. Were you involved in any patient chart updates?

A. Not personally.

THE WITNESS: May I interrupt? This thing is -- it's not loading. It says, "File preview, generation is still in progress. You can stay on this page, keep retrying manually, or exit link."

MR. LIVINGSTON: Try to refresh one

Page 98

more time.

MR. STOCK:  I was going to say, my version did come up, Frank.

MS. CLARK:  Are you having any luck accessing the Excel?

THE WITNESS:  The spinning circle.

BY MS. CLARK:

Q.    Okay.  I'm going to download it and then share my screen with you, which means I will have to scroll for you, but I'm happy to do that.  And if it becomes cumbersome, we can just come back to it later when it loads.  I'm going to challenge my screen share abilities.

MS. CLARK:  Do you all see an Excel spreadsheet on your screen right now?

MR. STOCK:  Yes.

THE WITNESS:  Yes.

BY MS. CLARK:

Q.    Have you seen this document before?

A.    I probably looked at it, yes.

Q.    Can you see the green bar at the top that has the file name Exhibit 0003 dash Vogel dash number sign --

A.    Yes.

Page 99

Q.    -- 4769706?

A.    Yes.

Q.    This is the exhibit that I just introduced, the privilege log that was sent to me.  It has thousands of rows, so if you need me to scroll, I'm happy to do that.

Are you able to identify any entry on this privilege log that is a record of the storage committee?

A.    No.

Q.    Are you able to identify any record on this privilege log that is a communication by or among the storage committee?

MR. STOCK:  I'll object, Counsel.  This is beyond the scope of the limitations of the structure of the peer review committee and instruct the witness not to answer.

BY MS. CLARK:

Q.    Can you tell me whether -- let me start that one over.

Can you identify any row on this document that is a record of any committee in your declaration?

Page 100

A.    Can you please rephrase your question?

Q.    Can you identify any entry on this privilege log exhibit that is a record of any of the committees in your declaration?

A.    I can't identify what committee is associated with any specific entry.

Q.    And can you identify any entry on this privilege log as a communication sent by any committee in your declaration?

MR. STOCK:  I'm going to object and instruct the witness not to answer.  It's outside the limitations ordered by the Court.

BY MS. CLARK:

Q.    Can you identify any individual on the privilege log that was delegated work by the storage committee?

A.    I can't.

Q.    Can you tell from looking at the privilege log who is a member of a peer review committee?

A.    Well, I see -- I see both creators and there's obviously a lot of lines here in

Page 101

this privilege log, but, for instance, on the first line, Dianne Witten was a member of a committee.  Sheila Hart is a member of a committee.  Maari Loy, Tony Kaufenberg, Nicole Christensen, Al Hurley, Rich Vetter, they were all members of committees, peer review committees within Essentia.

Q.    Earlier we discussed that Anthony Kaufenberg is a member of multiple committees.  Do you remember that?

A.    I do.

Q.    Can you tell what committee row 2 on the privilege log this -- can you tell which documents -- I'm sorry, let me start that over.

Looking at row 2, we can see Anthony Kaufenberg is in the recipient column.  Can you tell what committee this document relates to?

A.    I can't with a hundred percent certainty.

Q.    Do you think you know which committee that this entry relates to?

A.    I believe it was the West Management Storage Committee, Medication

26 (Pages 98 - 101)

FRANK MODICH

Page 102

Storage Committee.

Q. And why do you believe that?

A. Just based on the individuals and SBAR.

Q. What is SBAR?

A. Situation, Background, Analysis, and Recommendation.

Q. I'm just scrolling through. I'm going to go up to row 1868 for those of you who are following on your own documents. This is the entry for the document Bates stamped or Bates numbered EHPRIV004346, and I'll highlight it with my mouse.

Do you see the row that I'm referring to?

A. I do.

Q. Do you see in the recipient column, or column D, it says, "Innovis Listserv as of May 5th, 2021, see Exhibit A, Recipient Supplement"?

A. Yes.

Q. Do you know what the Innovis Listserv is?

A. I do not.

Page 103

Q. What is Innovis?

A. Innovis is West Innovis Health, LLC. That was our West Market legal entity.

MS. CLARK: Okay. I'm going to go ahead and introduce the exhibit that that privilege log entry refers to so we can take a look at it.

This will be Plaintiffs' Exhibit 4. It's -- the title is Exhibit A Recipient Supplement, innovispartners@essentiahealth.org Listserv as of May 5th, 2021.

- - -

(Whereupon the document was marked, for identification purposes, as Exhibit-4.)

- - -

BY MS. CLARK:

Q. Let me know when you have that exhibit available to you.

A. It's loading.

Q. Okay.

A. It's loaded.

Q. Okay. Have you seen this document

Page 104

before?

A. I don't remember it.

Q. Do you recognize this list of individuals as the list of individuals who were on the Innovis Partners Listserv at the innovispartners@essentiahealth.org email address?

A. I'm sorry, I didn't follow that.

Q. Sure. Do you recognize the list of individuals in this document as members of the Innovis Listserv?

A. I don't know.

Q. Can you identify on this document anyone who was working at the express direction of a peer review committee in your declaration for peer review purposes?

A. I don't know.

Q. Do you know why members of the Innovis Listserv were receiving communications that are now designated as peer review privileged?

A. I do not.

Q. Do you know if members on the Innovis Listserv were informed of any duty to

Page 105

keep communications they received from Ollie Oh (phonetic), Richard Vetter, Suzanne Zeltinger, or Kristen Luttio, L-U-T-T-I-O, as confidential?

A. I don't know.

Q. Do you know if anybody on the Innovis Listserv was informed they were receiving peer review communications?

A. I don't know.

Q. I'm scrolling down to what is on my version row 2747.

MR. STOCK: 2747?

MS. CLARK: Yes, 47. I was...

BY MS. CLARK:

Q. Okay. Let me just expand this so we can see the whole row and all of the names. I think that gets it. I'm getting close.

This is Bates number EHPRIV001648. Do you see the row that I'm referring to?

A. I do.

Q. In column C it identifies an email address ehrtooltips@essentiahealth.org. Do you know whose email address that is?

A. I do not.

Q. Was this document part of a peer

27 (Pages 102 - 105)

FRANK MODICH

Page 106

review?

A.    I -- I don't know.  I don't know.

Q.    Do you know which peer review committee this document relates to?

A.    I do not.

Q.    There's some individuals in the column D listed as recipients.  I'm going to ask about some of them.  I will try to highlight them so we can find them.  Let's see here.  So it's a little bit tricky using Excel for me to highlight them.

Do you have -- well, I'll ask you about the names of the individuals in here.  I'll represent to you that they are in this entry.  If you have access to the Excel spreadsheet on your own and can download it, it might be a little bit easier for you to navigate if you want to see exactly where the names are, but, if you look up here, I can also scroll the recipient list at the top for you.

There's an individual in here named Nicholas Coleman identified as environmental services supervisor, St. Mary's Medical Center.  Do you know what environmental services is?

Page 107

A.    I believe it's janitorial.

Q.    Do you know if Nicholas Coleman was delegated any work by any of the committees identified in your declaration?

A.    I don't know.

Q.    Another individual is Todd Pederson, P-E-D-E-R-S-O-N, identified as print production supervisor Essentia Health.  Do you know what print production is?

A.    I do not.

Q.    Another individual is Jacob Vossler, V-O-S-S-L-E-R.  Do you know who Jacob Vossler is?

A.    I do not.

Q.    They are identified as a physical therapist, I believe Essentia Health Fosston.  Have I typed that right, F-O-S-S-T-O-N?  Does that sound familiar to you?

A.    It does.

Q.    Do you know if any physical therapists were delegated work by -- sorry, delegated peer review work by any of the committees in your declaration?

A.    I do not.

Page 108

Q.    Another individual is Julie Malecha, M-A-L-E-C-H-A.  Are you familiar with that person?

A.    I am not.

Q.    They are listed as an MRI/CT technologist team lead, Essentia Health Virginia Hospital.  Does that refresh your recollection at all to who Julie Malecha is?

A.    I don't know a Julie.  I know the Virginia Hospital and Clinic.

Q.    Was Julie Malecha working at the express direction of any of the committees in your declaration on peer review work?

A.    I don't know.

Q.    Another individual is Kelly Fugere, F-U-G-E-R-E, identified as a fitness operations supervisor with Polinsky Medical Rehab Center.  Are you familiar with that individual?

A.    Not the individual, just the facility.

Q.    What are fitness operations?

A.    I -- I -- I don't know.

Q.    Do you know if anybody in fitness operations was delegated work by a peer review

Page 109

committee in your declaration?

A.    I don't know.

Q.    Do you know if anyone in nutrition services was delegated peer review work by a peer review committee in your declaration?

A.    I don't know.

Q.    Do you know in anybody in nutrition services with Essentia performed work related to the excursion?

A.    I don't know.

Q.    Do you know if any MRI or CT technologists performed work related to the excursion?

A.    I don't know.

Q.    Are you familiar with an email address biprd@essentiahealth.org?

A.    No.

Q.    I'm going to scroll to row 1874.  There's that email address I mentioned.  Does it look familiar to you now that you can see it?

A.    I don't know what it is.

Q.    Okay.  I'm looking at the row for Bates number EHPRIV002425.  Can you tell whether this row relates to a document or communication

28 (Pages 106 - 109)

FRANK MODICH

Page 110

that involved peer review committee work?

A.    Well, I would assume if it's on here, it likely involved peer review committee work.

Q.    Can you tell from looking at this privilege log entry which peer review committee sent or received this communication?

A.    I cannot.

Q.    I hope you'll bear with me.  I'm just going to go through a few more email addresses.  I am not going to pull all of them up.  I will try to say them and spell them, and I would just -- I'm going to ask, if you're familiar with them, if you can help me identify who they are.

Isehrambulatory@essentiahealth, are you familiar with that email address?

A.    Can you restate that again, please?

Q.    Sure, isehrambulatory@essentiahealth.org.

A.    No, I'm not.

Q.    Are you familiar with servicerequestsis@essentiahealth.org?

A.    No, I'm not.

Page 111

Q.    Are you familiar with covid19capital@essentiahealth.org?

A.    No.

Q.    Are you familiar with the letter U; so it's urevenuecyclesystemleadershipteam@essentiahealth.org?

A.    No, I'm not.

Q.    Are you familiar with patientaccountsall@essentiahealth.org?

A.    No.

Q.    Are you familiar with essentianewsalerts@essentiahealth.org?

A.    No.

Q.    Are you familiar with isehrsystemsteams@essentiahealth.org?

A.    No.

Q.    Are you familiar with leadershipsupervisorswest@essentiahealth.org?

A.    No.

Q.    Are you familiar with leadershipmanagerswest@essentiahealth.org?

A.    No.

Q.    Are you familiar with

Page 112

leadershipdirectorswest@essentiahealth.org?

A.    No.

Q.    Are you familiar with leadershipphysicianadministrativedyadswest@essentiahealth.org?

A.    No.

Q.    Are you familiar with ehrtooltips@essentiahealth.org?

A.    I am not.

Q.    Are you familiar with pcccleads@essentiahealth.org?

A.    No.

Q.    Do you know what PCCC is?

A.    No.

Q.    Are you familiar with tooltip-eh@essentiahealth.org?

A.    No.

Q.    Are you familiar with epic.communication@ashlandmmc -- that's A-S-H-L-A-N-D-M-M-C -- .com?

A.    Epic is our EMR, but I'm not familiar with that address.

Q.    Do you know what Ashland is or Ashland MMC?

Page 113

A.    I know what -- it's hospital, yes.

Q.    Is it an Essentia hospital?

A.    It is not an Essentia hospital.

Q.    Are you familiar with epicinformation@boisforte nsn.gov?  I may have mispronounced it.  I'll spell it.  It's epicinformation at B-O-I-S-F-O-R-T-E, dash (sic) nsn.gov.

A.    I'm not familiar.

Q.    Are you familiar with minvalleyepic -- M-I-N-V-A-L-L-E-Y-E-P-I-C -- @mvhc.org?

A.    Minnesota Valley Hospital, but I'm not familiar with the address.

Q.    Is Minnesota Valley Hospital an Essentia affiliated hospital?

A.    It was previously an Essentia hospital.

Q.    When did it cease being an Essentia hospital?

A.    Several years ago.

Q.    Before the excursion was discovered?

A.    I believe so.

Q.    Rutherfordium03 --

29 (Pages 110 - 113)

Page 114

R-U-T-H-E-R-F-O-R-D-I-U-M-0-3 -- @hotmail.com, do you know that email address?

A. I do not.

Q. Do you know who David Baldridge is?

A. I remember -- I recognize the name. I just -- I'm trying to remember who -- I don't remember exactly who he is.

Q. Sure. We can go to row 649. That's EHPRIV000443, and David Baldridge is listed in column C as a consultant. Do you see that?

A. I do.

Q. Does this refresh your recollection at all as to who David Baldridge is?

A. I think he was with the firm Fleishman, but I'm -- yeah, it's been a long time.

Q. My understanding is that he was with the firm Fleishman, but I am not sure. What is Fleishman?

A. They are a consultant used by Essentia following the potential temperature excursion.

Q. Did Essentia ever use Fleishman before the temperature excursion?

Page 115

A. Not to my knowledge.

Q. Did Fleishman perform peer review work?

A. They may have been delegated work by committees or committee members.

Q. What work did Fleishman do that was for peer review purpose?

A. I don't know.

Q. Was Fleishman instructed of any confidentiality obligations related to its work with Essentia?

A. That would be our process and standard.

Q. Was Fleishman informed that it was working with any peer review committees at Essentia?

A. I don't know if it would necessarily say peer review committees, but that everything that was being done on behalf of the committee was confidential.

Q. Was Fleishman given a list of Essentia employees that it was permitted to share information with?

A. I don't know.

Page 116

Q. I'm going to stop our screen share for now. Were you able to access the Excel spreadsheet?

A. I've tried multiple times, and the last one is unable to generate preview.

Q. Well, I think, you know, that way we're only waiting on one of us to scroll to, you know, one of these lines, so hopefully that worked out okay.

A. Yes.

Q. Did any member of the Olive Committee work on informing patients that they were affected by the temperature excursion?

A. I don't know.

Q. Did any member of the Olive Committee communicate directly with a patient?

A. I don't know.

Q. Did any member of the Olive Committee have job responsibilities related to medication storage outside of their peer review work?

A. I don't know.

Q. Did any members of the Olive Committee have job responsibilities related to

Page 117

the excursion outside of their peer review work?

A. I don't know.

Q. Did anyone other than members of the Olive Committee use the Olive software or tool?

A. I would assume only if delegated as part of the -- you know, the committee's work.

Q. Does Essentia still use Olive for reasons other than related to the excursion?

A. I don't know.

Q. Did anyone other than Olive committee members identify patients impacted by the excursion?

A. I think, like I said, there was work being done by multiple committees that involved potentially impacted patients, so it's quite possible.

Q. How can -- how would Essentia distinguish between work that a nurse performed as a result of peer review Olive Committee work and a chart update that she performed that was not peer review work?

A. I don't know.

Q. Do you know anybody who would know the answer to that question?

30 (Pages 114 - 117)

FRANK MODICH

Page 118

A.   I don't.  I mean, if the nurse is doing it on behalf of the committee, she's going to know she's doing it on behalf of the committee.  What she does in her normal day outside of the temperature excursion, I -- is something separate and apart.

THE WITNESS:  Any chance we could take a break?

MS. CLARK:  Absolutely.

THE WITNESS:  Thank you.

MS. CLARK:  Fifteen minutes, ten minutes?

THE WITNESS:  Perfectly fine, yes.

MS. CLARK:  Okay.  So we will go off the record and plan to be back here at 11:30 Central.

VIDEOGRAPHER:  We're off the video at 11:14.  This ends media unit two.

- - -

(A short recess was taken.)

- - -

VIDEOGRAPHER:  We're back on video record at 11:28.  This begins media unit three.  Counsel, you may proceed.

Page 119

BY MS. CLARK:

Q.   Mr. Modich, earlier you mentioned that some committees are Essentia standing committees.  Do you remember that?

A.   I do.

Q.   Can you tell me which of the committees in your declaration are standing committees?

A.   Yes, I certainly can.  So the Patient Relations and Risk Management Committee is a standing committee; the Essentia System Quality Committee is a standing committee; the Essentia Clinical Practice Committee is a standing committee; the Clinical Alert Subgroup is a standing committee; and the IM Pharmacy Prioritization and Project Partnering Committee is a standing committee.

Q.   Of the five standing committees that you just identified, are they all still active committees?

A.   Yes.

Q.   When was the Patient Relations and Risk Management Committee established?

A.   It has been in existence as long as

Page 120

I have been here.

Q.   How long have you been with Essentia?

A.   2012.

Q.   When was the Essentia System Quality Committee established?

A.   I don't know.  It's been around for a very long time.

Q.   More than five years?

A.   Yes.

Q.   More than ten years?

A.   I assume so, but I don't know.  I don't sit on that committee.

Q.   When was the Essentia Clinical Practice Committee established?

A.   That, I believe, existed even prior to me being with Essentia in 2012.

Q.   When was the Clinical Alert Subgroup established?

A.   I don't know.

Q.   And when was the IM Pharmacy Prioritization and Project Partnering Committee established?

A.   I don't know.

Page 121

Q.   Okay.  So I am looking at page 15 of your declaration.  You have a heading there that says Other Committees, and below that heading you have paragraph 45 which identifies the One Essentia Fridge Project Committee, paragraph 49 which identifies the immunization clinic transition teams, and paragraph 53 that identifies the IM Pharmacy Prioritization and Project Partnering Committee.

Why are these listed as other committees?

A.   Just other committees.

Q.   Do they have any different significance than the committees that have their own heading?

A.   No, I don't believe so.

Q.   Did they have a lesser role in working on excursion-related work than the other committees?

A.   Not to my knowledge.

Q.   On the Patient Relations and Risk Management Committee, is it okay if I just refer to them as the Risk Management Committee today?

A.   Sure.

31 (Pages 118 - 121)

Page 122

Q.    I can see on page 9 that a risk management subgroup was created.

A.    Yes.

Q.    Why was a risk management subgroup created?

A.    That was in response to the potential temperature excursion.

Q.    Was everyone in the subgroup also a member of the main Risk Management Committee?

A.    I believe they were, yes.  Wait, except -- no, I'm sorry -- Kristen Luttio, Suzanne Zeltinger, I think.  There were some more operational administrative staff that were on the subgroup as well.

Q.    I'm just looking at the groups now. Janice Schlaht, S-C-H-L-A-H-T, it looks like she was on both the committee and the subcommittee.

I'm not sure if this is a test of your knowledge or your eyesight, but was Lindi, L-I-N-D-I, Bjornson, B-J-O-R-N-S-O-N, a member of both the committee and the subgroup?

A.    Yes.  So Al would have been just on the subgroup, Christine just on the subgroup. Candace would have been on both.  Suzanne would

Page 123

have just been on the subgroup.  Dr. Vetter would have been on both.  Jess Fetzer would have been on both.  Jan Schlaht would be on both.  Sherry Jensen would be on both.  Lindi Bjornson would be on both.

Q.    Okay, thank you.

What is operations?  And I'm referring to the operations roles for Kristen Luttio and Suzanne Zeltinger.

A.    They're just administrative staff leaders on the, I guess, healthcare operations. So they just -- they're leaders within the organization.

Q.    Can you tell me more about what type of work operations does?

A.    I mean, they're going to be responsible for overseeing the day-to-day activities in the hospitals and clinics and things of that nature.

Q.    Is it a human resources related role?

A.    No, not at all, no.

Q.    What skill set would operations have offered to the risk management subcommittee that

Page 124

worked on issues related to the temperature excursion?

A.    It would have had a subject matter expertise, but it's really, you know, the maintenance and operations in the hospitals and clinics.  They're there for the day-to-day function of our healthcare organization, so that was probably the value they added.

Q.    Can you give me one example of something that operations does?

A.    Just management of our hospitals and clinics, so, you know, just that overall leadership component.

Q.    Do they have any management of medical care provided to patients?

A.    They may ultimately be responsible for operating the hospital.  Providers fall under that, fall within that structure.  So I can't -- I don't do that work, so I can't say exactly what their day-to-day function looks like.

Q.    That makes two of us.

Okay.  So tell me about the Risk Management Committee.  And I'm talking about

Page 125

the overall committee and not the subgroup. What is the Risk Management Committee's peer review role?

A.    Well, I think it's -- I, again, refer back to my declaration, but they provide that ongoing comprehensive and systematic approach to reduce risk of harm to patients by collecting, identifying, reviewing, investigating, analyzing, and evaluating regular event reports with feedback about care for both -- from both patients and providers. So ultimately they're reviewing and evaluating these events with a purpose of improving the care and treatment provided in our facilities.

Q.    For the sake of our transcript and our reporter, would you mind pointing us to the paragraph that you were just reading from?

A.    I would certainly do that.  That would be, I believe, paragraph 24, but then I would also refer to paragraph 27 as well.

Q.    What does patient relations mean in the context of the Patient Relations and Risk Management Committee?

A.    Patient relations is that

32 (Pages 122 - 125)

Page 126

interaction between our group via Essentia and patients.

Q.    Do members of the Risk Management Committee correspond directly with patients about patient concerns?

A.    They may.

Q.    Do they correspond directly with patients about medical care?

A.    They may.

Q.    Are you a member of the Patient Relations Committee?

A.    Yes.

Q.    And you're a member of the subcommittee as well --

A.    Yes.

Q.    -- that addressed the excursion, correct?

A.    Yes.

Q.    Did you review any documents to help you prepare your declaration as it relates to the Risk Management Committee?

A.    I did not.

Q.    Was the Risk Management Committee ever referred to by any other name?

Page 127

A.    It's possible patient safety, but usually the term is -- it's usually referred to as risk management or patient relations or the combination of both.

Q.    What does risk management mean?

A.    I would just refer back to what the purpose is of the committee.

Q.    Is it referring to risk to patients?

A.    It can be.

Q.    Does it refer to risk to the hospital?

A.    It can be that as well.

Q.    Does it refer to legal risk?

A.    I think -- I think, you know, risk has a very, very broad umbrella, but everybody's definitions or opinions are going to be different.

Q.    Does the Risk Management Committee do peer review work related to Essentia's legal risk?

A.    I guess I don't understand that question.

Q.    Does the Risk Management -- sorry, let me start that over.

Page 128

Does the Risk Management Committee assess any litigation risk to Essentia?

A.    They may, but really a lot of -- it's hard for -- I mean, they are not attorneys.  They're not paralegals.  They're not going to evaluate risk like the legal department will.

Q.    Does the Risk Management Committee address any risk of financial loss that Essentia might face?

A.    It's possible, but that usually doesn't fall -- that doesn't usually fall within their bailiwick.

Q.    Does the Risk Management Committee consider anything that would cause a risk to patient safety?

A.    I think that's fair, yes.

Q.    Do all of the individuals identified in your declaration at pages -- I'm sorry, paragraph 26 and paragraph 30 know that they are members of the Risk Management Committee?

A.    Yes.

Q.    Do all of the individuals identified in your declaration at paragraphs 26 and 30 know

Page 129

the scope of responsibilities for the Risk Management Committee?

A.    I believe so.

Q.    Do all of the individuals at paragraphs 26 and 30 know who the other members of the Risk Management Committee are?

A.    I believe so.

Q.    Do all of those individuals identified in paragraphs 26 and 30 know that they have an obligation to keep Risk Management Committee work confidential?

A.    That is my understanding.

Q.    Do members of the Risk Management Committee ever share their peer review work with anyone outside of the committee?

A.    Not unless it's for, you know, an extent necessary to carry out their purpose of the committee.

Q.    Is a communication between the Risk Management Committee and a patient governed by the peer review privilege?

MR. STOCK:  Object; it calls for a legal conclusion and it's vague.

MS. CLARK:  Can your client answer?

33 (Pages 126 - 129)

Page 130

MR. STOCK: If possible, sure.

BY MS. CLARK:

Q. Are communications between the Risk Management Committee and patients for peer review purposes?

MR. STOCK: Counsel, I'm going to object as the question is vague. It has no context whatsoever and it calls for a legal conclusion, but go ahead, Mr. Modich, if you can.

THE WITNESS: I don't know.

BY MS. CLARK:

Q. Does the Risk Management Committee ever speak with patients as part of its peer review work?

A. I believe in terms of when it gathers information, I think they may have conversations with patients.

Q. Does the Risk Management Committee ever provide information to patients as part of their peer review work?

A. Unless it were to be, you know, to the extent necessary to carry out one of the purposes, I'm not aware.

Page 131

Q. At paragraph 24 you talk about the work of the Risk Management Committee evaluating, quote, regular event reports, end quote. What are regular event reports?

A. It can be either patient questions or concerns and it can be provider questions or concerns, but it all relates to the provision of patient care.

Q. How do patient concerns come to the attention of the Risk Management Committee?

A. There's a whole host of ways: Websites, phone calls, emails. They can say something to a provider, express a concern. So there's a wide variety of ways that it can get to the Patient Relations and Risk Committee.

Q. How would a patient question or concern submitted by the website make it to the Risk Management Committee?

A. I don't know.

Q. Does the Risk Management Committee have a phone number that a patient could call?

A. I believe so.

Q. At paragraph 24 you say that the Risk Management Committee, among other things,

Page 132

analyzes and evaluates regular event reports with feedback about care from both patients and providers. When the Risk Management Committee analyzes and evaluates regular event reports, what does it do with the results of that investigation, analysis, or evaluation?

MR. STOCK: Object to the extent it calls for information that's privileged, peer review privileged, and outside the scope of the limitations ordered by the Court. I'll instruct the witness not to answer.

BY MS. CLARK:

Q. Does the Risk Management Committee share the results of its investigations with anyone outside of the committee?

A. Not except to the extent necessary to carry out its purpose.

Q. Does the Risk Management Committee share the results of its investigation -- let me say that over.

Has the Risk Management Committee ever sent the results of its analysis to anyone outside of the committee?

Page 133

A. Not to my knowledge. I don't know.

Q. Has the Risk Management Committee ever sent the results of its investigation, analysis, or evaluation to anyone outside of the committee?

A. I don't know.

Q. How does the Risk Management Committee help reduce the risk of harm to patients without sharing information with others at Essentia?

MR. STOCK: Counsel, I'm going to instruct him not to answer. Again, it's outside the scope of the limitations ordered by the Court and has nothing to do with the structure of the committee.

BY MS. CLARK:

Q. Did the Risk Management Committee have any sort of shared file or folder or source of information?

A. I mean, there's the standard -- you know, I guess we call it the incident data reporting system.

Q. Is that an electronic system?

A. Yes, yeah.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

FRANK MODICH

Page 134

Q.    Does anybody else at Essentia use that system besides the Risk Management Committee?

A.    No, I -- there's different modules. I think there's a quality module. There's a risk module. There's an HR module. So relative to this, they're the only ones that use their module.

Q.    Is access to those modules restricted to certain individuals?

A.    Yes.

Q.    Is access password protected?

A.    You can't get into it unless you -- I don't know. Again, I don't have the technology background, but others are prevented from accessing it.

Q.    Does the Risk Management Committee ever create meeting agendas for its meetings or phone calls?

A.    I believe so.

Q.    Where are those Risk Management Committee agendas saved?

A.    I don't know.

Q.    How are those agendas shared with

Page 135

members of the committees?

A.    It's hard to say. Either -- it's usually electronically, email, teams, something of that nature.

Q.    Did anyone on the Risk Management Committee use any other employer provided software to communicate besides email and teams?

A.    I don't know; not to my knowledge.

Q.    Did the Risk Management Committee ever communicate with one another about peer review work by text message?

A.    I don't know.

Q.    Did you ever communicate with anybody else about Risk Management Committee work by text message?

A.    Not to my knowledge.

Q.    Have you ever communicated with anyone about peer review committee by text message as it relates to any of the committees in your declaration?

A.    I don't believe so.

Q.    Did the Risk Management Committee have any calls or meetings that were open to Essentia employees who were not part of the

Page 136

committee?

A.    No.

Q.    Did the Risk Management Committee ever draft any policies for Essentia or any department of Essentia?

A.    I don't know.

Q.    Did the Risk Management Committee ever draft any guidelines for Essentia or any department at Essentia?

A.    I don't know.

Q.    Were Risk Management Committee members informed of any duty of confidentiality as a result of their role on that particular committee?

A.    It's my understanding they know. I've never -- it's always been considered confidential.

Q.    Does Essentia have any standard practice for informing individuals of their peer review confidentiality obligations when they join the peer review committee?

A.    I think it's up to each committee. I don't know of any standardized way of doing it.

Page 137

Q.    Did the Risk Management Committee communicate about committee work with any other committee?

A.    Unless -- you know, unless it's, you know, pursuant to the purpose of why the committee exists, I don't -- I don't know.

Q.    Did they make any communications pursuant to the purpose of why the committee exists with other committees?

A.    I'm sure they did, but I don't have specific examples.

Q.    Did members of the Risk Management Committee review any legal filings in connection with their role on the committee?

MR. STOCK:  Object; it's beyond the scope of the limitations ordered by the Court and instruct you not to answer.

BY MS. CLARK:

Q.    Was the Risk Management Committee responsible for reviewing legal filings?

A.    Is that the same question or -- I'm sorry, I must have -- okay.

Q.    I'm asking about the purpose of the committee and not any particular committee

35 (Pages 134 - 137)

FRANK MODICH

Page 138

member.

A.    I don't believe so.

Q.    Did the Risk Management Committee draft public relations communications?

A.    I don't know if they did or not. I don't think so.

Q.    When you -- have you been on the Risk Management Committee since you first joined Essentia in -- did you say 2012?

A.    2012. No, I would say probably around 2014 or 2015.

Q.    Who invited you to join the Risk Management Committee?

A.    Our former chief legal officer.

Q.    And how were you invited to join the Risk Management Committee?

A.    She wanted me to take -- basically be on that committee.

Q.    Did you receive a list of individuals who were members of the committee at that time?

A.    I don't remember.

Q.    Is there a roster of members of the Risk Management Committee in writing?

Page 139

A.    Not to my knowledge.

Q.    Did the Risk Management Committee review pharmacy records?

A.    I don't know.

Q.    Did the Risk Management Committee review financial records?

MR. STOCK:  Objection; it's beyond the scope of the structure of the committee as a limitation ordered by the Court and I'll instruct you not to answer.

BY MS. CLARK:

Q.    Does the Risk Management Committee have any responsibilities to communicate with governmental agencies?

A.    They may. I don't know. I don't know specifics.

Q.    At paragraph 27 in your declaration, you state that the Risk Management Committee reviews information about, quote, alleged adverse events, end quote. What are adverse events?

A.    I would just describe it as a negative outcome.

Q.    Are adverse events different from

Page 140

regular events?

A.    It can be. I think, you know, adverse events often time have a meaning of where you have to report to, say, the Minnesota Department of Health. There's those adverse events, there's negative events, there's fentanyl events, just significant events.

Q.    Who creates regular event reports?

A.    Anybody can. I mean, essentially it can be from a patient asking a question or expressing a concern to a provider question or concern.

Q.    And what about adverse event reports? Who would create an adverse event report?

A.    It can be basically anybody.

Q.    Is a report a particular form or process?

A.    No, not necessarily, no.

Q.    Could a report be a phone call?

A.    It could be a phone call, yep.

Q.    Could a report be an email?

A.    Yes.

Q.    You mentioned earlier that reports

Page 141

are sometimes made by the website. Is that -- is there a messaging capability on the website?

A.    I don't know how. Somehow it gets from the website to the Patient Relations and Risk Management Committee.

Q.    At paragraph 27 you mention that the Risk Management Committee reviews, quote, feedback reported by patients and providers. What do you mean by feedback?

A.    The exact same thing we've talked about. Interchangeably in healthcare, complaints, feedback, compliments, it's all within that same arena.

Q.    And at that same paragraph, paragraph 27, you mention, quote, disputes or questions from patients regarding their care. What kind of disputes are you referring to?

A.    It can be any dispute: I didn't receive the care, I didn't get the outcome that I wanted to. It can be anything, but where the patient believes that, you know, something didn't go as they envisioned.

Q.    Would that include billing disputes as well?

36 (Pages 138 - 141)

FRANK MODICH

Page 142

A. It could be.

Q. After reviewing a patient dispute or question, does the Risk Management Committee prepare a response?

A. Not always. I don't -- I don't know. I guess I don't know.

Q. If a response is prepared, do you know if that comes directly from the Risk Management Committee to the patient or is there another way in which the response is transmitted to the patient?

A. I don't know.

Q. We talked about this a little bit. Paragraph 27 mentions a standardized incident reporting system. Is that the electronic system that you were talking about before --

A. Yes.

Q. -- that has the different module?

A. Yes.

Q. Does that system have a name?

A. RLDatix. It used to be called RL6.

Q. Does that system identify patients by name?

A. I don't -- I don't know.

Page 143

Q. Do people using that system anonymize patient information before putting it in the system?

A. I'm not savvy with the actual system itself. I do not use it.

Q. Do you know who on the Risk Management Committee does use that system as part of their peer review work?

A. Yes.

Q. Who on the committee uses that incident reporting system as part of their peer review work?

A. There's quite a few in the -- I'll start with Jess Fetzer. She's the current interim director of risk management. She uses it, and then people under her use it as well.

Q. Can you identify anybody else who's on these committee lists?

A. Yes. Let's see here. Jan Schlaht, Sherry Jensen, Lindi Bjornson, Ann Bertoch, Mary Langner, Lauri Tahtinen, Andy Verant, Megan Solem-Ritter, Betsy Verant, Ashanti Halli, Julie Rollin.

Q. Are there individuals who are not

Page 144

committee members who use the standardized incident reporting system?

A. No.

Q. Is it --

A. Let me correct that. Providers can, say, enter events, but then they don't actually use the system itself.

Q. But they can enter events into the system?

A. Yes, there's a process for that.

Q. Does the standardized incident reporting system have any non-peer review purpose?

A. Not to my knowledge.

Q. In paragraph 25 you wrote, "The Risk Management Committee supports and includes all Essentia facilities, departments, services, and healthcare professionals."

What do you mean when you say the Risk Management Committee supports all of those facilities, departments, services, and professionals?

A. This committee and its purpose, it's Essentia-wide. It doesn't just support

Page 145

Essentia. It doesn't just support Innovis. It is Essentia, Innovis, and all of the affiliates and subsidiaries and folks.

Q. Has membership of the Risk Management Committee changed over time?

A. Only due to people leaving the organization, retiring, things of that nature.

Q. Does the Risk Management Committee have a leadership structure?

A. It does.

Q. Is there a chair of the Risk Management Committee?

A. It's the director of risk management.

Q. And who is that?

A. Jessica Fetzer.

Q. Are there any other titled roles on the Risk Management Committee?

A. No. The risk director has a dyad, and each market has a provider/physician dyad. We've used that term before.

Q. And what about for the Risk Management Committee subgroup that was gathered to -- sorry, that was created to gather and

37 (Pages 142 - 145)

FRANK MODICH

Page 146

review information relative to the excursion? Does that subgroup have a chair?

A.    Not a -- there is no chair. Jessica Fetzer as the director was more responsible for overseeing the meetings.

Q.    So paragraph 26, letter C, lists Timothy Sayler, the former chief operating officer. The last name is S-A-Y-L-E-R. What was Timothy Sayler's role on the Risk Management Committee?

A.    He was just an administrative staff member from operations.

Q.    And what kind of skill set does an administrative staff member from operations offer to patient relations and risk management?

A.    Just overall functioning of the hospital and provision of patient care.

Q.    Did Timothy Sayler have any job responsibilities that were unrelated to his role on the Risk Management Committee?

A.    Well, he was the chief operating officer of Innovis Health, so, yes, he had other job duties.

Q.    Letter H is Sherry, S-H-E-R-R-Y,

Page 147

Jensen, J-E-N-S-E-N, patient relations associate. What was her role on the Risk Management Committee?

A.    Just another administrative member.

Q.    What skill set did she offer to the Risk Management Committee?

A.    Patient relations associate.

Q.    Why was she selected to be on the subgroup created to work on excursion-related work?

A.    She's involved in the intake of patient feedback events.

Q.    And how does that support the risk management subcommittee that's related to excursion-related work?

A.    That's kind of getting into the function, but she provided the necessary support and it was determined that she would participate.

Q.    Who determined that?

A.    Probably the committee as a whole. I don't know.

Q.    Did you ever determine that anybody should join any of the committees that you were

Page 148

a member of?

A.    I can't remember if there was any circumstance of that.

Q.    Were you ever the person tasked with reaching out to a new committee member to invite them to join a committee that you were on?

A.    I don't believe so.

Q.    Betsy Verant, V-E-R-A-N-T --

A.    Verant.

Q.    -- at letter U, RN senior patient relations specialist, what skill set did she provide to the Risk Management Committee?

A.    It would be the same as Sherry, the same role, just in a different market.

Q.    What market was Betsy in?

A.    Betsy sits in the Duluth market which is considered the East Market.

Q.    And did Betsy have job duties at Essentia that were unrelated to her role on the Risk Management Committee?

A.    I don't -- I think her role is strictly this committee, sitting on this committee.

Q.    Does Essentia have any patient

Page 149

relations work that is not peer review work?

A.    I'm not aware of any.

Q.    There are a few RNs listed here who are also patient relations specialists; so, for example, Lindi Bjornson, Ann Bertoch, Betty Verant. Did these nurses also see patients?

A.    They do not.

Q.    Is there anyone on the Risk Management Committee who also sees patients as a provider?

A.    No.

Q.    Did the Risk Management Committee delegate any work to providers who see patients?

A.    They very well may have.

Q.    At paragraph 31 you mention that the subgroup maintained a standardized reporting system. Is that the same standardized reporting system that we've been discussing previously?

A.    Yes.

Q.    At paragraph 31 you mention that the subgroup developed recommendations. What kind of recommendations did the group develop?

MR. STOCK:  Object; beyond the scope of the Rule 30(b)6 and the

38 (Pages 146 - 149)

FRANK MODICH

Page 150

limitations ordered by the Court. I'll instruct you not to answer the question.

BY MS. CLARK:

Q.    Who did the Risk Management Committee make recommendations to?

MR. STOCK:  Same objection; it's beyond the scope of the limitations ordered by the Court and I'll instruct you not to answer.

BY MS. CLARK:

Q.    Did the Risk Management Committee develop any recommendations that were shared outside of the Risk Management Committee?

A.    I don't know.

Q.    Did anyone at Essentia leadership ask for reports from any peer review committee?

A.    I don't remember.

Q.    Did anyone at Essentia leadership ever receive any reports from a peer review committee?

A.    I don't know.

Q.    Did anyone at Essentia leadership ever receive recommendations from a peer review committee?

Page 151

A.    I don't know.

Q.    Did any members of the Risk Management Committee have job responsibilities related to medication storage other than their peer review work?

A.    No.

Q.    Did any members of the Risk Management Committee, including the subcommittee, have job responsibilities related to the excursion other than their peer review work?

A.    I don't think so.

Q.    Who determined that the subgroup should be created to address the excursion?

A.    I don't remember.

Q.    Candace Moore, RN patient relations and risk management director, what was her role on the Risk Management Committee subgroup?

A.    She was a leader.

Q.    What do you mean by a leader?

A.    So Jess Fetzer replaced Candace. Candace is no longer with the organization.

Q.    I see.  Did Suzanne Zeltinger, who's listed as operations administrator, review

Page 152

disputes from providers as a result of her role on the committee?

A.    I don't know.

Q.    Did Suzanne Zeltinger respond to disputes from patients related to the excursion?

A.    I don't think so.

Q.    Did the subcommittee delegate peer review work to anyone?

A.    It very well may have.

Q.    Who would the subcommittee have delegated work to?

A.    I don't know.  I mean, I would refer back to the supplemental privilege log.

Q.    If we pull up the supplemental privilege log, would you be able to point me to any example of work that was delegated as a result of delegation by the risk management subcommittee?

A.    Not with a hundred percent certainty.

Q.    Okay.  What is the Essentia System Quality Committee?

A.    Just a standing committee at Essentia overseeing quality and safety

Page 153

initiatives.  Let's just say cite the paragraph 33.

Q.    What does Essentia system mean in the name of this committee?

A.    Just nomenclature, just a name. It's -- you know, in Essentia it's a system. It's a full Essentia family committee.

Q.    So it refers to the Essentia entities but not a computer system or something?

A.    No, correct.

Q.    How does the quality committee, the Essentia System Quality Committee, differ from the Risk Management Committee?

A.    It just -- it's a different committee, different individuals involved in it, really focused on -- again, I think there's a commonality in the sense of evaluating care and treatment to improve the quality of care and treatment.  This is just another committee that does that.

Q.    How would you be able to identify work that was performed by the Essentia System Quality Committee?

A.    I don't know if I would.

39 (Pages 150 - 153)

FRANK MODICH

Page 154

Q.   Are you on the Essentia System Quality Committee?

A.   I am not.

Q.   Can you identify for me any differences between work that the Essentia System Quality Committee does and the Patient Relations and Risk Management Committee?

MR. STOCK:  Object to the extent it's been asked and answered, but go ahead if you can.

THE WITNESS:  I can't.

BY MS. CLARK:

Q.   Why were there two different committees to address similar functions?

A.   They're -- I don't know.  There was a need for them and to have two committees.

Q.   Who decided who should be among the membership of the Essentia System Quality Committee?

A.   I do not know.

Q.   Why were the members of the Essentia System Quality Committee selected to be on that committee?

A.   Likely because, similar to our

Page 155

other committees, they brought a subject matter expertise or skill set they felt was necessary on the committees.  That's why -- my understanding is that's why any one of our folks end up on these committees.

Q.   One of the committee members at letter P in paragraph 34 is Debbie L. Welle, W-E-L-L-E, hyphen Powell, P-O-W-E-L-L, listed as chief population health officer, Essentia Health.  What is a chief population health officer?

A.   I don't have the definition, but she just looks at population health as a whole. I -- I don't have her -- I don't have a definition for her title.

Q.   Does population refer to Essentia patient population?

A.   Generally, yes.

Q.   What skill set did Debbie L. Welle-Powell offer to the Essentia System Quality Committee?

A.   I don't know.

Q.   Were all of the committee members informed that they were members of this

Page 156

committee?

A.   I would assume so, but, again, I don't sit on that committee.

Q.   Were all of the members of the Essentia System Quality Committee informed of any confidentiality obligation related to their role on this committee?

A.   That's typically the process, but I don't -- I don't sit on that committee.

Q.   Are there any members of the Essentia System Quality Committee who only did peer review work on this committee and didn't have any other Essentia job responsibilities?

A.   I don't know.

Q.   What does the Essentia Clinical Practice Committee do?  It's on page 12 of your declaration.

A.   They're really assessing the quality of clinical care to, again, improve quality, affordability, and reliability of care in the setting, in that clinical care setting.

Q.   When you mention affordability, do you mean affordability to the patient?

A.   Yes.

Page 157

Q.   Does this committee ever address cost effectiveness of care to Essentia?

A.   I think it's more focused on -- you know, the ultimate purpose in these decisions for Essentia is the ultimate cost to the patient.  That's where the focus is.

Q.   What is a clinical practice?

A.   It's just their name.  So basically there can be different clinical practices: Pediatrics, emergency medicine, just there's a whole -- hospitalists, internal medicine.  So it's just their -- it's a combination of all those groups.

Q.   Does the work of the Essentia Clinical Practice Committee overlap with the work of any other peer review committee?

A.   There may be some overlap.  I just -- I can't speak to it.

Q.   Joseph Bianco, B-I-A-N-C-O, is identified as a physician with the Duluth Clinic and a member of that committee.  Do you recall that?

A.   Yes.

Q.   What was Joseph Bianco's role on the

40 (Pages 154 - 157)

FRANK MODICH

Page 158

Essentia Clinical Practice Committee?

A. Just another committee member that had -- he's got medical expertise.

Q. Does Doctor, I presume, Bianco see patients as a medical provider?

A. Dr. Bianco does see patients, yes.

Q. What is Daniel Collins' role on the Essentia Clinical Practice Committee? He's listed as a vice president, quality.

A. I don't know his specific role. He's just a committee member.

Q. What is the role of Shannon Dahnke, D-A-H-N-K-E, communications director, on the Essentia Clinical Practice Committee?

A. I don't know her role. I'm just assuming that she brought a specific skill set.

Q. Were you ever on any Essentia Clinical Practice Committee communications with Shannon Dahnke?

A. I very well may have been.

Q. Were you ever on any phone calls with her related to the work on this Essentia Clinical Practice Committee?

A. Probably.

Page 159

Q. Were you ever in any meetings with her related to the Essentia Clinical Practice Committee?

A. Yes.

Q. Are there any other individuals listed at paragraph 38 that are practicing providers, medical providers that see patients?

A. Yes.

Q. And who else on this list is a medical provider that sees patients?

A. Keith Henry, Michael Van Scoy, Joe Bianco, Christie Erickson, Sam Kapphahn, Mike Mollerus, Kassandra Nelson, Anne Stephen, Steve Sutherland, Rich Vetter, Elena Rieger, Andy Moen, Melissa Simonson, Kristina Thell, Gratia Pitcher, Maria Beaver. I don't know if Sarah Manney still sees patients. And Ryan Groeschl.

Q. At X, letter X, there's Kristina Thell, NP, Brainerd Medical Center. What is Brainerd Medical Center?

A. It's another Essentia subsidiary. It's what we used to call our Essentia Central Market. St. Joseph's Medical Center-Brainerd Medical Center, Inc., it now just rolls up to

Page 160

Essentia Health East.

Q. Are you familiar with Jana Hollingsworth, Former Editor, Essentia Health?

A. Not personally.

Q. Do you know what the role of a former editor at Essentia is?

A. No.

Q. Do you know what the role of an editor at Essentia Health is?

A. No.

Q. Do you know what Jana Hollingsworth's contribution to the Essentia Clinical Practice Committee is?

A. I do not.

Q. At paragraph 35 you mention that this committee gathers and reviews information and data regarding current issues of concern. What are current issues of concern?

A. It's just -- it can be a broad category; a provider wants to change treatment regiments at Essentia Health or it can be anything or everything.

Q. Can you give me another example of what an issue of concern might be?

Page 161

A. For instance, maybe they want to change a policy on the way they provide care at Essentia Health. They might -- that term concern or question or change or whatever, it's -- it's just a lot. It can be anything.

Q. Does concern necessarily mean problem?

A. No.

Q. Can concern just mean a change?

A. A change.

Q. And was the clinical practice committee responsible for determining whether a change would be appropriate?

A. They would evaluate that and, yeah, I'm sure there were -- there would be a recommendation or something of that nature.

Q. Who would the Essentia Clinical Practice Committee make recommendations to?

A. I don't know.

Q. Did the Essentia Clinical Practice Committee ever draft guidelines?

A. I don't remember.

Q. Did they ever draft policies?

A. I don't believe they've ever

41 (Pages 158 - 161)

FRANK MODICH

Page 162

drafted -- I don't remember them drafting policies.

Q. Did they ever draft procedures for others in the Essentia system to follow?

A. Not to my knowledge.

MS. CLARK: So I'm wondering if now might be a good time to break for lunch. Does that work for everyone else?

MR. STOCK: Yeah, that's fine.

MS. CLARK: Okay. Let's go off the record, please, and then we can talk about how long we'll need.

VIDEOGRAPHER: We're off the video record at 12:19. This ends media unit three.

- - -

(Lunch recess 12:19-1:05 p.m.)

- - -

VIDEOGRAPHER: Back on the video record at 1:01. This begins media unit four. Counsel, you may proceed.

BY MS. CLARK:

Q. Welcome back. I just have a quick clean-up question about the Essentia System

Page 163

Quality Committee.

At paragraph 35 of your declaration it says, "The Essentia System Quality Committee gathers and reviews information relating to the care and treatment of patients to, among other things, evaluate and improve the quality of healthcare, obtain information relative to care," and it continues.

Can you tell me what's meant by obtain information relative to care?

A. Likely just, you know, they're finding out -- it can be patient-specific or it can be population-specific. It just depends in terms of care provided to patients.

Q. So it could be any information about care?

A. Yeah. I mean, that's essentially it.

Q. Okay. I think the words "relative to" just strikes me as a lawyerly word, so I just wanted to make sure we're talking about the same thing.

A. Sure.

Q. Okay. Let's talk about the clinical

Page 164

alerts subgroup on page 14 of your declaration starting around paragraph 41.

Can you tell me about this subgroup? What did this subgroup do?

A. This group was primarily focused on assessing monitoring and overseeing that relative to the care and treatment of patients, and so -- whether that be best practice alerts, anything of that nature where there needs to be -- there's a monitoring component or alert component associated with it.

Q. What do you mean when you say monitoring?

A. Again, monitoring a patient in a bed. It could be monitoring the patient electronically or whatever, you know. And as part of that and through the electronic medical record, there can be alerts or processes that I'm not intimately familiar with that is associated with that care and treatment.

Q. So when you talk about clinical alerts, like, in the name of the subgroup, are those electronic alerts?

A. I believe that's what it is. I

Page 165

don't want to say exclusively that because I don't sit on this committee, but this is their -- kind of their overall purpose.

Q. Have you ever seen a patient care alert before?

A. No.

Q. Do you know if they're ever sent out by email?

A. Oh, I don't -- I don't -- I don't think so, but, again, I don't sit on that committee and I don't do that work. So I don't know.

Q. How did the clinical alerts subgroup committee's work relate to the excursion?

MR. STOCK: I'm going to object, Counsel, as beyond the scope of the 30(b)6 limitations ordered by the Court and I'm going to instruct this witness not to answer that question.

BY MS. CLARK:

Q. What excursion-related responsibilities did the clinical alerts subgroup have?

MR. STOCK: Same objection; it's

42 (Pages 162 - 165)

FRANK MODICH

Page 166

beyond the scope of the limitations set by the Court. You're asking -- now you're asking for specifically privileged information, peer review privileged information.

BY MS. CLARK:

Q. At paragraph 41 of the declaration, you say that the subgroup was part of Essentia's Executive Steering Committee. What is the Executive Steering Committee?

A. Again, I don't sit on that. I just know there is a committee. I think it's more focused on the application of IS resources in the healthcare -- within our healthcare system, but, again, I don't sit on that one as well.

Q. What does IS mean?

A. Information services, information technology, IT/IS, yes.

Q. Do you know who the members of the Executive Steering Committee are?

A. I do not.

Q. Is the Executive Steering Committee a peer review committee?

A. I don't know.

Page 167

Q. Who decided to establish the clinical alerts subgroup?

A. I don't know. It's been -- it's a standing committee. In my recollection, it's been around for quite a while, but, again, I don't have any specifics.

Q. Who did the clinical alerts subgroup delegate work to?

A. I don't know.

Q. At paragraph 42 you identify members of the clinical alerts subgroup. Are there any members of the subgroup who are not identified in paragraph 42?

A. Not to my knowledge.

Q. How did you identify who to include in paragraph 42?

A. Working with counsel.

Q. With your outside counsel?

A. Yes.

Q. Is that the Vogel Law Firm?

A. Yes.

Q. What was Taylor Mertz, M-E-R-T-Z, Midwife Innovis Health, LLC's, role on the clinical alerts subgroup?

Page 168

A. I can't speak to her function within that committee.

Q. What was the role of Kari, K-A-R-I, Straub, S-T-R-A-U-B, nurse informaticist, at Essentia Health?

A. I can't speak to her role either.

Q. What is a nurse informaticist, if I'm even pronouncing that correctly?

A. Again, I don't have a definition, but there is a -- I think there's another IS component to that function as well.

Q. Is it your understanding that the clinical alerts subgroup is IT or IS related?

A. I think it really relates to alerts within our electronic medical record and those processes. So there's an IS component, but there's a healthcare component as well.

Q. On page 15, Lindsay Romine, R-O-M-I-N-E, registered nurse acute care 3 medical/surgical with St. Mary's Regional Health Center, what was their role on the clinical alerts subgroup?

A. I can't speak to her role.

Q. Is St. Mary's Regional Health Center

Page 169

an Essentia entity?

A. Yes, it is.

Q. Were there any members of any of the peer review committees in your declaration that were not Essentia employees?

A. No, not to my knowledge. They're all employees.

Q. Jason Hoeksema, H-O-E-K-S-E-M-A, pharmacy systems analyst, do you know their role on the subgroup?

A. I do not.

Q. At paragraph 43 you note that the subgroup gathers and reviews information and data concerning clinical patient care and alerts. What kind of data and information does the subgroup gather?

A. I'm not aware.

Q. From what sources does this subgroup gather data and information?

A. Please understand in healthcare it can come from a lot of different sources. So it's a general category, your description, but whether it's coming in directly from patients or providers or literature or -- I don't know.

43 (Pages 166 - 169)

FRANK MODICH

Page 170

It can be a lot.

Q. At paragraph 45 you identify the One Essentia Fridge Project Committee. What did that committee do?

A. So that was actually -- it was intended to be in existence prior to the potential temperature excursion, but the temperature excursion was the impetus to really kick off that committee.

That is a -- what I would call more of a standing committee now, and that was really -- they were responsible for really looking Essentia-wide at the temperature monitoring systems and evaluating and providing guidance with the ultimate goal of improving patient care.

Q. Does fridge refer to a refrigerator?

A. That's how it is. I don't know what kind of storage systems as a whole that relates to. I'm going to say I think it's broader than a fridge, but yes.

Q. And is it refrigerator for the storage of medications?

A. Could be, could maybe be other

Page 171

things, too, to preserve. That's why I don't want to necessarily limit it to just the refrigeration of medications.

Q. So potentially it could relate to the storage of lab specimens?

A. Could be anything like that, any temperature monitoring systems that we would have within Essentia.

Q. Would it be related to food storage in a kitchen?

A. I don't know. I don't know.

Q. Okay. Would it relate to a refrigerator in a break room or someone's individual office?

A. I don't think so, but I don't know.

Q. Your declaration says this committee was established to oversee comprehensive review and analysis of Essentia's current temperature monitoring systems. What is meant by current?

A. Well, the monitoring systems that would be in place at the time.

Q. And you mentioned that this committee was going to predate discovery of the excursion, but then the excursion really

Page 172

launched that. Can you tell me a little bit more about when the committee was first created?

A. I cannot.

Q. Were members of the committee notified about the committee before the excursion was discovered?

A. I think it was in process, but I don't know the actual notification process.

Q. Did work on the One Essentia Fridge Project Committee begin before the excursion was discovered?

A. I don't know.

Q. Did work on the One Essentia Fridge Project Committee begin before this litigation was filed?

A. I think so, but I don't know for sure.

Q. Paragraph 45 says the One Essentia Fridge Project Committee made recommendations. Who did the committee make recommendations to?

A. I don't know.

Q. What kind of recommendations did the committee make?

MR. STOCK: I'm going to instruct

Page 173

the witness not to answer. It's outside the scope of the limitations ordered by the Court and also requests peer review privileged information.

BY MS. CLARK:

Q. Does one in the name of the committee refer to a single fridge?

A. No.

Q. Does one refer to Essentia as a united entity?

A. That is -- I've heard that used in other terms. One Essentia, one big Essentia family, all of its affiliates, so I'm assuming that's why the name is One Essentia.

Q. Was the One Essentia Fridge Project Committee referred to by any other name?

A. Not to my knowledge, but, again, we've had -- these people use some of these terms a little more loosely.

Q. Is the One Essentia Fridge Project Committee still in existence today?

A. I believe so.

Q. Did the One Essentia Fridge Project Committee have any meetings?

44 (Pages 170 - 173)

FRANK MODICH

Page 174

A.   I would assume so, but I didn't attend any of those meetings.

Q.   Did the One Essentia Fridge Project Committee members exchange any written materials related to their work on the committee?

A.   I don't know.

Q.   Did the One Essentia Fridge Project Committee disseminate information to Essentia or Essentia employees outside of the committee?

A.   I don't know.

Q.   Who at Essentia would have information about the function and membership and responsibilities of the One Essentia Fridge Project Committee?

A.   Well, I would think any of the members identified would have information about their committee.

Q.   How did you determine who to list as committee members in your declaration for the One Essentia Fridge Project Committee?

A.   Working with counsel, outside counsel.

Q.   Did you talk to any Essentia employees about membership on the One Essentia

Page 175

Fridge Project Committee?

A.   No.

Q.   Did you talk to any members of the committee about their membership on the One Essentia Fridge Project Committee?

A.   No.

Q.   Did you review any documents about the One Essentia Fridge Project Committee?

A.   I may have seen things in the past, but, you know, if -- I remember it, I have recollections, but I don't remember specific documents.

Q.   Were members of the One Essentia Fridge Project Committee instructed to keep peer review committee information confidential?

A.   That is our standard, but I don't know.

Q.   Do you know if any member of the One Essentia Fridge Project Committee broke that duty of confidentiality?

A.   Nothing has been brought to my attention.

Q.   Did the One Essentia Fridge Project Committee draft any guidelines?

Page 176

A.   I don't know.

Q.   Did the One Essentia Fridge Project Committee draft any policies?

A.   I don't know.

Q.   Dianne Witten, D-I-A-N-N-E, W-I-T-T-E-N, former vice president pharmacy, is listed as a member of the One Essentia Fridge Project Committee.  What was Dianne Witten's role on the committee?

A.   She must have had subject matter expertise necessary to the committee.  She was a pharmacist and a pharmacist leader.

Q.   And what subject matter expertise did she offer to this fridge committee?

A.   I can't speak because I wasn't at the committee, but she is a pharmacist.

Q.   Do you know Charles Robbins, R-O-B-B-I-N-S, who's listed as a business systems director with Essentia Health?

A.   I do know Chuck.

Q.   Do you know what Chuck offered in terms of skill set to the One Essentia Fridge Project Committee?

A.   I cannot speak to his role on the

Page 177

committee.

Q.   Do you know what Charles Robbins' job responsibilities are as a business systems director?

A.   I do not.

Q.   Cassandra Kennell, K-E-N-N-E-L-L, is listed as an executive assistant.  Do you know who Cassandra Kennell assists in that role?

A.   I don't.  She may have been Al's assistant, Al Hurley, but I can't speak with any certainty.

Q.   Paragraph 47 mentions that the committee, or should I say the subgroup --

A.   It's essentially a committee.

Q.   A committee.  So paragraph 47 says the committee worked to, quote, maintain automated reporting, end quote.  What kind of automated reporting is that referring to?

A.   I just assume relative to the temperature monitoring systems and automated reporting from it, but I don't have specifics.

Q.   Who did the One Essentia Fridge Project Committee delegate work to?

A.   I don't know.  It would be likely

45 (Pages 174 - 177)

FRANK MODICH

Page 178

on the supplemental privilege log.

Q.    If we pulled up the supplemental privilege log, would you be able to identify any examples of documents that resulted from the delegation of work by the One Essentia Fridge Project Committee?

A.    I would not.

Q.    Are you familiar with the immunization clinic transition team?

A.    Generally, yes.

Q.    What work does that team do?

A.    It was really providing that ongoing oversight and evaluation of immunizations in the clinical setting and where and how and just all of the elements of providing immunizations with sites they were going to be provided at, things of that nature.

Q.    What does transition mean in the context of this committee's name?

A.    I can't -- I can't speak with certainty.  I don't know.

Q.    Did the immunization clinics have a transition at some point?

A.    No.  It was in the midst of

Page 179

COVID-19.  A lot of outpatient services were not being provided.  As part of our revaccination efforts, clinics were made available to provide those free revaccinations, so that was part and parcel with this committee's work.

Q.    When was this immunization clinic transition team established?

A.    It was around the time of the potential temperature excursion.

Q.    Can you tell me approximately when that was?

A.    So likely it wouldn't have been exactly at the time of it in spring of 2020, but it would have been sometime thereafter.  I cannot give you a date.

Q.    When you say it was around the time of the potential temperature excursion, do you mean around the time Essentia learned about the temperature excursions?

A.    In the -- yeah, in the spring of 2020.

Q.    Was the immunization clinic transition team created before this litigation

Page 180

was filed?

A.    I don't know.

Q.    Do you know what the role of Suzanne Zeltinger was on the immunization clinic transition team?

A.    I do not know her role on the team or the committee.

Q.    Do you know what skill set Chandra, C-H-A-N-D-R-A, Eaton, E-A-T-O-N, operations manager 2, offered to this immunization clinic transition team?

A.    I do not.

Q.    Do you know what skill set Shelby Simon offered to the immunization clinic transition team?

A.    She was a nurse, but I do not.

Q.    Do you know what role Shelby Simon played on the immunization clinic transition team?

A.    I do not.

Q.    Beth Satrom, S-A-T-R-O-M, is listed as a telecare services director.  Do you know what a telecare services director does?

A.    I do not.

Page 181

Q.    Do you know what Beth Satrom's role was on the immunization clinic transition team?

A.    I do not.

Q.    Do you know what skill set a telecare services director would provide to the immunization clinic transition team?

A.    As I said before with these committees, the committees make a determination of what the issue is and the services they need, but I do not know.

Q.    Do you know who would have made that determination for this particular committee, the immunization clinic transition team?

A.    I would assume the committee as a whole, you know, would have made those determinations.

Q.    Do you know the role of -- oh, I'm sorry.  Did I interrupt you?

A.    No, go ahead.

Q.    Do you know the role of Kelsie, K-E-L-S-I-E, Conway, marketing planner, on the immunization clinic transition team?

A.    I do not.

Q.    Paragraph 51 says that this team

46 (Pages 178 - 181)

FRANK MODICH

Page 182

does work to, quote, review the cost of healthcare services, end quote. Does that cost refer to the cost to patients?

A.    Yes, it can include that.

Q.    Does it refer to the costs to Essentia?

A.    I think when you look at costs as a whole, what it costs Essentia is similar to what it costs to the patient, so as a whole cost of healthcare, yes.

Q.    Who did the immunization clinic transition team delegate work to?

A.    I do not know.

Q.    Are you familiar with the IM Pharmacy Prioritization and Project Partnering Committee?

A.    I'm generally familiar.

Q.    What does IM mean?

A.    I don't know actually what that stands for. I kind of -- I know the group exists.

Q.    What does the group do?

A.    They're really providing that oversight to pharmacy projects to prioritize

Page 183

those projects, I think looking at pharmaceutical patterns, things of that nature.

Q.    What does pharmacy prioritization mean?

A.    I can't speak for the committee. My understanding is that they were responsible for prioritizing projects to ensure that the best possible care was being provided to our patients.

Q.    Is that -- does that include prioritization of human resources?

A.    It may, but I don't -- I don't sit on that committee, so I don't know exactly everything it covers.

Q.    Do you know if it involves prioritization of budget or funding?

A.    I don't know.

Q.    Do you know what project partnering means in the context of the name of this committee?

A.    Not in terms necessarily of this committee, but oftentimes various groups within our organization partner as part of these projects to prioritize and determine what

Page 184

project proceeds first.

Q.    In paragraph 53 and our discussions so far, you reference pharmacy projects. What kind of projects are pharmacy projects?

A.    I don't know. I'd have to -- the committee would.

Q.    And you also mention pharmacy patterns. What's a pharmacy pattern?

A.    A pattern of pharmaceutical use. Yeah, just -- I don't -- it really relates to the work that they do.

Q.    At paragraph 54 you list members of this committee, quote, during the time frame relevant here, end quote. What time frame was used for this list of members?

A.    I want to say it was somewhere like January 2020 to like January 2022. I think it was approximately a two-year span.

Q.    How did you determine who to include on this list?

A.    Working with outside counsel, Vogel.

Q.    Did you do anything to vet the lists of committee members in your declaration aside

Page 185

from discussing with your outside counsel?

A.    I don't believe so.

Q.    Were you a member of the IM Pharmacy Prioritization and Project Partnering Committee?

A.    I was not.

Q.    Do you know what the role of Jill Coleman, analytics manager, was on the IM Pharmacy Prioritization and Project Partnering Committee?

A.    I do not.

Q.    For all of our sakes, if I refer to the IM Pharmacy Prioritization and Project Partnering Committee as the IM committee, will you understand that I'm referring to the committee you've identified in paragraph 53?

A.    Yes, I will.

Q.    Do you know what the job responsibilities are of an analytics manager?

A.    No.

Q.    Do you know what an analysts manager would provide in terms of skill set to the IM committee?

A.    Again, the committee makes that determination, but I do not know.

47 (Pages 182 - 185)

FRANK MODICH

Page 186

Q. In paragraph 54(F) an individual is listed, Bryan, B-R-Y-A-N, Lundberg, L-U-N-D-B-E-R-G, and he's identified as a former 340B senior program coordinator. Do you know what 340B means?

A. Actually, yes. 340B is a government program that requires manufacturers to offer certain outpatient drugs at discounted prices to clinics in the outpatient setting.

Q. G lists Roseann, R-O-S-E-A-N-N, Hines, H-I-N-E-S, as a senior operations manager in medications use management. Do you know what medications use management is?

A. I don't.

Q. H identifies Kevin Tellinghuisen as a member of the committee, T-E-L-L-I-N-G-H-U-I-S-E-N, as a senior business analyst SMDC Medical Center. What is SMCD Medical Center?

A. It's a hospital. It's a part of our East Market.

Q. What does SMDC stand for?

A. St. Mary's Duluth Clinic Medical Center.

Page 187

Q. And do you know this individual's role on the IM committee?

A. I do not.

Q. Do you know the skill set that a senior business analyst would offer to the peer review undertaken by the IM committee?

A. No. It's the committee's decision.

Q. Letter I identifies a labor productivity manager. What's a labor productivity manager?

A. I don't know.

Q. At letter P there is a business intelligent analyst identified. What are the job responsibilities of a business intelligent analyst?

A. I don't know.

Q. Did this committee review questions from patients?

A. I don't believe so, but I don't know.

Q. When -- and my apologies if I've asked this. When was the IM committee established?

A. I don't know.

Page 188

Q. Is the IM committee still active today?

A. Yes, it's what we would consider a standing committee.

Q. Does the IM committee have any meetings?

A. I don't attend, but I would assume yes.

Q. Do you know if those meetings are in person?

A. I do not.

Q. Do you know if they have remote meetings?

A. I -- based on how our system operates post COVID-19, most meetings are now remote.

Q. Do you know if the IM committee has agendas for their meetings?

A. I do not.

Q. Do you know if the IM committee keeps minutes of their meetings?

A. I do not.

Q. Do you know if the IM committee issues guidelines?

Page 189

A. I do not.

Q. Do you know if the IM committee drafts policies?

A. I do not.

Q. Does anyone at Essentia work to evaluate pharmaceutical patterns outside of the work of the IM committee?

A. I don't know.

Q. Did anyone at Essentia work on establishing revaccination services outside of the peer review committees identified in your declaration?

A. I don't think so.

Q. Does Essentia have any employees who only do peer review committee work?

A. Well, there are -- like on the Patient Relations and Risk Committee, there's going to be certain people that are going to be really focused on evaluation and gathering information for peer review protected activity.

Q. We talked earlier about some medical providers that are on peer review committees but also actively treat patients. Do you remember that discussion generally?

48 (Pages 186 - 189)

FRANK MODICH

Page 190

A.    I do.

Q.    How would you be able to determine whether the work of a treating provider was within the scope of their peer review committee work as opposed to their non-peer review committee work?

A.    I mean, if they're doing work related to this potential temperature excursion, it's going to be on behalf of the committee.  Otherwise, in the treatment of their patients, I don't see them necessarily doing committee work.

Q.    If a nurse on a peer review committee administers revaccination to a patient and charts that revaccination, is that peer review committee work?

MR. STOCK:  Object to the extent it calls for a legal conclusion.  You're also now asking for potentially peer review privileged information and I'll instruct the witness not to answer.

BY MS. CLARK:

Q.    Is the nurse's -- is a nurse's administration of a vaccine to a patient peer

Page 191

review work?

MR. STOCK:  Same objection, Counsel, and you're now also outside the scope of the limitations ordered by the Court.  It has nothing to do with structure of these committees.

MS. CLARK:  I'm trying to understand when a peer review committee member is working as part of the peer review or is working outside of the peer review.

MR. STOCK:  I'll instruct the witness not to answer that question.

BY MS. CLARK:

Q.    Did Essentia do anything to investigate the excursion that is not peer review work?

MR. STOCK:  Counsel, same objection.  You're outside the scope of the limitations ordered by this -- by the Court, and you're also now asking for peer review privileged information itself.  I'll instruct the witness not to answer the question.

Page 192

BY MS. CLARK:

Q.    Did anyone other than the individuals in your declaration do anything to investigate the excursion?

MR. STOCK:  Also I'm going to object and I'm going to instruct the witness not to answer.  You're now again outside the scope of the limitations ordered by the Court with respect to this deposition.  I'll instruct the witness not to answer.

BY MS. CLARK:

Q.    Did anyone at Essentia send emails about the excursion that were not sent for peer review purposes?

MR. STOCK:  Same objection and I'll instruct the witness not to answer.  It's outside the limitations ordered by the Court with respect to this deposition.

BY MS. CLARK:

Q.    Did anyone listed in your declaration send emails related to the excursion that were not part of a peer review?

MR. STOCK:  Same instruction.  I'll

Page 193

instruct you not to answer.  The question is outside the scope of the limitations ordered by the Court.

BY MS. CLARK:

Q.    Did anyone listed in your declaration as a member of a peer review send emails related to revaccination that were not part of a peer review?

MR. STOCK:  Same objection, Counsel.  You're now far outside the structure of these committees, and I'll instruct the witness not to answer as it's outside the limitations ordered by the Court.

BY MS. CLARK:

Q.    Did Essentia maintain lists of its committees before your declaration was drafted?

A.    Not to my knowledge.

Q.    Did Essentia maintain lists of committee members before your declaration was drafted?

A.    When you say maintain lists, I mean, there's likely meeting minutes and things like that, but there's not an organizational

49 (Pages 190 - 193)

FRANK MODICH

Page 194

chart or a specific list of anything of that nature.

Q. Did anyone at -- let me rephrase that.

Did anyone on an Essentia peer review committee ever draft a Word document as part of their peer review work?

MR. STOCK: Again, Counsel, now you're getting into the function application of the peer review privilege. It's beyond the limitations ordered by the Court with respect to the structure of the committees themselves and I'll instruct the witness not to answer.

BY MS. CLARK:

Q. Did any Essentia peer review committee draft guidelines related to the storage of temperature sensitive pharmaceuticals?

MR. STOCK: Same objection. You're beyond the limitations ordered by the Court and I'll instruct the witness not to answer.

Page 195

BY MS. CLARK:

Q. Did any of the committees identified in your declaration have any responsibilities related to Dakota Clinic Pharmacy?

A. I mean, gathering information probably from Dakota Clinic Pharmacy, but Dakota Clinic Pharmacy is not an Essentia Health pharmacy.

Q. Did any of the committees identified in your declaration have responsibilities that included communicating with employees or owners of Dakota Clinic Pharmacy?

A. It's possible to gather information, but I don't know.

Q. Are any employees of Dakota Clinic Pharmacy members of the peer review organizations identified in your declaration?

A. They're not committee members, no.

Q. Are any owners of Dakota Clinic Pharmacy members of the peer review organizations identified in your declaration?

A. I don't believe so.

Q. Did any employee or owner of Dakota Clinic Pharmacy work at the direction of a peer

Page 196

review committee for peer review purposes?

A. I don't know.

Q. In your declaration at paragraph 2, you say that some matters have been, quote, assembled or relayed by authorized agents. Who are those authorized agents?

A. I am not entirely sure.

MR. STOCK: I'm sorry. What paragraph are we referencing?

THE WITNESS: Paragraph 2.

BY MS. CLARK:

Q. Besides yourself, who are the people at Essentia with the most knowledge about Essentia's peer review committees?

A. I don't know.

Q. Has anyone at Essentia been charged with a crime for disclosing what transpired at a peer review meeting?

A. No.

Q. Has anybody at Essentia been charged with a crime for disclosing data and information acquired by a peer review committee?

A. No, not to my knowledge.

Q. Were any of the committees in your

Page 197

declaration created after the litigation was filed?

A. I don't know. Like I said before, committees within healthcare are formed, but you're saying specific to the declaration. Yeah, I don't know.

Q. Okay. Are you aware that Minnesota law states that disclosure of data and information acquired by a review committee is a misdemeanor unless that disclosure is authorized by the peer review statute?

A. I'm generally aware of that, yes.

Q. Are you aware that Minnesota law states that any disclosure of what transpired at a review meeting is a misdemeanor unless that disclosure was authorized by the peer review statute?

A. Yes.

Q. Are peer review committee members made aware that they may be committing a misdemeanor if they disclose peer review information?

A. I've heard that mentioned at many committee meetings, yes.

50 (Pages 194 - 197)

Page 198

Q.   At which committee meetings?

A.   There's a lot of committees within Essentia, but common knowledge, keep that stuff confidential and privileged. Don't disclose it because you could become in -- have serious problems.

Q.   Have all of the individuals in your declaration been informed that they may be committing a misdemeanor if they disclose peer review information?

A.   I can't -- I don't know for all of those. My general understanding is it's common knowledge.

Q.   Do the individuals who receive work delegated from the peer review committee members know that they may be subject to misdemeanor liability if they reveal confidential information?

A.   I don't know for everyone that's ever been delegated work.

MS. CLARK:  Okay.  Let's take a short break now if that's good with everybody.

MR. STOCK:  Fine.

Page 199

VIDEOGRAPHER:  We're off the video at 1:40.

- - -

(A short recess was taken.)

- - -

VIDEOGRAPHER:  Back on the video record at 1:56. Counsel, you may proceed.

MS. CLARK:  Thank you.

BY MS. CLARK:

Q.   So I think we're nearing the end, and what I'd like to do is just walk through the committees in your declaration and I'm going to ask -- again, I've asked for some but not others -- really about the timing and membership of the committee. So, again, my apologies if we've gone over some of this. I'm just hoping to kind of make sure we've covered it all and then also find out any witnesses who might have information that you didn't have today.

So we'll -- I'm just going to walk through your declaration. For the West Market Storage Committee, when was that committee formed?

A.   That was soon after identification

Page 200

of a potential temperature excursion, so I'm going to say early spring 2020.

Q.   Do you know if it was formed before this litigation?

A.   Likely it was.

Q.   When was the first meeting of the storage committee?

A.   I don't know.

Q.   Do you remember when the first email was sent to the storage committee?

A.   No, I don't.

Q.   Do you remember when each individual on the storage committee was added to the storage committee?

A.   I do not.

Q.   Who would know when each individual was added?

A.   I don't know of anyone necessarily. If there's one specific person, I don't know.

Q.   Who would know the job responsibilities of each member of the storage committee?

A.   I don't know.

Q.   Who would know the committee role of

Page 201

each member on the storage committee?

A.   I don't know.

Q.   Who would know the reason why each member was added to the committee as in what their skill set was that they offered to the committee?

A.   I don't know.

Q.   Who would know about any communications that the storage committee sent outside of the storage committee?

A.   I don't know.

Q.   Who would know whether information was relayed by the storage committee to Essentia leadership?

A.   I don't know.

Q.   Who would know whether information was relayed by the storage committee to medical providers?

A.   I don't know.

Q.   Who would know whether information was relayed by the storage committee to patients?

A.   I don't know.

Q.   Who would know whether information

51 (Pages 198 - 201)

FRANK MODICH

Page 202

was relayed by the storage committee to the public?

A. I don't know.

Q. Do you know how nurses who staffed the revaccination clinics were informed about the revaccination clinic?

A. I do not.

Q. When was the Olive Committee formed?

A. I don't know.

Q. Was it formed after the excursion was discovered by Essentia?

A. Yes.

Q. Was it formed after the litigation was filed?

A. I don't know.

Q. When was the first meeting of the Olive Committee?

A. I don't know.

Q. Do you know who would know the job responsibilities, roles, or skill sets of each member on the Olive Committee?

A. I don't.

Q. Do you know of a witness who would know about communications the committee sent to

Page 203

others outside of the committee?

A. I do not.

Q. For the Patient Relations and Risk Management Committee, that was a standing committee that's been around for a number of years; is that right?

A. Correct.

Q. Do you know when the Risk Management Committee had its first meeting related to the excursion?

A. I do not.

Q. Do you recall when the risk management's subgroup related to the temperature excursion was created?

A. I do not.

Q. Do you know when that subgroup had its first meeting?

A. I do not.

Q. Do you know if the subgroup was created after the litigation was filed?

A. I do not.

Q. Who would know the job responsibilities, roles, committee roles, and skill sets of the members on the Patient

Page 204

Relations and Risk Management Committee and the excursion-related subgroup?

A. I don't know.

Q. Who would know whether the Patient Relations and Risk Management Committee ever disseminated information outside of the committee?

A. I do not know.

Q. The Essentia System Quality Committee, when was that committee established?

A. That's a standing committee. I don't know.

Q. When did that committee begin to work on issues related to the temperature excursion?

A. I do not know.

Q. Who would know when each individual was added to this committee?

A. I do not know.

Q. Who would know when this committee began to meet on issues related to the temperature excursion?

A. I do not know.

Q. Who would know when this committee

Page 205

began to work on issues related to the temperature excursion?

A. I do not know.

Q. Who would know why the individuals on the Essentia System Quality Committee were chosen to serve on this committee?

A. I do not know.

Q. Who would know about any information the Essentia System Quality Committee disseminated outside of the committee?

A. I do not know.

Q. When was the Essentia Clinical Practice Committee created?

A. That's another standing committee.

Q. And when did the Essentia Clinical Practice Committee begin working on issues related to the excursion?

A. I do not know.

Q. Who would be able to identify which members of the Essentia Clinical Practice Committee worked on issues related to the excursion?

A. Well, they all potentially worked on issues, but I don't know of anybody that

52 (Pages 202 - 205)

FRANK MODICH

Page 206

specifically can identify anything else.

Q. Who would be able to identify when the Essentia Clinical Practice Committee began to work on issues related to the excursion?

A. I don't know.

Q. Who would be able to explain the excursion-related work or roles of anybody on the Essentia Clinical Practice Committee?

A. I don't know.

Q. Who would be able to testify about any information that the Essentia Clinical Practice Committee disseminated outside of the committee?

A. I don't know.

Q. When was the Clinical Alerts Subgroup Committee created?

A. Again, a standing committee. I don't know.

Q. When did that subgroup begin to work on issues related to the excursion?

A. I don't know.

Q. Who would know the roles of each member of the clinical alerts subgroup as it related to excursion-related work?

Page 207

A. I don't know.

Q. Who would know about any information the clinical alerts subgroup disseminated outside of the committee?

A. I don't know.

Q. When was the One Essentia Fridge Project Committee created?

A. It was -- the idea was pre-potential temperature excursion, but the potential temperature excursion kind of kicked off the group, the committee.

Q. Who had the idea to establish the One Essentia Fridge Project Committee?

A. I don't know. It was Essentia -- all of these are Essentia leadership as a whole. I don't know who specifically within that chain of command or if any specific one person was responsible.

Q. Did you initiate the creation of any of the committees in your declaration?

A. No.

Q. Who would know when the One Essentia Fridge Project Committee first began its work?

A. I don't know.

Page 208

Q. Who would know why each individual listed in your declaration as a member of this committee was added to this committee?

A. Can you repeat that question, please?

Q. Sure. Who would know why each individual committee member was added to this committee?

A. I don't know if there's one person.

Q. Who would know the committee-related roles and responsibilities of each member of the One Essentia Fridge Project Committee?

A. I don't know if there would be just one person.

Q. Are there multiple people who would know?

A. I mean, it's just the committees met. There was a purpose for them. I don't know if there's one person that could answer that question.

Q. Who would know about any information disseminated from the One Essentia Fridge Project Committee to others outside of the committee?

Page 209

A. I don't know.

Q. When was the immunization clinic transition team created?

A. That was about -- it was sometime after the potential temperature excursion.

Q. And when you say after the potential temperature excursion, do you mean in spring 2020?

A. It was after that. I have -- I can't give you a date. I don't know.

Q. It's my understanding that the actual potential excursion happened from 2017 'til it was discovered in 2020. So my question is, did it happen after 2020 --

A. Yes.

Q. -- or in 2020?

And who would be able to testify as to the roles of the members of the immunization clinic transition team?

A. I don't know.

Q. Who would know about any information that the immunization clinic transition team disseminated outside of the team?

A. I don't know.

53 (Pages 206 - 209)

FRANK MODICH

Page 210

Q. Who would know about the skill sets offered by these committee members to the immunization clinic transition team?

A. I don't know.

Q. When was the IM Pharmacy Prioritization and Project Partnering Committee created?

A. That was a standing committee.

Q. And when did the IM committee's work related to the excursion begin?

A. I don't know.

Q. Who would know when the IM committee's work related to the excursion began?

A. I don't know.

Q. Who would know the role of each member of the committee as it related to work pertaining to the excursion?

A. I don't know.

Q. Who would know about any information the IM committee disseminated to Essentia leadership?

A. I don't know.

Q. Who would know about any information the IM committee disseminated to anyone outside

Page 211

of the committee?

A. I don't know.

Q. Is there anyone who would have information about any of the committees' correspondence with third parties?

A. I don't know.

MS. CLARK: Okay. Let's take a break here, please.

VIDEOGRAPHER: We're off the video at 2:07.

- - -

(A short recess was taken.)

- - -

VIDEOGRAPHER: Back on the video at 2:12. Counsel, you may proceed.

MS. CLARK: Thank you. Well, thank you, Mr. Modich. I really appreciate your time today. That is all I have today.

MR. STOCK: Terri, we'll read and sign.

COURT REPORTER: Okay. And would you like a copy as well?

MR. STOCK: Yes, so electronic condensed for us with a copy of any

Page 212

exhibits.

THE COURT REPORTER: Okay.

VIDEOGRAPHER: We're off the video at 2:12. This ends the video deposition.

- - -

(Witness excused.)

- - -

(Deposition concluded at 2:12 p.m.)

- - -

Page 213

CERTIFICATE

I do hereby certify that I am a Notary Public in good standing, that the aforesaid testimony was taken before me, pursuant to notice, at the time and place indicated; that said deponent was by me duly sworn to tell the truth, the whole truth, and nothing but the truth; that the testimony of said deponent was correctly recorded in machine shorthand by me and thereafter transcribed under my supervision with computer-aided transcription; that the deposition is a true and correct record of the testimony given by the witness; and that I am neither of counsel nor kin to any party in said action, nor interested in the outcome thereof.

WITNESS my hand and official seal this 10th day of March, 2023.

Theresa F. Franco
_____
Theresa F. Franco
Notary Public

54 (Pages 210 - 213)

Page 214

Robert Stock, Esquire

rstock@vogellaw.com

March 10, 2023

RE:   Kraft, Jessica Et Al. v. Essentia Health Et Al.

2/22/2023, Frank Modich  , Essentia Health (#5699488)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

---

Page 216

Kraft, Jessica Et Al. v. Essentia Health Et Al.

Frank Modich  , Essentia Health (#5699488)

ACKNOWLEDGEMENT OF DEPONENT

I, Frank Modich, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____  _____

Frank Modich                Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

---

Page 215

Kraft, Jessica Et Al. v. Essentia Health Et Al.

Frank Modich  , Essentia Health (#5699488)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

Frank Modich                Date

55 (Pages 214 - 216)

**[& - 4769706]**

| & | | | |
|---|---|---|---|
| **&** 3:7 | **16** 60:19 89:18 90:4 | **2020** 34:24 87:2 179:14,22 184:17 200:2 209:8,13,14,16 | **2:12** 211:15 212:4,8 |

| **0** | **1622** 213:22 | **2021** 4:17 102:19 103:12 | **3** |
|---|---|---|---|
| **0-3** 114:1 | **17** 61:21 | **2022** 81:1 95:22 184:17 | **3** 4:14 95:8,13 168:19 |
| **0003** 98:22 | **18** 78:18 81:9 84:1 | **2023** 1:21 4:13 5:4 11:20 57:9 80:21 213:19 214:3 | **30** 4:10 11:19 12:10 29:5,12 30:5 53:16 54:12 73:20 128:20,24 129:5,9 149:24 165:16 214:17 |

| **1** | **1800** 2:23 | | |
|---|---|---|---|
| **1** 4:9 11:18,24 | **1801** 2:23 | **21** 81:23 82:2 86:6,21 89:9 89:12 92:21 94:15,21 96:15 97:10 | |
| **10** 71:9 214:3 | **1868** 102:9 | **218** 3:14 | **31** 149:15,20 |
| **100** 3:9 | **1874** 109:18 | **22** 1:21 87:3 89:19 90:4 | **31st** 95:22 |
| **10005** 3:4 | **19** 42:19 179:1 188:15 | **227** 4:13 57:8 | **33** 153:2 |
| **103** 4:16 | **19103** 2:24 | **22nd** 5:4 | **34** 155:7 |
| **10:02** 71:17 | **1:01** 162:20 | **23** 94:7 | **340b** 186:4,5,6 |
| **10:15** 71:13 | **1:40** 199:2 | **23rd** 4:13 57:8 | **35** 160:15 163:2 |
| **10:17** 71:22 | **1:56** 199:7 | **24** 125:19 131:1,23 | **38** 159:6 |
| **10th** 213:19 | **2** | **25** 144:15 | **3:20** 1:14 5:20 |
| **11** 4:9 | | **26** 128:20,24 129:5,9 146:6 | **4** |
| **11:14** 118:18 | **2** 4:11 29:12 56:24 57:5 84:20 101:12 101:15 180:10 196:3,10 | **27** 125:20 139:17 141:6 141:15 142:14 | **4** 4:16 103:8,16 |
| **11:28** 118:23 | | **2747** 105:10,11 | **41** 164:2 166:7 |
| **11:30** 118:16 | **2/15/2023** 4:10 | **2:07** 211:10 | **42** 167:10,13,16 |
| **12** 57:20,20 156:16 | **2/22/2023** 214:5 | | **43** 169:12 |
| **121** 1:14 5:20 | **20** 81:19 82:2 84:18 89:9,12 91:3,13 92:21 216:15 | | **45** 121:4 170:2 172:18 |
| **12:19** 162:14 | | | **46th** 3:3 |
| **12:19-1:05** 162:17 | | | **47** 105:12 177:12,15 |
| **1389** 3:15 | **2012** 120:4,17 138:9,10 | | **4769706** 95:24 99:1 |
| **14** 62:21 90:24 91:10,11 164:1 | | | |
| **140** 3:3 | **2014** 138:11 | | |
| **15** 59:3 67:8 71:9 121:1 168:18 | **2015** 138:11 | | |
| **15th** 11:20 | **2017** 209:12 | | |

**[49 - administrator]** Page 2

**49** 121:5

**5**

**5015** 3:8
**50265** 3:9
**51** 181:24
**515-223-4567** 3:10
**53** 121:7 184:2 185:15
**54** 184:12 186:1
**56** 4:11
**5699488** 214:5 215:2 216:2
**58107** 3:15
**5th** 4:17 102:19 103:12

**6**

**6** 4:10 11:19 12:10 29:5 30:5 53:16 54:12 73:20 149:24 165:16
**646-502-7910** 3:4
**649** 114:8

**7**

**7** 4:4
**701-237-6983** 3:16

**8**

**8:55** 5:3

**9**

**9** 122:1
**95** 4:14
**9:00** 2:6

**a**

**a.b.** 1:11
**a.m.** 2:6 5:3
**a.s** 1:5
**abilities** 98:13
**ability** 11:9
**able** 44:21 99:7 99:11 116:2 152:15 153:21 178:3 190:2 205:19 206:2,6 206:10 209:17
**above** 214:6 216:7
**absolutely** 118:9
**access** 72:20 73:3 106:15 116:2 134:9,12
**accessed** 72:16
**accessing** 98:5 134:16
**accounts** 10:13 10:18
**accuracy** 214:9
**acknowledge** 6:16,19
**acknowledge...** 216:3
**acknowledg...** 214:12

**acquired** 196:22 197:9
**action** 6:2 58:14 213:16
**active** 43:20 80:14 119:19 188:1
**actively** 189:23
**activities** 16:16 49:17 80:15 83:24 123:18
**activity** 16:18 16:19 31:4 189:20
**acts** 83:23
**actual** 80:8 143:4 172:8 209:12
**actually** 144:7 170:5 182:19 186:6
**acute** 85:8 168:19
**add** 97:10
**added** 59:4 67:9,10,12 68:11,16,18,21 81:24 86:7,9 86:12,14,21 124:8 200:13 200:17 201:4 204:18 208:3,7
**additional** 59:5 59:7,15 67:9 81:23 86:6,20

96:16
**additions** 216:6
**address** 19:23 22:5,23 24:2 104:7 105:21 105:22 109:16 109:19 110:17 112:22 113:14 114:2 128:9 151:14 154:14 157:1
**addressed** 27:22 59:12 80:19 126:16
**addresses** 110:11
**addressing** 24:4
**administer** 6:1 6:21
**administered** 6:20
**administers** 190:14
**administration** 190:24
**administrative** 18:6,7 19:1 21:16 22:3 65:8 66:10 94:19 122:13 123:10 146:11 146:14 147:4
**administrator** 151:24

**[advance - anyway]**

| | | | |
|---|---|---|---|
| **advance** 63:10 | **agreement** 7:8 | **amended** 4:9 | 67:24 69:10 |
| **adverse** 139:20 | **agreements** | 11:18 12:9 | 71:6 73:19 |
| 139:20,24 | 50:15 | **amy** 1:6 94:15 | 74:11 77:2 |
| 140:3,5,13,14 | **ahead** 56:3,18 | **analysis** 58:19 | 81:17 84:9 |
| **advice** 8:7 | 74:7 87:17 | 102:6 132:6,23 | 87:7,16 99:18 |
| 18:14 | 103:5 130:9 | 133:4 171:18 | 100:12 117:24 |
| **affect** 11:12 | 154:9 181:19 | **analyst** 84:20 | 129:24 132:12 |
| **affected** 26:17 | **ai** 78:7,10 | 84:21 86:12 | 133:12 137:17 |
| 27:1,6,10,15 | **aided** 213:12 | 94:23,24 169:9 | 139:10 150:2,9 |
| 38:9,14,21 | **aimed** 29:17 | 186:18 187:5 | 165:19 173:1 |
| 39:8 58:6 | **al** 5:16,17 35:6 | 187:13,15 | 190:21 191:13 |
| 60:10 116:13 | 41:9 46:8 | **analysts** 185:20 | 191:23 192:7 |
| **affiliated** 8:8 | 90:24 91:3 | **analytics** 68:4 | 192:11,17 |
| 13:2 35:9 | 101:5 122:22 | 68:5 185:7,18 | 193:1,12 |
| 113:16 | 177:10 214:4,4 | **analyzes** 132:1 | 194:14,23 |
| **affiliates** 12:23 | 215:1,1 216:1 | 132:4 | 208:19 |
| 145:2 173:13 | 216:1 | **analyzing** | **answered** 59:1 |
| **affordability** | **al's** 177:9 | 125:9 | 154:9 |
| 156:20,22,23 | **alert** 32:15 | **anderson** 3:7 | **answers** 9:5 |
| **aforesaid** 213:4 | 119:14 120:18 | 86:8 96:17 | 51:13 |
| **age** 47:20 | 164:10 165:5 | **andy** 143:21 | **anthony** 63:12 |
| **agencies** 30:3 | **alerts** 164:1,8 | 159:14 | 91:9 92:15 |
| 30:11,20 60:22 | 164:18,22,23 | **ann** 143:20 | 101:8,16 |
| 61:15,16,17,19 | 165:13,22 | 149:5 | **anybody** 9:20 |
| 139:14 | 167:2,7,11,24 | **anne** 1:6 | 25:24 79:11 |
| **agendas** 72:7,9 | 168:13,14,22 | 159:13 | 96:11 97:10 |
| 72:15,19,22 | 169:15 206:15 | **announce** 6:6 | 105:5 108:23 |
| 134:18,22,24 | 206:23 207:3 | **anonymize** | 109:7 117:23 |
| 188:18 | **alleged** 139:19 | 143:2 | 134:1 135:14 |
| **agents** 196:5,6 | **allotted** 214:20 | **answer** 9:4 | 140:9,16 |
| **ago** 35:14 44:1 | **allowed** 30:5 | 13:7 22:22 | 143:17 147:23 |
| 44:6 49:17 | **amanda** 1:9 | 29:2,12 30:7 | 196:20 205:24 |
| 113:21 | **ambulatory** | 53:19 54:2,6 | 206:7 |
| **agree** 5:12 75:4 | 85:6,7,8 | 54:11 56:2 | **anyway** 9:2 |
| | | 58:22 67:5,21 | |

**apart**  118:6
**apologies**  61:13
  187:21 199:15
**appear**  10:11
**appearance**  6:6
**appearances**
  3:1
**appended**
  216:7
**applicable**
  214:8
**application**
  166:13 194:10
**applications**
  68:8 83:8,12
  83:13 86:12
**appreciate**  9:1
  75:21 76:8
  211:17
**approach**
  125:7
**appropriate**
  92:19 161:13
**approximately**
  86:15 179:11
  184:18
**arena**  141:13
**arises**  19:22
  80:18
**arrangement**
  6:23
**artificial**  78:1,7
  78:19,22
**ashanti**  143:22

**ashland**  112:23
  112:24
**ashlandmmc**
  112:19
**aside**  184:24
**asked**  22:15
  23:10 31:8
  50:14,23 68:23
  154:9 187:22
  199:13
**asking**  74:15
  137:23 140:10
  166:2,3 190:19
  191:21
**assembled**
  196:5
**asserted**  14:5
**assess**  128:2
**assessing**  28:4
  156:18 164:6
**assigning**  69:18
  70:8
**assist**  79:11
**assistance**
  69:20 79:10
**assistant**  21:16
  21:16 177:7,10
**assists**  177:8
**associate**  8:4,6
  147:2,7
**associated**
  24:21 100:7
  164:11,20
**assume**  23:13
  65:17 96:21

110:2 117:5
  120:12 156:2
  174:1 177:19
  181:14 188:7
**assuming**
  158:16 173:13
**assurance**
  35:22 66:21,22
  67:3
**atlantic**  2:23
**attached**
  214:11
**attend**  44:21
  174:2 188:7
**attending**  10:2
**attention**  66:1
  131:10 175:22
**attorney**  18:13
  31:2,6,15
  56:15 95:22
  214:13
**attorneys**  6:14
  7:17 128:5
**audibly**  9:4
  10:2
**audio**  5:10
**authoring**
  15:21
**authority**  39:5
  45:9 49:1
  69:22
**authorize**
  62:10
**authorized**  6:1
  16:20 51:11

85:24 86:1,5
  93:18,18 196:5
  196:6 197:10
  197:16
**authorizes**
  16:14
**automated**
  177:17,18,20
**available**
  103:20 179:4
  214:6
**avenue**  3:14
**aware**  14:4,7
  22:12 23:8
  39:10 43:22
  77:9 93:19
  130:24 149:2
  169:17 197:7
  197:12,13,20

**b**

**b**  1:16 3:13 4:6
  4:10 11:19
  12:10 29:5
  30:5 53:16
  54:12 63:13
  73:20 113:7
  122:20 149:24
  157:19 165:16
  168:4 176:18
  176:18 186:2,3
**back**  10:23
  18:1 32:3
  34:23 46:7
  49:7 56:14
  62:3 71:13,21

**[back - c.r.f.]**

72:2 77:21 94:12 96:15 98:12 118:15 118:22 125:5 127:6 152:13 162:19,23 199:6 211:14

**background** 102:6 134:15

**bailey** 1:6

**bailiwick** 128:13

**baldridge** 114:4,9,13

**bar** 98:21

**barton** 3:8

**based** 22:1,2 36:9 59:14 67:14 72:24 102:3 188:14

**basically** 24:17 138:17 140:16 157:8

**basis** 14:6,12 43:23 84:10

**bates** 102:11,12 105:17 109:23

**bear** 110:9

**beaton** 1:8

**beaver** 159:16

**bed** 164:15

**began** 204:21 205:1 206:3 207:23 210:13

**begins** 71:22 118:23 162:20

**behalf** 1:12 6:10,12 12:19 13:1,19 16:20 21:17 38:3,13 45:10 62:11 115:19 118:2,3 190:9

**believe** 21:14 38:23 46:16 51:4 64:8 79:4 80:16 89:14 101:23 102:2 107:1,16 113:23 120:16 121:16 122:10 125:19 129:3,7 130:16 131:22 134:20 135:21 138:2 148:7 161:24 164:24 173:22 185:2 187:19 195:22

**believes** 141:21

**berg** 1:11

**bertoch** 143:20 149:5

**best** 22:4 82:16 164:8 183:8

**beth** 180:21 181:1

**betsy** 143:22 148:8,15,16,18

**betty** 149:5

**beyond** 30:5 99:15 137:15 139:7 149:23 150:7 165:16 166:1 194:11 194:21

**bianco** 157:19 158:4,6 159:12

**bianco's** 157:24

**big** 173:12

**billing** 141:23

**biprd** 109:16

**bit** 106:10,17 142:13 172:1

**bjornson** 122:20 123:5 143:20 149:5

**blanking** 18:21

**boisforte.nsn....** 113:5

**boundary** 29:19 74:21

**box** 3:15

**boy** 43:2

**brainerd** 159:19,20,23

**break** 9:11,13 71:9 93:8 118:8 162:7 171:13 198:22 211:8

**brianna** 3:14

**bring** 15:12

**brings** 63:19

**broad** 20:10 127:15 160:19

**broader** 58:8 170:21

**broadway** 3:3

**broke** 175:19

**brought** 57:14 65:13,16,21 66:1 67:16,17 67:19,23 89:4 96:20 155:1 158:16 175:21

**bryan** 186:2

**budget** 183:16

**business** 29:20 68:8 70:20,22 71:2,5 74:23 76:1,12 84:19 84:20,23 94:16 176:18 177:3 186:17 187:5 187:12,14

**c**

**c** 7:22 29:12 67:22 83:4 91:3 94:16,16 105:20 108:2 112:20 113:11 114:10 122:16 146:6 157:19 180:9 213:1,1

**c.j.f.** 1:10

**c.r.f.** 1:10

**call** 16:15 17:19 18:22 19:21 20:19 37:15 46:22 63:19 80:4 131:21 133:21 140:20,21 159:22 170:10
**called** 40:3 43:8 78:4,20 142:21
**calling** 87:8
**calls** 36:18 44:10 45:2,6 56:1 73:17 84:14 89:1 129:22 130:8 131:12 132:8 134:19 135:23 158:21 190:18
**camera** 5:7
**candace** 122:24 151:16,21,22
**capability** 141:2
**care** 16:23 20:1 31:11 35:21,22 36:1,3,4,4,13 47:10 58:16 67:1 73:15,16 73:24 74:5 76:24 85:6,7,9 124:15 125:10 125:14 126:8 131:8 132:2 141:16,19

146:17 153:17 153:18 156:19 156:20,21 157:2 161:2 163:5,8,10,14 163:16 164:7 164:20 165:4 168:19 169:14 170:16 183:8
**carry** 129:17 130:23 132:18
**case** 1:13 5:19 7:18 14:6,18 15:22
**casey** 18:17
**cassandra** 177:6,8
**category** 160:20 169:22
**cause** 128:15
**ce** 20:8
**cease** 113:19
**cell** 11:4
**center** 106:23 108:17 159:19 159:20,23,24 168:21,24 186:18,19,24
**central** 5:4 40:7 71:15 90:22 118:16 159:22
**ceo** 20:7,9
**certain** 53:18 134:10 186:8 189:18

**certainly** 119:9 125:18
**certainty** 52:18 86:10 101:20 152:20 177:11 178:21
**certify** 213:3
**chain** 207:17
**chair** 18:15,17 19:8 145:11 146:2,3
**challenge** 98:13
**chance** 118:7
**chandra** 180:8
**change** 160:20 161:2,4,9,10,13 215:4,7,10,13 215:16,19
**changed** 145:5
**changes** 214:10 216:6
**charged** 196:16 196:20
**charles** 176:17 177:2
**chart** 78:1,12 84:2,4,6 92:2,9 97:17 117:20 194:1
**charts** 78:9 85:15,18 86:24 87:3,13,19,21 190:15
**chief** 63:4 68:1 90:18 138:14

146:7,21 155:9 155:10
**chosen** 205:6
**christensen** 101:5
**christie** 159:12
**christine** 122:23
**chuck** 176:20 176:21
**circle** 98:6
**circumstance** 65:23 148:3
**cite** 81:7 153:1
**claims** 13:18 31:11 75:2
**clarification** 17:9
**clarify** 14:10 24:8 36:21
**clark** 3:2 4:4 6:9,10 7:14,17 12:3 29:1,13 30:1,8 36:21 37:2 54:14 56:8,18 57:2 59:2 71:7,14 71:24 72:1 73:22 74:12 76:10,21 77:5 81:18 84:10,16 84:17 87:12 88:2 95:6,15 95:19 98:4,7 98:14,18 99:19

**[clark - committee]**

100:15 103:4 103:18 105:12 105:13 118:9 118:11,14 119:1 129:24 130:2,12 132:13 133:16 137:18 139:11 150:3,10 154:12 162:6 162:10,22 165:20 166:6 173:5 190:22 191:7,14 192:1 192:12,20 193:4,15 194:15 195:1 196:11 198:21 199:8,9 211:7 211:16

**clean** 162:24

**clear** 9:6 35:15 35:15 42:10 76:11 77:22

**client** 31:2,6,15 129:24

**clinic** 1:17 18:9 28:9,13,15 32:16 108:10 121:6 157:20 178:9 179:7,23 180:4,10,14,18 181:2,6,13,22 182:11 186:23 195:4,6,7,12,15

195:19,24 202:6 209:2,19 209:22 210:3

**clinical** 17:21 18:5 32:14,22 83:6,7,12 86:12 119:13 119:14 120:14 120:18 156:15 156:19,21 157:7,9,15 158:1,8,14,18 158:23 159:2 160:13 161:11 161:17,20 163:24 164:21 165:13,22 167:2,7,11,24 168:13,21 169:14 178:14 205:12,15,20 206:3,8,11,15 206:23 207:3

**clinics** 85:9 123:18 124:6 124:12 178:22 179:3 186:9 202:5

**close** 10:16 105:16

**closely** 83:2

**code** 25:10

**coleman** 106:22 107:2 185:7

**collected** 77:23

**collecting** 125:8

**collection** 81:4

**collins** 158:7

**column** 101:16 102:17,18 105:20 106:7 114:10

**com** 112:20

**combination** 127:4 157:12

**come** 27:18 71:12 98:3,12 131:9 169:21

**comes** 56:17 142:8

**coming** 32:19 48:14 52:10 56:6 60:15 62:6 70:24 74:18 169:23

**command** 207:17

**commencing** 2:5

**comments** 75:22 76:8

**commit** 64:2

**committee** 17:2 17:7,21,23 18:3,5,12,15,19 19:7,12,14,16 19:21,22 20:5 20:12,14,17

21:13,17,20,21 22:5,6,7,14,15 22:19 23:1,2,4 23:7,11,12,14 24:16,19,22 25:4,9,11,13,17 25:19,22 26:1 26:3 27:18,21 30:12 32:13,14 32:15,17,18,23 33:3,4,7,8,9,12 33:16,20,24 34:3,7,14,19 35:2,16,24 36:16,23 37:3 37:10,22,23 38:1,3,8,19,20 39:3,12,13 40:2,4,9,14,18 40:19,20,23 41:3,4,6,11,12 41:20 42:3,6,7 42:8,9,15 43:5 43:16,19,24 44:2,6,9,16,18 44:20,23 45:1 45:5,7,10,11,14 45:15,19 46:3 46:11,15,15,17 46:20,21 47:4 47:5,12,16,17 47:19,23,24 48:2,4,5,11,11 48:16,18,20,21 48:22 49:6,12

**[committee - committee]**

| | | | |
|---|---|---|---|
| 49:15,19,20 | 79:3,6,16,20,23 | 119:11,12,12 | 146:20 147:3,6 |
| 50:4,9,11,14,17 | 80:9,14,20,24 | 119:13,14,15 | 147:21 148:5,6 |
| 50:20,23 51:7 | 81:4,13,20,21 | 119:16,17,23 | 148:12,20,22 |
| 51:9,10,17,20 | 82:2,4,6,9 83:5 | 120:6,13,15,22 | 148:23 149:9 |
| 51:21,23 52:2 | 83:18,21 84:2 | 121:5,9,22,23 | 149:12 150:5 |
| 52:3,5,7,11,21 | 85:2,12,16,24 | 122:9,17,21 | 150:11,13,16 |
| 52:22 53:3,3,7 | 86:2,3,7,9,13 | 124:24 125:1 | 150:20,24 |
| 53:12,20,22 | 86:17,20,22 | 125:23 126:4 | 151:3,8,18 |
| 54:3,7,15,19,21 | 88:3,7,13,18,21 | 126:11,21,23 | 152:2,22,23 |
| 54:24 55:1,3,9 | 88:22,24 89:2 | 127:7,18 128:1 | 153:4,7,11,12 |
| 55:13,16,20,22 | 89:5,6,8,13,19 | 128:8,14,21 | 153:13,15,19 |
| 56:7,11 57:21 | 89:20 90:10,11 | 129:2,6,11,14 | 153:23 154:2,6 |
| 59:5,8,16,18,23 | 90:13,23 91:1 | 129:15,18,20 | 154:7,19,22,23 |
| 60:6,11,18,20 | 91:4,16,17,18 | 130:4,13,19 | 155:6,21,23 |
| 61:23 62:6,6 | 91:23 92:1,3,4 | 131:2,10,15,18 | 156:1,3,5,7,9 |
| 62:12,14,16,22 | 92:6,7,8,12,17 | 131:20,24 | 156:11,12,16 |
| 62:22 63:3,7 | 92:17,22,24 | 132:3,14,16,19 | 157:1,15,16,21 |
| 63:10,14,22 | 93:1,5,8,11,11 | 132:22,24 | 158:1,2,8,11,14 |
| 64:10,12,12,14 | 93:15,21,24 | 133:2,5,8,15,17 | 158:18,23 |
| 64:23,24 65:6 | 94:3,9,18 96:9 | 134:3,17,22 | 159:3 160:13 |
| 65:10,13,16,21 | 96:13,16,20 | 135:6,9,14,18 | 160:16 161:12 |
| 66:2,8,14 | 97:1,2,5,7,8,11 | 135:22 136:1,3 | 161:18,21 |
| 67:11,15,16,20 | 97:14 99:9,13 | 136:7,11,14,21 | 163:1,3 165:2 |
| 67:23 68:11,14 | 99:17,23 100:6 | 136:22 137:1,2 | 165:11 166:9 |
| 68:17,19,21,23 | 100:10,18,22 | 137:3,6,8,13,14 | 166:10,12,20 |
| 68:24 69:6,7,7 | 101:3,4,12,17 | 137:19,24,24 | 166:22,23 |
| 69:14,18,21,24 | 101:22,24 | 138:3,8,13,16 | 167:4 168:2 |
| 70:1,5,8,10,11 | 102:1 104:15 | 138:18,20,24 | 170:3,4,9,11 |
| 70:13,19 71:1 | 106:4 109:1,5 | 139:2,5,9,12,18 | 171:16,23 |
| 72:3,4,8,9,23 | 110:1,3,6 | 141:5,7 142:3 | 172:2,4,5,10,14 |
| 73:1,6,10,13,23 | 115:5,20 | 142:9 143:7,10 | 172:19,20,23 |
| 74:3 75:2,3 | 116:12,16,19 | 143:18 144:1 | 173:7,16,21,24 |
| 76:22 77:6,8 | 116:24 117:4 | 144:16,20,23 | 174:4,5,8,9,14 |
| 77:12,15,17,19 | 117:11,19 | 145:5,8,12,18 | 174:17,19,20 |
| 77:20 78:19,23 | 118:2,4 119:10 | 145:23 146:10 | 175:1,4,5,8,14 |

175:15,19,24
176:3,8,9,11,14
176:16,23
177:1,13,14,15
177:16,23
178:6 180:7
181:12,14
182:16 183:5
183:13,20,22
184:6,13,24
185:4,9,13,13
185:15,22,23
186:16 187:2,6
187:17,22
188:1,4,5,17,20
188:23 189:2,7
189:15,17
190:4,6,10,12
190:14,16
191:8 193:20
194:6,17
195:18 196:1
196:22 197:9
197:19,24
198:1,15
199:15,22,22
200:7,10,13,14
200:22,24
201:1,4,6,9,10
201:13,17,21
202:1,8,17,21
202:24 203:1,4
203:5,9,23
204:1,5,7,10,10
204:11,13,18

204:20,24
205:5,6,9,10,13
205:14,16,21
206:3,8,12,13
206:16,17
207:4,7,11,13
207:23 208:3,3
208:7,8,10,12
208:23,24
210:2,6,8,16,20
210:24 211:1
**committee's**
  24:14 84:7
  93:19 117:6
  125:2 165:14
  178:19 179:6
  187:7 210:9,13
**committees**
  16:15 17:12,14
  17:15,20 19:4
  20:23 21:7
  23:5,17,18,19
  23:23,24 24:3
  24:5,7,8 25:14
  25:20 26:8,18
  29:15 30:10
  31:3,17,20
  32:1,10,16,19
  35:18 39:21,22
  39:23,24 40:5
  41:14,21,23
  42:1 49:4,23
  50:7 59:11,24
  60:3,13,14,16
  64:2,19 70:14

70:15,24 73:2
80:17 89:21
90:5,16,19,22
91:7,10,14
100:5 101:6,7
101:9 107:3,23
108:12 115:5
115:15,18
117:14 119:3,4
119:7,8,18,20
121:3,11,12,14
121:19 135:1
135:19 137:9
147:24 154:14
154:16 155:1,3
155:5 169:4
181:8,8 189:11
189:22 191:6
193:11,17
194:13 195:2,9
196:14,24
197:4 198:2
199:12 207:20
208:17 211:4
**committing**
  197:20 198:9
**common**  41:22
  49:23 198:3,12
**commonality**
  153:17
**communicate**
  9:24 10:20
  26:21 55:14
  93:15 116:16
  135:7,10,13

137:2 139:13
**communicated**
  29:3 135:17
**communicating**
  195:11
**communication**
  89:16 99:12
  100:9 109:24
  110:7 129:19
**communicati...**
  10:7 27:24
  41:16 45:18
  51:13 55:5,10
  65:5,9,11,12,15
  65:20,24 66:10
  104:19 105:1,7
  130:3 137:7
  138:4 158:13
  158:18 201:9
  202:24
**companies**
  12:22
**complaints**
  141:12
**complete**  216:8
**completed**
  24:15 214:17
**compliments**
  141:12
**component**
  124:13 164:10
  164:11 168:11
  168:16,17
**comprehensive**
  125:6 171:17

**[computer - court]**

| | | | |
|---|---|---|---|
| **computer** 11:2 83:13 153:9 213:12 | **confidentiality** 25:5 26:2 50:15 51:16 69:1 70:6 93:4 93:8 115:10 136:12,20 156:6 175:20 | **convene** 41:7 **convened** 44:12 **convening** 41:8 **conversation** 69:3 | 15:8,10 30:4 34:5,17 54:9 58:21 71:23 74:8 75:22 79:6,10,11 |
| **concern** 131:13 131:17 140:11 140:12 160:17 160:18,24 161:4,6,9 | | **conversations** 15:8 25:2,8 28:12,14 30:13 69:17 130:18 | 99:14 118:24 130:6 133:11 162:21 165:16 167:17,18 174:21,22 |
| **concerning** 169:14 | **confines** 51:19 **connection** 5:8 54:20 55:3 137:13 | **conway** 181:21 **coo** 20:8 **coordinator** 186:4 | 184:21 185:1 191:3,18 193:10 194:8 199:7 211:15 213:15 214:14 |
| **concerns** 126:5 131:6,7,9 | **consent** 6:22 **consider** 128:15 188:3 | **copies** 214:14 **copy** 57:16 211:22,24 | **couple** 43:18 72:5 |
| **concierge** 3:21 **concluded** 212:8 | **considered** 39:18 136:16 148:17 | **correct** 33:4 86:4 90:8 91:6 126:17 144:5 153:10 203:7 213:13 216:8 | **course** 15:4 29:20 58:14 70:20,22 71:2 71:4 74:22 76:1,12 |
| **conclusion** 129:23 130:9 190:18 | **consistent** 40:12 | **corrections** 216:6 | **court** 1:1 2:1,7 5:18,23 6:7,14 7:4 9:5 29:6 |
| **condensed** 211:24 | **consultant** 114:10,20 | **correctly** 168:8 213:10 | 54:13 73:21 74:10 81:16 |
| **conduct** 16:15 25:10 | **contained** 31:22 | **correspond** 126:4,7 | 84:13 87:9 100:14 132:11 |
| **conducted** 5:6 **conference** 44:10 | **contains** 24:13 **context** 125:22 130:8 178:19 183:19 | **corresponden...** 211:5 **cost** 157:2,5 182:1,2,3,10 | 133:14 137:17 139:10 150:1,8 165:17 166:2 173:3 191:5,21 |
| **confidential** 25:1 49:21 50:1,4,5,8,20 50:24 51:3,18 51:22 69:4 92:23 105:3 115:20 129:11 136:17 175:15 198:4,17 | **continue** 5:11 24:10 29:21 **continues** 163:8 **continuous** 19:20 **contribution** 160:12 | **costs** 182:5,7,8 182:9 **counsel** 6:5,22 7:9 8:4,6 9:17 | 192:9,19 193:3 193:14 194:12 |

**[court - declaration]**                                          Page 11

194:22 211:21 212:2

**court's** 4:12 57:7

**covered** 39:18 199:17

**covers** 183:14

**covid** 42:19 179:1 188:15

**covid19capital** 111:2

**create** 54:15 77:6 134:18 140:14

**created** 19:15 31:20 37:19 45:19 57:21 86:17,20 122:2 122:5 145:24 147:9 151:14 172:2 179:24 197:1 203:14 203:20 205:13 206:16 207:7 209:3 210:7

**creates** 20:23 140:8

**creating** 21:19

**creation** 19:11 207:19

**creators** 100:23

**crime** 196:17 196:21

**cs** 214:15

**ct** 108:5 109:11

**cumbersome** 98:11

**current** 17:19 143:14 160:17 160:18 171:18 171:19

**currently** 7:23 17:16 18:16,17 31:17 80:22

**cv** 1:14 5:20

**d**

**d** 1:16 4:1 7:22 65:3 66:5 83:4 85:6 90:24 94:21 102:18 106:7 107:7 112:20 114:1 122:20 158:13 176:5 180:9 186:3

**d.b.** 1:6

**dahnke** 66:4,4 66:6 158:12,19

**dakota** 1:1,17 2:1 3:15 5:19 28:9,13,15 39:19 195:4,6 195:7,12,15,19 195:23

**daniel** 158:7

**dash** 98:22,23 113:7

**data** 54:4 60:21 61:16 77:23

81:5,11 90:6 94:9 133:21 160:17 169:14 169:15,19 196:21 197:8

**date** 44:4 79:19 179:16 209:10 215:24 216:12

**dated** 4:10 11:20

**dave** 20:7 35:6

**david** 114:4,9 114:13

**day** 24:11 43:18 118:4 123:17,17 124:6,6,20,20 213:19 216:15

**days** 43:18 214:17

**debbie** 155:7 155:19

**decide** 21:20 62:7

**decided** 154:17 167:1

**decides** 20:11 20:12

**decision** 187:7

**decisions** 157:4

**declaration** 4:11 10:24 14:24 15:6,14 15:16,22 16:2 16:3 17:18

18:1 23:20 24:13 25:21 26:1 29:16 30:10,19 31:23 32:4,7,9 33:1 33:22 34:1,8 34:14,17 46:6 46:7,12,18 47:11 56:19 57:5,20 59:3 61:21 77:22 78:18 79:2,7,9 79:12,14 80:2 81:3 89:8,12 92:21 99:24 100:5,10 104:15 107:4 107:23 108:13 109:1,5 119:7 121:2 125:5 126:20 128:19 128:24 135:20 139:17 156:17 163:2 164:1 166:7 169:4 171:16 174:19 184:24 189:12 192:3,22 193:6 193:17,20 195:3,10,17,21 196:3 197:1,5 198:8 199:12 199:21 207:20 208:2

**[declare - disclosing]**                                                    Page 12

| | | | |
|---|---|---|---|
| **declare** 216:4 | **delegation** 93:1 | **description** 4:8 | 64:13 121:13 |
| **decreased** | 152:17 178:5 | 169:22 | 127:17 134:4 |
| 88:17 | **department** | **designated** | 139:24 142:18 |
| **deemed** 216:6 | 66:17,18,24 | 104:20 | 148:14 153:14 |
| **defendants** | 67:4,7 95:2 | **determination** | 153:15 154:13 |
| 1:19 3:17 6:13 | 96:22 128:7 | 97:10 181:8,12 | 157:9 169:21 |
| **defer** 49:7 | 136:5,9 140:5 | 185:24 | **direction** 61:23 |
| **defined** 40:22 | **departments** | **determinations** | 62:2,5,14,16 |
| 52:24 80:7 | 61:19 66:20 | 181:16 | 64:10 75:3 |
| **definition** | 144:17,21 | **determine** | 94:8 104:14 |
| 84:22 155:12 | **depending** | 58:14 147:23 | 108:12 195:24 |
| 155:15 168:9 | 40:14 46:24 | 174:18 183:24 | **directive** 19:17 |
| **definitions** | 51:8 59:11 | 184:19 190:2 | 20:18 35:3,9 |
| 127:16 | **depends** 5:7 | **determined** | 91:21,23 |
| **deiss** 65:3,3 | 163:13 | 82:7 97:3,6 | **directly** 35:5 |
| **delegate** 38:2 | **deponent** 213:7 | 147:18,20 | 116:16 126:4,7 |
| 48:21 62:10 | 213:9 214:13 | 151:13 | 142:8 169:23 |
| 149:13 152:7 | 216:3 | **determining** | **director** 63:15 |
| 167:8 177:23 | **deposing** | 29:18 161:12 | 65:4 68:5,6 |
| 182:12 | 214:13 | **develop** 52:11 | 94:17 143:15 |
| **delegated** | **deposition** 2:3 | 53:7 149:22 | 145:13,19 |
| 38:12 39:4 | 4:9 5:5,15 6:15 | 150:12 | 146:4 151:17 |
| 45:9 46:14 | 6:17,18 8:12 | **developed** | 158:13 176:19 |
| 49:1,5,11 | 8:16,21,24 | 149:21 | 177:4 180:22 |
| 50:22 51:6,12 | 9:15 10:3,11 | **dialogue** 21:22 | 180:23 181:5 |
| 69:6,13,23 | 11:19 12:10,12 | **dianne** 41:9 | **directors** 65:9 |
| 70:4 86:2,4 | 14:22 15:7,10 | 46:8 101:2 | **disbanded** |
| 100:17 107:3 | 15:13 28:22 | 176:5,8 | 24:17 |
| 107:21,22 | 29:5,10 33:19 | **differ** 92:6 | **disclose** 70:7 |
| 108:24 109:4 | 54:12 95:16 | 153:12 | 197:21 198:4,9 |
| 115:4 117:5 | 192:10,19 | **differed** 90:2 | **disclosed** 39:8 |
| 152:11,16 | 212:4,8 213:13 | **differences** | 69:21 |
| 198:15,20 | **des** 3:9 | 154:5 | **disclosing** 52:5 |
| **delegating** 69:8 | **describe** 41:17 | **different** 21:24 | 196:17,21 |
| | 82:16 139:22 | 23:22 40:15 | |

**[disclosure - early]**

**disclosure** 73:12 197:8,10 197:14,16

**disclosures** 27:24 73:9

**discounted** 186:8

**discovered** 86:16 113:22 172:6,11 202:11 209:13

**discovery** 171:23

**discussed** 101:8

**discussing** 149:18 185:1

**discussion** 189:24

**discussions** 28:7,9 184:2

**dispute** 141:18 142:2

**disputes** 141:15 141:17,23 152:1,5

**disseminate** 174:8

**disseminated** 204:6 205:10 206:12 207:3 208:22 209:23 210:20,24

**distinction** 17:8

**distinguish** 42:6 70:17

117:18

**distributor** 1:18

**district** 1:1,1 2:1,1 5:18,19

**docket** 57:8,15

**docking** 10:12

**doctor** 61:11 158:4

**document** 11:22 12:6,8 21:4 23:9 56:22 57:11,18 95:11 98:19 99:23 101:17 102:11 103:14 103:24 104:10 104:13 105:24 106:4 109:24 194:6

**documented** 78:10

**documents** 14:6,8,12,14,16 15:12 21:4 34:6,11 50:10 52:8 53:18,21 55:2 69:3 79:1 101:14 102:10 126:19 175:7 175:12 178:4

**doe** 1:17,18 62:8

**doing** 42:9 50:1 52:3 70:1 78:8

92:1,4 118:2,3 136:23 190:7 190:12

**doubt** 67:16

**download** 98:8 106:16

**dr** 18:16,22 123:1 158:6

**draft** 52:7 53:12 55:2 79:2,9 93:24 94:4 136:4,8 138:4 161:21 161:23 162:3 175:24 176:3 194:6,17

**drafted** 162:1 193:17,21

**drafting** 27:23 79:7,12 162:1

**drafts** 189:3

**drive** 3:8

**driven** 24:24

**drug** 28:17 29:3

**drugs** 186:8

**due** 145:6

**dugan** 3:21

**duluth** 148:16 157:20 186:23

**duly** 7:8 213:7

**duties** 63:21,23 64:14 75:20 146:23 148:18

**duty** 70:6 93:8 104:24 136:12 175:20

**dyad** 18:21,22 18:24 19:2 145:19,20

**dyke** 85:6,14

**dyke's** 85:11

**e**

**e** 4:1,6 62:24 63:13,13 65:3 66:5,12,12 68:3 82:6,6 83:4 84:19,19 85:6 94:22,22 96:17 107:7,7 107:12 108:2 108:16,16 113:7,11,11 114:1 146:8,24 147:1,1 148:8 155:8,8,8 158:13 167:22 168:19 169:8,8 176:5,6 177:6 177:6 180:9 181:21,21 186:3,10,11,17 186:17 213:1,1 215:3,3,3

**earlier** 23:16 101:8 119:2 140:24 189:21

**early** 43:11 81:21 88:9,11

200:2
**easier** 106:17
**east** 40:6
  148:17 160:1
  186:21
**eaton** 180:9
**ecf** 4:13 57:8
**ecpc** 17:22 18:4
  18:20
**editor** 160:3,6
  160:9
**effectiveness**
  157:2
**efforts** 179:3
**eh** 112:16
**ehpriv000443**
  114:9
**ehpriv001648**
  105:17
**ehpriv002425**
  109:23
**ehpriv004346**
  102:12
**ehrtooltips**
  105:21 112:8
**eighteen** 81:10
**either** 31:6 75:2
  131:5 135:2
  168:6
**el.l** 1:7
**electronic** 83:9
  84:4 133:23
  142:15 164:17
  164:23 168:15
  211:23

**electronically**
  72:12 135:3
  164:16
**elements**
  178:15
**elena** 159:14
**elizabeth** 1:7
**em.l** 1:7
**email** 10:13,17
  20:19 45:15,17
  46:23 89:17
  95:21 104:6
  105:20,22
  109:15,19
  110:10,17
  114:2 135:3,7
  140:22 165:8
  200:9
**emailed** 51:10
**emails** 10:6
  45:23 131:12
  192:13,22
  193:7
**emergency**
  157:10
**employed** 7:23
  63:24 93:12
**employee** 18:8
  48:12 75:19
  195:23
**employees** 53:9
  64:17 89:1
  115:22 135:24
  169:5,7 174:9
  174:24 189:14

195:11,15
**employer** 8:1
  135:6
**emr** 83:8,9,15
  112:21
**ends** 71:17
  118:18 162:14
  212:4
**enhance** 16:22
**ensure** 183:7
**enter** 68:23
  144:6,8
**enterprise** 68:4
  68:5
**entirely** 26:9
  46:1 196:7
**entities** 8:8
  13:2,5,9 30:14
  35:9 55:6
  153:9
**entity** 12:15,18
  13:8 18:9
  103:3 169:1
  173:10
**entry** 99:7
  100:3,7,8
  101:22 102:11
  103:6 106:15
  110:6
**environmental**
  106:22,24
**envisioned**
  141:22
**epic** 112:21

**epic.commun...**
  112:19
**epicinformati...**
  113:5,7
**equals** 41:6,11
**erickson**
  159:12
**errata** 214:11
  214:13,17
**error** 78:11,12
**esquire** 3:2,8
  3:13,14 214:1
**essen** 112:4
**essentia** 1:16
  1:16 3:17 5:17
  8:2,8,19 12:20
  12:21,23,24
  13:1,3,4,12
  14:5 17:12,20
  18:5,9 19:5,10
  19:15,18 20:2
  20:3,6,15,22
  21:6,23 23:22
  26:7 28:2,5
  29:8 31:5,17
  31:20 32:22
  35:3,7,8,19
  39:15,17 40:5
  40:8 41:1,15
  42:7 48:12
  53:8,13 58:5
  59:21 60:13
  63:24 64:17
  65:5 69:13,24
  70:5,17 71:3

**[essentia - exact]**

73:7 75:1,6,19
76:13,23 78:15
78:16 89:1
93:12,16,22
94:1,4 96:7,11
101:7 107:8,16
108:6 109:8
113:2,3,16,17
113:19 114:21
114:23 115:11
115:16,22
117:7,17 119:3
119:11,13
120:3,5,14,17
121:5 126:1
128:2,9 133:10
134:1 135:24
136:4,5,8,9,18
138:9 144:17
144:24 145:1,2
148:19,24
150:15,18,22
152:21,24
153:3,6,7,8,12
153:22 154:1,5
154:18,21
155:9,16,20
156:5,11,13,15
157:2,5,14
158:1,8,14,17
158:22 159:2
159:21,22
160:1,3,6,9,12
160:21 161:3
161:17,20

162:4,24 163:3
168:5 169:1,5
170:3,13 171:8
172:9,13,18
173:9,12,12,14
173:15,20,23
174:3,7,8,9,11
174:13,20,23
174:24 175:5,8
175:13,19,23
176:2,7,19,22
177:22 178:5
179:19 182:6,8
189:5,9,14
191:15 192:13
193:16,19
194:5,16 195:7
196:13,16,20
198:3 201:13
202:11 204:9
205:5,9,12,15
205:20 206:3,8
206:11 207:6
207:13,14,15
207:22 208:12
208:22 210:20
214:4,5 215:1
215:2 216:1,2
**essentia's** 4:14
15:22 36:10
95:9,20 127:19
166:8 171:18
196:14
**essentiahealth**
110:16 111:6

**essentiahealt...**
103:11 104:6
109:16 110:23
111:2,10,13,16
111:19,22
112:1,8,11,16
**essentiahealt...**
105:21 110:20
**essential** 21:3
46:16,16
**essentially**
13:18 14:23
16:14,22 19:2
19:23 20:11
22:5 44:23
50:1 51:11
58:2 62:19
140:9 163:17
177:14
**essentianews...**
111:13
**estab** 82:19
**establish** 20:16
167:1 207:12
**established**
34:20 35:1,16
79:17,20
119:23 120:6
120:15,19,23
171:17 179:8
187:23 204:10
**establishing**
189:10
**establishment**
20:4

**estates** 8:18
**et** 5:16,17
214:4,4 215:1
215:1 216:1,1
**ethical** 24:20
24:23
**evaluate** 19:23
27:4,14 35:20
35:20 36:3,12
36:13 58:13
128:6 161:14
163:6 189:6
**evaluates** 132:1
132:4
**evaluating** 27:8
37:13 47:9
125:9,12 131:3
153:17 170:14
**evaluation**
132:6 133:4
178:13 189:19
**event** 125:10
131:3,4 132:1
132:4 140:8,13
140:14
**events** 125:13
139:20,21,24
140:1,3,6,6,7,7
144:6,8 147:12
**everybody**
21:23 198:23
**everybody's**
127:16
**exact** 141:10

**exactly** 34:12 44:11 76:18 106:18 114:7 124:20 179:14 183:13

**examination** 7:12

**examined** 7:9

**example** 81:20 96:17 124:9 149:5 152:16 160:23

**examples** 137:11 178:4

**excel** 95:17 98:5,14 106:10 106:15 116:2

**excellence** 82:13,14,16,22

**except** 9:12 122:11 132:17

**exchange** 10:6 45:11 88:18,21 174:4

**exclusion** 76:3 76:6

**exclusively** 40:4 165:1

**excursion** 13:20,22,23 14:2 23:21 24:4,10,12 26:7,13,17,22 27:2,6,10,16,20 28:1,5,10,18

30:3,11,21,23 31:21 32:2,11 32:21 33:15 34:23 35:12 38:10,15,22 39:8 40:1 47:9 55:21 56:10 57:23 58:5,10 58:19,20 64:1 64:6 65:11 70:12,16,18,19 71:4 79:21,24 80:3,5,8 85:19 85:23 86:16 92:14 109:9,13 113:22 114:22 114:24 116:13 117:1,8,12 118:5 121:18 122:7 124:2 126:16 146:1 147:9,15 151:10,14 152:5 165:14 165:21 170:7,8 171:24,24 172:6,10 179:10,18 190:9 191:16 192:4,14,22 200:1 202:10 203:10,14 204:2,15,22 205:2,17,22 206:4,7,20,24

207:9,10 209:5 209:7,12 210:10,13,17

**excursions** 179:20

**excused** 212:6

**executive** 21:16 166:9,10,20,22 177:7

**exhibit** 4:9,11 4:14,16,16 11:16,18,24 12:4 15:17 56:19,24 57:4 57:4 95:7,8,13 98:22 99:3 100:4 102:19 103:5,8,9,16,20

**exhibits** 11:17 57:11 96:2 212:1

**exist** 79:23

**existed** 24:9 52:20 94:14 120:16

**existence** 119:24 170:6 173:21

**exists** 43:21 137:6,9 182:21

**exit** 97:23

**expand** 105:14

**expertise** 21:24 38:13 48:24 59:16 62:9

63:20 68:13 83:7 124:4 155:2 158:3 176:11,13

**explain** 91:22 206:6

**express** 61:23 62:1,15 92:24 104:14 108:12 131:13

**expressing** 140:11

**extensive** 32:6

**extent** 36:17 55:24 81:14 129:17 130:23 132:7,17 154:8 190:17

**external** 53:4

**eyesight** 122:19

**f**

**f** 2:7 7:21 63:13 66:13 82:6 83:4,4 84:19 94:15 107:17 108:16 113:7 114:1 186:1 213:1,23

**face** 46:24,24 47:1,1 128:10

**facilities** 125:14 144:17 144:21

**facility** 108:20

**[fails - foundation]**

**fails** 214:19
**fair** 128:17
**fall** 124:17,18
  128:12,12
**familiar** 9:1
  13:13 14:8
  33:3,11 77:11
  107:18 108:2
  108:18 109:15
  109:20 110:14
  110:17,22
  111:1,4,9,12,15
  111:18,21,24
  112:3,7,10,15
  112:18,22
  113:4,9,10,14
  160:2 164:19
  178:8 182:14
  182:17
**family** 8:17
  40:6,8 41:15
  153:7 173:13
**far** 28:22 184:3
  193:10
**fargo** 3:15
**farther** 28:24
**fast** 25:7,18,19
**fauske** 1:9
**february** 1:21
  5:4 11:20
**feedback**
  125:10 132:2
  141:8,9,12
  147:12

**fegan** 3:2,21
  6:10
**feganscott.com**
  3:5
**felt** 155:2
**fentanyl** 140:7
**ferrell** 84:19
**fetzer** 123:2
  143:14 145:16
  146:4 151:21
**fifteen** 118:11
**figure** 75:15
**file** 95:24 96:3
  97:21 98:22
  133:18
**filed** 4:13 5:17
  57:7 172:15
  180:1 197:2
  202:14 203:20
**filings** 54:20
  137:13,20
**fill** 22:10
**finance** 83:19
  83:20 84:24
  95:1 96:22
**financial** 28:5
  58:20 68:1
  96:23 97:2
  128:9 139:6
**financially** 6:3
**find** 75:8 106:9
  199:18
**finding** 22:2
  163:12

**findings** 73:7
**fine** 57:16 77:1
  118:13 162:9
  198:24
**finish** 61:13
**firm** 3:13 5:24
  34:11 79:19
  95:23 114:14
  114:18 167:20
**firmly** 40:7
**first** 7:7 11:16
  48:2 88:13
  101:2 138:8
  172:2 184:1
  200:6,9 202:16
  203:9,17
  207:23
**fitness** 108:16
  108:21,23
**five** 119:18
  120:9
**fleishman**
  114:15,18,19
  114:23 115:2,6
  115:9,14,21
**floor** 3:3
**focus** 157:6
**focused** 19:24
  37:13 66:11,20
  77:21 83:15
  92:9,12 153:16
  157:3 164:5
  166:13 189:19
**folder** 11:17
  57:11 72:16

  95:18 133:18
**folks** 48:6
  145:3 155:5
**follow** 74:17
  75:13 104:8
  162:4
**following**
  102:10 114:21
**follows** 7:10
**food** 171:9
**force** 42:19
**foregoing**
  216:5
**forget** 32:22
**forgive** 35:14
**form** 64:10
  73:4 140:17
**formal** 19:18
  21:18 23:9,23
  24:18 47:1
**formalized**
  20:21
**formed** 19:23
  33:13 35:4
  39:15 88:13
  197:4 199:23
  200:3 202:8,10
  202:13
**former** 68:4,5
  138:14 146:7
  160:3,6 176:6
  186:3
**fosston** 107:16
**foundation**
  56:2

**[four - good]**

**four** 162:21
**frame** 184:13
  184:14
**franco** 2:7 5:24
  213:23
**frank** 2:3 4:3
  4:11 5:15 7:7
  7:21 57:5 77:1
  87:17 98:3
  214:5 215:2,24
  216:2,4,12
**free** 27:14
  36:11 179:4
**frequency**
  88:15
**frequent** 43:12
  43:15
**frequently**
  88:10
**fridge** 121:5
  170:3,17,21
  172:9,13,19
  173:7,15,20,23
  174:3,7,13,20
  175:1,5,8,14,19
  175:23 176:2,7
  176:14,22
  177:22 178:5
  207:6,13,23
  208:12,22
**fugere** 108:15
**fulfill** 61:24
**full** 39:12 42:19
  153:7

**fully** 75:14
**function** 64:10
  80:17 88:14
  89:5 90:1 96:9
  96:13 124:7,20
  147:17 168:1
  168:11 174:12
  194:9
**functioning**
  43:22 146:16
**functions**
  154:14
**funding** 183:16
**further** 6:19

**g**

**g** 63:13 108:16
  186:3,10,17
**gather** 16:21
  20:13 35:10,19
  36:7 53:24
  54:4 60:20
  89:21 145:24
  169:16,19
  195:13
**gathered**
  145:23
**gathering**
  189:19 195:5
**gathers** 130:17
  160:16 163:4
  169:13
**general** 8:4,6
  78:14 169:22
  198:12

**generally** 37:11
  40:12 70:2
  155:18 178:10
  182:17 189:24
  197:12
**generate** 116:5
**generating**
  96:3
**generation**
  97:21
**generic** 78:17
**getting** 28:20
  105:16 147:16
  194:9
**give** 27:5 37:3
  37:10 54:6
  74:14 124:9
  160:23 179:16
  209:10
**given** 36:22
  37:9,17 38:5
  115:21 213:14
  216:9
**gives** 75:11
**glanced** 12:7
**go** 5:12 8:23
  26:19 28:22,23
  53:4 56:3,18
  60:10 71:10
  74:7 87:17
  102:9 103:4
  110:10 114:8
  118:14 130:9
  141:22 154:9
  162:10 181:19

**goal** 170:15
**goals** 61:24
**going** 8:23
  11:15 15:3,15
  20:20 21:8,23
  22:2,4,22 23:4
  23:15 25:7
  28:23 31:13,14
  33:6 34:23
  35:4,11 36:11
  36:13 37:7
  39:1 41:2 45:9
  46:20 49:7
  54:9 57:3,19
  58:3,5 61:6
  62:4,7,7 73:18
  77:21 87:6
  95:6 98:2,8,12
  100:11 102:9
  103:4 106:7
  109:18 110:10
  110:11,13
  116:1 118:3
  123:16 127:16
  128:6 130:6
  133:11 165:15
  165:18 170:20
  171:23 172:24
  178:17 189:18
  189:18 190:9
  192:5,6 199:12
  199:20 200:2
**good** 5:2 6:9
  7:15 32:24
  162:7 198:22

**[good - hope]**

213:4
**goplerud** 3:7,8
  3:10
**governed**
  129:20
**government**
  186:7
**governmental**
  30:2,11,14,20
  55:6 61:18
  139:14
**grand** 3:8
**granted** 69:22
**gratia** 159:15
**great** 11:15
**greater** 96:8,12
**green** 98:21
**groeschl**
  159:17
**group** 20:13
  43:24 63:17
  126:1 149:22
  164:5 182:20
  182:22 207:11
**groups** 27:22
  122:15 157:13
  183:22
**guess** 26:8
  76:17 123:11
  127:21 133:21
  142:6
**guidance** 25:21
  26:14 31:10
  36:13,15,22
  37:4,9,11 94:1

97:15 170:15
**guidelines**
  25:15 53:13
  94:4 136:8
  161:21 175:24
  188:24 194:17

**h**

**h** 4:6 7:22 66:5
  83:3,4 91:10
  91:11 94:16,22
  108:2 112:20
  114:1 122:16
  122:16 146:24
  146:24 158:13
  169:8 180:9
  186:11,15,17
  215:3
**halli** 143:23
**hand** 7:5
  213:18
**handle** 65:10
**hansmeier**
  94:21
**happen** 209:14
**happened**
  58:14 209:12
**happening**
  39:11
**happens** 49:4
**happy** 74:13
  98:10 99:6
**hard** 22:20
  25:7,19 44:11
  53:1 57:16
  91:21 128:4

135:2
**harm** 125:7
  133:8
**hart** 101:3
**head** 9:7
**heading** 47:18
  121:2,3,15
**health** 1:16,16
  1:17 3:17,17
  5:17 8:2,19
  12:20,21,24
  13:1 18:9
  19:19 20:9
  39:18 40:6
  41:15 61:19
  65:5 103:2
  107:8,16 108:6
  140:5 146:22
  155:9,10,10,13
  160:1,3,9,21
  161:3 167:23
  168:5,20,24
  176:19 195:8
  214:4,5 215:1
  215:2 216:1,2
**health's** 29:8
**healthcare** 87:5
  123:11 124:7
  141:11 144:18
  163:7 166:14
  166:14 168:17
  169:20 182:2
  182:10 197:4
**hear** 9:5 10:3

**heard** 5:9 50:2
  173:11 197:23
**hearing** 7:4
**held** 82:18
**help** 35:24 38:8
  38:20 63:9
  79:1 82:15,19
  82:19 110:14
  126:19 133:8
**helpful** 10:16
**helps** 75:9
**henry** 18:22
  159:11
**hereto** 216:7
**herman** 20:7
  35:6
**hertz** 95:22
**hey** 51:2
**hibbing** 2:5
**highlight**
  102:12 106:8
  106:11
**hines** 186:11
**hoeksema**
  169:8
**holding** 21:3
**hollingsworth**
  160:3
**hollingsworth's**
  160:12
**home** 24:24
**honest** 60:8
**honestly** 43:7
**hope** 110:9

**hopefully** 116:8
**hoping** 199:16
**hospital** 18:8
  37:11 53:13
  85:8 108:7,10
  113:1,2,3,13,15
  113:16,18,20
  124:17 127:11
  146:17 186:20
**hospitalists**
  157:11
**hospitals**
  123:18 124:5
  124:11
**host** 42:24
  131:11
**hotmail.com**
  114:1
**hour** 15:4 71:8
**house** 8:7
**housed** 49:10
**hr** 134:6
**huh** 91:2
**human** 78:12
  123:20 183:11
**hundred**
  101:19 152:19
**hurley** 35:6
  41:9 46:8 91:1
  91:3 101:5
  177:10
**hyphen** 155:8

**i**
**idea** 70:2 207:8
  207:12
**identification**
  11:23 56:23
  95:12 103:15
  199:24
**identified**
  30:19 37:6,19
  40:16 46:17
  47:11 60:18
  72:13 86:21
  106:22 107:4,7
  107:15 108:16
  119:19 128:18
  128:23 129:9
  157:20 167:12
  174:16 185:15
  186:3 187:13
  189:11 195:2,9
  195:17,21
**identifies** 17:18
  105:20 121:4,6
  121:8 186:15
  187:8
**identify** 26:20
  26:24 38:9,21
  58:6 59:22
  61:3 74:21
  77:23 83:23
  99:7,11,22
  100:3,6,8,16
  104:13 110:14
  117:11 142:22
  143:17 153:21

154:4 167:10
  167:15 170:2
  178:3 205:19
  206:1,2
**identifying**
  26:16 33:14
  34:22 39:2
  60:7 78:2
  125:8
**immediately**
  52:10
**immunization**
  32:15 121:6
  178:9,22 179:7
  179:23 180:4
  180:10,14,18
  181:2,6,13,22
  182:11 209:2
  209:18,22
  210:3
**immunizations**
  178:14,16
**impact** 11:9
  28:5 58:20
**impacted** 36:6
  36:7 59:22
  60:2,7 61:4,5
  77:24 81:5,12
  87:1,4,14
  89:22 90:6
  92:10 117:11
  117:15
**impetus** 170:8
**improve** 16:22
  19:24 35:22

36:1,3 58:16
  73:14,15,24
  74:4 76:24
  87:4 153:18
  156:19 163:6
**improving** 20:1
  125:13 170:15
**inappropriately**
  53:5
**incident** 133:21
  142:14 143:11
  144:2,11
**include** 58:19
  97:6 141:23
  167:15 182:4
  183:10 184:19
**included** 44:24
  81:22 97:5
  195:11
**includes** 81:22
  144:16
**including** 12:22
  151:8
**indicate** 7:2
**indicated** 75:24
  213:6
**individual**
  23:10 56:5
  62:4,10 68:2
  91:15 94:15
  96:19 100:16
  106:21 107:6
  107:11 108:1
  108:15,18,19
  171:14 186:1

**[individual - interchangeably]**

200:12,16
204:17 208:1,7
**individual's**
187:1
**individually**
1:3,5,8,9,10,12
**individuals**
16:20 27:15
30:18 49:10
50:22 59:14
60:8 61:22
67:10 68:16
75:5 82:20
83:24 89:4,11
90:9 92:20
102:3 104:4,4
104:10 106:6
106:13 128:18
128:23 129:4,8
134:10 136:19
138:20 143:24
153:15 159:5
192:3 198:7,14
205:4
**inform**  75:9
76:8
**informal**  19:18
21:2 24:1,5,6
**informaticist**
168:4,7
**information**
16:22 25:1
35:10,20 36:8
36:12,18,19
37:21 38:4

49:10 51:22
52:5 53:24
54:1,4,16
55:21 60:21
61:15 69:15
73:14 84:15
87:8,11,14
88:16 89:21
90:6 92:16
93:22 115:23
130:17,20
132:8 133:9,19
139:19 143:2
146:1 160:16
163:4,7,10,15
166:4,5,17,17
169:13,15,19
173:4 174:8,12
174:16 175:15
189:20 190:20
191:22 195:5
195:14 196:21
197:9,22
198:10,18
199:19 201:12
201:16,20,24
204:6 205:8
206:11 207:2
208:21 209:21
210:19,23
211:4
**informed**  22:14
22:17 23:1,11
24:19 25:4
47:16,23 49:20

62:14 68:17
92:21 93:3
104:24 105:6
115:14 136:12
155:24 156:5
198:8 202:5
**informing**
116:12 136:19
**infrequently**
88:9
**initiate**  207:19
**initiating**  20:4
**initiatives**
153:1
**innovis**  1:16
3:17 12:24
13:4 20:9
39:18 102:18
102:22 103:1,2
103:2 104:5,11
104:19,24
105:6 145:1,2
146:22 167:23
**innovispartners**
103:11 104:6
**input**  31:8
**instance**  18:3
78:9 101:1
161:1
**instances**  49:3
**instant**  11:1
88:22
**instruct**  30:6
54:10 58:22
73:18 74:10

81:17 84:8
87:7 99:17
100:12 132:11
133:12 137:17
139:10 150:2,8
165:18 172:24
190:20 191:12
191:23 192:6
192:10,17
193:1,12
194:13,22
**instructed**
115:9 175:14
**instructing**
29:1,11
**instruction**
26:2 192:24
**intake**  147:11
**integrity**  86:8
94:22,23 95:3
96:18,21
**intellectual**
8:19
**intelligence**
68:8 78:1,20
78:22 84:19,20
**intelligent**
187:13,14
**intended**  50:7
170:6
**intent**  58:7
**interaction**
126:1
**interchangea...**
17:3,5,7

**[interchangeably - kennell]**

141:11
**interested** 6:3 213:16
**interim** 143:15
**internal** 26:14 27:24 28:1 65:15 157:11
**internet** 5:8
**interrupt** 97:19 181:18
**intimately** 164:19
**introduce** 11:15 15:17 57:4 95:7 103:5
**introduced** 11:17 99:4
**investigate** 191:16 192:4
**investigating** 125:9
**investigation** 132:6,20 133:3
**investigations** 132:15
**invite** 148:5
**invited** 44:18 44:20,22 47:13 68:20 138:12 138:15
**involved** 26:12 26:16 27:19,23 28:4 84:2 97:9 97:16 110:1,3

117:15 147:11 153:15
**involves** 183:15
**iowa** 3:9
**ira** 3:21
**isehrambulat...** 110:16,20
**isehrsystemst...** 111:16
**issue** 19:19,22 22:1,5 31:10 59:11 80:18 160:24 181:9
**issues** 27:18 32:1,11 65:12 65:15,20 124:1 160:17,18 188:24 204:14 204:21 205:1 205:16,21,24 206:4,20

**j**

**j** 3:8 122:20 147:1
**jacob** 107:11 107:12
**jan** 123:3 143:19
**jana** 160:2,11
**janice** 122:16
**janitorial** 107:1
**january** 4:13 57:8 184:17,17
**jason** 169:8

**jennifer** 1:10 83:3
**jensen** 123:4 143:20 147:1
**jerame** 3:20 5:21
**jess** 123:2 143:14 151:21
**jessica** 1:3,11 5:16 145:16 146:4 214:4 215:1 216:1
**jill** 185:6
**job** 8:3,5 63:21 63:23 64:14 75:5,19 116:19 116:24 146:18 146:23 148:18 151:3,9 156:13 177:3 185:17 187:14 200:20 202:19 203:22
**jody** 20:8
**joe** 159:11
**john** 1:17,18 62:8
**join** 22:15,18 23:10 68:23 136:21 138:12 138:15 147:24 148:6
**joined** 138:8
**joining** 55:22
**joseph** 157:19 157:24

**joseph's** 159:23
**julie** 108:1,8,9 108:11 143:23

**k**

**k** 7:21 63:13 66:5,12,13 68:3 85:6 158:13 168:3 169:8 177:6 181:21
**kailee** 66:12
**kapphahn** 159:12
**kari** 168:3
**kassandra** 159:13
**kaufenberg** 63:13 91:9 92:15 101:4,9 101:16
**kaufenberg's** 64:5
**keep** 20:22 21:6 21:17 25:1 49:20 50:20,23 51:18 92:22 97:23 105:1 129:10 175:14 198:3
**keeps** 188:21
**keith** 159:11
**kelly** 108:15
**kelsie** 181:20
**kennell** 177:6,8

**[kept - know]** Page 23

| | | | |
|---|---|---|---|
| **kept** 21:4 | 53:3,10 55:4,6 | 112:13,23 | 167:3,9 169:9 |
| **kevin** 18:16 | 55:15,18,19,23 | 113:1 114:2,4 | 169:24 170:18 |
| 186:15 | 56:5 58:11 | 115:8,17,24 | 171:11,11,15 |
| **kick** 170:9 | 59:20 61:1,2,5 | 116:6,8,14,17 | 172:8,12,16,21 |
| **kicked** 207:10 | 62:17 64:1 | 116:22 117:2,6 | 174:6,10 |
| **kim** 65:3 66:9 | 65:12,18 66:19 | 117:9,22,23,23 | 175:10,17,18 |
| **kin** 213:15 | 67:5,13,18 | 118:3 120:7,12 | 176:1,4,17,20 |
| **kind** 41:5 49:11 | 68:10,21,24 | 120:20,24 | 176:21 177:2,7 |
| 52:14 53:16 | 69:9,9,10,14,16 | 124:4,12 | 177:24 178:21 |
| 81:11 82:21 | 69:24 70:6,21 | 127:14 128:20 | 180:2,3,6,8,13 |
| 84:6 141:17 | 71:6 72:13,18 | 128:24 129:5,9 | 180:17,22 |
| 146:13 147:16 | 72:19 73:11 | 129:16 130:11 | 181:1,4,10,11 |
| 149:21 165:3 | 74:24 75:11,23 | 130:22 131:19 | 181:15,17,20 |
| 169:15 170:19 | 76:14 77:23 | 133:1,6,21 | 182:13,19,20 |
| 172:22 177:17 | 78:14 79:19 | 134:14,23 | 183:13,15,17 |
| 182:20 184:4 | 82:8,10 83:23 | 135:8,12 136:6 | 183:18 184:5 |
| 199:17 207:10 | 84:23 85:4,17 | 136:10,15,23 | 185:6,17,20,24 |
| **kitchen** 171:10 | 86:14,15,19 | 137:4,5,6 | 186:4,12 187:1 |
| **knew** 47:6,12 | 87:20 89:12,15 | 138:5 139:4,15 | 187:4,11,16,20 |
| 56:6,13 | 90:1,21 91:17 | 139:16 140:2 | 187:24 188:9 |
| **know** 9:3,8,13 | 91:24 92:3,18 | 141:3,21 142:6 | 188:12,17,20 |
| 16:6,13 19:24 | 93:13,18,23 | 142:6,8,12,24 | 188:23 189:2,8 |
| 21:22 22:9,11 | 94:2,6,20 95:2 | 143:6 147:22 | 195:14 196:2 |
| 23:4,15 24:23 | 95:3 96:10,14 | 150:14,21 | 196:15 197:3,6 |
| 25:20,24 31:16 | 96:18 101:21 | 151:1 152:3,12 | 198:11,16,19 |
| 31:19 34:2,4 | 102:22 103:19 | 153:6,24 | 200:3,8,16,18 |
| 34:11 36:9 | 104:12,17,18 | 154:15,20 | 200:19,20,23 |
| 37:7,12,18 | 104:23 105:4,5 | 155:22 156:14 | 200:24 201:2,3 |
| 38:1,2,6 39:1,5 | 105:8,22 106:2 | 157:4 158:10 | 201:7,8,11,12 |
| 40:17 43:6,22 | 106:2,3,24 | 158:15 159:16 | 201:15,16,19 |
| 44:5 45:21,22 | 107:2,5,8,12,20 | 160:5,8,11 | 201:20,23,24 |
| 46:13 47:7,10 | 108:9,9,14,22 | 161:19 163:11 | 202:3,4,9,15,18 |
| 47:20 48:2,10 | 108:23 109:2,3 | 164:16 165:7 | 202:19,19,23 |
| 49:24 50:4 | 109:6,7,10,11 | 165:12 166:12 | 202:24 203:8 |
| 51:8 52:1,24 | 109:14,21 | 166:19,24 | 203:16,19,22 |

204:3,4,8,12,16 204:17,19,20 204:23,24 205:3,4,7,8,11 205:18,24 206:5,9,14,18 206:21,22 207:1,2,5,14,16 207:22,24 208:1,6,9,10,13 208:16,19,21 209:1,10,20,21 209:24 210:1,4 210:11,12,14 210:15,18,19 210:22,23 211:2,6

**knowledge** 19:13 25:23 28:16 30:22 50:12,13,18,21 54:18 56:9,10 64:20 80:23 82:3 93:9,17 96:8,12 115:1 121:20 122:19 133:1 135:8,16 139:1 144:14 162:5 167:14 169:6 173:17 193:18 196:13 196:23 198:3 198:13

**kofal** 66:12

**kraft** 1:3 5:16 13:12 214:4 215:1 216:1

**kristen** 105:3 122:11 123:8

**krister** 68:2,10

**kristina** 159:15 159:18

**l**

**l** 66:12,13 83:4 84:19,19 105:3 107:12 108:2 112:20 113:11 113:11 122:16 122:20 146:8 155:7,8,8,8,8 155:19 177:6,6 181:21 186:3 186:17,17

**l.k.** 1:4

**lab** 171:5

**labor** 187:8,9

**lacks** 56:2

**langner** 143:21

**laptop** 10:10,14

**large** 96:5

**launched** 172:1

**lauri** 143:21

**lavelle** 1:6

**law** 3:13 16:13 95:23 167:20 197:8,13

**lawsuit** 13:13 13:17,24

**lawsuits** 31:11

**lawyerly** 163:20

**lead** 108:6

**leader** 19:3 20:6,10,11 64:16 151:19 151:20 176:12

**leaders** 123:11 123:12

**leadership** 18:19 19:5,19 20:2,3,12,16 35:4,8 41:1,4 73:7 93:22 124:13 145:9 150:15,18,22 201:14 207:15 210:21

**leadershipdir...** 112:1

**leadershipma...** 111:22

**leadershipph...** 112:4

**leadershipsu...** 111:19

**leading** 63:17

**learn** 33:19,23

**learned** 37:21 48:2 55:22 56:6,10,16 92:16 179:19

**leave** 22:9 48:5 93:11

**leaving** 145:6

**left** 48:7,11 72:2

**legal** 2:22 8:7 18:14 26:12,14 31:9 54:20 63:4,5,8 97:15 97:15 103:3 127:13,19 128:6 129:23 130:9 137:13 137:20 138:14 190:18 214:23

**leipfinger** 3:20 5:21

**lesser** 121:17

**letter** 66:13 84:18 85:5 111:4 146:6,24 148:10 155:7 159:18 187:8 187:12

**liability** 198:17

**lieu** 6:20

**likely** 31:22 42:17 110:3 154:24 163:11 177:24 179:13 193:23 200:5

**likewise** 90:3

**limit** 171:2

**limitation** 29:7 73:20 74:9 139:9

**[limitations - m]**

**limitations** 29:6 54:12 81:16 84:13 87:9 99:16 100:13 132:10 133:13 137:16 150:1,7 165:17 166:1 173:2 191:4,20 192:8 192:18 193:2 193:13 194:11 194:21

**limited** 13:8 72:21

**lindi** 122:19 123:4 143:20 149:5

**lindsay** 168:18

**line** 101:2 215:4,7,10,13 215:16,19

**lines** 100:24 116:8

**link** 97:23

**list** 32:4,6 38:14 39:7 48:8 62:21 63:12 81:19,22 86:6 104:3,4,9 106:20 115:21 138:19 159:9 174:18 184:12 184:15,20 194:1

**listed** 29:14 46:5,11 65:4 68:4 82:12 94:16 106:7 108:5 114:9 121:10 149:3 151:24 155:8 158:9 159:6 176:7,18 177:7 180:21 186:2 192:21 193:5 208:2

**lists** 143:18 146:6 184:23 186:10 193:16 193:19,22

**listserv** 4:16 102:18,23 103:12 104:5 104:11,19,24 105:6

**literature** 169:24

**litigation** 13:12 128:2 172:14 179:24 197:1 200:4 202:13 203:20

**little** 71:9 106:10,17 142:13 172:1 173:19

**livingston** 3:21 97:24

**llc** 1:16,17 3:2 39:18 103:3

**llc's** 167:23

**load** 96:7

**loaded** 103:23

**loading** 97:20 103:21

**loads** 98:12

**location** 2:4

**log** 4:15 14:17 14:20 37:6,20 49:8 52:19,19 65:19 72:14 75:1 94:13 95:9,21 99:4,8 99:12 100:4,9 100:17,21 101:1,13 103:6 110:6 152:13 152:15 178:1,3

**logistics** 8:24

**long** 44:1 48:8 49:17 52:16 86:19 114:15 119:24 120:2,8 162:12

**longer** 151:22

**look** 17:17 32:8 57:16 67:4 90:24 103:7 106:19 109:20 182:7

**looked** 33:21 98:20

**looking** 60:1 89:18 90:3,20 96:15 100:20 101:15 109:22 110:5 121:1 122:15 170:13 183:1

**looks** 67:1 89:20 90:4 122:16 124:20 155:13

**loose** 80:11

**loosely** 173:19

**loss** 128:9

**lot** 21:2 23:22 25:8 31:18 37:12 40:2 42:3,18,21 46:5,9 49:9 51:8 78:11 90:21 100:24 128:3 161:5 169:21 170:1 179:1 198:2

**loy** 64:21,21 101:4

**luck** 98:4

**lunch** 162:7,17

**lundberg** 186:2

**luttio** 105:3 122:11 123:9

**m**

**m** 4:11 7:22 57:5 64:21 68:3 94:22

**[m - matter]**

108:2 112:20
112:20 113:11
114:1 167:22
168:19 169:8
180:21
**m.b.** 1:8
**maari** 64:21,21
101:4
**machine**
213:10
**mackenzie**
95:22
**made** 141:1
172:19 179:3
181:11,15
197:20 216:5
**main** 70:14
122:9
**maintain** 26:2
177:16 193:16
193:19,22
**maintained**
21:11 149:16
**maintenance**
124:5
**make** 9:4 35:14
36:8 41:18
42:5,10 62:8
74:3 75:22
76:2,7,17,22
82:18 131:17
137:7 150:5
161:18 163:21
172:20,23
181:8 199:17

**makes** 124:22
185:23
**malecha** 108:1
108:8,11
**managed** 92:11
**management**
17:23 18:3
32:14 81:4
82:24 101:24
119:10,23
121:22,23
122:2,4,9
123:24 124:11
124:14,24
125:2,23 126:3
126:21,23
127:3,5,18,23
128:1,8,14,21
129:2,6,10,13
129:20 130:4
130:13,19
131:2,10,18,20
131:24 132:3
132:14,19,22
133:2,7,17
134:2,17,21
135:5,9,14,22
136:3,7,11
137:1,12,19
138:3,8,13,16
138:24 139:2,5
139:12,18
141:5,7 142:3
142:9 143:7,15
144:16,20

145:5,8,12,14
145:18,23
146:9,15,20
147:3,6,14
148:12,20
149:9,12 150:4
150:11,13
151:3,8,17,18
152:17 153:13
154:7 186:12
186:13 203:4,8
204:1,5
**management's**
203:13
**manager** 82:13
82:22 86:9
96:18 180:10
185:7,18,20
186:11 187:9
187:10
**manner** 6:24
82:19
**manney** 159:17
**mansfield** 20:8
**manual** 78:1,8
84:2
**manually** 78:8
97:23
**manufacturers**
1:18 28:18
29:3 186:7
**march** 213:19
214:3
**maria** 159:16

**mark** 56:18
**marked** 11:22
56:22 57:10
95:11 96:1
103:14
**market** 2:23
18:2 20:9
32:12 33:2,3,7
39:13,14,20,20
40:1,3,5,6,7,7
70:13 91:22
103:3 145:20
148:14,15,16
148:17 159:23
186:21 199:21
**marketing**
55:17,18 65:4
65:9 181:21
**markets** 39:16
**mary** 3:21
143:21
**mary's** 106:23
168:20,24
186:23
**materials** 45:12
73:3 88:19
174:4
**matter** 5:16
8:18,20 21:24
38:12 48:24
59:15 62:9
63:20 68:13
124:3 155:1
176:10,13

**[matters - members]** Page 27

| | | | |
|---|---|---|---|
| **matters** 196:4 | **media** 5:14 | **meeting** 21:9 | 64:23 66:10 |
| **mattson** 68:3 | 71:17,22 | 21:11 34:9 | 69:5 77:14,16 |
| 68:10 | 118:18,23 | 41:8,9 44:2,12 | 90:15,19 91:1 |
| **mean** 13:4 14:1 | 162:14,20 | 44:15 51:10 | 91:3,6,8,9,14 |
| 18:7 22:20 | **medical** 54:8 | 56:7 72:7,8,15 | 100:21 101:2,3 |
| 24:23 26:9,10 | 61:8,11 83:10 | 72:19,22 93:6 | 101:9 116:11 |
| 28:1 39:14,22 | 84:4 90:18 | 134:18 193:23 | 116:15,18 |
| 49:8 56:13 | 94:5 106:23 | 196:18 197:15 | 122:9,20 |
| 57:24 58:5,8 | 108:17 124:15 | 200:6 202:16 | 126:10,13 |
| 60:23 61:8,15 | 126:8 158:3,5 | 203:9,17 | 138:1 146:12 |
| 62:1 70:2 74:7 | 159:7,10,19,20 | **meetings** 27:18 | 146:14 147:4 |
| 76:12 85:21 | 159:23,24 | 42:16,22,23 | 148:1,5 157:21 |
| 86:2 88:12 | 164:17 168:15 | 43:1,5,10,12,14 | 158:2,11 |
| 91:20 118:1 | 168:20 186:18 | 44:17 45:2,6 | 175:18 176:7 |
| 123:16 125:21 | 186:19,23 | 51:1,7 69:2 | 185:3 186:16 |
| 127:5 128:4 | 189:21 201:17 | 72:10 82:18 | 191:9 193:6 |
| 133:20 140:9 | **medicated** | 88:4,8,17 | 200:21 201:1,4 |
| 141:9 144:19 | 37:14 | 134:18 135:23 | 202:21 206:23 |
| 151:20 152:12 | **medication** | 146:5 159:1 | 208:2,7,11 |
| 153:3 156:23 | 32:12 33:4,7 | 173:24 174:2 | 210:16 |
| 161:6,9 163:17 | 39:13 40:19 | 188:6,9,13,15 | **members** 18:19 |
| 164:12 166:16 | 92:11 101:24 | 188:18,21 | 21:6 22:6,14 |
| 178:18 179:19 | 116:20 151:4 | 197:24 198:1 | 23:1,2,12 |
| 182:18 183:4 | **medications** | **megan** 82:5 | 24:19 25:4,9 |
| 190:7 193:23 | 27:1 36:6 38:9 | 143:22 | 29:9 30:13 |
| 195:5 208:17 | 38:14 58:6,12 | **melanie** 83:16 | 40:14 44:17 |
| 209:7 | 59:22 60:2,7 | **melissa** 3:2,5 | 45:7,14 46:2,9 |
| **meaning** 75:16 | 60:11 61:4 | 6:9 7:17 | 46:10,17,19,21 |
| 140:3 | 77:24 92:10 | 159:15 | 47:3,15 48:10 |
| **means** 76:13 | 170:23 171:3 | **member** 20:16 | 48:20 49:19 |
| 98:9 183:19 | 186:12,13 | 21:20 29:14 | 50:9,14,19 |
| 186:5 | **medicine** | 39:3 44:20,24 | 55:1 59:4,5 |
| **meant** 61:7 | 157:10,11 | 47:13,19,22 | 62:13,22,23 |
| 163:9 171:19 | **meet** 7:18 | 48:9,15 51:10 | 67:9 73:1 |
| | 43:16 204:21 | 51:17 56:12 | 81:19,21,23 |

**[members - n]**

82:1,4 86:7,21
89:7,13 90:10
90:14 93:7,10
93:14 96:16
101:6 104:10
104:18,23
115:5 116:23
117:3,11 126:3
128:21 129:5
129:13 135:1
136:12 137:12
138:20,23
144:1 151:2,7
154:21 155:6
155:23,24
156:4,10
166:19 167:10
167:12 169:3
172:4 174:4,16
174:19 175:3
175:13 184:12
184:15,24
193:20 195:16
195:18,20
197:19 198:15
203:24 205:20
209:18 210:2
**membership**
18:11 23:7
24:21 41:22
50:10 145:4
154:18 174:12
174:24 175:4
199:14

**memories** 34:4
**memory** 11:13
15:19 32:5,24
34:23
**mention** 84:1
141:6,15
149:15,20
156:22 160:15
184:7
**mentioned**
23:16 32:17
72:7 78:4
109:19 119:2
140:24 171:22
197:23
**mentions**
142:14 177:12
**mertz** 167:22
**message** 11:1
135:11,15,19
**messages** 10:6
88:22
**messaging**
141:2
**met** 7:15 37:24
73:9 88:15
208:18
**michael** 62:23
159:11
**mid** 2:23
**midatlantic**
214:15
**midst** 178:24
**midwife** 167:23

**mike** 159:12
**mind** 32:19
41:10 48:14
52:10 56:17
60:16 61:18
125:16
**minnesota** 2:5
39:19 113:13
113:15 140:4
197:7,13
**minor** 1:6,8,11
**minors** 1:4,5,7
**minute** 71:9
**minutes** 21:9
21:11,12 34:9
118:11,12
188:21 193:23
**minvalleyepic**
113:11
**misdemeanor**
197:10,15,21
198:9,16
**mispronounced**
113:6
**mmc** 112:24
**modich** 2:4 4:3
4:11 5:15 7:5,7
7:15,21 29:14
57:6 119:2
130:10 211:17
214:5 215:2,24
216:2,4,12
**module** 134:5,6
134:6,8 142:18

**modules** 134:4
134:9
**moen** 159:15
**moines** 3:9
**mollerus**
159:13
**moment** 35:13
**monitoring**
164:6,10,13,14
164:15 170:14
171:7,19,20
177:20
**months** 44:6
**moore** 151:16
**morning** 5:2
6:9 7:15
**morris** 67:22
**mouse** 102:13
**mouthful** 76:15
**move** 72:4
76:16
**mri** 108:5
109:11
**multiple** 72:16
101:9 116:4
117:14 208:15
**mvhc.org**
113:12

---

**n**

**n** 4:1 7:21
63:13 66:5
68:3 82:6,6,6,6
85:5 94:16,22
107:7,17
112:20 113:11

**[n - nutrition]**

122:20,20,20
147:1,1 148:8
157:19 158:13
168:19 176:5,5
176:6,18 177:6
177:6 180:9,9
186:2,3,10,10
186:11,17,17
**name** 5:21 7:16
7:20 18:21
39:12,14 40:10
40:15 47:16,20
62:8 63:12
66:13 78:6
80:10 95:24
98:22 114:5
126:24 142:20
142:23 146:8
153:4,5 157:8
164:22 173:6
173:14,16
178:19 183:19
**named** 89:8,11
106:21
**names** 31:24
40:17 41:10
49:9 50:3
105:15 106:13
106:19
**nature** 18:14
19:20 21:5,10
31:12 38:7
47:21 49:3
53:6,18 61:20
62:20 68:9

82:23 85:10
123:19 135:4
145:7 161:16
164:9 178:17
183:2 194:2
**navigate**
106:18
**nearing** 199:10
**necessarily**
20:24 87:19,21
115:18 140:19
161:6 171:2
183:21 190:11
200:18
**necessary**
20:13 43:23
52:4 68:12
97:4 129:17
130:23 132:17
147:17 155:2
176:11 216:6
**need** 9:13,23
10:1 33:1
35:19 43:23
61:2,5 62:7,19
67:15 69:19
97:1 99:5
154:16 162:12
181:10
**needed** 43:8
44:23 49:1
59:6,8,18
68:14 69:19
82:9 83:11

**needs** 19:14
78:10 80:18
82:20 164:9
**negative**
139:23 140:6
**neither** 213:15
**nelson** 159:13
**never** 22:8
28:11 80:7
136:16
**new** 3:4,4 148:5
**nice** 7:18
**nicholas** 106:22
107:2
**nicole** 101:4
**nods** 9:7
**nomenclature**
153:5
**non** 54:16
74:20 76:12,14
85:8 144:12
190:5
**nonverbal** 10:7
**normal** 118:4
**north** 1:1 2:1
3:15 5:19
39:19
**notary** 2:7
213:3,24
216:13,19
**note** 5:5 40:11
60:19 81:23
169:12 214:10
**noted** 216:7

**notes** 10:6
**notice** 4:9
11:18 12:9,10
12:12 213:6
**notification**
172:8
**notified** 46:20
47:4 51:5
172:5
**np** 3:14 159:19
**nsn.gov.** 113:8
**number** 4:8
5:19 57:5,8
72:22 88:17
95:8,23 98:23
105:17 109:23
131:21 203:5
**numbered**
102:12
**nurse** 61:9
85:13 117:18
118:1 168:4,7
168:19 180:16
190:13
**nurse's** 190:23
190:23
**nurses** 78:8
84:3,7 85:18
94:5,8,11
149:6 202:4
**nursing** 23:24
**nutrition** 109:3
109:7

**[o - ordered]**

| o | | | |
|---|---|---|---|
| **o** 7:22 66:13 68:3 85:5 94:16 105:3 107:7,12,17,17 113:7,7 114:1 122:20,20 155:8 157:19 168:19 169:8 176:18 180:9 180:21 186:10 | **obligation** 49:20 51:16 129:10 156:6 | 71:7 76:10,16 81:10 83:16 96:5 98:8 103:4,22,24 105:14 109:22 116:9 118:14 121:1,22 123:6 124:23 137:22 152:21 162:10 163:19,24 171:12 197:7 198:21 211:7 211:21 212:2 | 117:7,10,19 202:8,17,21 |
| | **obligations** 24:20 25:5 93:4 115:10 136:20 | | **ollie** 105:1 |
| | **obtain** 163:7,10 | | **once** 8:17 43:17 43:17,18 67:17 |
| | **obtained** 73:14 | | **ones** 17:24 134:7 |
| | **obviously** 100:24 | | **ongoing** 125:6 178:13 |
| **o.k.** 1:4 | | | **open** 10:13 11:2 12:4 45:2 45:6 89:1 96:4 135:23 |
| **oath** 6:1,20,21 8:10 | **offer** 27:9 36:11 146:15 147:5 155:20 176:14 186:8 187:5 | **olive** 77:11,14 77:16,19,20 78:5,5,6,13,14 78:20,22 79:3 79:6,16,20,23 80:9,14,20,24 81:3,13 82:1,6 83:5,11,18,21 84:7 85:1,12 85:16 86:7,9 86:13,17,19,22 88:3,7,18,21,24 89:2,7,13,20 90:11,23 91:4 91:17 92:3,6,8 92:17,22,23 93:1,7,11,14,21 93:24 94:3,3,8 94:18 96:13,16 96:20 97:1,13 116:11,15,18 116:23 117:4,4 | **opened** 57:12 |
| **object** 36:17 54:10 55:24 75:12 76:19 81:14 87:6 99:14 100:11 129:22 130:7 132:7 137:15 149:23 154:8 165:15 190:17 192:6 | | | **operates** 188:15 |
| | **offered** 59:15 123:24 176:21 180:10,14 201:5 210:2 | | **operating** 75:16 124:17 146:7,21 |
| | **office** 171:14 | | **operational** 122:13 |
| | **officer** 63:4,8 68:1 90:19 138:14 146:8 146:22 155:9 155:11 | | **operations** 108:16,21,24 123:7,8,11,15 123:23 124:5 124:10 146:12 146:14 151:24 180:9 186:11 |
| **objection** 7:1 29:22 30:4 73:17,18 74:8 84:11 139:7 150:6 165:24 191:2,19 192:16 193:9 194:20 | **official** 213:18 | | |
| | **oftentimes** 67:14 183:22 | | **opinions** 127:16 |
| | **oh** 43:2 46:4 60:10 90:19 105:1 165:9 181:17 | | **opposed** 190:5 |
| | | | **order** 4:13 57:7 |
| **objections** 6:23 75:10,23 76:7 76:9 | **okay** 10:10 57:13,17 61:14 | | **ordered** 29:6 54:13 73:21 74:10 81:16 |

**[ordered - paralegal]**

84:13 87:9
100:13 132:10
133:14 137:16
139:9 150:1,8
165:17 173:2
191:4,20 192:9
192:18 193:3
193:13 194:11
194:21
**ordinary**   29:20
70:20,22 71:2
71:4 74:22
76:1,11
**org**   111:7
**organization**
4:12 16:7,9,9
16:11,12,14,21
17:2,7,14
22:10 29:9
47:13 48:7
56:15 57:6
58:3,24 59:13
60:9 123:13
124:7 145:7
151:22 183:23
**organizational**
193:24
**organizations**
15:23 41:13
195:17,21
**outcome**   6:4
139:23 141:19
213:16
**outpatient**   85:9
179:1 186:8,9

**outside**   15:10
28:21 29:4
30:20,24 34:17
37:22 38:15
39:9 40:1
48:21 51:7
52:22 53:2,21
54:11 56:11
58:23 63:22
64:14 69:6
70:7 73:19
75:6 77:7 79:6
81:15 84:12
85:19 87:8
89:2 93:15
100:13 116:20
117:1 118:5
129:15 132:9
132:16,24
133:4,13
150:13 167:18
173:1 174:9,21
184:21 185:1
189:6,10 191:3
191:10,19
192:8,18 193:2
193:10,13
201:10 203:1
204:6 205:10
206:12 207:4
208:23 209:23
210:24
**overall**   90:1
92:13 124:12
125:1 146:16

165:3
**overlap**   157:15
157:17
**oversaw**   81:4
**oversee**   57:22
70:11 81:13
88:14 171:17
**overseeing**
123:17 146:5
152:24 164:6
**oversight**   82:17
92:13 178:13
182:24
**own**   60:10
102:10 106:16
121:15
**owner**   195:23
**owners**   195:11
195:19

**p**

**p**   82:6 94:16
107:7 113:11
155:7,8 187:12
**p.m.**   162:17
212:8
**p.o.**   3:15
**page**   4:3,8
90:20 97:22
121:1 122:1
156:16 164:1
168:18 215:4,7
215:10,13,16
215:19
**pages**   128:19

**paragraph**
57:19,20 59:3
60:19 61:21
62:21 66:13
67:8 78:18
81:7,9,19,23
84:1,18 86:6
86:21 87:2,3
89:18,19 94:7
96:15 97:10
121:4,5,7
125:17,19,20
128:20,20
131:1,23
139:17 141:6
141:14,15
142:14 144:15
146:6 149:15
149:20 153:1
155:7 159:6
160:15 163:2
164:2 166:7
167:10,13,16
169:12 170:2
172:18 177:12
177:15 181:24
184:2,12
185:15 186:1
196:3,9,10
**paragraphs**
82:2 89:9,12
90:4 92:21
128:24 129:5,9
**paralegal**   3:21

**paralegals**
  128:5
**parcel** 179:5
**parent** 1:3,5,6
  1:7,8,11 12:22
  39:17
**parents** 1:9
**part** 27:21
  30:15 31:3
  84:7 85:15
  86:3 93:5
  105:24 117:6
  130:14,20
  135:24 143:8
  143:11 164:17
  166:8 179:2,5
  183:23 186:20
  191:9 192:23
  193:8 194:7
**participants**
  5:8
**participate**
  28:8 147:19
**participated**
  18:2 28:6
**participating**
  6:15 23:14
  73:2
**particular**
  136:13 137:24
  140:17 181:12
**parties** 5:12
  6:22 53:5
  93:15 211:5

**partner** 183:23
**partnering**
  119:16 120:22
  121:9 182:15
  183:18 185:4,8
  185:13 210:6
**partners** 104:5
**party** 6:2
  213:15
**password**
  72:21 134:12
**past** 8:13 14:14
  34:10 175:9
**patience** 9:2
**patient** 17:22
  31:11 32:13
  36:7 54:8
  65:24 66:22
  67:4 73:24
  74:5 76:24
  78:3 81:5,12
  84:3 85:15,18
  86:24 87:3,13
  90:7 94:9
  97:16 116:16
  119:10,22
  121:21 125:21
  125:22,24
  126:5,10 127:1
  127:3 128:16
  129:20 131:5,8
  131:9,15,16,21
  140:10 141:4
  141:21 142:2,9
  142:11 143:2

  146:15,17
  147:1,7,12
  148:10,24
  149:4 151:16
  154:6 155:17
  156:23 157:6
  163:12 164:14
  164:15 165:4
  169:14 170:16
  182:9 189:17
  190:14,24
  203:3,24 204:4
**patientaccou...**
  111:10
**patients** 16:24
  20:1 26:17,20
  26:22 27:9
  35:23 36:2
  37:13 38:21
  39:2,7 55:5
  58:17 61:1,3,5
  67:2 92:11
  116:12 117:11
  117:15 124:15
  125:7,11 126:2
  126:4,8 127:8
  130:4,14,18,20
  132:2 133:9
  141:8,16
  142:22 149:6,9
  149:13 152:5
  158:5,6 159:7
  159:10,17
  163:5,14 164:7
  169:23 182:3

  183:9 187:18
  189:23 190:11
  201:22
**pattern** 184:8,9
**patterns** 183:2
  184:8 189:6
**paul** 86:11
**pc** 3:7
**pccc** 112:13
**pcccleads**
  112:11
**pederson** 107:6
**pediatrics**
  157:10
**peer** 14:5,13
  15:23 16:2,6,9
  16:10,12,15,16
  16:18 17:1,2
  17:11,13,14,15
  17:19 19:4,14
  20:16,22 21:7
  21:12 22:19,24
  22:24 23:2
  24:21 25:11,14
  25:16 29:8,15
  29:16,18,19
  30:9,15,20,24
  31:4,6,16,19
  32:10 35:18
  36:18 38:16,18
  39:9,22,23
  41:13,20 42:6
  42:8,10 49:4
  49:12 50:16
  51:16,20,21,22

54:16 56:11
58:24 60:3,5
60:14,18 64:3
64:4,6,18
68:18,24 69:14
70:5,7 74:20
74:21 75:7,8
75:16 76:3,12
76:14,14 84:14
85:20 86:3
87:10,15,23,23
88:1 99:16
100:21 101:6
104:15,16,20
105:7,24 106:3
107:22 108:13
108:24 109:4,5
110:1,3,6
115:2,7,15,18
116:20 117:1
117:19,21
125:2 127:19
129:14,21
130:4,14,21
132:9 135:10
135:18 136:19
136:21 143:8
143:11 144:12
149:1 150:16
150:19,23
151:5,10 152:7
156:12 157:16
166:4,23 169:4
173:3 175:14
187:5 189:11

189:15,20,22
190:4,5,13,15
190:19,24
191:8,9,10,16
191:21 192:14
192:23 193:6,8
194:5,7,10,16
195:16,20,24
196:1,14,18,22
197:11,16,19
197:21 198:9
198:15
**pending** 9:12
**pennsylvania**
2:24
**people** 22:9
41:7 45:6 46:7
48:21 51:6
67:15 72:17,22
75:1 143:1,16
145:6 173:18
189:18 196:12
208:15
**percent** 101:19
152:19
**perfectly**
118:13
**perform** 62:11
71:3 80:24
115:2
**performance**
82:22
**performed** 26:6
30:24 70:18
109:8,12

117:18,20
153:22
**performing**
91:18
**permanent**
23:18
**permitted** 52:2
53:1 73:9
115:22
**person** 6:20
19:1 22:10
42:16 51:11
65:2,8 66:15
66:16 69:17
83:19 88:4,8
108:3 148:4
188:10 200:19
207:18 208:9
208:14,19
**personal** 8:17
34:2,3 56:9
**personally** 27:3
27:17 97:18
160:4
**persons** 86:11
**perspective**
20:9 51:4
**pertaining**
210:17
**pertains** 13:7
**pertinent** 60:21
60:23 61:7,17
**pfannenstein**
82:5

**pharmaceutical**
37:16 63:18
183:2 184:9
189:6
**pharmaceutic...**
194:19
**pharmacist**
176:12,12,16
**pharmacy** 1:17
28:9,13,15
32:16 63:15,17
63:17 64:16
65:1 119:15
120:21 121:8
139:3 169:9
176:6 182:15
182:24 183:3
184:3,4,7,8
185:3,8,12
195:4,6,7,8,12
195:16,20,24
210:5
**philadelphia**
2:24
**phone** 11:4
20:19 46:22
131:12,21
134:19 140:20
140:21 158:21
**phonetic** 105:2
**phrase** 13:21
80:3
**physical** 107:15
107:20

**[physically - prioritization]**                                    Page 34

physically  6:16
physician  19:2
  23:24 145:20
  157:20
physicians  94:4
pier  19:11 20:5
pitcher  159:16
place  5:12
  19:16 21:3
  22:11 25:2
  171:21 213:6
plaintiffs  1:14
  3:5,11 4:9 6:11
  7:18 11:18
  13:19 14:18
  57:4 76:2 95:8
  103:8
plan  118:15
planner  181:21
played  38:11
  180:18
please  5:5 6:6
  7:1,5,19 9:4
  14:10 27:12
  40:11 71:11
  100:1 110:18
  162:11 169:20
  208:5 211:8
pocrnich  94:16
point  15:16
  47:1 57:19
  152:15 178:23
pointing
  125:16

policies  19:10
  25:15 77:7,10
  136:4 161:23
  162:2 176:3
  189:3
policy  74:4
  161:2
polinsky
  108:17
population
  36:7 78:3 81:6
  81:12 155:9,10
  155:13,16,17
  163:13
populations
  90:7
position  36:22
possess  59:13
possible  40:21
  42:21 117:16
  127:1 128:11
  130:1 183:8
  195:13
post  188:15
potential  13:19
  13:23 23:21
  24:9,12 32:20
  33:14 34:22
  35:12 37:14
  47:8 57:23
  58:9,12,18
  64:1 70:16
  80:3,4 92:14
  114:21 122:7
  170:7 179:10

  179:18 190:8
  200:1 207:9,10
  209:5,6,12
potentially
  31:1 36:5,6
  37:14 58:11
  59:22 60:2,7
  61:4,4 77:24
  81:5,12 87:1,4
  87:14 89:22
  90:6 92:10
  117:15 171:4
  190:19 205:23
powell  155:8
  155:20
practice  8:22
  17:21 18:5
  32:22 36:10
  119:13 120:15
  136:19 156:16
  157:7,15 158:1
  158:8,14,18,23
  159:2 160:13
  161:11,18,20
  164:8 205:13
  205:16,20
  206:3,8,12
practices  157:9
practicing
  159:6
pre  207:9
predate  171:23
prefer  57:15
preparation
  33:18

prepare  14:21
  15:6 33:24
  34:7,14,17
  126:20 142:4
prepared  53:19
  142:7
preparing  15:2
present  3:19
  6:6,17
preserve  171:1
president  63:16
  83:17 158:9
  176:6
press  55:14
presumably
  72:12
presume  158:4
prevented
  134:15
preview  97:21
  116:5
previously  8:22
  14:19 113:17
  149:18
prices  186:9
primarily
  78:20 164:5
print  107:7,9
prior  24:9
  120:16 170:6
prioritization
  32:17 119:16
  120:22 121:8
  182:15 183:3
  183:11,16

**[prioritization - public]**

185:4,8,12
210:6
**prioritize**
182:24 183:24
**prioritizing**
183:7
**private** 8:22
**privilege** 4:15
14:5,13,17,20
31:15 36:24
37:6,20 49:8
52:19,19 65:19
72:14 75:1
94:13 95:9,21
99:4,8,12
100:4,9,17,21
101:1,13 103:6
110:6 129:21
152:13,15
178:1,3 194:10
**privileged** 25:2
31:2 36:18,19
51:3 74:19
84:14 87:11
104:21 132:8,9
166:3,4 173:4
190:20 191:22
198:4
**probably** 10:15
15:17 17:17
22:2 25:3
43:12 44:7
46:22 65:22
66:3 69:16
98:20 124:8

138:10 147:21
158:24 195:6
**problem** 161:7
**problems** 198:6
**procedures**
25:16 162:3
**proceed** 71:23
118:24 162:21
199:7 211:15
**proceeds** 184:1
**process** 20:21
21:15,18 22:12
22:21 24:15,18
36:10 39:9
76:3 82:13,13
82:16,21 87:22
115:12 140:18
144:10 156:8
172:7,8
**processes**
164:18 168:16
**produced**
14:18
**product** 31:2
45:20
**production**
107:7,9
**productivity**
187:9,10
**products** 37:16
**professionals**
22:3 144:18,22
**program** 78:4,7
78:11,20 82:12
186:4,7

**progress** 97:22
**project** 82:24
119:16 120:22
121:5,9 170:3
172:10,14,19
173:15,20,23
174:3,7,14,20
175:1,5,8,14,19
175:23 176:2,8
176:23 177:23
178:6 182:15
183:18 184:1
185:4,8,12
207:7,13,23
208:12,23
210:6
**projects** 82:17
182:24 183:1,7
183:24 184:3,4
184:4
**pronouncing**
168:8
**property** 8:19
**proprietary**
78:16
**protected**
36:23 64:3,6
72:21 134:12
189:20
**protections**
72:20 87:24
**provide** 8:7
18:14 26:14
27:14 31:8
36:12,14,16

63:6 82:17
125:5 130:20
148:12 161:2
179:4 181:5
185:21
**provided** 16:23
35:21,23 36:1
36:5 47:10
58:16 67:2,2
124:15 125:14
135:6 147:17
163:14 178:17
179:2 183:8
**provider** 131:6
131:13 140:11
145:20 149:10
158:5 159:10
160:20 190:3
**providers**
60:22,24 61:2
61:2,6,7,8 94:5
124:17 125:11
132:3 141:8
144:5 149:13
152:1 159:7,7
169:24 189:22
201:18
**providing** 31:8
170:14 178:12
178:16 182:23
**provision** 131:7
146:17
**public** 2:8
27:19 45:3
55:2,10 65:20

**[public - recall]**

138:4 202:2
213:4,24
216:19
**pull** 110:11
152:14
**pulled** 178:2
**purpose** 16:16
24:2 28:21
35:17 40:22
47:4,10,14
52:24 53:1
60:17 63:10
73:10 74:2
79:22 82:9,10
87:15 88:14
90:1 93:19
115:7 125:13
127:7 129:17
132:18 137:5,8
137:23 144:13
144:23 157:4
165:3 208:18
**purposes** 11:23
38:1,4 41:2
52:2 54:17
56:23 58:15
64:4 71:1 76:4
87:24 95:12
103:15 104:16
130:5,24
192:15 196:1
**pursuant** 4:9
4:12 7:8 11:19
12:10 29:12
57:7 137:5,8

213:5
**put** 19:15 69:2
**putting** 143:2

**q**

**quality** 5:6,7
16:23 20:1
32:18 35:21,22
36:1 58:16
66:15,16,17,18
66:20,22,24
67:1,3,6,7
73:15,15,24
74:4 76:24
87:5 119:12
120:5 134:5
152:22,24
153:11,12,18
153:23 154:2,6
154:18,22
155:21 156:5
156:11,19,20
158:9 163:1,3
163:6 204:9
205:5,9
**question** 9:12
26:11 27:11
51:14 54:2
56:1,3 59:1,11
69:11 76:18
100:2 117:24
127:22 130:7
131:16 137:21
140:10,11
142:3 150:2
161:4 162:24

165:19 191:13
191:24 193:1
208:4,20
209:13
**questions** 9:9
29:17,21 72:5
74:16,17 131:5
131:6 141:16
187:17
**quick** 162:23
**quite** 117:16
143:13 167:5
**quote** 57:22,23
59:5,6 60:21
60:22 61:16,16
61:22,24 62:15
62:16 94:7,9
131:3,4 139:19
139:20 141:7
141:15 177:16
177:17 182:1,2
184:13,14
196:4

**r**

**r** 7:21 62:24
63:13 64:21
67:22 68:3,3
83:4 84:18,19
84:19 94:16,22
107:7,12
108:16 113:7
114:1,1,1
122:20 146:8
146:24,24
148:8 167:22

168:3,4,19
176:18 180:9
180:21 186:2,3
186:10 213:1
215:3,3
**raise** 7:5
**raised** 24:1
**reaching** 148:5
**read** 211:19
214:9 216:5
**reading** 125:17
**really** 24:24
42:19 56:5
68:7 74:14
77:21 78:2
80:7 83:2 95:5
124:4 128:3
153:16 156:18
168:14 170:8
170:12,12
171:24 178:12
182:23 184:10
189:19 199:14
211:17
**reason** 201:3
214:11 215:6,9
215:12,15,18
215:21
**reasons** 85:19
87:22 117:8
**recall** 15:21
31:24 32:10
43:9 77:4
157:21 203:12

receipt  214:18
receive  25:9,14
  48:16 53:21
  138:19 141:19
  150:19,23
  198:14
received  25:21
  26:1 37:19
  105:1 110:7
receiving  69:12
  104:19 105:7
recess  71:19
  118:20 162:17
  199:4 211:12
recipient  4:16
  101:16 102:17
  102:19 103:9
  106:20
recipients
  106:7
recognize
  104:3,9 114:5
recollection
  11:13 34:12
  78:24 108:7
  114:12 167:4
recollections
  34:3 175:11
recommendat...
  102:7 161:16
recommendat...
  74:4 76:23
  77:4 149:21,22
  150:5,12,23
  161:18 172:19

172:20,22
reconvened
  43:24
record  5:3,13
  6:7 7:2 9:6
  10:1,8,21 71:8
  71:11 75:23
  83:10 94:10
  99:8,11,23
  100:4 118:15
  118:23 162:11
  162:14,20
  164:18 168:15
  199:7 213:13
recorded  2:6
  5:10 213:10
recording  5:6
  5:11
records  54:8
  84:4 139:3,6
reduce  125:7
  133:8
refer  10:23
  13:3 16:1
  17:21 18:1
  32:3 33:6
  39:16 40:18
  46:6 77:21
  90:12 94:12
  121:22 125:5
  125:20 127:6
  127:10,13
  152:13 155:16
  170:17 173:7,9
  182:3,5 185:11

reference  10:23
  50:3 55:12
  73:11 184:3
referenced
  23:20 40:13
  214:6
referencing
  196:9
referred  40:10
  80:10 126:24
  127:2 173:16
referring  16:2
  17:9 33:9 84:3
  102:15 105:18
  123:8 127:8
  141:17 177:18
  185:14
refers  103:6
  153:8
refresh  97:24
  108:7 114:12
refrigeration
  171:3
refrigerator
  170:17,22
  171:13
refunds  27:5
regard  70:15
regarding  4:11
  15:22 19:11
  27:24 28:10
  29:16 30:3,11
  30:21 50:10
  57:6 60:21
  61:16 87:1,4

89:19,20
  141:16 160:17
regiments
  160:21
region  2:23
regional  168:20
  168:24
registered
  168:19
regular  43:4,22
  75:19 125:10
  131:3,4 132:1
  132:4 140:1,8
regularly  88:15
rehab  108:17
rein  1:10
relate  165:14
  171:4,12
related  6:2 8:18
  13:18,19 16:3
  21:12 25:10,16
  30:23 31:4
  32:1,11 39:24
  55:10,17 60:6
  63:24 64:6
  70:18,19 71:4
  83:20 85:19,22
  90:5 91:18
  109:8,12
  115:10 116:19
  116:24 117:8
  121:18 123:20
  124:1 127:19
  147:9,14,15
  151:4,9 152:5

**[related - responsibilities]**                              Page 38

156:6 158:22
159:2 165:21
168:13 171:9
174:5 190:8
192:22 193:7
194:17 195:4
203:9,13 204:2
204:14,21
205:1,17,21
206:4,7,20,24
206:24 208:10
210:10,13,16
**relates**  26:7
31:11 32:20
79:2 101:18,22
106:4 109:24
126:20 131:7
135:19 168:14
170:20 184:10
**relating**  163:4
**relations**  17:22
27:20 32:13
55:2 119:10,22
121:21 125:21
125:22,24
126:11 127:3
131:15 138:4
141:4 146:15
147:1,7 148:11
149:1,4 151:16
154:7 189:17
203:3 204:1,5
**relationships**
21:22

**relative**  26:15
31:9,10 35:10
55:5 62:5
63:18 70:23
78:12 80:15
83:8 92:2,9
134:7 146:1
163:7,10,19
164:7 177:19
**relayed**  196:5
201:13,17,21
202:1
**relevant**  184:14
**reliability**
156:20
**remain**  93:11
**remained**  48:12
**remember**  35:5
40:24 41:6
42:24 43:6,7
44:4 45:13
46:7 50:2
52:15 53:11,14
56:14 65:7
76:18 80:13
81:2 88:5,20
88:23 97:12
101:10 104:2
114:5,6,7
119:4 138:22
148:2 150:17
151:15 161:22
162:1 175:10
175:11 189:23
200:9,12

**remote**  2:3
42:18,20,20,22
42:23 43:10
44:13 88:6,8
188:12,16
**remotely**  2:4
3:1 6:19,21 7:8
9:16 43:16
**remove**  78:11
**removed**  22:6
**repeat**  208:4
**rephrase**  100:1
194:3
**replaced**
151:21
**report**  73:6
93:21 140:4,15
140:17,20,22
**reported**  141:8
**reporter**  2:7
5:23 6:8,14 7:4
9:5 125:16
211:21 212:2
**reporting**  6:18
6:24 133:22
142:15 143:11
144:2,12
149:16,17
177:17,18,21
**reports**  52:12
52:14,22 53:8
125:10 131:3,4
132:1,4 140:8
140:14,24
150:16,19

**represent**
106:14
**representative**
12:15 63:5
**representing**
3:5,11,17 5:22
**request**  22:18
64:11
**requesting**  52:4
87:10
**requests**  173:3
**required**
216:13
**requires**  186:7
**resources**
123:20 166:13
183:11
**respect**  31:13
192:9,19
194:12
**respond**  152:4
**response**  7:3
24:11 26:12
27:20 35:11
57:22,24 58:4
58:18 65:11
70:11 79:21
92:13 122:6
142:4,7,10
**responsibilities**
8:5 18:11
48:17 55:17
60:6 75:6
116:19,24
129:1 139:13

146:19 151:3,9
156:13 165:22
174:13 177:3
185:18 187:14
195:3,10
200:21 202:20
203:23 208:11
**responsibility**
39:5 62:11
64:18 85:22
90:5
**responsible**
20:4 41:8 68:7
85:14 123:17
124:16 137:20
146:5 161:12
170:12 183:6
207:18
**restate**   27:11
110:18
**restricted**
92:23 134:10
**result**   12:11
18:11 31:20
58:3,9 117:19
136:13 152:1
152:17
**resulted**   51:9
178:4
**results**   132:5
132:15,20,23
133:3
**retired**   48:6
**retiring**   145:7

**retrying**   97:23
**return**   214:13
214:17
**revaccination**
27:9,14 36:11
58:11 78:9
179:3 189:10
190:14,15
193:7 202:5,6
**revaccinations**
179:4
**reveal**   198:17
**revenue**   83:17
86:8 94:22,23
95:3 96:18,21
**review**   4:11
14:5,13 15:6
15:16,23 16:3
16:7,8,9,11,12
16:16,17,18,21
16:21 17:1,2
17:11,13,14,15
17:20 19:4,11
19:14 20:5,17
20:23 21:7,12
22:19,24 23:2
24:21 25:11,14
25:17 29:8,15
29:16,18,19
30:9,16,21,24
31:4,6,16,19
32:10 34:6
35:10,18 36:8
36:19 38:16,18
39:9,22,23

41:13,21 42:6
42:8,10 49:4
49:12 50:16
51:16,20,21,23
54:7,16,19
55:2 56:11
57:6,22 58:24
60:3,6,14,18,20
64:3,4,7,19
68:18,24 69:14
70:5,7 74:20
74:22 75:7,8
75:17 76:3,13
76:14,15 79:1
79:14 81:13
84:14 85:20
86:3 87:10,15
87:23,24 88:1
92:13 94:9
99:17 100:21
101:6 104:15
104:16,20
105:7 106:1,3
107:22 108:13
108:24 109:4,5
110:1,3,6
115:2,7,15,18
116:20 117:1
117:19,21
125:3 126:19
127:19 129:14
129:21 130:5
130:15,21
132:9 135:11
135:18 136:20

136:21 137:13
139:3,6 143:8
143:12 144:12
146:1 149:1
150:16,19,23
151:5,10,24
152:8 156:12
157:16 166:4
166:23 169:4
171:17 173:3
175:7,15 182:1
187:6,17
189:11,15,20
189:22 190:4,5
190:13,16,19
191:1,8,10,11
191:17,22
192:15,23
193:6,8 194:6
194:7,10,16
195:16,20
196:1,1,14,18
196:22 197:9
197:11,15,16
197:19,21
198:10,15
214:7
**reviewed**   14:11
14:17,23 55:8
55:8
**reviewing**
54:24 125:8,12
137:20 142:2
**reviews**   139:19
141:7 160:16

**[reviews - s]**

163:4 169:13
**rich** 101:5
   159:14
**richard** 90:18
   105:2
**ridge** 3:8
**rieger** 159:14
**right** 7:5 10:14
   11:2 12:8
   23:19 32:10,19
   32:19 70:8
   74:1 89:23
   90:7 98:15
   107:17 203:6
**risk** 17:22
   32:13 119:10
   119:23 121:21
   121:23 122:1,4
   122:9 123:24
   124:23 125:2,7
   125:22 126:3
   126:21,23
   127:3,5,8,10,13
   127:14,18,20
   127:23 128:1,2
   128:6,8,9,14,15
   128:21 129:1,6
   129:10,13,19
   130:3,13,19
   131:2,10,15,18
   131:20,24
   132:3,14,19,22
   133:2,7,8,17
   134:2,6,17,21
   135:5,9,14,22

136:3,7,11
137:1,12,19
138:3,8,12,16
138:24 139:2,5
139:12,18
141:5,7 142:3
142:8 143:6,15
144:15,20
145:4,8,11,13
145:18,19,22
146:9,15,20
147:2,6,13
148:12,20
149:8,12 150:4
150:11,13
151:2,7,17,18
152:17 153:13
154:7 189:17
203:3,8,12
204:1,5
**ritter** 143:22
**rl6** 142:21
**rldatix** 142:21
**rn** 85:6 148:10
   151:16
**rns** 149:3
**road** 9:3
**robbins** 176:17
   177:2
**robert** 3:13
   6:12 214:1
**role** 18:4 22:11
   25:22 26:19
   28:3 38:11
   39:1,6 50:16

54:20 55:3
56:11 63:2,14
63:22 64:15,24
65:6 66:7,14
83:4,17,22
84:23 85:1,11
85:15 94:17,20
95:2 121:17
123:21 125:3
136:13 137:14
146:9,19 147:2
148:14,19,21
151:17 152:1
156:7 157:24
158:7,10,12,15
160:5,8 167:23
168:3,6,21,23
169:9 176:9,24
177:8 180:3,6
180:17 181:1
181:17,20
185:6 187:2
200:24 210:15
**roles** 48:17
   70:15 123:8
   145:17 202:20
   203:23,23
   206:7,22
   208:11 209:18
**rollin** 143:23
**rolls** 159:24
**romine** 168:18
**room** 6:17 9:16
   9:17,20 11:6
   171:13

**roseann** 186:10
**roster** 23:6,9
   138:23
**row** 99:22
   101:12,15
   102:9,14
   105:10,15,18
   109:18,22,24
   114:8
**rows** 99:5
**rstock** 3:16
   214:2
**rule** 4:10 11:19
   25:7,19 29:5
   29:12 149:24
**rules** 8:24
**rummel** 3:14
**rutherfordiu...**
   113:24
**ryan** 3:2 84:18
   159:17

**s**

**s** 4:6 62:24 65:3
   65:3 68:3,3
   82:6 83:4 85:5
   94:22 107:7,12
   107:12,17,17
   112:20 113:7
   122:16,20
   146:8,24 147:1
   168:4 169:8
   176:18 180:21
   181:21 186:10
   186:11,17
   215:3

**[s.b. - set]**                                                      Page 41

| | | | |
|---|---|---|---|
| **s.b.** 1:11 | **sbar** 102:4,5 | **see** 12:2 57:3 | **sense** 21:9 |
| **s.k.** 1:4 | **schedule** 43:4,8 | 61:1,6 90:23 | 153:17 |
| **safety** 66:22 | **schlaht** 122:16 | 90:24 98:14,21 | **sensitive** |
| 127:1 128:16 | 123:3 143:19 | 100:23,23 | 194:18 |
| 152:24 | **schlauderaff** | 101:15 102:14 | **sent** 95:21 99:4 |
| **sagwlaw.com** | 83:3 | 102:17,19 | 100:9 110:7 |
| 3:10 | **schneider** 1:4 | 105:15,18 | 132:23 133:3 |
| **sake** 125:15 | **science** 63:18 | 106:9,18 | 165:7 192:14 |
| **sakes** 185:11 | **scope** 28:21 | 109:20 114:10 | 200:10 201:9 |
| **sam** 159:12 | 29:5 30:5 | 122:1 143:19 | 202:24 214:14 |
| **sarah** 159:16 | 51:15,19 54:11 | 149:6,13 | **sentence** 58:1 |
| **sat** 26:8,18 34:2 | 58:23 73:20 | 151:23 158:4,6 | **sentences** 13:16 |
| **satisfaction** | 81:15 84:12 | 159:7 190:11 | **separate** 9:19 |
| 67:4 | 87:8 99:15 | **seeing** 61:3 | 118:6 |
| **satrom** 180:21 | 129:1 132:10 | **seeking** 31:9 | **serious** 198:5 |
| **satrom's** 181:1 | 133:13 137:16 | **seem** 54:23 | **serve** 40:6 50:6 |
| **save** 70:13 | 139:8 149:24 | **seen** 5:9 12:6 | 87:15 205:6 |
| **saved** 45:20,22 | 150:7 165:16 | 14:14,19 22:8 | **served** 82:8 |
| 57:15 72:9 | 166:1 173:2 | 34:9 48:1 | **service** 25:10 |
| 134:22 | 190:4 191:4,19 | 72:24 98:19 | 25:12,16 |
| **savvy** 43:3 | 192:8 193:2 | 103:24 165:4 | **servicereques...** |
| 143:4 | **scott** 3:2,21 | 175:9 | 110:23 |
| **saying** 35:8 | 6:10,12 | **sees** 149:9 | **services** 83:17 |
| 44:20 87:19 | **scoy** 159:11 | 159:10,17 | 94:17 97:15 |
| 197:5 | **screen** 5:10 | **selected** 147:8 | 106:23,24 |
| **sayler** 146:7,18 | 98:9,13,15 | 154:22 | 109:4,8 144:17 |
| **sayler's** 146:9 | 116:1 | **send** 192:13,22 | 144:21 166:17 |
| **says** 57:20 59:4 | **scroll** 98:10 | 193:6 | 179:1 180:22 |
| 61:22 78:19 | 99:6 106:20 | **senior** 65:4 | 180:23 181:5,9 |
| 81:3,20 94:7 | 109:18 116:7 | 86:9,11 94:22 | 182:2 189:10 |
| 97:21 102:18 | **scrolling** 102:8 | 94:23 96:18 | **set** 13:8,8 21:14 |
| 121:3 163:3 | 105:9 | 148:10 186:4 | 22:21 48:24 |
| 171:16 172:18 | **seal** 213:18 | 186:11,17 | 59:13 62:9 |
| 177:15 181:24 | **security** 73:4 | 187:5 | 63:6 68:13 |
| | | | 83:10 96:19 |

**[set - sources]**

97:4 123:23
146:13 147:5
148:11 155:2
155:19 158:16
166:1 176:22
180:8,13 181:4
185:21 187:4
201:5
**sets** 59:6,7,17
67:9 202:20
203:24 210:1
**setting** 156:21
156:21 178:14
186:9
**several** 29:15
113:21
**shakes** 9:7
**shannon** 66:4
158:12,19
**share** 51:21
52:21 69:15
92:15 98:9,13
115:23 116:1
129:14 132:15
132:20
**shared** 37:22
38:15 52:6
53:8 72:16
133:18 134:24
150:12
**sharing** 38:4
133:9
**sheet** 214:11
**sheila** 18:20
101:3

**shelby** 180:13
180:17
**shelli** 1:4
**sherry** 123:4
143:20 146:24
148:13
**shindler** 3:7
**short** 71:19
118:20 198:22
199:4 211:12
**shorthand**
213:10
**shortly** 33:13
34:21
**sic** 47:20 113:7
**side** 84:24
**sign** 50:10,15
98:23 211:20
214:12
**signature**
213:22
**signed** 214:20
**significance**
121:14
**significant**
140:7
**similar** 66:9
154:14,24
182:8
**similarity**
89:24 90:13
**similarly** 1:12
**simon** 180:14
180:17

**simonson**
159:15
**single** 173:7
**sit** 17:13
120:13 156:3,9
165:2,10
166:11,15
183:12
**site** 45:24
**sites** 178:16
**sits** 148:16
**sitting** 23:3
148:22
**situated** 1:13
22:4
**situation** 22:23
102:6
**six** 44:6
**skill** 48:24 59:6
59:7,13,17
62:9 63:6 67:9
68:12 83:10
96:19 97:4
123:23 146:13
147:5 148:11
155:2,19
158:16 176:22
180:8,13 181:4
185:21 187:4
201:5 202:20
203:24 210:1
**skills** 96:23
97:2
**slightly** 90:2

**slowed** 43:13
**smcd** 186:18
**smdc** 186:18,22
**software** 78:15
78:17 83:13
117:4 135:7
**sole** 64:18
**solely** 33:21
**solem** 143:22
**solutions** 2:22
214:23
**somebody** 39:4
40:14 44:22
46:14 49:1
**someone's**
171:13
**soon** 86:15
199:24
**sorry** 43:3
45:22 49:13,14
61:12 87:2
90:20 101:14
104:8 107:21
122:11 127:23
128:19 137:22
145:24 181:18
196:8
**sort** 53:3 83:1
89:5 133:18
**sound** 107:18
**sounds** 23:17
**source** 133:18
**sources** 54:2
169:18,21

**[span - stock]**

**span** 184:18
**speak** 15:9
  28:17 30:2,10
  30:19 63:11
  64:9 73:4
  130:14 157:18
  168:1,6,23
  176:15,24
  177:10 178:20
  183:5
**specialist**
  148:11
**specialists**
  149:4
**specific** 18:10
  23:21 24:2
  48:23 49:2
  50:16 54:1,6
  55:12 65:23
  73:11 77:4,9
  78:15 82:3
  83:10,23 95:2
  100:7 137:11
  158:10,16
  163:12,13
  175:11 194:1
  197:5 200:19
  207:17
**specifically**
  16:13 24:20
  25:12 26:19
  29:7 36:20
  41:17 53:15
  56:17 62:18
  65:14 68:14,22

  77:3 85:3
  94:20 96:23
  166:3 206:1
  207:16
**specificity**
  14:15 48:9
  49:18 55:7
  59:9
**specifics** 53:17
  139:16 167:6
  177:21
**specify** 13:9
  17:8 69:7
**specimens**
  171:5
**speculate** 22:22
  67:14
**spell** 7:19
  110:12 113:6
**spend** 15:1
**spinning** 98:6
**spreadsheet**
  95:17 98:15
  106:16 116:3
**spring** 34:24
  179:14,21
  200:2 209:7
**st** 106:23
  159:23 168:20
  168:24 186:23
**staff** 18:6,7
  22:3,4 66:10
  94:19 122:13
  123:10 146:11
  146:14

**staffed** 202:4
**stages** 81:21
**stamped** 95:16
  102:11
**stand** 17:24
  29:22 186:22
**standard**
  115:13 133:20
  136:18 175:16
**standardized**
  136:23 142:14
  144:1,11
  149:16,17
**standing** 17:19
  19:21 23:17,19
  24:7,8 119:3,7
  119:11,12,14
  119:15,17,18
  152:23 167:4
  170:11 188:4
  203:4 204:11
  205:14 206:17
  210:8 213:4
**stands** 182:20
**start** 99:21
  101:14 127:24
  143:14
**starting** 20:7
  164:2
**starts** 75:8
**state** 7:19
  14:15 16:13
  86:10 139:18
**stated** 62:18

**states** 1:1 2:1
  5:18 197:8,14
**station** 10:12
**statute** 75:17
  197:11,17
**statutory** 76:5
  76:6
**stay** 97:22
**stayed** 38:17
**steering** 166:9
  166:10,20,22
**stenographic...**
  2:6
**stephen** 159:13
**steps** 19:15
  20:15
**steve** 159:13
**stock** 3:13 6:12
  28:20 30:4
  36:17 37:1
  54:9 55:24
  58:21 71:12,15
  73:17 74:7
  75:21 77:1
  81:14 84:8,12
  87:6,16 98:2
  98:16 99:14
  100:11 105:11
  129:22 130:1,6
  132:7 133:11
  137:15 139:7
  149:23 150:6
  154:8 162:9
  165:15,24
  172:24 190:17

**[stock - sure]**

191:2,12,18
192:5,16,24
193:9 194:8,20
196:8 198:24
211:19,23
214:1
**stop** 116:1
**stopped** 75:17
**stops** 75:9
**storage** 18:3
32:12 33:2,4,7
33:8,9,12 34:7
34:19 35:1,16
35:24 36:16,23
37:3,10,22,23
38:8,20 39:13
40:3,9,19,20,23
41:3,12,20
42:15 43:5,15
43:19 44:1,5,9
44:16,17 45:1
45:5,7,11,14,15
45:19 46:2,10
46:19 47:3,12
47:15,22 48:4
48:11,15,20,22
49:6,14,19
50:9,14,19,23
51:7 52:7,11
52:21 53:7,12
53:20,21 54:3
54:7,15,19
55:1,9,13,16,20
57:21 59:4,18
59:23 60:20

62:14,22 63:3
63:7,10,14,22
65:10,16,21
66:1,14 67:11
67:20,23 68:11
68:17 69:5
70:11,19 72:3
72:8,9,23 73:6
73:13,23 74:3
76:22 77:6,7
89:19 90:10
91:1,16 92:5
92:12,16 96:9
99:9,13 100:18
101:24 102:1
116:20 151:4
170:19,23
171:5,9 194:18
199:22 200:7
200:10,13,14
200:21 201:1,9
201:10,13,17
201:21 202:1
**stored** 72:12,15
**straub** 168:4
**street** 2:23
**strictly** 148:22
**strikes** 163:20
**structure** 4:12
19:5 29:8,10
29:17 38:18
41:4 47:2
53:16 57:6
58:23 60:12
99:16 124:18

133:15 139:8
145:9 191:6
193:11 194:12
**stuff** 198:3
**sub** 32:15
**subcommittee**
122:17 123:24
126:14 147:14
151:9 152:7,10
152:18
**subgroup**
119:14 120:18
122:2,4,8,14,21
122:23,23
123:1 125:1
145:23 146:2
147:9 149:16
149:21 151:13
151:18 164:1,4
164:4,22
165:13,23
166:8 167:2,7
167:11,12,24
168:13,22
169:10,13,16
169:18 177:13
203:13,16,19
204:2 206:16
206:19,23
207:3
**subject** 13:24
21:24 38:12
48:24 59:15
62:9 63:20
68:13 124:3

155:1 176:10
176:13 198:16
**submitted**
131:17
**subscribed**
216:14
**subsidiaries**
12:22 145:3
**subsidiary**
159:21
**substance**
74:18,19
**suite** 2:23 3:9
**supervision**
213:11
**supervisor**
106:23 107:8
108:17
**supplement**
4:16 102:20
103:10
**supplemental**
4:14 14:20
37:6,20 52:19
65:19 72:14
94:13 95:9,20
152:13,14
178:1,2
**support** 144:24
145:1 147:13
147:18
**supports** 19:2
144:16,20
**sure** 9:1,4
14:11 26:9

27:13 32:8
35:14 36:8
39:15 41:15,18
42:5 45:17
46:1 48:6,23
52:9,13,18
53:23,24 55:11
63:19 73:8
76:17 82:18
83:8 90:13
94:12 104:9
110:19 114:8
114:18 121:24
122:18 130:1
137:10 161:15
163:21,23
172:17 196:7
199:17 208:6
**surgical** 168:20
**sutherland**
159:14
**suzanne** 67:19
105:2 122:12
122:24 123:9
151:23 152:4
180:3
**swear** 6:8
**sworn** 7:8
213:7 216:14
**system** 119:11
120:5 133:22
133:23 134:2
142:15,15,20
142:22 143:1,3
143:5,7,11

144:2,7,9,12
149:17,18
152:21 153:3,6
153:9,12,22
154:1,6,18,22
155:20 156:5
156:11 162:4
162:24 163:3
166:14 188:14
204:9 205:5,9
**systematic**
125:6
**systems** 169:9
170:14,19
171:7,19,20
176:19 177:3
177:20

**t**

**t** 4:6 62:24,24
67:22 68:3,3,3
82:6 85:5
105:3,3 107:17
113:7 114:1
122:16 148:8
167:22 168:4
176:6,6 180:9
180:21 186:17
213:1,1 215:3
215:3
**tahtinen**
143:21
**take** 5:11 9:11
19:15 20:16
25:2 71:9
74:13 103:7

118:8 138:17
198:21 211:7
**taken** 2:4 5:15
8:13,16,21
9:15 71:19
118:20 199:4
211:12 213:5
**talk** 33:2 34:13
34:16 53:2
56:20 67:8
79:5 131:1
162:11 163:24
164:21 174:23
175:3
**talked** 69:1
141:10 142:13
189:21
**talking** 13:22
41:19 42:9
72:3 124:24
142:16 163:21
**tasked** 24:4
148:4
**taylor** 167:22
**team** 20:12
108:6 178:9,11
179:8,24 180:5
180:6,11,15,19
181:2,6,13,22
181:24 182:12
209:3,19,22,23
210:3
**teams** 44:14
45:24 94:7,10
121:7 135:3,7

**technician** 3:21
**technologically**
43:3
**technologist**
108:6
**technologists**
109:12
**technology**
134:15 166:18
**telecare** 180:22
180:23 181:5
**teleconference**
3:1
**tell** 8:10 13:15
32:9 37:8 38:5
59:17,19 77:18
99:20 100:20
101:12,13,17
109:23 110:5
119:6 123:14
124:23 163:9
164:3 172:1
179:11 213:7
**tellinghuisen**
186:15
**temp** 58:11
**temperature**
13:20,21,23
14:1 23:21
24:10,12 26:13
26:22 27:2,6
27:10,15 31:21
32:20 33:14
34:22 35:12
37:15 38:10,15

**[temperature - time]**

38:22 39:2,8
47:9 57:23
58:10,19,20
64:1 70:12,16
80:3,4,8 85:23
92:14 114:21
114:24 116:13
118:5 122:7
124:1 170:7,8
170:13 171:7
171:18 177:20
179:10,18,20
190:8 194:18
200:1 203:13
204:14,22
205:2 207:9,10
209:5,7
**ten** 118:11
120:11
**term** 17:1
20:10 35:7
45:9 75:24
76:1,5,6 80:6
80:12 127:2
145:21 161:3
**terminated**
22:7,9
**terminating**
24:15
**terminology**
40:11 47:21
80:11
**terms** 17:6
47:20 56:14
130:16 163:14

173:12,19
176:22 183:21
185:21
**terri** 5:23
211:19
**test** 15:19
122:18
**testified** 7:9
**testify** 11:9
13:11 206:10
209:17
**testifying** 12:15
12:18
**testimony**
74:13 213:5,9
213:14 214:9
214:18 216:8
**text** 10:6
135:11,15,18
**thank** 11:8 14:4
15:19 16:6
42:13 66:7
71:24 84:16
118:10 123:6
199:8 211:16
211:16
**thell** 159:15,19
**theme** 49:23
**therapist**
107:16
**therapists**
107:21
**thereof** 213:16
**theresa** 2:7
213:23

**thing** 24:24
41:19 66:23
97:20 141:10
163:22
**things** 18:2,14
21:9 53:4,18
55:6 61:19
68:9 69:2,4
70:23 72:24
85:9 123:19
131:24 145:7
163:6 171:1
175:9 178:17
183:2 193:23
**think** 17:4,4,18
17:23 20:24
25:6,18 31:7
31:22 32:5,17
32:18 35:13
37:5 38:11,17
40:2,20 41:1
43:21,23 44:14
49:8 54:22
58:7 60:1,17
66:24 68:7
75:4,24 83:1
83:14,14 85:21
87:20,22
101:21 105:16
114:14 116:6
117:13 122:12
125:4 127:14
127:14 128:17
130:17 134:5
136:22 138:6

140:2 148:21
151:12 152:6
153:16 157:3
163:19 165:10
166:12 168:10
168:14 170:20
171:15 172:7
172:16 174:15
182:7 183:1
184:17 189:13
199:10
**thinking** 31:14
**third** 53:5
93:15 211:5
**thousands**
74:24 99:5
**three** 118:24
162:15
**tiahealth.org**
112:5
**tile** 8:3
**time** 5:4 6:5
9:11 15:1 44:8
59:8 63:16
67:11 80:17
88:10,16 98:1
114:16 120:8
138:21 140:3
145:5 162:7
171:21 179:9
179:14,17,19
184:13,14
211:18 213:6
214:19

**[timeframe - understand]**

**timeframe** 214:8
**timely** 82:19
**times** 67:12 116:4
**timing** 199:14
**timothy** 146:7 146:9,18
**title** 47:18,23 48:1 82:12 103:9 155:15
**titled** 145:17
**today** 8:10 9:18 9:21 10:1,8 11:10,13 12:11 12:16 13:3,11 13:22 15:13,19 16:1 42:3 53:17 96:8,12 121:23 173:21 188:2 199:19 211:18,18
**today's** 14:21 15:6
**todd** 107:6
**together** 9:17
**told** 47:20
**tony** 64:9 101:4
**tonya** 85:5,11 85:14
**tool** 42:24 44:13 117:4
**tools** 11:2
**tooltip** 112:16

**top** 98:21 106:20
**topics** 30:6
**total** 31:18
**touched** 35:13
**traci** 67:22
**track** 20:22 21:1,6
**tracy** 94:21
**transcribed** 213:11
**transcript** 9:6 35:15 125:15 214:6,20 216:5 216:8
**transcription** 213:12
**transition** 121:7 178:9,18 178:23 179:8 179:24 180:5 180:11,15,18 181:2,6,13,22 182:12 209:3 209:19,22 210:3
**transmitted** 142:10
**transparent** 74:15 75:14
**transpired** 196:17 197:14
**treat** 61:6 189:23

**treating** 190:3
**treatment** 16:23 125:14 153:18,19 160:20 163:5 164:7,20 190:10
**tricky** 106:10
**tried** 76:2 116:4
**trista** 86:8 96:17
**true** 213:13 216:8
**truly** 74:16
**truth** 8:10 213:8,8,9
**truthfully** 11:9
**try** 9:7 10:15 76:10 97:24 106:8 110:12
**trying** 44:13 74:8,20 75:7 75:15 96:4 114:6 191:7
**ttspps** 87:1,4 87:14 89:22
**twice** 8:17
**two** 41:9 71:22 118:18 124:22 154:13,16 184:18
**type** 36:15 42:7 123:14

**typed** 107:17
**types** 78:21
**typically** 156:8
**tyrell** 1:9

**u**

**u** 63:13 83:4 105:3 108:16 111:4 114:1,1 148:10 168:4 186:3,17
**uh** 91:2
**ultimate** 157:4 157:5 170:15
**ultimately** 35:7 35:21 36:9 49:9 51:24 55:4 58:13 91:20 124:16 125:12
**umbrella** 127:15
**unable** 116:5
**uncommon** 19:22 51:2
**under** 8:9 16:12 75:19 87:23 124:18 143:16 213:11
**understand** 8:9 9:9,23 10:5 12:14 13:5 14:1 16:3 29:23 33:8 36:4 53:15,16 75:13 76:20

127:21 169:20 185:14 191:8

**understanding** 13:16 16:8,10 50:6 70:9 93:2 114:17 129:12 136:15 155:4 168:12 183:6 198:12 209:11

**undertaken** 187:6

**unit** 5:14 71:17 71:22 118:18 118:23 162:14 162:20

**united** 1:1 2:1 5:18 173:10

**unrelated** 146:19 148:19

**update** 85:18 87:20 117:20

**updates** 78:2 78:12 84:2,6 92:2,9 97:17

**updating** 85:15 86:24 87:3,13 87:18,21

**urevenuecycl...** 111:6

**use** 13:21 17:1 17:6 35:7 40:15 44:14 45:9 73:13 75:24 80:2 114:23 117:4,7

134:1,8 135:6 143:5,7,16 144:1,7 173:18 184:9 186:12 186:13

**used** 17:5 39:16 40:13,18 42:24 44:13 54:16 77:7 78:19,23 80:7,12 114:20 142:21 145:21 159:22 173:11 184:15 214:20

**uses** 143:10,15

**using** 10:10,17 10:22 11:6 42:2 77:24 80:13 106:10 143:1

**usually** 19:17 127:2,2 128:11 128:12 135:3

**v**

**v** 107:12 113:11 148:8 214:4 215:1 216:1

**vaccine** 190:24

**vague** 129:23 130:7

**valley** 113:13 113:15

**value** 124:8

**van** 85:5,11,14 159:11

**variations** 40:21

**variety** 131:14

**various** 17:13 41:7,24 61:1 67:12 183:22

**verant** 143:21 143:22 148:8,9 149:6

**verbal** 26:5 89:16 93:5

**verbally** 10:1

**verify** 214:9

**veritext** 2:22 5:22 214:14,23

**veritext.com** 214:15

**version** 98:3 105:10

**versus** 5:16 13:12 76:14

**vet** 184:23

**vetter** 90:18 101:5 105:2 123:1 159:14

**vice** 63:16 83:16 158:9 176:6

**video** 5:3,11,14 7:16 71:16,21 118:17,22 162:13,19 199:1,6 211:9 211:14 212:3,4

**videographer** 3:20 5:2,23 71:16,21 118:17,22 162:13,19 199:1,6 211:9 211:14 212:3

**videotaped** 2:3

**view** 72:22

**virginia** 108:6 108:10

**virtually** 5:6

**visits** 27:5

**vogel** 3:13 95:23 98:22 167:20 184:22

**vogellaw.com** 3:16 214:2

**vossler** 107:11 107:12

**vs** 1:15

**w**

**w** 62:24 155:8,8 176:6

**w.s.** 1:5

**wait** 122:10

**waiting** 96:6 116:7

**waive** 6:23

**walk** 9:2 199:11,20

**want** 18:20 21:5 37:12 41:18 42:5 43:11 44:7

**[want - work]** Page 49

63:19 71:12
74:13 75:12
106:18 161:1
165:1 171:2
184:16
**wanted** 72:5
138:17 141:20
163:21
**wants** 160:20
**watters** 62:23
63:2,9,11
**way** 23:11
116:6 136:23
142:10 161:2
**ways** 76:23
131:11,14
**we've** 71:7
141:10 145:21
149:18 173:18
199:16,17
**website** 131:17
141:1,2,4
**websites**
131:12
**wednesday**
1:21
**weese** 3:7
**welcome** 72:2
162:23
**welle** 155:7,20
**went** 7:16
42:19,20 88:10
**west** 3:9 18:2
32:12 33:2,3,6
39:13,14,17,20

39:20 40:1,3,5
40:6 47:11
91:22 101:23
103:2,3 199:21
**western** 39:19
**whatsoever**
130:8
**wide** 131:14
144:24 170:13
**wilson** 83:16
**withheld** 14:9
14:12
**withhold** 14:6
**witness** 2:5 4:3
5:9 6:8 12:2
29:2,4,11 30:6
54:10 56:2,4
58:22 73:19
74:11 75:11
77:3 81:17
84:9 87:7,18
97:19 98:6,17
99:17 100:12
118:7,10,13
130:11 132:11
154:11 165:18
173:1 190:21
191:13,23
192:7,10,17
193:12 194:14
194:22 196:10
202:23 212:6
213:14,18
214:8,10,12,19

**witnesses**
199:18
**witten** 41:9
46:8 101:2
176:5
**witten's** 176:8
**wondering**
162:6
**word** 42:2
163:20 194:6
**words** 163:19
**work** 21:13
24:14 26:3,6,9
26:10,24 27:4
27:8,13 29:18
29:18 30:16,21
30:24 31:2,3,5
31:6,6 38:2
39:24 41:12,16
41:20,24 42:10
44:23 45:16,20
46:14 48:21
49:2,5,11,21,24
50:4,20,23,24
51:6,12 52:3
52:17 55:4,10
59:21 62:5,11
63:9 64:2,5,18
67:6 69:6,8,13
69:13,23 70:1
70:5,7,18,20,21
71:4,10 74:18
74:19 75:17
81:1 82:19
83:2,20 84:7

85:20 91:18
92:4,5,6,22
97:13 100:17
107:3,21,22
108:13,24
109:4,8,12
110:1,4 115:3
115:4,6,10
116:12,21
117:1,6,14,18
117:19,21
121:18 123:15
124:19 127:19
129:11,14
130:15,21
131:2 135:11
135:15 137:2
143:8,12 147:9
147:10,15
149:1,1,13
151:5,11 152:8
152:11,16
153:22 154:5
156:12 157:14
157:16 158:22
162:8 165:11
165:14 167:8
172:9,13 174:5
177:23 178:5
178:11 179:6
182:1,12
184:11 189:5,7
189:9,15 190:3
190:5,6,7,12,16
191:1,17 194:7

**[work - zeltinger]**

195:24 198:14
198:20 204:14
205:1 206:4,7
206:19,24
207:23 210:9
210:13,16
**worked** 32:1,11
34:4 60:20
61:22 62:13
73:23 89:21
94:8 116:9
124:1 177:16
205:21,23
**working** 60:1
62:15 75:2,18
91:16 92:24
104:14 108:11
115:15 121:18
167:17 174:21
184:21 191:9
191:10 205:16
**works** 66:17
83:7 84:23
**writing** 25:5
48:16,17
138:24
**written** 25:15
25:21 26:1
45:12,20 88:19
174:4
**wrong** 90:20
**wrote** 144:15

**x**

**x** 4:1,6 159:18
159:18

**y**

**y** 85:5,6 113:11
146:8,24 186:2
**yeah** 10:15
44:19 48:1,7
56:4 78:17
114:15 133:24
161:14 162:9
163:17 179:21
184:10 197:6
**year** 184:18
**years** 113:21
120:9,11 203:6
**yep** 50:3
140:21
**york** 3:4,4

**z**

**z** 167:22
**zeltinger** 67:19
105:2 122:12
123:9 151:23
152:4 180:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.