## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | | |
|---|---|---|
| Jessica Kraft, et al., | ) | |
| | ) | Case No. 3:20-cv-121 |
| Plaintiffs, | ) | |
| | ) | **ORDER REGARDING DISCOVERY** |
| vs. | ) | **DISPUTE AND REFERRING** |
| | ) | **CASE TO A SPECIAL MASTER** |
| Essentia Health, et al., | ) | |
| | ) | |
| Defendants. | ) | |

In this putative class action, plaintiffs allege defendants Essentia Health and Innovis Health, LLC, (collectively Essentia) sold and administered injectable pharmaceuticals—time and temperature sensitive pharmaceutical products (TTSPPs)—that had been stored outside the proper temperature range. Plaintiffs contend the improper storage of TTSPPs resulted in "reduced vaccine potency and the increased risk of vaccine-preventable diseases." (Doc. 28, p. 2). Essentia admits that in April 2020, it advised patients who had received certain TTSPPs that the TTSPPs may have been subjected to a temperature excursion, potentially rendering them less effective. (Doc. 30, p. 2). Essentia offered revaccination at no cost to the affected patients. Id. at 3.

The court has issued a series of orders addressing the parties' disputes regarding application of various privileges, including a medical peer review privilege.[1] The court

---

[1] An August 2, 2021 order addressed Essentia's privilege log and supplemental privilege log, which at the time contained a combined total of nine entries. The logs' entries described the dates of documents as "Various; February 2020-Present" and described the documents' subject matter only as "Investigation" or "Investigation; lawsuit." (Doc. 79, p. 2). The August 2 order directed Essentia to produce a more specific privilege log that included certain information. See id. Essentia appealed the August 2 order to the presiding district judge, who affirmed it. (Doc. 109). Essentia then filed an interlocutory appeal and later sought a writ of mandamus in the United States Court of Appeals for the Eighth Circuit, but that court dismissed the appeal and denied Essentia's request for a writ of mandamus. (Doc. 113).

has determined the medical peer review privilege law of Minnesota, rather than that of

North Dakota, applies. After in camera review of a small fraction of the disputed

documents, on January 13, 2023, the court ordered submission of evidence and briefs

concerning the structure of Essentia's asserted peer review organizations and permitted

plaintiffs to conduct a deposition pursuant to Federal Rule of Civil Procedure 30(b)(6)

regarding Essentia's peer review structure. As described in the January 13 order, after

review of the evidence and briefs, the court planned to determine whether Essentia's

---

Following the Eighth Circuit's orders, Essentia provided more detailed privilege logs, but plaintiffs again raised a question of sufficiency of the detail of Essentia's subject matter descriptions. At that time, the subject matter of almost every document over which Essentia claimed the peer review privilege was described only as "investigation and quality assurance." (Doc. 129, p. 1). The court then entered an October 14, 2021 order directing Essentia to provide "additional detail, specific to each document over which it claims the privilege." Id. at 2. "In the absence of additional detail," the court stated, "plaintiffs might be forced to challenge the privilege claim as to every document." The court stated its desire to avoid in camera review of every document. Id.

Claiming Essentia had made little effort to comply with the October 14 order, plaintiffs moved to compel Essentia to disclose all 8,147 documents on its privilege logs and for sanctions. Plaintiffs argued Essentia had failed to establish any of the documents were privileged and Essentia should consequently be found to have waived any privilege because of its failure to more fully describe the documents. (Doc. 161, p. 8). In opposing that motion, as an alternative to denial, Essentia asserted the court should conduct in camera review. (Doc. 169, p. 3). Following a decision of the North Dakota Supreme Court regarding that state's peer review statute, the parties filed supplemental briefs. (Doc. 178; Doc. 180).

On May 9, 2022, after considering the original and supplemental briefing, the court determined Minnesota's privilege law applied and ordered in camera review of up to fifty documents selected by each side. (Doc. 181). Essentia appealed that order to the presiding district judge, who denied the appeal in a July 8, 2022 order. (Doc. 200). Essentia then sought a writ of mandamus from the Eighth Circuit, which denied the writ and denied Essentia's motion to certify a question to the North Dakota Supreme Court. In re Essentia Health; Innovis Health LLC, No. 22-2583 (8th Cir. Aug. 25, 2022).

asserted review organizations meet the statutory definition of a peer review organization and to appoint a special master to review documents Essentia claims to be privileged. (Doc. 225). The parties have advised the court they have agreed on selection of a special master who will accept the appointment. (Doc. 239, p. 9).

**Law and Discussion**

Federal Rule of Civil Procedure 26(b)(1) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." For documents withheld on the basis of privilege or under the work product doctrine, the withholding party must "expressly make the claim" and "describe the nature of the documents." Fed. R. Civ. Pro. 26(b)(5)(A). Essentia—the withholding party—bears the burden of establishing privilege. Corkrean v. Drake Univ., No. 421CV00336, 2022 WL 18632, at *2 (S.D. Iowa Jan. 3, 2022).

**1.      Minnesota Peer Review Privilege**

Minnesota statutes governing the medical peer review privilege provide the following:

> **Subdivision 1. Scope.** As used in sections 145.61 to 145.67, the terms defined in this section have the meanings given them.

> **Subd. 2. Professional.** "Professional" means a person licensed or registered to practice a healing art under chapter 147 or 148, to practice dentistry under chapter 150A, to practice as a pharmacist under chapter 151, or to practice podiatry under chapter 153.

> **Subd. 3. Professional service.** "Professional service" means service rendered by a professional of the type such professional is licensed to perform.

> **Subd. 4. Health care.** "Health care" means professional services rendered by a professional or an employee of a professional and services

3

furnished by a hospital, sanitarium, nursing home or other institution for the hospitalization or care of human beings.

**Subd. 4a. Administrative staff.** "Administrative staff" means the staff of a hospital, clinic, nursing home, nonprofit health service plan corporation, or health maintenance organization.

. . . .

**Subd. 5. Review organization.** "Review organization" means . . . a committee whose membership is limited to professionals, administrative staff, and consumer directors, except where otherwise provided for by state or federal law, and which is <u>established by</u> one or more of the following: a hospital, a clinic, a nursing home, an ambulance service or first responder service regulated under chapter 144E, one or more state or local associations of professionals, an organization of professionals from a particular area or medical institution, a health maintenance organization as defined in chapter 62D, a community integrated service network as defined in chapter 62N, a nonprofit health service plan corporation as defined in chapter 62C, a preferred provider organization, a professional standards review organization established pursuant to United States Code, title 42, section 1320c-1 et seq., a medical review agent established to meet the requirements of section 256B.04, subdivision 15, the Department of Human Services, or a nonprofit corporation that owns, operates, or is established by one or more of the above referenced entities, to <u>gather and review information relating to the care and treatment of patients</u> for the purposes of:

      (a)    evaluating and improving the quality of health care;

      (b)    reducing morbidity or mortality;

      (c)    obtaining and disseminating statistics and information relative to the treatment and prevention of diseases, illness and injuries;

      (d)    developing and publishing guidelines showing the norms of health care in the area or medical institution or in the entity or organization that established the review organization;

      (e)    developing and publishing guidelines designed to keep within reasonable bounds the cost of health care;

(f) developing and publishing guidelines designed to improve the safety of care provided to individuals;

. . . .

(j) reviewing, ruling on, or advising on controversies, disputes or questions between:

    (1) health insurance carriers, nonprofit health service plan corporations, health maintenance organizations, community integrated service networks, self-insurers and their insureds, subscribers, enrollees, or other covered persons;

    (2) professional licensing boards and health providers licensed by them;

    (3) professionals and their patients concerning diagnosis, treatment or care, or the charges or fees therefor;

    (4) professionals and health insurance carriers, nonprofit health service plan corporations, health maintenance organizations, community integrated service networks, or self-insurers concerning a charge or fee for health care services provided to an insured, subscriber, enrollee, or other covered person;

    (5) professionals or their patients and the federal, state, or local government, or agencies thereof;

. . . .

(m) providing recommendations on the medical necessity of a health service, or the relevant prevailing community standard for a health service;

. . . .

(p) providing information to other, affiliated or nonaffiliated review organizations, when that information was originally generated within the review organization for a purpose specified by this subdivision, and as long as that information

will further the purposes of a review organization as specified by this subdivision; or

(q) participating in a standardized incident reporting system, including Internet-based applications, to share information for the purpose of identifying and analyzing trends in medical error and iatrogenic injury.

Minn. Stat. § 145.61 (emphasis added). Another section of the peer review statutes provides:

**Subdivision 1. Data and information.** (a) Except as provided in subdivision 4, data and information acquired by a review organization, in the exercise of its duties and functions, or by an individual or other entity acting at the direction of a review organization, shall be held in confidence, shall not be disclosed to anyone except to the extent necessary to carry out one or more of the purposes of the review organization, and shall not be subject to subpoena or discovery. No person described in section 145.63 shall disclose what transpired at a meeting of a review organization except to the extent necessary to carry out one or more of the purposes of a review organization. The proceedings and records of a review organization shall not be subject to discovery or introduction into evidence in any civil action against a professional arising out of the matter or matters which are the subject of consideration by the review organization. Information, documents or records otherwise available from original sources shall not be immune from discovery or use in any civil action merely because they were presented during proceedings of a review organization, nor shall any person who testified before a review organization or who is a member of it be prevented from testifying as to matters within the person's knowledge, but a witness cannot be asked about the witness' testimony before a review organization or opinions formed by the witness as a result of its hearings. For purposes of this subdivision, records of a review organization include Internet-based data derived from data shared for the purposes of the standardized incident reporting system described in section 145.61, subdivision 5, clause (q), and reports submitted electronically in compliance with sections 144.706 to 144.7069.

. . . .

(c) The confidentiality protection and protection from discovery or introduction into evidence provided in this subdivision shall also apply to the governing body of the review organization and shall not be waived as a

result of referral of a matter from the review organization to the governing body or consideration by the governing body of decisions, recommendations, or documentation of the review organization.

. . . .

Id. § 145.64 (emphasis added). Another statute addresses admissibility of guidelines established by a review organization:

No guideline established by a review organization shall be admissible in evidence in any proceeding brought by or against a professional by a person to whom such professional has rendered professional services.

Id. § 145.65.

## 2.   Evidence Submitted Pursuant to January 13 Order[2]

The January 13 order permitted Essentia to submit evidence "supporting its position that its asserted peer review organization meets the statutory definition" and evidence supporting its claims of attorney-client privilege and work product protection. (Doc. 225, pp. 52-53). In response to the order, Essentia submitted two declarations of Associate General Counsel Frank M. Modich—one concerning Essentia's asserted peer review organizations and the other concerning Essentia's Legal and Regulatory Services (LRS) Department. (Doc. 227; Doc. 228). As permitted by the January 13 order, plaintiffs requested a Rule 30(b)(6) deposition concerning Essentia's peer review organization, and Essentia designated Modich as its witness for that deposition. (Doc. 238-1).

---

[2] The January 13 order rejected Essentia's assertion that the structure of its peer review/quality assurance process is itself privileged. In its subsequent briefing and declarations, Essentia states it submitted information about that structure without waiving its previously asserted privilege. (Doc. 212, p. 3 n.2; Doc. 227, p. 2; Doc. 228, p. 2).

### A.    Declarations

Modich's first declaration stated he was familiar with the "peer review/quality assurance structures and functions at Essentia." (Doc. 227, p. 2). Modich stated various committees—some of which were established after Essentia learned of the TTSPP issue and some of which had been established earlier—gathered and reviewed information relating to patient care. Further, he described the committees having "performed various roles in connection with the potential temperature excursion, ranging from evaluating the quality of care, seeking to reduce adverse events, developing recommendations, reviewing the safety, quality, and cost of healthcare services, and participating in standardized incident reporting." Id. He identified a total of ten committees, teams, and subcommittees: West Market Storage Committee, Olive Committee, Patient Relations and Risk Management Committee (with a subcommittee focused on the potential temperature excursion), Essentia System Quality Committee, Essentia Clinical Practice Committee, Clinical Alerts Subgroup (part of Executive Steering Committee), One Essentia Fridge Project Committee, Immunization Clinic Transition Team, and IM Pharmacy Prioritization & Project Partnering Committee. Modich's declaration listed members of each committee and described all members of all committees as professional or administrative employees of an Essentia entity at the time they were committee members. Modich stated the various committees delegated work to other individuals and teams.

In addition to listing committee members, Modich's declaration briefly described each of the committees:

> **West Market Storage Committee**—Established to specifically review and oversee response to the potential temperature excursion. Gathered and reviewed

information and data regarding (1) potentially impacted TTSPPs, (2) potentially impacted patient populations and care and communication options for those populations, and (3) pertinent providers and agencies. Id. at 3-5.

**Olive Committee**—Established to specifically review and oversee management and collection of data for the potentially impacted patient populations, using artificial intelligence (primarily, a program called Olive) and manual chart updating. Gathered and reviewed information and data to perform chart updates regarding (1) potentially impacted TTSPPs and (2) potentially impacted patient populations. Id. at 5-7.

**Patient Relations and Risk Management Committee**—Established to provide ongoing, comprehensive, and systematic approach to reduce risk of patient harm by collecting, identifying, reviewing, investigating, analyzing, and evaluating regular event reports. Generally gathers and reviews information and data regarding alleged adverse events. Id. at 7-9.

>    **Subcommittee**—Patient Relations and Risk Management Committee established a ten-person subcommittee to gather and review information about the potential temperature excursion from data collected by Risk Management Committee. Id. at 9-10.

**Essentia System Quality Committee**—Established to oversee quality and safety initiatives to improve quality and reliability of patient care while minimizing preventable harms. Gathered and reviewed information and data regarding current issues of concern for quality assurance purposes. Id. at 10-12.

**Essentia Clinical Practice Committee**—Established to assess quality of clinical care to improve quality, affordability, and reliability of clinical care. Gathers and review information and data regarding current issues of concern for quality assurance and improvement of patient care in clinical setting. Id. at 12-14.

**Clinical Alerts Subgroup**—Established as part of Executive Steering Committee to oversee and assess monitoring of patient care in clinical setting. Gathers and reviews information relating to patient care and treatment as it specifically relates to clinical alerts. Id. at 14-15.

**One Essentia Fridge Project**—Established to oversee comprehensive review and analysis of current temperature monitoring systems and make recommendations regarding those systems. Gathered and reviewed information regarding temperature monitoring across Essentia system. Id. at 15-16.

**Immunization Clinic Transition Team**—Established by Essentia leadership to provide ongoing and comprehensive oversight of immunization in clinical setting, including revaccination following potential temperature excursion. Gathers and reviews information to evaluate and improve quality of and access to care and to review health care cost, specifically related to immunizations. Id. at 16-17.

**IM Pharmacy Prioritization & Project Partnering Committee**— Established by Essentia leadership to provide ongoing and comprehensive oversight of pharmacy projects, including those involving potential temperature excursion. Evaluates pharmaceutical patterns and prioritizes resources. Id. at 17-18.

In a separate declaration, Modich described Essentia's LRS Department and services personnel in that department provided in addressing the alleged temperature excursion. He identified forty-two individuals—including himself, eight other attorneys, three paralegals, and thirty "associates" and "specialists"—who were part of the LRS Department during the relevant timeframe. (Doc. 228). Modich's declaration stated LRS Department employees communicated with and delegated tasks to other Essentia employees in connection with the alleged temperature excursion. As to their involvement with the asserted peer review committees, Modich stated it was common for LRS Department employees to work in tandem, or simultaneously, with those committees. Modich described the LRS Department's primary purpose being "to render legal services, while the peer review/quality assurance committees fulfill peer review/quality assurance functions." Id. at 4.

Along with their brief, plaintiffs filed a declaration of Jessica Berg, one of the named plaintiffs, who was employed as a registered nurse at Essentia when Essentia learned of the alleged temperature excursion. (Doc. 238-5). On Essentia's privilege log, Berg's name appears as a recipient of several emails over which Essentia has asserted

multiple privileges, though Berg stated some appear to have been sent after she left Essentia. She stated she received communications about the alleged temperature excursion while she was employed at Essentia but was never told (1) her work or the communications were made in anticipation of litigation; (2) her work or the communications were privileged, made at the direction of counsel, or for the purpose of receiving legal advice; (3) her work or her communications were part of a peer review; or (4) her work or her communications were related to or delegated by a peer review committee. Berg further declared she did not think any of her work or communications were subject to any peer review privilege, attorney-client privilege, or work product protection or were subject to any internal confidentiality requirement beyond the usual requirements that she keep patient information confidential. Rather, she stated she understood her work and communications were part of her general job duties performed in Essentia's ordinary course of business. Berg stated she had never heard of any of the peer review organizations identified in Modich's declaration prior to reviewing that declaration and was never told not to discuss her excursion-related work with other Essentia employees. Berg also stated she discussed her excursion-related work with other Essentia employees and "[t]he excursion was discussed generally and openly at Essentia." <u>Id.</u> at 4.

**B.     Rule 30(b)(6) Deposition Testimony**

As Essentia's Rule 30(b)(6) designee, Modich acknowledged (1) Essentia had no policies or standards for the creation, conduct, or oversight of peer review committees; (2) not all asserted committees had a leadership structure or chair; (3) Essentia did not maintain lists or rosters of the asserted committees or of their membership; and

(4) Essentia had no documents describing roles and responsibilities of the asserted committees. (Doc. 238-1, pp. 7-8, 14, 50). Modich, as Essentia's designee, testified it was "hard to say" how a person was informed of a request to join a committee and there was not a defined process for advising a committee member of other members of the committee. Id. at 8. He testified there was not a defined process for maintaining committee meeting minutes. Id. at 7.

Modich also testified he worked with the law firm representing Essentia in this litigation in determining who to identify in his declaration as members of at least two of the committees. Id. at 44, 48. He was not aware of Essentia having maintained any lists of committee members before his declaration was drafted, apart from "likely meeting minutes and things like that." Id. at 50. Modich described no training Essentia provided to those identified as committee members about the confidentiality required under the peer review statutes; rather, he described it as "common knowledge" that committee work is confidential. Id. at 14-15, 51-52. He was not able to identify any Essentia committee that Essentia did not consider to be a peer review committee. Id. at 17. He testified no excursion-related work done by any of the committees was done in the ordinary course of business. Id. at 20.

In Modich's declaration, he described "teams of nurses who worked at the direction of the Olive Committee to review patient data." (Doc. 227, p. 7). And, in the Rule 30(b)(6) deposition, Modich was asked if there was a record of who had been part of those teams. He replied, "I'm not sure. I would refer back to the supplemental privilege log, if anything existed." (Doc. 238-1, p. 26). He said he did not know how Essentia would distinguish between work a nurse performed as Olive Committee work

and a chart update that was not peer review work. He further testified, "[I]f the nurse is doing it on behalf of the committee, she's going to know she's doing it on behalf of the committee. What she does in her normal day outside of the temperature excursion, I – is something separate and apart." Id. at 32. He was not sure how those who worked at the direction of a committee were told they were doing so. Id. at 18.

**3.**    **Evidence Regarding Assertion of Attorney-Client and Work Product Privileges**

Modich's second declaration stated LRS Department employees identified on Essentia's privilege log, and those working at their direction, exchanged information and communications to render legal services. (Doc. 228, p. 4). He stated the primary purpose of those communications was the rendition of legal services in response to possible or actual litigation arising from the alleged temperature excursion and not for business advice. Further, Modich stated he and other LRS Department personnel applied legal principles in directing other Essentia employees and agents to act in furtherance of rendering legal services.

As to the asserted work product protection, Modich stated Essentia anticipated possible litigation immediately after it discovered the alleged temperature excursion. He stated LRS Department personnel and those acting at their direction gathered new information "in anticipation of or preparation for litigation related to the potential temperature excursion." Id. at 5-6.

Modich's declaration also addressed the LRS Department's use of third-party consultants. Because it identified legal risks about communications concerning the alleged temperature excursion with patients and the public, Modich stated the LRS Department authorized retention of consultants to assist in those communications.

13

Modich stated the "consultants acted as the functional equivalent of Essentia employees in assisting with those communications." <u>Id.</u> at 6. Further, he stated the primary purpose of communications between LRS Department personnel and the consultants was to render legal services, with the LRS Department proposing, reviewing, and approving communications to insure they did not raise legal concerns and were consistent with Essentia's legal position. Modich stated communications and drafts exchanged between the LRS Department and the consultants contained "mental impressions and opinions of members of Essentia's LRS department, created because of anticipated or actual litigation." <u>Id.</u> at 7.

**4.     Essentia's Asserted Peer Review Structure**[3]

Essentia contends the peer review structure described in Modich's declaration and in the Rule 30(b)(6) testimony meets the Minnesota Statutes section 145.61, subdivision 5 definition of a "review organization." Essentia posits a review organization must meet three requirements under that statute: (1) that it be established by a hospital, clinic, or a nonprofit corporation owning or operating a hospital or clinic; (2) that its membership be limited to professionals, administrative staff, and "consumer directors";[4] and (3) that it be formed to gather and review patient care and treatment information for one of the purposes set forth in the statute. Modich's declaration states

---

[3] In its publicly filed brief, Essentia asked that its earlier briefing, which is not available to plaintiffs, be considered along with its publicly filed briefing. (Doc. 226, p. 2 n.1). For purposes of this order, the court finds it unnecessary to consider arguments made in the in-camera submissions that are not made in the publicly filed documents.

[4] There is no assertion that persons identified on Essentia's privilege logs were "consumer directors" as that term is defined in Minnesota Statutes section 145.61, subdivision 4b.

(1) defendants Essentia Health and Innovis Health, LLC, are nonprofit entities owning and operating hospitals and clinics; (2) the persons identified as members of the various committees are—or were at the time of their positions on the committees—professional or administrative staff at Essentia; and (3) each of the committees performed one or more of the functions included in section 145.61, subdivision 5. (Doc. 227, p. 2). Essentia asks that a special master be tasked with "further review contemplated by the Court's Order Regarding In Camera Review," (Doc. 239, p. 9), which the court interprets as a request that a special master review all documents over which Essentia claims privilege.

Plaintiffs argue Essentia has not shown the asserted peer review structure meets the statutory definition because (1) the committees Modich described in his declaration were "manufactured in hindsight to shield documents in this litigation"; (2) members of the described committees communicated broadly and for ordinary business purposes—such as pharmaceutical temperature monitoring, updating patient charts, and responding to patient and provider questions—rather than for peer review purposes; and (3) Essentia construes its entire system and its peer review organization as "one in the same," including an assertion of delegation of peer review work to "the thousands of employees and third parties who sent or received withheld communications" over which Essentia now asserts privilege. (Doc. 238, p. 3). Plaintiffs contend Essentia should be considered to have waived any peer review privilege because of its failure to establish an organization meeting the definition of section 145.61, subdivision 5.

In questioning whether Essentia sufficiently demonstrated its asserted review structure meets the statutory definition, plaintiffs point to portions of the Rule 30(b)(6) testimony. In his role as Essentia's Rule 30(b)(6) designee, Modich was unable to

provide detail beyond that in his declaration as to who established each of the described committees. He testified Essentia had no standards or policies governing its peer review committees, Essentia had no list of all its peer review committees, and Essentia worked with outside counsel to decide who should be identified as committee members in his declaration. Essentia argues that section 145.61, subdivision 5 does not require the "rigid universe" for establishing a review organization that plaintiffs posit. (Doc. 239, pp. 6-7). Plaintiffs also point to Berg's declaration, stating she was not told that work she was assigned had been delegated by a peer review committee or that she had any confidentiality obligations beyond those in her regular work as a nurse and stating the alleged temperature excursion was widely discussed among Essentia staff.

Essentia contends plaintiffs' argument "is one of *application* as opposed to determining whether Essentia sufficiently demonstrated the structure of the asserted review organizations themselves." Id. at 3. That may in fact be true, but whether the described committees functioned in accordance with the statutory definition may be relevant to the question of whether the committees were established for a purpose permitted under the statute.

As discussed in the January 13 order, courts in both Minnesota and in other states have required evidence demonstrating an entity meets a statutory definition of a peer review organization. (Doc. 225, pp. 10-11). That requirement is consistent with the principle that a party claiming a privilege has the burden to establish application of the privilege. See Shell v. Sudan, No. 8:08CV260, 2010 WL 1418303, at *7 (D. Neb. Mar. 31, 2010). But the parties have identified no case law addressing standards for determining when an entity has sufficiently demonstrated its peer review structure meets the

statutory definition. Neither has this court's research revealed cases addressing that issue.

In interpreting the statute, the court looks to the plain language of the statute and to the purposes for which it was enacted. Minnesota Statutes section 645.08 provides that words and phrases of a statute are to be construed according to their common and approved usage. Additionally, the court considers the principal embodied in Minnesota law that privileges are to be construed narrowly because they limit the right of litigants to evidence. Broadus v. Johnson, No. 16-cv-1211, 2017 WL 11707855, at *4 (D. Minn. Aug. 29, 2017); Burris v. Versa Prods., Inc., Civ. No. 07-3938, 2013 WL 608742, at *4 (D. Minn. Feb. 19, 2013).

As discussed in previous orders, section 145.61, subdivision 5 defines a review organization as one "established by" a health care entity, not as the entity itself. And section 145.64, subdivision 1(c) refers to a review organization's governing body, suggesting a review organization is part of a larger entity. The court must determine whether the committees described in Modich's declaration were "established by" Essentia within the meaning of the statute.

Black's Law Dictionary describes "establish" as meaning, "To settle, make, or fix firmly; to enact permanently" or "To make or form; to bring about or into existence." That description implies some degree of formality. Essentia has demonstrated little formality in its formation of the described committees. Though section 145.61, subdivision 5 does not require a rigid structure, it is logical to construe establishment of a committee—especially one given the broad privilege ascribed to a peer review

committee—to require some record of the process by which it was established, some records of the committee's membership, and some records of committee meetings.

Essentia states only that the various committees were "established by Essentia leadership," without defining the positions of the individuals it considers to be its "leadership." Essentia has not produced any documentation regarding when the various committees were formed or who in its leadership decided the committees should be formed. That outside counsel was consulted for purposes of determining who would be identified as committee members leads to serious questioning of whether Essentia in fact "established" the various committees.

Under the statutory interpretation Essentia advocates, virtually any internal document would be immune from discovery. Had the legislature intended that result, it likely would have written the peer review statute quite differently.

Essentia's privilege logs do not identify documents as having been prepared by or received by any of the asserted committees, though the court recognizes that is consistent with Essentia's contention that the very structure of its peer review organization is privileged. Though the court reviewed only a small fraction of the documents at issue, those documents made scant mention of any peer review purpose. None of the reviewed documents were identified as minutes of committee meetings. None of those documents made any mention of obligations for confidentiality in the context of peer review responsibilities.

Of the asserted committees and teams, several were organized solely to deal with issues related to the alleged temperature excursion. Having reviewed all evidence presented, the court concludes Essentia has not met its burden of showing those

committees were established for purposes of peer review withing the meaning of section 145.61, subdivision 5. The committees which have not been shown to meet the statutory requirements are West Market Storage Committee, Olive Committee, Subcommittee of Patient Relations and Risk Management Committee, One Essentia Fridge Project Committee, Immunization Clinic Transition Team, and IM Pharmacy Prioritization & Project Partnering Committee. The court accepts that committees not organized in response to the temperature excursion meet the statutory requirements—Patient Relations and Risk Management Committee, Essentia System Quality Committee, Essentia Clinical Practice Committee, and Clinical Alerts Subgroup meet the statutory requirements.

## 5.    Delegation

Minnesota Statutes section 145.64 provides that "data and information acquired by a review organization, in the exercise of its duties and functions, <u>or by an individual or other entity action at the direction of a review organization</u>, shall be held in confidence." (Emphasis added). Essentia invokes that provision broadly, asserting its peer review committees delegated tasks to others. Modich's first declaration makes multiple references to "identities of the individuals delegated committee work" being reflected in Essentia's supplemental privilege logs. (Doc. 227, pp. 3, 5, 7, 9, 10, 12, 14-17, 19).

Essentia's purported delegation of work of its asserted peer review committees, especially in light of Berg's declaration, would seem to result in any Essentia employee performing peer review tasks, without clear definition of the tasks being performed in furtherance of a peer review purpose. Though the statute does not require that

delegation of a peer review entity's tasks be regimented, one would expect some documentation of a peer review entity making a delegation and the scope of the delegation. Since Essentia's privilege logs do not include that information, the court cannot broadly conclude that Essentia properly delegated peer review committee tasks to individual Essentia employees.

**6.    Ordinary Course of Business**

Plaintiffs argue some of the asserted committees did not function for peer review purposes but rather were operated in the ordinary course of Essentia's business. As discussed in the January 13 order, neither the parties nor this court's research identified any case law addressing application of Minnesota's peer review privilege to documents created in the ordinary course of business. (Doc. 225, pp. 24-27). Cases from other jurisdictions, though applying statutory language differing in some respects from that of the Minnesota statutes, provide useful guidance. Illinois courts have held the peer review privilege is limited to documents generated specifically for the use of a peer-review committee. One Illinois state court wrote, "Documents created in the ordinary course of business, to weigh potential liability risk, or for later corrective action by hospital staff are not privileged, even if they are later used by a committee in a peer-review process." Chi. Trust Co. v. Cook Cnty. Hosp., 698 N.E.2d 641, 649 (Ill. App. Ct. 4d 1998). As the Illinois Supreme Court explained, "If the simple act of furnishing a committee with earlier-acquired information were sufficient to cloak that information with the statutory privilege, a hospital could effectively insulate from disclosure virtually all adverse facts known to its medical staff, with the exception of those matters actually

contained in a patient's records." <u>Roach v. Springfield Clinic</u>, 623 N.E.2d 246, 251 (Ill. 1993).

New Mexico's peer review statutes include a provision similar to Minnesota Statutes section 145.61, subdivision 5. In applying that statute, New Mexico's Court of Appeals described balancing the peer review purpose of "promoting health and welfare of society against an overbroad implementation of confidentiality to the extent it might impinge on the right of litigants to obtain and present relevant and material evidence." <u>Chavez v. Lovelace Sandia Health Sys., Inc.</u>, 189 P.3d 711, 715 (N.M. Ct. App. 2008) (citing <u>Sw. Cmty. Health Servs. v. Smith</u>, 755 P.2d 40, 44 (N.M. 1988)). Under New Mexico case law, a party invoking peer review privilege must show the data or information was generated exclusively for peer review and for no other purpose and opinions were formed exclusively as a result of peer review deliberations. If the evidence was neither generated nor formed exclusively for or as a result of peer review, it is not immune from discovery unless it is shown to be otherwise available by the exercise of reasonable diligence. <u>Sw. Cmty. Health Servs.</u>, 755 P.2d at 44; <u>see also</u> <u>Quimbey v. Cmty. Health Sys. Pro. Servs. Corp.</u>, CIV 14-0559, 2017 WL 5634111 (D.N.M. Nov. 22, 2017).

The court's January 13 order questioned whether, for example, documents dealing with fiscal impact to Essentia of the alleged temperature excursion come within the purpose of any peer review privilege. The court now also questions whether work described as updating patient charts, analyzing Essentia's system for monitoring temperatures at which pharmaceuticals are stored, or developing a plan for providing revaccination come within any purpose of the peer review privilege. Rather, it appears

that work was done in the ordinary course of Essentia's business of providing health care.

**7.     Distribution of Documents to Persons Outside Review Organization**

The January 13 order also noted some of the documents submitted in camera appeared to have been widely distributed; for example, periodic newsletters were widely distributed to Essentia medical providers and documents addressed to "Essentia Health West Market Colleagues" and to "All Essentia Health Colleagues." Documents distributed to individuals who were not a part of the peer review committees the court has recognized are not protected by the peer review privilege.

**8.     Communications with Public Relations Consultants**

Plaintiffs question application of the attorney-client privilege to communications between Essentia and its public relations consultants. Modich's second declaration describes Essentia using public relations consultants as the "functional equivalent" of employees in Essentia's LRS Department. Whether any of Essentia's communications with public relations consultants are privileged is dependent on the predominant purpose of the communication. Factors to be considered in that determination are discussed in In re Polaris, Inc., 967 N.W.2d 397, 409-11 (Minn. 2021).

**9.     Original Source Documents**

Though recognizing Minnesota Statutes section 145.64 excepts original source documents from those subject to the peer review privilege, Essentia argues none of the documents it claims as privileged are actually original source documents. (Doc. 210, p. 7). As discussed in the January 13 order, if the original source of the document is a person or entity other than one of the committees the court recognizes as meeting

22

requirements of a peer review committee, the document is not protected by the peer review privilege. (See Doc. 225, p. 16).

## Conclusion

Though the court would prefer a process requiring special master review of a more limited number of documents, that does not appear feasible at this time. Essentia is directed to review its claims of privilege considering the standards outlined in this order and in the January 13 order. Documents as to which Essentia maintains its claims of privilege after reviewing these standards must be submitted for special master review.

The court will appoint a special master, at Essentia's expense, to make recommendations on whether Essentia has met its burden of establishing one or more privileges as to each document over which it maintains a claim of privilege. The court asks that the special master consider the following standards in making recommendations:

(1)    The entities Essentia identified as the Patient Relations and Risk Management Committee, the Essentia System Quality Committee, the Essentia Clinical Practice Committee, and the Clinical Alerts Subgroup meet the statutory requirements of a peer review committee. Documents generated by or acquired by those entities may be protected under the peer review privilege, if the special master determines they were generated by or acquired to carry out a statutory purpose of peer review.

(2)    Documents distributed to persons not identified as members of the entities listed above are not protected by the peer review privilege, though they may be protected by other asserted privileges.

(3)    Documents generated in the ordinary course of Essentia's business of providing health care are not protected by the peer review privilege, though they may be protected by other asserted privileges. The court views documents concerning the fiscal impact to Essentia of the alleged temperature excursion, updating of patient charts, analyzing Essentia's system for monitoring temperatures at which pharmaceuticals are stored, or developing a plan for providing revaccination as having been generated for ordinary business purposes.

23

(4)    If the original source of a document is a person or entity other than one of the committees the court recognizes as meeting requirements of a peer review committee, the document is not protected by the peer review privilege, though it may be protected by other asserted privileges.

(5)    Documents involving public relations consultants should be analyzed to determine their primary purpose, consistent with factors discussed in In re Polaris, Inc.

The parties are directed to confer and prepare a proposed order appointing a special master, consistent with this order and with the January 13 order, to confirm the special master who has agreed to review the documents is willing and able to accept the appointment under terms of the proposed order, and to submit a proposed order appointing a special master **within ten business days** of the date of this order. Recognizing the time that has lapsed while this issue was under consideration, the parties are also directed to confer about any adjustments to the scheduling order that might be necessary.

**IT IS SO ORDERED**.

Dated this 3rd day of October, 2023.

/s/ Alice R. Senechal
Alice R. Senechal
United States Magistrate Judge