# EXHIBIT L

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

------------------------------------------------------------------

Court File No:  3:20-CV-121

JESSICA KRAFT, INDIVIDUALLY AND
AS PARENT OF MINORS L.K., S.K. and
O.K.; SHELLI SCHNEIDER,
INDIVIDUALLY AND AS PARENT OF
MINORS A.S. and W.S.; ANNE BAILEY,
AS PARENT OF MINOR D.B.; AMY
LAVELLE, AS PARENT OF MINORS
Em.L. and El.L; ELIZABETH BEATON,
INDIVIDUALLY AND AS PARENT OF
MINOR M.B.; AMANDA AND TYRELL
FAUSKE, INDIVIDUALLY AND AS
PARENTS OF MINORS C.R.F. and C.J.F.;
JENNIFER REIN, INDIVIDUALLY; and
JESSICA BERG, AS PARENT OF MINORS
A.B. and S.B., individually and on behalf of
all others similarly situated,

              Plaintiffs,

v.

ESSENTIA HEALTH, INNOVIS
HEALTH, LLC d/b/a ESSENTIA
HEALTH, JOHN DOE
MANUFACTURERS, and
JOHN DOE DISTRIBUTOR,

              Defendants.
------------------------------------------------------------------

          HYBRID VIDEOTAPED DEPOSITION OF FRANK MODICH
                    Thursday, April 24, 2025
                     503 East Third Street
                       Duluth, Minnesota

          COURT REPORTER:  SARAH J. HAINES

too, but, you know, obviously, North Dakota and Minnesota Department of Health reference.  So it's clear to me that this is for our West facilities.

Q.   Are you aware of any Essentia policies that applied to Dakota Clinic?

A.   No, not policies like this (indicating) no.  You referenced the Shared Services Agreement before, that, you know, if it's in a contract, specifically identifying something like that, then that's what's going to be referenced. But our policies by themselves, do not apply to Dakota Clinic Pharmacy.

(Exhibit No. 24 marked for identification.)

BY MR. VON KLEMPERER:

Q.   This is Exhibit No. 24 I'm handing you.  And this is Bates No. EH0204.  This appears to be an email from Maari Loy to Dan Beauchamp and Tony Kaufenberg.

A.   Okay.

Q.   Who is Dan Beauchamp?

A.   Dan is our facilities manager, if you will, for Innovis Essentia Health West.

Q.   And do you know what his responsibilities are?

A.   Just oversight of facilities.

Q.   Okay.  So Ms. Loy writes in the email, "Hey Dan. Thanks for the drive-by in the pharmacy this afternoon.  Thanks also for the conversation regarding the historic DCP

refrigerators.  It sounded like you had already had some back and forth conversations with Frank about purchase history, maintenance requests, etc., on these refrigerators.  Also any information on the Dakota Refrigeration contract.  Any information you provide to Kyle Dorow, or Frank Modich is much appreciated.  Thanks!  Maari"; did I read that correctly?

A.   You did.

Q.   She specifically references Frank Modich in the second to the last sentence; do you see that?

A.   I do.

Q.   Earlier in the email she references a Frank without a last name, do you believe that she is referring to you?

A.   Yes.

Q.   Do you recall the conversation with Dan Beauchamp about purchase history and maintenance request, et cetera, on the refrigerators?

A.   I don't remember those conversations.

Q.   Okay.  Do you remember why those conversations were occurring?

A.   Probably as part of our just overall investigation.

Q.   Was it your practice to take notes when you had conversations of that sort during the investigation?

A.   As an attorney?

Q.   Yes.

A.   I don't usually, no.  I don't take notes.

Q.   Do you know why Dan Beauchamp was looking into the topics of purchase history, maintenance requests, et cetera, on the refrigerators?

A.   I can't say with certainty.

Q.   Do you believe he may have sent you any written correspondence on those topics?

A.   I'm not remembering anything offhand from him.

Q.   Did you receive any documentation from Dakota Clinic directly on those topic?

A.   No.

Q.   Did you receive from anyone else that you can recall.

A.   Not recalling.  I remember we looked into it, but I don't remember exactly what the response or what the materials were.

Q.   Why were you looking into those topics?

A.   Because we were investigating the potential temperature excursion.

Q.   And why was it important to look into the purchase history, maintenance requests?

A.   So we had all the information at our disposal.

Q.   And do you believe that the information that you've learned on those topics would be reflected in some notes or minutes or other documentation?

A.   No.

Q.   You don't have a reason to know either way?

A.   I'm not aware of --

MS. LORD:  I'll object to form.

THE WITNESS:  In terms of the potential temperature excursion, I'm not aware of anyone else.

BY MR. VON KLEMPERER:

Q.   Who specifically at Dakota Clinic is responsible for the excursion?

MS. LORD:  Object to form.

THE WITNESS:  I can't answer that.

BY MR. VON KLEMPERER:

Q.   Why can't you answer?

A.   I have no insight or knowledge into DCP.

Q.   Okay.  So it's not Essentia's position that there is a specific individual within DCP that's responsible for the excursion?

MS. LORD:  Object to form.

THE WITNESS:  Can you repeat the question, please?

BY MR. VON KLEMPERER:

Q.   It's not Essentia's position that there is a specific individual within DCP that is responsible for the temperature excursion at issue in this case?

A.   Regarding potential temperature excursion, all we can rely on is the Shared Services Agreement and the requirements thereof.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.   My question is, is Essentia it is not Essentia's position that there was a specific individual within DCP that is responsible for the temperature excursion at issue in this case?

MS. LORD:  Object to form.

THE WITNESS:  As I stated previously, regarding the potential temperature excursion, the Shared Service Agreement outlines the responsibility of the parties specifically DCP and its role in this.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.   Is Essentia's position it has no responsibility for the temperature excursion at issue in this case?

A.   Essential has no responsibility and I refer you back to the Shared Services Agreement and the responsibilities therein.

MR. VON KLEMPERER:  Objection; nonresponsive; after the Answer that "Essentia has no responsibility".

MS. LORD:  It is responsive.  The record speaks for itself.

BY MR. VON KLEMPERER:

Q.   Other than the Shared Services Agreement, is there anything that you base your answer on that Essentia has no responsibility for the temperature excursion at issue in this case?

A.    Again, I refer you back to the Shared Services Agreement and the responsibilities therein.

Q.    But my question is beyond the Shared Services Agreement, is there any other basis for your answer?

A.    That dictates the party's responsibility in this potential temperature excursion.

Q.    Okay.  So it's Essentia's position that it has no responsibility for the temperature excursion at issue?

A.    Essentia Health has no responsibility for the potential temperature excursion and I refer you back to the --

(Court reporter gets clarification.)

THE WITNESS:  Essentia Health has no responsibility for the potential temperature excursion and I refer you back to the Shared Services Agreement between Innovis Health, LLC, and Dakota Clinic Pharmacy.

BY MR. VON KLEMPERER:

Q.    How long have you worked for Essentia?

A.    Since 2012.

Q.    What was your initial title when you started?

A.    Senior Attorney.

Q.    And how long did you hold onto that role?

A.    Approximately a year, year and a half.

Q.    What was your next title?

A.    Assistant General Counsel.

Q.    And how long were you in that position?