# EXHIBIT N

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

-----------------------------------------------------------------

                                  Court File No:  3:20-CV-121
JESSICA KRAFT, INDIVIDUALLY AND
AS PARENT OF MINORS L.K., S.K. and
O.K.; SHELLI SCHNEIDER,
INDIVIDUALLY AND AS PARENT OF
MINORS A.S. and W.S.; ANNE BAILEY,
AS PARENT OF MINOR D.B.; AMY
LAVELLE, AS PARENT OF MINORS
Em.L. and El.L; ELIZABETH BEATON,
INDIVIDUALLY AND AS PARENT OF
MINOR M.B.; AMANDA AND TYRELL
FAUSKE, INDIVIDUALLY AND AS
PARENTS OF MINORS C.R.F. and C.J.F.;
JENNIFER REIN, INDIVIDUALLY; and
JESSICA BERG, AS PARENT OF MINORS
A.B. and S.B., individually and on behalf of
all others similarly situated,

          Plaintiffs,

v.

ESSENTIA HEALTH, INNOVIS
HEALTH, LLC d/b/a ESSENTIA
HEALTH, JOHN DOE
MANUFACTURERS, and
JOHN DOE DISTRIBUTOR,

          Defendants.
-----------------------------------------------------------------

       HYBRID VIDEOTAPED DEPOSITION OF ANTHONY KAUFENBERG
               Wednesday, APRIL 23, 2025
                503 East Third Street
                 Duluth, Minnesota

               COURT REPORTER:  SARAH J. HAINES

R O U G H   D R A F T                           3

     Deposition of ANTHONY KAUFENBER, taken in the above-entitled matter before Sarah J. Haines, a Notary Public, at 503 East Third Street, Duluth, Minnesota, on Wednesday, April 23, 2025, commencing at approximately 9:30 a.m.

APPEARANCES:

MICHAEL VON KLEMPERER (live)
FEGAN SCOTT LLC
1763 Columbia Road NW
Suite 100
Washington, D.C. 20009
(202) 921-0002
mike@feganscott.com

          On behalf of the Plaintiffs.

ANGELA E. LORD (live)
VOGEL LAW FIRM
218 NP Avenue
PO Box 1389
Fargo, ND 58107-1389
(701) 237-6983
alord@vogellaw.com

          On behalf of Defendants.


Present via zoom:

Brian Marty
Briana Rummel
Bart Goplerud
Ashali Chimata

ALSO PRESENT:  Frank Modich (live)

R O U G H   D R A F T

within that space, in developing a response, then there is continued work of assuring we have appropriate follow up.

Q.   What did that continued work involve?

A.   The continued work involved helping and assisting with assuring people had access to product to be revaccinated, to help assist with setting up of a revaccination clinic, ongoing monitoring of -- to assure that we are following up with potentially affected patients to assure that they get the best care that they need.

Q.   And how long did those continued activities take approximately?

A.   Through December of 2020.

Q.   Why do you recall that date so specifically?

A.   I recall that date specifically because that is when we in pharmacy had a change in resource availability.

Q.   And what was the change in resource availability?

A.   In my department it was staffing.

Q.   You can you explain what the change in staffing was?

A.   Specifically staffing is just the availability of people.

Q.   What was the change in staffing?

A.   We had additional resources that were available that were no longer available at that time.

Q.   So can you identify what the additional resources were that were originally available?

R O U G H   D R A F T

MS. LORD:  I think I'll object to the form.  I think we got started down this path because you asked about how he was recalling December of 2020, ask then he responded that it was availability of resources and staffing and I don't know that we're -- I think we are starting to go off track from the Notice.

MR. VON KLEMPERER:  Counsel, please in speaking your objections, your objection is noted.

BY MR. VON KLEMPERER:

Q.   Can you identify the additional staffing that was originally provided?

A.   We have a number of student is that flow throughout in a stance and help -- it follows a typical staffing pattern in a pharmacy.

Q.   You mentioned students; is that correct?

A.   Correct.

Q.   So you originally had students available to assist with Essentia's response to the excursion and they were no longer available after December of 2020?

MS. LORD:  I'll object to form and foundation.

THE WITNESS:  Incorrect in asking about the response, no students, etc., around the response, but we also run a pharmacy.  And so from our pharmacy standpoint, it's the same resources that are assisted with any other project within that space.

MR. VON KLEMPERER:  Yes, sorry.

MS. ROMMEL:  Thank you.

THE WITNESS:  Can you please repeat the question?

BY MR. VON KLEMPERER:

Q.  Can you identified a single date in which the time, the staff initials, and the temperature were completed?

A.  In reviewing the logs, I do not see where all three were completed by the Dakota Clinic Pharmacy staff.

Q.  Or any other individual, correct?

A.  Again, this document is completed by the Dakota Clinic Pharmacy.

Q.  Okay.  So you could not find a single date in which all of the required information was provided; is that correct?

MS. LORD:  Objection; asked and answered.

THE WITNESS:  Again, I do not see where all of the three items you referred to:  time, staff initials, and temp were recorded by the Dakota Clinic Pharmacy staff.

Q.  Do you agree that all three of those items are required to be filled out each day, correct?

MS. LORD:  Object to form.

THE WITNESS:  Again, I'm not -- I do not know the standard work as approached by Dakota Clinic Pharmacy who was responsible for this.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.   All three of those items are required to be filled out each day, correct?

MS. LORD:   Object to form; asked and answered.

THE WITNESS:   Again, the form is a form that was produced by Dakota Clinic Pharmacy and I cannot speak on behalf or are aware of their work.

MR. VON KLEMPERER:   Objection; nonresponsive.

Q.   The instructions on how to fill this form out are located at the bottom of the form, correct?

A.   There is suggestion of how to complete the form, correct.

Q.   And those instructions provide that the temperature is supposed it be provided twice daily, staff is supposed to initial, and the specific temperature is supposed to be indicated in the temperature column, correct?

MS. LORD:   Object to form and foundation.

THE WITNESS:   As identified by the wording at the bottom of the form, it identifies the suggestion of how to complete the form.

BY MR. VON KLEMPERER:

Q.   And it requires all of those items, correct?

MS. LORD:   Object to form and foundation.

THE WITNESS:   Again, as you read, it does not use the word, "require."

BY MR. VON KLEMPERER:

Q.   Is it your understanding that these instructions are voluntary?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Again, I cannot respond to the approach Dakota Clinic Pharmacy took in filling these forms.

MR. VON KLEMPERER:  Objection; nonresponsive.

MS. LORD:  It is responsive.  He has answered the same question multiple times, again and again.

MR. VON KLEMPERER:  He hasn't.  He's answering a different question.

MS. LORD:  He has.  He's answering the question in a way you do not agree with, but it doesn't mean he hasn't answered the same question over and over again.

MR. VON KLEMPERER:  That's not correct.

MS. LORD:  It is correct.

BY MR. VON KLEMPERER:

Q.   Is it your understanding that the instructions at the bottom of this form are voluntary or mandatory?

MS. LORD:  Object to form and foundation.

THE WITNESS:  In clarification of your question, are you asking voluntarily or mandatory as it relates to Dakota Clinic Pharmacy practice or the Department of Health -- North Dakota Immunization Department of Health.

BY MR. VON KLEMPERER:

Q.   Department of health?

A.    I would refer you from the North Dakota Department of Health to their vaccine storage requirements at that time, which does provide the recommendations of temperature monitoring.

Q.    And do those requirements differ from these instructions in any material way?

MS. LORD:  Object to form.

THE WITNESS:  Again, I can't respond to the Dakota Clinic Pharmacy practices nor from the North Dakota Department of Health, specifics.  I can -- well, again, speak in generalities of temperature monitoring.

BY MR. VON KLEMPERER:

Q.    Okay.  So can you do so?

A.    Again, the practice of temperature monitoring is -- is for state provided vaccines, it's clearly defined in the North Dakota Department of Health Immunization Program on how and to monitor -- or to monitor temperatures of stored vaccines, as well as there is additional guidance and information from the CDC in their vaccine tool kit.

Q.    And those -- that guidance you just referred to requires that temperatures be monitored twice daily?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I would have to refer to those documents.

BY MR. VON KLEMPERER:

Q.    Do you have any reason to believe that the documents you are referring to are materially different than the requirements that are written at the bottom of this form?

MS. LORD:  Object to form and foundation.  You said requirements more than once and requirements has not been identified by the witness.  So I'll object to form and foundation.

THE WITNESS:  Again, as it refers to the guidance from the clinical -- you know CDC and the Department of Health in North Dakota, they have specific language on how to store vaccines that come from the State in what is called the VFC Program.  Without having that information directly, I cannot recite directly what those say, off the top of my head.

Q.    This form that we are discussing is a form issued by the North Dakota Department of Health, correct?

A.    Correct.

Q.    And so the instructions that are placed at the bottom of this form are instructions from the North Dakota department of health?

MS. LORD:  Object to form.

THE WITNESS:  Again, I cannot respond to nor did I create this document.

Q.    Right.  The North Dakota department of health did correct?

A.    Correct.

MS. LORD:  He also identified that this is related to vaccines provided by the State.  He has said that multiple times in his answer and you have not recognized that.

MR. VON KLEMPERER:  Please stop making speaking objections.

MS. LORD:  Please ask questions that recognize the witness's answer.

BY MR. VON KLEMPERER:

Q.   Is there anything in the language of the instructions at the bottom of this form that suggests to you that they are voluntary and not mandatory?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Directly in the form that was provided by DCP or Dakota Clinic Pharmacy, the statement on the form does not have the term mandatory or required; therefore, I cannot respond to that, without having direct knowledge of the information in front of me at the time from the department of health.

Q.   So because the instructions don't use those two words, you believe that these instructions may be voluntary and not mandatory?

MS. LORD:  Object to form and foundation and completely taking the witness's answers out of context.  He's already answered the question multiple times.

THE WITNESS:  As was stated before, the

information of appropriate documentation around state provided vaccines is driven by the CDC and by the department of health in select states therefore I would ask that they be the once to respond to the specifics of what their statement refer is to. I cannot personally respond to that statement about required.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.   Who was responsible for maintaining these logs?

A.   Dakota Clinic Pharmacy.

Q.   Do you know who specifically that worked there was responsible?

A.   I'm not aware of or have knowledge of who would have been responsible.

Q.   Who would know?

A.   Again, at DCP I would not be aware of or understand who may be involved.

Q.   I understand that but who -- who would have that information?

A.   Dakota Clinic Pharmacy.

Q.   Only Dakota Clinic Pharmacy?

A.   As it relates to their standard work and their preparation, it would be Dakota Clinic Pharmacy.

Q.   Is there a particular individual that you are aware of that would have that information?

A.   Again, at Dakota Clinic Pharmacy I could refer you to

within that, that Dakota Clinic Pharmacy follow all Federal and State laws.

Q.    Beyond the requirements of the agreement, did Essentia do anything to ensure that Dakota Clinic was actually following all State and Federal laws?

MS. LORD:  Object to form.

THE WITNESS:  As defined by the shared agreement the expectation is that they follow all Federal and State laws.

Q.    I understand.  I understand that's what the agreement says, but my question is different:  Did Essentia do anything to ensure Dakota Clinic actually was complying with State and Federal law?

A.    Compliance of all State and Federal laws is oversight by the North Dakota Board of Pharmacy.

MR. VON KLEMPERER:  Objection; nonresponsive.

Can you read my question again?

THE COURT REPORTER:  "QUESTION:  I understand.  I understand that's what the agreement says, but my question is different:  Did Essentia do anything to ensure Dakota Clinic actually was complying with State and Federal law?"

MS. LORD:  Object to form and foundation; it's been asked and answered.

THE WITNESS:  As stated, the Shared Service Agreement specifically calls out that Dakota Clinic Pharmacy follow all State and Federal laws and the expectation is that

would be monitored and followed up through the board of pharmacy.

BY MR. VON KLEMPERER:

Q.   So then the answer is no, Essentia, itself, wasn't doing anything to ensure that Dakota Clinic actually was following State and Federal law, correct?

MS. LORD:   I'll object to form and foundation; it's been asked and answered.

THE WITNESS:   My answer to that is, it's clearly defined in the shared agreement that they should be following State and Federal laws.

Q.   And Essentia wasn't doing inspections of Dakota Clinic Pharmacy, correct?

A.   As defined by the shared agreement, they should follow all State and Federal laws and the expectation as we would with any distributor, expect that to be monitored by the appropriate authority figures.

MR. VON KLEMPERER:   Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.   Essentia, itself, was not conducting any inspections of Dakota Clinic Pharmacy, correct?

A.   Essentia Health is not obligated to do any inspections of Dakota Clinic Pharmacy.

MR. VON KLEMPERER:   Objection; nonresponsive.

(Court reporter gets clarification.)

MR. VON KLEMPERER:  Essentia did not in fact conduct any inspections of Dakota Clinic Pharmacy, correct?

MS. LORD:  I'm going to objection as asked and answered, if the court reporter could please read back the answer to the last question?

THE COURT REPORTER:  "ANSWER:  Essentia Health is not obligated to do any inspections of Dakota Clinic Pharmacy."

MR. VON KLEMPERER:  Which was not my question.

MS. LORD:  It is.

MR. VON KLEMPERER:  I wasn't asking what they were obligated to do.  I was actually asking whether they actually did it.

MS. LORD:  It is an answer to the question that was asked and it's been answered multiple times and the basis for it as well.

MR. VON KLEMPERER:  It has not been answered.

MS. LORD:  It has.

BY MR. VON KLEMPERER:

Q.    I'll ask again:  Did Essentia Health conduct any inspections of Dakota Clinic Pharmacy?

MS. LORD:  Objection; asked and answered.

THE WITNESS:  And, again, I would recite the fact that as a contracted distributor, Dakota Clinic Pharmacy was treated no different than any other contracted distributor.

Q.    So the answer is no, correct?

A.    Again I am reciting that there is no obligation for us to follow through within the space as we would treat any other distributor that we are contracted with.

MR. VON KLEMPERER:  Objection; nonresponsive.

Q.    The question is not the obligation.  The question is whether it was done.  Were there any inspections by Essentia of Dakota Clinic?

MS. LORD:  Object to form and foundation and asked and answered.

THE WITNESS:  And I, again, would recite that it is the treatment of Dakota Clinic Pharmacy is no different than how would we would treat and manage a distributing partner as we would with any other path and have no obligation to do inspections.

MR. VON KLEMPERER:  Objection; nonresponsive.

At the current rate, we are going to have to come back for another day.

MS. LORD:  No, we're not.  You can move on with your question.  It's been asked and answered.

MR. VON KLEMPERER:  It has not been answered.

MS. LORD:  Not to your liking.  It's been answered.

BY MR. VON KLEMPERER:

MR. VON KLEMPERER:  Should we break for lunch?

THE VIDEOGRAPHER:  This concludes Media Unit No. 1

temperature logs before administering medications, correct?

A.   Just to clarify the generality of your question, healthcare workers who were only administering or healthcare workers in general to check temperature logs?

Q.   The doctors and nurses who are giving the medications directly to the patients?

MS. LORD:  Object to form.

THE WITNESS:  As it relates to the potentially affected medications or any other medications, there is no -- they would not be referring to a temperature log at the time that they removed a product from the refrigerator.

BY MR. VON KLEMPERER:

Q.   Okay.  Is it Essentia's position that anyone other than Dakota Clinic is responsibility for the temperature excursion at issue in this lawsuit?

MS. LORD:  Object to form.

THE WITNESS:  As an expert related again to pharmacy, I would not feel comfortable answering that question.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.   Is it Essentia's position that anyone other than Dakota Clinic is responsible for the temperature excursion at issue in this lawsuit?

MS. LORD:  Object to form.

THE WITNESS:  As a subject matter expert on just

R O U G H   D R A F T

identifying potentially impacted patients and potentially impacted medications, I cannot comment or feel comfortable commenting about the question you've asked.

BY MR. VON KLEMPERER:

Q.   When you say, "you are not comfortable," are you just not -- you are just refusing to answer the question?

MS. LORD:   I'll object to form.

THE WITNESS:   As an Essentia Health subject matter around the practice of pharmacy, I feel uncomfortable addressing any questions regarding the legal aspects of this case.

BY MR. VON KLEMPERER:

Q.   As a subject matter expert, is it your view that anyone other than Dakota Clinic Pharmacy is to blame for the temperature excursion issue in this case?

MS. LORD:   Object to form.

THE WITNESS:   Again, as an expert around pharmacy only, I cannot comment on the legal questions around a case as it relates to --

BY MR. VAN KLEMPERER:

Q.   I'm not asking for legal opinion.  I'm just asking if you think there is anyone else to blame for the temperature excursion beyond Dakota Clinic?

MS. LORD:   Object to form.

THE WITNESS:   I'm stating as a subject matter

R O U G H   D R A F T

expert, I cannot provide an answer on that, only as it relates to pharmacy.

BY MR. VON KLEMPERER:

Q.    Is it Essentia Health's position that it has no responsibility for the temperature excursion at issue in this lawsuit?

MS. LORD:  Object to form.

THE WITNESS:  As noted previously and again as a subject matter expert around pharmacy, I can only respond to factual states within this case.

MR. VON KLEMPERER:

Q.    Okay.  Can you pull up Exhibit 1 again, please, which is the Deposition Notice?

A.    Yes.

Q.    You are designated on topic 1g; is that correct, as well as 1h?

A.    Correct.

Q.    Okay.  So in light of your designation as Essentia's witness on those topics, is it Essentia's position that it has no responsibility for the temperature excursion at issue in this case?

MS. LORD:  Object to form.

THE WITNESS:  Again, as stated, I have provided, you know, as a subject matter expert, around pharmacy, have made the comments around our role as in managing this potential

excursion.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.    Is it Innovis's position that it has no responsibility for the issues in this lawsuit?

MS. LORD:  Object to form.

THE WITNESS:  Again, as a subject matter around the pharmacy department, I cannot comment around Innovis.

BY MR. VON KLEMPERER:

Q.    And you understand that you are here as a witness designated by Essentia to testify to address the topics that we've discussed in this Notice, correct?

A.    Correct.

Q.    And you are unable to respond concerning Essentia and Innovis's responsibility for the excursion; is that correct?

MS. LORD:  Object to form.

THE WITNESS:  Throughout the role of answering the factual statements as we move through on how we participated in the investigation of identifying patients -- potential patients, potential medications, and potential clinics served, I feel I have identified the Innovis's role in the potential temperature excursion.

MR. VON KLEMPERER:  Objection; nonresponsive.

BY MR. VON KLEMPERER:

Q.    I'm asking about the responsibility not the role, which

you are not addressing.

MS. LORD:  I'll object to form.

THE WITNESS:  I would ask for clarification on your definition of responsibility, in definition of g and h. What is your understanding of the responsibility.

MS. LORD:  Object to form you asked the question I think it's a fair request for clarification on how you are defining responsibility.

BY MR. VON KLEMPERER:

Q.    What is the source of your confusion about the term, "responsibility"?

A.    I don't have any confusion on responsibility.  I'm trying to get clarification from you on what your terminology of responsibility is.

Q.    Well, you understand the term, so you can just apply your definition?

A.    But I want to answer it based on your knowledge of responsibility.

Q.    I'm fine accepting your understanding of the term. What is your understanding of the term?

A.    As it relates to what?

Q.    Essentia and Innovis's responsibility for the temperature excursion at issue in the case?

MS. LORD:  I'll object to form.

THE WITNESS:  Again, can I have clarification on

ROUGH DRAFT

the responsibility?  I'm truly asking for your definition of responsibility within the relatives of this language as it relates to the ask in this deposition.

BY MR. VON KLEMPERER:

Q.    What is your understanding of the term, "responsibility"?

MS. LORD:  I think there's confusion in the question in that he's explained Essentia Health's and Innovis's response and what those steps involved, in response to the potential temperature excursion.  And he's identified those as what Essentia Health and Innovis did, in response to the information from DCP.  And I think that's where your two ships passing in the night and not on the same page, with all due respect.

BY MR. VON KLEMPERER:

Q.    Do you feel that there is anything Essentia should have done to prevent temperature excursion at issue in this case that it didn't do?

MS. LORD:  Object to form.

THE WITNESS:  I feel Essentia Health is always in the mindset of looking at ways of performance improvement.  As it relates to this specific, I don't have any direct comments at this time on your question, but we are always trying to deliver values and improve on the care that we provide.

MR. VON KLEMPERER:  Objection; nonresponsive,

except for the portion in which he said he didn't have any response to the question.

BY MR. VON KLEMPERER:

Q.   Is there anything that Innovis should have done to prevent the temperature excursion in this case that it didn't do?

MS. LORD:  Object to form.

THE WITNESS:  Again, I'd refer you back to our Shared Service Agreement with Dakota Clinic Pharmacy and our expectations of them following all federal, state, and local rules as determined as an independent pharmacy in the distribution of products.

BY MR. VON KLEMPERER:

Q.   Is it Essentia's position that it had no obligation whatsoever to monitor what was occurring at Dakota Clinic Pharmacy regarding monitoring of temperatures and refrigerators?

A.   Again, I would refer you back to the shared agreement, which states that Dakota Clinic Pharmacy is responsible for meeting all federal and state regulations, which is clearly defined in managing product at DCP.

Q.   That's the same Shared Services Agreement that indicates that Innovis employees would be staffing the Dakota Clinic Pharmacy, correct?

MS. LORD:  Object to form.

THE WITNESS:  Again, as recited earlier, I have referred you to that discussion around with our HR and legal department.

BY MR. VON KLEMPERER:

Q.  Does Essentia care about the safety of patients?

A.  No.  Our mission is to provide -- to make a healthy difference in people's lives.  We follow our values of quality, stewardship, all of those, and that's our intent everyday that we live.

BY MR. VON KLEMPERER:

Q.  Does it care that patients receive effective treatments?

A.  And, again, I think our mission recites exactly what we are:  We want to make a healthy difference in people's lives.

Q.  Do you agree Dakota Clinic was Essentia's partner in providing healthcare to Essentia's patients?

MS. LORD:  Object to form.

THE WITNESS:  I would ask for your definition of "healthcare"?

BY MR. VON KLEMPERER:

Q.  My definition of healthcare?

A.  Yes.  You just asked me do you feel DCP, as a partner to provide healthcare.

Q.  What about the term, "healthcare," don't you understand?

A.    As it relates to this potential excursion and DCP's role.

Q.    Right.  And you understand the definition of the term, "healthcare," correct?

A.    Again, I'm asking you for your definition of healthcare, because the definition of healthcare is very broad and I do want to answer your question as it relates to healthcare, but the healthcare is very broad as it relates to specifically DCP.

Q.    Do you agree that DCP was Essentia's partner in providing affected medications to Essentia's patients?

MS. LORD:  I'll object to form.

THE WITNESS:  DCP was independently contracted with Essentia Health Innovis to provide distribution services to our clinics which would allow for care by our Essentia Health clinics.

BY MR. VON KLEMPERER:

Q.    And DCP was operating within Essentia's facility, right?

MS. LORD:  Object to form.

THE WITNESS:  As noted previously, Dakota Clinic Pharmacy leases space as defined in the lease agreement.

BY MR. VON KLEMPERER:

Q.    And that lease, that space, was within the Essentia facility, correct?