**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**EASTERN DIVISION**

---

JESSICA KRAFT, individually and as parent of minors L.K., S.K., and O.K.; SHELLI SCHNEIDER, individually and as parent of minors A.S. and W.S.; ANNE BAILEY, individually and as parent of minor D.B; AMY LAVELLE, individual and as parent of minors Em.L.and El.L.; ELIZABETH BEATON, individually and as parent of minor M.B.; AMANDA AND TYRELL FAUSKE, individually and as parents of minors C.R.F. and C.J.F; JENNIFER REIN, individually; and JESSICA BERG, individually and as parent of minors A.B. and S.B, individually and on behalf of all others similarly situated,

        Plaintiffs,

vs.

ESSENTIA HEALTH, INNOVIS HEALTH, LLC d/b/a ESSENTIA HEALTH, DAKOTA CLINIC PHARMACY, LLC, JOHN DOE MANUFACTURERS, and JOHN DOE DISTRIBUTOR,

        Defendants.

Civil File No.: 3:20-cv-00121-PDW-ARS
Hon. Peter D. Welte
Mag. J. Alice R. Senechal

**ESSENTIA HEALTH'S AND INNOVIS HEALTH, LLC'S RESPONSE TO PLAINTIFFS' MOTION TO COMPEL**

---

## I.   INTRODUCTION

Defendants, Essentia Health and Innovis Health, LLC d/b/a Essentia Health West (collectively, "Essentia"), submit this brief in response to Plaintiffs' Motion to Compel by which Plaintiffs seek an Order from this Court requiring Essentia to designate a Rule 30(b)(6) witness on topics that do not comport with the Federal Rules of Civil Procedure. Within the confines of this response, Essentia respectfully requests this Court deny Plaintiffs' Motion

because the discovery sought is simply irrelevant to any party's claim or defense and is disproportionate to the needs of the case.

## II.     STATEMENT OF FACTS

This Court is well-versed in the factual and procedural background of this case. However, the claims and defenses at issue in this matter bear repeating, particularly as they relate to Plaintiffs' present Motion.   Plaintiffs allege Essentia sold and administered temperature sensitive pharmaceutical products ("TTSPPs"), which Plaintiffs claim were subjected to one or more temperature excursions, to Plaintiffs, their children, and alleged class members.  (Doc. ID No. 119, *Second Amended Class Action Complaint*, at ¶¶ 1-4). Plaintiffs assert multiple claims against Essentia, under both North Dakota and Minnesota law, including breach of express and implied warranties, violation of consumer protection and deceptive trade practices laws, unjust enrichment, and negligence.  *Id.* at ¶¶ 239-354.

It also bears repeating what is not in dispute—that the potentially impacted products were stored and distributed by Dakota Clinic Pharmacy, LLC ("DCP") pursuant to a Shared Services Agreement with Innovis Health, LLC.  Indeed, DCP was at one time a named party to this proceeding.  (Doc. ID No. 56, *Order Granting Motion to Dismiss*; Doc. ID No. 192, *Order Granting Motion to Dismiss*).  Plaintiffs' own allegations are telling in that they assert DCP represented and warranted the quality of the potentially impacted products and that DCP distributed the potentially impacted products to Essentia facilities for administration to patients.  (Doc. ID No. 119, at ¶¶ 248-250; 273-275).  In no uncertain terms, Plaintiffs assert DCP was responsible for maintaining, storing, and distributing TTSPP inventory, including the responsibility to monitor and log temperatures at which

2

TTSPPs were stored.  *Id*. at ¶¶ 304-306.  The allegations against Essentia in this regard stem only from what Plaintiffs claim is a "closely linked" relationship between Essentia and DCP such that "they blended into a single unit" for purposes of administration.  *Id*. at ¶¶ 256, 281.  In other words, Plaintiffs allege the potentially impacted products were compromised by improper temperature storage by DCP and that despite this allegation Essentia is somehow responsible.

Essentia denies any allegations of wrongdoing and there is no concession that any of the potentially impacted products stored by DCP pursuant to the Shared Services Agreement between September 2017 and February of 2020 were indeed exposed to a temperature excursion; however, in an abundance of caution, patients were notified of a potential temperature excursion and offered revaccination at no cost.  (Doc. ID No. 103, *Essentia Health's Answer to Second Amended Complaint*).  It is this notification, informing patients that medications or vaccines they received might have been compromised by improper storage by a distribution partner, that served as the catalyst for this litigation.

Although this case has been pending since July of 2020, Plaintiffs served a Rule 30(b)(6) Notice of Deposition on March 24, 2025, noticing the corporate deposition of Essentia and outlining 20 broad areas of anticipated inquiry, including multiple subparts. (Doc. ID No. 284-2, *Plaintiffs' Notice of Deposition to Essentia Health Pursuant Fed. R. Civ. P. 30(b)(6)*).  The parties engaged in the meet and confer process, including conferences with this Court.  Since the initial service of the Rule 30(b)(6) Notice of Deposition, Essentia has presented three corporate designees to testify on at least 19 subtopics.  Other topics were resolved by written discovery and/or withdrawn.  In addition,

within this same time period, Essentia has produced three witnesses for their individual depositions.[1]  Two additional witnesses are scheduled to be deposed on May 22nd and 23rd, respectively, including one 30(b)(6) designee.  Yet another deposition is set for June 5th.  Despite this, there remains a dispute as to some of the noticed topics for which Plaintiffs now seek an Order from this Court compelling Essentia to designate a corporate representative for this purpose.  Essentia resists Plaintiffs' Motion as outlined below.

III.    **LAW AND ARGUMENT**

Rule 26 of the Federal Rules of Civil Procedure permits discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.  FED. R. CIV. P. 26(b)(1).  Proportionality is to be measured by the importance of the issues at stake in the action, the importance of the discovery in resolving the issues, and whether the burden or expense of the discovery outweighs its likely benefit, among other factors.  *Id*.  While broad, the scope of all discovery, including depositions taken by Rule 30(b)(6) of the Federal Rules of Civil Procedure, must be tempered by this standard.  Applying this standard appropriately in the context of Rule 30(b)(6) is even more important because a designated witness "must testify about information known or reasonably available to the organization," not just what the individual witness has personal and direct knowledge of.  FED. R. CIV. P. 30(b)(6).

Discovery need not be admissible, but it must be both relevant and proportional. FED. R. CIV. P. 26(b)(1).  Rule 401 of the Federal Rules of Evidence provides that relevant

---

[1] Essentia resists any assertion that these witnesses somehow failed to satisfy their obligations as deponents in their individual capacities.

4

evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence; *and* the fact is of consequence in determining the action."  FED. R. EVID. 401 (emphasis added).  In keeping with this standard, in complex cases the Court "must establish limits of time and subject matter…to keep discovery within bounds of reason and relevancy."  *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877, 898 (8th Cir. 1978).  Here, the discovery Plaintiffs seek does not meet this metric.

More specifically, Plaintiffs request this Court order Essentia to prepare and present a witness(es) to address Topics 1(c), 1(d), 1(k), 2, 8, and 14.[2]  These Topics generally relate to Essentia's policies and procedures relative to storage and monitoring (Topics 1(c) and 8), temperature monitoring systems and equipment replacement (Topics 1(d) and 14), and any prior potential temperature excursions (Topic 2).  These topics are irrelevant to the claims and defenses at issue and requiring Essentia to designate a witness to testify consistent with the commands of Rule 30(b)(6) for this purpose would be disproportionate to the needs of the case.  Plaintiffs' Motion should, therefore, be denied.

### A.    Essentia's policies and procedures are irrelevant to any party's claim or defense.

DCP contracted with Innovis Health, LLC to provide pharmaceutical management services to Innovis Health, LLC, which included the storage of vaccines and medications.

---

[2] As noted, following the deposition of Laura Morris ("Morris"), President, Pharmacist, and majority owner of DCP, Essentia indicated it would review Topic 1(k), seeking discovery regarding "the refrigerators involved, including their purchase, breakdown, and maintenance history" and provide further update following the opportunity to do so.  (Doc. ID No. 284-2).  Essentia intends to designate a witness to testify with respect to this Topic and details regarding this designation, including witness and counsel availability will be forthcoming.

The scope of services DCP was to provide to Innovis Health, LLC, are specified in Exhibit

A to the Shared Services Agreement entered into between DCP and Innovis Health, LLC

in August of 2017.  By contract, DCP was responsible for the

> management of Innovis's clinic pharmaceutical inventory, including but not limited to maintenance of Innovis's formulary, management of ordering and purchasing, periodic inspection of storage areas, security of stored pharmaceuticals, controlled substance recordkeeping, conduct of periodic audits and all other actions required for compliance with all local, state, and federal laws regulating or otherwise applicable to pharmaceuticals.

(Doc. ID No. 284-11, *Shared Services Agreement*; Doc. ID No. 291-5, *Deposition*

*Transcript of Laura Morris*, at 229:3-7; 236:13-238:1-12)[3].    Consistent with this

contractual obligation, DCP leased space from Innovis Health, LLC at 1702 South

University Drive in Fargo, North Dakota.  Exhibit A, *2015 Lease*.  As Morris testified,

pursuant to the 2015 Lease, the DCP-leased space included an area where the two

refrigerators at issue were stored.  (Doc. ID No. 291-5, 215:20-216:1-17; 218:8-17; *see*

Doc. ID No. 291-10, *Deposition Transcript of Anthony Kaufenberg*, 64:24-65:1-4).  DCP

utilized these two refrigerators for the purpose of storing pharmaceutical inventory to be

distributed by DCP to Essentia facilities.  (Doc. ID No. 291-5, at 35:3-16).   Morris

specifically testified she was unaware of any Essentia policy which would govern the

storage and monitoring of DCP's management of pharmaceutical inventory for distribution

to Essentia facilities.   *Id*. at 39:23-40:1-5.   Essentia witnesses, including a 30(b)(6)

---

[3] It should be noted that the rough transcripts provided by the court reporter to Plaintiffs' counsel specifically provide that they are not to be used or cited in any court proceedings. (Doc. ID No. 291-5).  Essentia is citing them here because Plaintiffs included them as Exhibits to their Motion and official transcripts are not yet available.

designee, did, however, explicitly testify that Essentia policies with respect to storage and monitoring were not applicable at DCP.  (Doc. ID No. 291-12, *Deposition Transcript of Maari Loy*, 102:7-10; 104:13-14; Doc. ID No. 291-10, 66:3-18).[4]

Essentia's own policies and practices regarding temperature monitoring and storage are simply irrelevant to any of the claims and defenses at issue.  This is particularly true because the crux of all of Plaintiffs' claims is that the potentially impacted products were compromised by improper temperature storage *by DCP*.  Plaintiffs have only cursorily alleged that the policies and practices on monitoring and storage are relevant to their claims without explaining *how* this is so.  *See* Doc. ID No. 291-3, pg. 9.  Instead, Plaintiffs appear to suggest that Essentia's minority ownership interest in DCP and Morris's testimony regarding the refrigerators[5] support their position.  Respectfully, these are red herrings.

The undisputed fact remains that DCP was in exclusive possession and control of the two refrigerators at issue and DCP was responsible for the storage and monitoring of any pharmaceutical inventory contained in the refrigerators during the relevant time period.  (Doc. ID No. 291-5, at 229:3-7; 236:13-238:1-12).  It is undisputed that Essentia's policies and procedures are not applicable or relevant to DCP.  Moreover, DCP was responsible for the rendition of pharmaceutical management services, which included the storage of

---

[4] Notably, Essentia deponents have been asked of their personal knowledge on these topics and have testified accordingly within their scope of knowledge.  This demonstrates Plaintiffs have in some respect already undertaking this line of discovery.

[5] Plaintiffs highlight that Morris testified she believed the two refrigerators at issue were owned by Essentia.  Morris also testified, however, that aside from a receipt which was produced as part of *DCP's production* in this case, reflecting the purchase of one of the two refrigerators at issue, she has no information about what entity purchased the refrigerators.  (Doc. ID No. 291-5, 208:9-210:1-13).

7

medications to be distributed to Essentia facilities, including the responsibility to maintain the appropriate temperature range. *Id*. And, it is DCP who Plaintiffs allege failed to maintain appropriate temperature ranges. To be sure, Morris testified she believes DCP properly monitored the temperatures of the two refrigerators at issue. *Id*. at 219:23-220:1-2.

It is similarly inconsequential to this analysis the minority ownership interest Innovis Health, LLC held in DCP. North Dakota law explicitly provides a registered pharmacist must be in charge of every pharmacy and "[t]he management of the pharmacy is under the personal charge of a pharmacist" licensed and in good standing in North Dakota. N.D. CENT. CODE §§ 43-15-32 and 43-15-35(d). Innovis Health, LLC's minority interest does not change this black letter law. The language of the Shared Services Agreement, DCP's Operating Agreement, and the law align in that it is the pharmacist, licensed and regulated by the North Dakota Board of Pharmacy, who is ultimately responsible for compliance with existing laws and regulations, including any that may relate to storage and temperature monitoring.[6] *See* Doc. ID No. 291-7, *Amended and Restated Operating Agreement of Dakota Clinic Pharmacy, LLC*, Section 6.2 (The Chief Manager, who is to be an individual holding a valid pharmacist license from the State of North Dakota, shall have general active management of DCP).

---

[6] In addition, Morris testified that while Essentia personnel would be permitted to enter the DCP-leased space pursuant to the terms of the lease in the event of an emergency; only pharmacist owners are otherwise permitted entry. (Doc. ID No. 291-5, at 227:9-228:1-17). This was consistent with the deposition testimony of Maari Loy, Pharmacy Operations Senior Manager for Essentia Health West Market. (Doc. ID No. 291-12, at 56:18-20).

8

Despite testimony by DCP and Essentia to the contrary, Plaintiffs cite to a provision of the Shared Services Agreement to suggest that DCP was, in fact, bound by Essentia policies. More specifically, Section 4 of the Shared Services Agreement addresses corporate compliance and required DCP to review and abide by Essentia's Code of Conduct, "the goal of which is to ensure that all federal, state, local laws and regulations are followed." (Doc. ID No. 284-11, pg. 2). Requiring DCP to comply with a Code of Conduct, applicable to all outside vendors, does not render Essentia's policies and procedures on temperature monitoring and storage applicable. *See* Doc. ID No. 284-11, pg. 3; Doc. ID No. 291-6, *Deposition Transcript of Frank Modich*, 38:13-17. Instead, this provision of the Shared Services Agreement reinforces that DCP was responsible for compliance with all federal, state, local laws and regulations. *Id*.

Plaintiffs further suggest that the administrative and staffing services provided by Innovis Health, LLC to DCP as part of the Shared Services Agreement alters this conclusion. However, that Innovis Health, LLC provided a Human Resource solution to DCP as part of the Shared Services Agreement does not render Essentia policies applicable either. As Morris herself testified, DCP reimbursed Innovis Health, LLC for payroll and the administration of benefits provided by Innovis Health, LLC, pursuant to the Shared Services Agreement. (Doc. ID No. 291-5, 156:9-157:1-5). Essentia did not participate in interviews and did not make ultimate hiring decisions. *Id*. at 155:25-156:1-8. Similarly, aside from providing the software, Essentia is not involved in any way in the employee disciplinary process at DCP either. *Id*. at 157:6-158:1. Morris recognized limitations in the software available to DCP pursuant to the Shared Services Agreement in that it denotes

a supervisor.  *Id*. at 246:2-16.  Accordingly, as Morris testified, this is why an individual affiliated with Essentia may be denoted as the supervisor or manager for a DCP employee.[7] *Id*.  However, Morris's testimony was unequivocal in that Essentia personnel did not supervise or otherwise manage the pharmacists and staff at DCP.  *Id*. at 246:17-247:1-3. Testimony of the Essentia designee on this point reinforced this understanding.  (Doc. ID No. 291-6, *Deposition Transcript of Frank Modich*, 43:18-44:1-3).  In other words, there is no dispute by DCP and Essentia that the personnel and staff at DCP are wholly managed by DCP.

Under the umbrella of policies and procedures, Plaintiffs now also appear to seek designation of a witness to testify regarding Essentia's policies with respect to medication administration.  While this language was initially included in Plaintiffs' Rule 30(b)(6) Notice, Essentia had understood this subtopic to be effectively withdrawn.  Even assuming this issue was properly before the Court, this subtopic is of even less relevance than Essentia's policies regarding temperature monitoring and storage.  Plaintiffs contend only that because the potentially impacted medications were administered by Essentia personnel[8] at Essentia facilities, they are entitled to testimony regarding medication administration policies.  However, Plaintiffs have only asserted allegations regarding the alleged improper storage of certain TTSPPs, which Plaintiffs repeatedly attribute to DCP;

---

[7] Morris was asked about a purported performance review of her by Al Hurley from September of 2020.  (Doc. ID No. 291-5, 183:3-185:1-5).  She testified she was not aware of any performance assessments conducted by Mr. Hurley in 2020 or any other occasion. *Id*.

[8] Essentia Health does not itself provide healthcare services and does not employ healthcare providers.

Plaintiffs have not made any allegations regarding administration of the vaccines or medications. Essentia's medication administration policies have simply no bearing on any of the claims or defenses at issue and requiring Essentia to designate a witness on such topic would be grossly disproportionate to the needs of the case.

     B.     **The availability of temperature monitoring systems and efforts to replace refrigerators or temperature monitoring systems is similarly irrelevant.**

Plaintiffs make much of the fact Essentia developed a process for replacing both its equipment, including refrigerators and freezers, as well as monitoring systems and repeatedly misstate that all of this work was done in direct response to the potential temperature excursion at DCP. Nonetheless, the One Essentia Fridge Project was implemented to "oversee comprehensive review and analysis of *Essentia's* current temperature monitoring systems and to make recommendations regarding the same." (Doc. ID No. 227, *Declaration of Frank Modich*, ¶ 45 (emphasis added)). Not unlike Essentia's storage and monitoring policies, what steps Essentia took, separate and apart from the potential temperature excursion, to implement and/or modify temperature monitoring systems or equipment internally has nothing to do with whether DCP appropriately conducted temperature monitoring for the DCP-stored medications and whether DCP experienced an actual temperature excursion.

Indeed, the discovery of the potential temperature excursion occurred as part of Essentia's standardization of pharmacy processes across the Essentia system. (Doc. ID No. 291-12, 27:19-28:1-11). Innovis Health, LLC provided notice to DCP of its intent to terminate the pharmaceutical services provision of the Shared Services Agreement in 2019.

To effectively manage that transition, Essentia pharmacy services began supplying Essentia facilities with inventory.  *Id*. at 35:3-17.  The final piece of this project was to relocate the remaining Essentia inventory DCP had on hand.  *Id*.  This work occurred in February of 2020.  As part of this project, the two refrigerators located in DCP's leased space and used for the purpose of storing product to be distributed to Essentia facilities pursuant to the Shared Services Agreement were relocated to the basement at Essentia's South University location.  *Id*. at 36:1-39:1-8.  DCP no longer had a need for these refrigerators since it would no longer be providing pharmaceutical management services to Innovis Health, LLC.  *Id.*

While located in DCP's leased space, DCP utilized Electro Watchman, a temperature regulation system, to monitor the refrigerators at issue.  (Doc. ID No. 291-5, 46:3-6; 220:3-6).  This system had been in place since before Morris began working at DCP in 2012.  *Id*. at 46:8-10; 13:5-8.  Morris testified that the Electro Watchman system was set up to notify a DCP pharmacist directly by phone if there was a documented temperature outside of a specified range.  *Id*. at 57:3-20; 109:7-11.

In the weeks leading up to the transition away from DCP's pharmaceutical management services, Essentia contracted with Electro Watchman for monitoring services and had an Electro Watchman panel installed in the location where the two DCP refrigerators were to be moved.  (Doc. ID No. 291-12, 41:6-17).  After the two DCP refrigerators were physically relocated, Electro Watchman alerted Essentia of an out-of-range temperature, which served as the genesis of Essentia's investigation into the potential temperature excursion.  *Id.* at 62:9-16.  At the time of the relocation, Essentia was already

in the process of transitioning from Night Owl to Digi Smart Sense, two entirely separate temperature monitoring technologies. *Id*. at 117:13-118:1-9.

With this backdrop, Plaintiffs cite *White v. Union Pacific* for the proposition that modifications made to equipment that could have prevented a plaintiff's injury are relevant. Importantly, the Plaintiff in *White* brought a negligence claim against his employer for workplace injuries sustained. *White v. Union Pacific R. Co.*, No. 09-1407-EFM-KGG, 2011 WL 721550, *1 (D. Kan. Feb. 22, 2011). In furtherance of his claim, the Plaintiff sought discovery regarding any alterations or modifications to the dismounting equipment the railroad provided to its employees. *Id*. at *7-8. The *White* Court permitted such inquiry. *Id.* This decision, however, does not and cannot stand for the proposition that Plaintiffs are entitled to discovery regarding any alteration or modification without first demonstrating a more than a tangential relationship between the claims and defenses at issue and the alleged alteration and/or modification.

Again, it is undisputed that DCP was responsible for the pharmaceutical management of Essentia's inventory stored in two refrigerators housed in DCP's leased space. This included the responsibility to manage and monitor temperature ranges. Morris testified that DCP used Electro Watchman and handwritten logs for this purpose. (Doc. ID No. 291-5, 46:3-15). What Essentia did or did not do over the course of the last five years to modify or alter its refrigerator equipment and/or temperature monitoring systems bears no reasonable relationship to whether DCP satisfied the terms of the Shared Services Agreement or its obligations under North Dakota law. Plaintiffs' superficial suggestion to the contrary does not make this so.

### C.    Any prior potential temperature excursions are irrelevant.

Topic 2 seeks discovery regarding any prior temperature excursions at Essentia facilities and any remedial measures implemented following any prior temperature excursion.  However, as noted above, the only refrigerators at issue in this lawsuit are those confined to DCP's leased space utilized exclusively by DCP to store pharmaceuticals pursuant to the Shared Services Agreement.  Without explanation, Plaintiffs contend that Essentia's response to prior temperature excursions, absent any temporal or geographical limitation, is relevant to foreseeability and unconscionability.  This simply is not the case.

For this proposition, Plaintiffs singularly cite *Mehner v. Panera, LLC*, a case in which the Plaintiff fell to the floor in a restaurant after the back of the chair he was sitting on broke.  No. 8:22CV168, 2023 WL 5844328, *1 (D. Neb. Sept. 11, 2023), objections overruled, No. 8:22CV168, 2023 WL 6810277 (D. Neb. Oct. 16, 2023).  The Plaintiff sought discovery regarding other similar incidents, denoting this as a 30(b)(6) Topic, among other discovery requests.  The court in *Mehner* recognized that evidence of prior and substantially related accidents or incidents may be relevant to demonstrate Plaintiffs' accident was foreseeable.  *Id*. at *11.  In other words, that "Panera was on notice that the back on this type of wood chair could splinter off." *Id*.  The operative words in the Court's analysis are "substantially related."

The substantial similarity doctrine stands for the proposition that prior incidents must generally be substantially similar in time, place, or circumstance to be considered relevant if offered for an otherwise proper purpose.  *Sobolik, Tr. For Sobolik v. Briggs & Stratton Corp.*, No. CV 09-1785 (JRT/RLE), 2010 WL 11640193, at *2–3 (D. Minn. Mar.

14

16, 2010), aff'd, No. CV 09-1785 (JRT/RLE), 2010 WL 11640190 (D. Minn. July 26, 2010). While the substantial similarity doctrine is often applied in the context of admissibility, it is no less applicable at the discovery phase because "it helps to define the parameters of relevant information." *Id*. (quoting *Wakehoue v. Goodyear Tire & Rubber Co.*, 2007 WL 1340788 at *8 (D. Neb. April 5, 2007)). The reason for this recognized limitation is because "the discovery of detailed information, that has no discernable relevance to the claim and defenses being litigated, simply increases the cost of litigation, without benefiting the search for the truth." *Id*. at *3. Importantly, "[t]he fact that a plaintiff's complaint alleges an expansive theory of liability does not necessarily justify expansive discovery," as "[d]iscovery must be relevant to the plaintiff's actual claims or defenses." *Id*. (quoting *Hajek v. Kumho Tire Co*., No. 4:08CV3157, 2010 WL 503044, at *5 (D. Neb., February 8, 2010)).

Here, Plaintiffs' Second Amended Complaint includes allegations regarding prior potential temperature excursions at Essentia facilities. (Doc. ID No. 119, ¶¶ 200-204). Importantly, these allegations in no way form the basis of Plaintiffs' various claims. In fact, the Second Amended Complaint does not tie these allegations to any of Plaintiffs' claims at all. Even so, it is clear that even the specifically referenced prior potential temperature excursions are not substantially similar to justify designation of a 30(b)(6) witness on this topic. For example, there is no suggestion that the referenced prior potential temperature excursions involved vaccines and/or medications stored by a distribution partner, generally, or DCP, specifically. In addition, the one potential temperature excursion on which Plaintiffs obtained documents from the North Dakota Department of

Health involved *high* temperature alarms, as opposed to a concern over potential temperatures *below* the recommended range as is at issue here.

This case is complex in many ways and discovery has been voluminous and extensive, but the reality remains that the universe of relevant information is confined by the fact that the potential temperature excursion at issue concerns product stored in two refrigerators physically located in DCP's leased space and for which DCP was contractually and legally responsible for the storage and monitoring, including monitoring of applicable temperature ranges. Whether and to what extent Essentia experienced potential temperature excursions internally prior to DCP's potential temperature excursion has no bearing on the claims and defenses at issue in this case whatsoever.

> **D.    Requiring Essentia to designate a witness to testify on these irrelevant topics is inconsistent with the scope of discovery and would be disproportionate to the needs of the case.**

The concept of proportionality is "designed to provide parties with efficient access to what is needed to prove a claim or defense, but eliminate unnecessary or wasteful discovery." *Alvarado-Herrera v. Acuity*, 344 F.R.D. 103, 105 (D. Nev. May 18, 2023). The discovery rules mandate reasonable limits in reliance on this principle. *Id*. Application of proportionality is arguably of even greater import to Rule 30(b)(6) depositions because the organization is required to prepare the designee "beyond matters personally known to the witness." *Id*. (quoting *Risinger v. SOC, LLC,* 306 F.R.D. 655, 663 (D. Nev. 2015)). Instead, "[t]he deponent must be 'thoroughly educated' on the topics." *Id*. (citing *Great Am. Ins. Co. of N.Y. v. Vegas Constr. Co.,* 251 F.R.D. 534, 539 (D. Nev. 2008)). This is itself a substantial responsibility which imposes a burden on the responding party. *Id*.

"Although a Rule 30(b)(6) deposition may necessarily entail considerable preparation, the court has a duty to protect a party from being needlessly burdened." *Id*. (quoting *Nichols v. Credit Union 1*, No. 2:17-cv-02337-APG-GWF, 2018 WL 11404371, at *2 (D. Nev. Dec. 26, 2018)). Accordingly, courts "'repeatedly emphasize[] the practical constraints on the scope of a [Rule] 30(b)(6) deposition' in that it is not feasible for 'a Rule 30(b)(6) witness to know the intimate details of everything.'" *Id*. (quoting *United States v. HVI Cat Canyon, Inc*., No. CV 11-5097 FMO, 2016 WL 11683593, at *7-8 C.D. Cal. Oct. 26, 2016)). Hence, the purpose and design of Rule 30(b)(6) is not to burden the responding party "with production and preparation of a witness on every facet of the litigation." *Id*. at *107 (quoting *Apple Inc. v. Samsung Elecs. Co*., No. C 11-1846 LHK, 2012 WL 1511901, at *2 (N.D. Cal. Jan. 27, 2012)).

While it is true that information regarding Essentia's policies and practices, temperature monitoring systems, and any prior temperature excursions are within its control as an organization, that does not mean there is no resulting harm in requiring Essentia to designate a witness to testify on these topics. Indeed, the Federal Rules of Civil Procedure directly require discovery to be both relevant and proportional. The discovery Plaintiffs seek to compel is neither and requiring Essentia to satisfy its obligations under Rule 30(b)(6) in designating a witness to testify regarding its policies and procedures results in a burden to Essentia for which there is no concomitant benefit.

For example, the existence and terms of Essentia's policies do not make whether a potential temperature excursion actually occurred more or less likely. The existence and terms of Essentia's policies similarly do not make whether DCP satisfied its obligations to

appropriately store and maintain vaccines and medication, including at appropriate temperature, more or less likely either. In that regard, the importance of the discovery in resolving any of the issues raised in this litigation is of demonstrably doubtful significance. For the same reason, there is no benefit to be gained in requiring Essentia to produce a witness for this purpose. The same is true with respect to the availability of temperature monitoring systems and any changes made to Essentia's refrigerator equipment and temperature monitoring technology. Similarly, any prior temperature excursions Essentia may have experienced is of no import to the issues at stake in this action and because of this the burden to Essentia in having to prepare a witness on this topic clearly outweighs any benefit, the existence of which is denied. On this record, the discovery Plaintiffs seek is not proportionate to the needs of the case.

In undertaking this analysis, it should not be lost on the parties or this Court the phenomenal volume of discovery that has been completed to date. Recognizing this Court has only had the benefit of reviewing select records for in-camera review, the Court questioned "whether many—perhaps most—are relevant to determination of Essentia's liability or to determination of the amount of plaintiffs' potential damages." (Doc. ID No. 225, pg. 51). Essentia has produced in excess of 50,000 pages of documents, many of which are themselves thousands of pages in length, and responded to various discovery requests without conceding relevance. Whereas Essentia has made designations on many of the Rule 30(b)(6) topics, Essentia respectfully requests that Plaintiffs' Motion be denied.

18

## CONCLUSION

For those reasons stated above, Essentia respectfully requests Plaintiffs' Motion be denied.

Dated this 20th day of May, 2025.

**VOGEL LAW FIRM**

*/s/ Briana L. Rummel*

BY:   Angela E. Lord (#05351)
Briana L. Rummel (#08399)
218 NP Avenue
PO Box 1389
Fargo, ND  58107-1389
Telephone:  701.237.6983
Email:    alord@vogellaw.com
          brummel@vogellaw.com

**BASSFORD REMELE**
*A Professional Association*

Christopher R. Morris (#230613)
Bryce D. Riddle (#398019)
100 South 5th Street, Suite 1500
Minneapolis, MN 55402-1254
Telephone:  612.333.3000
cmorris@bassford.com
briddle@bassford.com

ATTORNEYS FOR DEFENDANTS
ESSENTIA HEALTH AND INNOVIS
HEALTH, LLC