# SEALED EXHIBIT I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

_____

JESSICA KRAFT,                    CASE NO. 320-CV-121
INDIVIDUALLY AND AS PARENT
OF MINORS L.K., S.K. AND
O.K.; SHELLI SCHNEIDER,
INDIVIDUALLY AND AS PARENT
OF MINORS A.S. AND W.S.;
ANNE BAILEY AS PARENT OF
MINOR D.B.; AMY LAVELLE AS
PARENT OF MINORS EM.L. AND
EL.L; ELIZABETH BEATON,
INDIVIDUALLY AND AS PARENT
OF MINOR M.B.; AMANDA AND
TYRELL FAUSKE, INDIVIDUALLY
AND AS PARENTS OF C.R.F. AND
C.J.F.; JENNIFER REIN
INDIVIDUALLY; AND JESSICA BERG
AS PARENT OF MINOR A.B. AND S.B.,
INDIVIDUALLY AND ON BEHALF
OF OTHERS SIMILARLY SITUATED,

          Plaintiffs,
vs.
ESSENTIA HEALTH, INNOVIS
HEALTH, LLC, D/B/A ESSENTIA
HEALTH, DAKOTA CLINIC
PHARMACY, LLC, JOHN DOE
MANUFACTURERS AND JOHN DOE
DISTRIBUTOR,

          Defendants.
_____

     VIDEO-RECORDED REMOTE ZOOM VIDEOCONFERENCE
  DEPOSITION OF MAARI LOY, PharmD, MBA, BCPS, FASHP
          Taken on Friday, May 9, 2025
          Scheduled for 9:30 a.m. CDT
REPORTED BY:  DANA S. ANDERSON-LINNELL
Job No.:  PA 7323163

Page 2

VIDEO-RECORDED REMOTE ZOOM VIDEOCONFERENCE DEPOSITION OF MAARI LOY, PharmD, MBA, BCPS, FASHP, taken on Friday, May 9, 2025, commencing at 9:32 a.m. CDT, via a REMOTE ZOOM PROCEEDING, before Dana S. Anderson-Linnell, a Stenographic Shorthand Reporter and Notary Public of and for the State of Minnesota.

***************

APPEARANCES

On Behalf of the Plaintiffs:

Brian Marty, Esquire

J. Barton Goplerud, Esquire (partial day)

SHINDLER, ANDERSON, GOPLERUD & WEESE, P.C.

5015 Grand Ridge Avenue, Suite 100

West Des Moines, IA 50265

Email:  marty@sagwlaw.com

        goplerud@sagwlaw.com

(Appearances continued on next page.)

Page 3

APPEARANCES (continued):


On Behalf of the Plaintiffs:

Mike von Klemperer, Esquire

Ashali Chimata, Esquire

FEGAN SCOTT, LLC

1763 Columbia Road Northwest, Suite 100

Washington, DC 20009

Email:  mike@feganscott.com

        ashali@feganscott.com


On Behalf of Defendants Essentia Health and

Innovis Health:

Angie E. Lord, Esquire

Briana L. Rummel, Esquire

VOGEL LAW FIRM

200 North Third Street, Suite 201

Bismarck, ND 58501

Email:  alord@vogellaw.com

        brummel@vogellaw.com


(Appearances continued on next page.)

Page 4

APPEARANCES (continued):


ALSO PRESENT:  Frank Modich, Essentia

              Jeff Gibbs, Concierge (part day)

              Chinyere Woods, Concierge (part day)

              Christine Stroia, Videographer


NOTE:  The original transcript will be filed with the

Shindler, Anderson, Goplerud and Weese Law Firm,

pursuant to the applicable Rules of Civil Procedure.

Page 5

INDEX                                                    PAGE

WITNESS:  MAARI LOY, PharmD, MBA, BCPS, FASHP

EXAMINATION BY:

Mr. Marty                                                9

Ms. Lord                                                 132

Mr. Marty                                                134

INSTRUCTIONS NOT TO ANSWER:  (None.)

PRODUCTION REQUESTS:  (None.)

INDEX OF MARKED EXHIBITS:

Exhibit 58 - (b) 2019.8.21 - EH026609 to 610      107

Exhibit 59 -  (f) 2020.2.25 - EH049462 to 468      110

Exhibit 60 - (i) 2020.3.24 – EH031784 to 85       119

Exhibit 61 -  (t) 2020.7.30 – EH046508             126

Exhibit 62 -  (u) 2020.9.10 - EH028304             128

Page 6

INDEX OF PREVIOUSLY MARKED EXHIBITS:                    PAGE


Exhibit 9 - Anthony Kaufenberg - 04-23-2025          96


Exhibit 10 - EH036563                                104


(Original exhibits attached to original transcript;
copies to counsel as requested.  Previously marked
exhibits referenced not attached.)


REPORTER'S NOTE:  All quotations from exhibits are
reflected in the manner in which they were read into
the record and do not necessarily indicate an exact
quote from the document.

Page 7

THE COURT REPORTER:  Do all counsel stipulate that I may swear in the witness remotely over the Zoom videoconference?

MR. MARTY:  Yes.

MS. LORD:  Yes.

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:32 a.m. on May 9th, 2025.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and Internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio and video recording will continue to take place until all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Maari Loy taken by counsel for plaintiff in the matter of Kraft, et al. versus Essentia Health, et al., filed in the United States District Court for the District of North Dakota, Case Number 320-CV-121.

My name is Christine Stroia, representing Veritext, and I am the

Page 8

videographer.  The court reporter is Dana Anderson-Linnell from the firm Veritext.

I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to the proceeding, please state them at the time of your appearance.  Counsel and all present, including remotely, will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MR. MARTY:  Brian Marty for the plaintiffs.

MR. VON KLEMPERER:  Mike von Klemperer for the plaintiffs.

MS. LORD:  Angie Lord representing the Essentia defendants and also the witness, Maari Loy.  And Frank Modich, the corporate representative, is also present.

MS. CHIMATA:  Ashali Chimata for the plaintiffs.

MR. RUMMEL:  Briana Rummel also for the Essentia defendants.  Thank you.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness, and then

Page 9

counsel may proceed.

MAARI LOY, PharmD, MBA, BCPS, FASHP,

called as a witness, being first duly sworn,

was examined and testified as follows:

EXAMINATION

BY MR. MARTY:

Q.    Dr. Loy, good morning.  My name is Brian Marty.  We met off the record.  I'm one of the lawyers that represents the plaintiffs in this matter.

Have you ever given a deposition before?

A.    I have not.

Q.    Okay.  Let's start by stating your name and your address for the record, please.

A.    My home address or my --

Q.    Business address is fine.

A.    Okay.  My name is Maari Loy, and my business address at Essentia Health is 3000 32nd Avenue South in Fargo, North Dakota 58103.

Q.    A couple of ground rules for the deposition that are geared primarily at making sure we have a clear transcript at the end of the day.  First of all, I need you to answer my questions using words.  If you nod your head up and down, I know what you're trying to

Page 10

communicate, but that is hard for the court reporter, Dana, to write down, so I need you to answer using words.

A.    Okay.

Q.    Does that make sense?

A.    Yes.

Q.    Okay.  We all sort of slip into head nods or shoulder shrugs or uh-huh at some point.  If I ask you is that a yes or is that a no, I'm not trying to nag you, I'm just trying to make sure we have a clear record.  Okay?

A.    Sure.

Q.    Also for the sake of the transcript it's important that we don't talk over each other. So please do your best to wait until I am done asking my question before you start your answer, and I'll try my hardest not to talk over you as well.  Okay?

A.    Okay.

Q.    If for some reason you don't understand a question that I ask, whether it's you don't understand substantively the question or maybe it gets garbled by the videoconferencing software we're using, let me know, and I'll be happy to rephrase or reask the question.  Okay?

Page 11

A.    Yep.

Q.    For each question you do answer we'll be entitled to assume that you understood the question, is that fair?

A.    Yes.

Q.    I'm not entitled to hear about what you talked with any of Essentia's lawyers about. So don't tell me what you talked with lawyers about, but otherwise would you tell me what you did to prepare for today's deposition?

A.    Yes.  So to prepare for today's deposition I met with Angie Lord, Briana Rummel and Frank Modich, and they prepared me to understand some of the processes of how this works.

MS. LORD:  He's not asking you about --

BY MR. MARTY:

Q.    Don't tell me what you talked about with lawyers.

A.    No, I'm not.  We just met to talk about what we're doing today.  Is that what you mean?

MS. LORD:  He's asking you -- I think you're asking what did she review outside of meeting with attorneys?

Page 12

MR. MARTY:  Let me ask it a different way.

MS. LORD:  Okay.

BY MR. MARTY:

Q.    Other than meeting with lawyers, did you do anything to prepare for today?

A.    No.

Q.    Did you review any documents?

A.    I reviewed the documents that were in the share file.  Is that what you mean?

Q.    Who did you receive that share --

A.    [Unintelligible].

Q.    Who set that share file up?

A.    Briana Rummel.

Q.    Okay.  Did you review any documents other than the documents in the share file?

A.    No.

Q.    Did you talk with anyone outside the presence of counsel about today's deposition?

A.    No.

Q.    Are you currently employed?

A.    Yes.

Q.    What is your current employment?

A.    I'm the pharmacy operations senior manager for Essentia Health west market.

Page 13

Q.    How long have you been in that role?

A.    Since June of 2019.

Q.    Were you employed before June of 2019?

A.    I was.

Q.    In what capacity and for whom?

A.    I was a senior pharmacy project manager and senior pharmacist for Sanford Health.

Q.    Is that in Fargo?

A.    Yes, Fargo and North Dakota, South Dakota, Minnesota.  I had responsibilities for many critical access hospitals and clinics.

Q.    How long were you in that role?

A.    I started that role in 2011.

Q.    Where were you employed before Sanford Health, or if it was within Sanford Health, what was your role before 2011?

A.    I was an ICU pharmacist, a critical care unit pharmacist for Sanford in Fargo.  And then prior to that, I was a pharmacy resident where I completed my PGY1 postgraduate pharmacy residency.

Q.    What year did you complete the residency?

A.    In 2011.

Q.    Tell me about your --

Page 14

A.    [Unintelligible].

Q.    I'm sorry.  Go ahead.

A.    I started in 2010.

Q.    Tell me about your education after high school.

A.    I completed my PharmD, my Doctor of pharmacy, from North Dakota State University from 2004 until 2010.  I also began working after I completed my master's of science in pharmaceutical sciences on my master's in business administration from 2008 until 2011 overlapping those times, also a board-certified pharmacotherapy specialist, which is a licensing and certification exam that is a Board of Pharmacy specialty certification exam. Also, a BCPS is my additional credential within that.  That particular credential has focus on clinical pharmacy services.  It also has regulatory medication management from the CMS and from the Joint Commission of Medication Management regulations for the United States. I also am a fellow of American Society of Health-System Pharmacists for my leadership within North Dakota Society of Health System Pharmacists group as well.  So that fellowship

Page 15

is an important part of publications, being a leader in the state and in national pharmacy organization.  So I'm a delegate for the ASHP, American Society of Health-System Pharmacists, for North Dakota in the ASHP House of Delegates, which I continue to hold that position right now.  I'm also past president and currently member at large for North Dakota Society of Health-System Pharmacists.

Q.    I tried to keep my notes up with your testimony, so I've got a couple follow-up questions.  Did you complete your MBA or just take courses towards an MBA?

A.    I completed my MBA in 2011 at NDSU, North Dakota State University.

Q.    What was the purpose of obtaining that degree?

A.    I knew that I wanted to be a leader. And as I was working through my residency program, I was recognizing the importance of being able to have leadership experience and knowledge to be able to successfully lead a team, and then also to assist health systems into my future in continuing to be strong in understanding business and finance and how to

Page 16

be successful within health system pharmacy.

Q.    Going back to your employment.  You left Sanford in 2019 to join Essentia.  Did I get that right?

A.    Yes.

Q.    Are Sanford and Essentia affiliated?

A.    They are not.

Q.    What was the purpose of the move to Essentia in 2019?

A.    The purpose of my move to Essentia in 2019 was the opportunity to be a leader within the Essentia Health team.  I was excited for the opportunity to lead a team that had great patient service and being able to continue to advance pharmacy practice within the team at Essentia.

Q.    Did I write down right that you're the pharmacy operations senior manager?

A.    Yes.

Q.    What does that involve day to day?

A.    Day to day, I lead a team of pharmacists, pharmacy technicians, intern pharmacists, pharmacy residents, and I lead the team for the hospital, the infusion centers, and then I have responsibility for the

Page 17

medication management in our clinics as well.
So day to day, I could be attending meetings, I
could be going to sites within the west market.
So from between Bismarck and Moorhead is really
my area.  And then -- from Moorhead, Minnesota
to Bismarck, North Dakota.  And then I also do
continue to have a staffing component as well
in the hospital at infusion center pharmacies.
So I could be found working in the hospital
pharmacy as well as a pharmacist.

Q.     I heard you describe several different
teams of people whom you supervise and maybe
three teams.  Did I hear that right?

A.     They're all one pharmacy team, but they
have different licenses.  So they're
pharmacists, pharmacy technicians and student
pharmacists.  So there's a different licensure
requirement from the North Dakota Board of
Pharmacy for that.

Q.     I'm trying to get a sense of where your
role fits into the organization structure.  Can
you tell me in a little bit more detail each of
the groups or teams that report to you and what
those groups or teams are tasked with doing?

A.     Are you talking about the teams of the

Page 18

people or the teams of the hospital infusion centers and the clinics?

Q.       However you want to describe it.  Give me a sense for the people or groups of people that report to you and what those people or groups of people do.

A.       Okay.  So I can -- I can start with how I did the hospital infusion centers and the clinics in the order that I listed them at the beginning.  The hospital pharmacy group is a group of pharmacists, pharmacy technicians and intern pharmacists that are in the hospital. They work in the central pharmacy, and then they also are really throughout the hospital serving patients.  And so from that, that looks like that there would be a pharmacist sitting at a nurse's station that is working on an interdisciplinary team and attending academic teaching rounds or team-based rounds within that team in the interdisciplinary, so the physician, the nursing colleague and, like, case management.  So they would be working in that particular area, those pharmacists.  A provider would put an order in, and we would in pharmacy verify the order, and then we would

Page 19

get the medication to the patient in the hospital pharmacy.

(Off the record 9:47 to 9:48.)

BY MR. MARTY:

Q.    Okay.  I think you were describing to me the different groups and teams --

A.    Yeah, the hospital?

Q.    Yep.  So if you could continue your answer, that would be great.

A.    Sure.  So the hospital pharmacy, then we would prepare the medication, so it would be medications that would be oral, medications that would be IV or intravenous or any routes that were needed for that patient's care.  In the infusion center we have pharmacists and pharmacy technicians also preparing medications in an infusion center setting where the patient comes and goes during that day for an infusion. And then in the clinics, our pharmacy technicians that are pharmacy buyers are also getting medications that are ordered by nursing -- or the order is put in by the physician for the patient's prescription order, but then the nurse colleague is requesting the medication from our pharmacy technicians and

Page 20

buyers, that then we send to them.  So those medications are then provided by us from all facets of the health system in the west market from Moorhead to Bismarck.

Q.     Have you told me about all of the groups or persons that report to you in your role?

A.     Yes.

Q.     Do you report to someone?

A.     I do.  I report to Wes Bickler.  He is the director of hospital pharmacy for Essentia Health.

Q.     How long has he been in that role?

A.     I don't recall.  I -- it's been a couple of years, but I -- not my entire time, but I don't recall if it was -- what year it was.

Q.     Who was Mr. Bickler's predecessor?

A.     David Sperl.  And he was in that position also for -- as the senior director for acute care pharmacy.  Yeah, Wes Bickler, B-i-c-k-l-e-r, is the -- my current leader.

Q.     Was --

A.     David --

Q.     I'm sorry.  Go ahead.

A.     David Sperl, S-p-e-r-l.  And he is senior director of acute care pharmacy.  And he

Page 21

was also my leader for a short time.  I don't recall the number of months.  And then prior to that, Tony Kaufenberg was the senior director of acute care pharmacy.

Q.    Are those three persons the only ones you've reported to since you joined in 2019?

A.    Yes.

Q.    Has your role or job duties changed materially since you joined in 2019?

A.    My job description has not changed. Different projects that I'm working on, I think, just within any role does change a bit, but generally my job description has stayed the same.

Q.    Let's shift gears a little bit.  Do you know what this lawsuit is about?

A.    I know that it is revolving around a potential temperature excursion that was stemming from one of our distributors or Dakota Clinic Pharmacy.  I know that about this case.

Q.    If I use the word "temperature excursion," will you understand -- or the phrase "temperature excursion," will you understand that to mean the temperature excursion that's the subject of this lawsuit?

Page 22

MS. LORD:  I'll just object to form.

BY MR. MARTY:

Q.    And I think your counsel or Essentia's counsel have called it the potential temperature excursion, but if I use those words or that phrase, you'll understand that we're talking about the temperature excursion or potential temperature excursion that's the subject of this case, fair?

A.    Yes.  And I will ask clarifying questions if I'm unsure what you're asking.

Q.    Okay.  And you're always entitled to ask clarifying questions if you don't understand what I'm asking.

A.    Sure.

Q.    So when did this temperature excursion or potential temperature excursion happen?

A.    Can you -- can you clarify which portion you're asking about right now?

Q.    Well, tell me why there's maybe more than one portion in your mind.

A.    I'm wondering if you're asking about, like, the beginning of the project that you're wanting to hear about or the day that -- I just am unsure what timeline you're asking about.

Page 23

Q.    Okay.  No, I appreciate -- appreciate that.  Tell me about the project that you refer to just so we're speaking the same language.

A.    Sure.  So when I started at Essentia in June of '19, my senior director of acute care pharmacy, Tony Kaufenberg, at the time had met with me and people on my team to really get to where Essentia is as a system.  We're a shared system pharmacy services department, and so we all report up to who at that time was Dianne Witten.  And as Essentia is moving toward more of, like, an operating health system where we have similar processes and standards of how we take care of our patients so that we can have the same workflows and serve patients in the same way within how we take care of our patients, we -- he really was requesting us to come alongside the standard process for how medications are provided in our clinics in the west market.  And so he had requested that we start -- and I had previous experience working at my previous health system in this type of a workflow, so it wasn't -- it was a very normal thing for me to understand and know that why -- you know, why we -- he wanted this standard to

Page 24

be this way and how we can really improve patient care by having consistent expectations through for all the care teams, and he had really been -- met with us to start working towards this goal of the west market pharmacy service team also providing medications to our clinic patients.

Q.    So let me make sure I understood you. The project was, generally speaking, to standardize how the medications were provided in west market?

A.    In west market, and then also from the system.  So the system in east market also was already providing medications to clinic patients.  So we were -- the key was aiming to standardize both markets together.  So we were standardizing to that system standard of the acute care pharmacy teams providing medications to patients in the clinic.

Q.    Tell me about the evolution of that project then.

A.    So this project was one of my first projects at Essentia.  And so I think that we all can -- as I've been reflecting in my mind about today and really, you know, trying to

Page 25

remember and understand the project as well, I -- I reflected that it was one of my first projects, and I had some pretty -- because it was -- it's kind of like your first -- I don't know, your first day at school or your first -- you know, the memories are more vivid, I feel like, on a first project like this at Essentia because I really wanted to do well and to serve patients really well within our west market teams, and so I was very intentional in how I rolled out the project, and we met with leaders in west market. We really were very intentional with how we did our training for our nursing colleagues to prepare for new processes. We were very intentional in how we were seeking to understand current processes so that we could communicate any changes that were happening, and just really trying to keep all lines of communication open as best that we could so that we could have a successful project. So we had training sessions and an intentional calendar and schedule of how we were going to be working through the fall into the end of February to complete this project.

Q.     You're familiar with the Shared Services

Page 26

Agreement with Dakota Clinic Pharmacy, right?

A.    I have read that, yes.  And I read that that summer, fall as well of 2020.  Sorry.  I want to clarify the year; or '19 into '20.

Q.    How did Essentia's relationship with Dakota Clinic Pharmacy fit into this standardization project you've been talking about?

A.    So Tony had shared with me the service agreement.  I'm unable to speak to anything before that June of '19 time of what preparation would have been prior to that.  But one of the steps that I knew within that service agreement was the notice that was needed to provide a change to the service agreement.  So that was an important part of the timeline for me within the project.  Also recognizing that they leased space from Essentia Health and that within day to day they had contact with our nursing colleagues, we were very up front with them just to, you know, help them to understand and have a good transition as well.

Q.    So the termination of the Shared Services Agreement with Dakota Clinic Pharmacy

Page 27

was part of the standardization project, is that right?

A.    Yes.  But I am unsure about the term "termination."  I -- because I don't recall all the details of that Shared Services Agreement. But the portion where they would be providing medications to our clinic patients was the portion that we were providing the notice about.

Q.    And Essentia was planning to take over that function and bring it in-house, is that right?

A.    Yes.

Q.    And was that part of the standardization project, bringing those services in-house?

A.    Yes.

Q.    From your perspective, what was Essentia's interactions with Dakota Clinic Pharmacy starting in June of 2019 through this notice period you've talked about?

A.    I had conversations with Laura Morris and Rob Haskell about it.  And then we worked through that transition time as well as far as -- because we were very diligent in our -- you know:  This week we're doing eye clinic,

Page 28

and this week we're doing allergy clinic, and this week we're doing family practice at South University. And so we had strong communication about that timeline so that we were all on the same page. Does that help answer that question?

Q.    Yeah. And I think I probably asked a bad question. What I'm looking for is what Dakota Clinic Pharmacy did as part of the Shared Services Agreement prior to February of 2020, prior to that being taken over in-house by Essentia.

A.    Like, what were their duties?

Q.    Yep.

A.    So they were responsible for -- and I don't have that, of course, in my -- all the sentences. But my understanding from how I recall it is that they -- within that portion of that clinic distribution and clinic management of that Shared Service Agreement is that they were responsible for getting the medications or ordering it from the wholesaler, receiving it, storing it, sending it out to the clinics. And then there also was topics about formulary management based on what Essentia

Page 29

Health had, and then also some, like, tracer responsibilities.  And when I say "tracer," to me, a tracer means when I go to this clinic, I ask these questions about how they're complying with regulatory within medication management for that clinic for my Joint Commission, CMS regulation requirements.

Q.     What is formulary management?

A.     Formulary management is if we have this medication for this disease state, and then this one for this other disease state, and this one for this disease state, that they as the distributor and storer of the medications and the -- getting the medications from the wholesaler, they needed to adhere to the Essentia Health formulary.  The formulary is kept in our electronic medical record and also in a pharmacy and therapeutics committee review.  And then adhering to that formulary is important for standardization of processes. And then also making sure that -- even how to document is set up correctly within the electronic medical record.  If you've never bought product at the grocery store, if you're thinking about, like, cereals -- if you've

Page 30

never bought product F, and you can't document it because no one's ever given it in your clinic, then you're outside of your formulary, and you have some difficulties with that.

Q.    Was Dakota Clinic Pharmacy responsible for anything you haven't told me about per your recollection?

A.    Not that I can recall at this time. There's a lot of little webs, so I'm not sure what you're exactly asking.

Q.    Is there anything that you can think of that Dakota Clinic Pharmacy did for Essentia that you haven't testified to already?

A.    I don't think that I mentioned controlled substances, but they also were responsible for the controlled substance management for the clinics as well.  I mean, really they were responsible for all of the clinic work that was happening within the distribution, receiving, ordering, storing and formulary and the controlled substance piece as well and the tracer.  So it was really all of the med management in the clinics.  And that's a Joint Commission chapter when I say medication management.  It's not just, like,

Page 31

organizing it.  It's the Joint Commission chapter of medication management that they were upheld to within those tracer questions.

Q.     What's the Joint Commission chapter? Just explain it in layman's terms if you could.

A.     Sure.  The Joint Commission is an accreditation body that, in layman's terms, would be -- that Centers for Medicare and Medicaid or CMS allows to survey and has some additional stringents [sic] on how health systems provide the most safe and best quality care for patients.  So Joint Commission has a medication management chapter.

Q.     You testified that Dakota Clinic Pharmacy leased space from Essentia.  Can you describe the physical space?

A.     Can you clarify what address you're talking about?

Q.     Sure.  If there's more than one space, just tell me about all of them.

A.     Okay.  So I am aware that there is more than one space.  There is a space at 1702 South University Drive.  That is the space where the clinic distribution was taking -- and storage and receiving and ordering was taking place.

Page 32

That space that they lease is -- has a front-end area where they have gifts and over-the-counters and a counseling room.  And there's a counter that is patient-facing.  And then there is another counter that they stand behind as pharmacy personnel.  There's a drive-through.  And then there's a back room where the medications were stored for clinic distribution.  There's also a controlled substance room.

Q.    Okay.  So we've got 1702 South University Drive.  That's in Fargo, right?

A.    Yes.

Q.    Okay.  How about other spaces that they lease from Essentia?

A.    They also have a space -- or they also lease a space at the hospital at 3000 32nd Avenue South.  That space I am not as familiar with.  I mean, this isn't areas that I oversee by any means, any of them.  I spent more time at the 1702 South University Drive during the transition, so that's why I can be familiar with that.  The 3000 32nd Avenue South address has a front-end area, and then also a counter that faces patients, and then a back area where

Page 33

the pharmacy personnel stands behind, but I am unfamiliar with the rest of the pharmacy space there.

Q.    Any other spaces that they leased from Essentia that you recall?

A.    No.

Q.    The temperature excursion or potential temperature excursion happened at 1702 South University Drive, correct?

A.    Yes.

Q.    And tell me about the refrigerators that were at 1702 South University Drive.

A.    What would you like to know about the refrigerators, or do you want to know what they look like?  I'm just not sure.

Q.    Yeah.  How big were they, what brand were they, if you recall, where were they located, et cetera?

A.    Sure.

Q.    How many of them were there?

A.    There were two refrigerators.  One was a double-door, double refrigerator.  And then that -- there was one next to it that was a triple-door, glass-front refrigerator.  They were in that back storage room.

Page 34

Q.    And as part of the standardization project that you testified to a few moments ago, Essentia was taking over the management of, among other things, these fridges, is that right?

MS. LORD:  Object to form.

But go ahead.

THE WITNESS:  We were taking over the medications, not that space.  And in that transition they were ordering less medications because we were in the acute care side going to be taking over that.  But as we were working through that in the fall into February, when we arrived at February, we had transitioned all of the clinics.  And we were -- the last step of the project was getting the medications that remained from Dakota Clinic Pharmacy that they had essentially over, you know -- I mean, it -- and I mean it in a good way, like, an over -- like, an inventory, if you would.  They had an inventory that was Essentia's inventory that we were then acquiring.

BY MR. MARTY:

Q.    Tell me about the context in which you first learned about the temperature excursion

Page 35

or potential temperature excursion.

A.    Are you talking about just that one moment, or are you wanting additional -- I just don't know how much background you wish to have.

Q.    Sure.  Why don't you give me some background.  I may have follow-up questions. So tell me about what was happening in February of 2020 that led to the discovery of the temperature excursion.

A.    So the discovery of that potential temperature excursion, we had finished those weeks of transition between all of the clinics and west market, and we had given a -- the service agreement notice.  We provided a little bit of -- you know, we had, like, contingency plans, right?  So I can't remember the exact date, but I feel like we still had a week after, even this week that we were ending so that we could have some contingency if something didn't go well.  I mean, we're in the Dakotas.  We have blizzards and things like that that change plans.  And so that week that we had finished everything, earlier in that week we -- and we're also in -- in the Dakotas

Page 36

we're also very neighborly, right?  And so we were working closely with Laura and Rob Haskell about this transition time.  And then that week had made plans of transitioning the remaining inventory that was Essentia's property already within those medications.  And we had made plans for moving the refrigerators, one of them a day at a time so that we could do that well. We were moving -- these refrigerators and the product of the room temperature medications, because there also was room temperature medications as well, we were moving that all on the end of that week, Thursday, Friday, in February.

Q.     Where were the fridges being moved to?

A.     The refrigerators were being moved to the basement room in the basement at 1702 South University Drive.  You know, I -- I want to be clear that the refrigerators themselves, I kind of -- I liken them to -- I mean, in the midwest we have garage fridges, right?  And so I don't -- I know that's not a thing that happens all over the United States, but -- and we're also neighborly.  And so they had them in their leased space.  And they -- as Dakota Clinic

Page 37

Pharmacy, it was a little unclear to -- and it wasn't really a big deal to me at the time or to any of my leaders at the time within what those refrigerators -- I am unsure of which pieces of them were in the history behind them prior to that 2019 time because I don't have the background of that. And so really those refrigerators, like: Well, these refrigerators, we don't need them anymore up here upstairs in this leased space. And we were transitioning that overstock and inventory. We were going to be moving everything to the hospital pharmacy anyways, but we just need -- we didn't have room for that, all of the product that they had in inventory and overstock because we were moving to a different process. So we were going to utilize those medications and send out to our clinics over the next weeks, eventually having no inventory at that location at 1702 and doing just-in-time inventory from the hospital only in Fargo over at 3000 32nd Avenue South.

So really it was just a time for us to be like: Okay. We've moved everything out of the clinics, or we moved everything that we

Page 38

have to be in our hospital pharmacy workflows. We recognize, you know, the service agreement. And all this inventory that is Essentia's inventory we're moving down to the basement so that we can -- because they had, like, lower moving products that was potentially going to take a while past that service agreement that we didn't -- we wanted to be honorable and respectful of not keeping our stuff in their -- the medications in their space that they were leasing from us. So that was the reason for that transition of the medication that were the overstock inventory items.

Q.   Who owned the two refrigerators? Did Essentia or Dakota Clinic Pharmacy own those?

A.   I don't know that --

MS. LORD:  I'll object to form and foundation.

But I won't instruct you not to answer.

BY MR. MARTY:

Q.   Do you know who owned the refrigerators prior to February of 2020?

A.   I do not. I don't know. I don't have the invoices. There was some belief, but I

Page 39

don't know who bought them.

Q.    What have you heard or what was the, quote, some belief?

A.    I don't know.  It was like a garage fridge, kind of like I mentioned.  I don't know.

Q.    Were these fridges specifically manufactured for storing medications, or were they refrigerators that you could -- you know, a consumer go to a store and purchase for, you know, home use?

A.    They're not refrigerators that you could buy at Menards or Lowe's.  So I wouldn't say that they're like that type of consumer use type of refrigerator.  However, they're -- I don't know that I would call them specifically medication refrigerators just because of as I was learning about them, that some of the settings and how they were -- had been set up or were -- had some questions for me.

Q.    Tell me more about the questions that you had and the issues that you saw with the setup.

A.    We had transitioned first the double-door refrigerator on Thursday, and we

Page 40

had set up the monitoring systems to be at the correct storage medication temperatures that we are required per our regulations. And as I was -- as I -- that Friday when we got a call about them that Friday night, it was unexpected that the refrigerators were calling me -- or the Electro Watchman was calling me about them.

Q.    Had the triple-door fridge been transitioned?

A.    That was a transition on Friday, yes.

Q.    So which fridge was -- or which Electro Watchman was pinging you?

A.    So the weeks before this transition time we had set up at Essentia a new panel with Electro Watchman and began a new service agreement with Electro Watchman with Essentia, and they had set this up to put two sensors down in that basement room. And the first one that -- the first one that called was on -- was the double refrigerator that called Friday night, that Electro Watchman called us on, and it was calling that it was a low temperature.

Q.    Can you describe the Electro Watchman system and hardware?

A.    Yeah. It is a -- I'm not an IT person,

Page 41

but -- so I don't know all the --

Q.    To the best of your understanding.  If you were an IT person, I wouldn't understand it, so tell me what you know.

A.    So when I go into that room still today, I see on the west wall a tan box.  I don't know if that's, like, two feet high.  It has an Electro Watchman sticker on it.  And then there is another white smaller box that has, like, a panel that has numbers in it.  And that is the transmitter and all of the technology to be on both of those refrigerators.

Q.    And I'm assuming there's some sort of temperature probe inside each refrigerator that connects to something?

A.    Yes.  And Electro Watchman, when I set that up with them, they asked me the range of which I wanted it to be monitored at, and I requested the standard 36 to 46 degrees Fahrenheit to be set up.  And we successfully got that set up that -- end of that week with those refrigerators being moved to that basement room.

Q.    The setup was something that was happening in the couple of days before the

Page 42

fridges were moved, is that right?

A.    Well, the end of the setup, yes.  But I don't recall the number of days leading up to that when they would have installed -- it was -- I mean, they would have probably -- they would have needed a lot of electricity and potentially cables and stuff.  So they were -- I don't think it all happened on those -- that very end of the week.  I think that there was some positioning prior to that time.  But the very end installation of those sensors would have been the end of that week when they -- when those refrigerators arrived down there.

Q.    I know you're not an expert in the system, but to your knowledge, does the Electro Watchman system use any of the refrigerator's components?

A.    No, it does not.  It only can tell me if the refrigerator is low or high or -- I mean -- or not in the right range.  It doesn't -- it also does not keep track of any specific temperature, that Electro Watchman system doesn't.

Q.    It doesn't keep a log of the historical temperature of the fridge, is that correct?

Page 43

A.    Correct.

Q.    It just --

A.    I don't know -- I don't know if it keeps a log of when it was triggered, but it doesn't -- if I said what temperature is it on May 8th at 2200, they wouldn't be able to tell me what that was.

Q.    Does the Electro Watchman trigger if the temperature goes outside of the assigned range at all, or does it need to be outside the assigned range for a period of time, or is that a setting in the system that can be changed?

          MS. LORD:  I'll object on form and foundation, but won't instruct her not to answer, if she knows.

BY MR. MARTY:

Q.    In light of that objection, I'm never asking you to guess at anything.

A.    Sure.

Q.    If you don't know, just tell me you don't know.

A.    I don't know how many minutes it has to be out of range.

Q.    You referred to the 36 degree to 46 degree range as standard.  Who sets that

Page 44

standard?

A.      That is a standard range that is utilized by pharmaceutical manufacturers to keep medications safe at a refrigerated temperature, and then enforced then also by -- I would say a lot of our background with -- in health care comes from the federal Vaccines for Children program.  And that is one of their recommended ranges.  And so none of those medications -- those vaccines or medications were affected in this.  But because that program has been so influential, that is the adopted range for medication storage.

Q.      That's interesting.  I'm going to sidetrack a little bit for a moment.  The pediatric medications were stored separately, is that right?

A.      No.  So these -- so in -- in health care we still have -- so in -- I'm like a history buff, right?  So I kind of -- I think this is kind of nerdy.  So this is maybe a nerd moment.  But before we had fancier things with better billing than what we have now, United States started a federal Vaccines for Children program that is assisted with the states as well.  And

Page 45

so because everything was being done on paper to bill out stuff for vaccines, the federal government and the states provided the product as well to health care and still do today for patients that are in specific categories of qualifying for that medication. So lower income patients, Alaskan natives, Native American populations are automatic qualifiers for the Vaccines for Children program, the Vaccines for Children at Essentia Health. And in North Dakota and on the Moorhead site, that product is ordered by clinic nursing and sent directly to the clinic. So it bypasses -- the Vaccines for Children program vaccines bypasses the other distributor and still does today because that's the state program. There are private vaccines for patients that don't qualify -- for pediatric vaccines as well that don't qualify for that program that were affected.

Q.    That were at the 1701 [sic] at the time of the potential excursion, you mean?

          MS. LORD:  Object to form.

BY MR. MARTY:

Q.    You said there were some --

Page 46

A.    [Unintelligible].

Q.    -- non-state program vaccines, pediatric vaccines, and you used the word "affected." What do you mean by "affected"?

A.    That they would go through the distributor process of a general clinic distributor.  So they would have been included in that potential temperature excursion.

Q.    Let's talk about the state program vaccines just for a moment.  Those are sent directly to the clinics, correct?

A.    Correct.  From the State of North Dakota or the State of Minnesota.

Q.    And the clinics -- each clinic will store those particular vaccines for use by patients in those specific clinics, right?

A.    Yes.  And in the specific qualified situations.  So nursing would utilize that federal vaccine for those federal patients that would qualify.  So it's stored segregated in the clinics.

Q.    And how physically are those stored? I'm assuming they're refrigerated, right?

A.    They're stored very segregated, depending on the clinic.  So if you're in a

Page 47

larger pediatrics clinic, you potentially would have two separate refrigerators, depending on the volume.  In a smaller rural clinic you might them in the same refrigerator, but they were would be on separate shelves or in separate baskets and labeled VFC, Vaccines for Children, either on the basket or on the box itself of the vaccines.

Q.    Are you familiar with the refrigerators storing these vaccines at the clinics?

A.    I do not have direct oversight of them. If one of my clinics had a question on it, in current state I could -- in our Digi-Sense thermometer system I could go look at that temperature, but I don't have direct oversight. I'm not on the call-in tree for all of those clinics.

Q.    Is Digi-Sense similar to Electro Watchman?

A.    It is a lot smarter than Electro Watchman.

Q.    I'm assuming it has sort of the same goal, which is to provide real-time temperature monitoring and notification of high or low temperatures?

Page 48

A.    Yes.  And it keeps a log.  And that --
yep.

Q.    That's how it's smarter than Electro
Watchman?

A.    Right.  We know what temperature it is,
yep.

Q.    How long have those -- strike that.

How long has the Digi-Sense system been
employed at the clinics?

A.    In my time here over the last few years,
but I cannot recall the date.  It was all
COVID.  And it gets a little fuzzy in what
month and year that those were installed.  And
that would have been installed across west
market.

Q.    Do you recall whether it was before or
after February of 2020?

A.    After.

Q.    Was there a predecessor system to
Digi-Sense that was used at the clinics?

A.    Not a system that was, like, web based
or that sent information, but the clinics had
monitoring systems and so did the pharmacy.  So
pharmacy had like a Night Owl one, I recall,
that had a similar type of option for some of

Page 49

that continuous data logging.  But within the clinics there was, like, a general logger where you collect the temperatures twice a day, and then reset it for the next -- do a high and a low and the current temperature for the last 24 hours.  And then also USB -- I'll just call them yellow loggers because that was some of what the State provided as well for being able to do data logs on that Vaccines for Children program.

MS. LORD:  I don't want to interpret your train of thought, Brian, if this isn't a good spot, but I know we've been going for over an hour now, so if there's a good spot for a five-minute break.

MR. MARTY:  Yeah.  Thanks, Angie.  I could use a break too.  Let me finish a couple of thoughts here, but it won't take more than a couple of minutes.  Does that work for everybody?

MS. LORD:  Thank you.

THE WITNESS:  Yep.

BY MR. MARTY:

Q.    So we have Electro Watchman, Digi-Sense, Night Owl that you've referenced.  Are you

Page 50

familiar with any other hardware systems that are used to monitor temperature in these circumstances?

A.    I also mentioned the yellow loggers. And then there would have been -- I mean, a lot of them were -- I don't have a name or a brand of what they were, but they were also white, black -- back logger as well.

Q.    And those are all systems that the clinics employed?

MS. LORD:  Object to form.

THE WITNESS:  They would have --

BY MR. MARTY:

Q.    Let me be more specific.  Other than Electro Watchman, Digi-Sense, Night Owl and the yellow loggers have been variously employed by the clinics.  Am I understanding that right?

A.    And I don't -- the clinics wouldn't have had -- I don't -- I'm not aware that the clinics had Electro Watchman or Night Owl. Those are more the pharmacy systems that I am aware of that we were working through.  The clinics -- in '19, if you would have gone to one of our clinics, you would have found a yellow data logger and then a backup.  I'm just

Page 51

going to call them the white ones because for some reason they mostly are white, but...

Q.    You had mentioned that temperatures are logged two times daily at the clinics or at least were at some point.  What's the process for logging that?  Is it automated, is it electronic, or is it somebody handwriting in temperatures or something else?  What's the process?

A.    So in '19, yes, they need to log twice a day, and it would have been on a written log.  And yes, they would write in the temperature that it was and the high, low, business day.

Q.    Is that twice daily logging an Essentia policy?  Is it an outside regulation or something else?  Where does that come from?

A.    It's a -- I would say that it originates in that Vaccines for Children piece.  And then to be able to be compliant successfully it is employed then for the vaccines in those spaces.  So you don't have to keep track:  Oh, does this -- what does this fridge have in it?  Does it have VFC or private vaccine?  That they would be just consistent -- or consistent and standardized approach to patient care in those

Page 52

refrigerators.

Q.    Sounds like something that would be a best practice, would you agree?

MS. LORD:  Object to form.

THE WITNESS:  Yeah.  I think it's a requirement by that particular program.

MR. MARTY:  I am at a good stopping point, so let's go off the record and take a short break.

MS. LORD:  Thank you.

THE VIDEOGRAPHER:  We are going off the record.

The time is 10:42 a.m.

This ends Media Unit 1.

(Off the record 10:42 to 10:54.)

THE VIDEOGRAPHER:  We are back on the record.

The time is 10:54 a.m.

And this begins Media Unit 2.

BY MR. MARTY:

Q.    You had testified before our break that you told Electro Watchman the 36 to 46 degree temperature range after the fridges were moved, right?

A.    Yes.

Page 53

Q.      Was that --

A.      And that was for the new setup that I was setting up with them in the basement room, the new setup that was now completely separate from what Dakota Clinic Pharmacy was utilizing.

Q.      Was that an email or written communication or a phone call in which that temperature range was conveyed to them?

A.      I do not recall an email.  I do recall standing in the room with Scott from Electro Watchman.  That would have been the time that I -- and I -- you know, I don't know what his recordkeeping is of that, but it would have been to him.

Q.      How is that temperature range physically set on the device?  Is it set remotely through, like, an app?  Is it set via the, you know, hardware on the actual product in the room?

A.      I don't know the answer to that.  That would be something that they would have to speak to.

Q.      Let's say that for some reason you wanted to change that temperature range on the Electro Watchman system.  Could you or someone affiliated with Essentia do that, or would you

Page 54

need to have Electro Watchman personnel do it for you?

A.    I would need them to do it for me.

Q.    Do you know how much Electro Watchman was paid by Essentia for monitoring these two refrigerators?

A.    The new ones down -- the new ones in the basement room?

Q.    Yes, after the move from the Dakota Clinic Pharmacy leased space.

A.    I do not recall.  I would have to go back and look at invoices for that.

Q.    Was that a monthly invoice plus, I'm assuming, some sort of setup fee?

A.    I do not see monthly invoices, so I don't know what their invoice cadence is.

Q.    Did Dakota Clinic Pharmacy have Electro Watchman set up when they had possession of the fridges prior to February 2020?

A.    Yes.

Q.    How do you know that?

A.    Because I saw it on the wall.

Q.    You saw it on the wall in their leased space?

A.    Yep.  The equipment for it, yep.

Page 55

Q.      How often were you physically present in Dakota Clinic Pharmacy's leased space prior to the transition in February 2020?

A.      Very rare.

Q.      Can you estimate how frequently, once a week, once a month, et cetera?

A.      I am in that building at South University once a week.  I am a friendly person, so I like to say hi to people.  But I would say every one or two months I would say hey to them.

Q.      I just didn't understand the end of your answer.  One to two months you --

A.      Every one or two months I would say hey to them, like --

Q.      Say hey to them.  Understood.

A.      Yes.

Q.      Okay.  You would go to the room with the fridges and say hi to somebody?

A.      No.  I would go to the counter.

Q.      How often were you in the room with the fridges?

A.      Just that week of the transition.  They would need to let me into that space, as I don't have access, and it's not my space.

Page 56

Q.      The week of the transition was the first time you set foot in the room with the fridges? We've been calling it the back room.

A.      No.  Yes, the back room.  No.  I would have been in there during that fall time when we were starting the conversations about it, but not regularly.  I would -- just to see what I would -- for planning purposes.

Q.      Did you see anything alarming or concerning with respect to the fridges when you were back there prior to the transition in February of 2020?

A.      I saw yogurt in there.  That is alarming to me.  I mean, but that would be -- I'm under oath so I wanted to make sure to say it.

Q.      Anything else that alarmed you at any point about those fridges prior to February of '20?

A.      No.

Q.      How about anything that alarmed you about the way DCP staff may have handled the medications or vaccines in that space prior to February of 2020?

A.      The what -- the what piece?

Q.      Yeah.

Page 57

A.    I missed the last part.

Q.    No, I'll reask it.  Did you ever see anything that concerned you about the way DCP staff handled anything related to the medications or vaccines prior to February of 2020?

A.    There was a lot of inventory.  And so that was of some concern for me within our value of stewardship.  Having inventory on hand like that is -- I mean, I guess it's subjective, but it -- it did ask -- cause me to ask some questions of how that was being managed.  There was also non-formulary products there that would then also -- that was part of the service agreement.  Those are some of the things that I can think of at this second.

Q.    Why was a large amount of inventory something that concerned you?

A.    With my background in business, a large amount of inventory that's not being utilized is potentially a misuse of resources.

Q.    That concerned you from a financial standpoint, it sounds like?

A.    Yes.

Q.    Okay.  Did you talk to anyone at DCP

Page 58

about that concern?

A.    No.  I don't have any oversight over DCP or Dakota Clinic Pharmacy.  They're not my team or my -- I don't have any oversight over them. It would not have been my place to ask a question like that.

Q.    How about the storage of non-formulary products, what was concerning about that?

A.    That was concerning because I knew that if it arrived to one of our clinics, our nursing colleagues would not have a way to document how it was given in a patient's medical record within the standard process. And also within the formulary it helps to standardize the processes for medication delivery to patients, but it can also have different effects on some of the contracts that we have within the -- within how we order the medications.

Q.    Was this a patient safety concern at all?

A.    What was what?

Q.    Yeah.  The storage of non-formulary products that you said was concerning, was that a potential patient safety issue?

Page 59

A.    Yes, because some of them were -- it was unclear where they were ordered from.  So when I was transitioning, I knew that we would not be transitioning those products into our process.

Q.    Was this a policy of DCP to store non-formulary products in this manner that you've talked about?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't know about DCP policies because they're a separate entity from Essentia Health.

BY MR. MARTY:

Q.    That wasn't a great question.  Did you notice this issue on more than one occasion?

A.    I knew that it was a challenge of our -- because Tony Kaufenberg had relayed that to me, that it was a challenge of our service agreement, that that part of the service agreement was not always being upheld to follow the formulary, but I would -- I can't say that I saw the medications until -- I mean, I saw the room, but I didn't, like, take things off of the shelf until that week.

Page 60

Q.      Let me make sure I understand your testimony on this then.  This storage of non-formulary products that was concerning to you is something that you saw in person the week of the transition, prior to that, it was an issue that Tony Kaufenberg had told you about, is that right?

A.      Yes.

Q.      Did Tony Kaufenberg mention this on just one occasion, or was this an ongoing issue?

A.      I -- I don't remember.  I don't -- I don't remember.  I think that it was part of the standardization of processes that -- like, I would get a question from somebody and say -- they would talk about a non-formulary vaccine, let's say, and then like:  Well, why do you even have that one?  It's kind of like that type of a question or a, like -- or a situation that would come up, but it wasn't like a:  Hey, mark this on the tally of this is the -- you know, a non-formulary thing.  It wasn't like that.  It was more, like, situation based.  And in that case it was a real product, so it wasn't a patient safety concern.  If it was a patient safety concern, then I, as a pharmacy

Page 61

leader, need to take the next step with that within that service agreement and elevating that. But I didn't see within, like, that situation that I just mentioned, that that was causing harm to anybody. Because if it did, then that would have been a different avenue I would have needed to take because patient safety is paramount for me.

Q. Okay. Do you know whether anybody affiliated with Essentia ever relayed any of these concerns about the storage of non-formulary products to DCP?

A. I don't.

Q. I'm going to shift gears a little bit. So my understanding from your earlier testimony is that the double fridge gets moved on Thursday, the triple-door fridge gets moved on Friday, and Friday night the Electro Watchman pings for an out-of-range temperature, is that right?

A. Yep.

Q. So tell me then what happened from that point.

A. So from that point -- I was at home. It was in the evening. It was like 8:00

Page 62

something.  And I met my pharmacy buyer, Chad,
at the basement room, and we evaluated that
both of the refrigerators were low.  At that
time, only the double had medications in it.
The triple had been moved that day.  So we did
not have medications in that one.  And we
evaluated that they were both low.  And I am
new to Essentia at this time.  I was not super
familiar with the building at South University.
And I called our director of ambulatory
nursing, Sara Hanson, and the director of
facilities, Dan Beauchamp, to assist us with
getting the medications that were in that
double refrigerator distributed to the other
clinic refrigerators in that building for the
rest of the weekend.  I needed their help
because I didn't know the codes, I didn't have
the keys, and I didn't know where the fridges
were.

Q.    So how did you receive this notification
on Friday at about 8:00, was it a text message,
a phone call, a page?

A.    So I live out of town.  And my
recollection at that time, we had set up this,
and we had our pharmacy buyer, Chad, be the

Page 63

first call.  And it is actually a phone call.
An actual person calls you.  It's more like a
security system like:  Hey, Dr. Loy.  Are you
okay?  You accidentally triggered your security
alarm.  It's like that kind of a guy that calls
you.  And Chad was first on the list because he
lived in town.  And so he received that call,
and then he called me.

Q.    That's a call from a live human
affiliated with Electro Watchman --

A.    Correct.

Q.    -- who makes the phone call to Chad?

A.    Yes.

Q.    Were you or Chad or someone else
notified about how low the temperature had
gotten to in, you know, both the double and the
triple fridge that triggered those alarms?

A.    No.  They only can tell you that it's
low on the phone.

Q.    Were you able to investigate that and
figure it out --

A.    Yeah.  We could read it --

Q.    -- when you looked at the fridge?

A.    We could read it on the log -- on the
white -- the white box that's in polyethylene

Page 64

glycol and the sensor, that it was below that range that we had set.

Q.    Do you recall what it was for each fridge when you got there?

A.    I don't recall the numbers for that item for both of them, but they were both below 32.

Q.    Do you know how the temperatures are set on those refrigerators?  If you want to maintain product temperature between 36 and 46, what physically do you have to do with each refrigerator to make them do that?

A.    I can't do anything for it other than I am responsible for it.  So I need a refrigeration expert to figure out how to get that successful range, and the range needs to be within 36 to 46.

Q.    [Unintelligible] --

A.    [Unintelligible] it is running.

Q.    I'm sorry.  I interrupted you.  What was -- what did you say there at the end?

A.    That range for the compressor -- for the cooling needs to be within that 36 to 46.

Q.    I'm thinking of my home refrigerator, which allows me to adjust the temperature up and down with a button.  And I think before we

Page 65

had to have electronics and everything.  Maybe it was a dial that you could use to set a refrigerator temperature.  Is it a similar system with these refrigerators?

A.    No.  I'm unaware of a dial on either of them that I can see.  Our refrigeration expert, like Dakota Refrigeration, who then I did call, was able to provide insight to me then that following week.

Q.    What did they tell you?

A.    They told me that the refrigerators that were now in my basement room were just as they were when they came off the line.  That's what he talked about when he said that.  So -- and that meant -- when he told that to me, he said the words "the compressor is set at 28 and 40." So every time it hits 40, it goes every -- it goes down to 28 every time.

Q.    Did he tell you whether Dakota Refrigeration had worked on these fridges before that point?

A.    No.

Q.    I'm sure you wondered why the fridges were set to a 28 to 40 degree range, right?

A.    Yes.

Page 66

Q.      What did you do to try and get an answer to that question?

A.      Well, in these moments of that Monday, Tuesday as we were trying to figure out what to do and make sure that our patients were safe, we had already taken over the clinic work.  So I needed to take care of patients first.  I already had the inventory that had been in them rerouted, if you will.  So I had to ask a lot of additional questions and do additional finding.  He did -- Andrew from Dakota Refrigeration, he did change the refrigerators that day.  We were in that like:  Oh -- we were in a problem solving mode, right?  Like -- but we still have more questions to ask.  And so he did change them.  I never -- and I was -- I continued to ask questions those following days.  I -- at that moment when he was servicing them because I put a maintenance ticket in, and maintenance had gotten ahold of him within that Essentia contract, and he -- he did the work on the refrigerators that we asked him to do, but I had a lot of questions as to why those refrigerators -- like, how this could be.

Page 67

Q.    Was he able to reset the temperature range to the 36 to 46 degree range?

A.    Yes.  He would have -- the numbers that pop into my head for that are in a tighter range so that you don't bounce out of them. So, like, 37, 41 is my numbers that -- so it doesn't get too low, it doesn't get too high every time.  It's this -- the compressor is cycling within the range that it's supposed to be in.

Q.    Did you watch him do that work?

A.    I was in the room.  I did not get on -- I don't know -- I was not watching him in his panel work.  I was in the room doing other things, but he was always supervised in my area, as that's a requirement for a pharmacy space for non-pharmacy personnel.

Q.    Do you know how long it took him to reset the temperature range?

A.    No.

Q.    Did he -- did it take him more than an hour?

A.    He would have been in and out of that space.  I remember multiple times coming in and out of that space for him, but I don't -- I

Page 68

don't know.  Because he also is doing fact finding as well.  Like, I recall that he was trying to ensure that there wasn't an additional problem with the refrigerator.  He was really all -- you know, all things were a potential at that time.

Q.    Did he have to put -- strike that.

Were both of the refrigerators set to the 28 to 40 degree range?

A.    That's my recollection, yes.

Q.    And so he did the same work on both fridges to get them reset to your 37 to 41 degree range?

A.    Yes.  But he didn't have all the parts for everything because they're two different refrigerators.  And so I don't know, like -- I don't know all the details.  I remember him trying to get different confirmationary [sic] types of thermostats that he wanted to make sure was being successful for it, but I don't know that he -- other than resetting that range, that he had to do additional work. Because they were working, they just -- essentially working as designed, which was not apparent at that moment, at that time.  It was

Page 69

approached that there was a problem, but really what ended up happening was that the range was not correct.

Q.    I'm sure you talked with Dakota Clinic Pharmacy staff about this issue --

A.    Yes.

Q.    -- literally immediately probably, right?

A.    Yeah.  I texted Laura on Friday night.

Q.    Laura Morris?

A.    Laura Morris, yes.

Q.    Okay.  Tell me about that interaction with her.

A.    I texted her really a question of:  Have you guys had problems with this before?  And if she knew any additional -- like, I just was kind of blind-sided.  I mean, it's kind of like, yeah, you're -- I didn't expect it.  So I wanted to know if she had any additional info.  And she got back to me Saturday morning and reflected that her clerk was the person that really was helping to monitor it.

Q.    Did you tell me that Dakota Clinic Pharmacy had Electro Watchman during the time the fridges were in the back room in its

Page 70

possession?

A.      Say that again.

Q.      Yeah.  Did -- before February of 2020, did DCP have Electro Watchman for these fridges?

A.      Yes.

Q.      Do you have any --

A.      They had -- they had -- and I found that out on Monday then.  It was all very surprising to me because they had it, but they only had one probe, and there was two refrigerators, and they were not connected.

Q.      The refrigerators or the probes were not connected, or the probe was not --

A.      The refrigerators were not connected. One's -- I mean, they're -- they don't look the same even at all.  So, like, Amy had a belief that they were connected, but, like, it didn't make any sense to me.

Q.      Who's Amy?

A.      There's no -- I don't know.  There's no space -- like, you can't put your hand into them to -- like, if you were getting -- I don't know.  It didn't make sense to me, like, why you would think one probe in this fridge would

Page 71

know what the probe in this fridge should be doing when there isn't a probe over here and the fridges are not connected together.

Q.    You mentioned a person named Amy.  Who is that?

A.    That's the clerk.

Q.    Laura Morris' clerk that was responsible for monitoring temperatures?

A.    She -- yes.  Amy, my understanding -- so in a pharmacy a clerk can do activities assigned that are nonclinical, but they are under the authority of the pharmacist, and so the pharmacist is still responsible for the work that is happening.

Q.    And Laura Morris told you that Amy helped to monitor the fridge temperatures?

A.    Yes.  And Rob Haskell also was part of that conversation.

Q.    Did you ever talk directly with Amy?

A.    Yeah.  I recall going to the pharmacy upstairs that Monday morning to, you know, start asking some additional -- like, try to get to the bottom of our situation that we're working through.  And Laura referred me to Amy. And Amy took me back to the back room that

Page 72

morning and showed me the logs.

Q.    What was your reaction --

A.    [Unintelligible].

Q.    I'm sorry.

A.    The log, I should say.  I mean, it was multiple pieces of paper.  So monthly logs, but it -- it also was one log for two refrigerators.

Q.    You probably weren't impressed when you looked at the log, were you?

        MS. LORD:  Object to form.

BY MR. MARTY:

Q.    Let me reask it a different way.  Were you surprised when you looked at the log?

A.    I was.

Q.    Why?

A.    Well, within pharmacy -- I mean, we are upheld to patient care.  And for me, as a pharmacy leader, to make sure that we're following all the things that we can make sure that our state board pharmacy requires of us to do correctly, I could see that from my standards of a pharmacy person, that the temperatures recorded on the log were alarming to me, and the nature of how the log was filled

Page 73

out was -- was disappointing.

Q.    What was disappointing about the nature, just the frequency of checks or something else?

A.    Yeah, the -- the inconsistency of how that log had been filled out of how many times per month it was being checked on.

Q.    If you were in charge of that space at that time, that log would have been filled out twice daily, is that fair?

MS. LORD:  Object to form.

THE WITNESS:  I can't speak to Dakota Clinic Pharmacy's processes or procedures because they're not part of us at Essentia.  So they have their own things that they're doing.  However, within my background within health system pharmacy, yes, they would have been filled out twice a day, and the temperature would have needed to be in that 36 to 46 degree range.

BY MR. MARTY:

Q.    What was the lowest temperature you recall being logged?

A.    I recall a 28.

Q.    Do you recall what the highest temperature logged was, at least as far as you

Page 74

saw?

A.     No.   That wasn't my focus.   Because I also recognize that doors open and can be ajar, so...

Q.     Do you know who was responsible for maintaining those fridges while they were with Dakota Clinic Pharmacy before February of 2020?

A.     Dakota Clinic Pharmacy.

Q.     Did Essentia have any role at all in maintaining those refrigerators during that time frame?

A.     No.

Q.     If there was a problem with the refrigerator, would Dakota Clinic Pharmacy notify Essentia, or would they take care of the maintenance on their own without Essentia's involvement?

A.     That -- my understanding is that there was some question about that from Laura Morris. From what I recall, Essentia did not have any record or responsibility that that was the case or that that needed to be happening or that that should happen.   They were Dakota Clinic Pharmacy's refrigerators in their space that they had control of, and it was their

Page 75

responsibility to store the medications in the way that they are required to by the North Dakota State Board of Pharmacy.

Q.    What's your understanding of Laura Morris' confusion about maintenance responsibilities?

A.    I just remember her asking me, like, just -- we would ask maintenance.  And then it never got fixed or something like that.  And I just had some -- I didn't understand why she would -- I didn't understand that piece, and I couldn't speak to the history of it either of why she thought that they should be doing something.  But they -- really ultimately Essentia did not have any responsibility for those refrigerators in that leased space in that med room.

Q.    Was it your understanding that Laura Morris thought that Essentia maintenance personnel were available to do maintenance on those fridges?

            MS. LORD:  I'll object to form and foundation.

            THE WITNESS:  I don't know.  I feel like -- I don't know.  I don't know what she

Page 76

thought.

BY MR. MARTY:

Q.    Yeah.

A.    She asked me the question.  That's all that I recall.

Q.    Did Essentia personnel at any time do any maintenance on those fridges before February of 2020, as far as you know?

A.    Not as far as I know.  And I also have -- that's -- if they are -- they don't do maintenance really on refrigerators, our maintenance people don't.  They called Dakota Refrigeration to do maintenance on our refrigerators.

Q.    When Dakota Refrigeration was there helping you in February of 2020 on -- I think you said it was a Saturday, did they say anything about working on these fridges previously, or being in Dakota Clinic Pharmacy's space to do work, or give you any indication that they had worked on those fridges before?

A.    No.  It would have been on a Monday because we had already rescued the meds out of there, and so we did not have work happening on

Page 77

the weekend that weekend.  No, they were not familiar with the refrigerators, Dakota Refrigeration was not.

Q.    Did anyone affiliated with Essentia ever ask to look at DCP's temperature logs before February of 2020, as far as you know?

A.    No.

Q.    Is there any reason that you can think of that DCP would not have shared those on request?

MS. LORD:  I'll object to form and foundation.

THE WITNESS:  No.  We had that service agreement with them that they were responsible for storage of medications, both temperature, room temp and refrigerated and freezer.

BY MR. MARTY:

Q.    My question is simply, though:  If someone at Essentia had asked to see those temperature logs, can you think of a reason why DCP wouldn't have been cooperative?

MS. LORD:  You cut out a little bit there, Brian.

MR. MARTY:  I'll just reask that

Page 78

question.

BY MR. MARTY:

Q.      If Essentia personnel had asked to see those temperature logs before February of 2020, can you think of a reason why DCP would have not cooperated with that?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't know.  And I really wasn't there.  I had started in summer of '19.

BY MR. MARTY:

Q.      When Essentia took over those refrigerators in February of 2020, were any maintenance records provided?

A.      No.

Q.      The fact that before February of 2020 those refrigerators had a low temperature setting of 28 degrees indicates that products stored in there were routinely at 28 degrees, fair?

MS. LORD:  I'll object to form and foundation.

MR. MARTY:  I can strike that question.

Page 79

BY MR. MARTY:

Q.      What I'm getting at is:  What's the concern about medications and vaccines being in a 28 degree environment?

A.      I want to add that potential part because we also didn't know how long or if that cycling -- that was -- that was the whole premise of the -- you know, out of patient service and making sure that we were taking care of our patients, we did not know, as Essentia, if or when or how long or the frequency that that was happening.  So that's why there could have been vaccines or medications that were never in there, or there could have been vaccines or medications that were in there for quite a few cycles of those -- of that compressor.  So that made it difficult to know.  And that's why "potential" is an important word.  Because if they received it and sent it out to the clinic that same day, it never was in our refrigerator or those refrigerators.  So it was hard to -- we didn't know.  We also didn't have any evidence of consistent monitoring.

Q.      You used the word "potential" because we

Page 80

can't know if a particular medication actually went through a cycle at 28 degrees. Am I paraphrasing your testimony right?

A. Yeah, we didn't know if it -- if it -- if within their processes, that it was in there or if it wasn't. And then also we've -- from the information provided by Amy and Rob and Laura, the free-air temperature of the refrigerator and the product temperature could be different within how -- and we're chemists, right? We're pharmacists. And so we knew that potentially that that -- the product temperature -- because Amy was getting it from a -- the glycol sensor base, that that could have been the product temperature. But glycol and the medication makeup is not for sure the same thing. So "potential" is the important part of that as well.

Q. So you came to learn through discussions with Laura, Rob and/or Amy that there was only one probe for two refrigerators at DCP, right?

A. There was one probe for Electro Watchman for two refrigerators. There were two white box probes on each of them, one on each.

Q. And the white box probe doesn't have any

Page 81

alert mechanism, am I right?

A.    You can turn your alarm on.  Like, it would just be -- if you're in the room, it would make a noise.  But yeah, nobody to call. It doesn't have the call feature.

Q.    It's not monitored, right?

A.    Well, it's not -- it's not -- it doesn't make an immediate call to somebody.  I mean, in my experience in health care, when you check it twice a day, you're writing down what time it was that you checked it.  And now you're doing high and low.  So you know if it's been eight hours or six hours that:  Okay.  It looks like I've had -- even if you're doing highs and lows you can pinpoint a time and a temperature that it would have been at, at the maximum or minimum of that recording.

Q.    The white box probe gives that functionality?

A.    Yes, just by you reading it.  So -- yep.

Q.    Do you know what temperature range the white box probes were set at to ring its alarm or their alarms?

A.    No.

Q.    Do you know what the Electro Watchman

Page 82

probe was set at?

A.      I do because I asked Electro Watchman.

Q.      What did they tell you?

A.      What's that?

Q.      I'm sorry.  What did they tell you?

A.      So Scott from Electro Watchman -- I said -- well, first I asked Laura, and she didn't know.  And Scott had been making our new account and canceling their accounts upstairs for this refrigerator.  I don't know what their current setup is for their current security system.  But he was taking the probe that was on this one off from where it was in that backroom leased space.  He reflected to me that the range was 20 to 54 to call.

Q.      Did you ever ask anyone affiliated with DCP why that range was set?

A.      I asked Laura and Rob.

Q.      What did they tell you?  Well, first of all, did they seem surprised that that was the range it was set at, or did they know?

A.      I don't think they knew or remembered.  It seemed like it was maybe a long time ago type of thing, that maybe it had been set --

Q.      Were they --

Page 83

A.    -- specifically from Rob.

Q.    Okay.  What was --

A.    He reflected to me that it barely ever called.  And he reflected to me a time that he was fishing and it called him and how irritating that was.  So that made sense to me.  Because why it didn't call him, because it was such a giant range that it -- it wasn't information of:  Oh, okay.  Now I understand, if that makes sense, of why -- because that was the thing, like, we were trying to figure out --

Q.    Sure.

A.    -- why --

Q.    The only time it would call is if a door got left open or the power went out for an extended period of time and the temperature got above 54?

MS. LORD:  Object to form.

THE WITNESS:  That would be my conclusion as well.  That's the only way that I would -- or I don't know how it could get that cold, under 20, but -- from what Dakota Refrigeration called me or told me.

BY MR. MARTY:

Page 84

Q.    Were Rob and Laura surprised that this was the range?

A.    I don't -- I don't recall their -- I don't recall their reaction to that information. I mean, it was more like a: Oh, you know, that type of -- I don't recall their reaction.

Q.    Did you have any other conversations with Laura or Rob about the refrigerators or the potential temperature excursion that we haven't talked about?

A.    There's not -- there were other conversations, but I can't think of additional information that would be helpful.

Q.    Well, tell me about the other conversations that you had with them on these topics.

A.    I recall Rob saying: Well, I guess they run kind of cold sometimes, and then we would just open them, and then they would reset.

Q.    Like, he would crack the door open, like, leave the door ajar to the fridge?

A.    Uh-huh.

Q.    Yes?

A.    Yes. Or wider. I mean, the way that he

Page 85

said it made it seem wider than a crack, but -- and then that was confusing to me because knowing what I was understanding now that the compressor was running to 28, no matter what, you cracked the door open, it didn't -- it -- it didn't really add up to me of why that would be a solution of trying to fix something.

Q.    Yeah.  Did he tell you that they tried to get an answer as to why the fridges ran cold?

A.    No.

Q.    Did he tell you how often they would open the door to warm them up?

A.    No.  He reflected as more like a random type of thing.

Q.    And this is a conversation that happened after February of 2020?

A.    Correct.  After the Friday night that it was identified they were cold.

Q.    Do you recall any other conversations with Rob or Laura on these topics?

A.    Another confusing thing to me as somebody that thinks this is important, and "this" being correct monitoring of temperature when I'm storing medications, was Laura

Page 86

reflected -- when I brought the logs to her from my conversation with Amy in the pharmacy that morning, she reflected to me:  Well, the product wasn't freezing.  And I was confused by that comment because I don't know how that could have been that you didn't know that that was because medications are in vials inside of a box.  And so you don't -- generally, the medications are sent to the clinic in a box still, not -- you don't open the vials to look at them.  They're contained in the box as they were sent by the wholesaler.  So that was another confusing thing for me.

Q.    When the fridges were moved from the back room to the basement, was the Electro Watchman hardware also moved, or was new hardware installed in the basement?

A.    New hardware was installed in the basement.

Q.    Do you know what happened to the old hardware?

A.    The last that I saw it, it was still there in that back room, and the probe was hanging off the top of the box, but I have not seen it for years now.

Page 87

Q.     Do you know who owns the Electro Watchman hardware?  And to, I guess, be more specific in my question, is it leased from the Electro Watchman company, or is it purchased by the user or some other arrangement, if you know?

MS. LORD:  And I'll object to form and foundation.

THE WITNESS:  I don't know.

BY MR. MARTY:

Q.     Are those two fridges still in use?

A.     They're not storing medications.  They are still in that basement room --

Q.     What --

A.     -- and they are on.

Q.     Oh, I'm sorry.

A.     And they are on.

Q.     What are they used for now?

A.     They're not used for anything.  They're used for waiting until this case is figured out.

Q.     Got it.

A.     When we were working on them that week, we didn't know all of these things.  So we -- it's kind of like a time capsule down there

Page 88

right now.

Q.    Sure.

MR. MARTY:  Let's go off the record.

THE VIDEOGRAPHER:  Okay.  We are going off the record.

The time is 11:54 a.m.

And this ends Media Unit 2.

(Off the record 11:54 to 12:25.)

THE VIDEOGRAPHER:  We are back on the record.

The time is 12:25 p.m.

BY MR. MARTY:

Q.    Okay.  Dr. Loy, did Dakota Clinic Pharmacy have responsibility for any other health systems other than Essentia?

A.    I don't know the answer to that.

Q.    And my question wasn't limited in time. Do you know whether at any point in time Dakota Clinic Pharmacy had responsibility, whether by contract or otherwise, with any other health systems?

A.    No, I don't.

MS. LORD:  And just for clarification, did you say you don't know the answer to that?

Page 89

THE WITNESS:  Yeah, I don't know that they -- what their other arrangements were with any other contracts.  I wasn't purview to their operations.

BY MR. MARTY:

Q.      I think we talked about your conversations with Rob and Laura and Amy regarding the refrigerators at DCP before we broke for lunch.  While we were on our lunch break, did you remember any other conversations you may have had with any of them on the topic of the refrigerator temperatures?

A.      No, nothing that I can recall at this second.

Q.      Was Tony your direct supervisor in February of 2020?

A.      Yes.

Q.      I assume you had conversations with him on this issue?

A.      Yeah, on Monday.

Q.      Can you tell me about your conversations with him?

A.      Yeah.  I can picture the exact moment and where I was when I called him in the basement hallway outside of this room.  He

Page 90

reflected -- you know, he listened very carefully to me and reflected our next steps of elevating to leadership within Essentia across the system, and then also in west market what the next steps would need to look like so that we could really make sure that we, as a team at Essentia, were doing due diligence for our patients.  And then he also reflected to me that Essentia would take this information and, you know, do the utmost for patients at that -- within the situation of these times and take it very seriously.

Q.    Was there ever an estimate of how many patients were potentially affected?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Not at -- not at that Monday.

BY MR. MARTY:

Q.    No.  I'm sorry.  At any time, do you know approximately how many patients were affected?

A.    I don't recall.  I know that there was a lot of data that was pulled, but I don't recall the number from the top of my head.  He -- Tony

Page 91

had done more with that part of the information.  Quite a lot is what I -- that's the best number I can come up right now.

Q.    So the way I think about this at least is there's:  What happened?  And there's:  How do we fix what happened?  Still focusing on the what happened part --

A.    Yeah.

Q.    -- do you recall any other conversations with anybody that we haven't talked about?

A.    Yes.

Q.    Can you tell me about what you recall?

A.    Can you provide a little more, like --

Q.    Yeah.  Do you recall talking to anybody -- other than the conversations we've already talked about, do you recall talking to anybody about the potential temperature excursion or its cause?

A.    Well, there was a lot of people within Essentia that week and the weeks remaining that -- of conversations that took place.  So I mean at west leadership, so Al Hurley, Nicole Christensen, Sara Hanson, those are, like, nursing and chief operating officer.

Dr. Vetter, a physician representative.  Dianne

Page 92

Witten was senior director and then promoted to vice president of pharmacy during these years, but -- so yeah, I do recall a lot of conversations, but I'm not sure which ones you want me to start with, I guess.

Q.    Well, is it easier for you to go chronologically or person by person?

A.    Probably chronologically or situation based.

Q.    So have we talked about all of the conversations that you had up to Saturday following the discovery of the temperature issue?

A.    Yes.  At this second from what I can recall, yes.

Q.    So can you take it from there and tell me what conversations you had at that point going forward?

A.    I recall a conversation with Tony on Monday.  I don't have direct knowledge of Tony's conversations going up, but he provided information to me that he would be escalating from -- to system leadership.  We started having nearly daily meetings at 5:00 during that following week just to have good

Page 93

conversations and make sure that we were having good resolution for immediate patients and past patients.

Q. What were immediate concerns? Like, what would a situation be that required an immediate solution?

A. The product that was in the clinics right now as it stood on Monday. So those we were able to quarantine and set aside and make sure to utilize product that we had provided from the hospital pharmacy over these transition weeks and months to the clinic teams.

Q. Were you involved in developing a solution to this problem? Let me be more specific. My understanding is that patients were offered revaccination, correct?

A. Yes. They were -- they were offered revaccination.

Q. Were you involved in that effort in any way, either in coming up with a program, notifying patients, et cetera?

A. Yeah. Myself and my pharmacist teams, we evaluated what medications would potentially be affected and contacted manufacturers to

Page 94

determine viability of the medication, and then from there determined which medications were affected potentially within -- you know, we don't know how many minutes, hours, days that they were potentially in an environment that wouldn't have been based on package insert.

Q.    Okay.  Do you know whether anybody determined the total number of medication or vaccine doses that were affected, potentially affected?

A.    Yeah.  I don't know how many from the top of my head, but I know that data was being reviewed from that 2017 to 2020 time.

Q.    Yeah.  Can you give me an approximate number of doses that were potentially affected?

MS. LORD:  I'll object to form and foundation.

THE WITNESS:  I can't.  I don't know the number off the top of my head.

BY MR. MARTY:

Q.    Okay.  Do you know whether any Essentia policies or procedures were changed as a result of this incident?

A.    No.  They're all pretty straightforward for temperature monitoring with the ranges.

Page 95

Q.    Let's look at some documents.

MR. MARTY:  Can we have Exhibit 9 displayed?

BY MR. MARTY:

Q.    Do you see Exhibit 9 in front of you?

A.    No.

Q.    Okay.  I don't see it in front of me either.

THE CONCIERGE:  What's the tab number for Exhibit 9?

MR. MARTY:  Oh, it's been marked in a prior deposition.

THE CONCIERGE:  Oh.

MR. MARTY:  Do you have that, or do you need us to upload that from this specific deposition?

THE CONCIERGE:  Yeah, I think I need it to be uploaded to the private folder.

MR. MARTY:  Okay.  I've got a couple of those.  So I'll deal with that during a break.

MS. LORD:  I do have a copy.  I don't want to interrupt your flow, Brian.  But I do have a printed-out copy of the exhibits.

MR. MARTY:  Yeah.  And do you

Page 96

mind --

THE CONCIERGE:  [Unintelligible] Exhibit 9 if you want me to give a copy to --

MR. MARTY:  Yeah, let's just do it that way.

BY MR. MARTY:

Q.    Dr. Loy, Essentia's counsel is going to hand you a copy of what we've marked as Exhibit 9 in an earlier deposition.  Are you looking at a document that says Essentia Health Temperature Monitoring for Refrigerators?

A.    (Views document.)  Yes.

Q.    And in the bottom right corner you'll see a number, EH002734.

Do you see that?

A.    Yes.

Q.    And does your document go through EH002739?

A.    Yes.

Q.    Perfect.  We're looking at the same document.  Do you know what this document is?

MS. LORD:  While she's doing that, I think I need to just put a foundational objection.  This was a sequence of documents that were marked as Exhibit 9.  And I think we

Page 97

established through the written discovery that they were produced in response to different discovery answers with the pleading that was served contemporaneously with this production. And so I won't instruct the witness not to answer, but just wanted to raise that foundational clarification.

MR. MARTY:  Sure.

BY MR. MARTY:

Q.     And, Dr. Loy, I am not concerned about the last two pages of this document.  So are you familiar with pages 1 and 2?

A.     Yeah.  It is a -- I'm trying to decide if it's a policy or a standard work, as we would call them at Essentia, which is another term for procedure, but it's a policy on temperature monitoring that Essentia would follow.

Q.     And pages 3 and 4 of the document you're holding, numbers ending 36 and 37, is that a similar policy or procedure?

A.     It is.  The second one has freezers. And there's some different references and policy numbers listed in the -- under Quick Review.

Page 98

Q.      These are both policies or procedures related to temperature monitoring for refrigerators and, at least with the revision, also freezers, fair?

A.      Yes.  It is just difficult for me to tell if that -- there's a revision or if there is a -- oh, I guess there's an EOC 113.  I mean, this is prior to my time at Essentia.  I would have expected a policy number at the top. So I'm not familiar with the EOC 0113 on the bottom.  But it does appear just from looking at it for this first time now from these documents that it would be the same one with adding the freezers.

Q.      So page 3 of this exhibit indicates that it was reviewed or revised December 21st, 2017.

        Do you see that at the top?

A.      Yes.

Q.      Okay.  Do you know whether this revision was the most recent revision of this policy or procedure?

A.      I do not.

Q.      Okay.  Do you know whether this policy or procedure was revised at any point before February of 2020?

Page 99

A.      No, I don't recall.

Q.      Okay.  Do you know whether this policy or procedure applied to all Essentia facilities beginning December 21st, 2017?

MS. LORD:  Object to form and foundation.

THE WITNESS:  This is prior to my time at Essentia in 20 -- I wasn't here until June of '19.  Again, I am unfamiliar with the term "Essentia West Safety Committee."  So I -- I don't -- I don't recall if there would have been -- or who sits on that committee or -- it wouldn't -- it would have just in my review applied to west.  But I don't have any information about this particular policy in '17.

BY MR. MARTY:

Q.      Okay.  Do you know whether this policy was in place when you joined in June of '19?

A.      I don't.  I would not be able to pull up in my Rolodex of my brain this monitoring or this policy number.

Q.      I'm looking at page 3 of the exhibit, which is the number in the right-hand corner ending 36.

Page 100

A.    Uh-huh.

Q.    Under paragraph (b), subsection 1, I'm just going to read it.  "A medical grade refrigerator/freezer is the recommended storage unit for medications and vaccines that require refrigeration."

Did I read that right?

A.    Yes.

Q.    The two refrigerators at DCP that are at issue here, were those, quote, unquote, medical grade?

A.    With the information that I have about them, that was what they were presented to me as.  With what I know about them now, I would count the double-door one as like a lab type. But the front glass ones, that triple one, that one is a little unclear to me.

Q.    What do you mean when you say a lab one? Is that different than medical grade?

A.    No.  It would be -- it would be this -- it would be medical-grade laboratory services for the [unintelligible].

Q.    Understood.  (b) 2 says, "Essentia-approved thermometers and/or Minnesota/North Dakota State Department of

Page 101

Health data loggers will be placed in all refrigerators or the factory installed thermometer on the refrigerator will be utilized."

A.    Uh-huh.

Q.    Was that done by DCP for the two refrigerators at issue here --

MS. LORD:  Object to form and foundation.

BY MR. MARTY:

Q.    -- to the best of your knowledge?

A.    I don't know their policies.  They were not adherent to -- or they're not part of Essentia, so they didn't -- these policies did not apply to them.

Q.    Did they have their own policies?

A.    I don't know.

Q.    Whether or not these policies applied to DCP, would they have been conveyed to DCP at any point?

A.    No.

Q.    I know that you weren't often in the back room at DCP, but following the incident you talked with its staff, and you at least were involved in the investigation of what

Page 102

happened.  Based on your knowledge from that, did they have approved thermometers or Department of Health data loggers in place?

MS. LORD:  Object to form.

THE WITNESS:  No, they -- they wouldn't have followed -- Essentia wouldn't have approved their thermometers because they're a separate entity, and the Department of Health would not have been reviewing their data loggers.

BY MR. MARTY:

Q.    In light of counsel's objection, I want to ask a similar but a little bit different question.  Do you have any information suggesting that DCP did use thermometers approved by Essentia for these two refrigerators?

A.    No.

Q.    Do you have any information suggesting that DCP used Minnesota or North Dakota DOH data loggers for these two refrigerators?

A.    No.

Q.    Do you have any information suggesting that DCP utilized the factory-installed thermometers for these two refrigerators?

Page 103

A.     No, they -- when I see factory-installed thermometers, that means that it's, like, on the -- you can read it on the -- there is not a thermometer like that on there.

Q.     Paragraph (b), subpart 3 reads, "A separate temperature log will be maintained for each refrigerator freezer."

We've talked about that for theses freezers at issue -- or these refrigerators at issue, right?

A.     Yep.  Sorry.  Yes, we have talked about that.

Q.     Read (b), subpart 4 to yourself.  And my question will be:  Assuming this provision applied to DCP, was DCP in compliance?

MS. LORD:  I'll object to form and foundation.

THE WITNESS:  This policy is an Essentia policy.  It is not a DCP policy.

BY MR. MARTY:

Q.     Yeah.  Let's just assume that this was a DCP policy.  Would DCP have been in or out of compliance with it?

MS. LORD:  Object to form and foundation.

Page 104

THE WITNESS:  DCP was not doing these things in 4 (b).

BY MR. MARTY:

Q.    You can set Exhibit 9 aside.

MR. MARTY:  Angie, can you pass her Exhibit 10?

MS. LORD:  I'm sorry.  You cut out there, Brian.

MR. MARTY:  Would you be able to pass her Exhibit 10, please?

MS. LORD:  She has it.

BY MR. MARTY:

Q.    Exhibit 10 should be a document that starts in the bottom right-hand corner EH036563.

Do you see that?

A.    (Views document.)  Yep.

Q.    I want to focus on a paragraph midway through page 1 that starts, "Maari Loy received copies of refrigerator temperature documentation logs."

Do you see that?

A.    Yes.

Q.    Just read that paragraph to yourself.  I have a couple of questions.

Page 105

A.    (Views document.)  Okay.  I've read that "Maari Loy" paragraph.

Q.    This indicates that you received copies of refrigerator temperature logs on February 24th of 2020 from DCP.  Do you have any reason to believe that's not true?

A.    That's correct.

Q.    To your knowledge, is this the first time that anybody affiliated with Essentia laid eyes on DCP's temperature logs?

A.    Yes.

Q.    The second paragraph indicates, and I'll paraphrase, the logs dated to September 2017 reflect inconsistent recordkeeping and temperatures below freezing with no documentation of remediation.  Did I paraphrase that right?

            MS. LORD:  I'll object to form.

            THE WITNESS:  Okay.  I read that second sentence.

BY MR. MARTY:

Q.    Okay.  Is that second sentence true?

A.    Yes.

Q.    How long did it take you from the time you decided you wanted to see the temperature

Page 106

logs until you were looking at them?  Was it a convoluted process, or did you just walk to DCP and ask to see them and they showed them to you?

A.    It was within five minutes, I would say. They had to go get them and...

Q.    To your knowledge, were they all located in one spot?

A.    Yeah.  They were on a clipboard.

Q.    And all of those dated from February of 2020 back to September of 2017 on that clipboard?

A.    I think there were some missing ones, if I recall.

Q.    Were those ever found?

A.    Not that I know of.

Q.    They weren't just missing from the clipboard, they were missing entirely, as far as you know?

            MS. LORD:  Object to form and foundation.

            THE WITNESS:  I don't know where they were.

BY MR. MARTY:

Q.    You can put that document aside.

Page 107

MR. MARTY:  Jeff, would you display document B that we uploaded?

THE CONCIERGE:  Sure.

THE COURT REPORTER:  Can we go off the record for 30 seconds?

MR. MARTY:  Sure.

THE VIDEOGRAPHER:  We're going off the record.

The time is 1:00 p.m.

(Off the record 1:00 to 1:02.)

THE VIDEOGRAPHER:  We are back on the record.

This begins Media Unit 4 at 1:02 p.m.

(Exhibit Number 58 marked for identification.)

MS. LORD:  It's a little small on our screen.  I wonder, are you able to read that, or can it be blown up a little bit?

MR. MARTY:  Yep.

Chinyere, can you blow up and focus on the top of the document?  Right there is perfect for me.

BY MR. MARTY:

Q.    Dr. Loy, can you see that and read it

Page 108

okay?

A.    Yes.

MS. LORD:  And if she could have the opportunity to read the full document if she chooses.

MR. MARTY:  Absolutely.

BY MR. MARTY:

Q.    And take your time and let us know when you're ready.

A.    (Views document.)  Can you scroll down? Can you scroll back up again?  Okay.  I've read the document.

Q.    Okay.  This is an email from Dianne Witten dated August of 2019.  It appears you were cc'd, correct?

A.    Yes.

Q.    In the first paragraph, Ms. Witten indicates, "We are looking to move the clinic distribution of medications from Dakota Clinic to EH Pharmacy Services."  And then she goes on to say, "This is due to new software that we go live with in early December, and so we are wanting to stage changes that we are looking to implement."

What was the software issue, or what was

Page 109

the new software?

A.    I think it's Epic inventory.  But the timelines are a little bit different from what I remember them.

Q.    What's the timeline that you recall?

A.    That it would have been later than that.  But also you can see that -- you can see that the transition was supposed to be occurring earlier than it happened also, so I guess that does sort of align.

Q.    Why would -- strike that.

If you know, why would the transition to the new software program make it advisable to move the clinic distribution in-house?  What's the link there?

MS. LORD:  And I'm just going to place an objection to form and foundation, but I won't instruct her not to answer if she knows.

THE WITNESS:  Dakota Clinic Pharmacy would not have access to EPIC, our electronic medical record.  And our pharmacy buyers on the acute care side that were doing all of the ordering and inventory for all of the rest of the west market sites between Moorhead and

Bismarck would have been able to operationalize that software.

BY MR. MARTY:

Q. Was this the only reason that those services were being brought in-house?

A. No.

Q. What were the other reasons?

A. The standardization of services.

MR. MARTY: Chinyere, would you be able to mark and display F, as in foxtrot?

(Exhibit Number 59 marked for identification.)

BY MR. MARTY:

Q. Dr. Loy, take your time to familiarize yourself with this document.

MS. LORD: Has this been marked as Exhibit 5?

MR. MARTY: You know, I -- it's possible. I tried to avoid duplicating, but I'm not a hundred percent sure I was successful.

MS. LORD: Does it start with EH049462?

MR. MARTY: That's it, yes.

MS. LORD: Okay. Thank you. I

Page 111

think it is number 5 as well.  What is the last page?

MR. MARTY:  68.

MS. LORD:  Yes.  Thank you.

THE WITNESS:  (Views document.) I've read this section now.

BY MR. MARTY:

Q.     Okay.

THE WITNESS:  If you want to go to the next page or the next section.  Okay.  I read that section.  Okay.  I've read that section.  Can you go up a little bit just so I can be sure I see the last line of the previous.  Okay.  I read that.  Okay.  I read that.  Okay.  I've read that.  Okay.  Okay. I've read that.  Okay.  Okay.

BY MR. MARTY:

Q.     Have you had a chance to look at the whole document?

A.     Yes.

Q.     I want to focus on the middle of page 1 first.  Do you see the sentence starting, "Sara Hanson is aware - she and Dan Beauchamp were there on Friday night and were aware of the issue.  Both of the owners are aware of the

Page 112

issue."

Who are the owners reflected in this sentence?

A.    Rob Haskell and Laura Morris.

Q.    That sentence goes on to say, "When Maari reviewed logs with them - one of the owners reflected that she didn't know what temperatures the refrigerators typically ran out."

I assume that should say "at."  Would you agree?

MS. LORD:  I'll object to form and foundation.

BY MR. MARTY:

Q.    Sorry.  Would you agree that that looks like a typo?

A.    Yeah, I -- they're not my notes.  I don't -- I would -- I don't know.

Q.    Who is the owner reflecting that she didn't know what temperatures the refrigerators typically ran at or out?

A.    Laura is the only female owner that I'm aware of.

Q.    Did you ever ask her or Rob -- strike that.

Page 113

Did you ask her why she didn't know what temperatures the refrigerators typically ran at?

A.    I don't think that I asked that question in that way.

Q.    What way did you ask that or a similar question?

A.    I recall standing at the counter in her pharmacy with her looking at the logs and just seeking to understand what was happening on the log.  It was just kind of a stunning couple of moments for me.

Q.    Yeah.  Did you perceive it to be stunning for Laura too?  Did she seem surprised?

A.    I would say maybe unaware.  I mean, she wasn't like exclamatory about it or anything, but, like, just kind of off, just maybe wonderment.  I don't know.

Q.    Would you have expected her to be more familiar with the temperatures the fridges were set at?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Yes, I would expect

Page 114

her to be more familiar with processes in her pharmacy that she is responsible to uphold for patient care.

BY MR. MARTY:

Q.    Did she tell you why she wasn't as familiar as you would have expected?

A.    Not in a clear sentence like you're describing.  I would say that it was more a group reflection that she reflected on.  So within her -- she would have pulled in Amy and Rob into that portion of all of their roles in it, but it was a little confusing to me as to maybe not really anybody taking accountability for this.

Q.    Yeah.  The next section of that -- oh, I'm sorry.

A.    Taking accountability for the log or the monitoring.

Q.    The next section says, "Maari talked with Laura and Rob - didn't realize how infrequently the logs were being monitored and didn't realize how often the temp of 28 or 31 degrees was recorded."

Were neither Laura nor Rob familiar with how often the temperature got that low?

Page 115

A.      Yeah, they were just -- they didn't -- they didn't seem to recognize that this was what the log looked like, even though, like I reflected earlier, that Rob did acknowledge that he knew that they ran cooler.

Q.      Were you told that it was Amy who was doing the temperature logs?

A.      Yes.

Q.      Do you know if anybody else was doing the temperature logging?

A.      No, I don't know.  I don't know what DCP had as expectations for their employees or their processes.

Q.      Let's go to the top part of the second page of this exhibit.  Looking right sort of where the cursor is, "Electro-Watchman is technology in place to monitor refrigerators in Fargo - technology is antiquated - no log or trend line is available."

        Do you see that?

A.      I do.

Q.      Let me go back a little bit.  Do you know who authored this document?

A.      When I was reading it within that -- within the person, it seemed like it was Dianne

Page 116

Witten.

Q.    Okay.  Back to the paragraph I just quoted.  Would you agree that Electro Watchman is technology that is antiquated?

MS. LORD:  Object to form.

THE WITNESS:  I would say that in -- within Essentia's, like, standard of care, this is not the common form of monitoring temperatures.

BY MR. MARTY:

Q.    Would you use the word "antiquated" or some other word in describing the technology?

A.    I would use the word "uncommon."  I also had not seen it before.

Q.    Is it uncommon because it doesn't have the real-time monitoring functionality?

A.    Yeah, or the trend line.

Q.    When were products developed that had that monitoring function or trend line?  How long have those been commercially available?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't know the answer to that question.  I would say if not all, most of my career since 2010.  You can see

Page 117

there within that rest of that sentence that there already was underway a plan from that previous summer that I was starting that they were ramping up for a new system for -- so Digi-Sense would have been that system that they were ramping up.  This -- when I mentioned Night Owl, would have been a different one that we couldn't expand on within that infusion center pharmacy space.  So to get us to transition, that is the reason that we re -- put a new Electro Watchman in that basement room until we were preparing for that -- that new one in the transition.  I wanted to make that clear.

BY MR. MARTY:

Q.    Toward the bottom of what's displayed we see, "Monday - Maari pulled refrigerator logs - only ten days in January documented - low temps recorded."

Does that refer to the time when you went in and looked at the logs on the clipboard?

A.    When I went in and asked them for the logs, yes.  I didn't have access to the logs.

Q.    Right.  Yeah.  That's my question.  I'm

Page 118

looking for clarification on the word "pulled."
By "pulled refrigerator logs," you actually
physically went to DCP and looked at them?

A.      I went to DCP and asked them for them.
And Laura and I had already texted over Friday
night into Saturday about them, about the
refrigerator situation.  So it wasn't like an
out of the blue type of deal.

Q.      Did she have any objection to showing
you the logs, or was she pretty cooperative?

A.      She was cooperative.

MS. LORD:  I'm not sure what your
thoughts are on a break, Brian.  I think we've
been going for another hour.

MR. MARTY:  Yeah, I'm real close to
a good spot.  Give me a minute.

MS. LORD:  Sounds good.

MR. MARTY:  Actually, this is a good
spot for a break.  Let's go off the record.

THE VIDEOGRAPHER:  Okay.  We're
going off the record.

The time is 1:31 p.m.

(Off the record 1:31 to 1:40.)

THE VIDEOGRAPHER:  We are back on
the record.

Page 119

The time is 1:40 p.m.

MR. MARTY:  Can we mark and display exhibit I -- or document I that we uploaded, please?

(Exhibit Number 60 marked for identification.)

BY MR. MARTY:

Q.    Dr. Loy, let me know when you're done reviewing this document.

A.    (Views document.)

MS. LORD:  Brian, could you identify the Bates number, please?

MR. MARTY:  Yeah.  It's EH031784 and 85.  It's a two-page document.

MS. LORD:  Thank you.

THE WITNESS:  You can -- you can go down to the next line after "Failure..."  Okay. Okay.

BY MR. MARTY:

Q.    Okay.  In the middle of page 1 there's a discussion about validating penicillin activity and treatment success or failure.

Do you see that?

A.    Yes.

Q.    Tell me what that refers to or what's

Page 120

going on here.

MS. LORD:  I'll object to form.

THE WITNESS:  Can you say what line it is again?

BY MR. MARTY:

Q.    Yeah.  I'm looking at paragraph 1, subpart (a), "During the temperature excursion by our previous clinic distributor, it was identified that there are some patients we need to validate penicillin activity and treatment success or failure."

A.    Okay.

Q.    What's the context here?

MS. LORD:  Do you remember?

THE WITNESS:  So this is a request from that project team to evaluate and make sure that there were not patients affected by the penicillin or Bicillin being at a different temperature range potentially.

BY MR. MARTY:

Q.    Okay.  Do you know whether there were any patients that were so affected?

A.    I don't recall that there were any.

Q.    What was the solution that Essentia came up with for addressing the penicillin or

Page 121

Bicillin patients specifically?

MS. LORD:  I'll object to form.

THE WITNESS:  We needed to make sure that patients weren't affected by that penicillin.  "Potential" being the potential temperature excursion.

BY MR. MARTY:

Q.    How did you go about doing that?  What steps were taken?

A.    Chart review.

Q.    Was this an after-the-fact look to see if anyone was affected, or was it aimed at preventing any persons from being affected to the extent possible?

A.    Both.  We wanted to ensure [unintelligible] no question that any of these patients were being affected by this.

Q.    Did these penicillin or Bicillin patients have to do anything?

A.    No.  I am unaware that there were any patients found.  I don't recall that.

Q.    Did these patients have to go get checked or have any tests or labs run or anything like that, anything affirmative that they had to do in connection with this process?

Page 122

A.      This would have been, like, an infectious disease item, and so it would have been based on chart review ensuring that the patient was having a good outcome.

Q.      Setting aside the penicillin and Bicillin patients, we talked about vaccines, correct?

A.      Yep.

Q.      Were all the potentially affected vaccines potentially affected in the same way, or are there perhaps different types of vaccines that may have been affected differently leading to the recipients being affected differently?

            MS. LORD:  Do you understand the question?

            THE WITNESS:  Maybe say it again.

BY MR. MARTY:

Q.      Sure.  Let's break it down into parts. What types of vaccines were potentially affected by the excursion?

A.      Well, we reviewed all of them that were potentially in those refrigerators.  And based on the review of all of them and manufacturer recommendations with potential temperature

Page 123

excursions, we took those next steps based on manufacturer recommendation.

Q.    What were those next steps?

A.    So depending on the recommendation that they had, some of the medications or vaccines had varying ranges that they had tested the product at, that then based on that were -- the recommendation from the manufacturer was that there wasn't an additional action.  Some of the vaccines or medications did have recommendations to offer revaccination.

Q.    Do you recall which manufacturers or particular vaccines had no recommended action?

A.    It was a really long list.  I kept track of it on the data sheet instead of in my brain.

Q.    Would the answer be the same for the medications or manufacturers -- strike that.

Would the answer be the same for the vaccines or the manufacturers that were recommending revaccination?

A.    Yeah.  They were all on a list and documentation.

Q.    What other types of medications were affected other than vaccines and penicillin/Bicillin?

Page 124

MS. LORD:  Object to form.

BY MR. MARTY:

Q.     Sorry.  I should have said potentially affected.

A.     Many medications that would have been potentially in those refrigerators, so medications that were going out to the clinics and the infusion centers from all different specialties.

Q.     Were those all similarly logged?

A.     Are you talking about the medication, like --

Q.     Yeah.  You --

A.     -- that we have a list of?

Q.     Yeah.  You mentioned a moment ago having a list of manufacturer recommendations for the vaccines.  Did you have a similar list for the medications?

A.     Yes.  Yep.

Q.     What's the 32nd Avenue facility in the Essentia network?

A.     It's the hospital and clinic at 32nd Avenue South in Fargo.

Q.     I have a document.  I'm not sure I need to mark it as an exhibit.  Do you recall

Page 125

written correspondence with Amgen about Prolia?

A.    Yeah.   They would have been one of the manufacturers.

Q.    Yeah.  Do you recall what their response was to your -- strike that.

Do you recall what your question was to Amgen?

A.    We would have used the same sentences to each of the manufacturers that we were reaching out to describing the potential ranges that we knew of.

Q.    What's your best recollection as to the verbiage you used in that -- in those standard letters?

MS. LORD:  I'm going to object to form and foundation.  I don't know that -- I don't know if you have it in front of you, but I have indicated that it's not a memory test, so...

MR. MARTY:  Yeah.

BY MR. MARTY:

Q.    Just your best recollection.

A.    Can you show it to me?

Q.    I don't think I have it in front of me.

A.    We just used the same -- we would use

Page 126

the same information.  And I don't recall the information back that they would have said about that Prolia.

Q.    The information you received back from the various manufacturers would have been reflected on your log or spreadsheet that you mentioned a moment ago?

A.    Yes.

MR. MARTY:  Chinyere, can we mark and display T, tango?

(Exhibit Number 61 marked for identification.)

BY MR. MARTY:

Q.    This exhibit is a one-page document, EH046508.  Let me know when you're familiar with this document?

A.    (Views document.)  Okay.  I read this.

Q.    This appears to me to be an email from Melissa Little in July of 2020 to you asking for -- well, why don't you tell me what your understanding of this document is.  What is it?

A.    It references that policy that we looked at a little bit ago.  And I wasn't here prior to June of '19, so I -- I don't -- I don't know anything about prior to '17.

Page 127

Q.      Okay.  The EOC 113 is the refrigeration policy that we discussed here recently, right?

A.      Yep.

Q.      Do you know why Melissa Little was looking for a prior version of that policy?

A.      No, not really.  I don't -- I don't -- I'm not really familiar with Melissa.  I -- I'm not sure what she was working on at the time, if it --

MS. LORD:  Don't guess.

THE WITNESS:  Okay.

BY MR. MARTY:

Q.      She also says she's looking for the temperature logs referenced in the policy.  Do you know more specifically what she was looking for?

A.      It appears that she -- just from reading this now, it appears that there is a standard log of some kind that she's looking for from that policy.

Q.      Did you respond with anything to her?

A.      I don't know.

Q.      Is there a standard log?  I mean, when you say "standard log," are you referring to, like, a form that can be filled in?

Page 128

MS. LORD:  I think I'm going to object on form and foundation.

MR. MARTY:  Let me withdraw that.

BY MR. MARTY:

Q.    What's your understanding of the standard log she may have been looking for?

MS. LORD:  Same objection and lack of foundation.

THE WITNESS:  I'm unfamiliar with 2017 things.

MR. MARTY:  Chinyere, can we mark and display U, please?

(Exhibit Number 62 marked for identification.)

BY MR. MARTY:

Q.    This is a one-page document, EH028304.

A.    (Views document.)  Okay.  I've read this.

Q.    Do you recall sending this email to Dan Beauchamp?

A.    Not before I read it.

Q.    Does reading this email trigger a memory about a conversation you had with him in September of 2020 that involved the, quote, historic DCP refrigerators?

Page 129

A.    Yeah.  Dan had stopped by in the pharmacy.  And within this conversation I -- when I read this, I think about something that Frank and/or Kyle had requested.  And similar to some of the conversations that I reflected earlier about some of the maintenance requests, like, suspicions that Laura had had, but they were not able to be founded, that's where this conversation comes back from my memory.

Q.    What do you mean "suspicions that Laura had had"?

A.    Well, Laura had some beliefs that -- similar how we had talked earlier today about that she had felt that she had asked Essentia maintenance something about them before, and I was following up within that.

Q.    Can you give me more detail about this conversation with Laura involving Essentia maintenance?

A.    No.  I just -- the same from this morning, that she had a belief that there had been some back-and-forth, but Essentia maintenance doesn't work on refrigerators.  They're for refrigerator things to refrigerator people.

Page 130

Q.      We're talking about Laura Morris, right?

A.      Uh-huh.

Q.      Yes?

A.      Yes.

Q.      And I want to make sure I understand your testimony.  From your perspective, Laura had thought that Essentia maintenance personnel may have done maintenance work on the refrigerators, is that right?

A.      No.  That she had somehow asked them to look at them, but there was no evidence that that actually happened.  And they were also unfamiliar with those requests prior to February of '20.

MR. MARTY:  Let's go off the record for ten minutes or so.  I'm pretty close, and I want to look over my notes.

THE VIDEOGRAPHER:  We're going off the record.

The time is 2:04 p.m.

(Off the record 2:04 to 2:19.)

THE VIDEOGRAPHER:  We are back on the record.

The time is 2:19 p.m.

BY MR. MARTY:

Page 131

Q.      Dr. Loy, when the fridges were moved from DCP's leased space to the basement, we've been referring to it as --

A.      Uh-huh.

Q.      -- how was that accomplished?

A.      They were moved on carts with the facilities team.

Q.      The facilities team from Essentia?

A.      Yep.  Yes.

Q.      Were there medications or vaccines that were potentially subject to a temperature excursion that were subsequently placed back in the distribution chain?

A.      Can you say that again?

Q.      Yeah.  Were there medications or vaccines that were potentially subject to a temperature excursion that were deemed to not have been affected and were placed back in distribution?

A.      Yes, if they were deemed that they were not affected.

Q.      How was that process done?

A.      By putting them back into distribution, or what part of the process?

Q.      Yeah.  How is it determined that they

Page 132

weren't affected?

A.   Based on the manufacturer's recommendation.

Q.   Is there anything Essentia could have done differently to prevent the possible temperature excursion?

A.   No.  Dakota Clinic Pharmacy was responsible for the storage.

Q.   Do you think Dakota Clinic Pharmacy is a hundred percent responsible for what happened?

        MS. LORD:  Object to form and foundation, outside the scope.

        THE WITNESS:  Yes.  It was outlined in their service agreement.

        MR. MARTY:  Those are all my questions.  Thanks for your time.

        THE WITNESS:  Thank you.

        MR. MARTY:  Essentia's counsel may have some follow-up, but I don't know.

                EXAMINATION

BY MS. LORD:

Q.   Dr. Loy, I just have a few follow-up questions just for clarification.

A.   Sure.

Q.   You have never worked as a pharmacist or

Page 133

otherwise at Dakota Clinic Pharmacy, is that correct?

A.    That is correct.

Q.    You were asked some questions about the compressor on the refrigerator or refrigerators.  And just to be clear, I think you said yourself you're not a refrigerator expert, is that true?

A.    I am not.

Q.    And would you know one way or another as we sit here today whether or not unplugging refrigerators would potentially have any impact on the range of temperature for the compressor?

A.    No.  I don't know what the refrigerators of any kind would -- how it would work.

Q.    That's the -- outside the scope of your expertise as a pharmacist?

A.    Yes.

          MS. LORD:  I have no further questions.

          MR. MARTY:  I do have a quick follow-up based on one of Essentia's counsel's questions.

               FURTHER EXAMINATION

BY MR. MARTY:

Page 134

Q.    Did anyone ever suggest that unplugging one of these refrigerators may have reset the temperature range?

A.    No.  The Dakota Refrigeration guy, Andrew, he reflected, as I said, the refrigerator was as it came off the line.

Q.    Nobody ever mentioned that unplugging one of these refrigerators could, for example, revert it back to its factory settings?  Did I understand your testimony right?

A.    Correct.  Nobody said that.

MR. MARTY:  Those are all my questions.  Thanks.

THE VIDEOGRAPHER:  All right.

MS. LORD:  Thank you.

THE VIDEOGRAPHER:  Is there anything else for the record?

MR. MARTY:  Nothing for me.

MS. LORD:  No.  We will take the opportunity to read and sign the deposition transcript.

THE VIDEOGRAPHER:  Okay.  Thank you. We are off the record at 2:24 p.m.

This concludes today's testimony. The total number of media units used was six

Page 135

and will be retained by Veritext.

(Deposition concluded at 2:24 p.m.)

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

Page 136

REPORTER'S CERTIFICATE

STATE OF MINNESOTA     )
                       ) ss.
COUNTY OF HENNEPIN     )

I hereby certify that I reported the remote deposition of MAARI LOY, PharmD, MBA, BCPS, FASHP, on Friday, May 9, 2025, from Gold Canyon, Arizona, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition transcript by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 14th day of May, 2025.

Dana S. Anderson-Linnell
Notary Public, Hennepin County, MN
My commission expires 1/31/2030

Page 137

Angie E. Lord, Esquire

alord@vogellaw.com

                        May 15, 2025

RE:    Kraft, Jessica Et Al. v. Essentia Health Et Al.

       5/9/2025, Maari Loy (#7323163)

       The above-referenced transcript is available for

review.

       Within the applicable timeframe, the witness should

read the testimony to verify its accuracy. If there are

any changes, the witness should note those with the

reason, on the attached Errata Sheet.

       The witness should sign the Acknowledgment of

Deponent and Errata and return to the deposing attorney.

Copies should be sent to all counsel, and to Veritext at

cs-midatlantic@veritext.com.

 Return completed errata within 30 days from

receipt of testimony.

   If the witness fails to do so within the time

allotted, the transcript may be used as if signed.

                   Yours,

                   Veritext Legal Solutions

Page 138

Kraft, Jessica Et Al. v. Essentia Health Et Al.

Maari Loy (#7323163)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Maari Loy                                          Date

Page 139

Kraft, Jessica Et Al. v. Essentia Health Et Al.

Maari Loy (#7323163)

ACKNOWLEDGEMENT OF DEPONENT

I, Maari Loy, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____
Maari Loy                                           Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.


_____

NOTARY PUBLIC

**[& - 37]**                                                                                                                                                       Page 1

| & | | | |
|---|---|---|---|
| **&** 2:14 | **17** 99:16 126:25 | **2011** 13:13,16 13:24 14:11 15:14 | **24** 49:6 |
| **0** | **1701** 45:21 | **2017** 94:13 | **24th** 105:5 |
| **0113** 98:10 | **1702** 31:22 32:11,21 33:8 33:12 36:17 37:20 | 98:16 99:4 105:13 106:11 128:10 | **28** 65:16,18,24 68:9 73:23 78:19,20 79:4 80:2 85:4 114:22 |
| **04-23-2025** 6:3 | **1763** 3:7 | **2019** 13:2,3 16:3,9,11 21:6 21:9 27:19 37:6 108:14 | **2:04** 130:20,21 |
| **1** | **17932** 136:23 | **2019.8.21** 5:15 | **2:19** 130:21,24 |
| **1** 7:17 52:14 97:12 100:2 104:19 111:21 119:20 120:6 | **19** 23:5 26:4,11 50:23 51:10 78:11 99:9,19 126:24 | **2020** 26:3 28:11 35:9 38:23 48:17 54:19 55:3 56:12,23 57:6 70:3 74:7 76:8 76:16 77:6 78:4,14,17 85:17 89:16 94:13 98:25 105:5 106:11 126:19 128:24 | **2:24** 134:23 135:2 |
| **1/31/2030** 136:25 | **1:00** 107:9,10 | | **3** |
| **10** 6:5 104:6,10 104:13 | **1:02** 107:10,14 | | **3** 97:19 98:15 99:23 103:5 |
| **100** 2:15 3:7 | **1:31** 118:22,23 | | **30** 107:5 137:16 |
| **104** 6:5 | **1:40** 118:23 119:1 | | **3000** 9:18 32:17,23 37:22 |
| **107** 5:15 | **2** | | **31** 114:23 |
| **10:42** 52:13,15 | **2** 52:19 88:7 97:12 100:23 | | **32** 64:6 |
| **10:54** 52:15,18 | **20** 26:4 56:18 82:15 83:23 99:8 130:14 139:15 | **2020.2.25** 5:17 | **320** 1:3 7:23 |
| **110** 5:17 | | **2020.3.24** 5:19 | **32nd** 9:19 32:17,23 37:22 124:20,22 |
| **113** 98:7 127:1 | | **2020.7.30** 5:21 | |
| **119** 5:19 | **200** 3:17 | **2020.9.10** 5:23 | **36** 41:19 43:24 52:22 64:9,16 64:22 67:2 73:18 97:20 99:25 |
| **11:54** 88:6,8 | **20009** 3:8 | **2025** 1:22 2:3 7:8 136:6,20 137:3 | |
| **121** 1:3 7:23 | **2004** 14:8 | | |
| **126** 5:21 | **2008** 14:11 | | |
| **128** 5:23 | **201** 3:17 | **21st** 98:16 99:4 | **37** 67:6 68:12 97:20 |
| **12:25** 88:8,11 | **2010** 14:3,8 116:25 | **2200** 43:6 | |
| **132** 5:6 | | | |
| **134** 5:7 | | | |
| **14th** 136:19 | | | |
| **15** 137:3 | | | |

**[4 - affected]**

| 4 | 8 | |
|---|---|---|
| **4** 97:19 103:13 104:2 107:13 | **85** 5:19 119:14 | **academic** 18:18 |
| **40** 65:16,17,24 68:9 | **8th** 43:6 | **access** 13:11 55:25 109:21 117:24 |
| **41** 67:6 68:12 | **9** | **accidentally** 63:4 |
| **46** 41:19 43:24 52:22 64:9,16 64:22 67:2 73:19 | **9** 1:22 2:3 5:5 6:3 95:2,5,10 96:3,9,25 104:4 136:6 | **accomplished** 131:5 |
| **468** 5:17 | **96** 6:3 | **account** 82:9 |

**acute** 20:19,25 21:4 23:5 24:18 34:11 109:23

**add** 79:5 85:6

**adding** 98:14

**additional** 14:16 31:10 35:3 66:10,10 68:4,22 69:16 69:19 71:22 84:13 123:9

**additions** 139:6

**address** 9:14,15 9:16,18 31:17 32:23

**addressing** 120:25

**adhere** 29:15

**adherent** 101:13

**adhering** 29:19

**adjust** 64:24

**administration** 14:11

**adopted** 44:13

**advance** 16:15

**advisable** 109:13

**affect** 136:16

**affected** 44:11 45:20 46:3,4 90:14,22 93:25 94:3,9,10,15

**5**

**5** 110:17 111:1
**5/9/2025** 137:5
**5015** 2:15
**50265** 2:16
**54** 82:15 83:18
**58** 5:15 107:15
**58103** 9:19
**58501** 3:18
**59** 5:17 110:11
**5:00** 92:24

**9:30** 1:23
**9:32** 2:3 7:7
**9:47** 19:3
**9:48** 19:3
**9th** 7:8

**account** 82:9
**accountability** 114:13,17
**accounts** 82:9
**accreditation** 31:7
**accuracy** 137:9
**acknowledge** 115:4
**acknowledge...** 139:3
**acknowledg...** 137:12
**acquiring** 34:22
**action** 8:4 123:9,13 136:15,16
**activities** 71:10
**activity** 119:21 120:10
**actual** 53:18 63:2
**actually** 63:1 80:1 118:2,18 130:12

**6**

**60** 5:19 119:5
**61** 5:21 126:11
**610** 5:15
**62** 5:23 128:13
**68** 111:3

**a**

**a.b.** 1:11
**a.m.** 1:23 2:3 7:7 52:13,18 88:6
**a.s.** 1:6
**able** 15:21,22 16:14 43:6 49:8 51:19 63:20 65:8 67:1 93:9 99:20 104:9 107:18 110:1 110:10 129:8
**above** 83:18 137:6 139:7
**absolutely** 108:6

**7**

**7323163** 1:25 137:5 138:2 139:2

120:17,22
121:4,12,13,17
122:9,10,12,14
122:21 123:24
124:4 131:18
131:21 132:1
**affects** 136:16
**affiliated** 16:6
53:25 61:10
63:10 77:4
82:16 105:9
**affiliations**
8:10
**affirmative**
121:24
**ago** 34:3 82:23
124:15 126:7
126:23
**agree** 7:16 52:3
112:11,15
116:3
**agreement** 26:1
26:10,14,16,25
27:5 28:10,20
35:15 38:2,7
40:16 57:15
59:20,21 61:2
77:14 132:14
**ahead** 14:2
20:23 34:7
**ahold** 66:20
**aimed** 121:12
**aiming** 24:15

**air** 80:8
**ajar** 74:3 84:22
**al** 7:20,20
91:22 137:4,4
138:1,1 139:1
139:1
**alarm** 63:5
81:2,22
**alarmed** 56:16
56:20
**alarming** 56:9
56:13 72:24
**alarms** 63:17
81:23
**alaskan** 45:7
**alert** 81:1
**align** 109:10
**allergy** 28:1
**allotted** 137:19
**allows** 31:9
64:24
**alongside** 23:18
**alord** 3:19
137:2
**amanda** 1:9
**ambulatory**
62:10
**american** 14:22
15:4 45:8
**amgen** 125:1,7
**amount** 57:17
57:20
**amy** 1:7 70:17
70:20 71:4,9

71:15,19,24,25
80:7,13,20
86:2 89:7
114:10 115:6
**anderson** 1:24
2:5,14 4:9 8:2
136:24
**andrew** 66:11
134:5
**angie** 3:14 8:16
11:12 49:16
104:5 137:1
**anne** 1:6
**answer** 5:9
9:23 10:3,17
11:2 19:9 28:5
38:20 43:15
53:19 55:13
66:1 85:9
88:16,25 97:6
109:18 116:24
123:16,18
**answers** 97:3
**anthony** 6:3
**antiquated**
115:18 116:4
116:11
**anybody** 61:5,9
91:10,15,17
94:7 105:9
114:13 115:9
**anymore** 37:9
**anyways** 37:13

**app** 53:17
**apparent** 68:25
**appear** 98:11
**appearance** 8:8
**appearances**
2:9,20 3:1,22
4:1 8:10
**appears** 108:14
126:18 127:17
127:18
**appended**
139:7
**applicable** 4:10
137:8
**applied** 99:3,14
101:18 103:15
**apply** 101:15
**appreciate** 23:1
23:1
**approach**
51:25
**approached**
69:1
**approved**
100:24 102:2,7
102:16
**approximate**
94:14
**approximately**
90:21
**area** 17:5 18:23
32:2,24,25
67:16

areas 32:19
arizona 136:6
arrangement 87:5
arrangements 89:2
arrived 34:14 42:13 58:10
ashali 3:5,10 8:20
ashp 15:3,5
aside 93:9 104:4 106:25 122:5
asked 28:7 41:17 66:22 76:4 77:20 78:3 82:2,7,18 113:4 117:23 118:4 129:14 130:10 133:4
asking 10:16 11:16,23,24 22:11,14,19,22 22:25 30:10 43:18 71:22 75:7 126:19
assigned 43:9 43:11 71:11
assist 15:23 62:12
assisted 44:25
assume 11:3 89:18 103:21

112:10
assuming 41:13 46:23 47:22 54:14 103:14
attached 6:7,9 137:11
attending 17:2 18:18
attorney 8:11 136:13,13 137:13
attorneys 11:25 136:15
audio 7:14
august 108:14
authored 115:23
authority 71:12
automated 51:6
automatic 45:8
available 75:20 115:19 116:20 137:6
avenue 2:15 9:19 32:18,23 37:22 61:6 124:20,23
avoid 110:19
aware 31:21 50:19,22 111:23,24,25 112:23

**b**

b 1:15 5:15 20:20 100:2,23 103:5,13 104:2 107:2
back 16:2 32:7 32:25 33:25 50:8 52:16 54:12 56:3,4 56:11 69:20,25 71:25,25 86:15 86:23 88:9 101:23 106:11 107:11 108:11 115:22 116:2 118:24 126:2,4 129:9,22 130:22 131:12 131:18,23 134:9
background 35:4,7 37:7 44:6 57:19 73:15
backroom 82:14
backup 50:25
bad 28:8
bailey 1:6
barely 83:3
barton 2:13
base 80:14

based 18:19 28:25 48:21 60:22 92:9 94:6 102:1 122:3,23 123:1 123:7 132:2 133:22
basement 36:17,17 38:4 40:18 41:23 53:3 54:8 62:2 65:12 86:15,17 86:19 87:13 89:25 117:11 131:2
basket 47:7
baskets 47:6
bates 119:12
bcps 1:21 2:2 5:3 9:2 14:16 136:5
beaton 1:8
beauchamp 62:12 111:23 128:20
began 14:8 40:15
beginning 8:11 18:10 22:23 99:4
begins 52:19 107:13
behalf 1:12 2:11 3:3,12

**belief** 38:25 39:3 70:17 129:21

**beliefs** 129:12

**believe** 105:6

**berg** 1:11

**best** 10:15 25:19 31:11 41:2 52:3 91:3 101:11 125:12 125:22

**better** 44:22

**bicillin** 120:18 121:1,18 122:6 123:25

**bickler** 20:9,19

**bickler's** 20:16

**big** 33:16 37:2

**bill** 45:2

**billing** 44:23

**bismarck** 3:18 17:4,6 20:4 110:1

**bit** 17:22 21:12 21:15 35:16 44:15 61:14 77:23 102:13 107:19 109:3 111:12 115:22 126:23

**black** 50:8

**blind** 69:17

**blizzards** 35:22

**blow** 107:21

**blown** 107:19

**blue** 118:8

**board** 14:12,15 17:18 72:21 75:3

**body** 31:7

**bottom** 71:23 96:13 98:11 104:14 117:16

**bought** 29:24 30:1 39:1

**bounce** 67:5

**box** 41:6,9 47:7 63:25 80:24,25 81:18,22 86:8 86:9,11,24

**brain** 99:21 123:15

**brand** 33:16 50:6

**break** 49:15,17 52:9,21 89:10 95:21 118:13 118:19 122:19

**brian** 2:12 8:12 9:7 49:12 77:24 95:23 104:8 118:13 119:11

**briana** 3:15 8:22 11:12 12:14

**bring** 27:11

**bringing** 27:15

**broke** 89:9

**brought** 86:1 110:5

**brummel** 3:20

**buff** 44:20

**building** 55:7 62:9,15

**business** 9:16 9:18 14:11 15:25 51:13 57:19

**button** 64:25

**buy** 39:13

**buyer** 62:1,25

**buyers** 19:20 20:1 109:22

**bypasses** 45:13 45:14

**c**

**c** 20:20

**c.j.f.** 1:10

**c.r.f.** 1:10

**cables** 42:7

**cadence** 54:16

**calendar** 25:22

**call** 39:16 40:4 47:16 49:6 51:1 53:7 62:22 63:1,1,7 63:9,12 65:7 81:4,5,8 82:15

83:7,15 97:15

**called** 9:3 22:4 40:19,20,21 62:10 63:8 76:12 83:4,5 83:24 89:24

**calling** 40:6,7 40:22 56:3

**calls** 63:2,5

**camera** 7:11

**canceling** 82:9

**canyon** 136:6

**capacity** 13:5

**capsule** 87:25

**care** 13:17 19:14 20:19,25 21:4 23:5,14 23:16 24:2,3 24:18 31:12 34:11 44:7,18 45:4 51:25 66:7 72:18 74:15 79:10 81:9 109:23 114:3 116:7

**career** 116:25

**carefully** 90:2

**carts** 131:6

**case** 1:3 7:22 18:22 21:20 22:9 60:23 74:21 87:20

**categories** 45:5

**cause**  57:11
  91:18
**causing**  61:5
**cc'd**  108:15
**cdt**  1:23 2:3
**center**  17:8
  19:15,17 117:9
**centers**  16:24
  18:2,8 31:8
  124:8
**central**  18:13
**cereals**  29:25
**certificate**
  136:1
**certification**
  14:14,15
**certified**  14:12
**certify**  136:5
**cetera**  33:18
  55:6 93:22
**chad**  62:1,25
  63:6,12,14
**chain**  131:13
**challenge**  59:17
  59:19
**chance**  111:18
**change**  21:12
  26:15 35:23
  53:23 66:12,16
  138:4,7,10,13
  138:16,19
**changed**  21:8
  21:10 43:12
  94:22

**changes**  25:17
  108:23 137:10
  139:6
**chapter**  30:24
  31:2,4,13
**charge**  73:7
**charged**  136:10
  136:11
**chart**  121:10
  122:3
**check**  81:9
**checked**  73:6
  81:11 121:23
**checks**  73:3
**chemists**  80:10
**chief**  91:24
**children**  44:8
  44:24 45:9,10
  45:14 47:7
  49:9 51:18
**chimata**  3:5
  8:20,20
**chinyere**  4:5
  107:21 110:9
  126:9 128:11
**chooses**  108:5
**christensen**
  91:23
**christine**  4:6
  7:24
**chronologica...**
  92:7,8
**circumstances**
  50:3

**civil**  4:10
**clarification**
  88:24 97:7
  118:1 132:23
**clarify**  22:18
  26:4 31:17
**clarifying**
  22:10,13
**clear**  9:22
  10:11 36:19
  114:7 117:14
  133:6
**clerk**  69:21
  71:6,7,10
**clinic**  1:16
  21:20 24:7,14
  24:19 26:1,6
  26:25 27:7,18
  27:25 28:1,9
  28:19,19 29:3
  29:6 30:3,5,12
  30:19 31:14,24
  32:8 34:17
  36:25 38:15
  45:12,13 46:6
  46:14,25 47:1
  47:3 53:5
  54:10,17 55:2
  58:3 62:15
  66:6 69:4,23
  73:12 74:7,8
  74:14,23 76:19
  79:20 86:9
  88:13,19 93:12

  108:18,19
  109:14,20
  120:8 124:22
  132:7,9 133:1
**clinical**  14:18
**clinics**  13:11
  17:1 18:2,9
  19:19 23:19
  28:24 30:17,23
  34:15 35:13
  37:19,25 46:11
  46:14,16,21
  47:10,12,17
  48:9,20,22
  49:2 50:10,17
  50:18,20,23,24
  51:4 58:10
  93:7 124:7
**clipboard**
  106:9,12,18
  117:22
**close**  118:15
  130:16
**closely**  36:2
**cms**  14:19 29:6
  31:9
**codes**  62:17
**cold**  83:23
  84:19 85:10,19
**colleague**  18:21
  19:24
**colleagues**
  25:14 26:20
  58:11

collect  49:3
columbia  3:7
come  23:18
  51:16 60:19
  91:3
comes  19:18
  44:7 129:9
coming  67:24
  93:21
commencing
  2:3
comment  86:5
commercially
  116:20
commission
  14:20 29:6
  30:24 31:1,4,6
  31:12 136:25
committee
  29:18 99:10,12
common  116:8
communicate
  10:1 25:17
communication
  25:19 28:3
  53:7
company  87:4
complete  13:22
  15:12 25:24
  139:8
completed
  13:20 14:6,9
  15:14 137:16

completely
  53:4
compliance
  103:15,23
compliant
  51:19
complying  29:4
component
  17:7
components
  42:17
compressor
  64:21 65:16
  67:8 79:17
  85:4 133:5,13
concern  57:8
  58:1,20 60:24
  60:25 79:3
concerned  57:3
  57:18,22 97:10
concerning
  56:10 58:8,9
  58:24 60:3
concerns  61:11
  93:4
concierge  4:4,5
  95:9,13,17
  96:2 107:3
concluded
  135:2
concludes
  134:24
conclusion
  83:21

conducted  7:10
confirmation...
  68:18
confused  86:4
confusing  85:2
  85:22 86:13
  114:12
confusion  75:5
connected
  70:12,14,15,18
  71:3
connection
  7:12 121:25
connects  41:15
consistent  24:2
  51:24,24 79:24
consumer
  39:10,14
contact  26:20
contacted
  93:25
contained
  86:11
contemporan...
  97:4
context  34:24
  120:13
contingency
  35:16,20
continue  7:15
  15:6 16:14
  17:7 19:8
continued  2:20
  3:1,22 4:1

66:17
continuing
  15:24
continuous
  49:1
contract  66:21
  88:20 136:15
contracts  58:17
  89:3
control  74:25
controlled
  30:15,16,21
  32:9
conversation
  71:18 85:16
  86:2 92:19
  128:23 129:2,9
  129:18
conversations
  27:21 56:6
  84:8,13,16
  85:20 89:7,10
  89:18,21 91:9
  91:15,21 92:4
  92:11,17,21
  93:1 129:5
conveyed  53:8
  101:19
convoluted
  106:2
cooler  115:5
cooling  64:22
cooperated
  78:6

**[cooperative - day]** Page 8

| | | | |
|---|---|---|---|
| **cooperative** 77:22 118:10 118:11 | **counsel's** 102:12 133:22 | **currently** 12:21 15:8 | 100:25 102:20 108:19 109:20 132:7,9 133:1 134:4 |
| **copies** 6:8 104:20 105:3 136:11,11 137:14 | **counseling** 32:3 **count** 100:15 **counter** 32:4,5 32:24 55:20 113:8 | **cursor** 115:16 **cut** 77:23 104:7 **cv** 1:3 7:23 **cycle** 80:2 **cycles** 79:16 | **dakotas** 35:22 35:25 **dan** 62:12 111:23 128:19 129:1 |
| **copy** 95:22,24 96:3,8 | **counters** 32:3 **county** 136:3 136:24 | **cycling** 67:9 79:7 | **dana** 1:24 2:4 8:1 10:2 136:24 |

**corner** 96:13 99:24 104:14

**corporate** 8:18

**correct** 33:9 40:2 42:25 43:1 46:11,12 63:11 69:3 85:18,24 93:17 105:7 108:15 122:7 133:2,3 134:11 139:8

**corrections** 139:6

**correctly** 29:22 72:22

**corresponden...** 125:1

**cost** 136:10

**counsel** 6:8 7:1 7:19 8:8 9:1 12:19 22:3,4 96:7 132:18 136:13,13 137:14

**couple** 9:20 15:11 20:13 41:25 49:17,19 95:19 104:25 113:11

**course** 28:16

**courses** 15:13

**court** 1:1 7:1 7:21 8:1,24 10:1 107:4

**covid** 48:12

**crack** 84:21 85:1

**cracked** 85:5

**credential** 14:16,17

**critical** 13:11 13:17

**cs** 137:15

**current** 12:23 20:20 25:16 47:13 49:5 82:11,11

**d**

**d** 1:15

**d.b.** 1:7

**daily** 51:4,14 73:9 92:24

**dakota** 1:2,16 7:22 9:19 13:9 13:10 14:7,24 15:5,8,15 17:6 17:18 21:19 26:1,6,25 27:18 28:9 30:5,12 31:14 34:17 36:25 38:15 45:11 46:12 53:5 54:9,17 55:2 58:3 65:7,19 66:11 69:4,23 73:12 74:7,8 74:14,23 75:3 76:12,15,19 77:2 83:23 88:13,18

**data** 49:1,9 50:25 90:24 94:12 101:1 102:3,10,21 123:15

**date** 35:18 48:11 138:24 139:12

**dated** 105:13 106:10 108:14

**david** 20:17,22 20:24

**day** 2:13 4:4,5 9:23 16:20,20 16:21,21 17:2 17:2 19:18 22:24 25:5 26:19,19 36:8 49:3 51:11,13 62:5 66:13 73:17 79:20 81:10 136:19

**[day - displayed]** Page 9

139:15
**days** 41:25 42:3
66:18 94:4
117:18 137:16
**dc** 3:8
**dcp** 56:21 57:3
57:25 58:2
59:6,11 61:12
70:4 77:9,22
78:5 80:21
82:17 89:8
100:9 101:6,19
101:19,23
102:15,20,24
103:15,15,19
103:22,22
104:1 105:5
106:2 115:11
118:3,4 128:25
**dcp's** 77:5
105:10 131:2
**deal** 37:2 95:20
118:8
**december**
98:16 99:4
108:22
**decide** 97:13
**decided** 105:25
**declare** 139:4
**deemed** 131:17
131:20 139:6
**defendants**
1:18 3:12 8:17
8:23

**degree** 15:17
43:24,25 52:22
65:24 67:2
68:9,13 73:19
79:4
**degrees** 41:19
78:19,20 80:2
114:23
**delegate** 15:3
**delegates** 15:6
**delivery** 58:16
**department**
23:9 100:25
102:3,8
**depending**
46:25 47:2
123:4
**depends** 7:11
**deponent**
137:13 139:3
**deposing**
137:13
**deposition** 1:21
2:1 7:9,18 9:11
9:21 11:10,12
12:19 95:12,16
96:9 134:20
135:2 136:5,10
136:18
**des** 2:16
**describe** 17:11
18:3 31:16
40:23

**describing** 19:5
114:8 116:12
125:10
**description**
21:10,13
**designed** 68:24
**detail** 17:22
129:17
**details** 27:5
68:17
**determine** 94:1
**determined**
94:2,8 131:25
**developed**
116:18
**developing**
93:14
**device** 53:16
**dial** 65:2,5
**dianne** 23:10
91:25 108:13
115:25
**different** 12:2
17:11,15,17
19:6 21:11
37:17 58:17
61:6 68:15,18
72:13 80:10
97:2,23 100:19
102:13 109:3
117:7 120:18
122:11 124:8
**differently**
122:13,14

132:5
**difficult** 79:18
98:5
**difficulties** 30:4
**digi** 47:13,18
48:8,20 49:24
50:15 117:5
**diligence** 90:7
**diligent** 27:24
**direct** 47:11,15
89:15 92:20
**directly** 45:13
46:11 71:19
**director** 20:10
20:18,25 21:3
23:5 62:10,11
92:1
**disappointing**
73:1,2
**discovery** 35:9
35:11 92:12
97:1,3
**discussed** 127:2
**discussion**
119:21
**discussions**
80:19
**disease** 29:10
29:11,12 122:2
**display** 107:1
110:10 119:2
126:10 128:12
**displayed** 95:3
117:16

**[distributed - elevating]**

**distributed**
  62:14
**distribution**
  28:19 30:20
  31:24 32:9
  108:19 109:14
  131:13,19,23
**distributor**
  1:17 29:13
  45:15 46:6,7
  120:8
**distributors**
  21:19
**district**  1:1,2
  7:21,22
**doctor**  14:6
**document**  6:14
  29:22 30:1
  58:12 96:10,12
  96:17,21,21
  97:11,19
  104:13,17
  105:1 106:25
  107:2,22 108:4
  108:10,12
  110:15 111:5
  111:19 115:23
  119:3,9,10,14
  124:24 126:14
  126:16,17,21
  128:16,17
**documentation**
  104:21 105:16
  123:22

**documented**
  117:18
**documents**
  12:8,9,15,16
  95:1 96:24
  98:13
**doe**  1:16,17
**doh**  102:20
**doing**  11:22
  17:24 27:25
  28:1,2 37:20
  67:14 68:1
  71:2 73:15
  75:13 81:11,14
  90:7 96:22
  104:1 109:23
  115:7,9 121:8
**door**  33:22,24
  39:25 40:8
  61:17 83:15
  84:21,22 85:5
  85:13 100:15
**doors**  74:3
**doses**  94:9,15
**double**  33:22
  33:22 39:25
  40:20 61:16
  62:4,14 63:16
  100:15
**dr**  9:7 63:3
  88:13 91:25
  96:7 97:10
  107:25 110:14
  119:8 131:1

  132:22
**drive**  31:23
  32:7,12,21
  33:9,12 36:18
**due**  90:7
  108:21
**duly**  9:3 136:6
**duplicating**
  110:19
**duties**  21:8
  28:13

**e**

**e**  3:14 20:20,24
  137:1 138:3,3
  138:3
**earlier**  35:24
  61:15 96:9
  109:9 115:4
  129:6,13
**early**  108:22
**easier**  92:6
**east**  24:13
**education**  14:4
**effects**  58:17
**effort**  93:20
**eh**  108:20
**eh002734**  96:14
**eh002739**  96:18
**eh026609**  5:15
**eh028304**  5:23
  128:16
**eh031784**  5:19
  119:13

**eh036563**  6:5
  104:15
**eh046508**  5:21
  126:15
**eh049462**  5:17
  110:23
**eight**  81:12
**either**  47:7 65:5
  75:12 93:21
  95:8
**el.l**  1:8
**electricity**  42:6
**electro**  40:7,11
  40:15,16,21,23
  41:8,16 42:15
  42:22 43:8
  47:18,20 48:3
  49:24 50:15,20
  52:22 53:10,24
  54:1,4,17
  61:18 63:10
  69:24 70:4
  80:22 81:25
  82:2,6 86:15
  87:1,4 115:16
  116:3 117:11
**electronic**
  29:17,23 51:7
  109:21
**electronics**
  65:1
**elevating**  61:2
  90:3

**elizabeth** 1:8
**em.l.** 1:7
**email** 2:17 3:9
  3:19 53:6,9
  108:13 126:18
  128:19,22
**employed**
  12:21 13:3,14
  48:9 50:10,16
  51:20
**employee**
  136:12,13
**employees**
  115:12
**employment**
  12:23 16:2
**ended** 69:2
**ends** 52:14 88:7
**enforced** 44:5
**ensure** 68:3
  121:15
**ensuring** 122:3
**entire** 20:14
**entirely** 106:18
**entitled** 11:3,6
  22:12
**entity** 59:12
  102:8
**environment**
  79:4 94:5
**eoc** 98:7,10
  127:1
**epic** 109:2,21

**equipment**
  54:25
**errata** 137:11
  137:13,16
**escalating**
  92:22
**esquire** 2:12,13
  3:4,5,14,15
  137:1
**essentia** 1:15
  1:15 3:12 4:3
  7:20 8:17,23
  9:18 12:25
  16:3,6,9,10,12
  16:16 20:10
  23:4,8,11
  24:23 25:7
  26:19 27:10
  28:12,25 29:16
  30:12 31:15
  32:15 33:5
  34:3 38:15
  40:14,16 45:10
  51:14 53:25
  54:5 59:13
  61:10 62:8
  66:21 73:14
  74:9,15,20
  75:15,19 76:6
  77:4,20 78:3
  78:13 79:11
  88:15 90:3,7,9
  91:20 94:21
  96:10 97:15,17

  98:8 99:3,8,10
  100:24 101:14
  102:6,16
  103:19 105:9
  120:24 124:21
  129:14,18,22
  130:7 131:8
  132:4 137:4
  138:1 139:1
**essentia's** 11:7
  22:3 26:5
  27:18 34:21
  36:5 38:3
  74:16 96:7
  116:7 132:18
  133:22
**essentially**
  34:18 68:24
**established**
  97:1
**estimate** 55:5
  90:13
**et** 7:20,20
  33:18 55:6
  93:22 137:4,4
  138:1,1 139:1
  139:1
**evaluate**
  120:16
**evaluated** 62:2
  62:7 93:24
**evening** 61:25
**eventually**
  37:19

**everybody**
  49:20
**evidence** 79:23
  130:11
**evolution** 24:20
**exact** 6:13
  35:17 89:23
**exactly** 30:10
**exam** 14:14,15
**examination**
  5:4 9:5 132:20
  133:24
**examined** 9:4
**example** 134:8
**excited** 16:12
**exclamatory**
  113:17
**excursion**
  21:18,22,23,25
  22:5,7,8,16,17
  33:7,8 34:25
  35:1,10,12
  45:22 46:8
  84:10 91:18
  120:7 121:6
  122:21 131:12
  131:17 132:6
**excursions**
  123:1
**exhibit** 5:15,17
  5:19,21,23 6:3
  6:5 95:2,5,10
  96:3,9,25
  98:15 99:23

104:4,6,10,13
107:15 110:11
110:17 115:15
119:3,5 124:25
126:11,14
128:13
**exhibits** 5:13
6:1,7,9,11
95:24
**expand** 117:8
**expect** 69:18
113:25
**expectations**
24:2 115:12
**expected** 98:9
113:20 114:6
**experience**
15:21 23:21
81:9
**expert** 42:14
64:14 65:6
133:8
**expertise**
133:17
**expires** 136:25
**explain** 31:5
**extended** 83:17
**extent** 121:14
**eye** 27:25
**eyes** 105:10

**f**

**f** 5:17 30:1
110:10

**faces** 32:25
**facets** 20:3
**facilities** 62:12
99:3 131:7,8
**facility** 124:20
**facing** 32:4
**fact** 68:1 78:17
121:11
**factory** 101:2
102:24 103:1
134:9
**fahrenheit**
41:20
**fails** 137:18
**failure** 119:17
119:22 120:11
**fair** 11:4 22:9
73:9 78:21
98:4
**fall** 25:23 26:3
34:13 56:5
**familiar** 25:25
32:18,22 47:9
50:1 62:9 77:2
97:12 98:10
113:21 114:1,6
114:24 126:15
127:7
**familiarize**
110:14
**family** 28:2
**fancier** 44:22
**far** 27:23 73:25
76:8,9 77:6

106:18
**fargo** 9:19 13:8
13:9,18 32:12
37:22 115:18
124:23
**fashp** 1:21 2:2
5:3 9:2 136:5
**fauske** 1:9
**feature** 81:5
**february** 25:24
28:10 34:13,14
35:8 36:14
38:23 48:17
54:19 55:3
56:12,17,23
57:5 70:3 74:7
76:8,16 77:6
78:4,14,17
85:17 89:16
98:25 105:5
106:10 130:14
**federal** 44:7,24
45:2 46:19,19
**fee** 54:14
**feel** 25:6 35:18
75:24
**feet** 41:7
**fegan** 3:6
**feganscott.com**
3:9,10
**fellow** 14:22
**fellowship**
14:25

**felt** 129:14
**female** 112:22
**figure** 63:21
64:14 66:4
83:11
**figured** 87:20
**file** 12:10,13,16
**filed** 4:8 7:20
**filled** 72:25
73:5,8,17
127:25
**finance** 15:25
**financial** 57:22
**financially** 8:4
136:14
**finding** 66:11
68:2
**fine** 9:16
**finish** 49:17
**finished** 35:12
35:24
**firm** 3:16 4:9
8:2
**first** 9:3,23
24:22 25:2,4,5
25:5,7 34:25
39:24 40:18,19
56:1 63:1,6
66:7 82:7,19
98:12 105:8
108:17 111:22
136:6
**fishing** 83:5

fit 26:6
fits 17:21
five 49:15
  106:5
fix 85:7 91:6
fixed 75:9
flow 95:23
focus 14:17
  74:2 104:18
  107:21 111:21
focusing 91:6
folder 95:18
follow 15:11
  35:7 59:21
  97:18 132:19
  132:22 133:22
followed 102:6
following 65:9
  66:17 72:20
  92:12,25
  101:23 129:16
follows 9:4
foot 56:2
foregoing
  139:5
form 22:1 34:6
  38:17 43:13
  45:23 50:11
  52:4 59:9
  72:11 73:10
  75:22 77:11
  78:7,22 83:19
  87:7 90:15
  94:16 99:5

101:8 102:4
103:16,24
105:18 106:20
109:17 112:12
113:23 116:5,8
116:21 120:2
121:2 124:1
125:16 127:25
128:2 132:11
formulary
  28:25 29:8,9
  29:16,16,19
  30:3,21 57:13
  58:7,14,23
  59:7,22 60:3
  60:15,21 61:12
forth 129:22
forward 92:18
found 17:9
  50:24 70:8
  106:15 121:21
foundation
  38:18 43:14
  59:10 75:23
  77:12 78:8,23
  87:8 90:16
  94:17 99:6
  101:9 103:17
  103:25 106:21
  109:17 112:13
  113:24 116:22
  125:16 128:2,8
  132:12

foundational
  96:23 97:7
founded 129:8
foxtrot 110:10
frame 74:11
frank 4:3 8:18
  11:13 129:4
free 80:8
freezer 77:17
  100:4 103:7
freezers 97:22
  98:4,14 103:9
freezing 86:4
  105:15
frequency 73:3
  79:12
frequently 55:5
friday 1:22 2:3
  36:13 40:4,5
  40:10,20 61:18
  61:18 62:21
  69:9 85:18
  111:24 118:5
  136:6
fridge 39:5
  40:8,11 42:25
  51:22 61:16,17
  63:17,23 64:4
  70:25 71:1,16
  84:22
fridges 34:4
  36:15,21 39:7
  42:1 52:23
  54:19 55:19,22

56:2,10,17
62:18 65:20,23
68:12 69:25
70:5 71:3 74:6
75:21 76:7,18
76:22 85:9
86:14 87:11
113:21 131:1
friendly 55:8
front 26:21
  32:2,24 33:24
  95:5,7 100:16
  125:17,24
full 108:4
function 27:11
  116:19
functionality
  81:19 116:16
further 133:19
  133:24
future 15:24
fuzzy 48:12

g

garage 36:21
  39:4
garbled 10:23
geared 9:21
gears 21:15
  61:14
general 46:6
  49:2
generally 21:13
  24:9 86:8

**[getting - health]**

**getting** 19:21 28:21 29:14 34:16 62:13 70:23 79:2 80:13

**giant** 83:8

**gibbs** 4:4

**gifts** 32:2

**give** 18:3 35:6 76:20 94:14 96:3 118:16 129:17

**given** 9:11 30:2 35:14 58:12 139:9

**gives** 81:18

**glass** 33:24 100:16

**glycol** 64:1 80:14,15

**go** 7:16 14:2 20:23 29:3 34:7 35:21 39:10 41:5 46:5 47:14 52:8 54:11 55:18,20 88:3 92:6 96:17 106:6 107:4 108:21 111:9 111:12 115:14 115:22 118:19 119:16 121:8 121:22 130:15

**goal** 24:5 47:23

**goes** 19:18 43:9 65:17,18 108:20 112:5

**going** 7:7 16:2 17:3 25:23 34:11 37:12,17 38:6 44:14 49:13 51:1 52:11 61:14 71:20 88:5 92:18,21 96:7 100:3 107:7 109:16 118:14 118:21 120:1 124:7 125:15 128:1 130:18

**gold** 136:6

**good** 7:6 9:7 26:22 34:19 49:13,14 52:7 92:25 93:2 118:16,17,18 122:4

**goplerud** 2:13 2:14,18 4:9

**gotten** 63:16 66:20

**government** 45:3

**grade** 100:3,11 100:19,21

**grand** 2:15

**great** 16:13 19:9 59:15

**grocery** 29:24

**ground** 9:20

**group** 14:25 18:10,11 114:9

**groups** 17:23 17:24 18:4,6 19:6 20:5

**guess** 43:18 57:10 84:18 87:2 92:5 98:7 109:9 127:10

**guy** 63:5 134:4

**guys** 69:15

**h**

**h** 138:3

**hallway** 89:25

**hand** 57:9 70:22 96:8 99:24 104:14 136:19

**handled** 56:21 57:4

**handwriting** 51:7

**hanging** 86:24

**hanson** 62:11 91:23 111:23

**happen** 22:17 74:23

**happened** 33:8 42:8 61:22

85:16 86:20 91:5,6,7 102:1 109:9 130:12 132:10

**happening** 25:18 30:19 35:8 41:25 69:2 71:14 74:22 76:25 79:12 113:10

**happens** 36:22

**happy** 10:25

**hard** 10:1 79:22

**hardest** 10:17

**hardware** 40:24 50:1 53:18 86:16,17 86:18,21 87:2

**harm** 61:5

**haskell** 27:22 36:2 71:17 112:4

**head** 9:24 10:7 67:4 90:25 94:12,19

**health** 1:15,15 1:16 3:12,13 7:20 9:18 12:25 13:7,15 13:15 14:23,24 15:4,9,23 16:1 16:12 20:3,11 23:12,22 26:19

29:1,16 31:10 44:7,18 45:4 45:10 59:13 73:16 81:9 88:15,20 96:10 101:1 102:3,9 137:4 138:1 139:1

**hear** 11:6 17:13 22:24

**heard** 7:13 17:11 39:2

**help** 26:22 28:5 62:16

**helped** 71:16

**helpful** 84:14

**helping** 69:22 76:16

**helps** 58:14

**hennepin** 136:3 136:24

**hereto** 139:7

**hey** 55:11,14,16 60:19 63:3

**hi** 55:9,19

**high** 14:4 41:7 42:19 47:24 49:4 51:13 67:7 81:12

**highest** 73:24

**highs** 81:14

**historic** 128:25

**historical** 42:24

**history** 37:5 44:19 75:12

**hits** 65:17

**hold** 15:6

**holding** 97:20

**home** 9:15 39:11 61:24 64:23

**honorable** 38:8

**hospital** 16:24 17:8,9 18:1,8 18:10,12,14 19:2,7,10 20:10 32:17 37:13,21 38:1 93:11 124:22

**hospitals** 13:11

**hour** 49:14 67:22 118:14

**hours** 49:6 81:13,13 94:4

**house** 15:5 27:11,15 28:11 109:14 110:5

**huh** 10:8 84:23 100:1 101:5 130:2 131:4

**human** 63:9

**hundred** 110:20 132:10

**hurley** 91:22

**i**

**ia** 2:16

**icu** 13:17

**identification** 107:16 110:12 119:6 126:12 128:14

**identified** 85:19 120:9

**identify** 119:11

**immediate** 81:8 93:2,4,6

**immediately** 69:7

**impact** 133:12

**impartiality** 136:16

**implement** 108:24

**importance** 15:20

**important** 10:14 15:1 26:16 29:20 79:19 80:17 85:23

**impressed** 72:9

**improve** 24:1

**incident** 94:23 101:23

**included** 46:7

**including** 8:9

**income** 45:7

**inconsistency** 73:4

**inconsistent** 105:14

**index** 5:1,13 6:1

**indicate** 6:13

**indicated** 125:18

**indicates** 78:19 98:15 105:3,12 108:18

**indication** 76:21

**individually** 1:4,5,8,9,11,12

**infectious** 122:2

**influential** 44:12

**info** 69:19

**information** 48:22 80:7 83:9 84:5,14 90:9 91:2 92:22 99:15 100:12 102:14 102:19,23 126:1,2,4

**infrequently** 114:21

**infusion** 16:24 17:8 18:1,8

19:15,17,18
117:8 124:8
**innovis** 1:15
3:13
**insert** 94:6
**inside** 41:14
86:7
**insight** 65:8
**installation**
42:11
**installed** 42:4
48:13,14 86:17
86:18 101:2
102:24 103:1
**instruct** 38:19
43:14 97:5
109:18
**instructions**
5:9
**intentional**
25:10,13,15,22
**interaction**
69:12
**interactions**
27:18
**interdisciplin...**
18:18,20
**interest** 136:15
**interested** 8:4
136:14
**interesting**
44:14
**intern** 16:22
18:12

**internet** 7:12
**interpret** 49:11
**interrupt** 95:23
**interrupted**
64:19
**intravenous**
19:13
**inventory**
34:20,21,21
36:5 37:12,16
37:20,21 38:3
38:4,13 57:7,9
57:17,20 66:8
109:2,24
**investigate**
63:20
**investigation**
101:25
**invoice** 54:13
54:16
**invoices** 38:25
54:12,15
**involve** 16:20
**involved** 93:14
93:20 101:25
128:24
**involvement**
74:17
**involving**
129:18
**irritating** 83:6
**issue** 58:25
59:16 60:6,10
69:5 89:19

92:13 100:10
101:7 103:9,10
108:25 111:25
112:1
**issues** 39:22
**item** 64:5 122:2
**items** 38:13
**iv** 19:13

**j**

**j** 2:13
**january** 117:18
**jeff** 4:4 107:1
**jennifer** 1:10
**jessica** 1:3,11
137:4 138:1
139:1
**job** 1:25 21:8
21:10,13
**john** 1:16,17
**join** 16:3
**joined** 21:6,9
99:19
**joint** 14:20
29:6 30:24
31:1,4,6,12
**july** 126:19
**june** 13:2,3
23:5 26:11
27:19 99:9,19
126:24

**k**

**k** 20:20
**kaufenberg** 6:3
21:3 23:6
59:18 60:6,9
**keep** 15:10
25:18 42:21,24
44:4 51:21
**keeping** 38:9
**keeps** 43:3 48:1
**kept** 29:17
123:14
**key** 24:15
**keys** 62:18
**kind** 25:4 36:19
39:5 44:20,21
60:17 63:5
69:17,17 84:19
87:25 113:11
113:18 127:19
133:15
**klemperer** 3:4
8:14,15
**knew** 15:18
26:13 58:9
59:3,17 69:16
80:11 82:22
115:5 125:11
**know** 9:25
10:24 21:16,17
21:20 23:24,25
24:25 25:5,6
26:21 27:25

33:13,14 34:18
35:4,16 36:18
36:22 38:2,16
38:22,24 39:1
39:4,6,9,11,16
41:1,4,6 42:14
43:3,3,20,21,22
48:5 49:13
53:12,12,17,19
54:4,16,21
59:11 60:21
61:9 62:17,18
63:16 64:7
67:13,18 68:1
68:5,16,17,21
69:19 70:21,24
71:1,21 74:5
75:24,25,25
76:8,9 77:6
78:9 79:6,8,10
79:18,23 80:1
80:4 81:12,21
81:25 82:8,10
82:21 83:22
84:6 86:5,6,20
87:1,6,9,24
88:16,18,24
89:1 90:1,10
90:21,23 94:3
94:4,7,11,12,18
94:21 96:21
98:19,23 99:2
99:18 100:14
101:12,17,22

106:16,19,22
108:8 109:12
110:18 112:7
112:18,20
113:1,19 115:9
115:11,11,23
116:23 119:8
120:21 125:16
125:17 126:15
126:24 127:4
127:15,22
132:19 133:10
133:14
**knowing** 85:3
**knowledge**
  15:22 42:15
  92:20 101:11
  102:1 105:8
  106:7
**knows** 43:15
  109:19
**kraft** 1:3 7:19
  137:4 138:1
  139:1
**kyle** 129:4

**l**

**l** 3:15 20:20,24
**l.k.** 1:4
**lab** 100:15,18
**labeled** 47:6
**laboratory**
  100:21

**labs** 121:23
**lack** 128:7
**laid** 105:9
**language** 23:3
**large** 15:8
  57:17,19
**larger** 47:1
**laura** 27:21
  36:2 69:9,10
  69:11 71:7,15
  71:24 74:19
  75:4,18 80:8
  80:20 82:7,18
  84:1,9 85:21
  85:25 89:7
  112:4,22
  113:14 114:20
  114:24 118:5
  129:7,10,12,18
  130:1,6
**lavelle** 1:7
**law** 3:16 4:9
**lawsuit** 21:16
  21:25
**lawyers** 9:9
  11:7,8,20 12:5
**layman's** 31:5
  31:7
**lead** 15:22
  16:13,21,23
**leader** 15:2,18
  16:11 20:20
  21:1 61:1
  72:19

**leaders** 25:11
  37:3
**leadership**
  14:23 15:21
  90:3 91:22
  92:23
**leading** 42:3
  122:13
**learn** 80:19
**learned** 34:25
**learning** 39:18
**lease** 32:1,15
  32:17
**leased** 26:18
  31:15 33:4
  36:25 37:10
  54:10,23 55:2
  75:16 82:14
  87:3 131:2
**leasing** 38:11
**leave** 84:22
**led** 35:9
**left** 16:2 83:16
**legal** 137:23
**letters** 125:14
**licenses** 17:15
**licensing** 14:14
**licensure** 17:17
**light** 43:17
  102:12
**liken** 36:20
**limited** 88:17
**line** 65:13
  111:13 115:19

**[line - low]**

116:17,19
119:17 120:3
134:6 138:4,7
138:10,13,16
138:19
**lines** 25:19
**link** 109:15
**linnell** 1:24 2:5
8:2 136:24
**list** 63:6 123:14
123:21 124:14
124:16,17
**listed** 18:9
97:24
**listened** 90:1
**literally** 69:7
**little** 17:22
21:15 30:9
35:15 37:1
44:15 48:12
61:14 77:23
91:13 100:17
102:13 107:17
107:19 109:3
111:12 114:12
115:22 126:19
126:23 127:4
**live** 62:23 63:9
108:22
**lived** 63:7
**llc** 1:15,16 3:6
**located** 33:18
106:7

**location** 37:20
**log** 42:24 43:4
48:1 51:10,11
63:24 72:5,7
72:10,14,24,25
73:5,8 103:6
113:11 114:17
115:3,18 126:6
127:19,23,24
128:6
**logged** 51:4
73:22,25
124:10
**logger** 49:2
50:8,25
**loggers** 49:7
50:4,16 101:1
102:3,10,21
**logging** 49:1
51:6,14 115:10
**logs** 49:9 72:1,6
77:5,21 78:4
86:1 104:21
105:4,10,13
106:1 112:6
113:9 114:21
115:7 117:18
117:21,24,24
118:2,10
127:14
**long** 13:1,12
20:12 48:7,8
67:18 79:6,11
82:23 105:24

116:20 123:14
**look** 33:15
47:14 54:12
70:16 77:5
86:10 90:5
95:1 111:18
121:11 130:11
130:17
**looked** 63:23
72:10,14 115:3
117:21 118:3
126:22
**looking** 28:8
96:10,20 98:11
99:23 106:1
108:18,23
113:9 115:15
118:1 120:6
127:5,13,15,19
128:6
**looks** 18:15
81:13 112:15
**lord** 3:14 5:6
7:5 8:16,16
11:12,16,23
12:3 22:1 34:6
38:17 43:13
45:23 49:11,21
50:11 52:4,10
59:9 72:11
73:10 75:22
77:11,23 78:7
78:22 83:19
87:7 88:23

90:15 94:16
95:22 96:22
99:5 101:8
102:4 103:16
103:24 104:7
104:11 105:18
106:20 107:17
108:3 109:16
110:16,22,25
111:4 112:12
113:23 116:5
116:21 118:12
118:17 119:11
119:15 120:2
120:14 121:2
122:15 124:1
125:15 127:10
128:1,7 132:11
132:21 133:19
134:15,19
137:1
**lot** 30:9 42:6
44:6 47:20
50:5 57:7 66:9
66:23 90:24
91:2,19 92:3
**low** 40:22
42:19 47:24
49:5 51:13
62:3,7 63:15
63:19 67:7
78:18 81:12
114:25 117:19

**lowe's** 39:13
**lower** 38:5 45:6
**lowest** 73:21
**lows** 81:14
**loy** 1:21 2:2 5:3
  7:18 8:18 9:2,7
  9:17 63:3
  88:13 96:7
  97:10 104:19
  105:2 107:25
  110:14 119:8
  131:1 132:22
  136:5 137:5
  138:2,24 139:2
  139:4,12
**lunch** 89:9,9

**m**

**m.b.** 1:9
**maari** 1:21 2:2
  5:3 7:18 8:18
  9:2,17 104:19
  105:2 112:6
  114:19 117:17
  136:5 137:5
  138:2,24 139:2
  139:4,12
**made** 36:4,6
  79:17 83:6
  85:1 139:5
**maintain** 64:9
**maintained**
  103:6

**maintaining**
  74:6,10
**maintenance**
  66:19,20 74:16
  75:5,8,19,20
  76:7,11,12,13
  78:15 129:6,15
  129:19,23
  130:7,8
**make** 10:5,11
  24:8 56:15
  60:1 64:11
  66:5 68:19
  70:19,24 72:19
  72:20 81:4,8
  90:6 93:1,9
  109:13 117:13
  120:16 121:3
  130:5
**makes** 63:12
  83:10
**makeup** 80:16
**making** 9:21
  29:21 79:9
  82:8
**managed** 57:13
**management**
  14:19,21 17:1
  18:22 28:20,25
  29:5,8,9 30:17
  30:23,25 31:2
  31:13 34:3
**manager** 12:25
  13:6 16:18

**manner** 6:12
  59:7
**manufactured**
  39:8
**manufacturer**
  122:24 123:2,8
  124:16
**manufacturer's**
  132:2
**manufacturers**
  1:17 44:3
  93:25 123:12
  123:17,19
  125:3,9 126:5
**mark** 60:20
  110:10 119:2
  124:25 126:9
  128:11
**marked** 5:13
  6:1,8 95:11
  96:8,25 107:15
  110:11,16
  119:5 126:11
  128:13
**market** 12:25
  17:3 20:3
  23:20 24:5,11
  24:12,13 25:9
  25:12 35:14
  48:15 90:4
  109:25
**markets** 24:16
**marty** 2:12,17
  5:5,7 7:4 8:12

8:12 9:6,8
11:18 12:1,4
19:4 22:2
34:23 38:21
43:16 45:24
49:16,23 50:13
52:7,20 59:14
72:12 73:20
76:2 77:18,25
78:2,12,24
79:1 83:25
87:10 88:3,12
89:5 90:19
94:20 95:2,4
95:11,14,19,25
96:4,6 97:8,9
99:17 101:10
102:11 103:20
104:3,5,9,12
105:21 106:24
107:1,6,20,24
108:6,7 110:3
110:9,13,18,24
111:3,7,17
112:14 114:4
116:10 117:15
118:15,18
119:2,7,13,19
120:5,20 121:7
122:18 124:2
125:20,21
126:9,13
127:12 128:3,4
128:11,15

130:15,25 132:15,18 133:21,25 134:12,18

**master's** 14:9 14:10

**materially** 21:9

**matter** 7:19 9:10 85:4

**maximum** 81:16

**mba** 1:21 2:2 5:3 9:2 15:12 15:13,14 136:5

**mean** 11:22 12:10 21:24 30:17 32:19 34:18,19 35:21 36:20 42:5,19 45:22 46:4 50:5 56:14 57:10 59:23 69:17 70:16 72:5,17 81:8 84:5,25 91:22 98:8 100:18 113:16 127:23 129:10

**means** 29:3 32:20 103:2

**meant** 65:15

**mechanism** 81:1

**med** 30:23 75:17

**media** 7:17 52:14,19 88:7 107:13 134:25

**medicaid** 31:9

**medical** 29:17 29:23 58:13 100:3,10,19,21 109:22

**medicare** 31:8

**medication** 14:19,20 17:1 19:1,11,25 29:5,10 30:25 31:2,13 38:12 39:17 40:2 44:13 45:6 58:15 80:1,16 94:1,8 124:11

**medications** 19:12,12,16,21 20:2 23:19 24:6,10,14,18 27:7 28:22 29:13,14 32:8 34:9,10,16 36:6,10,12 37:18 38:10 39:8 44:4,10 44:10,16 56:22 57:5 58:19 59:23 62:4,6 62:13 75:1

77:15 79:3,14 79:15 85:25 86:7,9 87:12 93:24 94:2 100:5 108:19 123:5,10,17,23 124:5,7,18 131:10,15

**meds** 76:24

**meeting** 11:25 12:5

**meetings** 17:2 92:24

**melissa** 126:19 127:4,7

**member** 15:8

**memories** 25:6

**memory** 125:18 128:22 129:9

**menards** 39:13

**mention** 60:9

**mentioned** 30:14 39:5 50:4 51:3 61:4 71:4 117:6 124:15 126:7 134:7

**message** 62:21

**met** 9:8 11:12 11:21 23:6 24:4 25:11 62:1

**midatlantic** 137:15

**middle** 111:21 119:20

**midway** 104:18

**midwest** 36:20

**mike** 3:4,9 8:14

**mind** 22:21 24:24 96:1

**minimum** 81:17

**minnesota** 2:6 13:10 17:5 46:13 100:25 102:20 136:2

**minor** 1:7,9,11

**minors** 1:4,6,7

**minute** 49:15 118:16

**minutes** 43:22 49:19 94:4 106:5 130:16

**missed** 57:1

**missing** 106:13 106:17,18

**misuse** 57:21

**mn** 136:24

**mode** 66:14

**modich** 4:3 8:18 11:13

**moines** 2:16

**moment** 35:3 44:15,21 46:10 66:18 68:25 89:23 124:15 126:7

**moments** 34:2 66:3 113:12

**monday** 66:3 70:9 71:21 76:23 89:20 90:18 92:20 93:8 117:17

**monitor** 50:2 69:22 71:16 115:17

**monitored** 41:18 81:6 114:21

**monitoring** 40:1 47:24 48:23 54:5 71:8 79:24 85:24 94:25 96:11 97:17 98:2 99:21 114:18 116:8 116:16,19

**month** 48:13 55:6 73:6

**monthly** 54:13 54:15 72:6

**months** 21:2 55:10,13,14 93:12

**moorhead** 17:4 17:5 20:4 45:11 109:25

**morning** 7:6 9:7 69:20

71:21 72:1 86:3 129:21

**morris** 27:21 69:10,11 71:7 71:15 74:19 75:5,19 112:4 130:1

**move** 16:8,10 54:9 108:18 109:14

**moved** 36:15 36:16 37:24,25 41:22 42:1 52:23 61:16,17 62:5 86:14,16 131:1,6

**moving** 23:11 36:7,9,12 37:12,16 38:4 38:6

**multiple** 67:24 72:6

**n**

**nag** 10:10

**name** 7:24 9:7 9:13,17 50:6

**named** 71:4

**national** 15:2

**native** 45:7

**natives** 45:7

**nature** 72:25 73:2

**nd** 3:18

**ndsu** 15:14

**nearly** 92:24

**necessarily** 6:13

**necessary** 139:6

**need** 9:23 10:2 37:9,14 43:10 51:10 54:1,3 55:24 61:1 64:13 90:5 95:15,17 96:23 120:9 124:24

**needed** 19:14 26:15 29:15 42:6 61:7 62:16 66:7 73:18 74:22 121:3

**needs** 64:15,22

**neighborly** 36:1,24

**neither** 114:24

**nerd** 44:21

**nerdy** 44:21

**network** 124:21

**never** 29:23 30:1 43:17 66:16 75:9 79:14,21 132:25

**new** 25:14 40:14,15 53:2 53:4 54:7,7 62:8 82:8 86:16,18 108:21 109:1 109:13 117:4 117:11,13

**nicole** 91:22

**night** 40:5,21 48:24 49:25 50:15,20 61:18 69:9 85:18 111:24 117:7 118:6

**nod** 9:24

**nods** 10:8

**noise** 81:4

**non** 46:2 57:13 58:7,23 59:7 60:3,15,21 61:12 67:17

**nonclinical** 71:11

**normal** 23:23

**north** 1:2 3:17 7:22 9:19 13:9 14:7,24 15:5,8 15:15 17:6,18 45:11 46:12 75:2 100:25 102:20

**northwest** 3:7

**notary** 2:6 136:24 139:13 139:19
**note** 4:8 6:11 7:9 137:10
**noted** 139:7
**notes** 15:10 112:17 130:17
**notice** 26:14 27:8,20 35:15 59:16
**noticed** 136:10
**noticing** 8:11
**notification** 47:24 62:20
**notified** 63:15
**notify** 74:15
**notifying** 93:22
**number** 7:22 21:2 42:3 90:25 91:3 94:8,15,19 95:10 96:14 98:9 99:22,24 107:15 110:11 111:1 119:5,12 126:11 128:13 134:25
**numbers** 41:10 64:5 67:3,6 97:20,24
**nurse** 19:24
**nurse's** 18:17

**nursing** 18:21 19:22 25:14 26:20 45:12 46:18 58:11 62:11 91:24

**o**

**o.k.** 1:5
**oath** 56:15
**object** 22:1 34:6 38:17 43:13 45:23 50:11 52:4 59:9 72:11 73:10 75:22 77:11 78:7,22 83:19 87:7 90:15 94:16 99:5 101:8 102:4 103:16 103:24 105:18 106:20 112:12 113:23 116:5 116:21 120:2 121:2 124:1 125:15 128:2 132:11
**objection** 43:17 96:24 102:12 109:17 118:9 128:7
**objections** 8:6
**obtaining** 15:16

**occasion** 59:16 60:10
**occurring** 109:8
**offer** 123:11
**offered** 93:17 93:18
**officer** 91:24
**oh** 51:21 66:13 83:9 84:5 87:16 95:11,13 98:7 114:15
**okay** 9:13,17 10:4,7,11,18,19 10:25 12:3,15 18:7 19:5 22:12 23:1 31:21 32:11,14 37:24 55:18 57:25 61:9 63:4 69:12 81:13 83:2,9 88:4,13 94:7 94:21 95:7,19 98:19,23 99:2 99:18 105:1,19 105:22 108:1 108:11,13 110:25 111:8 111:10,11,14 111:14,15,15 111:15,16,16 116:2 118:20 119:17,18,20

120:12,21 126:17 127:1 127:11 128:17 134:22
**old** 86:20
**once** 55:5,6,8
**one's** 30:2 70:16
**ones** 21:5 51:1 54:7,7 92:4 100:16 106:13
**ongoing** 60:10
**open** 25:19 74:3 83:16 84:20,21 85:5 85:13 86:10
**operating** 23:12 91:24
**operationalize** 110:1
**operations** 12:24 16:18 89:4
**opportunity** 16:11,13 108:4 134:20
**option** 48:25
**oral** 19:12
**order** 18:9,24 18:25 19:22,23 58:18
**ordered** 19:21 45:12 59:2 136:11

**ordering** 28:22 30:20 31:25 34:10 109:24

**organization** 15:3 17:21

**organizing** 31:1

**original** 4:8 6:7 6:7 136:10

**originates** 51:17

**outcome** 8:5 122:4

**outlined** 132:13

**outside** 11:24 12:18 30:3 43:9,10 51:15 89:25 132:12 133:16

**overlapping** 14:12

**oversee** 32:19

**oversight** 47:11 47:15 58:2,4

**overstock** 37:11,16 38:13

**owl** 48:24 49:25 50:15,20 117:7

**own** 38:15 73:14 74:16 101:16

**owned** 38:14 38:22

**owner** 112:19 112:22

**owners** 111:25 112:2,7

**owns** 87:1

**p**

**p** 20:24

**p.c.** 2:14

**p.m.** 88:11 107:9,14 118:22 119:1 130:20,24 134:23 135:2

**pa** 1:25

**package** 94:6

**page** 2:20 3:22 5:1 6:1 28:5 62:22 98:15 99:23 104:19 111:2,10,21 115:15 119:14 119:20 126:14 128:16 138:4,7 138:10,13,16 138:19

**pages** 97:11,12 97:19

**paid** 54:5

**panel** 40:14 41:10 67:14

**paper** 45:1 72:6

**paragraph** 100:2 103:5

104:18,24 105:2,12 108:17 116:2 120:6

**paramount** 61:8

**paraphrase** 105:13,16

**paraphrasing** 80:3

**parent** 1:4,5,6 1:7,8,11

**parents** 1:10

**part** 4:4,5 15:1 26:16 27:1,14 28:9 34:1 57:1 57:14 59:20 60:12 71:17 73:13 79:5 80:18 91:1,7 101:13 115:14 131:24

**partial** 2:13

**participants** 7:12

**particular** 14:17 18:23 46:15 52:6 80:1 99:15 123:13

**parties** 7:16 136:11,13,15

**parts** 68:14 122:19

**party** 8:3 136:10

**pass** 104:5,10

**past** 15:7 38:7 93:2

**patient** 16:14 19:1,17 24:2 32:4 51:25 58:20,25 60:24 60:25 61:7 72:18 79:8 114:3 122:4

**patient's** 19:14 19:23 58:12

**patients** 18:15 23:14,15,17 24:7,15,19 25:9 27:7 31:12 32:25 45:5,7,17 46:16,19 58:16 66:5,7 79:10 90:8,10,14,21 93:2,3,16,22 120:9,17,22 121:1,4,17,19 121:21,22 122:6

**pediatric** 44:16 45:18 46:2

**pediatrics** 47:1

**penicillin** 119:21 120:10 120:18,25

121:5,18 122:5
123:25
**people** 17:12
18:1,4,4,5,6
23:7 55:9
76:12 91:19
129:25
**perceive**
113:13
**percent** 110:20
132:10
**perfect** 96:20
107:23
**period** 27:20
43:11 83:17
**person** 40:25
41:3 55:9 60:4
63:2 69:21
71:4 72:23
92:7,7 115:25
**personnel** 32:6
33:1 54:1
67:17 75:20
76:6 78:3
130:7
**persons** 20:6
21:5 121:13
136:15
**perspective**
27:17 130:6
**pgy1** 13:20
**pharmaceutical**
14:10 44:3

**pharmacies**
17:8
**pharmacist**
13:7,17,18
17:10 18:16
71:12,13 93:23
132:25 133:17
**pharmacists**
14:23,25 15:4
15:9 16:22,23
17:16,17 18:11
18:12,23 19:15
80:11
**pharmacothe...**
14:13
**pharmacy** 1:16
12:24 13:6,19
13:20 14:7,15
14:18 15:2
16:1,15,18,22
16:23 17:10,14
17:16,19 18:10
18:11,13,25
19:2,10,16,19
19:20,25 20:10
20:19,25 21:4
21:20 23:6,9
24:5,18 26:1,6
26:25 27:19
28:9 29:18
30:5,12 31:15
32:6 33:1,2
34:17 37:1,13
38:1,15 48:23

48:24 50:21
53:5 54:10,17
58:3 60:25
62:1,25 67:16
67:17 69:5,24
71:10,20 72:17
72:19,21,23
73:16 74:7,8
74:14 75:3
86:2 88:14,19
92:2 93:11
108:20 109:20
109:22 113:9
114:2 117:9
129:2 132:7,9
133:1
**pharmacy's**
55:2 73:12
74:24 76:20
**pharmd** 1:21
2:2 5:3 9:2
14:6 136:5
**phone** 53:7
62:22 63:1,12
63:19
**phrase** 21:23
22:6
**physical** 31:16
**physically**
46:22 53:15
55:1 64:10
118:3
**physician**
18:21 19:23

91:25
**picture** 89:23
**piece** 30:21
51:18 56:24
75:11
**pieces** 37:5
72:6
**pinging** 40:12
**pings** 61:19
**pinpoint** 81:15
**place** 7:15
31:25 58:5
91:21 99:19
102:3 109:17
115:17
**placed** 101:1
131:12,18
**plaintiff** 7:19
**plaintiffs** 1:13
2:11 3:3 8:13
8:15,21 9:9
**plan** 117:2
**planning** 27:10
56:8
**plans** 35:17,23
36:4,7
**pleading** 97:3
**please** 7:9 8:7
8:25 9:14
10:15 104:10
119:4,12
128:12
**plus** 54:13

**[point - processes]**

| | | | |
|---|---|---|---|
| **point** 10:9 51:5 52:8 56:17 61:23,24 65:21 88:18 92:17 98:24 101:20 | **postgraduate** 13:20 | **prescription** 19:23 | **probably** 28:7 42:5 69:7 72:9 92:8 |
| **policies** 59:12 94:22 98:1 101:12,14,16 101:18 | **potential** 21:18 22:4,8,17 33:7 35:1,11 45:22 46:8 58:25 68:6 79:5,18 79:25 80:17 84:10 91:17 121:5,5 122:25 125:10 | **presence** 12:19 **present** 4:3 8:8 8:19 55:1 **presented** 100:13 **president** 15:7 92:2 | **probe** 41:14 70:11,14,25 71:1,2 80:21 80:22,25 81:18 82:1,12 86:23 |
| **policy** 51:15 59:6 97:14,16 97:21,24 98:9 98:20,23 99:2 99:15,18,22 103:18,19,19 103:22 126:22 127:2,5,14,20 | | **pretty** 25:3 94:24 118:10 130:16 **prevent** 132:5 **preventing** 121:13 | **probes** 70:13 80:24 81:22 **problem** 66:14 68:4 69:1 74:13 93:15 **problems** 69:15 |
| **polyethylene** 63:25 | **potentially** 38:6 42:7 47:1 57:21 80:12 90:14 93:24 94:3,5,9,15 120:19 122:9 122:10,20,23 124:3,6 131:11 131:16 133:12 | **previous** 23:21 23:22 111:14 117:3 120:8 **previously** 6:1 6:8 76:19 | **procedure** 4:10 97:16,21 98:21 98:24 99:3 **procedures** 73:13 94:22 98:1 |
| **pop** 67:4 **populations** 45:8 | **power** 83:16 **practice** 16:15 28:2 52:3 | **primarily** 9:21 **printed** 95:24 **prior** 13:19 21:2 26:12 28:10,11 37:6 38:23 42:10 54:19 55:2 56:11,17,22 57:5 60:5 95:12 98:8 99:7 126:23,25 127:5 130:13 | **proceed** 9:1 **proceeding** 2:4 8:7 |
| **portion** 22:18 22:21 27:6,8 28:18 114:11 | **predecessor** 20:16 48:19 **premise** 79:8 **preparation** 26:12 | | **process** 23:18 37:17 46:6 51:5,9 58:13 59:5 106:2 121:25 131:22 131:24 |
| **position** 15:7 20:18 | **prepare** 11:10 11:11 12:6 19:11 25:14 | | |
| **positioning** 42:10 | | | |
| **possession** 54:18 70:1 | **prepared** 11:13 **preparing** 19:16 117:12 | **private** 45:17 51:23 95:18 | **processes** 11:14 23:13 25:15,16 29:20 58:15 60:13 73:12 80:5 114:1 |
| **possible** 110:19 121:14 132:5 | | | |

115:13
**produced** 97:2
**product** 29:24
30:1 36:10
37:15 45:3,12
53:18 60:23
64:9 80:9,12
80:15 86:4
93:7,10 123:7
**production**
5:11 97:4
**products** 38:6
57:13 58:8,24
59:4,7 60:3
61:12 78:19
116:18
**program** 15:20
44:8,12,24
45:9,14,16,19
46:2,9 49:10
52:6 93:21
109:13
**project** 13:6
22:23 23:2
24:9,21,22
25:1,7,11,21,24
26:7,17 27:1
27:15 34:2,16
120:16
**projects** 21:11
24:23 25:3
**prolia** 125:1
126:3

**promoted** 92:1
**property** 36:5
**provide** 26:15
31:11 47:23
65:8 91:13
**provided** 20:2
23:19 24:10
35:15 45:3
49:8 78:15
80:7 92:21
93:10
**provider** 18:24
**providing** 24:6
24:14,18 27:6
27:8
**provision**
103:14
**public** 2:6
136:24 139:19
**publications**
15:1
**pull** 99:20
**pulled** 90:24
114:10 117:17
118:1,2
**purchase** 39:10
**purchased** 87:4
**purpose** 15:16
16:8,10
**purposes** 56:8
**pursuant** 4:10
**purview** 89:3
**put** 18:24 19:22
40:17 66:19

68:7 70:22
96:23 106:25
117:11
**putting** 131:23

**q**

**qualified** 46:17
**qualifiers** 45:8
**qualify** 45:18
45:19 46:20
**qualifying** 45:6
**quality** 7:10,11
31:11
**quarantine**
93:9
**question** 10:16
10:21,22,25
11:2,4 28:6,8
47:12 58:6
59:15 60:14,18
66:2 69:14
74:19 76:4
77:19 78:1,25
87:3 88:17
102:14 103:14
113:4,7 116:24
117:25 121:16
122:16 125:6
**questions** 9:24
15:12 22:11,13
29:4 31:3 35:7
39:20,21 57:12
66:10,15,17,23
104:25 132:16

132:23 133:4
133:20,23
134:13
**quick** 97:24
133:21
**quite** 79:16
91:2
**quotations** 6:11
**quote** 6:14 39:3
100:10 128:24
**quoted** 116:3

**r**

**r** 20:20,24
138:3,3
**raise** 97:6
**ramping** 117:4
117:6
**ran** 85:9 112:8
112:21 113:2
115:5
**random** 85:14
**range** 41:17
42:20 43:9,11
43:23,25 44:2
44:13 52:23
53:8,15,23
61:19 64:2,15
64:15,21 65:24
67:2,2,5,9,19
68:9,13,22
69:2 73:19
81:21 82:15,17
82:21 83:8

**[range - referenced]**

84:2 120:19
133:13 134:3
**ranges** 44:9
94:25 123:6
125:10
**rare** 55:4
**rate** 136:11
**reaching** 125:9
**reaction** 72:2
84:4,7
**read** 6:12 26:2
26:2 63:22,24
100:3,7 103:3
103:13 104:24
105:1,19
107:18,25
108:4,11 111:6
111:11,11,14
111:14,15,16
126:17 128:17
128:21 129:3
134:20 136:17
137:9 139:5
**reading** 81:20
115:24 127:17
128:22
**reads** 103:5
**ready** 108:9
**real** 47:23
60:23 116:16
118:15
**realize** 114:20
114:22

**really** 17:4
18:14 23:7,17
24:1,4,25 25:8
25:9,12,18
30:18,22 37:2
37:7,23 68:5
69:1,14,22
75:14 76:11
78:10 85:6
90:6 114:13
123:14 127:6,7
**reask** 10:25
57:2 72:13
77:25
**reason** 10:20
38:11 51:2
53:22 77:8,21
78:5 105:6
110:4 117:10
137:11 138:6,9
138:12,15,18
138:21
**reasons** 110:7
**recall** 20:13,15
21:2 27:4
28:18 30:8
33:5,17 42:3
48:11,16,24
53:9,9 54:11
64:3,5 68:2
71:20 73:22,23
73:24 74:20
76:5 84:3,4,6
84:18 85:20

89:13 90:23,24
91:9,12,14,16
92:3,15,19
99:1,11 106:14
109:5 113:8
120:23 121:21
123:12 124:25
125:4,6 126:1
128:19
**receipt** 137:17
**receive** 12:11
62:20
**received** 63:7
79:19 104:19
105:3 126:4
**receiving** 28:23
30:20 31:25
**recent** 98:20
**recently** 127:2
**recipients**
122:13
**recognize** 38:2
74:3 115:2
**recognizing**
15:20 26:18
**recollection**
30:7 62:24
68:10 125:12
125:22
**recommendat...**
123:2,4,8
132:3
**recommendat...**
122:25 123:11

124:16
**recommended**
44:9 100:4
123:13
**recommending**
123:20
**record** 6:13 7:7
7:16 8:10 9:8
9:14 10:11
19:3 29:17,23
52:8,12,15,17
58:13 74:21
88:3,5,8,10
107:5,8,10,12
109:22 118:19
118:21,23,25
130:15,19,21
130:23 134:17
134:23 136:8
**recorded** 1:20
2:1 7:14,18
72:24 114:23
117:19
**recording** 7:11
7:15 81:17
**recordkeeping**
53:13 105:14
**records** 78:15
**refer** 23:2
117:20
**referenced** 6:9
49:25 127:14
137:6

**[references - required]**

**references**
97:23 126:22
**referred** 43:24
71:24
**referring**
127:24 131:3
**refers** 119:25
**reflect** 105:14
**reflected** 6:12
25:2 69:21
82:14 83:3,4
85:14 86:1,3
90:1,2,8 112:2
112:7 114:9
115:4 126:6
129:5 134:5
**reflecting**
24:24 112:19
**reflection**
114:9
**refrigerated**
44:4 46:23
77:16
**refrigeration**
64:14 65:6,7
65:20 66:12
76:13,15 77:3
83:24 100:6
127:1 134:4
**refrigerator**
33:22,24 39:15
39:25 40:20
41:14 42:19
47:4 62:14

64:11,23 65:3
68:4 74:14
79:21 80:9
82:10 89:12
100:4 101:3
103:7 104:20
105:4 117:17
118:2,7 129:24
129:24 133:5,7
134:6
**refrigerator's**
42:16
**refrigerators**
33:11,14,21
36:7,9,16,19
37:4,8,9 38:14
38:22 39:9,12
39:17 40:6
41:12,22 42:13
47:2,9 52:1
54:6 62:3,15
64:8 65:4,11
66:12,22,24
68:8,16 70:11
70:13,15 72:8
74:10,24 75:16
76:11,14 77:2
78:14,18 79:22
80:21,23 84:9
89:8 96:11
98:3 100:9
101:2,7 102:17
102:21,25
103:9 112:8,20

113:2 115:17
122:23 124:6
128:25 129:23
130:9 133:6,12
133:14 134:2,8
**regarding** 89:8
**regularly** 56:7
**regulation** 29:7
51:15
**regulations**
14:21 40:3
**regulatory**
14:19 29:5
**rein** 1:10
**related** 8:3 57:4
98:2
**relationship**
26:5
**relative** 136:12
136:13
**relayed** 59:18
61:10
**remained** 34:17
**remaining** 36:4
91:20
**remediation**
105:16
**remember** 25:1
35:17 60:11,12
67:24 68:17
75:7 89:10
109:4 120:14
**remembered**
82:22

**remote** 1:20 2:1
2:4 136:5
**remotely** 7:3
8:9 53:16
**rephrase** 10:25
**report** 17:23
18:5 20:6,8,9
23:10
**reported** 1:24
21:6 136:5
**reporter** 2:5
7:1 8:1,25 10:2
107:4
**reporter's** 6:11
136:1
**representative**
8:19 91:25
**representing**
7:25 8:16
**represents** 9:9
**request** 77:10
120:15
**requested** 6:8
23:20 41:19
129:4
**requesting**
19:24 23:17
**requests** 5:11
129:6 130:13
**require** 100:5
**required** 40:3
75:2 93:5
139:13

**requirement** 17:18 52:6 67:16

**requirements** 29:7

**requires** 72:21

**rerouted** 66:9

**rescued** 76:24

**reserved** 136:18

**reset** 49:4 67:1 67:19 68:12 84:20 134:2

**resetting** 68:21

**residency** 13:21,23 15:19

**resident** 13:19

**residents** 16:23

**resolution** 93:2

**resources** 57:21

**respect** 56:10

**respectful** 38:9

**respond** 127:21

**response** 97:2 125:4

**responsibilities** 13:10 29:2 75:6

**responsibility** 16:25 74:21 75:1,15 88:14 88:19

**responsible** 28:15,21 30:5 30:16,18 64:13 71:7,13 74:5 77:15 114:2 132:8,10

**rest** 33:2 62:16 109:24 117:1

**result** 94:22

**retained** 135:1

**return** 137:13 137:16

**revaccination** 93:17,19 123:11,20

**revert** 134:9

**review** 11:24 12:8,15 29:19 97:25 99:13 121:10 122:3 122:24 137:7

**reviewed** 12:9 94:13 98:16 112:6 122:22

**reviewing** 102:9 119:9

**revised** 98:16 98:24

**revision** 98:3,6 98:19,20

**revolving** 21:17

**ridge** 2:15

**right** 15:7 16:4 16:17 17:13

22:19 26:1 27:2,12 32:12 34:5 35:17 36:1,21 42:1 42:20 44:17,20 46:16,23 48:5 50:17 52:24 60:7 61:20 65:24 66:14 69:8 80:3,11 80:21 81:1,6 88:1 91:3 93:8 96:13 99:24 100:7 103:10 104:14 105:17 107:22 115:15 117:25 127:2 130:1,9 134:10 134:14 136:17

**ring** 81:22

**road** 3:7

**rob** 27:22 36:2 71:17 80:7,20 82:18 83:1 84:1,9,18 85:21 89:7 112:4,24 114:11,20,24 115:4

**role** 13:1,12,13 13:16 17:21 20:6,12 21:8 21:12 74:9

**roles** 114:11

**rolled** 25:11

**rolodex** 99:21

**room** 32:3,7,10 33:25 36:10,11 36:17 37:14 40:18 41:5,23 53:3,10,18 54:8 55:18,21 56:2,3,4 59:24 62:2 65:12 67:12,14 69:25 71:25 75:17 77:16 81:3 86:15,23 87:13 89:25 101:23 117:12

**rounds** 18:19 18:19

**routes** 19:13

**routinely** 78:20

**rules** 4:10 9:20

**rummel** 3:15 8:22,22 11:12 12:14

**run** 84:19 121:23

**running** 64:18 85:4

**rural** 47:3

**s**

**s** 1:24 2:4 20:24 136:24 138:3

**[s.b. - serving]**

**s.b.** 1:11
**s.k.** 1:4
**safe** 31:11 44:4
  66:5
**safety** 58:20,25
  60:24,25 61:8
  99:10
**sagwlaw.com**
  2:17,18
**sake** 10:13
**sanford** 13:7
  13:14,15,18
  16:3,6
**sara** 62:11
  91:23 111:22
**saturday** 69:20
  76:17 92:11
  118:6
**saw** 39:22
  54:22,23 56:13
  59:23,23 60:4
  74:1 86:22
**saying** 84:18
**says** 96:10
  100:23 114:19
  127:13
**schedule** 25:22
**scheduled** 1:23
**schneider** 1:5
**school** 14:5
  25:5
**science** 14:9
**sciences** 14:10

**scope** 132:12
  133:16
**scott** 3:6 53:10
  82:6,8
**screen** 7:13
  107:18
**scroll** 108:10
  108:11
**seal** 136:19
**second** 57:16
  89:14 92:14
  97:22 105:12
  105:20,22
  115:14
**seconds** 107:5
**section** 111:6
  111:10,11,12
  114:15,19
**security** 63:3,4
  82:11
**see** 41:6 54:15
  56:7,9 57:2
  61:3 65:6
  72:22 77:20
  78:3 95:5,7
  96:14,15 98:17
  103:1 104:16
  104:22 105:25
  106:3 107:25
  109:7,7 111:13
  111:22 115:20
  116:25 117:17
  119:23 121:11

**seeking** 25:16
  113:10
**seem** 82:20
  85:1 113:14
  115:2
**seemed** 82:23
  115:25
**seen** 7:13 86:25
  116:14
**segregated**
  46:20,24
**send** 20:1 37:18
**sending** 28:23
  128:19
**senior** 12:24
  13:6,7 16:18
  20:18,25 21:3
  23:5 92:1
**sense** 10:5
  17:20 18:4
  47:13,18 48:8
  48:20 49:24
  50:15 70:19,24
  83:6,10 117:5
**sensor** 64:1
  80:14
**sensors** 40:17
  42:11
**sent** 45:12
  46:10 48:22
  79:20 86:9,12
  137:14
**sentence**
  105:20,22

  111:22 112:3,5
  114:7 117:1
**sentences** 28:17
  125:8
**separate** 47:2,5
  47:6 53:4
  59:12 102:8
  103:6
**separately**
  44:16
**september**
  105:13 106:11
  128:24
**sequence** 96:24
**seriously** 90:12
**serve** 23:15
  25:8
**served** 97:4
**service** 16:14
  24:6 26:9,14
  26:15 28:20
  35:15 38:2,7
  40:15 57:15
  59:19,20 61:2
  77:14 79:9
  132:14
**services** 14:18
  23:9 25:25
  26:25 27:5,15
  28:10 100:21
  108:20 110:5,8
**servicing** 66:19
**serving** 18:15

**[sessions - space]**

| | | | |
|---|---|---|---|
| **sessions** 25:21 | **shelves** 47:5 | **sit** 133:11 | 81:8 85:23 |
| **set** 12:13 29:22 | **shift** 21:15 | **site** 45:11 | **sorry** 14:2 |
| 39:19 40:1,14 | 61:14 | **sites** 17:3 | 20:23 26:3 |
| 40:17 41:16,20 | **shindler** 2:14 | 109:25 | 64:19 72:4 |
| 41:21 53:16,16 | 4:9 | **sits** 99:12 | 82:5 87:16 |
| 53:17 54:18 | **short** 21:1 52:9 | **sitting** 18:16 | 90:20 103:11 |
| 56:2 62:24 | **shorthand** 2:5 | **situated** 1:12 | 104:7 112:15 |
| 64:2,7 65:2,16 | **shoulder** 10:8 | **situation** 60:18 | 114:16 124:3 |
| 65:24 68:8 | **show** 125:23 | 60:22 61:4 | **sort** 10:7 41:13 |
| 81:22 82:1,17 | **showed** 72:1 | 71:23 90:11 | 47:22 54:14 |
| 82:21,24 93:9 | 106:3 | 92:8 93:5 | 109:10 115:15 |
| 104:4 113:22 | **showing** 118:9 | 118:7 | **sounds** 52:2 |
| **sets** 43:25 | **shrugs** 10:8 | **situations** | 57:23 118:17 |
| **setting** 19:17 | **sic** 31:10 45:21 | 46:18 | **south** 9:19 13:9 |
| 43:12 53:3 | 68:18 | **six** 81:13 | 28:2 31:22 |
| 78:19 122:5 | **side** 34:11 | 134:25 | 32:11,18,21,23 |
| **settings** 39:19 | 109:23 | **slip** 10:7 | 33:8,12 36:17 |
| 134:9 | **sided** 69:17 | **small** 107:17 | 37:22 55:7 |
| **setup** 39:23 | **sidetrack** 44:15 | **smaller** 41:9 | 62:9 124:23 |
| 41:24 42:2 | **sign** 134:20 | 47:3 | **space** 26:18 |
| 53:2,4 54:14 | 136:17 137:12 | **smarter** 47:20 | 31:15,16,19,22 |
| 82:11 | **signature** | 48:3 | 31:22,23 32:1 |
| **several** 17:11 | 136:23 | **society** 14:22 | 32:16,17,18 |
| **share** 12:10,11 | **signed** 137:19 | 14:24 15:4,9 | 33:2 34:9 |
| 12:13,16 | **similar** 23:13 | **software** 10:24 | 36:25 37:10 |
| **shared** 23:8 | 47:18 48:25 | 108:21,25 | 38:10 54:10,24 |
| 25:25 26:9,24 | 65:3 97:21 | 109:1,13 110:2 | 55:2,24,25 |
| 27:5 28:10,20 | 102:13 113:6 | **solution** 85:7 | 56:22 67:17,24 |
| 77:9 | 124:17 129:4 | 93:6,15 120:24 | 67:25 70:22 |
| **sheet** 123:15 | 129:13 | **solutions** | 73:7 74:24 |
| 137:11 | **similarly** 1:12 | 137:23 | 75:16 76:20 |
| **shelf** 59:25 | 124:10 | **solving** 66:14 | 82:14 117:9 |
| **shelli** 1:5 | **simply** 77:19 | **somebody** 51:7 | 131:2 |
| | | 55:19 60:14 | |

spaces   32:14 33:4 51:20
speak   26:10 53:21 73:11 75:12
speaking   23:3 24:9
specialist   14:13
specialties 124:9
specialty   14:15
specific   42:21 45:5 46:16,17 50:14 87:3 93:16 95:15
specifically 39:7,16 83:1 121:1 127:15
spent   32:20
sperl   20:17,24
spot   49:13,14 106:8 118:16 118:19
spreadsheet 126:6
ss   136:3
staff   56:21 57:4 69:5 101:24
staffing   17:7
stage   108:23
stand   32:5
standard   23:18 23:25 24:17 41:19 43:25

44:1,2 58:13 97:14 116:7 125:13 127:18 127:23,24 128:6
standardization 26:7 27:1,14 29:20 34:1 60:13 110:8
standardize 24:10,16 58:15
standardized 51:25
standardizing 24:17
standards 23:13 72:23
standing   53:10 113:8
standpoint 57:23
stands   33:1
start   9:13 10:16 18:7 23:21 24:4 71:22 92:5 110:22
started   13:13 14:3 23:4 44:24 78:10 92:23
starting   27:19 56:6 111:22 117:3

starts   104:14 104:19
state   2:6 8:7,9 14:7 15:2,15 29:10,11,12 45:16 46:2,9 46:12,13 47:13 49:8 72:21 75:3 100:25 136:2
states   1:1 7:21 14:21 36:23 44:23,25 45:3
stating   9:13
station   18:17
stayed   21:13
stemming 21:19
stenographic 2:5
step   34:15 61:1
steps   26:13 90:2,5 121:9 123:1,3
stewardship 57:9
sticker   41:8
stipulate   7:2
stood   93:8
stopped   129:1
stopping   52:7
storage   31:24 33:25 40:2 44:13 58:7,23

60:2 61:11 77:15 100:4 132:8
store   29:24 39:10 46:15 59:6 75:1
stored   32:8 44:16 46:20,22 46:24 78:20
storer   29:13
storing   28:23 30:20 39:8 47:10 85:25 87:12
straightforward 94:24
street   3:17
strike   48:7 68:7 78:24 109:11 112:24 123:17 125:5
stringents 31:10
stroia   4:6 7:24
strong   15:24 28:3
structure   17:21
student   17:16
stuff   38:9 42:7 45:2
stunning 113:11,14
subject   21:25 22:9 131:11,16

**subjective** 57:11

**subpart** 103:5 103:13 120:7

**subscribed** 139:14

**subsection** 100:2

**subsequently** 131:12

**substance** 30:16,21 32:10

**substances** 30:15

**substantial** 136:16

**substantively** 10:22

**success** 119:22 120:11

**successful** 16:1 25:20 64:15 68:20 110:21

**successfully** 15:22 41:20 51:19

**suggest** 134:1

**suggesting** 102:15,19,23

**suite** 2:15 3:7 3:17

**summer** 26:3 78:10 117:3

**super** 62:8

**supervise** 17:12

**supervised** 67:15

**supervisor** 89:15

**supposed** 67:9 109:8

**sure** 9:22 10:11 10:12 19:10 22:15 23:4 24:8 29:21 30:9 31:6,19 33:15,19 35:6 43:19 56:15 60:1 65:23 66:5 68:20 69:4 72:19,20 79:9 80:16 83:13 88:2 90:6 92:4 93:1 93:10 97:8 107:3,6 110:20 111:13 118:12 120:17 121:3 122:19 124:24 127:8 130:5 132:24

**surprised** 72:14 82:20 84:1 113:15

**surprising** 70:9

**survey** 31:9

**suspicions** 129:7,10

**swear** 7:2 8:25

**sworn** 9:3 136:6 139:14

**system** 14:23 14:24 15:4,9 16:1 20:3 23:8 23:9,12,22 24:13,13,17 40:24 42:15,16 42:22 43:12 47:14 48:8,19 48:21 53:24 63:3 65:4 73:16 82:12 90:4 92:23 117:4,5

**systems** 15:23 31:11 40:1 48:23 50:1,9 50:21 88:15,21

**t**

**t** 5:21 126:10 138:3,3

**tab** 95:9

**take** 7:15 15:13 23:14,16 27:10 38:7 49:18 52:8 59:24 61:1,7 66:7 67:21 74:15 90:9,11 92:16

105:24 108:8 110:14 134:19

**taken** 1:22 2:2 7:18 28:11 66:6 121:9

**talk** 10:14,17 11:21 12:18 46:9 57:25 60:15 71:19

**talked** 11:7,8 11:19 27:20 59:8 65:14 69:4 84:11 89:6 91:10,16 92:10 101:24 103:8,11 114:19 122:6 129:13

**talking** 17:25 22:7 26:7 31:18 35:2 91:14,16 124:11 130:1

**tally** 60:20

**tan** 41:6

**tango** 126:10

**tasked** 17:24

**teaching** 18:19

**team** 15:23 16:12,13,15,21 16:24 17:14 18:18,19,20 23:7 24:6 58:3 90:6 120:16

131:7,8
**teams** 17:12,13
  17:23,24,25
  18:1 19:6 24:3
  24:18 25:10
  93:13,23
**technicians**
  16:22 17:16
  18:11 19:16,20
  19:25
**technology**
  41:11 115:17
  115:18 116:4
  116:12
**tell** 11:8,9,19
  13:25 14:4
  17:22 22:20
  23:2 24:20
  31:20 33:11
  34:24 35:8
  39:21 41:4
  42:18 43:6,20
  61:22 63:18
  65:10,19 69:12
  69:23 82:3,5
  82:19 84:15
  85:8,12 89:21
  91:12 92:16
  98:6 114:5
  119:25 126:20
  136:7
**temp** 77:16
  114:22

**temperature**
  21:18,21,23,24
  22:5,7,8,16,17
  33:7,8 34:25
  35:1,10,12
  36:10,11 40:22
  41:14 42:22,25
  43:5,9 44:5
  46:8 47:15,23
  48:5 49:5 50:2
  51:12 52:23
  53:8,15,23
  61:19 63:15
  64:9,24 65:3
  67:1,19 73:18
  73:21,25 77:5
  77:16,21 78:4
  78:18 80:8,9
  80:13,15 81:15
  81:21 83:17
  84:10 85:24
  91:17 92:12
  94:25 96:11
  97:17 98:2
  103:6 104:20
  105:4,10,25
  114:25 115:7
  115:10 120:7
  120:19 121:6
  122:25 127:14
  131:11,17
  132:6 133:13
  134:3

**temperatures**
  40:2 47:25
  49:3 51:3,8
  64:7 71:8,16
  72:24 89:12
  105:15 112:8
  112:20 113:2
  113:21 116:9
**temps** 117:19
**ten** 117:18
  130:16
**tendency**
  136:16
**term** 27:3
  97:16 99:10
**termination**
  26:24 27:4
**terms** 31:5,7
**test** 125:18
**tested** 123:6
**testified** 9:4
  30:13 31:14
  34:2 52:21
**testimony**
  15:11 60:2
  61:15 80:3
  130:6 134:10
  134:24 136:8,8
  137:9,17 139:8
**tests** 121:23
**text** 62:21
**texted** 69:9,14
  118:5

**thank** 8:23
  49:21 52:10
  110:25 111:4
  119:15 132:17
  134:15,22
**thanks** 49:16
  132:16 134:13
**therapeutics**
  29:18
**thermometer**
  47:14 101:3
  103:4
**thermometers**
  100:24 102:2,7
  102:15,25
  103:2
**thermostats**
  68:19
**theses** 103:8
**thing** 23:24
  36:22 60:21
  80:17 82:24
  83:11 85:15,22
  86:13
**things** 34:4
  35:22 44:22
  57:16 59:24
  67:15 68:5
  72:20 73:14
  87:24 104:2
  128:10 129:24
**think** 11:24
  19:5 21:12
  22:3 24:23

**[think - treatment]**                                                     Page 35

28:7 30:11,14
42:8,9 44:20
52:5 57:16
60:12 64:25
70:25 76:16
77:8,21 78:5
82:22 84:13
89:6 91:4
95:17 96:23,25
106:13 109:2
111:1 113:4
118:13 125:24
128:1 129:3
132:9 133:6
**thinking** 29:25
  64:23
**thinks** 85:23
**third** 3:17
**thought** 49:12
  75:13,19 76:1
  130:7
**thoughts** 49:18
  118:13
**three** 17:13
  21:5
**thursday** 36:13
  39:25 61:17
**ticket** 66:20
**tighter** 67:4
**time** 8:7 20:14
  21:1 23:6,10
  26:11 27:23
  30:8 32:20
  36:3,8 37:2,3,6

37:21,23 40:13
42:10 43:11
45:21 47:23
48:10 52:13,18
53:11 56:2,5
62:4,8,24
65:17,18 67:8
68:6,25 69:24
73:8 74:11
76:6 81:10,15
82:23 83:4,15
83:17 87:25
88:6,11,17,18
90:20 94:13
98:8,12 99:8
105:9,24 107:9
108:8 110:14
116:16 117:20
118:22 119:1
127:8 130:20
130:24 132:16
137:18
**timeframe**
  137:8
**timeline** 22:25
  26:17 28:4
  109:5
**timelines** 109:3
**times** 14:12
  51:4 67:24
  73:5 90:11
**today** 11:22
  12:6 24:25
  41:5 45:4,15

129:13 133:11
**today's** 11:10
  11:11 12:19
  134:24
**together** 24:16
  71:3
**told** 20:5 30:6
  52:22 60:6
  65:11,15 71:15
  83:24 115:6
**tony** 21:3 23:6
  26:9 59:18
  60:6,9 89:15
  90:25 92:19
**tony's** 92:21
**took** 67:18
  71:25 78:13
  91:21 123:1
**top** 86:24 90:25
  94:12,19 98:9
  98:17 107:22
  115:14
**topic** 89:11
**topics** 28:24
  84:17 85:21
**total** 94:8
  134:25
**toward** 23:11
  117:16
**towards** 15:13
  24:5
**town** 62:23
  63:7

**tracer** 29:1,2,3
  30:22 31:3
**track** 42:21
  51:21 123:14
**train** 49:12
**training** 25:13
  25:21
**transcribed**
  136:8
**transcript** 4:8
  6:7 9:22 10:13
  134:21 136:18
  137:6,19 139:5
  139:8
**transition**
  26:23 27:23
  32:22 34:10
  35:13 36:3
  38:12 40:10,13
  55:3,23 56:1
  56:11 60:5
  93:12 109:8,12
  117:10,13
**transitioned**
  34:14 39:24
  40:9
**transitioning**
  36:4 37:11
  59:3,4
**transmitter**
  41:11
**treatment**
  119:22 120:10

**[tree - use]**

**tree**  47:16
**trend**  115:19
  116:17,19
**tried**  15:10
  85:8 110:19
**trigger**  43:8
  128:22
**triggered**  43:4
  63:4,17
**triple**  33:24
  40:8 61:17
  62:5 63:17
  100:16
**true**  105:6,22
  133:8 136:8
  139:8
**truth**  136:7
**try**  10:17 66:1
  71:22
**trying**  9:25
  10:10,10 17:20
  24:25 25:18
  66:4 68:3,18
  83:11 85:7
  97:13
**tuesday**  66:4
**turn**  81:2
**twice**  49:3
  51:10,14 73:9
  73:17 81:10
**two**  33:21
  38:14 40:17
  41:7 47:2 51:4
  54:5 55:10,13

55:14 68:15
  70:11 72:7
  80:21,23,23
  87:11 97:11
  100:9 101:6
  102:16,21,25
  119:14
**type**  23:22
  39:14,15 48:25
  60:18 82:24
  84:6 85:15
  100:15 118:8
**types**  68:19
  122:11,20
  123:23
**typically**  112:8
  112:21 113:2
**typo**  112:16
**tyrell**  1:9

**u**

**u**  5:23 128:12
**uh**  10:8 84:23
  100:1 101:5
  130:2 131:4
**ultimately**
  75:14
**unable**  26:10
**unaware**  65:5
  113:16 121:20
**unclear**  37:1
  59:2 100:17
**uncommon**
  116:13,15

**under**  56:14
  71:12 83:23
  97:24 100:2
**understand**
  10:20,22 11:14
  21:22,24 22:6
  22:13 23:24
  25:1,16 26:22
  41:3 55:12
  60:1 75:10,11
  83:9 113:10
  122:15 130:5
  134:10
**understanding**
  15:25 28:17
  41:2 50:17
  61:15 71:9
  74:18 75:4,18
  85:3 93:16
  126:21 128:5
**understood**
  11:3 24:8
  55:16 100:23
**underway**
  117:2
**unexpected**
  40:5
**unfamiliar**
  33:2 99:9
  128:9 130:13
**unintelligible**
  12:12 14:1
  46:1 64:17,18
  72:3 96:2

100:22 121:16
**unit**  7:17 13:18
  52:14,19 88:7
  100:5 107:13
**united**  1:1 7:21
  14:21 36:23
  44:23
**units**  134:25
**university**  14:7
  15:15 28:3
  31:23 32:12,21
  33:9,12 36:18
  55:8 62:9
**unplugging**
  133:11 134:1,7
**unquote**  100:10
**unsure**  22:11
  22:25 27:3
  37:4
**upheld**  31:3
  59:21 72:18
**uphold**  114:2
**upload**  95:15
**uploaded**  95:18
  107:2 119:3
**upstairs**  37:10
  71:21 82:9
**usb**  49:6
**use**  21:21 22:5
  39:11,14 42:16
  46:15 49:17
  65:2 87:11
  102:15 116:11
  116:13 125:25

**[used - way]** Page 37

used  46:3 48:20 50:2 79:25 87:18,19,20 102:20 125:8 125:13,25 134:25 137:19
user  87:5
using  9:24 10:3 10:24
utilize  37:18 46:18 93:10
utilized  44:3 57:20 101:4 102:24
utilizing  53:5
utmost  90:10

**v**

v  137:4 138:1 139:1
vaccine  46:19 51:23 60:15 94:9
vaccines  44:7 44:10,24 45:2 45:9,10,14,14 45:17,18 46:2 46:3,10,15 47:6,8,10 49:9 51:18,20 56:22 57:5 79:3,13 79:15 100:5 122:6,10,12,20 123:5,10,13,19

123:24 124:17 131:10,16
validate  120:10
validating  119:21
value  57:9
various  126:5
variously  50:16
varying  123:6
verbiage  125:13
verify  18:25 137:9
veritext  7:25 8:2 135:1 137:14,23
veritext.com.  137:15
version  127:5
versus  7:20
vetter  91:25
vfc  47:6 51:23
viability  94:1
vials  86:7,10
vice  92:2
video  1:20 2:1 7:14,18
videoconfere...  1:20 2:1 7:3
videoconfere...  10:23
videographer  4:6 7:6 8:1,24 52:11,16 88:4

88:9 107:7,11 118:20,24 130:18,22 134:14,16,22
views  96:12 104:17 105:1 108:10 111:5 119:10 126:17 128:17
virtually  7:10
vivid  25:6
vogel  3:16
vogellaw.com  3:19,20 137:2
volume  47:3
von  3:4 8:14,15
vs  1:14

**w**

w.s.  1:6
wait  10:15
waiting  87:20
walk  106:2
wall  41:6 54:22 54:23
want  18:3 26:4 33:14 36:18 49:11 64:8 79:5 92:5 95:23 96:3 102:12 104:18 111:9,21 130:5 130:17

wanted  15:18 23:25 25:8 38:8 41:18 53:23 56:15 68:19 69:19 97:6 105:25 117:13 121:15
wanting  22:24 35:3 108:23
warm  85:13
washington  3:8
watch  67:11
watching  67:13
watchman  40:7 40:12,15,16,21 40:23 41:8,16 42:16,22 43:8 47:19,21 48:4 49:24 50:15,20 52:22 53:11,24 54:1,4,18 61:18 63:10 69:24 70:4 80:22 81:25 82:2,6 86:16 87:2,4 115:16 116:3 117:11
way  12:2 23:16 24:1 34:19 56:21 57:3 58:11 72:13 75:2 83:21 84:25 91:4 93:21 96:5

113:5,6 122:10 133:10

**we've**   32:11 37:24 49:13 56:3 80:6 91:15 96:8 103:8 118:13 131:2

**web**   48:21

**webs**   30:9

**week**   27:25 28:1,2 35:18 35:19,23,25 36:3,13 41:21 42:9,12 55:6,8 55:23 56:1 59:25 60:5 65:9 87:23 91:20 92:25

**weekend**   62:16 77:1,1

**weeks**   35:13 37:19 40:13 91:20 93:12

**weese**   2:14 4:9

**went**   80:2 83:16 117:21 117:23 118:3,4

**wes**   20:9,19

**west**   2:16 12:25 17:3 20:3 23:20 24:5,11 24:12 25:9,12 35:14 41:6

48:14 90:4 91:22 99:10,14 109:25

**white**   41:9 50:7 51:1,2 63:25 63:25 80:23,25 81:18,22

**wholesaler** 28:22 29:15 86:12

**wider**   84:25 85:1

**wish**   35:4

**withdraw** 128:3

**witness**   5:3 7:2 7:13 8:17,25 9:3 34:8 49:22 50:12 52:5 59:11 73:11 75:24 77:13 78:9 83:20 87:9 89:1 90:17 94:18 97:5 99:7 102:5 103:18 104:1 105:19 106:22 109:20 111:5,9 113:25 116:6,23 119:16 120:3 120:15 121:3 122:17 127:11 128:9 132:13

132:17 136:6,9 136:18,19 137:8,10,12,18

**witten**   23:11 92:1 108:14,17 116:1

**wonder**   107:18

**wondered** 65:23

**wondering** 22:22

**wonderment** 113:19

**woods**   4:5

**word**   21:21 46:3 79:19,25 116:11,12,13 118:1

**words**   9:24 10:3 22:5 65:16

**work**   18:13 30:19 49:19 66:6,22 67:11 67:14 68:11,22 71:14 76:20,25 97:14 129:23 130:8 133:15

**worked**   27:22 65:20 76:21 132:25

**workflow** 23:23

**workflows** 23:15 38:1

**working**   14:8 15:19 17:9 18:17,22 21:11 23:21 24:4 25:23 34:12 36:2 50:22 68:23,24 71:24 76:18 87:23 127:8

**works**   11:15

**write**   10:2 16:17 51:12

**writing**   81:10

**written**   51:11 53:6 97:1 125:1

**y**

**yeah**   19:7 20:19 28:7 33:16 40:25 49:16 52:5 56:25 58:23 63:22 69:9,18 70:3 71:20 73:4 76:3 80:4 81:4 85:8 89:1 89:20,23 91:8 91:14 92:3 93:23 94:11,14 95:17,25 96:4 97:13 103:21

**[yeah - zoom]**                                                                          Page 39

106:9 112:17
113:13 114:15
115:1 116:17
117:25 118:15
119:13 120:6
123:21 124:13
124:15 125:2,4
125:20 129:1
131:15,25
**year**   13:22
20:15 26:4
48:13
**years**   20:14
48:10 86:25
92:2
**yellow**   49:7
50:4,16,25
**yep**   11:1 19:8
28:14 48:2,6
49:22 54:25,25
61:21 81:20
103:11 104:17
107:20 122:8
124:19 127:3
131:9
**yogurt**   56:13

**z**

**zoom**   1:20 2:1
2:4 7:3

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.