# SEALED

# EXHIBIT O

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

_____

JESSICA KRAFT,                          CASE NO. 320-CV-121
INDIVIDUALLY AND AS PARENT
OF MINORS L.K., S.K. AND
O.K.; SHELLI SCHNEIDER,
INDIVIDUALLY AND AS PARENT
OF MINORS A.S. AND W.S.;
ANNE BAILEY AS PARENT OF
MINOR D.B.; AMY LAVELLE AS
PARENT OF MINORS EM.L. AND
EL.L; ELIZABETH BEATON,
INDIVIDUALLY AND AS PARENT
OF MINOR M.B.; AMANDA AND
TYRELL FAUSKE, INDIVIDUALLY
AND AS PARENTS OF C.R.F. AND
C.J.F.; JENNIFER REIN
INDIVIDUALLY; AND JESSICA BERG
AS PARENT OF MINOR A.B. AND S.B.,
INDIVIDUALLY AND ON BEHALF
OF OTHERS SIMILARLY SITUATED,

            Plaintiffs,
vs.
ESSENTIA HEALTH, INNOVIS
HEALTH, LLC, D/B/A ESSENTIA
HEALTH, DAKOTA CLINIC
PHARMACY, LLC, JOHN DOE
MANUFACTURERS AND JOHN DOE
DISTRIBUTOR,

            Defendants.
_____
            VIDEO-RECORDED REMOTE ZOOM
    VIDEOCONFERENCE DEPOSITION OF ALAN JAMES HURLEY
            Taken on Thursday, May 22, 2025
                Scheduled for 9:00 a.m. CDT
REPORTED BY:  DANA S. ANDERSON-LINNELL
Job No.:  PA 7353469

Page 2

VIDEO-RECORDED REMOTE ZOOM VIDEOCONFERENCE DEPOSITION

OF ALAN JAMES HURLEY, taken on Thursday,

May 22, 2025, commencing at 9:05 a.m. CDT, via a

REMOTE ZOOM PROCEEDING, before Dana S.

Anderson-Linnell, a Stenographic Shorthand Reporter

and Notary Public of and for the State of Minnesota.

***************

APPEARANCES

On Behalf of the Plaintiffs:

Michael von Klemperer, Esquire

Ashali Chimata, Esquire (partial day)

FAGAN SCOTT, LLC

1763 Columbia Road Northwest, Suite 100

Washington, DC 20009

Email:  mike@feganscott.com

        ashali@feganscott.com

(Appearances continued on next page.)

Page 3

APPEARANCES (continued):


On Behalf of Defendants Essentia Health,

Innovis Health and the Witness:

Angela E. Lord, Esquire

Briana L. Rummel, Esquire (partial day)

VOGEL LAW FIRM

200 North Third Street, Suite 201

Bismarck, ND 58501

Email:  alord@vogellaw.com

          brummel@vogellaw.com


ALSO PRESENT:  Frank Modich, Essentia

               Dave Young, Videographer

               Dimitri Kipa, Concierge (partial day)


NOTE:  The original transcript will be filed with the

Fagan Scott Law Firm, pursuant to the applicable

Rules of Civil Procedure.

Page 4

INDEX                                                    PAGE

WITNESS:  ALAN JAMES HURLEY

EXAMINATION BY:

Mr. von Klemperer                                          9

INSTRUCTIONS NOT TO ANSWER:  16

PRODUCTION REQUESTS:  121

INDEX OF EXHIBITS MARKED:

Exhibit 76 - CONFIDENTIAL INFORMATION -

SUBJECT TO PROTECTIVE ORDER, 3-26-20

Vaccine Storage EH West (updates),

EH057338 to 346                                            44

Exhibit 77 - CONFIDENTIAL INFORMATION -

SUBJECT TO PROTECTIVE ORDER,

February 8, 2021, email, EH044386                         70

INDEX OF EXHIBITS (continued):                    PAGE

Exhibit 78 - CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER, Essentia Health
SBAR — One Essentia Refrigerator Replacement
and Temperature Monitoring, Author:  Al Hurley,
5/6/2020, EH031257 to 261                          97

Exhibit 79 - CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER, May 5, 2020,
email chain, EH031553 to 555                       141

Exhibit 80 - CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER, April 3, 2020,
email chain, EH025415 to 416                        160

Exhibit 81 - CONFIDENTIAL INFORMATION -
SUBJECT TO PROTECTIVE ORDER, April 6, 2020,
email chain, EH046253 to 255                        164

Page 6

INDEX OF EXHIBITS PREVIOUSLY MARKED:                PAGE

Exhibit 23 - CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER, Joint Unanimous Written
Action in lieu of Meeting of the Board of
Governors and Members of Dakota Clinic
Pharmacy, LLC, DCP 000025 to 28                     54

Exhibit 56 - CONFIDENTIAL - SUBJECT TO
PROTECTIVE ORDER, Morris Personnel File,
EH048469 to 569                                     169

Exhibit 65 - Confidential Information -
Subject to Protective Order 3-24-20 West
Market Medication Storage (updates),
EH057307 to 317                                     146

Exhibit 67 - Confidential Information -
Subject to Protective Order, Review West
Excursion Epic Charge Options, EH025571 to 574   154

(Original exhibits attached to original transcript;
copies to counsel as requested.  Previously marked
exhibits referenced not attached.)

Page 7

REPORTER'S NOTE:  All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

Page 8

THE COURT REPORTER:  Do all counsel stipulate that I may swear in the witness remotely over the Zoom videoconference?

MR. VON KLEMPERER:  I do, yes.

MS. LORD:  Yes.  That's fine.

THE VIDEOGRAPHER:  Good morning. We're going on the record at 9:05 a.m. on May 22nd, 2025.

Please note this deposition is being conducted virtually.  Quality of recording depends on quality of camera and Internet connection of participants.  What is seen from the witness and heard on the screen is what will be recorded.  Audio and video recording will continue to take place unless all parties agree to go off the record.  This is Media Unit 1 of the video-recorded deposition of Alan Hurley taken by counsel for the plaintiffs in the matter of Jessica Kraft, et al. versus Essentia Health, et al., filed in the United States District Court for the District of North Dakota, Case No. 320-CV-121.

My name is Dave Young.  I'm the videographer.  The court reporter today is Dana Anderson.  We are both representing

Page 9

Veritext Legal Solutions.  I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to this proceeding, please state them at the beginning of the deposition.  Will counsel now state their appearances and affiliations for the deposition.

MR. VON KLEMPERER:  Mike Von Klemperer for the plaintiffs.

MS. LORD:  Angie Lord for the Essentia defendants.

THE VIDEOGRAPHER:  And will the court reporter please swear in the witness, and then we can proceed.

MS. LORD:  Briana Rummel is also present for the Essentia defendants and Frank Modich is the corporate representative.

Thank you.

ALAN JAMES HURLEY, called as a witness, being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. VON KLEMPERER:

Q.    Al, good morning.  My name is Mike

Page 10

Von Klemperer.  I represent the plaintiffs in this case.

Can you please state your full name and address?

A.    Yes.  Alan James Hurley.  My address is 2511 River's Bend Drive East in West Fargo, North Dakota.

Q.    Who is your employer?

A.    Essentia Health.

Q.    What is your occupation?

A.    I am the chief operating officer for the west market located in Fargo.

Q.    And how long have you been with Essentia?

A.    I began November of 2018.

Q.    Okay.  And has your title changed over time?

A.    It has.

Q.    What was your title prior to your current title?

A.    Senior vice president.

Q.    And when did that transition occur?

A.    Approximately a year.  I don't recall the exact date.

Q.    One year ago from today?

Page 11

A.      No.   One year from employment.

Q.      Okay.   So you started as a senior vice president?

A.      I did.

Q.      Okay.   Have you been deposed before?

A.      I have.

Q.      How many times?

A.      Once.

Q.      And what was the case in which you were deposed?

A.      The case was the -- when I was at Sanford Health in Bismarck, North Dakota, it was the acquisition of a private medical group called Mid Dakota Clinic.

Q.      So it was when you were with another employer?

A.      It was.

Q.      And how long ago was that?

A.      On or about 2016.

Q.      Okay.   And you understand that while there's no judge or jury present here today, this deposition proceeds as if you're testifying in court before a judge and jury?

A.      I do.

Q.      And you understand that you're under

Page 12

oath and that it's the same oath you would give as if you were testifying before a judge and jury?

A.    I do.

Q.    You understand that this deposition constitutes evidence that can be presented to the jury at trial?

A.    I do.

Q.    Okay.  If I ask you a question, you answer it, I'll assume that you understood it. If you don't understand, please ask me to clarify.  Fair?

A.    I will.

Q.    Let me know if you do not know or cannot remember the information I ask about.  If you answer, I'll assume that you know and remember the information.  Fair?

A.    Yes.

Q.    Similarly, don't guess or speculate.  If you don't know the answer to a question, please let me know.  Okay?

A.    Okay.

Q.    And let me know if you realize that an answer you previously gave is inaccurate or incomplete.  Just say you want to correct or

supplement a previous answer, we can go back. Fair?
A. Yes.
Q. Okay. Is there any reason that you cannot give full and complete answers today?
A. No.
Q. No? Let me know if you want to take a break for any reason. And please be sure to answer verbally so the court reporter can take down what you say. Fair?
A. Yes.
Q. And especially since this is a remote deposition, please do your best not to speak over me, and I'll do my best to do the same. The reporter can't really transcribe what we're saying if we talk at the same time. Okay?
A. Yes.
Q. Can you please identify who else is in the room with you?
A. Angie of counsel is in the room.
Q. Okay. And since this is a remote deposition and you have access to a computer, I would ask that you not review or send any emails, text messages, other written communications using that computer today, is

Page 14

that fair?

A.     Yes.

Q.     Okay.  You're here today to testify in the case Kraft versus Essentia pending in the District of North Dakota.  Are you familiar with the lawsuit generally?

A.     Yes.

Q.     And what is your understanding of what the case is about?

A.     The potential excursion of medications being stored.

Q.     Anything else that you know about the lawsuit?

A.     Generally, no.

Q.     Okay.  And you may be aware, but the parties have been referring to both of the Essentia defendants collectively as Essentia.  Innovis Health is also a defendant.  So when I refer to Essentia today, I'll mean both Essentia and Innovis.  Will you understand if I refer to Essentia that way?

A.     Yes.

Q.     Okay.  And if your answer pertains to only one of those two entities, please specify that.  Is that okay?

Page 15

A.    Yes.

Q.    Okay.  And you reference that you have an understanding that the case is about a potential temperature excursion.  If I use the phrase "temperature excursion," I'll be referring to that potential temperature excursion that this lawsuit is about unless I specify something else.  Will you understand what I mean if I use the term "temperature excursion"?

A.    Yes.  That it is potential, yes.

Q.    Okay.  And if I use the phrase "affected medications," I'll be referring to the medications that were subject to the potential temperature excursion that the lawsuit is about.  Will you understand what I mean if I use that terminology?

A.    Yes.

Q.    Okay.  What did you do to prepare for today's deposition?

A.    I met with Angie in preparation.

Q.    Okay.  Other than meeting with counsel, did you speak with anyone to prepare for today's deposition?

A.    No.

Page 16

Q.    Okay.  Did you review any documents?

A.    No.

Q.    Approximately how much time would you say you spent preparing?

A.    I'd estimate probably two hours, estimated.

Q.    Okay.  And how many times did you meet with counsel?

MS. LORD:  I'll object on attorney-client work product basis, and we'll instruct him not to answer that question.

BY MR. VON KLEMPERER:

Q.    Okay.  And will you follow your counsel's instruction not to answer?

A.    Yes.

Q.    Okay.  Did you bring any documents with you today to the deposition?

A.    No.

Q.    Okay.  And in preparation you didn't review any documents to help refresh your recollection about any facts?

A.    No.

Q.    Okay.  Are you an employee of Essentia or Innovis?

A.    Essentia.

Page 17

Q.      Okay.  There are individuals who are employed by Innovis, though, correct?

A.      Yes.

Q.      Okay.  And have you always been since you started in 2018 an employee of Essentia?

A.      I might have to say I don't know.

Q.      Okay.  Why is that something that you're not sure about?

A.      We do have the separate -- we have the entity as Innovis.  And upon my employment we -- it was in the process of becoming an operating company.  And so I would need to go back and review if I was always -- if I was under Innovis or under Essentia.  But to my knowledge, I've always been employed by Essentia.  But from a corporate standpoint, I would have to go back and look and see if it was Innovis or Essentia.  My position is chief operating officer for the west market, which is Innovis.

MS. LORD:  And just for the record, when you've been saying Innovis, you're both referring to Innovis Health, LLC.

BY MR. VON KLEMPERER:

Q.      Is there another entity that you're

Page 18

familiar with that goes by the name Innovis other than Innovis Health, LLC?

A.    I am not.

Q.    Okay.

A.    Not that I remember.

Q.    And is west market another term that people at Essentia use to refer to Innovis Health, LLC?

A.    West market is referred to a region within Essentia.

Q.    Okay.  And you said that you would have to go back and look to see if you had ever been employed by Innovis Health, LLC.  What would you do to make that determination?

A.    I'd refer to our human resource department just to be certain.

Q.    Okay.  So you would look at your human resource records?

A.    That's correct.

Q.    Okay.  And as the chief operating officer for the west market, what are your current job functions?

A.    Provide leadership and oversight of the operations for the west market region.

Q.    And could you give some examples of sort

Page 19

of your day-to-day responsibilities in that role?

A.     To ensure that our patients and our staff are provided the high quality of care, provided safe work environment, provided the resources as appropriate and as necessary as we can provide for the communities we're privileged to serve.

Q.     Okay.  And I believe you said you provide leadership and oversight of operations, is that correct?

A.     Yes.

Q.     Could you sort of define what you mean by "operations" in layman's terms?

A.     We strive to have a higher liability organization.  So we strive to have standard work throughout our organization across all of Essentia.  And so my oversight is to strive that we employ that across the delivery of care in the west market as well as the entire system.

Q.     Okay.  Who is your current supervisor?

A.     Jodi Mansfield.

Q.     And what is her title?

A.     She's the executive vice president and

Page 20

chief operating officer for Essentia Health.

Q.    Okay.  And do you have any people that report directly to you?

A.    Yes.

Q.    How many people?

A.    As of today, I believe there are ten.

Q.    Okay.  And could you just identify who those people are and what their role or responsibilities are?

A.    They are one senior vice president, and the others are vice presidents of the west market, and they represent different areas of the west market geographically and by service.

Q.    Okay.  Have your responsibilities changed since you took on the chief operating officer title around 2019?

A.    Responsibilities have not necessarily changed.  I've been assigned additional roles within the system from time to time, but as a general statement my responsibilities as a chief operating officer have not changed.

Q.    Okay.  What additional responsibilities have you been assigned over time?

A.    To participate with system initiatives.

Q.    What do you mean by "system

Page 21

initiatives"?

A.    Oh, as we again strive to have standard work, standard operations, standard delivery of care across our system, I participate with other leaders across the health system, my counterpart in the west and other leaders, dyad leaders to participate and -- within those initiatives.

Q.    So are you referring to specific projects that you've worked on, or are these additional ongoing responsibilities that you've been assigned?

            MS. LORD:  I'll object to form.

            Go ahead.

            THE WITNESS:  I'd say they're both, participate as well as -- could you repeat the question again, please, Mike?

BY MR. VON KLEMPERER:

Q.    Well, you referred to these additional responsibilities that you've been assigned and you mentioned system initiative.  And my question is:  Were those discrete projects that you were assigned, or are they sort of ongoing responsibilities that you now have that you didn't previously have?

Page 22

A.      Oh, thank you.  Specific.

Q.      Okay.  And could you just give a few examples of those specific initiatives?

A.      One example would be our DME program for the health system.

Q.      Did you say DME system?

A.      DME.  Durable medical equipment, DME.  I apologize.  Durable medical equipment.

Q.      Okay.  And what was that initiative concerning?

A.      It is a service provided by Essentia Health across the system, and I was asked to review its service to our customers and our patients and report back with opportunities.

Q.      Okay.  And in your prior role as the senior vice president that you started at Essentia with, could you describe your responsibilities in that position?

A.      Yes.  My role is specifically to develop service line programs in the west market.

Q.      Could you explain in layman's terms what you mean by "service line programs"?

A.      Yes.  Service lines in health care are commonly referred to or related to oncology or heart and vascular, primary care, women's and

Page 23

children's.  Those are examples of service lines in health care to develop access and support services to deliver care to our patients.

Q.    Okay.  And you held that role for approximately one year, is that right?

A.    Correct.

Q.    Okay.  So you're the chief operating officer of the west market, correct?

A.    Correct.

Q.    Who are the other officers in the west market?

A.    We have a president of the west market, chief medical officer of the west market, chief nursing officer of the west market.  Those are the major officers of the west market.

Q.    Okay.  And can you identify who holds each of those positions currently.

A.    By name?

Q.    Yes.

A.    Dr. Gefroh Ellison is the president of the west market, Suzanne Zeltinger is the chief marketing officer for the west market and Dr. Dev Mannuru, who is new to our organization is the chief medical officer.

Page 24

Q.    But you do not report to the president of the west market, correct?

A.    Correct.

Q.    What was the position that Jodi Mansfield holds?

A.    She's the executive vice president, chief operating officer for Essentia Health.

Q.    Okay.  And do you report to her because she's the chief operating officer for Essentia?

A.    I report to her because that is our organizational structure within Essentia.

Q.    Okay.  Do you know who the president of the west market reports to?

A.    Yes.

Q.    Who is that person?

A.    That is the CEO and president of Essentia Health.  And that is Dr. David Herman.

Q.    Okay.  And what about the west market chief medical officer, who does that person report to?

A.    Dr. Gefroh Ellison.

Q.    And what is that person's title?

A.    Chief medical officer.

Q.    For?

A.    For the west market.  I'm going to

Page 25

pause.  I believe that was your question, Michael.  I'll ask you to repeat it.  I think I'll repeat it back -- or if you could repeat that again.

Q.    Okay.  So could you give me the name of the chief medical officer again?

A.    Yes.  Dr. Dev -- that's a shortened named.  Dr. Dev Mannuru is his last name.  He's the chief medical officer --

Q.    Okay.

A.    -- [unintelligible]chief medical officer, and he does report to Dr. Gefroh Ellison for the west market.

Q.    And what was Dr. Ellison's title?

A.    She is the president of the west market.

Q.    Okay.  An who does the chief nursing officer, Suzanne Zeltinger, report to?

A.    She reports to me.

Q.    Okay.  Does Innovis have its own board of directors?

A.    Yes.

Q.    Who are the members of the board currently?

A.    I do not have the list of directors of the board in front of me.  There are a

Page 26

number --

Q.    Do you know how many members there are?

A.    I do not have that in front of me.

Q.    Do you have an estimate?

A.    I would like not to estimate.

Q.    You have no sense of the number?

A.    It ranges depending on terms, et cetera. We've had at times nine and up to 13. So it depends on ending of terms and recruitment of new directors to the board.

Q.    Okay. Do you know any of the current members by name?

A.    I do.

Q.    Who -- could you give any names that you know of?

A.    Yes. Kim Platsen is a new director.

Q.    Anyone else?

A.    Dr. Jackson, who's a Ph.D., who's a community member. Both are community members.

Q.    Anyone else?

A.    Dr. Haugen is the president of the board, retired Dr. Haugen.

Q.    Okay. Can you just list every other person that you know of?

A.    Could you repeat that, Mike?

Page 27

Q.      Can you just list any other names that you know of?

A.      Not at this moment.

Q.      What was your role in Essentia's response to the discovery of the temperature excursion at issue in the case?

A.      My role of -- as chief operating officer was that -- it was brought to my attention. And my role was to oversee the -- and understand what the potential excursion was by getting the right leaders and individuals with expertise to come up with that determination.

Q.      So your role was to identify the right people with the expertise to conduct an investigation to obtain the details of the excursion --

MS. LORD:  Object to form.

BY MR. VON KLEMPERER:

Q.      -- is that right?

A.      To the best of our ability, yes.

Q.      Okay.  Other than identifying the right people, did you have any other role in Essentia's response to the execution?

A.      My role was just -- and to -- to inform and participate in the recommendation to our

Page 28

leadership within Essentia Health, including Jodi Mansfield and Dr. Herman.

Q.    So you had a role in making recommendations to Essentia's leadership, is that right?

A.    Based on the information we discovered, yes.

Q.    And was it more than one recommendation that you were involved with or just a single recommendation?

MS. LORD:  Object to form.

THE WITNESS:  Am I to answer that question?

MS. LORD:  You can.

THE WITNESS:  Yes.  We updated Ms. Mansfield and Dr. Herman as appropriate throughout the process.

BY MR. VON KLEMPERER:

Q.    But you were providing updates and recommendations to those two individuals?

A.    As we received information and as -- as we -- as we -- as the group at -- made discoveries that required recommendations or required decisions, yes.

Q.    Okay.  And what recommendations do you

Page 29

recall providing to Mansfield and Herman?

A.    Consistently our recommendations included a collaboration of leaders internal and external to the information surrounding the potential excursion and how to serve our patients using our values and to understand what the situation and assessment was.  And then depending upon the particular issue within the potential excursion, there may have been a particular recommendation and not just one recommendation depending on what we were finding.

Q.    And my question is:  Do you recall any specific recommendations that you recall making to Mansfield and Herman?

A.    Yes.

Q.    And what recommendations do you recall?

A.    The recommendations at the -- was that we would -- for the abundance of caution to our patients and based on the information we received internally and externally, we would offer to all of our patients that we could identify to the -- re-immunize at their request at no cost and be seen in consultation at no cost if necessary so that we could ensure that

Page 30

our patients were included in the -- this process and were engaged in their care.

Q.     Okay.  So that's an example of a recommendation that you gave to Ms. Mansfield and Dr. Herman.  And did they agree to adopt the recommendation?

A.     Yes.

Q.     Okay.  So it was ultimately their decision?

A.     It was a decision made by the collective group, but they're accountable for the organization.

Q.     And what do you mean by "the collective group"?

A.     Well, there was -- this is -- there were many, many individuals that were participating in the research and discovery of the information that led into a collective recommendation.  I solely did not -- I may have represented the group, but I did not make the sole recommendation.  It was a group recommendation.  And then it was presented to our leadership group of Essentia Health so that we could make sure that we're living our values and supporting our patients' care and...

Page 31

Q.      You mentioned the leadership group.  Who is a member of the leadership group?

A.      The leadership group is led by Dr. Herman and Jodi Mansfield.  And that is from Essentia Health across the system.

Q.      Any other members of the leadership group that you refer to?

A.      That would be members of the east market and other system leaders that would have reviewed our recommendation, reviewed the information and gave input on the decision or recommendation.

Q.      Can you identify any other members of the leadership group?

A.      There's a chief medical officer for the health system who was a part of that as an example.

Q.      And can you identify that person?

A.      He is retired, has not been with the organization for some time now.  His name is escaping me for right now, but we can get that.

Q.      Other than Herman, Mansfield and the chief medical officer, any other members of the leadership group that you're referring to?

A.      Well, there are leaders that are -- our

Page 32

communication, the -- my colleague in the east market, COO of the east market, the president of the east market at the time. There's a -- other leaders that were referred to as the Essentia Health leadership team. Those are the ones that come to mind right now.

Q.   Okay. So you mentioned a COO of the east market. Who is that individual?

A.   Brad Beard.

Q.   And do you know how long he's been in that role?

A.   Yes. He's -- he started before I did, approximately six to nine months before I did.

Q.   Okay. And who is the communications person that you referred to as a member of the leadership group?

A.   Kim Deiss.

Q.   You stated that you made a recommendation about the re-immunization of patients without cost, as well as the opportunity to be seen without cost to the leadership group. Was it then the leadership group that accepted that recommendation, or had the decision already been made at the time you made the recommendation?

Page 33

MS. LORD:  Object to form.

THE WITNESS:  The decision hadn't been made.  We made the recommendation to the group.

BY MR. VON KLEMPERER:

Q.    And then the leadership group made the decision?

A.    They supported the decision.  They supported the recommendation.  Excuse me.  They supported the recommendation.

Q.    And by "supported," do you mean something different than they made the decision?

A.    We provided all the data that was necessary to reach that decision, including reaching out to government agencies, third-party payers, internal leadership to develop this plan.  And given that information, they -- I do not recall if there was a formal vote, but they supported the recommendation.  And then Dr. Herman supported by Jodi Mansfield supported the recommendation to move forward.

Q.    Other than that recommendation, are there other recommendations that you recall making to Mansfield, Herman and the leadership

Page 34

group as part of this process?

A.      Relative to this potential excursion, that was the -- that was the primary recommendation.

Q.      That you were involved in?

A.      From the -- as a primary recommendation. There -- I do not recall.  But there are other sub-recommendations within that, but that was the primary recommendation to move forward.

Q.      Okay.  And by "the primary recommendation," do you mean the primary recommendation that you presented, or the primary recommendation that the collective group presented to the leadership?

A.      Well, as an example within that recommendation to the -- to the medications that were stored, within that recommendation there -- term is biologics that are used for not just immunization but treatment, such as oncology or rheumatology.  And then there was discussion by our chief medical officer and other experts about how to handle those subgroup of patients.  So that was within that global recommendation.  So there are many different opportunities for caring for our

Page 35

patients within our values and the abundance of caution that we followed -- that we recommended and we followed.

Q.    Okay.  And were these recommendations being made to Mansfield, Herman and the leadership group during a single meeting, or was it a series of meetings?

A.    I don't recall the exact detail on that right now.

Q.    Okay.  And do you recall if there were written documents sent to Mansfield, Herman and the leadership group as part of that process?

A.    I don't recall the exact detail right now.

Q.    Who did you primarily work with as part of your responsibilities in Essentia's response to the excursion issue?

A.    Within Essentia we work within a dyad framework.  And so I worked very closely with the chief medical officer at the time, who was Dr. Rich Vetter, M.D.  He and I collaborated together on this.

Q.    I'm sorry.  Did you say dyad?

A.    Dyad, yes.  [Unintelligible].

Q.    What does that mean?

Page 36

A.      Within Essentia Health it is a health system that the leadership as a matrix leadership in which we work collaboratively as operation -- as administrative leaders with clinical leaders working together to make sure that we're reaching the right care at the right time at the right place for our patients.  And so we work collaboratively in my role with clinicians, in this case, a physician, chief medical officer, to get the right folks around the table to make the right decisions or recommendations for our patients and our organization.  So we work collaboratively as a dyad.

Q.      Other than Dr. Vetter, were there other folks that you worked closely with as part of this process?

A.      Yeah, there were numbers of individuals I worked with as a team that had specific expertise, such as pharmacists.

Q.      And can you identify those individuals?

A.      Maari Loy, pharmacist; Dianne Witten, pharmacist; Tom [sic] Kaufenberg, pharmacist. Those would be the three in that -- in that lane.

Page 37

Q.    Okay.  Were there other lanes of individuals you worked with?

A.    Yes.  Then there'd be communications that was led by Dianne -- I apologize.  I'm sorry.  Kim Deiss, who led that lane.

Q.    Any other lanes?

A.    Suzanne Zeltinger.  At that time she was not chief nursing officer.  She was in operations.  And then Nicole Christensen was the chief nursing officer at that time, who is no longer at the organization.

Q.    Okay.  Any other lanes of individuals that you worked with?

A.    There may be, but I don't have those that I recall right at this moment.

Q.    Okay.  And what was your collaboration with Dr. Vetter concerning?

A.    Dr. Vetter led the clinical process to work with the pharmacy, to work with the clinicians, to work with the understanding of the potential situation and collecting that together.

Q.    And what was your contribution to Dr. Vetter's work?

A.    I was able to facilitate and help with

Page 38

any collaboration to bring that information together.

Q.    Can you provide any examples of specific contributions you made?

A.    Well, I was facilitating -- I was -- my role was to, to the best of my ability, make sure we had the right individuals at the table as we're discovering, making sure we're staying focused on our values and our patients as well as -- as we go through this process, collecting the information in a way that it would lead to a -- the best solution possible, whatever that may be.

Q.    You mentioned values.  What are those values?

A.    Well, in our -- our values of quality, our -- one of -- one of our values has to do with the delivery of our services and our care to our patients and our staff.  That was front and center on this particular situation that led us to make sure that the services we provide to our patients were met.  That would be an example of the values.

Q.    Okay.

A.    We have many more values that may have

Page 39

not all been applied to this situation, but that was the key one.

Q.    And that value was quality of care?

A.    Quality of care and safety to our patients.

Q.    Who is Dan Collins?

A.    Dan Collins is a system leader over the quality program within Essentia Health.

Q.    But he's the leader of the quality program at Essentia?

MS. LORD:  Object to form.

THE WITNESS:  He -- I do not remember his exact title, but he is a leader that -- is a system leader that led programs for the health system.  And he was an individual that we engaged to provide standard leadership work, standard opportunity to make sure that we're looking at this from a potential excursion in -- [unintelligible] making recommendations, so he provided input.

BY MR. VON KLEMPERER:

Q.    What's a system leader?

A.    As we describe it internally within Essentia, there -- as I mentioned, we have a -- we currently have two regions, two markets, if

Page 40

you will.  There were three, central, east and west.  Currently there are two, east and west. And then there are system resources, system support teams.  And Dan is a leader, as an example, in the quality support services team. As an example, Kim Deiss is a leader in the communications systems support team.  And there are others.

Q.    And what's your understanding of the role of the quality support services team?

A.    They provide resources and recommendations based on their knowledge or information they bring to the table to whatever our -- whatever we're trying to accomplish.

Q.    Can you break that down in layman's terms, what actual services they're providing?

A.    They would provide -- I'll give you an example.  We are accredited by the Joint Commission as an example.  So they would provide a standard leadership approach to ensure that we are following, preparing, and on a daily basis as much as possible, to all of the standards necessary for our accreditation for Joint Commission, but also just to ensure that we are providing the best quality of care

Page 41

we can to our patients.  So he's providing those standards of care that we should be employing across all of Essentia.

Q.    Okay.  And you mentioned that he was providing input as part of Essentia's response to the excursion.  What type of input was he providing?

MS. LORD:  Object to form.

THE WITNESS:  I'd respectfully like to review the exact information, but basically to the example I gave from Joint Commission and other standard practices for the storage of medications as an example in concert with pharmacy team.

BY MR. VON KLEMPERER:

Q.    So he was providing input on the appropriate standards of care for the storage of temperature-sensitive medications --

MS. LORD:  Object to form and foundation.

BY MR. VON KLEMPERER:

Q.    -- is that correct?

A.    In concert with the pharmacy team.

Q.    Okay.  And do you recall what specific input he provided on that subject?

Page 42

A.    Not at this time.

Q.    Do you know if he made -- he provided that input in writing?

A.    Not at this time.

Q.    You don't recall one way or the other?

A.    I'd like not to guess at that.

Q.    You just have no sense one way or the other then, correct?

A.    Not at this time.

MS. LORD:  I don't want to interrupt your train of thought, Mike.  We've been going for about an hour.  Whenever there's a good time for a break from your perspective.

MR. VON KLEMPERER:  Can we go about another ten, 15 minutes or so, does that work?

THE WITNESS:  Sure.  I'm sorry. Yes.

BY MR. VON KLEMPERER:

Q.    Sure is fine.

You had a responsibility for contacting regulatory agencies about the excursion, correct?

A.    Are you asking -- could you reframe the question, please?

Q.    You had a responsibility for contacting

Page 43

regulatory agencies about the excursion, correct?

MS. LORD:  Object to form.

THE WITNESS:  I defer that to the experts on the notification requirements.

BY MR. VON KLEMPERER:

Q.    No, no.  I'm just asking:  You had a role in contacting government agencies regarding the excursion, correct?

A.    I did not contact them.

Q.    Okay.

MR. VON KLEMPERER:  Angie, if it works for you, why don't we just take a short five-minute break now.

MS. LORD:  Sure.

MR. VON KLEMPERER:  Okay.

THE VIDEOGRAPHER:  We are going off the record.

Time now is 10:02.

(Off the record 10:02 to 10:09.)

THE VIDEOGRAPHER:  We are back on the record.

This is the start of Media Number 2.

The time is 10:09.

BY MR. VON KLEMPERER:

Page 44

Q.     Welcome back.  I'm going to introduce the first exhibit today, which is number 76. We're continuing the numbering from the previous deposition, so that's why it's number 76.  Let me know when you have that --

(Exhibit Number 76 marked for identification.)

MS. LORD:  If you want to click on the link, unless you're going to share your screen, Mike.  But yeah, you can click on that. And then you can make it bigger in the upper left.  And then feel free to scroll.  You can make it even bigger too.  Can you read it?

THE WITNESS:  I can read it.  Do you want it bigger for you?

MS. LORD:  No.  Thank you.

BY MR. VON KLEMPERER:

Q.     Are you familiar with this document?

A.     (Views document.)

MS. LORD:  Do you want to identify it for the record, Mike?

MR. VON KLEMPERER:  Sure.  It's Bates number EH057338 through EH057346.

THE WITNESS:  I am.

BY MR. VON KLEMPERER:

Page 45

Q.     Okay.   And if you could turn to the seventh page of the document, please, which ends in number 344 in the bottom right corner. Let me know when you're there.

MS. LORD:  Did you read it?  Have you read this document?

THE WITNESS:  I've not read that document in its entirety.  I scanned through it.

BY MR. VON KLEMPERER:

Q.     And I'm not going to ask you about the vast majority of it, just asking about something that starts on page 7.

A.     I believe I have that in front of me.

Q.     Okay.  Do you see the row that's labeled Contacting Regulatory Agencies?

A.     Yes.

Q.     And it -- two columns over it reads, "Dan Collins and Al Hurley began contacting regulatory agencies Monday, 3/16."

Do you see that language?

A.     I do.

Q.     Does this help refresh your recollection about whether you had any role in contacting regulatory agencies as part of Essentia's

Page 46

response to the excursion?

MS. LORD:  Object to form.

THE WITNESS:  This is an internal document.  I do not recall who made the direct contacts to the regulatory agencies.

BY MR. VON KLEMPERER:

Q.    But you personally had no role whatsoever in that process, is that correct?

A.    Again, I have the oversight of the -- of this entire process, and this is one of those areas of oversight.

Q.    Do you recall who the specific individuals were who were making that direct contact with the agencies?

MS. LORD:  He's asking if you remember.

THE WITNESS:  I do not recall at this time.

BY MR. VON KLEMPERER:

Q.    And do you recall what oversight you were providing as part of the process of contacting regulatory agencies?

A.    Part of the work plan that the group recommended was to contact appropriate outside agencies.

Page 47

Q.     And did you have any role in that recommendation or approving that recommendation?

A.     I supported the recommendation.

Q.     Do you know which agencies were contacted?

A.     I don't want to guess so that I omit any.  But I do know that the states of North Dakota and Minnesota were contacted, but that may not be the entire list.

Q.     Is that the Departments of Health for North Dakota and Minnesota?

A.     Yes.

Q.     Are you familiar with any other agencies that were contacted?

A.     I do not want to guess at this time.

Q.     So you're not familiar with any other beyond those two?

          MS. LORD:  He just said he doesn't want to guess.  I'll object to form.  It's been asked and answered more than once.

          MR. VON KLEMPERER:  Angie, my question wasn't does he want to guess.  My question is does he know of any others.

          MS. LORD:  I know.  But that was in

Page 48

response to the question you had just asked, which was exactly the same.  And at the outset of the deposition you asked him to tell you when he would be guessing.

MR. VON KLEMPERER:  I'm just trying to clarify his answer, if he knows of any others.  It's a yes-or-no question.

THE WITNESS:  At this time, no.

BY MR. VON KLEMPERER:

Q.    Okay.  Do you know if any agency conducted an investigation concerning the excursion issue?

MS. LORD:  Object to form.

THE WITNESS:  Not that I'm aware of.

BY MR. VON KLEMPERER:

Q.    Okay.

A.    Or let me restate.  Not that I recall.

Q.    Okay.  Do you recall whether any agency issued a written report or findings concerning the excursion?

A.    I would like to not guess at this time.

Q.    So you wouldn't -- you don't have any information --

A.    Not that I recall.

Q.    Okay.  Tell me about your role on the

Page 49

Dakota Clinic Pharmacy board.

A.   Does this -- do we need the screen continued on this?

Q.   You can take that all down.

THE WITNESS:  Is that okay?

MS. LORD:  Yes.

THE WITNESS:  Okay.

MS. LORD:  Thank you.  Thanks for catching that.

THE WITNESS:  [Unintelligible].

MS. LORD:  Okay.

THE WITNESS:  Thank you, Mike. Could you repeat the question for me, please?

BY MR. VON KLEMPERER:

Q.   Can you tell me about your role on the Dakota Clinic Pharmacy board?

A.   Yes.  I was a director on the pharmacy board representing Essentia Health's 49 percent investment.

Q.   Okay.  And when did you become a director?

A.   I do not have the exact date.  It was sometime after I became COO of the west market.

Q.   Okay.  Do you recall if it was in 2018?

A.   I would be guessing.

Page 50

Q.    Do you know if it was in 2019?

A.    I was not COO until 2019.  So my recollection -- again, not to guess, but my recollection, it would be sometime in 2019.

Q.    Okay.  And when you assumed that role of director, was there some written documentation reflecting that?

A.    I do not recall.

Q.    Have you observed other individuals being made director of Dakota Clinic after you assumed that title in 2019?

MS. LORD:  Object to form.

THE WITNESS:  The director who was there prior -- that was there of the two directors, Kyle Dorow was the other director.

BY MR. VON KLEMPERER:

Q.    Was he already a director at the time you were made a director?

A.    That's correct.

Q.    And have you observed any other people becoming directors since then?

A.    Yes.

Q.    Who?

A.    That would be Bob Green.

Q.    Anyone else?

Page 51

A.      Not that I recall.

Q.      Who is Bob Green?

A.      Bob Green was the replacement to Kyle Dorow, chief financial officer, vice president for finance, shared services.

Q.      And that title is for Bob Green, correct, not Kyle Dorow?

A.      They were the same title.

Q.      Okay.

A.      Bob was the replacement.

Q.      And they both worked for Essentia, correct?

A.      Correct.

Q.      And do you recall when Bob was made a director?

A.      I don't recall the date.  It was sometime after Kyle left the organization.

Q.      Do you know when Kyle left the organization?

A.      I do not recall the date.

Q.      Are you able to provide any estimate whatsoever?

A.      I'd be guessing.  I do not want to guess.

Q.      When Bob was made a director, was there

Page 52

some written memorialization of that decision?

A.     Not that I recall.

Q.     Okay.

A.     I'm not aware.

Q.     Why were you made a director or Dakota Clinic?

A.     My -- the previous COO held that director position.  And when he retired, then I was requested to serve in that capacity.

Q.     And who was the previous COO?

A.     Tim Saylor.

Q.     So who made the request for you to serve in that capacity?

A.     Kyle Dorow.

Q.     And do you recall if he made that request in writing or verbally?

A.     I don't recall.

Q.     Okay.  And why did you agree to serve in that capacity?

A.     As a 49 percent investor of Dakota Clinic Pharmacy, we had board seats that needed to be filled.  And that was previously filled by the COO.  And so in my new capacity I was asked to fill that.

Q.     I understand that you were asked to.

Page 53

Was that a request that you had a say in one way or another?

MS. LORD:  Object to form.

THE WITNESS:  I was asked and accepted.

BY MR. VON KLEMPERER:

Q.    And did you -- do you receive any compensation for serving in that role?

A.    No.

Q.    Do you receive any other benefits for serving in that role?

A.    No.

Q.    Who is Greg Glasner?

A.    Dr. Glasner is a board-certified OB/GYN who was the president of the west market at the time I was employed.

Q.    And he was a member of Dakota Clinic's board as well, correct?

MS. LORD:  Object to form.

THE WITNESS:  I believe so.  I'd have to confirm, but I believe so.

BY MR. VON KLEMPERER:

Q.    And do you know when his role ended on the board?

A.    I do not have the date, so I'm not aware

Page 54

of the date at this time.

Q.     I'm going to introduce a document that's been previously marked as Exhibit 23.  Let me know when you have that.

          MS. LORD:  If you refresh in the upper -- there we go, the upper left.

          THE WITNESS:  Upper left.  Right there.

          MS. LORD:  Yeah.  There we go.

          THE WITNESS:  Okay.

BY MR. VON KLEMPERER:

Q.     Let me know when you have that.

A.     I have it open.

Q.     Okay.  And this is a -- this document is titled Joint Unanimous Written Action in lieu of Meeting of the Board of Governors and Members of Dakota Clinic Pharmacy, LLC.

          Do you see that at the top of the document?

A.     (Views document.)  I do.

Q.     And then in the first paragraph of the document it indicates that the action's being taken on December 31st, 2019, correct?

A.     I do.  Correct.

Q.     All right.  And if you could turn to the

Page 55

third page, which is the page that has signatures on it.

A.    I see that.

Q.    Okay.  And this lists under Innovis governors, Greg Glasner, Kyle Dorow and yourself, correct?

A.    Yes.

Q.    So these three individuals were the Innovis governors at least as of the date of this document, correct?

A.    Yes.

Q.    All right.  You can close that document.

Dakota Clinic holds board meetings once a year, correct?

A.    Yes.

Q.    Do you recall receiving information packets at the beginning of each meeting?

A.    At the meeting there is an agenda that we -- was presented at the meeting, yes.

Q.    Was it just an agenda, or were there other documents that you would receive regularly?

A.    I don't want to guess.  But the one document that was reviewed annually was the financial information of Dakota Clinic

Page 56

Pharmacy.

Q.    And do you recall receiving the minutes for the prior meeting during each board meeting?

A.    I don't want to guess.

Q.    You don't recall one way or the other?

A.    Not as I sit here.

Q.    Okay.  And would you take the documents with you at the end of the meeting?

A.    Could you ask that question or rephrase the question, please?

Q.    You mentioned an agenda and review of financials.  When you would leave the board meetings, would you take documents with you regularly?

A.    Not that I recall.

Q.    Okay.  Do you have in your possession any minutes or other records from the Dakota Clinic board meetings?

A.    No.

Q.    You mentioned the financials of Dakota Clinic were regularly discussed.  Any other topics that were regularly discussed at the board meetings that you recall?

A.    Not that I recall.

Page 57

Q.    And what about the financials, what was regularly discussed?

A.    Standard financial reporting of the Dakota Clinic Pharmacy.  It's a standard financial report.

Q.    What kind of information do you recall being reflected in that standard report?

A.    That I recall, revenue, expenses, net operating income.

Q.    Were personnel issues ever discussed at the board meetings that you recall?

A.    Not that I recall.  The board in our capacity is not to provide oversight of the operations of Dakota Clinic Pharmacy.

MR. VON KLEMPERER:  Objection, nonresponsive after, "Not that I recall."

BY MR. VON KLEMPERER:

Q.    Do you recall discussing any management issues during the board meetings?

A.    I would not want to guess.

Q.    Do you recall discussing any other types of business decisions during the board meetings?

A.    There was an individual pharmacist who is going to retire, so there was discussion

Page 58

concerning the pharmacist acquiring that individual's ownership shares at the meeting.

Q.    And who was that person?

A.    I don't recall his name at this time.  I don't recall at this time.

Q.    Could it have been Rob Haskell?

A.    There was an individual before him.

Q.    Okay.  Other than that individual who was retiring, any other business decisions that you recall being discussed at the board meetings?

A.    Again, most recently Bob Haskell retirement was another one.  So those are the two key decisions that I recall.

Q.    Other than those two, anything else -- any other business decisions you recall being discussed?

A.    For decisions, not that I recall.

Q.    When the financials were discussed, would you be asked to take any action or make any votes related to the financials?

A.    As a scope of the annual meeting, we did -- I believe there was a vote of approving financials for the year.

Q.    Any types of votes that you can recall

Page 59

being taken on a regular basis?

MS. LORD:  Object to form.

THE WITNESS:  Not that I recall.

BY MR. VON KLEMPERER:

Q.    Any other votes that you recall taking ever beyond voting on the financials?

A.    Not that I recall.

Q.    Okay.  Was the temperature excursion at issue in this case ever discussed during a meeting?

MS. LORD:  Object to form.

THE WITNESS:  Not that I recall.

BY MR. VON KLEMPERER:

Q.    Do you recall -- do you know an individual by the name Laura Morris?

A.    Yes.

Q.    Do you recall Ms. Morris ever stating during a meeting that she did not want to discuss the temperature excursion at issue in the case?

MS. LORD:  Object to form.

THE WITNESS:  I do not recall.

BY MR. VON KLEMPERER:

Q.    Okay.  Were the services that Dakota Clinic was performing for Innovis under its

Page 60

Shared Services Agreement ever discussed during a board meeting?

MS. LORD:  Object to form.

THE WITNESS:  Not that I recall.

BY MR. VON KLEMPERER:

Q.    Why wasn't that discussed?

MS. LORD:  Object to form.

THE WITNESS:  Dakota Clinic Pharmacy as the oversight has the responsibility through the Shared Services Agreement to perform on their services, and I do not recall any of those -- any concerns being brought forward to the board.

BY MR. VON KLEMPERER:

Q.    The board itself never raised any concerns, correct?

MS. LORD:  I missed that, Mike.  The first part of your question cut out on my end.

BY MR. VON KLEMPERER:

Q.    The board itself never raised any concerns, correct?

MS. LORD:  Object to form.

THE WITNESS:  There were no concerns raised to the board to address.

MR. VON KLEMPERER:  Objection,

Page 61

nonresponsive.

BY MR. VON KLEMPERER:

Q.      My question is whether the board itself ever raised any concerns?

MS. LORD:  Object to form and foundation.

THE WITNESS:  The temperature log, -logs were discovered during the process by which the Essentia pharmacy team was canceling or terminating its agreement with Dakota Clinic Pharmacy to maintain the storage at Dakota Clinic Pharmacy.  So the temperature log -- the temperature logs were brought to our attention through our pharmacy team, not through the board.

MR. VON KLEMPERER:  Objection, nonresponsive.

Can the reporter read back my last question?

THE COURT REPORTER:  Sure.

(Whereupon, the court reporter read back the previous question.)

THE WITNESS:  The concerns were raised to the DCP directors when this was discovered by the Essentia Health pharmacists

Page 62

about the temperature logs.

BY MR. VON KLEMPERER:

Q.     The concern was brought to -- sorry.
Strike that.

       Who brought the concern to Dakota Clinic
after the discovery of the logs?

A.     I do not -- I would be guessing at the
exact details, but it was Innovis had brought
that to the attention of -- to the Dakota
Clinic Pharmacy.

Q.     You don't know who at Innovis brought
that to Dakota Clinic Pharmacy?

A.     I would be guessing right now.

Q.     Okay.  And do you know who at Dakota
Clinic Pharmacy that was brought to?

A.     I would be guessing right now.

Q.     So you were not involved in that
process?

A.     I was involved with the process.
Answering your question did I believe I heard
who delivered the information to at Dakota
Clinic Pharmacy, I just don't recall exactly
who did that.  I was involved with the process.

Q.     What was your involvement in that
process?

Page 63

A.      That it was brought to my attention through Maari Loy, a pharmacist employed by Essentia Health, that through the -- bringing back into Innovis the -- if I may use the term inventory of stored medications, part of that collection was the log -- were the logs of the temperatures, and she discovered that there were gaps in the logs.  And that was brought to my attention through Maari Loy.

Q.      And then you mentioned that this information was brought to Dakota Clinic, correct?

A.      That is correct.

Q.      And -- but it wasn't you that brought that information to them, correct?

MS. LORD:  I'll object to form.

THE WITNESS:  What I stated was that I do not recall exactly who delivered that to Dakota Clinic Pharmacy.

BY MR. VON KLEMPERER:

Q.      Do you recall whether you were the person who brought that to them?

MS. LORD:  Object to form.

THE WITNESS:  I had a conversation with Laura that.

Page 64

BY MR. VON KLEMPERER:

Q. Were you done?

A. Yes.

Q. Okay. So you mentioned you had a conversation with Laura. Do you know when that was?

A. I do not recall the date.

Q. Was it shortly after Essentia discovered the temperature log issue?

A. I do not recall the date. I would not like to guess.

Q. And who else was present for that conversation?

A. I believe it was just between her and I, to my memory.

Q. And what do you recall from that conversation?

A. My recollection was to acknowledge that it's been brought to my attention that there were gaps in the temperature log, and that we would need to research the potential excursion of the medications and see -- determine what, if anything, we needed to do.

Q. And what was her response to that information?

Page 65

A.    To my memory, is that they follow the guidance of the North Dakota Board of Pharmacy, and I believe that they follow all the regulations of the Board of Pharmacy.

Q.    That's what you recall her telling you?

A.    To my memory right now, that would be a summary of the conversation.

Q.    And did you have any response to that from her?

A.    I just acknowledged and said I understood that we would need to follow our process to that -- to make a determination if there was any concern at all on that -- of any potential excursion.

Q.    And did she respond to that further?

A.    I think it was just -- to my memory, it was understanding.

Q.    Okay.  How long do you recall this conversation taking place?

A.    To my recollection right now, if I remember, it was brief.

Q.    Was that conversation in person?

A.    To my memory, it was.

Q.    After that conversation, did you have any other conversations with Ms. Morris about

Page 66

the temperature logs or the excursion issue?

A.     I would not want to guess.

Q.     You don't recall any other additional conversations?

A.     I do not remember at this time.

Q.     That conversation that you just mentioned, did Ms. Morris bring her newborn baby to that conversation?

A.     I don't recall.

Q.     Do you recall having a conversation with Ms. Morris where she brought a newborn baby?

A.     I've met her family.  I don't recall if it was during that meeting or not, but I'd met her family before.

Q.     My question is more specific.  It's:  Do you recall ever having a conversation with her concerning the temperature logs or the excursion at which she brought a newborn baby?

A.     I do not recall.

Q.     And the conversation that you had with Ms. Morris, that wasn't a formally convened meeting of the board of governors of Dakota Clinic, correct?

A.     Correct.

Q.     Was the temperature log issue ever

Page 67

discussed during a formal board meeting of
Dakota Clinic?

MS. LORD:  Objection, asked and
answered.

BY MR. VON KLEMPERER:

Q.    You can answer.

THE WITNESS:  May I respond?

MS. LORD:  You can.

THE WITNESS:  Not that I recall.

BY MR. VON KLEMPERER:

Q.    And you don't recall the services that
Dakota Clinic Pharmacy was providing to Innovis
under the Shared Services Agreement ever being
discussed during any board meeting, correct?

MS. LORD:  Object to form.

THE WITNESS:  Could you rephrase the
question, please?

BY MR. VON KLEMPERER:

Q.    Were you familiar with the services that
Dakota Clinic Pharmacy was providing to Innovis
under the Shared Services Agreement?

A.    I was not aware of the Shared Services
Agreement upon becoming a director of Dakota
Clinic Pharmacy.

Q.    When did you become aware of the Shared

Page 68

Services Agreement?

A.    One, when this occurred, when it was brought forward to Maari Loy, I was not aware that we were -- that Innovis was storing medication.  Let me pause just a moment.  Could you ask the question again, please?

MR. VON KLEMPERER:  Can the reporter read back the last question, please?

THE COURT REPORTER:  One moment.

(Whereupon, the court reporter read back the previous question.)

THE WITNESS:  When this was presented -- when this was discovered that we had an agreement to have our medications being stored at Dakota Clinic Pharmacy.

BY MR. VON KLEMPERER:

Q.    So it was not until the temperature log issue was discovered that you became aware of Dakota Clinic's services that it was provided to Innovis regarding storing pharmaceuticals?

A.    I don't want to guess at the exact date or time.  There was another occasion where I became aware of it, but I don't remember the timing of it.

Q.    But this -- the discovery of the

Page 69

temperature logs is when you first learned that Dakota Clinic was storing pharmaceuticals for Innovis, is that right?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I was not -- until the --  this was brought to my attention, I was not aware that we were storing -- that we had an agreement to store the medications at Dakota Clinic Pharmacy.

BY MR. VON KLEMPERER:

Q.    Okay.  So it's safe to assume then that that subject was not discussed during board meetings that you were a participant in prior to that time, correct?

MS. LORD:  Object to form.

THE WITNESS:  Not that I recall.

BY MR. VON KLEMPERER:

Q.    You don't recall that topic being discussed at board meetings?

A.    Not that I recall.

Q.    Okay.  Do you recall a board meeting for Dakota Clinic in February of 2021?

MS. LORD:  What was the date you gave, Mike?

Page 70

MR. VON KLEMPERER:  February -- on or about February of 2021.

MS. LORD:  Object to form.

THE WITNESS:  I'd need more specific information.

BY MR. VON KLEMPERER:

Q.     I'm going to introduce Exhibit 77.

(Exhibit Number 77 marked for identification.)

BY MR. VON KLEMPERER:

Q.     Let me know when you have that in front of you.

A.     (Views document.)

Q.     This is an email.  The Bates number is EH044386.  This is an email that you sent to several of your colleagues at Essentia Health, correct?

MS. LORD:  Do you want to identify the page?

MR. VON KLEMPERER:  I did.

MS. LORD:  Oh, pardon me.  There we go.  Thank you.

THE WITNESS:  I have that in front of me.  Can you ask the question again, please?

BY MR. VON KLEMPERER:

Page 71

Q.      This is an email that you sent on February 8th of 2021 to a group of your colleagues at Essentia Health, correct?

A.      (Views document.)  Correct.

Q.      And the first line reads, "I just saw an invite come across for the Dakota Clinic Pharmacy Board meeting."

        Did I read that right?

A.      Yes.

Q.      So does this help refresh your recollection of there being a board meeting for Dakota Clinic Pharmacy on or about February of 2021?

A.      This acknowledges that there is a board meeting request.  It doesn't -- I don't know if the board meeting occurred.  I do not have that in front of me.  This does acknowledge that I saw a request come through on my calendar for a meeting.

Q.      Who would regularly send a meeting invite for the Dakota Clinic board meetings?

A.      To my memory, this would have come from the Dakota Clinic Pharmacy owners.

Q.      Do you recall specifically the individual?

Page 72

A.    I do not.

Q.    When was the last board meeting that you attended?

A.    I do not have the date.  To my memory, it would have been the last board meeting where Rob was resigning his position, his ownership of Dakota Clinic Pharmacy.

Q.    Do you have any approximate recollection of when that was?

A.    I do not.

Q.    Was it this year or...

A.    I'd be guessing.

Q.    Okay.  And for that last board meeting, do you remember receiving the invitation to attend it?

A.    As a clarification, my invitations are by meetings being put on my calendar.  That would be my interpretation of an invitation.  And so --

Q.    And do you know --

A.    -- that would be a calendar on my -- meeting request on my calendar for a meeting for the Dakota Clinic Pharmacy board.

Q.    Okay.  And when meetings are added to your calendar, does somebody usually send out

Page 73

an invite for that to happen?

MS. LORD:  Object to form.

THE WITNESS:  Meetings can get on my calendar in many forms, sometimes automatically, sometimes by the request of my executive assistant to schedule.

BY MR. VON KLEMPERER:

Q.    Continuing on in your email, Exhibit 77, you continue, "I do not know if we requested this meeting, or not.  Regardless, we need to meet to discuss the current state of the lawsuit, the current state of the operations, ownership, EPIC, and 32nd Ave operations."

Did I read that correctly?

A.    Yes.

Q.    Do you recall having a board meeting for Dakota Clinic in which those topics were discussed?

A.    I do not want to guess.

Q.    You don't recall?

A.    I do not want to guess.

Q.    Well, I'm not asking if you want to guess --

A.    No.  I do not recall.

Q.    Okay.  Do you recall having a

Page 74

preliminary meeting before the board meeting with the recipients of this email to discuss those topics?

A.    I cannot recall.  I just don't recall.

Q.    Okay.  What did you mean when you wrote "the current state of the lawsuit"?

A.    This is a request of our -- this email was a request for our team to get together to understand where we were relative to the lawsuit so that I was -- that we were all up to speed understanding where it was, just asking for an update.

Q.    Okay.  There was nothing specific happening that you were aware of that you wanted to discuss?

A.    No.

Q.    Okay.

A.    Just wanted to get an update.

Q.    What did you mean when you wrote "the current state of the operations"?

A.    I don't recall anything specific around that.  That would be more of just a generalized question.

Q.    Was it the operations of Dakota Clinic that you wanted to discuss?

Page 75

A.      No.

Q.      And now why are you so certain that it wasn't?

A.      Given I'd be -- I would be guessing on that particular statement --

Q.      Okay.

A.      -- on the intent at that time.

Q.      So you don't recall what you meant by "the current state of operations"?

A.      At that time -- I don't recall at this time.

Q.      What did you mean by "ownership"?

A.      I would be guessing.  But I believe it was at the time when there was a change in their ownership of retirement, if I remember correctly.

Q.      Dakota Clinic's ownership?

A.      Individual ownership within Dakota Clinic Pharmacy.

Q.      And why is that something you would want to discuss?

A.      Just as a matter of process because there were two physicians that were owners and one was retiring.  Again, I'd have to look at the dates, but...

Page 76

MS. LORD:  I think you said "physicians."  Did you mean pharmacists?

THE WITNESS:  Apologize.  Yes. Pharmacist.  Pharmacists.  Thank you.

BY MR. VON KLEMPERER:

Q.     This email indicates that you want to have a conversation with this group of individuals who are Essentia Health employees regarding these topics, correct?

A.     That was my -- that was the ask of this email, is that we would have a discussion ahead of the meeting, ahead of time, yes.

Q.     And why did you want to discuss the Dakota Clinic Pharmacy ownership with this group of individuals?

A.     It was to bring awareness of that -- if I recall, that Rob was looking at retiring, and just to make sure that they were aware of his retirement.

Q.     Why did you think it was significant or necessary to update these individuals about that subject?

A.     Information.  We have ownership interest in it.  And Dr. Heegaard at that time was a west market president.  And at that time Kyle

Page 77

Dorow was still employed with us. So I just wanted to make sure having discussion about our interest in Dakota Clinic Pharmacy. I would just consider that that's my standard work.

Q. Given the ownership interest that Essentia has in Dakota Clinic, you wanted to keep them updated about things that were happening at Dakota Clinic, right?

MS. LORD: Object to form.

THE WITNESS: On the ownership. Not what's happening at Dakota Clinic, but just the fact that one of the owners was retiring, if I remember correctly.

BY MR. VON KLEMPERER:

Q. And you wanted to keep them updated about that, right?

A. Correct.

Q. What did you need to discuss about Epic?

A. If Dakota Clinic Pharmacy wanted to move to Epic, it would require an investment as a general statement. And so if that were to come up, both parties would have to agree on the investment to employ Epic, which is the electronic medical record.

Q. So is that something that had been

Page 78

brought to your attention, that Dakota Clinic Pharmacy wanted to start using Epic?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Outside of the board function, operations of 32nd Avenue and other operations we have Epic.  And Dakota Clinic Pharmacy uses a different medical record.  And so independent of the board -- there had been discussions independent of the board by operations if there'd be an opportunity or an appropriate [unintelligible] EMR for the -- for our patients' continuity of care between pharmacy and our operations.

BY MR. VON KLEMPERER:

Q.    But this is a topic of conversation that was occurring within Essentia's operations department?

A.    We had from time to time had that discussion.

Q.    And were those discussions coming about as a result of a request from someone at Dakota Clinic, or was it your idea?

A.    From an operations standpoint and outside of the board, there's then general

Page 79

discussion, nothing specific, nothing definitive, about moving towards Epic because of the cost to Dakota Clinic, et cetera.  But as a general statement, it wasn't unilateral from Essentia Health that we wanted Epic or didn't want Epic.  It was:  How do we continue to provide integrated care to our patients?

Q.    And I'm just trying to determine:  Is that an idea that you folks came up with internally at Essentia, or was there someone from Dakota Clinic that approached you and said:  We'd like to integrate with Epic?

A.    I recall a discussion with Laura outside of the board when I was filling one of my prescriptions for my family, and just a generalized statement:  We may -- she stated: We may need to consider -- may like to consider moving into Epic.  And my response was:  Happy to look into that.  And I believe my response was:  Just as a reminder, we have to consider what that investment looks like from both parties.  It was a very short discussion.

Q.    Okay.  And that's what prompted this whole consideration of whether or not Dakota Clinic could be incorporated into Epic?

Page 80

MS. LORD:  Object to form and foundation.

THE WITNESS:  There was no discussion.  Again, my responsibility is to bring forward items that if there is a request to have a board meeting, what items we -- what we may want to bring forward or have an understanding of how we're working together.

BY MR. VON KLEMPERER:

Q.    Okay.  And was the decision made that Dakota Clinic would be integrated into the Epic system?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't recall -- if it made it to the agenda, I don't recall.  But as a statement, there was no -- there is no decision today that Dakota Clinic Pharmacy was -- is going on Epic.

BY MR. VON KLEMPERER:

Q.    So as we sit here today, they have not been incorporated into the Epic?

A.    That is correct.

Q.    Okay.  And do you recall if this topic was ever discussed at a Dakota Clinic board

Page 81

meeting?

A.    I do not recall.

Q.    All right.  And you used the phrase earlier "independent of the board" or "outside of the board."  What did you mean by that?

A.    I would have opportunity to be a customer of Dakota Clinic Pharmacy and/or -- and if I were -- have an opportunity to see Laura, who I would say hello to, and I'd just simply ask how things going, just general conversation.  So she would offer in general terms how are things going at the clinic as general conversation.

Q.    And you mentioned that you're a customer of Dakota Clinic in your personal life, right?

A.    Yes.

Q.    And you remain a customer today?

A.    Yes.

Q.    Do you trust them as a pharmacy?

        MS. LORD:  Object to form.

        THE WITNESS:  Yes.  They are our pharmacy under our health plan.

BY MR. VON KLEMPERER:

Q.    And you trust the services that they provide as a pharmacy then, correct?

Page 82

A.    Yes.  Pause if I may.  Does this -- do we to continue this to be up on the screen, Mike?

Q.    I'm just looking.  You can leave it up for a moment, and I'll let you know.

A.    Thank you.

Q.    What did you mean when you said "...we need to discuss 32nd Ave operations"?

A.    There are certain operations inside of a hospital -- not just specifically to Essentia, but in hospital in general where there are pharmacy services that are provided to inpatients, patients leaving our stay.  And independent of Dakota Clinic Pharmacy, we're reviewing how can we serve our patients better by providing certain pharmacy refills, et cetera, upon leaving -- being discharged and returning home.

Q.    How does that relate to the statement that you need to discuss 32nd Ave operations?

A.    There are many ways to provide that internally or through -- or potentially it could have been -- could be provided through Dakota Clinic Pharmacy as an independent provider.

Page 83

Q.     And that was the subject matter that you wanted to discuss when you mentioned 32nd Avenue operations?

A.     Internally, that's correct.

Q.     Okay.  Do you remember the ultimate decision you went with on that issue?

A.     There still has not been a decision on that issue.

Q.     Okay.  But this was a topic of discussion in 2021, correct?

A.     Internal with our group.

Q.     And there's still no decision?

A.     Correct.  There is a -- that's correct.

Q.     Do you interact with Dakota Clinic Pharmacy in any capacity in your day-to-day job functions?

A.     No.

Q.     What about in the 2017 to 2020 time frame?

          MS. LORD:  Object to form.

          THE WITNESS:  I wasn't employed until November of '18.  I believe, Mike, you said 2017, is that correct?

BY MR. VON KLEMPERER:

Q.     Yes.

Page 84

A.    Yep.  As a day-to-day operations, I do not recall anything that I would have interacted with to my knowledge, to my recollection.

Q.    Okay.  You're familiar with Laura Morris, though, correct?

A.    Yes.

Q.    And do you have any opinions about her?

A.    Could you be more specific in your question, please?

Q.    Do you believe she's an honest person?

A.    Yes.

Q.    And you're familiar with Rob Haskell as well, correct?

A.    Yes.

Q.    Do you recall any meetings between yourself and Mr. Haskell concerning the temperature logs and the excursion issue?

MS. LORD:  Object to form.

THE WITNESS:  Not to my recollection.

BY MR. VON KLEMPERER:

Q.    The meeting that you mentioned earlier with Ms. Morris where you discussed the temperature log issue and you brought that to

Page 85

her attention, was that documented in any way in writing?

A.    Not to my recollection.

Q.    Okay.  And was it your decision to have that meeting?

A.    It was, again, as we met as a collective group within Essentia Health, it was determined that we needed to let Dakota Clinic Pharmacy know the process that we were taking.

Q.    Okay.  And do you recall who made that recommendation or made that decision?

A.    It was a collective within the group to my understanding, to my memory.

Q.    Okay.  And do you know why you were selected as this messenger to go have that conversation?

        MS. LORD:  Object to form.

        THE WITNESS:  Through my role as the chief operating officer for the west market, that would have been my responsibility to provide that to her.

BY MR. VON KLEMPERER:

Q.    Okay.  What about your role as the chief operating officer would make that your responsibility?

Page 86

A.    The medications and the potential excursion were part of the services provided to the patients of the west market.

Q.    And that ultimately falls within your purview as COO?

A.    As a general statement, yes.

Q.    Okay.  And were there other instances in your role as COO where you had to go to Dakota Clinic and discuss an issue or a problem that you'd been made aware of?

A.    Not that I recall.

Q.    And I believe you may have already addressed this, but other than the one meeting you mentioned with Ms. Morris, you're not -- you don't recall any other meetings with her or Mr. Haskell regarding the temperature excursion or the temperature logs, right?

          MS. LORD:  Object to form.

          THE WITNESS:  Not any formal meetings, no, not that I recall.

BY MR. VON KLEMPERER:

Q.    Okay.  So you believe that you had all the information that you needed from Dakota Clinic?

          MS. LORD:  Object to form.

Page 87

THE WITNESS:  The purpose of the meeting wasn't -- the purpose of the meeting was just to acknowledge of what we were moving forward with, to my recollection.  It was not whether or not there's information that was necessary or gathered from or needed from Dakota Clinic Pharmacy.  That wasn't my role.

BY MR. VON KLEMPERER:

Q.    Whose role was that?

MS. LORD:  Object to form.

THE WITNESS:  Once this process took place, I do not want to guess on who was delegated to contact Dakota Clinic Pharmacy.

BY MR. VON KLEMPERER:

Q.    Do you know if there is any individual who was delegated that responsibility?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Not that I recall.

BY MR. VON KLEMPERER:

Q.    You don't recall one way or the other whether there was a person who was delegated that responsibility, correct?

MS. LORD:  Object to form and foundation.

Page 88

THE WITNESS:  I do not recall.

BY MR. VON KLEMPERER:

Q.    Okay.  And you're not aware of any other person from Essentia going and having other meetings with Ms. Morris or Mr. Haskell about the temperature logs or the excursion, right?

MS. LORD:  Object to form.

THE WITNESS:  Again, not that I recall.

BY MR. VON KLEMPERER:

Q.    Okay.  Do you recall any discussions internally in which the -- you considered going to Dakota Clinic to obtain more information from them?

A.    I would not want to guess at that.

Q.    You don't recall any such discussions?

A.    I do not recall.

MR. VON KLEMPERER:  Angie, is this a good time for a break?

MS. LORD:  Sure.  What are you thinking on timing?

THE COURT REPORTER:  Should we go off the record?

MR. VON KLEMPERER:  Yes.

THE VIDEOGRAPHER:  We are going off

Page 89

the record.

The time now is 11:31.

(Off the record 11:31 to 11:43.)

THE VIDEOGRAPHER:  We are back on the record.

This is the Media Number 3.

The time is 11:43.

BY MR. VON KLEMPERER:

Q.    Welcome back.  As a byproduct of the temperature excursion in this case, Dr. Herman asked you to review Essentia's refrigeration equipment and monitoring systems Essentia-wide, correct?

MS. LORD:  Object to form.

THE WITNESS:  Yes.

BY MR. VON KLEMPERER:

Q.    Do you recall if he made that request to you verbally or in writing?

A.    Verbally.

Q.    Okay.  And what do you recall about that conversation with him?

A.    It was in the context of our organization moving to an operating company and that we're the -- that started before I joined Essentia Health and was continuing.  And it was

Page 90

just acknowledged that this is one of the opportunities to continue in that standardization across the organization.

Q.    Anything else that you recall about that conversation?

A.    Not specifically.

Q.    And that project was called the one Essentia fridge project, correct?

MS. LORD:  Object to form.

THE WITNESS:  I don't have the document in front of me.  I'll assume that's accurate.  I do not have that in front of me.

BY MR. VON KLEMPERER:

Q.    Did you have another name in mind for that process?

A.    No.

Q.    Okay.  And how about -- how did you go about completing that project?

A.    Well, my role was to provide oversight from a systems standpoint to review the standardization of refrigeration of patient-facing product, could be blood, could be tissue, et cetera, across the organization. And so the standard work that I would do is to lead that and bring those individuals together

Page 91

that would have the expertise or knowledge as we walked through the organization, not just in the west market, but in the -- Essentia Health at large.

Q.    And what steps did you take as part of that oversight that you were providing?

A.    At the beginning, collected, to my knowledge, the right individuals on the front end of the project, and we added others, for collaboration, transparency and reporting to determine the current state of our equipment for refrigeration, all the opportunities, look at the current state of inventory of that equipment and then recommendations for -- that the equipment was in good stead or maybe in consideration for replacement.  Also looked at the different ways in which automation could be utilized for best practice for notification of any changes in temperatures.

Q.    And are you a subject-matter expert on refrigeration of temperature-sensitive pharmaceuticals?

A.    No.

Q.    All right.  Did you bring in subject-matter experts with expertise in that

Page 92

topic?

A.    I brought in our leaders that are leading our organization to either know what the expectation is or are depending on the product or to bring someone else in if necessary.

Q.    And who were those leaders that you brought in?

A.    So the example would have been -- under pharmacy, that would have been Maari Loy, Tony Kaufenberg to lead that. And then under their responsibility as an example might be the blood lab. It might be storage of tissue, those things that are under their responsibility as a pharmacy leaders of the organization as an example. And then they would have that knowledge either because of their experience and education, or they would bring in an expert of that product for storing to give guidance to what particular equipment would be needed.

Q.    Any other subject-matter experts that you recall bringing in as part of this project?

A.    Not that I recall relative to the refrigeration per se. We did look at different vendors relative to the monitoring equipment

Page 93

commonly referred to as the alarm system, but the monitoring equipment for the temperature controlling, monitoring the temperatures for each of the units.

Q.    Okay.  Was there a subject-matter expert within Essentia who you talked to about the monitoring equipment topic?

A.    I'd say there's a -- there was leadership within Essentia that provided the current state and what we're doing today across Essentia.  And then they would have been charged to either determine what is best in practice or bring in someone to -- or bring in an entity to make recommendations what is the right -- what is an opportunity for us to consider.

Q.    And who were those people that you're referring to?

A.    In the monitoring for current state, it would have been the -- commonly known as IS or information services, where at this time that fell under their responsibility because it was a technology, as well as facility leadership, as there are certain technologies within facility controls, such as controlling HVAC

Page 94

systems, et cetera.  They also have controls
that have the ability to control these things
within the newer facilities.  So I recall
having two bodies of leaders, both facilities,
as well as IS to lead and bring in new and
current inventory and also recommendations with
pharmacy and others for what we should do to
keep the current state or to change.

Q.    Okay.  Do you remember the individuals
from IS and facilities that were --

A.    As I recall, Chuck Robbins would have
been the individual that was on the IS side.
And Dan Beauchamp would have been the
individual on the facilities side, as I recall.

Q.    And you mentioned that one of the things
you were looking at was the current state of
the equipment.  How did you go about looking at
the current state of the equipment?

A.    The, of course, damages to separate
patient product from any -- what I will call
common use or staff use.  So making sure that
if we had patient product that -- absolutely
that was the case that there was a -- if that
was any unit or department, that that had a
separate refrigeration.  And then if there was

Page 95

a product in that department, then we would determine what product -- that the team would determine what product that we would normally store in that department.  And then given that, was the refrigeration that's currently being used and monitored and does that meet the standards with -- from the regulatory bodies that were governed by, as an example, a Joint Commission or any other regulatory body.

Q.    And so what was the actual process of going about gathering that information?

A.    Those individuals were charged to determine throughout all of Essentia where -- as I just mentioned, where all of our inventory lived.  So it was a very in depth, very broad but very discrete process to determine what our inventory was across all of Essentia.

Q.    And are there certain records that were used as part to determine that information?

MS. LORD:  Object to form and foundation.

THE WITNESS:  They as teams that went out to collect this -- collected an inventory by site.  And they would have had put those into a record in a -- using some

Page 96

application to determine by unit by location what's in there and what -- and what product was being stored there, to my remembrance.

BY MR. VON KLEMPERER:

Q.    Okay.  So the site-by-site inventory, is that something that your team was creating as part of this process, or was that something that they were just collecting when they went to each site?

MS. LORD:  Object to form and foundation.

THE WITNESS:  They would have collected it to determine current state.

BY MR. VON KLEMPERER:

Q.    Okay.  And what was -- you mentioned working with the facilities leadership.  What was facilities' role in this project?

A.    Facilities' role in this project was, again, to determine throughout all of the Essentia facilities in which we had the opportunity or need to store refrigerated items for our patients, where they were -- where these -- what equipment was located there, what was the equipment and how it was being monitored, whether it was manual or automated,

Page 97

and if it was automated, how was it -- what application or software was being used to automate it.

Q.     Okay.  And what kind of records did you create as part of the project?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I'd lean back to the records that I don't have in front of me.  But they collected information, created a document, to my remembrance, that -- as I stated earlier, that would tell the team -- bring back to the team that information that was requested for current state.

BY MR. VON KLEMPERER:

Q.     I'm going to introduce Exhibit 78.  Let me know when you have that.

(Exhibit Number 78 marked for identification.)

BY MR. VON KLEMPERER:

Q.     For the record, this is EH031257 through EH031261.  Are you familiar with this document?

A.     (Views document.)  I am.

Q.     What is this document?

A.     This document is an overview using the

Page 98

standard reporting -- using the SBAR, situation, background assessment and recommendation, for a specific purpose.  And this purpose was to look at the refrigeration and temperature monitoring throughout the system.

Q.   Okay.  And does this memo summarize your findings and recommendations as part of the one Essentia refrigerator replacement and temperature monitoring project?

MS. LORD:  Object to form.

THE WITNESS:  For -- could you repeat the question again, please?  Apologize.

BY MR. VON KLEMPERER:

Q.   Does this document summarize your findings and recommendations as part of the one Essentia refrigerator project?

A.   This was a -- presented as an overview of the current findings.  There was more work to be done, but this was an overview of the current findings as of that date.  And just as clarity, we were still under the potential temperature excursion for the refrigerations' medications.

Q.   So is it your understanding that there

Page 99

is a later version of this document?

MS. LORD:  Object to form.

THE WITNESS:  This was the initial recommendation that was provided to give -- to give guidance for the entire project.  And as you can see under Next Steps, based on the information that was provided, there would be a follow-up to my direct report and then to presentation to the EHLT with a final recommendation, and then to primary care EMG, which is the Essentia medical group, with implementation.  The purpose of this document was to bring forward an overview with some potentially -- potential opportunities with potential further recommendations to follow.

BY MR. VON KLEMPERER:

Q.    Are you aware if there were any additional recommendations that followed this document?

A.    I don't have the document in front of me, nor have I reviewed it -- reviewed this a long time ago.  But from my recollection, this -- these next steps were completed with an updated SBAR relative to an implementation plan, as it's located -- as it's stated here.

Page 100

Q.      So it's your understanding that after the four items listed in Next Steps were completed, there was an updated SBAR document created, is that right?

A.      To be clear, this was a high-level overview of the equipment and monitoring.  And then what was asked for from the presentation was to follow up with these four items.  So to my recollection, there was a document out there, I don't have it in front of me, but that would have -- for the next steps.

Q.      What's your understanding of what that document reflected?

                MS. LORD:  I'll object to the form and foundation.

                THE WITNESS:  I do not want to guess on that document.  I do not have it in front of me.  I'd like to review that document.

BY MR. VON KLEMPERER:

Q.      Okay.  But you're aware that there's some document that was created after this one regarding this project, correct?

A.      There was information provided that was including this information as laid out for the next steps on 1 through 4.

Page 101

Q.    And that was reflected in separate documents?

A.    Again, I don't want to guess at that.  I know that this document was the foundation.

Q.    And you described this as a high-level overview.  Is there a more detailed document concerning this -- the recommendations in this project?

A.    Again, I do not want to guess at that.

Q.    You don't recall --

A.    I do not recall the document at this time.

Q.    And how would you go about determining whether there was a more detailed document created as part of the project?

A.    The scope of this document, as I recall, was to present this to Jodi Mansfield and this team as listed here to review this document.  And then from this document, present to EHLT and then to primary care and that EMG for -- and then implementation.

So as I stated, this is the framework of the situation, background, assessment and recommendation.  And then after presenting this to Jodi Mansfield with this team, then next

Page 102

steps would have been taken.

Q.    And those next steps are numbers 2, 3 and 4 listed here on the last page?

A.    Yes.

Q.    And would an updated SBAR document have been created for each step of that process?

A.    Again, I do not want to guess at that.

Q.    Would that have been --

A.    This is the document that was to be presented to Jodi Mansfield for review and consideration.

Q.    Okay.  In your experience, would that have been your standard practice, to create an updated SBAR document?

MS. LORD:  Object to form and foundation.

THE WITNESS:  The standard work is to have this reviewed.  Again, we did this in a very collaborative way throughout the entire system.  So she would review this with the input of those that participated in it to agree with this and/or any modifications to it.

BY MR. VON KLEMPERER:

Q.    And my question is:  If it was modified, would it be your standard practice to then

Page 103

update the SBAR document to reflect those modifications?

MS. LORD:  Object to form.

THE WITNESS:  If there were modifications to this, they would have been made prior to the EHLT.  But as a statement, I do not recall if there were any.

BY MR. VON KLEMPERER:

Q.    You don't recall if Ms. Mansfield made any modifications?

A.    I do not recall at this time.  I do not want to guess.

Q.    Okay.  And what does EHLT stand for?

A.    Essentia Health Leadership Team.

Q.    Okay.  And do you recall the presentation of this to Ms. Mansfield?

A.    I do.

Q.    Okay.  And what do you recall about that presentation?

A.    As it states, just presenting the findings for the -- overview of findings, as is stated here in this document, and what the recommendations would be if agreed to.  And then subject to this approval, then how would we move forward with resources and

Page 104

implementation.  And, again, as a collective team, this would be the team that was mutually presenting at that time to Ms. Mansfield.

Q.    And the team that you're referring to are the folks listed there in Next Steps under 1, "Present SBAR to Jodi Mansfield"?

A.    That was the plan, correct.

Q.    Okay.  And other than what's reflected in the document itself, do you have a recollection of that presentation?

A.    No other recollection than I just stated.

Q.    Okay.  And then did you go on to present it to EHLT?

A.    My understanding, to my recollection, the answer is yes.

Q.    Do you have any recollection of that presentation?

A.    Not specifically, no.

Q.    And do you recall as either -- as part of either of those presentations, did you create a PowerPoint or anything of that nature?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't recall.

Page 105

BY MR. VON KLEMPERER:

Q.    And do you recall presenting this proposal to the primary care EMG?

A.    I do not recall.  That would not -- that would have been not my role.  This primary care EMG is a clinical group.

Q.    What is primary care EMG?

A.    That's the medical group of Essentia Health.  So they've been a -- that's a subset of primary care leaders within Essentia Health.

Q.    And you believe that if such a presentation was made, it would have been made by someone else?

A.    It would have been presented as a collaborative.  I just don't recall who would have presented that.

Q.    But it wouldn't have been you?

A.    I do not -- not as a presentation, no. I would have been part of the -- as a resource or as support of it.

Q.    The final entry here under Next Steps is "Implementation."  Do you recall if any documents were created as part of that implementation process?

A.    I don't recall the documents that were

Page 106

used for implementation.

Q.      The proposals were ultimately implemented, is that correct?

            MS. LORD:  Object to form.

            THE WITNESS:  The proposals that were approved were implemented, yes.

BY MR. VON KLEMPERER:

Q.      And were those proposals, the one -- the three entries under Recommendation on the second to the last page of the document?

A.      This was, again, the original draft of the recommendation.  I do not have the final one in front of me that was finalized.  The framework of refrigeration units, monitoring system, oversight are consistent, yes.  What we chose to replace, we reviewed very carefully as we moved forward by each location to make sure that we were covering all of the refrigeration units that needed to be replaced.

Q.      Okay.  And it's your understanding that this is not the final draft of the proposal?

A.      This is the draft that was presented to Jodi Mansfield.  I do not recall if there was an updated draft after the meeting.

Q.      Okay.  Do you recall if the

Page 107

recommendations that are listed here changed before the proposal was implemented?

A.    I don't recall that the recommendations were changed.

Q.    There's nothing that stands out to you as something that was rejected or changed in any way?

A.    Not to my knowledge.  Not to my recollection, excuse me.

Q.    Okay.  If you could scroll to the Background section, the first page.  The third bullet there reads, "CDC provides written expectations and guidance for the safe storage and monitoring of patient injectables and remains and blood products."

Did I read that right?

A.    Yes.

Q.    What are the CDC expectations and guidance that you're referring to there?

A.    I'm not the content expert on that.  I'd have to defer that.

Q.    So you didn't write that portion of this document?

A.    We had -- again, we had a collaborative input on these recommendations from clinicians,

Page 108

pharmacists and others that put this together, so this was a collective body of work.

Q.    Who would have been the person who would have added that statement to the -- this memo?

A.    This would come from our quality team, our pharmacy team and our CMO back -- those three groups working together.

Q.    And is there a particular member of the quality team that was working on this project with you?

A.    The quality leader on this team was Dan Collins.

Q.    Okay.  And what about the pharmacy team?

A.    That would be Dianne Witten, Dan Collins.

Q.    And you mentioned a CMO, is that the chief medical officer?

A.    Yes.  That would have been Dr. Vetter, also with giving guidance as a medical officer.

Q.    Okay.  And the purpose of this project was to evaluate gaps and best practices and Essentia's temperature-monitoring systems, is that correct?

          MS. LORD:  Object to form and foundation.

Page 109

THE WITNESS:  It was identify current state, and identify if any changes needed to be made or any replacement needed to be made or improvements needed to be made as stated in the beginning, I believe, current state of refrigeration across the system.

BY MR. VON KLEMPERER:

Q.    Okay.  I'll just direct your attention under the first entry under Assessment on the first page.  It reads, "This is the first system-wide inclusive inventory of refrigeration assets and monitoring.  The data collected uncovered information that was known in locations, but not shared as a system in order to evaluate gaps or best practices within and outside of Essentia Health.  The areas reviewed within 40-day window are refrigeration units, monitoring systems, process/policies/ education and oversight.  The inventory data is attached."

Did I read that correctly?

A.    Yes.

Q.    So it's correct that an objective of this project was to evaluate gaps and best practices for temperature monitoring, correct?

Page 110

A.    If any existed.

Q.    If any gaps existed?

A.    Yes.

Q.    Did you identify any gaps?

A.    It identified that there were certain refrigeration units that needed to be -- or were at the life cycle that should be replaced. We identified -- because we were moving from a holding company to an operating company -- opportunity for continued education on refrigeration.  Those would be two identified items.

Q.    And are those two items reflected in this document?

A.    This would be one within the refrigeration unit specifically.  Did not mean that the refrigerating units were not valid ones, just a variation of brand and type.  Did not mean that they were not necessarily storing them improperly or properly, just that there were variations from vendors, et cetera.

Part of our scope was to create a standardization of vendors as well so that ongoingly [sic], as we expanded the need for refrigeration or refrigeration units needed to

Page 111

be replaced, the departments or those areas of accountability would have a standard approach, know which refrigeration equipment to order through our supply chain, support services. That would be an example.

Q.      You mentioned that there was a transition between a holding company to an operating company.  What did you mean by that?

A.      Again, before I became employed -- and just from a health care integration, when entities are acquired by health systems, they can roll into systems in many different ways, one of those is a holding company, the other is integrating immediately.  Innovis was brought in under the model of a holding company.  And this, again, was before I came on board.  And so as Jodi Mansfield joined the organization, one of her charges were to integrate all of the entities, not only Innovis, but others that were joined into Essentia Health to be under an operating company model, which is to utilize data support services, resources, utilize standardization in contracting, utilize standardization in delivering quality, et cetera.  And that's the difference in

Page 112

general between a holding company and an operating company.

So this was one of the processes to be completed, and I was asked to lead that. And I believe this had already started prior to me joining. And I was just asked to, on behalf of the system, lead that to completion.

Q. You mentioned that Innovis was brought in in a holding company model. Was the holding company Essentia Health?

MS. LORD: Object to form and foundation.

THE WITNESS: I would like to defer that to our legal counsel to give a very -- a correctly framed answer to that. I just know that it was brought into the organization as a separate entity under -- underneath all of Essentia.

BY MR. VON KLEMPERER:

Q. It was operating essentially as a separate entity, and there was a process by which all of its systems and processes were aligned with what the rest of Essentia Health was doing, is that correct?

MS. LORD: Object to form and

Page 113

foundation.

THE WITNESS:  Again, I'd like to defer that to how they were brought in before I got here and the process of rolling that in.

BY MR. VON KLEMPERER:

Q.    Well, you've just testified to it. You're explaining this transition from the holding company model to the operating company model.  And I'm trying to understand what you mean by that.

A.    Yeah.  So from an operational standpoint, creating standard leadership work, creating standard utilization of support services such as supply chain management, peer contracting and many other types of services that are afforded through an integration or an acquisition.  That's what I'm referring to where operations would begin that integration. And that's what I mean by my role in this work here would be to integrate this particular body of work into the system so that all of operations had a standard uniform process.  And that's what I mean by moving towards an operating -- operations framework.

I just wanted to separate that from a --

Page 114

the legal construct of the entity structures, if that makes sense.

MR. VON KLEMPERER:  Perhaps we should pause here for lunch if that works for you and -- Angie, does that sound good?

MS. LORD:  Is that okay with you, Al?

THE WITNESS:  That sounds great, Mike.  Appreciate that.

THE VIDEOGRAPHER:  We are going off the record.

Time now is 12:27.

(Off the record 12:27 to 12:59.)

THE VIDEOGRAPHER:  We are back on the record.

This is the start of Media Number 4.

The time is 12:59.

BY MR. VON KLEMPERER:

Q.    Mr. Hurley, welcome back.  You understand that you remain under oath?

A.    Yes.

Q.    Okay.  Where is your office address?

A.    My office address is currently at 32nd Avenue in Fargo.  The address is 3800 32nd Avenue.

Page 115

Q.    Okay.  And has that been your office location throughout your time at Essentia?

A.    I've had two different offices.  One was at South University as well as the one that I'm currently at, at 32nd.

Q.    Okay.  And when did you make that move?

A.    It was during this last six months.

Q.    Okay.  So until about six months ago you were at the South University location?

A.    And at 32nd.  I had two different -- I had two offices.

Q.    Concurrently?

A.    And currently I'm at one, which is at 32nd.

Q.    No.  I mean, you had two offices concurrently at the same time?

A.    Yes.  Oh, I'm sorry.  Concurrently, yes.  Yes.

Q.    Okay.  Do you still have Exhibit 78 in front of you?

A.    I do not.  I'll need to open that.  I have that open.

Q.    Okay.  I'll direct your attention to the first paragraph in the Assessment row.  We read this earlier, but just to read the final

Page 116

sentence of that, it reads, "The areas reviewed within the 40-day window are refrigeration units, monitoring systems, process/policies/education, and oversight.  The inventory data is attached."

What is the 40-day window that's referenced there?

A.    We just set an expected time frame to have the inventory of current state completed.

Q.    And that 40-day window was completed by the time this SBAR was created on May 6, 2020?

A.    Yes.

Q.    Okay.  And were the documents, such as the policies that you collected as part of that process, collected in some centralized location?

A.    I'm not certain.  I do not want to guess at that.

Q.    You don't recall whether that was the case or not?

A.    I do not recall.

Q.    Do you recall that documents were collected as part of the process?

A.    Yes.

Q.    And do you have any memory of where they

Page 117

were stored?

A.    I do not.

Q.    Would you still have access to those documents?

A.    I'm not aware of that.

Q.    You just don't know one way or the other?

A.    No.

Q.    What fridges and freezers did you look at as part of the project?

A.    Again, when I -- I provided oversight, so I did not look at the fridges or freezers.

Q.    You mean that you personally didn't go and inspect them?

A.    No.

Q.    Okay.  But do you have an understanding of what fridges and freezers were inspected by others as part of this project?

A.    Yes.  The scope was to review those that were being utilized for patient-facing products.

Q.    And what is a patient-facing product?

A.    Medication for immunization as an example, blood products as an example, tissues as an example.  Those that would be for patient

Page 118

use or of a patient.

Q.    So what type of fridges would fall outside of that classification?

A.    Refrigerators used in break rooms for staff use only.

Q.    Like staff lunches and things like that?

A.    Correct.

Q.    Okay.  Any other examples of fridges that would fall outside of that category?

A.    Not that I'm aware of.

Q.    Okay.  There's then a heading below the language I read just now that reads Refrigeration Units.  It reads, "Across the Essentia footprint, there is variation is refrigerators and freezers for the proper use to store medications, patient food, lab specimens and other items necessary for patient care.  Not all these units are medical grade for storing needed patient care materials mentioned above.  In addition, there are units that are functioning inadequately."  And then the next bullet continues, "The accountable oversight for the refrigeration units is unclear."

What did you mean by, "The accountable

Page 119

oversight for the refrigeration units is unclear"?

A.    The -- as mentioned earlier, the system which has -- as an example, that has the electronic monitoring could fall under a facilities because it's part of the building electronic-monitoring system and that's appropriate.  And we just wanted to clarify that in every area that there is a refrigeration unit that's patient facing, that there's clarity to who is accountable for the monitoring, and therefore have that standardized or have that understood at every location.

Q.    And at the time that you conducted this investigation, that oversight was unclear, correct?

          MS. LORD:  Object to form and foundation.

          THE WITNESS:  It wasn't well documented.  It was being performed, it just wasn't well documented.

BY MR. VON KLEMPERER:

Q.    And what steps did you take to address that, if any?

Page 120

A.      Just added clarity for the departments that have patient-facing refrigeration and leadership at that location to have the accountability for the refrigeration.

Q.      So you provided clarity on who had the responsibility for that oversight as part of this project, is that correct?

A.      That's correct.  And/or pharmacy, again, depending upon where it was stored and what was being stored.

Q.      And what was the clarity that you provided as part of that?

A.      As just mentioned, that the units -- the department units that have refrigeration for patient-facing product would be monitored and -- by the leaders in those departments, or depending on what was being stored, it would be on the oversight of lab or pharmacy.  So it would be three different...

Q.      And how was that different from how the oversight was before you made those changes?

MS. LORD:  Object to form and foundation.

THE WITNESS:  In most cases, it was clarification and clarity and documentation of

Page 121

that.  And in some cases, depending upon the electronic monitoring, as mentioned before, whether or not it would stay with facilities on the monitoring or if it was going to be transferred to the department depending upon what monitoring system we chose to have in that department.

BY MR. VON KLEMPERER:

Q.    Can you turn to page 3, please?

A.    Am I on page 3?

Q.    It's got what looks like a pie chart at the top?

A.    Yes.

Q.    Was this pie chart originally in color when you created it?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't recall.

BY MR. VON KLEMPERER:

Q.    Okay.

MR. VON KLEMPERER:  Well, Angie, we're going to ask that you produce a color version of this because it's clear it's not possible to understand this document without a color version of it.

Page 122

BY MR. VON KLEMPERER:

Q.    Do you have an understanding of what the numbers on the pie chart correspond to?

MS. LORD:  I'll object to form and foundation.

MR. VON KLEMPERER:  This is a document he created, Angie.  So I'm asking him what his understanding --

MS. LORD:  I don't know that that was established, but I think he said it was collaborative.

THE WITNESS:  Respond?

MS. LORD:  If you can.

THE WITNESS:  This would have been provided in this document by those that are -- that were either knowledgeable or familiar with the equipment and how they're being stored, that would be their responsibility to provide that information on this document for recommendation.

BY MR. VON KLEMPERER:

Q.    You're listed as the author of the document on page 1, correct?

MS. LORD:  Object to form.  Page 1.

THE WITNESS:  Oh.  On page 1.

Page 123

Sorry.  It's put together in collaboration.

BY MR. VON KLEMPERER:

Q.    But you're listed as the author, correct?

A.    It is listed in this document as author through collaboration of the team.

Q.    If you could go back to page 3.  It reads there about halfway down Monitoring Systems.  And the first bullet reads, "Excursion reports by location were not easily accessible."

Did I read that right?

A.    That's correct.

Q.    What are those excursion reports that are referenced there?

MS. LORD:  Object to form and foundation.

THE WITNESS:  The standardization that we wanted to establish was that we'd have a standard methodology to retrieve any reports as necessary or easily than they were.  That does not mean they weren't available.  It just means that we wanted to create a more standardized approach to being able to review them.

Page 124

BY MR. VON KLEMPERER:

Q.    My question is:  What are the excursion reports?

            MS. LORD:  Object to form and foundation.

            THE WITNESS:  These are the temperature logs.  Not that there were excursions, but they were -- they're temperature logs that were maintained.  This is not to assume that there were any excursions.

BY MR. VON KLEMPERER:

Q.    You're saying that the excursion reports that are referenced here are just temperature logs?

            MS. LORD:  Object to form and foundation.

            THE WITNESS:  That was the intent.

BY MR. VON KLEMPERER:

Q.    Your counsel keeps objecting to lack of foundation.  Is there someone else who's better suited to address this topic?

A.    Establishing the standard of the reports would be -- was being guided through Dan Collins and Dianne Witten and Mary Ravala.

Q.    And who is the person going to the

Page 125

locations and determining that the excursion reports were not easily accessible?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I don't have that in front of me.  I do not have that information in front of me.

BY MR. VON KLEMPERER:

Q.    What would you have to look at to find that information out?

A.    I'd be guessing at where that would be. I do not want to guess at that.

Q.    Do you know who wrote this bullet point regarding the excursion reports if it wasn't you?

A.    Again, this was put together in collaboration.  I do not recall who provided input on that.

Q.    Other than the three names you provided, who else collaborated on it?

A.    This is the shared team, Dianne, Mary and Dan, that collaborated.  Others, of course, as the team that collected information were part of the information.

Q.    And my question is:  Who other than

Page 126

those three people was on this collaborative team?

A.    Again, I'd be guessing at who all were involved, that this was a system-wide approach and without --

Q.    [Unintelligible].  Go ahead.

A.    No, I'm done.  I've completed.

Q.    This is a report with your name as the author, correct?

A.    Correct.

Q.    And you would be guessing on who contributed the information that went into this report.  Explain that to me.

A.    There was a process that was put together by the teams involved for the collection of all the data.  So there were multiple, multiple people involved with providing input and information on the current state.

Q.    Okay.  Other than the three names that you provided, there's no other names that you can think of who's provided information that went into this report?

A.    I would be guessing.

Q.    Okay.  The next bullet down reads,

Page 127

"Multiple documents and policies exist for the management of monitoring refrigerators/freezers."

MS. LORD:  I don't think we're on the same location, Mike.

THE WITNESS:  We're still on page 3, Mike?

BY MR. VON KLEMPERER:

Q.    Yeah, page 3.  Second bullet under Monitoring Systems.

Do you see that language?

MS. LORD:  Can you repeat it?

BY MR. VON KLEMPERER:

Q.    "Multiple documents and policies exist for the management of monitoring refrigerators/freezers."

Did I read that right?

A.    Yes.  I see that.

Q.    And what are the documents and policies that are being referred to there?

A.    Those would have been, again, documents that would have been collected at locations.

Q.    And each location had its own temperature-monitoring policy?

MS. LORD:  Object to form and

Page 128

foundation.

THE WITNESS:  I'm not saying that they had their own.  I'm just suggesting that there are multiple locations that were involved and that we collected -- the team collected documents across the system and policies across the system.

BY MR. VON KLEMPERER:

Q.   Okay.  So there were different policies in different locations, right?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Is there a question, there, Mike, for me to answer?

BY MR. VON KLEMPERER:

Q.   Yeah.

MR. VON KLEMPERER:  Can the reporter read back the last question?

THE WITNESS:  Please.

THE COURT REPORTER:  One moment.

(Whereupon, the court reporter read back the previous question.)

THE WITNESS:  There are -- policies existed across the system that were collected. And this is just acknowledging that there are

Page 129

policies that are existing across.  The process would have been to ensure that the policies were consistent.

BY MR. VON KLEMPERER:

Q.     And you don't know where those policies exist today, right?

A.     I would be guessing.

Q.     The next bullet point lists three different types of monitoring systems, automated, semi-automated and manual, correct?

A.     Correct.

Q.     And was there a particular type of temperature-monitoring system that Essentia was using at the time this report was created?

MS. LORD:  Object to form.

THE WITNESS:  Could you ask that question again, please?

BY MR. VON KLEMPERER:

Q.     Was there a particular type of temperature-monitoring system that Essentia was using at the time this report was created?

A.     The systems that were used at this time are the ones that are listed here.

Q.     Okay.  And then did you recommend standardizing those systems across all of

Essentia as part of this project?

A.     There's a recommendation to standardize as appropriate depending on the location and then the situation.

Q.     A couple more bullets down it reads, "An assessment was made to have one system (Smart Sense) for the entire system."

Do you see that?

A.     I do.

Q.     And did Essentia adopt that SmartSense for the entire system?

A.     We adopted that in the areas that -- where it made sense that it needed to be automated.

Q.     And what areas were those?

A.     I do not have that.  I would be guessing.

Q.     Who would know that?

A.     That would be the IS team, Chuck Robbins.

Q.     The bottom bullet point on this page going on to the next page reads, "Of note - SmartSense (on the new software) beginning July 1, 2020, will have the capability to record temperatures per

Page 131

requirements of the Vaccines for Children Program."

Do you see that?

A.    I do.

Q.    And what are the requirements that are being referenced there?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Again, I'm not the expert on the content of this.  Children's program is a specific program by state.

BY MR. VON KLEMPERER:

Q.    You're not familiar with those requirements?

A.    No.

Q.    So is it accurate to say that at the time this report was created, Essentia wasn't in compliance with those requirements?

A.    No.

MS. LORD:  Object to form.

BY MR. VON KLEMPERER:

Q.    No, that's not accurate?

A.    I believe the next sentence, "Currently at Essentia, paper charting is done for the..." "...requirement."  And therefore it is being

Page 132

monitored.  There are other best practices out there that were identified for following this, but it wasn't being monitored correctly.  There were just better practices to monitor in an automated way.

Q.    Do you know that paper charting complies with the Vaccines for Children requirements?

A.    It was determined that it was at that time, yes.

Q.    But you just testified earlier that you're not the expert on those requirements, right?

A.    I'm not.  I'm stating that the paper charting is being done.  It's a statement that was being provided by the expert on this.

Q.    So who is the person who determined that paper charting complied with those requirements?

A.    I would go back down to these individuals that provided it.

Q.    Are you still thinking about my question?

A.    No.  I thought -- I responded, I believe.

Q.    What was your response?

Page 133

A.    I scrolled down.  I scrolled down to the bottom of the document to those individuals that were on this document in pharmacy and in quality, Dan Collins and Dianne Witten.

Q.    So they are the ones who made that assessment?

A.    They would have been the ones that made that assessment.

Q.    Okay.  And why is paper charting not a best practice?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Being able to automate has been -- has become best practice when -- paper charting is not considered wrong, it's just best practice.

BY MR. VON KLEMPERER:

Q.    And why is automation best practice?

A.    Again, lean back in to the Dan Collins and Dianne Witten respond to that.

Q.    You don't have any knowledge yourself of that topic?

A.    Not specifically.

Q.    What's the Joint Commission?

A.    Joint Commission is an agency that

Page 134

reviews organizations for compliance with CMS

regulations.  And we use Joint Commission in

many of our facilities for that review.

Q.    Is that a government commission?

A.    It's -- the Joint Commission is a -- in

my layman's terms is a group that reviews --

organizations that choose to be the Joint

Commission entity to review practices that are

outlined by CMS.

Q.    Sounds like this is a topic that's also

sort of outside of your expertise, is that

correct?

A.    Yes.

Q.    Who would be a better person to talk to

about the Joint Commission at Essentia?

A.    Again, that would be Dan Collins.

Q.    Further down on the fourth page there's

a heading that reads

Education/Processes/Policies.

Do you see that?

A.    Yes.

Q.    The first bullet reads, "There are 68

clinics, and each clinic must have a designated

Immunization Champion.  This position must be

provided education and training on the CDC

Page 135

guidelines for monitoring and reporting the care and keeping of products required to be refrigerated or frozen. In general, the Immunization Champion is an MA with little training on the CDC expectations."

Did I read that right?

A.    Yes.

Q.    And what's your understanding of this title of Immunization Champion?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Again, I defer to our quality team on that, Dan Collins.

BY MR. VON KLEMPERER:

Q.    You don't have any idea what the Immunization Champion is?

A.    Again, I defer to Dan Collins.

Q.    I'm not asking if you defer to him.  I mean, do you have any personal knowledge whatsoever about what the Immunization Champion is?

A.    Not within the regulations, as it's -- I defer to Dan on that.

Q.    Do you understand what the reference to MA is in the final sentence of that bullet?

Page 136

A.    MA is referred to as a medical assistant.

Q.    And what does that mean?

A.    It's a credential by a staff person in nursing.

Q.    But would that person be considered a nurse, or is it something different than a nurse?

MS. LORD:  Object to form.

THE WITNESS:  Again, it's a credential based on their training.

BY MR. VON KLEMPERER:

Q.    And your investigation as part of this report reveal that the immunization champions have little training on the CDC expectations, correct?

MS. LORD:  Object to form.

THE WITNESS:  Again, that was provided by our quality team and refer to them.

BY MR. VON KLEMPERER:

Q.    Do you have any reason to doubt the statement that's in this document?

A.    No.

Q.    The next bullet reads, "The training has been left up to the local market clinic

Page 137

leadership to provide the training.  There has been no centralized support through primary care, nor through any quality reporting."

Did I read those sentences correctly?

A.    Yes.

Q.    And so at the time of this report there had been no centralized training provided to the immunization champions on CDC expectations, is that right?

MS. LORD:  Object to form.

THE WITNESS:  Again, I'd lean back to Dan in quality.

BY MR. VON KLEMPERER:

Q.    That's what this document indicates, though, isn't it?

A.    Again, centralized is the goal of standardizing throughout the system.  Does not indicate that there wasn't training completed. This states that there hasn't been no centralized support.  So I, again, lean back into quality as to what the intent was.

Q.    Do you know any of the individuals who served as immunization champions?

A.    I do not have that information.

Q.    Do you know who the champion was at the

Page 138

1702 University Street location?

A.      I do not have that information.

Q.      Do you know if the immunization champion for that location oversaw Dakota Clinic's temperature-monitoring practices in any way?

A.      Essentia Health nurse did not oversee any operations at Dakota Clinic or any of its refrigeration.

Q.      Dakota Clinic was just left to its own devices, correct?

A.      Yes.

Q.      Nobody from Essentia went to determine if Dakota Clinic was following the CDC expectations, right?

                MS. LORD:  Object to form.

                THE WITNESS:  Not to my knowledge.

BY MR. VON KLEMPERER:

Q.      Can you go to the next row on the document under Recommendation?  And under Oversite [sic] it reads, "Quality will oversee the reporting for the two areas of accountability below (appropriate metrics, reporting frequency, reporting to COO Council (Jodi's structure)."

                Did I read those sentences correctly?

Page 139

A.      Yes.

Q.      What is the COO Council?

A.      It's a leadership group under Ms. Mansfield.

Q.      And are you part of that council?

A.      I am.

Q.      And what has the COO Council done with respect to oversight as a result of the recommendations in this report, if anything?

            MS. LORD:  Object to form.

            THE WITNESS:  Again, I would refer to Dan in quality for that responsibility.

BY MR. VON KLEMPERER:

Q.      Well, this indicates that quality was reporting to the COO Council, right?

A.      This is a recommendation that they do that.

Q.      Did that ever happen?

A.      I would be guessing at that.

Q.      Well, you're on the COO Council, right?

            MS. LORD:  I'm going to object to the form.

            MR. VON KLEMPERER:  What's the objection based on form, Angie?

            MS. LORD:  Well, you're taking that

Page 140

COO Council out of the context of the parenthetical, which is all under the quality, and he said time and time again that it would be under quality and Dan Collins.

MR. VON KLEMPERER:  And he just testified that he's a member of the COO Council.

MS. LORD:  Right.  Which is a separate question from the context of the quality.  That's what I mean.  The form is that you're taking out of context COO Council and recognition that it's within a parenthetical talking about what quality is overseeing.

BY MR. VON KLEMPERER:

Q.     Well, and my question is:  You're a member of the COO Council, right?

A.     Correct.

Q.     Did quality report to the COO Council regarding the items listed here under Oversite?

A.     Again, I would need to respond that this is a recommendation in quality through Jodi. For the reporting and how to report and when to report was from quality to Jodi.  So, again, I delegate that back to Dan Collins and the quality department.

Page 141

Q.      My question is just:  Was there ever a reporting to the COO Council by quality about this topic -- these topics here?

MS. LORD:  Object to form.

THE WITNESS:  I would be guessing.

BY MR. VON KLEMPERER:

Q.      So you don't recall any instance where you received a report from quality about these issues?

A.      I don't recall.

Q.      I'm going to introduce Exhibit 79.

(Exhibit Number 79 marked for identification.)

BY MR. VON KLEMPERER:

Q.      Bates number is EH031553 through EH031555.  Do you have that document in front of you?

A.      I have it in front of me.

Q.      Okay.  Are you familiar with this email chain?

A.      I have this in front of me.

Q.      And if you go scroll down to the very first email chronologically, which is at the bottom of the document, it's an email from you on May 4th, 2020, 4:27 p.m.

Page 142

Do you see that?

A.    (Views document.)  I believe that I have that on my screen.

Q.    Okay.  And you write, "Dianne, Mary and Dan, please find attached the draft SBAR for the refrigeration Project."

So it looks like you're providing them a draft of the document that we were looking at earlier, Exhibit 78, is that fair?

A.    Yes.

Q.    And then in the very last email, which is the very top of the document on the first page --

MS. LORD:  Sorry.  Was -- Exhibit 78, the SBAR, wasn't the date on that 5/6/20?

MR. VON KLEMPERER:  Yeah, I think so.

MS. LORD:  Okay.  And you're asking about the email dated May 4th?

MR. VON KLEMPERER:  Right.  I said this is an earlier draft of that SBAR.

MS. LORD:  Okay.  I thought I heard you say it was Exhibit 78.

MR. VON KLEMPERER:  No, not this --

Page 143

an earlier draft of Exhibit 78.

MS. LORD:  Okay.  Thanks for that.

BY MR. VON KLEMPERER:

Q.    So in your last email in this chain you write, "The overall concern for me is that the facilities team could not provide for me an exact list of the units to be replaced.  That is why I intentionally left it rather open for now to get just this discussion.  If we can get an exact list of units failing now, those need to be replaced [sic] now.  The question, is what if we cannot?"

Did I read that right?

MS. LORD:  Object to form.

BY MR. VON KLEMPERER:

Q.    Just question if I said the words right?

A.    Yes.

Q.    Did facilities ever get you the list of units that were failing?

A.    I would be guessing.

Q.    You don't remember?

A.    I don't recall at this time.

Q.    How did they go about coming up with a list of units that were failing?

MS. LORD:  Object to form and

Page 144

foundation.

THE WITNESS:  So, again, I do not have that document in front of me.  What the ask was:  Are there any refrigerations that are failing?  And as I read through this document, again, from the three that are providing the information, they're acknowledging about refrigeration with their expertise.

BY MR. VON KLEMPERER:

Q.    Are you waiting on a question, or are you still thinking?

A.    No.  I'm just acknowledging that on this document there is not a statement that there are any that are failing.

Q.    You're waiting on the list from facilities of units that are failing, right?

A.    Replaced and failing are two different things.  And, again, when we read through the emails, it identifies that there were recommendations of replacement refrigeration units that were not necessarily failing but would be a better refrigeration for what is being stored, i.e., medical grade as an example.

MR. VON KLEMPERER:  Objection,

Page 145

nonresponsive.

BY MR. VON KLEMPERER:

Q.    What instructions did you provide to facilities to get you the list of units to be replaced?

MS. LORD:  Object to form.

THE WITNESS:  Again, back to these emails by the individuals who were the -- providing the feedback and information on these units, they required -- they responded with, reviewing the document that was being proposed, proposed changes that would move forward with.

MR. VON KLEMPERER:  Objection, nonresponsive.

BY MR. VON KLEMPERER:

Q.    You were involved with Essentia's decision not to issue refunds to patients who received the affected medications, correct?

MS. LORD:  Object to form.

THE WITNESS:  I facilitated the team to get input from all of the appropriate areas internal and external to our plan and provide input to what is a right decision for our patients and give us that guidance.

BY MR. VON KLEMPERER:

Page 146

Q.    I'm showing you what's been previously marked as Exhibit 65.  Let me know when you have that up.  Are you familiar with this document?

A.    (Views document.)  Not familiar with the document.

Q.    Are you familiar with documents in this format?

A.    Yes.

Q.    And how are you familiar with documents in this format?

A.    This is a --

Q.    I'm sorry?

A.    Looks like it's a meeting structure out of Outlook or out of Teams.

Q.    Is this a standardized format that you folks use at Essentia for meeting structures?

MS. LORD:  Object to form.

THE WITNESS:  Yeah, this is simply -- this is just simply someone updating a calendar with individuals.

BY MR. VON KLEMPERER:

Q.    Okay.  Can you turn to page 3, please? In the last row in this table in the column it's titled Topic, reads, "Revenue cycle/no

Page 147

charge re-vaccine versus refund initial vaccine."

Do you see that?

A.    I do.

Q.    Okay.  And then a couple columns over it reads, "3-20-20 - Suzanne - discussion on refunding patient from initial vaccine/offering free re-vaccine."  Then it reads, "Refund all patients initial cost for vaccines."  And there's another bullet, "Because ND requires us to remove the vaccination record from the chart, refunding may be the cleanest."  Going on to the next page, next bullet reads, "Jolene B recommended not refunding from a compliance standpoint oncology patients - case by case patients.  Al, Dan C work with Melanie and Suzanne Monday and bring back the decision to team.  Need final answer for details in the letter."

Did I read that language right?

A.    Correct.

Q.    So do you recall a meeting between yourself, Dan C, Melanie and Suzanne around March 20th, 2020, to discuss the topic of issuing refunds versus free revaccinations?

Page 148

Are you still thinking about that?

A.      I'm reviewing the document.  Thank you.

            MS. LORD:  Do you need the question repeated.

            THE WITNESS:  Yes I've reviewed the document now if you could repeat the question, please.

BY MR. VON KLEMPERER:

Q.      My question is:  Do you recall having a meeting with your -- between yourself, Dan C, Melanie and Suzanne on or about March 20, 2020, to discuss whether to issue refunds or free revaccinations for individuals who received the affected medications?

A.      Yes.

Q.      You do recall that meeting?

A.      I recall that meeting, yes.

Q.      And what can you tell me about -- what was discussed during the meeting?

A.      That there would be a conversation with the Department of Health in North Dakota with the plan that we're recommending.  And based on that review of the plan and the letters that we were going to send out to the patients, they would review and provide any modification or

Page 149

changes to that.

Q.    What was discussed during this meeting regarding the topic of issuing a refund versus free revaccination?

A.    That we wanted to reach out to the Departments of Health of Minnesota and North Dakota and get their guidance as to what's a best approach.

Q.    And when did you make that outreach?

A.    Again, I did not make the outreach. That was done by -- that is done by Dan.  I did not make -- I was not part of that conversation.

Q.    What decision did you make on whether to issue refunds versus revaccination?

A.    Well, the decision was to reach out to the Department of Health in North Dakota and Minnesota to get that guidance as well as BlueCross of Minnesota and North Dakota and get their guidance as well as sharing the letters that were going out and share with them the plan and get their guidance.  And they all supported the plan to -- which we laid out, which was to provide the patient with free immunization and/or consultation, whatever they

Page 150

preferred, at no cost to the patient or no cost to the State and no cost to the health -- to the payer.

Q.    Do you recall how quickly those conversations happened after you had this meeting?

A.    I do not.

Q.    Do you have any estimate whatsoever?

A.    I just know they occurred.

Q.    Okay.  So your testimony is that it was -- this decision was made in consultation with the Departments of Health and -- of Minnesota and North Dakota and that they concurred in that decision?

A.    Yes.

Q.    And that the decision wasn't made until you had that conversation with those agencies?

A.    Yes.

Q.    Okay. So turning back to this document, it says, "3-23-20 update on refund/no charge decision.  No charge for future visits is the decision that was made.  Will need to add a modifier by the clinician when delivering care. Need to add a WQ for these to run thru for double check on billing."

Page 151

Did I read that right?

A.    Yes.

Q.    So between your meeting on or about 3/20/20 and this update on 3/23/20 the decision had been made, right?

A.    Yes.

Q.    So it's your position that you folks reached out to those two agencies, got their feedback and made that decision in the span of approximately three days?

A.    Yes.  I'm stating that the conversations took place from the Department of North Dakota, Department of Health in Minnesota for guidance on that, and they agreed with our plan.

Q.    And those conversations must have occurred then within that three-day time period then, right?

MS. LORD:  Object to form.

THE WITNESS:  Again, the decision was made with consultation with Department of Health in Minnesota and North Dakota.

MR. VON KLEMPERER:  Objection, nonresponsive.

BY MR. VON KLEMPERER:

Q.    Those questions must have occurred

Page 152

within that three-day time period then, right?

MS. LORD:  Object to form.

BY MR. VON KLEMPERER:

Q.    Still thinking about that?

A.    I'm sorry.  Is there a question in there, Mike?

Q.    Yeah.  Those conversations with the agency must have occurred within that three-day time period then, right?

MS. LORD:  Object to form and foundation.

THE WITNESS:  I'm not going to guesstimate on the -- when the calls were made.

BY MR. VON KLEMPERER:

Q.    Were they phone calls or written correspondence?

A.    Again, I would not guesstimate on that.

Q.    Why was the decision made to offer free revaccination instead of a refund?

A.    Again, in consultation and collaboration in a very transparent way with the states of North Dakota and Minnesota as well as key payers on the plan, what is the best approach to not only provide the care to the patients given the data we provided to them as well as

Page 153

to -- how to handle it from a transactional standpoint, they all supported the plan.

Q.    What factors went into that decision?

A.    Again, I was not on those calls.  I just know that the responses from those external entities that I just mentioned provided their rationales and supported it.

Q.    What were factors that Essentia considered?

MS. LORD:  Object to form and foundation.

THE WITNESS:  We wanted to make sure that we provide the best solution to our patients.  And given the input we received from those that we reached out to for direction internally and externally, this was the best plan for providing the best care to our patients, which was to give them the unilateral choice for revaccination or not, given the information, including consultation if they wished.

BY MR. VON KLEMPERER:

Q.    Why did you decide that this was the best option for the patients?

A.    We believe that having our patients

Page 154

involved with their care is always the best option, and we were very transparent on the information in allowing them to reach that decision or ask for consulting to reach a good decision.

MS. LORD:  We've been going for more than an hour and 15 minutes, Mike.  Are we about ready for a break?

MR. VON KLEMPERER:  Yeah.  Sure. Sounds good.

THE VIDEOGRAPHER:  We are going off the record.

Time now is 2:15.

(Off the record 2:15 to 2:21.)

THE VIDEOGRAPHER:  We are back on the record.

This is the start of Media Number 5.

The time is 2:21.

BY MR. VON KLEMPERER:

Q.    I'm going to show you what's been previously marked as Exhibit 67.  Let me know when you have that.  Are you familiar with this document?

A.    I have it open.

Q.    Are you familiar with it?

Page 155

A.      Oh.  I'm just reviewing it.  (Views document.)

Q.      Okay.  Bates number is EH025571 through EH025574.  This is a meeting invite from June 3rd, 2020, that you received, is that correct?

MS. LORD:  Object to form and foundation.

MR. VON KLEMPERER:  Angie, what's the basis for your objection?

MS. LORD:  It says Tentative.

MR. VON KLEMPERER:  Where does it say that?

MS. LORD:  Show Time As:  Tentative.

MR. VON KLEMPERER:  Okay.

BY MR. VON KLEMPERER:

Q.      Did you receive this document on or about June 3rd, 2020?

MS. LORD:  If you know.

THE WITNESS:  I recall the topics, yes.

BY MR. VON KLEMPERER:

Q.      Okay.  Do you know who wrote this document?

A.      I do not.

Page 156

Q.    Are you familiar with a person called Tara Jacobson?

A.    I'm not recognizing the name.

Q.    Okay.

A.    I'm sorry.  Apologize.  I do not recognize the name.

Q.    Do you recall having a meeting to discuss the topics addressed in this document?

A.    I'm not recalling a specific meeting.  I do recall the issues.

Q.    Okay.  So I'll just read the language under Background.  "When clinicians invalidate vaccines, the associated charges are automatically voided.  Essentia has decided that they do not wish to issue refunds and instead will offer free vaccines to replace the invalid ones due to these charges spanning thousands of accounts and 2.5 years.  The issue is that the voided charges create a high volume of unwanted credits.  This document offers a few possible options to consider in order to handle this situation."

Do you have an understanding of what is meant by "unwanted credits"?

A.    I'm not familiar with that terminology.

Page 157

Q.     Are you aware of someone who would have more information about that?

A.     This would fall under -- I would be guessing.

Q.     It would -- would it potentially be in the finance department?

A.     Again, I would be guessing.

Q.     Okay.  And then the document proposes several possible options to handle this issue. Option 1 reads, "Follow Essentia's standard workflow and give refunds for the invalidated vaccines.  Refrigeration issues have occurred at other customers and from Epic's research, most have allowed their charges to void.  In order to do this, we would let clinicians continue to invalidate the vaccines and work with the billing team in order to process the credits and distribute refunds.  Epic can help provide recommended workflows in order to automate some of this process."

       Are you familiar with the research from Epic that's referenced there in the first sentence?

A.     I'm familiar with the Epic and the dialogue here on how to handle if we were to

Page 158

provide refunds.

Q.    So my question is just:  There's a reference to Epic's research in the first line there?

A.    Yes.

Q.    Do you see that?

A.    I do.

Q.    Are you familiar with that specific research that's referenced there?

A.    I'm aware of it.  I wasn't part of it, but I was aware of it, yes.

Q.    So is that something that you were sent then?

A.    Could you ask the question again, please?

Q.    Did you receive the research in an email or in some other form?

A.    No.

         MS. LORD:  I'll object to form and foundation.

BY MR. VON KLEMPERER:

Q.    Okay.  So what do you know about the research?

A.    What's in this document.

Q.    Nothing beyond what's stated here?

A.      Not to my recollection.

Q.      But you testified earlier that you're aware of it.  You're awareness stems solely from reading it in this document just now?

A.      Yes.  I'm aware that the research was done.

Q.      Which suggests to me that you had some awareness outside of the document itself, right?

MS. LORD:  I'll object to form and foundation.  I won't instruct him not to answer, but I'm placing that objection.

BY MR. VON KLEMPERER:

Q.      You're aware that research was done?

A.      I'm aware the research was done.

Q.      What do you know about that research?

A.      I'm sorry.  Was there a question, Mike?

Q.      What do you know about the research?

A.      What's in front of us here.

Q.      Okay.  Do you know who requested the research?

A.      I do not.  I would be guessing.

Q.      Okay.  Where it says Pros, the first line reads, "This is how Essentia has handled invalid charges in the past and is a standard

Page 160

workflow."  Is that consistent with your understanding of Essentia's standard workflow?

MS. LORD:  I'll object to form.

THE WITNESS:  I'm not involved with that -- this process, so I'm not aware of this --

BY MR. VON KLEMPERER:

Q.    Okay.

A.    Being standard workflow.

Q.    All right.  Of the options that are recommended -- or addressed in this document rather, do you know which one Essentia elected to follow, if any?

MS. LORD:  I'll object to the form on that.

THE WITNESS:  What we elected to do was to provide the service of revaccination or -- at no charge or consultation to our patients.

BY MR. VON KLEMPERER:

Q.    I'm going to introduce what I'm marking as Exhibit 80, which is EH025415 through 16.

(Exhibit Number 80 marked for identification.)

BY MR. VON KLEMPERER:

Page 161

Q.    Are you familiar with this document?

A.    Did you say Exhibit 80, Mike?

Q.    Yes.  Do you have that up?

A.    I refreshed that and I got 67.  Let me try it again.

MS. LORD:  It looks like it's four pdfs up.

THE WITNESS:  Oh, I'm sorry.  Up here.  I've got that.  It's opening now.

MS. LORD:  And what was the last number in the sequence, Mike?

MR. VON KLEMPERER:  1-6.

MS. LORD:  Thank you.

THE WITNESS:  I have it in front of me.

BY MR. VON KLEMPERER:

Q.    Okay.  Are you familiar with this document?

A.    (Views document.)

MS. LORD:  Can you pull it up to the top?

THE WITNESS:  Oh, yes.  I'm sorry.  Yes.

MS. LORD:  Okay.  Thank you.

THE WITNESS:  I'm just reviewing it,

Page 162

Mike.

BY MR. VON KLEMPERER:

Q.    Sure.

A.    (Views document.)  Yes, I've reviewed this.

Q.    And this is a memo from yourself and Dr. Herman to the Essentia Health Board of Directors and the Essentia West Market Board of Directors, right?

A.    Correct.

Q.    And do you recall who was on the Essentia Health Board of Directors at this time?

A.    I do not recall at this time.

Q.    Okay.  And is the Essentia West Market Board of Directors the same as the Innovis Board of Directors that we discussed earlier?

A.    Yes.

Q.    Do you recall who was on the Innovis Board of Directors at this time?

A.    I don't recall at this time who was on the board at that time.

Q.    Okay.  And why did you send this memo?

A.    Communicating with our board members is important, especially if -- whether it's --

Page 163

anything that involves the communities that we're privileged to serve.  And it was acknowledged that this would be an opportunity that would be in our community, and Dr. Herman agreed that the board members should be aware of it as the notifications were being sent out in case they received any questions or comments.

Q.    Okay.  Did you receive any follow-up from the board or from individual board members?

A.    Not that I recall.

Q.    Okay.  Was there a board meeting at which this topic was discussed?

A.    I don't recall at this time.

Q.    Do you attend the board meetings?

A.    Not all of them, no.

Q.    But you do on occasion?

A.    Yes.

Q.    And to your recollection, you can't recall whether there was a board meeting that you attended in which this was discussed?

A.    Again, not at this time.

Q.    Who is Sandra Buckley?

A.    Name is not ringing a bell for me.  I do

Page 164

not recognize that name right now.

Q.    I'm going to introduce Exhibit 81.

(Exhibit Number 81 marked for identification.)

BY MR. VON KLEMPERER:

Q.    Let me know when you have that.  It's Bates EH046253 through 55.

A.    You said 81, Mike?

Q.    Yes, 81.

A.    (Views document.)

Q.    Are you familiar with this email chain?

A.    There are a couple of these that I was not copied on, but I am familiar with the ones that I have been.

Q.    Okay.  So the very first email on the bottom of page 3 is an email from a Janna Hollingsworth to Dianne Witten on April 6, 2020.

Do you see that?

A.    Yes.  This is the one I have up now, yes.

Q.    Right.  First line says, "Hi Dianne, I am working on the medication storage issue for STAT, and aside from what to do if patients call with concerns and explaining the general

Page 165

issue - which I have taken from all of the approved materials - I am wondering if there is a message you think this specific audience should hear from you."

Do you have an understanding of what STAT is?

A.    STAT is an internal forum through Essentia Health.

Q.    And what is that forum used for?

A.    It's used for communicating many different items, many different opportunities, issues, celebrations, things that we share with our associates.

Q.    Okay.  So is this -- when something is posted to STAT, does it get pushed out to all of the Essentia employees, or how does it work?

A.    It's out there at the front of the internal website accessible to the employees --

Q.    Okay.

A.    -- that they review.

Q.    Okay.  So Dianne responds a few minutes later saying, "Perhaps you can share with me before the call what content you intend to include so far?  That will help me as I consider additional details."

Page 166

Do you see that?

A.    I do.

Q.    Okay.  And then Jana sends Dianne a blurb about the temperature excursion, is that fair?

A.    A potential excursion, yes.

Q.    Yeah.  This is what she's considering posting to STAT, right?

A.    Yes.

Q.    Okay.  And then in the next email above that, Dianne forwards that to yourself, William Heegaard and Dr. Vetter, right, with some additional --

A.    Correct.

Q.    -- with some additional commentary?

A.    Correct.  Yes.

Q.    Okay.  And then a little higher up in the chain on April 6, 2020, at 2:25 p.m., you respond to the emails, and the first thing you write here is, "We did not mention Dakota Clinic in any other releases.  I question whether we should start."

Did I read that right?

A.    Yes.

Q.    Why did you question that?

Page 167

A.      I thought we should be consistent.

Q.      Did you not want Dakota Clinic -- did you not want it to be widely known that Dakota Clinic was the distributor at issue in the temperature excursion?

MS. LORD:  Object to form.

THE WITNESS:  Again, I asked the question about consistency, previous communication did not include.

BY MR. VON KLEMPERER:

Q.      Other than consistency, you had no other concerns with Dakota Clinic's name being out there?

A.      I was just suggesting consistency.

Q.      Kim Deiss then responds to your email, and she says, "Hello.  I agree with Al that we should be careful about introducing new information in this broadly distributed email newsletter.  Only place where we mention Dakota Clinic Pharmacy is in the board memo.  So let's leave it out here."

Did I read that right?

A.      Yes.

Q.      Why do you think it was important to be careful about introducing the name of Dakota

Page 168

Clinic Pharmacy?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Again, for consistency.

BY MR. VON KLEMPERER:

Q.     But just because you hadn't mentioned Dakota Clinic previously you didn't want to ever bring their name up?

A.     Being consistent in our messaging.

Q.     And why was consistency important?

A.     Because consistency is important in communication.

Q.     Why?

A.     As a general statement, it reduces confusion, and that's why.

Q.     But you think that if the name Dakota Clinic was included in this STAT posting, it would cause confusion?

MS. LORD:  Object to form.

THE WITNESS:  Our focus to communicating with our staff is providing how we are serving our patients and being transparent with our staff, so as they ask questions they can have the accurate

Page 169

information and how to reach out with any questions they have on their care.  So consistency is very important.

BY MR. VON KLEMPERER:

Q.    But it didn't seem like you wanted to be transparent, it seemed like you didn't want to provide them with new information, right?

A.    That's not accurate.

Q.    I'm going to introduce what's been previously marked as Exhibit 56.  This is a larger file, so it might take a moment to show up for you.  Let me know when it pops up for you.

A.    It's the one with 101 pages?

Q.    Yeah.  So I'm not going to ask you about 101 pages.  Don't worry.  This was produced. I'll just represent to you that this is Laura Morris' personnel file.  And my question for you begins on page 72.  It's really just a collection of individual documents that make up her personnel file, but I'm going to ask you about a document that starts on page 72, which is Bates number EH048540.  Let me know when you're there.

A.    (Views document.)  I am there.

Page 170

Q.    This is a performance assessment by you of Laura Morris, is that right?

MS. LORD:  Object to form.

THE WITNESS:  I cut out, I think, Mike.  Could you repeat that, please?

BY MR. VON KLEMPERER:

Q.    This is a performance assessment by you of Laura Morris, is that right?

MS. LORD:  I'll object to form and foundation.

THE WITNESS:  This is a document within Workday.  Laura does not report to me. So this is not a formal performance review, as she's not an employee of Essentia Health.

MR. VON KLEMPERER:  Objection, nonresponsive as to Laura Morris' employment or who she reports to.

BY MR. VON KLEMPERER:

Q.    Did you create this document?

A.    I did.

Q.    Why did you create it?

A.    In Workday, of which is an application through human resources that is provided through the Support Services Agreement, Laura is -- it's necessary that she's in Workday

Page 171

given how the Workday application works.  And therefore in Workday it requires that she's assigned a manager.  And so in Workday I was assigned as the manager.

MR. VON KLEMPERER:  Objection, nonresponsive.

BY MR. VON KLEMPERER:

Q.    Why did you create this document?

A.    The document is a form document that I was required to complete because it could not be left unfinished.

Q.    Who required you to complete it?

A.    Again, in Workday, because I was assigned to her per the application, I was getting notices that I was not up to date on completing the performance, assessing performance of Laura in this case.  At that time, I was not aware that I was even assigned to her.  That's why I'm very familiar with this.  I was not aware that I was assigned to her.  So I did need to complete an assessment.

Q.    Did you complete assessments on other occasions for her?

A.    Not that I'm aware of.

Q.    So it was just this one time that you

Page 172

were receiving these notifications?

A.    That is my recollection.

Q.    Towards the top right there's a date, September 30th, 2020.

Do you see that?

A.    I do.

Q.    Is that around the time when you created this document?

MS. LORD:  I'll object to form.

THE WITNESS:  I believe that is the date that populated about when I completed it.

BY MR. VON KLEMPERER:

Q.    Okay.  Under Manager Overall Evaluation towards the top of that first page.

Do you see that?

A.    I do.

Q.    You gave her a rating of Needs Improvement.  Why?

A.    At that time, again, not someone -- someone who does not report to me at that time, communication -- or improved communication is really what I was focusing on when I completed this.  And as you can see in the rest of the document, look at the font, that's different.  This is what I typed in where she's the owner.

Page 173

We do not manage her daily work or operations. This is all -- all this information in here is what's in Workday.  It's not what I put in.  So this is the part that I completed in each of these areas.

MS. LORD:  And he cannot see.

THE WITNESS:  Oh, I apologize.

MS. LORD:  -- what -- you don't have a share screen, so he can't see what you're highlighting.

THE WITNESS:  I apologize, Mike.

MS. LORD:  That's okay.

THE WITNESS:  So in the areas under Rating of Development or Rating of Manager Evaluation, each of the categories, I put in each one of those, "She is owner of the JV pharmacy with EH..." which is Essentia Health. "We do not manage her daily work or operations."

MR. VON KLEMPERER:  Objection, nonresponsive.

BY MR. VON KLEMPERER:

Q.    My question is solely:  Why did you give her a rating of Needs Improvement under Manager Overall Evaluation at the top?

Page 174

A.    I'm sorry.  I thought I responded.  I was -- internally, I was addressing communication.

Q.    You believe she had a lack of communication?  Are you still thinking about that?

A.    I am.

Q.    Okay.

A.    Remembering this is all in the middle of COVID, and my new role is chief operating officer.  As I became chief operating officer, knowing that we have an investment with Dakota Clinic, I would like to have just communication.  So at that time, that's how I responded in my mind on what I would like for improvement.

Q.    She wasn't communicating with you adequately, you felt?

A.    I'm responding as a general comment.

Q.    But your concern was communication, lack of communication, so I'm asking:  What do you mean by that?  She wasn't communicating with you or someone else?

A.    Reflecting, I would say, just in general.

Page 175

Q.      What should she have done to improve her communication?

A.      Any concerns she might have had through the Support Services Agreement to be lifted up timely, if there are any.

Q.      And there were -- she had concerns that she wasn't timely bringing?

A.      Again, it's a general statement.

Q.      Well, if there weren't any concerns that she wasn't timely bringing, what was the problem with her communication?

A.      I have no more to express other than that.

Q.      You didn't share this with her, right?

A.      No.

Q.      Why not?

A.      Again, she's not an employee of ours. This was, again, new to the organization, completing this document as necessary.

Q.      But it sounds like you thought about what to put in here, you wrote things that you believe she needed to improve on.  How was she going to improve on those things if you didn't share it with her?  Do you have an answer?

A.      I just reflect as I just did on this.

Page 176

And I just stand by what I responded in this document.

Q.    So there wasn't any way for her to actually improve on those things because it wasn't shared with her, right?

A.    Again, internal working document on Workday, completed an internal work document on Workday and submitted it.

MR. VON KLEMPERER:  Objection, nonresponsive.

BY MR. VON KLEMPERER:

Q.    Can you turn to the top of the second page?  Under Manager Evaluation, the rating is Developing.  And the response reads, "She is owner of the JV pharmacy with EH.  We do not manage her daily work or operations.  However, I do not see improvement with the major excursion."

What is JV pharmacy?

A.    That is an investment of the -- our 49 percent investment of Dakota Clinic Pharmacy.

Q.    What does the acronym -- or what does JV stand for?

A.    It's my vernacular as joint venture.

Page 177

Q.     What did you mean by "However, I do not
see improvement with the major excursion"?

A.     Again, we were in the process of this
work, and it was the potential excursion
process we were working on, and just a
generalized statement, I just wanted to do good
communication.

Q.     You wanted to have good communication
with Ms. Morris?

A.     As a general statement, yes.

Q.     Were you making efforts to communicate
with her that she wasn't reciprocating?

A.     No.  You know, just pause there.

Q.     So what improvement would you have liked
to see from her regarding the major excursion?

A.     This is some time ago, and I do not see
this as being significant.

          MR. VON KLEMPERER:  Objection,
nonresponsive.

BY MR. VON KLEMPERER:

Q.     Question is:  What improvement would you
have liked to see from her regarding the major
excursion?

          MS. LORD:  Object to form and
foundation.

Page 178

THE WITNESS:  I can't recall at this time what those issues were.

BY MR. VON KLEMPERER:

Q.   Would they have been documented somewhere?

A.   No.

Q.   The bottom here under Manager Evaluation calculated rating is "1."  What's the scale on which people are graded here?

MS. LORD:  I'll object to form.

BY MR. VON KLEMPERER:

Q.   Just is it a five-point scale, ten-point scale, do you know?

A.   I don't recall.

Q.   Have you given other individuals performance assessments using this system?

A.   In this particular case, because she's not an employee of ours, this wasn't completed in its totality.

MR. VON KLEMPERER:  Objection, nonresponsive.

MS. LORD:  He's being responsive, with all due respect.

MR. VON KLEMPERER:  It's not even remotely responsive, Angie.

Page 179

MS. LORD:  It is.

MR. VON KLEMPERER:  Please stop interrupting.  Angie, the question was:  Have you given other individuals performance assessments using this system?

MS. LORD:  He was explaining to you the system.

MR. VON KLEMPERER:  He's not.  It's a simple yes-or-no question.

MS. LORD:  And it's not.

BY MR. VON KLEMPERER:

Q.    Are you still thinking about that?

A.    I stand by my response.

Q.    My question is:  Have you given other individuals performance assessments using this system?

A.    I have.

Q.    Okay.  And what is the highest rating you can give someone?

A.    I can't recall at this time --

Q.    Okay.

A.    -- what that is.

Q.    Is a "1" the highest rating or the lowest rating?

A.    I can't -- I don't know the answer at

Page 180

this time.

Q.     Why did you give her a "1"?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Again, I was completing this to comply with having this -- to have this document completed with her in our Workday.

BY MR. VON KLEMPERER:

Q.     My question is simply:  Why did you give her a "1"?

MS. LORD:  Object to form and foundation.

THE WITNESS:  Again, just following the format of this document, completing -- typing in the selection of developing throughout.  I believe this is what the Workday completes.  I needed to complete the document.

BY MR. VON KLEMPERER:

Q.     You can close that.  What's the highest level of education that you've completed?

A.     I have my master's degree, MBA.

Q.     Okay.  Can you list all of your degrees and the schools that you've received them and the years?

Page 181

A.      Is it okay, Mike, to take this down?

Q.      Yeah.

A.      Thank you.  Completed my undergrad degree -- starting with undergrad -- or high school, high school at 1978.  My undergrad, a private business school, National College of Business, in '84.  MBA from Iowa in 2003.

Q.      Okay.  And have you received any formal certifications or licenses after leaving school?

A.      I received my fellowship in the American College of Healthcare Executives and fellowship in American College of Medical Practice Executives.

Q.      When was that?

A.      I do not have the dates on those.

Q.      Any estimate at all?

A.      They were about at the same time, somewhere in that early 2000s to 2010, in that range, completing those two fellowships.  I don't have the exact dates.

Q.      Have you been convicted of any felonies in the last ten years?

A.      No.

Q.      Is there any answer that you gave today

Page 182

that you would like to change?

A.     No.

Q.     Are there any questions that you answered that you now think you did not understand?

A.     No.

MR. VON KLEMPERER:  I have no further questions at this time.

MS. LORD:  Thank you.  He will take the opportunity to read and sign the deposition transcript.

MR. VON KLEMPERER:  All right. Thank you, Mr. Hurley.

THE WITNESS:  Thank you.

THE VIDEOGRAPHER:  This concludes today's deposition.

The time now is 3:17.

(Deposition concluded at 3:17 p.m.)

* * * * * * * * * * * * * *

Page 183

REPORTER'S CERTIFICATE

STATE OF MINNESOTA      )
                        ) ss.
COUNTY OF HENNEPIN      )

I hereby certify that I reported the remote deposition of ALAN JAMES HURLEY on Thursday, May 22, 2025, from Gold Canyon, Arizona, and that the witness was by me first duly sworn to tell the whole truth;

That the testimony was transcribed by me and is a true record of the testimony of the witness;

That the cost of the original has been charged to the party who noticed the deposition, and that all parties who ordered copies have been charged at the same rate for such copies;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel;

That I am not financially interested in the action and have no contract with the parties, attorneys, or persons with an interest in the action that affects or has a substantial tendency to affect my impartiality;

That the right to read and sign the deposition transcript by the witness was reserved.

WITNESS MY HAND AND SEAL THIS 23rd day of May, 2025.

*Dana Anderson*

Dana S. Anderson-Linnell
Notary Public, Hennepin County, MN
My commission expires 1/31/2030

Page 184

Angela E. Lord, Esq.

alord@vogellaw.com

May 27, 2025

RE:    Kraft, Jessica Et Al. v. Essentia Health Et Al.

5/22/2025, Alan Hurley (#7353469)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at cs-midatlantic@veritext.com.

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 185

Kraft, Jessica Et Al. v. Essentia Health Et Al.

Alan Hurley (#7353469)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____    _____

Alan Hurley                                          Date

Page 186

Kraft, Jessica Et Al. v. Essentia Health Et Al.

Alan Hurley (#7353469)

ACKNOWLEDGEMENT OF DEPONENT

I, Alan Hurley, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Alan Hurley                              Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20____.

_____

NOTARY PUBLIC

**[000025 - 55]**                                                                 Page 1

| 0 |
| --- |

**000025**  6:7

| 1 |
| --- |

**1**  8:17 100:25
  104:6 122:23
  122:24,25
  130:24 157:10
  178:8 179:23
  180:2,11
**1-6**  161:12
**1/31/2030**
  183:25
**100**  2:15
**101**  169:14,16
**10:02**  43:19,20
**10:09**  43:20,24
**11:31**  89:2,3
**11:43**  89:3,7
**121**  1:3 4:9
  8:22
**12:27**  114:12
  114:13
**12:59**  114:13
  114:17
**13**  26:8
**141**  5:11
**146**  6:16
**15**  42:15 154:7
**154**  6:20
**16**  4:7 160:22
**160**  5:15
**164**  5:19

**169**  6:11
**1702**  138:1
**1763**  2:15
**17932**  183:23
**18**  83:22
**1978**  181:5

| 2 |
| --- |

**2**  43:23 102:2
**2.5**  156:18
**20**  148:11
  186:15
**200**  3:8
**20009**  2:16
**2000s**  181:19
**2003**  181:7
**201**  3:8
**2010**  181:19
**2016**  11:19
**2017**  83:18,23
**2018**  10:15
  17:5 49:24
**2019**  20:16
  50:1,2,4,11
  54:23
**2020**  5:10,14,18
  83:18 116:11
  130:24 141:25
  147:24 148:11
  155:5,18
  164:18 166:18
  172:4
**2021**  4:20
  69:23 70:2

71:2,13 83:10
**2025**  1:22 2:3
  8:8 183:6,20
  184:3
**20th**  147:24
**22**  1:22 2:3
  183:6
**22nd**  8:8
**23**  6:3 54:3
**23rd**  183:19
**2511**  10:6
**255**  5:19
**261**  5:7
**27**  184:3
**28**  6:7
**2:15**  154:13,14
**2:21**  154:14,18
**2:25**  166:18

| 3 |
| --- |

**3**  5:14 89:6
  102:2 121:9,10
  123:7 127:6,9
  146:23 164:16
**3-20-20**  147:6
**3-23-20**  150:20
**3-24-20**  6:14
**3-26-20**  4:14
**3/16**  45:20
**3/20/20**  151:4
**3/23/20**  151:4
**30**  184:16
**30th**  172:4

**317**  6:16
**31st**  54:23
**320**  1:3 8:22
**32nd**  73:13
  78:6 82:8,20
  83:2 114:23,24
  115:5,10,14
**344**  45:3
**346**  4:16
**3800**  114:24
**3:17**  182:17,18
**3rd**  155:5,18

| 4 |
| --- |

**4**  100:25 102:3
  114:16
**40**  109:17
  116:2,6,10
**416**  5:15
**44**  4:16
**49**  49:18 52:20
  176:21
**4:27**  141:25
**4th**  141:25
  142:20

| 5 |
| --- |

**5**  5:10 154:17
**5/22/2025**
  184:5
**5/6/20**  142:16
**5/6/2020**  5:7
**54**  6:7
**55**  164:7

**555** 5:11
**56** 6:9 169:10
**569** 6:11
**574** 6:20
**58501** 3:9

**6**

**6** 5:18 116:11
  164:17 166:18
**65** 6:13 146:2
**67** 6:18 154:21
  161:4
**68** 134:22

**7**

**7** 45:13
**70** 4:20
**72** 169:19,22
**7353469** 1:25
  184:5 185:2
  186:2
**76** 4:13 44:2,5
  44:6
**77** 4:18 70:7,8
  73:8
**78** 5:3 97:16,18
  115:19 142:9
  142:15,24
  143:1
**79** 5:9 141:11
  141:12

**8**

**8** 4:20

**80** 5:13 160:22
  160:23 161:2
**81** 5:17 164:2,3
  164:8,9
**84** 181:7
**8th** 71:2

**9**

**9** 4:5
**97** 5:7
**9:00** 1:23
**9:05** 2:3 8:7

**a**

**a.b.** 1:11
**a.m.** 1:23 2:3
  8:7
**a.s.** 1:6
**ability** 27:20
  38:6 94:2
**able** 37:25
  51:21 123:24
  133:13
**above** 118:20
  166:10 184:6
  186:7
**absolutely**
  94:22
**abundance**
  29:19 35:1
**accepted** 32:23
  53:5
**access** 13:22
  23:2 117:3

**accessible**
  123:11 125:2
  165:18
**accomplish**
  40:14
**accountability**
  111:2 120:4
  138:22
**accountable**
  30:11 118:22
  118:25 119:11
**accounts**
  156:18
**accreditation**
  40:23
**accredited**
  40:18
**accuracy** 184:9
**accurate** 90:12
  131:16,22
  168:25 169:8
**acknowledge**
  64:18 71:17
  87:3
**acknowledged**
  65:10 90:1
  163:3
**acknowledge...**
  186:3
**acknowledges**
  71:14
**acknowledging**
  128:25 144:7
  144:12

**acknowledg...**
  184:12
**acquired**
  111:11
**acquiring** 58:1
**acquisition**
  11:13 113:17
**acronym**
  176:23
**action** 6:5 9:2
  54:15 58:20
  183:15,16
**action's** 54:22
**actual** 40:16
  95:10
**actually** 176:4
**add** 150:22,24
**added** 72:24
  91:9 108:4
  120:1
**addition**
  118:20
**additional**
  20:18,22 21:11
  21:19 66:3
  99:18 165:25
  166:13,15
**additions** 186:6
**address** 10:4,5
  60:24 114:22
  114:23,24
  119:24 124:21
**addressed**
  86:13 156:8

160:11
**addressing**
  174:2
**adequately**
  174:18
**administrative**
  36:4
**adopt** 30:5
  130:10
**adopted** 130:12
**affect** 183:16
**affected** 15:12
  145:18 148:14
**affects** 183:16
**affiliations** 9:7
**afforded**
  113:16
**agencies** 33:16
  42:21 43:1,8
  45:16,20,25
  46:5,14,22,25
  47:5,14 150:17
  151:8
**agency** 48:10
  48:18 133:25
  152:8
**agenda** 55:18
  55:20 56:12
  80:16
**ago** 10:25
  11:18 99:22
  115:8 177:16
**agree** 8:16 30:5
  52:18 77:22

102:21 167:16
**agreed** 103:23
  151:14 163:5
**agreement** 60:1
  60:10 61:10
  67:13,21,23
  68:1,14 69:9
  170:24 175:4
**ahead** 21:14
  76:11,12 126:6
**al** 5:6 8:19,20
  9:25 45:19
  114:7 147:16
  167:16 184:4,4
  185:1,1 186:1
  186:1
**alan** 1:21 2:2
  4:3 8:17 9:20
  10:5 183:5
  184:5 185:2,24
  186:2,4,12
**alarm** 93:1
**aligned** 112:23
**allotted** 184:19
**allowed** 157:14
**allowing** 154:3
**alord** 3:10
  184:2
**amanda** 1:9
**american**
  181:11,13
**amy** 1:7
**anderson** 1:24
  2:5 8:25

183:24
**angela** 3:5
  184:1
**angie** 9:11
  13:20 15:21
  43:12 47:22
  88:18 114:5
  121:21 122:7
  139:24 155:9
  178:25 179:3
**anne** 1:6
**annual** 58:22
**annually** 55:24
**answer** 4:7
  12:10,16,20,24
  13:1,9 14:23
  16:11,14 28:12
  48:6 67:6
  104:16 112:15
  128:14 147:18
  159:12 175:24
  179:25 181:25
**answered**
  47:21 67:4
  182:4
**answering**
  62:20
**answers** 13:5
**apologize** 22:8
  37:4 76:3
  98:13 156:5
  173:7,11
**appearances**
  2:9,20 3:1 9:7

**appended**
  186:7
**applicable** 3:18
  184:8
**application**
  96:1 97:2
  170:22 171:1
  171:14
**applied** 39:1
**appreciate**
  114:9
**approach**
  40:20 111:2
  123:24 126:4
  149:8 152:23
**approached**
  79:11
**appropriate**
  19:6 28:16
  41:17 46:24
  78:12 119:8
  130:3 138:22
  145:21
**approval**
  103:24
**approved**
  106:6 165:2
**approving** 47:2
  58:23
**approximate**
  72:8
**approximately**
  10:23 16:3
  23:6 32:13

**[approximately - basically]**                                     Page 4

151:10
**april** 5:14,18
  164:17 166:18
**area** 119:9
**areas** 20:12
  46:11 109:16
  111:1 116:1
  130:12,15
  138:21 145:21
  173:5,13
**arizona** 183:6
**ashali** 2:13,18
**aside** 164:24
**asked** 22:12
  47:21 48:1,3
  52:24,25 53:4
  58:20 67:3
  89:11 100:7
  112:4,6 167:7
**asking** 42:23
  43:7 45:12
  46:15 73:22
  74:11 122:7
  135:18 142:19
  174:21
**assessing**
  171:16
**assessment**
  29:7 98:2
  101:23 109:9
  115:24 130:6
  133:6,8 170:1
  170:7 171:21

**assessments**
  171:22 178:16
  179:5,15
**assets** 109:12
**assigned** 20:18
  20:23 21:12,20
  21:23 171:3,4
  171:14,18,20
**assistant** 73:6
  136:2
**associated**
  156:13
**associates**
  165:13
**assume** 12:10
  12:16 69:12
  90:11 124:10
**assumed** 50:5
  50:11
**attached** 6:22
  6:24 109:20
  116:5 142:5
  184:11
**attend** 72:15
  163:16
**attended** 72:3
  163:22
**attention** 27:8
  61:13 62:9
  63:1,9 64:19
  69:7 78:1 85:1
  109:8 115:23
**attorney** 16:10
  183:13,13

184:13
**attorneys**
  183:15
**audience** 165:3
**audio** 8:14
**author** 5:6
  122:22 123:3,5
  126:9
**automate** 97:3
  133:13 157:20
**automated**
  96:25 97:1
  129:10,10
  130:14 132:5
**automatically**
  73:5 156:14
**automation**
  91:17 133:18
**available**
  123:22 184:6
**ave** 73:13 82:8
  82:20
**avenue** 78:6
  83:3 114:24,25
**aware** 14:15
  48:14 52:4
  53:25 67:22,25
  68:3,18,23
  69:8 74:14
  76:18 86:10
  88:3 99:17
  100:20 117:5
  118:10 157:1
  158:10,11

159:3,5,14,15
  160:5 163:5
  171:18,20,24
**awareness**
  76:16 159:3,8

**b**

**b** 1:15 147:14
**baby** 66:8,11
  66:18
**back** 13:1
  17:13,17 18:12
  22:14 25:3
  43:21 44:1
  61:18,22 63:4
  68:8,11 89:4,9
  97:8,12 108:6
  114:14,19
  123:7 128:18
  128:22 132:19
  133:19 137:11
  137:20 140:24
  145:7 147:17
  150:19 154:15
**background**
  98:2 101:23
  107:11 156:12
**bailey** 1:6
**based** 28:6
  29:20 40:12
  99:6 136:11
  139:24 148:22
**basically** 41:10

**basis** 16:10
40:22 59:1
155:10
**bates** 44:23
70:14 141:15
155:3 164:7
169:23
**beard** 32:9
**beaton** 1:8
**beauchamp**
94:13
**becoming**
17:11 50:21
67:23
**began** 10:15
45:19
**beginning** 9:5
55:17 91:7
109:5 130:24
**begins** 169:19
**behalf** 1:12
2:11 3:3 112:6
**believe** 19:9
20:6 25:1
45:14 53:20,21
58:23 62:20
64:14 65:3
75:13 79:19
83:22 84:11
86:12,22
105:11 109:5
112:5 131:23
132:24 142:2
153:25 172:10

174:4 175:22
180:17
**bell** 163:25
**bend** 10:6
**benefits** 53:10
**berg** 1:11
**best** 13:13,14
27:20 38:6,12
40:25 91:18
93:12 108:21
109:15,24
132:1 133:10
133:14,16,18
149:8 152:23
153:13,16,17
153:24 154:1
**better** 82:15
124:20 132:4
134:14 144:22
**beyond** 47:18
59:6 158:25
**bigger** 44:11,13
44:15
**billing** 150:25
157:17
**biologics** 34:18
**bismarck** 3:9
11:12
**blood** 90:22
92:12 107:15
117:24
**bluecross**
149:19

**blurb** 166:4
**board** 6:5
25:19,22,25
26:10,22 49:1
49:16,18 52:21
53:14,18,24
54:16 55:13
56:3,13,19,24
57:11,12,19,22
58:10 60:2,13
60:15,20,24
61:3,15 65:2,4
66:22 67:1,14
69:13,20,22
71:7,11,14,16
71:21 72:2,5
72:13,23 73:16
74:1 78:5,9,10
78:25 79:14
80:6,25 81:4,5
111:16 162:7,8
162:12,16,17
162:20,22,24
163:5,10,10,13
163:16,21
167:20
**bob** 50:24 51:2
51:3,6,10,14,25
58:12
**bodies** 94:4
95:7
**body** 95:9
108:2 113:20

**bottom** 45:3
130:21 133:2
141:24 164:16
178:7
**brad** 32:9
**brand** 110:18
**break** 13:8
40:15 42:13
43:14 88:19
118:4 154:8
**briana** 3:6 9:16
**brief** 65:21
**bring** 16:16
38:1 40:13
66:7 76:16
80:5,7 90:25
91:24 92:5,18
93:13,13 94:5
97:12 99:13
147:17 168:9
**bringing** 63:3
92:22 175:7,10
**broad** 95:15
**broadly** 167:18
**brought** 27:8
60:12 61:13
62:3,5,8,11,15
63:1,8,11,14,22
64:19 66:11,18
68:3 69:7 78:1
84:25 92:2,8
111:14 112:8
112:16 113:3

**[brummel - charged]**

**brummel** 3:11
**buckley** 163:24
**building** 119:6
**bullet** 107:12
  118:22 123:9
  125:13 126:25
  127:9 129:8
  130:21 134:22
  135:25 136:24
  147:10,13
**bullets** 130:5
**business** 57:22
  58:9,16 181:6
  181:7
**byproduct** 89:9

**c**

**c** 147:16,23
  148:10
**c.j.f.** 1:10
**c.r.f.** 1:10
**calculated**
  178:8
**calendar** 71:18
  72:17,21,22,25
  73:4 146:21
**call** 94:20
  164:25 165:23
**called** 9:21
  11:14 90:7
  156:1
**calls** 152:13,15
  153:4

**camera** 8:11
**canceling** 61:9
**canyon** 183:6
**capability**
  130:25
**capacity** 52:9
  52:13,19,23
  57:13 83:15
**care** 19:4,19
  21:4 22:23,25
  23:2,3 30:2,25
  36:6 38:18
  39:3,4 40:25
  41:2,17 78:13
  79:7 99:10
  101:20 105:3,5
  105:7,10
  111:10 118:18
  118:19 135:2
  137:3 150:23
  152:24 153:17
  154:1 169:2
**careful** 167:17
  167:25
**carefully**
  106:16
**caring** 34:25
**case** 1:3 8:22
  10:2 11:9,11
  14:4,9 15:3
  27:6 36:9 59:9
  59:20 89:10
  94:23 116:20
  147:15,15

163:7 171:17
  178:17
**cases** 120:24
  121:1
**catching** 49:9
**categories**
  173:15
**category** 118:9
**cause** 168:19
**caution** 29:19
  35:2
**cdc** 107:12,18
  134:25 135:5
  136:15 137:8
  138:13
**cdt** 1:23 2:3
**celebrations**
  165:12
**center** 38:20
**central** 40:1
**centralized**
  116:15 137:2,7
  137:16,20
**ceo** 24:16
**certain** 18:16
  75:2 82:9,16
  93:24 95:18
  110:5 116:17
**certificate**
  183:1
**certifications**
  181:9
**certified** 53:14

**certify** 183:5
**cetera** 26:7
  79:3 82:17
  90:23 94:1
  110:21 111:25
**chain** 5:11,15
  5:19 111:4
  113:14 141:20
  143:4 164:11
  166:18
**champion**
  134:24 135:4,9
  135:16,20
  137:25 138:3
**champions**
  136:14 137:8
  137:23
**change** 75:14
  94:8 182:1
  185:4,7,10,13
  185:16,19
**changed** 10:16
  20:15,18,21
  107:1,4,6
**changes** 91:19
  109:2 120:21
  145:12 149:1
  184:10 186:6
**charge** 6:20
  147:1 150:20
  150:21 160:18
**charged** 93:12
  95:12 183:10
  183:11

**charges** 111:18 156:13,17,19 157:14 159:25
**chart** 121:11,14 122:3 147:12
**charting** 131:24 132:6 132:14,17 133:9,15
**check** 150:25
**chief** 10:11 17:18 18:20 20:1,15,21 23:8,14,14,22 23:25 24:7,9 24:19,23 25:6 25:9,11,16 27:7 31:15,23 34:21 35:20 36:9 37:8,10 51:4 85:19,23 108:17 174:10 174:11
**children** 131:1 132:7
**children's** 23:1 131:10
**chimata** 2:13
**choice** 153:19
**choose** 134:7
**chose** 106:16 121:6
**christensen** 37:9

**chronologica...** 141:23
**chuck** 94:11 130:19
**civil** 3:19
**clarification** 72:16 120:25
**clarify** 12:12 48:6 119:8
**clarity** 98:22 119:11 120:1,5 120:11,25
**classification** 118:3
**cleanest** 147:12
**clear** 100:5 121:23
**click** 44:8,10
**client** 16:10
**clinic** 1:16 6:6 11:14 49:1,16 50:10 52:6,21 54:17 55:13,25 56:19,22 57:4 57:14 59:25 60:8 61:10,12 62:5,10,12,15 62:22 63:11,19 66:23 67:2,12 67:20,24 68:15 69:2,10,23 71:6,12,21,23 72:7,23 73:17 74:24 75:19

76:14 77:3,6,8 77:11,19 78:1 78:7,23 79:3 79:11,25 80:11 80:18,25 81:7 81:12,15 82:14 82:24 83:14 85:8 86:9,24 87:7,13 88:13 134:23 136:25 138:7,9,13 166:21 167:2,4 167:20 168:1,8 168:18 174:13 176:21
**clinic's** 53:17 68:19 75:17 138:4 167:12
**clinical** 36:5 37:18 105:6
**clinician** 150:23
**clinicians** 36:9 37:20 107:25 156:12 157:15
**clinics** 134:23
**close** 55:12 180:20
**closely** 35:19 36:16
**cmo** 108:6,16
**cms** 134:1,9
**collaborated** 35:21 125:20

125:22
**collaboration** 29:3 37:16 38:1 91:10 123:1,6 125:17 152:20
**collaborative** 102:19 105:15 107:24 122:11 126:1
**collaboratively** 36:3,8,13
**colleague** 32:1
**colleagues** 70:16 71:3
**collect** 95:23
**collected** 91:7 95:23 96:13 97:10 109:13 116:14,15,23 125:23 127:22 128:5,5,24
**collecting** 37:21 38:10 96:8
**collection** 63:6 126:16 169:20
**collective** 30:10 30:13,18 34:13 85:6,12 104:1 108:2
**collectively** 14:17

college 181:6 181:12,13

collins 39:6,7 45:19 108:12 108:15 124:24 133:4,19 134:16 135:13 135:17 140:4 140:24

color 121:14,22 121:25

columbia 2:15

column 146:24

columns 45:18 147:5

come 27:12 32:6 71:6,18 71:22 77:21 108:5

coming 78:21 143:23

commencing 2:3

comment 174:19

commentary 166:15

comments 163:8

commission 40:19,24 41:11 95:9 133:24,25 134:2,4,5,8,15 183:25

common 94:21

commonly 22:24 93:1,20

communicate 177:11

communicating 162:24 165:10 168:22 174:17 174:22

communication 32:1 167:9 168:13 172:21 172:21 174:3,5 174:14,20,21 175:2,11 177:7 177:8

communicati... 13:25 32:14 37:3 40:7

communities 19:7 163:1

community 26:19,19 163:4

company 17:12 89:23 110:9,9 111:7,8,13,15 111:21 112:1,2 112:9,10 113:8 113:8

compensation 53:8

complete 13:5 171:10,12,21 171:22 180:18

186:8

completed 99:23 100:3 112:4 116:9,10 126:7 137:18 172:11,22 173:4 176:7 178:18 180:7 180:21 181:3 184:16

completes 180:18

completing 90:18 171:16 175:19 180:6 180:15 181:20

completion 112:7

compliance 131:18 134:1 147:14

complied 132:17

complies 132:6

comply 180:6

computer 13:22,25

concern 62:3,5 65:13 143:5 174:20

concerning 22:10 37:17 48:11,19 58:1 66:17 84:17

101:7

concerns 60:12 60:16,21,23 61:4,23 164:25 167:12 175:3,6 175:9

concert 41:13 41:23

concierge 3:15

concluded 182:18

concludes 182:15

concurred 150:14

concurrently 115:12,16,17

conduct 27:14

conducted 8:10 48:11 119:15

confidential 4:13,18 5:3,9 5:13,17 6:3,9 6:13,18

confirm 53:21

confusion 168:16,19

connection 8:12

consider 77:4 79:17,17,20 93:16 156:21 165:25

**consideration** 79:24 91:16 102:11

**considered** 88:12 133:15 136:6 153:9

**considering** 166:7

**consistency** 167:8,11,14 168:5,11,12 169:3

**consistent** 106:15 129:3 160:1 167:1 168:10

**consistently** 29:2

**constitutes** 12:6

**construct** 114:1

**consultation** 29:24 149:25 150:11 151:20 152:20 153:20 160:18

**consulting** 154:4

**contact** 43:10 46:14,24 87:13

**contacted** 47:6 47:9,15

**contacting** 42:20,25 43:8

45:16,19,24 46:22

**contacts** 46:5

**content** 107:20 131:10 165:23

**context** 89:22 140:1,9,11

**continue** 8:15 73:9 79:6 82:2 90:2 157:16

**continued** 2:20 3:1 5:1 49:3 110:10

**continues** 118:22

**continuing** 44:3 73:8 89:25

**continuity** 78:13

**contract** 183:15

**contracting** 111:23 113:15

**contributed** 126:12

**contribution** 37:23

**contributions** 38:4

**control** 94:2

**controlling** 93:3,25

**controls** 93:25 94:1

**convened** 66:21

**conversation** 63:24 64:5,13 64:17 65:7,19 65:22,24 66:6 66:8,10,16,20 76:7 78:16 81:11,13 85:16 89:21 90:5 148:20 149:13 150:17

**conversations** 65:25 66:4 150:5 151:11 151:15 152:7

**convicted** 181:22

**coo** 32:2,7 49:23 50:2 52:7,10,23 86:5,8 138:23 139:2,7,15,20 140:1,6,11,16 140:18 141:2

**copied** 164:13

**copies** 6:23 183:11,11 184:14

**corner** 45:3

**corporate** 9:18 17:16

**correct** 12:25 17:2 18:19 19:11 23:7,9 23:10 24:2,3 41:22 42:8,22 43:2,9 46:8 50:19 51:7,12 51:13 53:18 54:23,24 55:6 55:10,14 60:16 60:21 63:12,13 63:15 66:23,24 67:14 69:15 70:17 71:3,4 76:9 77:17 80:23 81:25 83:4,10,13,13 83:23 84:6,14 87:23 89:13 90:8 100:22 104:7 106:3 108:23 109:23 109:25 112:24 118:7 119:17 120:7,8 122:23 123:4,13 126:9 126:10 129:10 129:11 134:12 136:16 138:10 140:17 145:18 147:21 155:6 162:10 166:14 166:16 186:8

| | | | |
|---|---|---|---|
| **corrections** 186:6 | **court** 1:1 8:1 8:21,24 9:14 11:23 13:9 61:20,21 68:9 68:10 88:22 128:20,21 | 94:16,18 96:13 97:14 98:19,21 109:2,5 116:9 126:18 | 62:5,9,12,14,21 63:11,19 65:2 66:22 67:2,12 67:20,23 68:15 |
| **correctly** 73:14 75:16 77:13 109:21 112:15 132:3 137:4 138:25 | | **currently** 23:18 25:23 39:25 40:2 95:5 114:23 115:5 115:13 131:23 | 68:19 69:2,9 69:23 71:6,12 71:21,23 72:7 72:23 73:17 74:24 75:17,18 |
| **correspond** 122:3 | **covering** 106:18 | **customer** 81:7 81:14,17 | 76:14 77:3,6,8 77:11,19 78:1 |
| **corresponden...** 152:16 | **covid** 174:10 | **customers** 22:13 157:13 | 78:7,22 79:3 79:11,24 80:11 |
| **cost** 29:24,25 32:20,21 79:3 147:9 150:1,1 150:2 183:10 | **create** 97:5 102:13 104:22 110:22 123:23 156:19 170:19 170:21 171:8 | **cut** 60:18 170:4 | 80:18,25 81:7 81:15 82:14,24 83:14 85:8 |
| | | **cv** 1:3 8:22 | 86:8,23 87:7 |
| **council** 138:23 139:2,5,7,15,20 140:1,7,11,16 140:18 141:2 | **created** 97:10 100:4,21 101:15 102:6 105:23 116:11 121:15 122:7 129:14,21 131:17 172:7 | **cycle** 110:7 146:25 | 87:13 88:13 138:4,7,9,13 148:21 149:7 149:17,19 |
| | | **d** | 150:13 151:12 151:21 152:22 |
| **counsel** 6:23 8:1,18 9:6 13:20 15:22 16:8 112:14 124:19 183:13 183:13 184:14 | | **d** 1:15 | 166:20 167:2,3 167:12,19,25 168:8,17 174:12 176:21 |
| | | **d.b.** 1:7 | |
| | | **daily** 40:22 173:1,18 176:16 | |
| | **creating** 96:6 113:12,13 | | |
| | **credential** 136:4,11 | **dakota** 1:2,16 6:6 8:22 10:7 11:12,14 14:5 47:9,12 49:1 49:16 50:10 52:5,20 53:17 54:17 55:13,25 56:18,21 57:4 57:14 59:24 60:8 61:10,11 | |
| **counsel's** 16:14 | **credits** 156:20 156:24 157:18 | | |
| **counterpart** 21:6 | **cs** 184:15 | | **damages** 94:19 |
| **county** 183:3 183:24 | **current** 10:20 18:22 19:22 26:11 73:11,12 74:6,20 75:9 91:11,13 93:10 93:19 94:6,8 | | **dan** 39:6,7 40:4 45:19 94:13 108:11,14 124:23 125:22 133:4,19 134:16 135:13 |
| **couple** 130:5 147:5 164:12 | | | |
| **course** 94:19 125:22 | | | |

135:17,23
137:12 139:12
140:4,24 142:5
147:16,23
148:10 149:11
**dana** 1:24 2:4
8:25 183:24
**data** 33:14
109:12,19
111:22 116:5
126:16 152:25
**date** 10:24
49:22 51:16,20
53:25 54:1
55:9 64:7,10
68:21 69:24
72:4 98:21
142:15 171:15
172:3,11
185:24 186:12
**dated** 142:20
**dates** 75:25
181:16,21
**dave** 3:14 8:23
**david** 24:17
**day** 2:13 3:6,15
19:1,1 83:15
83:15 84:1,1
109:17 116:2,6
116:10 151:16
152:1,8 183:19
186:15
**days** 151:10
184:16

**dc** 2:16
**dcp** 6:7 61:24
**december**
54:23
**decide** 153:23
**decided** 156:14
**decision** 30:9
30:10 31:11
32:24 33:2,7,8
33:13,15 52:1
80:10,18 83:6
83:7,12 85:4
85:11 145:17
145:23 147:17
149:14,16
150:11,14,16
150:21,22
151:4,9,19
152:18 153:3
154:4,5
**decisions** 28:24
36:11 57:22
58:9,14,16,18
**declare** 186:4
**deemed** 186:6
**defendant**
14:18
**defendants**
1:18 3:3 9:12
9:17 14:17
**defer** 43:4
107:21 112:13
113:3 135:12
135:17,18,23

**define** 19:13
**definitive** 79:2
**degree** 180:22
181:4
**degrees** 180:23
**deiss** 32:17
37:5 40:6
167:15
**delegate** 140:24
**delegated**
87:13,16,22
**deliver** 23:3
**delivered** 62:21
63:18
**delivering**
111:24 150:23
**delivery** 19:19
21:3 38:18
**department**
18:16 78:18
94:24 95:1,4
120:14 121:5,7
140:25 148:21
149:17 151:12
151:13,20
157:6
**departments**
47:11 111:1
120:1,16 149:6
150:12
**depending** 26:7
29:8,11 92:4
120:9,17 121:1
121:5 130:3

**depends** 8:11
26:9
**deponent**
184:13 186:3
**deposed** 11:5
11:10
**deposing**
184:13
**deposition** 1:21
2:1 8:9,17 9:6
9:8 11:22 12:5
13:13,22 15:20
15:24 16:17
44:4 48:3
182:10,16,18
183:5,10,18
**depth** 95:15
**describe** 22:17
39:23
**described**
101:5
**designated**
134:23
**detail** 35:8,13
**detailed** 101:6
101:14
**details** 27:15
62:8 147:18
165:25
**determination**
18:14 27:12
65:12
**determine**
64:22 79:8

**[determine - document]**

91:11 93:12
95:2,3,13,16,19
96:1,13,19
138:12
**determined**
85:7 132:8,16
**determining**
101:13 125:1
**dev** 23:24 25:7
25:8
**develop** 22:19
23:2 33:18
**developing**
176:14 180:16
**development**
173:14
**devices** 138:10
**dialogue**
157:25
**dianne** 36:22
37:4 108:14
124:24 125:21
133:4,20 142:4
164:17,22
165:21 166:3
166:11
**difference**
111:25
**different** 20:12
33:12 34:25
78:8 91:17
92:24 111:12
115:3,10
120:19,20

128:9,10 129:9
136:7 144:17
165:11,11
172:24
**dimitri** 3:15
**direct** 46:4,13
99:8 109:8
115:23
**direction**
153:15
**directly** 20:3
**director** 26:16
49:17,21 50:6
50:10,13,15,17
50:18 51:15,25
52:5,8 67:23
**directors** 25:20
25:24 26:10
50:15,21 61:24
162:8,9,12,16
162:17,20
**discharged**
82:17
**discovered**
28:6 61:8,25
63:7 64:8
68:13,18
**discoveries**
28:23
**discovering**
38:8
**discovery** 27:5
30:17 62:6
68:25

**discrete** 21:22
95:16
**discuss** 59:19
73:11 74:2,15
74:25 75:21
76:13 77:18
82:8,20 83:2
86:9 147:24
148:12 156:8
**discussed** 56:22
56:23 57:2,10
58:10,17,19
59:9 60:1,6
67:1,14 69:13
69:20 73:18
80:25 84:24
148:19 149:2
162:17 163:14
163:22
**discussing**
57:18,21
**discussion**
34:21 57:25
76:11 77:2
78:20 79:1,13
79:22 80:4
83:10 143:9
147:6
**discussions**
78:10,21 88:11
88:16
**distribute**
157:18

**distributed**
167:18
**distributor**
1:17 167:4
**district** 1:1,2
8:21,21 14:5
**dme** 22:4,6,7,7
**document** 7:4
44:18,19 45:2
45:6,8 46:4
54:2,14,19,20
54:22 55:10,12
55:24 70:13
71:4 90:11
97:10,22,23,24
97:25 98:15
99:1,12,19,20
100:3,9,13,17
100:18,21
101:4,6,11,14
101:16,18,19
102:5,9,14
103:1,22 104:9
106:10 107:23
110:14 121:24
122:7,15,19,23
123:5 133:2,3
136:22 137:14
138:19 141:16
141:24 142:2,8
142:12 144:3,5
144:13 145:11
146:4,5,6
148:2,6 150:19

**[document - email]**

154:23 155:2 155:17,24 156:8,20 157:8 158:24 159:4,8 160:11 161:1 161:18,19 162:4 164:10 169:22,25 170:11,19 171:8,9,9 172:8,24 175:19 176:2,6 176:7 180:7,15 180:18

**documentation** 50:6 120:25

**documented** 85:1 119:21,22 178:4

**documents** 16:1,16,20 35:11 55:21 56:8,14 101:2 105:23,25 116:13,22 117:4 127:1,14 127:19,21 128:6 146:7,10 169:20

**doe** 1:16,17

**doing** 93:10 112:24

**dorow** 50:15 51:4,7 52:14

55:5 77:1
**double** 150:25
**doubt** 136:21
**dr** 23:21,24 24:17,21 25:7 25:8,12,14 26:18,21,22 28:2,16 30:5 31:4 33:21 35:21 36:15 37:17,18,24 53:14 76:24 89:10 108:18 162:7 163:4 166:12
**draft** 106:11,21 106:22,24 142:5,8,22 143:1
**drive** 10:6
**due** 156:17 178:23
**duly** 9:21 183:6
**durable** 22:7,8
**dyad** 21:6 35:18,23,24 36:14

**e**

**e** 3:5 184:1 185:3,3,3
**earlier** 81:4 84:23 97:11 115:25 119:3

132:10 142:9 142:22 143:1 159:2 162:17
**early** 181:19
**easily** 123:10 123:21 125:2
**east** 10:6 31:8 32:1,2,3,8 40:1 40:2
**education** 92:18 109:19 110:10 116:4 134:19,25 180:21
**efforts** 177:11
**eh** 4:15 173:17 176:15
**eh025415** 5:15 160:22
**eh025571** 6:20 155:3
**eh025574** 155:4
**eh031257** 5:7 97:21
**eh031261** 97:22
**eh031553** 5:11 141:15
**eh031555** 141:16
**eh044386** 4:20 70:15
**eh046253** 5:19 164:7

**eh048469** 6:11
**eh048540** 169:23
**eh057307** 6:16
**eh057338** 4:16 44:23
**eh057346** 44:23
**ehlt** 99:9 101:19 103:6 103:13 104:14
**either** 92:3,17 93:12 104:20 104:21 122:16
**el.l** 1:8
**elected** 160:12 160:16
**electronic** 77:24 119:5,7 121:2
**elizabeth** 1:8
**ellison** 23:21 24:21 25:13
**ellison's** 25:14
**em.l.** 1:7
**email** 2:17 3:10 4:20 5:11,15 5:19 70:14,15 71:1 73:8 74:2 74:7 76:6,11 141:19,23,24 142:11,20 143:4 158:16 164:11,15,16 166:10 167:15

**[email - estimate]** Page 14

167:18
emails 13:24
144:19 145:8
166:19
emg 99:10
101:20 105:3,6
105:7
employ 19:19
77:23
employed 17:2
17:15 18:13
53:16 63:2
77:1 83:21
111:9
employee 16:23
17:5 170:14
175:17 178:18
183:12,13
employees 76:8
165:16,18
employer 10:8
11:16
employing 41:3
employment
11:1 17:10
170:16
emr 78:12
ended 53:23
ends 45:3
engaged 30:2
39:16
ensure 19:3
29:25 40:21,24
129:2

entire 19:20
46:10 47:10
99:5 102:19
130:7,11
entirety 45:8
entities 14:24
111:11,19
153:6
entity 17:10,25
93:14 112:17
112:21 114:1
134:8
entries 106:9
entry 105:21
109:9
environment
19:5
epic 6:20 73:13
77:18,20,23
78:2,7 79:2,5,6
79:12,18,25
80:11,19,22
157:18,22,24
epic's 157:13
158:3
equipment
22:7,8 89:12
91:11,14,15
92:20,25 93:2
93:7 94:17,18
96:23,24 100:6
111:3 122:17
errata 184:11
184:13,16

escaping 31:21
especially
13:12 162:25
esq 184:1
esquire 2:12,13
3:5,6
essentia 1:15
1:15 3:3,13 5:4
5:5 8:20 9:12
9:17 10:9,14
14:4,17,17,19
14:20,21 16:23
16:25 17:5,14
17:16,18 18:7
18:10 19:18
20:1 22:11,17
24:7,9,11,17
28:1 30:23
31:5 32:5
35:18 36:1
39:8,10,24
41:3 49:18
51:11 61:9,25
63:3 64:8
70:16 71:3
76:8 77:6 79:5
79:10 82:10
85:7 88:4
89:12,25 90:8
91:3 93:6,9,11
95:13,17 96:20
98:9,17 99:11
103:14 105:8
105:10 109:16

111:20 112:10
112:18,23
115:2 118:14
129:13,20
130:1,10
131:17,24
134:15 138:6
138:12 146:17
153:8 156:14
159:24 160:12
162:7,8,12,15
165:8,16
170:14 173:17
184:4 185:1
186:1
essentia's 27:4
27:23 28:4
35:16 41:5
45:25 78:17
89:11 108:22
145:16 157:10
160:2
essentially
112:20
establish
123:19
established
122:10
establishing
124:22
estimate 16:5
26:4,5 51:21
150:8 181:17

**estimated** 16:6
**et** 8:19,20 26:7
  79:3 82:17
  90:23 94:1
  110:21 111:25
  184:4,4 185:1
  185:1 186:1,1
**evaluate**
  108:21 109:15
  109:24
**evaluation**
  172:13 173:15
  173:25 176:13
  178:7
**evidence** 12:6
**exact** 7:3 10:24
  35:8,13 39:13
  41:10 49:22
  62:8 68:21
  143:7,10
  181:21
**exactly** 48:2
  62:22 63:18
**examination**
  4:4 9:23
**examined** 9:22
**example** 22:4
  30:3 31:17
  34:15 38:23
  40:5,6,18,19
  41:11,13 92:9
  92:12,16 95:8
  111:5 117:24
  117:24,25

119:4 144:24
**examples** 18:25
  22:3 23:1 38:3
  118:8
**excursion** 6:20
  14:10 15:4,5,7
  15:10,15 27:6
  27:10,16 29:5
  29:9 34:2
  35:17 39:19
  41:6 42:21
  43:1,9 46:1
  48:12,20 59:8
  59:19 64:21
  65:14 66:1,18
  84:18 86:2,16
  88:6 89:10
  98:23 123:10
  123:14 124:2
  124:12 125:1
  125:14 166:4,6
  167:5 176:18
  177:2,4,15,23
**excursions**
  124:8,10
**excuse** 33:9
  107:9
**execution**
  27:23
**executive** 19:25
  24:6 73:6
**executives**
  181:12,14

**exhibit** 4:13,18
  5:3,9,13,17 6:3
  6:9,13,18 44:2
  44:6 54:3 70:7
  70:8 73:8
  97:16,18
  115:19 141:11
  141:12 142:9
  142:15,24
  143:1 146:2
  154:21 160:22
  160:23 161:2
  164:2,3 169:10
**exhibits** 4:11
  5:1 6:1,22,24
  7:1
**exist** 127:1,14
  129:6
**existed** 110:1,2
  128:24
**existing** 129:1
**expanded**
  110:24
**expectation**
  92:4
**expectations**
  107:13,18
  135:5 136:15
  137:8 138:14
**expected** 116:8
**expenses** 57:8
**experience**
  92:17 102:12

**expert** 91:20
  92:18 93:5
  107:20 131:10
  132:11,15
**expertise** 27:12
  27:14 36:20
  91:1,25 134:11
  144:8
**experts** 34:22
  43:5 91:25
  92:21
**expires** 183:25
**explain** 22:21
  126:13
**explaining**
  113:7 164:25
  179:6
**express** 175:12
**external** 29:4
  145:22 153:5
**externally**
  29:21 153:16

**f**

**facilitate** 37:25
**facilitated**
  145:20
**facilitating**
  38:5
**facilities** 94:3,4
  94:10,14 96:16
  96:17,18,20
  119:6 121:3
  134:3 143:6,18

144:16 145:4
**facility** 93:23
  93:25
**facing** 90:22
  117:20,22
  119:10 120:2
  120:15
**fact** 77:12
**factors** 153:3,8
**facts** 16:21
**fagan** 2:14 3:18
**failing** 143:10
  143:19,24
  144:5,14,16,17
  144:21
**fails** 184:18
**fair** 12:12,17
  13:2,10 14:1
  142:9 166:5
**fall** 118:2,9
  119:5 157:3
**falls** 86:4
**familiar** 14:5
  18:1 44:18
  47:14,17 67:19
  84:5,13 97:22
  122:16 131:13
  141:19 146:3,5
  146:7,10
  154:22,25
  156:1,25
  157:21,24
  158:8 161:1,17
  164:11,13

171:19
**family** 66:12,14
  79:15
**far** 165:24
**fargo** 10:6,12
  114:24
**fauske** 1:9
**february** 4:20
  69:23 70:1,2
  71:2,12
**feedback** 145:9
  151:9
**feel** 44:12
**feganscott.com**
  2:17,18
**fell** 93:22
**fellowship**
  181:11,12
**fellowships**
  181:20
**felonies** 181:22
**felt** 174:18
**file** 6:10 169:11
  169:18,21
**filed** 3:17 8:20
**fill** 52:24
**filled** 52:22,22
**filling** 79:14
**final** 99:9
  105:21 106:12
  106:21 115:25
  135:25 147:18
**finalized**
  106:13

**finance** 51:5
  157:6
**financial** 51:4
  55:25 57:3,5
**financially** 9:2
  183:14
**financials**
  56:13,21 57:1
  58:19,21,24
  59:6
**find** 125:9
  142:5
**finding** 29:12
**findings** 48:19
  98:8,16,19,21
  103:21,21
**fine** 8:5 42:19
**firm** 3:7,18
**first** 9:21 44:2
  54:21 60:18
  69:1 71:5
  107:11 109:9
  109:10,10
  115:24 123:9
  134:22 141:23
  142:12 157:22
  158:3 159:23
  164:15,22
  166:19 172:14
  183:6
**five** 43:14
  178:12
**focus** 168:21

**focused** 38:9
**focusing**
  172:22
**folks** 36:10,16
  79:9 104:5
  146:17 151:7
**follow** 16:13
  65:1,3,11 99:8
  99:15 100:8
  157:10 160:13
  163:9
**followed** 35:2,3
  99:18
**following** 40:21
  132:2 138:13
  180:14
**follows** 9:22
**font** 172:24
**food** 118:16
**footprint**
  118:14
**foregoing**
  186:5
**form** 21:13
  27:17 28:11
  33:1 39:11
  41:8,19 43:3
  46:2 47:20
  48:13 50:12
  53:3,19 59:2
  59:11,21 60:3
  60:7,22 61:5
  63:16,23 67:15
  69:4,16 70:3

**[form - general]**

73:2 77:9 78:3
80:1,13 81:20
83:20 84:19
85:17 86:18,25
87:10,17,24
88:7 89:14
90:9 95:20
96:10 97:6
98:11 99:2
100:14 102:15
103:3 104:23
106:4 108:24
112:11,25
119:18 120:22
121:16 122:4
122:24 123:16
124:4,15 125:3
127:25 128:11
129:15 131:7
131:20 133:11
135:10 136:9
136:17 137:10
138:15 139:10
139:22,24
140:10 141:4
143:14,25
145:6,19
146:18 151:18
152:2,10
153:10 155:7
158:17,19
159:10 160:3
160:14 167:6
168:2,20 170:3

170:9 171:9
172:9 177:24
178:10 180:3
180:12
**formal** 33:19
67:1 86:19
170:13 181:8
**formally** 66:21
**format** 146:8
146:11,16
180:15
**forms** 73:4
**forum** 165:7,9
**forward** 33:22
34:9 60:12
68:3 80:5,7
87:4 99:13
103:25 106:17
145:12
**forwards**
166:11
**foundation**
41:20 61:6
69:5 78:4 80:2
80:14 87:18,25
95:21 96:11
97:7 100:15
101:4 102:16
104:24 108:25
112:12 113:1
119:19 120:23
121:17 122:5
123:17 124:5
124:16,20

125:4 128:1,12
131:8 133:12
135:11 144:1
152:11 153:11
155:8 158:20
159:11 168:3
170:10 177:25
180:4,13
**four** 100:2,8
161:6
**fourth** 134:17
**frame** 83:19
116:8
**framed** 112:15
**framework**
35:19 101:22
106:14 113:24
**frank** 3:13 9:17
**free** 44:12
147:8,25
148:12 149:4
149:24 152:18
156:16
**freezers** 117:9
117:12,17
118:15 127:3
127:16
**frequency**
138:23
**fridge** 90:8
**fridges** 117:9
117:12,17
118:2,8

**front** 25:25
26:3 38:19
45:14 70:11,23
71:17 90:11,12
91:8 97:9
99:20 100:10
100:17 106:13
115:20 125:6,7
141:16,18,21
144:3 159:19
161:14 165:17
**frozen** 135:3
**full** 10:3 13:5
**function** 78:6
**functioning**
118:21
**functions** 18:22
83:16
**further** 65:15
99:15 134:17
182:8
**future** 150:21

**g**

**gaps** 63:8 64:20
108:21 109:15
109:24 110:2,4
**gathered** 87:6
**gathering**
95:11
**gefroh** 23:21
24:21 25:12
**general** 20:20
77:21 78:25

79:4 81:10,11 81:13 82:11 86:6 112:1 135:3 164:25 168:15 174:19 174:25 175:8 177:10

**generalized** 74:22 79:16 177:6

**generally** 14:6 14:14

**geographically** 20:13

**getting** 27:11 171:15

**give** 12:1 13:5 18:25 22:2 25:5 26:14 40:17 92:19 99:4,5 112:14 145:24 153:18 157:11 173:23 179:19 180:2 180:10

**given** 33:18 75:4 77:5 95:4 152:25 153:14 153:19 171:1 178:15 179:4 179:14 186:9

**giving** 108:19

**glasner** 53:13 53:14 55:5

**global** 34:24

**go** 8:16 13:1 17:12,17 18:12 21:14 38:10 42:14 54:6,9 70:22 85:15 86:8 88:22 90:17 94:17 101:13 104:13 117:13 123:7 126:6 132:19 138:18 141:22 143:23

**goal** 137:16

**goes** 18:1

**going** 8:7 24:25 42:11 43:17 44:1,9 45:11 54:2 57:25 70:7 80:19 81:10,12 88:4 88:12,25 95:11 97:16 114:10 121:4,22 124:25 130:22 139:21 141:11 147:12 148:24 149:21 152:12 154:6,11,20 160:21 164:2 169:9,15,21 175:23

**gold** 183:6

**good** 8:6 9:25 42:12 88:19 91:15 114:5 154:4,10 177:6 177:8

**governed** 95:8

**government** 33:16 43:8 134:4

**governors** 6:6 54:16 55:5,9 66:22

**grade** 118:18 144:23

**graded** 178:9

**great** 114:8

**green** 50:24 51:2,3,6

**greg** 53:13 55:5

**group** 11:13 28:22 30:11,14 30:20,21,23 31:1,2,3,7,14 31:24 32:16,22 32:23 33:4,6 34:1,14 35:6 35:12 46:23 71:2 76:7,15 83:11 85:7,12 99:11 105:6,8 134:6 139:3

**groups** 108:7

**guess** 12:19 42:6 47:7,16

47:20,23 48:21 50:3 51:24 55:23 56:5 57:20 64:11 66:2 68:21 73:19,21,23 87:12 88:15 100:16 101:3,9 102:7 103:12 116:17 125:12

**guessing** 48:4 49:25 51:23 62:7,13,16 72:12 75:4,13 125:11 126:3 126:11,24 129:7 130:17 139:19 141:5 143:20 157:4,7 159:22

**guesstimate** 152:13,17

**guidance** 65:2 92:19 99:5 107:13,19 108:19 145:24 149:7,18,20,22 151:13

**guided** 124:23

**guidelines** 135:1

**gyn** 53:14

| h | | | |
|---|---|---|---|
| **h** 185:3 | 39:8,15 47:11 | **hennepin** 183:3 | **hours** 16:5 |
| **halfway** 123:8 | 61:25 63:3 | 183:24 | **human** 18:15 |
| **hand** 183:19 | 70:16 71:3 | **hereto** 186:7 | 18:17 170:23 |
| **handle** 34:22 | 76:8 79:5 | **herman** 24:17 | **hurley** 1:21 2:2 |
| 153:1 156:22 | 81:22 85:7 | 28:2,16 29:1 | 4:3 5:6 8:18 |
| 157:9,25 | 89:25 91:3 | 29:15 30:5 | 9:20 10:5 |
| **handled** 159:24 | 103:14 105:9 | 31:4,22 33:21 | 45:19 114:19 |
| **happen** 73:1 | 105:10 109:16 | 33:25 35:5,11 | 182:13 183:5 |
| 139:18 | 111:10,11,20 | 89:10 162:7 | 184:5 185:2,24 |
| **happened** | 112:10,23 | 163:4 | 186:2,4,12 |
| 150:5 | 138:6 148:21 | **hi** 164:22 | **hvac** 93:25 |
| **happening** | 149:6,17 150:2 | **high** 19:4 100:5 | i |
| 74:14 77:8,11 | 150:12 151:13 | 101:5 156:19 | **i.e.** 144:23 |
| **happy** 79:18 | 151:21 162:7 | 181:4,5 | **idea** 78:23 79:9 |
| **haskell** 58:6,12 | 162:12 165:8 | **higher** 19:15 | 135:15 |
| 84:13,17 86:16 | 170:14 173:17 | 166:17 | **identification** |
| 88:5 | 184:4 185:1 | **highest** 179:18 | 44:7 70:9 |
| **haugen** 26:21 | 186:1 | 179:23 180:20 | 97:19 141:13 |
| 26:22 | **health's** 49:18 | **highlighting** | 160:24 164:4 |
| **heading** 118:11 | **healthcare** | 173:10 | **identified** |
| 134:18 | 181:12 | **holding** 110:9 | 110:5,8,11 |
| **health** 1:15,15 | **hear** 165:4 | 111:7,13,15 | 132:2 |
| 1:16 3:3,4 5:4 | **heard** 8:13 | 112:1,9,9 | **identifies** |
| 8:20 10:9 | 62:20 142:23 | 113:8 | 144:19 |
| 11:12 14:18 | **heart** 22:25 | **holds** 23:17 | **identify** 13:18 |
| 17:23 18:2,8 | **heegaard** 76:24 | 24:5 55:13 | 20:7 23:17 |
| 18:13 20:1 | 166:12 | **hollingsworth** | 27:13 29:23 |
| 21:5 22:5,12 | **held** 23:5 52:7 | 164:17 | 31:13,18 36:21 |
| 22:23 23:2 | **hello** 81:9 | **home** 82:18 | 44:20 70:18 |
| 24:7,17 28:1 | 167:16 | **honest** 84:11 | 109:1,2 110:4 |
| 30:23 31:5,16 | **help** 16:20 | **hospital** 82:10 | **identifying** |
| 32:5 36:1,1 | 37:25 45:23 | 82:11 | 27:21 |
| | 71:10 157:18 | **hour** 42:12 | |
| | 165:24 | 154:7 | |

| | | | |
|---|---|---|---|
| **immediately** 111:14 | 177:2,14,21 | 71:25 75:18 | 76:23 86:23 |
| **immunization** 32:19 34:19 | **improvements** 109:4 | 87:15 94:12,14 163:10 169:20 | 87:5 88:13 93:21 95:11,19 |
| 117:23 134:24 | **inaccurate** | **individual's** | 97:10,13 99:7 |
| 135:4,9,16,20 | 12:24 | 58:2 | 100:23,24 |
| 136:14 137:8 | **inadequately** | **individually** | 109:13 122:19 |
| 137:23 138:3 | 118:21 | 1:4,5,8,9,11,12 | 125:6,10,23,24 |
| 149:25 | **include** 165:24 | **individuals** | 126:12,18,22 |
| **immunize** | 167:9 | 17:1 27:11 | 137:24 138:2 |
| 29:23 | **included** 29:3 | 28:20 30:16 | 144:7 145:9 |
| **impartiality** | 30:1 168:18 | 36:18,21 37:2 | 153:20 154:3 |
| 183:16 | **including** 28:1 | 37:12 38:7 | 157:2 167:18 |
| **implementati...** | 33:15 100:24 | 46:13 50:9 | 169:1,7 173:2 |
| 99:12,24 | 153:20 | 55:8 76:8,15 | **initial** 99:3 |
| 101:21 104:1 | **inclusive** | 76:21 90:25 | 147:1,7,9 |
| 105:22,24 | 109:11 | 91:8 94:9 | **initiative** 21:21 |
| 106:1 | **income** 57:9 | 95:12 132:20 | 22:9 |
| **implemented** | **incomplete** | 133:2 137:22 | **initiatives** |
| 106:3,6 107:2 | 12:25 | 145:8 146:21 | 20:24 21:1,8 |
| **important** | **incorporated** | 148:13 178:15 | 22:3 |
| 162:25 167:24 | 79:25 80:22 | 179:4,15 | **injectables** |
| 168:11,12 | **independent** | **inform** 27:24 | 107:14 |
| 169:3 | 78:9,10 81:4 | **information** | **innovis** 1:15 |
| **improperly** | 82:14,24 | 4:13,18 5:3,9 | 3:4 14:18,20 |
| 110:20 | **index** 4:1,11 | 5:13,17 6:13 | 16:24 17:2,10 |
| **improve** 175:1 | 5:1 6:1 | 6:18 12:15,17 | 17:14,18,20,22 |
| 175:22,23 | **indicate** 7:3 | 28:6,21 29:4 | 17:23 18:1,2,7 |
| 176:4 | 137:18 | 29:20 30:18 | 18:13 25:19 |
| **improved** | **indicates** 54:22 | 31:11 33:18 | 55:4,9 59:25 |
| 172:21 | 76:6 137:14 | 38:1,11 40:13 | 62:8,11 63:4 |
| **improvement** | 139:14 | 41:10 48:23 | 67:12,20 68:4 |
| 172:18 173:24 | **individual** 32:8 | 55:16,25 57:6 | 68:20 69:3 |
| 174:16 176:17 | 39:16 57:24 | 62:21 63:11,15 | 111:14,19 |
| | 58:7,8 59:15 | 64:25 70:5 | 112:8 162:16 |

162:19

**inpatients** 82:13

**input** 31:11 39:20 41:5,6 41:16,25 42:3 102:21 107:25 125:18 126:18 145:21,23 153:14

**inside** 82:9

**inspect** 117:14

**inspected** 117:17

**instance** 141:7

**instances** 86:7

**instruct** 16:11 159:11

**instruction** 16:14

**instructions** 4:7 145:3

**integrate** 79:12 111:18 113:20

**integrated** 79:7 80:11

**integrating** 111:14

**integration** 111:10 113:16 113:18

**intend** 165:23

**intent** 75:7 124:17 137:21

**intentionally** 143:8

**interact** 83:14

**interacted** 84:3

**interest** 76:23 77:3,5 183:15

**interested** 9:3 183:14

**internal** 29:3 33:17 46:3 83:11 145:22 165:7,18 176:6 176:7

**internally** 29:21 39:23 79:10 82:22 83:4 88:12 153:16 174:2

**internet** 8:11

**interpretation** 72:18

**interrupt** 42:10

**interrupting** 179:3

**introduce** 44:1 54:2 70:7 97:16 141:11 160:21 164:2 169:9

**introducing** 167:17,25

**invalid** 156:17 159:25

**invalidate** 156:12 157:16

**invalidated** 157:11

**inventory** 63:5 91:13 94:6 95:14,17,24 96:5 109:11,19 116:5,9

**investigation** 27:15 48:11 119:16 136:13

**investment** 49:19 77:20,23 79:21 174:12 176:20,21

**investor** 52:20

**invitation** 72:14,18

**invitations** 72:16

**invite** 71:6,21 73:1 155:4

**involved** 28:9 34:5 62:17,19 62:23 126:4,15 126:17 128:4 145:16 154:1 160:4

**involvement** 62:24

**involves** 163:1

**iowa** 181:7

**issue** 27:6 29:8 35:17 48:12 59:9,19 64:9 66:1,25 68:18 83:6,8 84:18 84:25 86:9 145:17 148:12 149:15 156:15 156:18 157:9 164:23 165:1 167:4

**issued** 48:19

**issues** 57:10,19 141:9 156:10 157:12 165:12 178:2

**issuing** 147:25 149:3

**items** 80:5,6 96:21 100:2,8 110:12,13 118:17 140:19 165:11

### j

**jackson** 26:18

**jacobson** 156:2

**james** 1:21 2:2 4:3 9:20 10:5 183:5

**jana** 166:3

**janna** 164:16

**jennifer** 1:10

**[jessica - know]**

**jessica**  1:3,11
8:19 184:4
185:1 186:1
**job**  1:25 18:22
83:15
**jodi**  19:23 24:4
28:2 31:4
33:21 101:17
101:25 102:10
104:6 106:23
111:17 140:21
140:23
**jodi's**  138:24
**john**  1:16,17
**joined**  89:24
111:17,20
**joining**  112:6
**joint**  6:4 40:18
40:24 41:11
54:15 95:8
133:24,25
134:2,5,7,15
176:25
**jolene**  147:13
**judge**  11:21,23
12:2
**july**  130:24
**june**  155:5,18
**jury**  11:21,23
12:3,7
**jv**  173:16
176:15,19,23

**k**

**kaufenberg**
36:23 92:11
**keep**  77:7,15
94:8
**keeping**  135:2
**keeps**  124:19
**key**  39:2 58:14
152:22
**kim**  26:16
32:17 37:5
40:6 167:15
**kind**  57:6 97:4
**kipa**  3:15
**klemperer**  2:12
4:5 8:4 9:9,10
9:24 10:1
16:12 17:24
21:18 27:18
28:18 33:5
39:21 41:15,21
42:14,18 43:6
43:12,16,25
44:17,22,25
45:10 46:6,19
47:22 48:5,9
48:15 49:14
50:16 53:6,22
54:11 57:15,17
59:4,13,23
60:5,14,19,25
61:2,16 62:2
63:20 64:1

67:5,10,18
68:7,16 69:11
69:18 70:1,6
70:10,20,25
73:7 76:5
77:14 78:15
80:9,20 81:23
83:24 84:22
85:22 86:21
87:8,14,20
88:2,10,18,24
89:8,16 90:13
96:4,14 97:15
97:20 98:14
99:16 100:19
102:23 103:8
105:1 106:7
109:7 112:19
113:5 114:3,18
119:23 121:8
121:19,21
122:1,6,21
123:2 124:1,11
124:18 125:8
127:8,13 128:8
128:15,17
129:4,18
131:12,21
133:17 135:14
136:12,20
137:13 138:17
139:13,23
140:5,14 141:6
141:14 142:17

142:21,25
143:3,15 144:9
144:25 145:2
145:13,15,25
146:22 148:8
151:22,24
152:3,14
153:22 154:9
154:19 155:9
155:12,15,16
155:22 158:21
159:13 160:7
160:20,25
161:12,16
162:2 164:5
167:10 168:6
169:4 170:6,15
170:18 171:5,7
172:12 173:20
173:22 176:9
176:11 177:18
177:20 178:3
178:11,20,24
179:2,8,11
180:9,19 182:7
182:12
**know**  12:14,14
12:16,20,21,23
13:7 14:12
17:6 24:12
26:2,11,15,24
27:2 32:10
42:2 44:5 45:4
47:5,8,24,25

48:10 50:1 51:18 53:23 54:4,12 59:14 62:11,14 64:5 70:11 71:15 72:20 73:9 82:5 85:9,14 87:15 92:3 97:17 101:4 111:3 112:15 117:6 122:9 125:13 129:5 130:18 132:6 137:22,25 138:3 146:2 150:9 153:5 154:21 155:19 155:23 158:22 159:16,18,20 160:12 164:6 169:12,23 177:13 178:13 179:25

**knowing** 174:12

**knowledge** 17:15 40:12 84:3 91:1,8 92:17 107:8 133:21 135:19 138:16

**knowledgeable** 122:16

**known** 93:20 109:13 167:3

**knows** 48:6

**kraft** 1:3 8:19 14:4 184:4 185:1 186:1

**kyle** 50:15 51:3 51:7,17,18 52:14 55:5 76:25

**l**

**l** 3:6

**l.k.** 1:4

**lab** 92:13 118:16 120:18

**labeled** 45:15

**lack** 124:19 174:4,20

**laid** 100:24 149:23

**lane** 36:25 37:5

**lanes** 37:1,6,12

**language** 45:21 118:12 127:11 147:20 156:11

**large** 91:4

**larger** 169:11

**laura** 59:15 63:25 64:5 79:13 81:9 84:5 169:17 170:2,8,12,16 170:24 171:17

**lavelle** 1:7

**law** 3:7,18

**lawsuit** 14:6,13 15:7,15 73:12 74:6,10

**layman's** 19:14 22:21 40:15 134:6

**lead** 38:11 90:25 92:11 94:5 112:4,7

**leader** 39:7,9 39:13,14,22 40:4,6 108:11

**leaders** 21:5,6 21:7 27:11 29:3 31:9,25 32:4 36:4,5 92:2,7,15 94:4 105:10 120:16

**leadership** 18:23 19:10 28:1,4 30:23 31:1,2,3,6,14 31:24 32:5,16 32:22,22 33:6 33:17,25 34:14 35:6,12 36:2,3 39:17 40:20 93:9,23 96:16 103:14 113:12 120:3 137:1 139:3

**leading** 92:3

**lean** 97:8 133:19 137:11 137:20

**learned** 69:1

**leave** 56:13 82:4 167:21

**leaving** 82:13 82:17 181:9

**led** 30:18 31:3 37:4,5,18 38:21 39:14

**left** 44:12 51:17 51:18 54:6,7 136:25 138:9 143:8 171:11

**legal** 9:1 112:14 114:1 184:23

**letter** 147:19

**letters** 148:23 149:20

**level** 100:5 101:5 180:21

**liability** 19:15

**licenses** 181:9

**lieu** 6:5 54:15

**life** 81:15 110:7

**lifted** 175:4

**liked** 177:14,22

**line** 22:20,22 71:5 158:3 159:24 164:22 185:4,7,10,13

185:16,19

**lines**  22:23 23:2

**link**  44:9

**linnell**  1:24 2:5
183:24

**list**  25:24 26:23
27:1 47:10
143:7,10,18,24
144:15 145:4
180:23

**listed**  100:2
101:18 102:3
104:5 107:1
122:22 123:3,5
129:23 140:19

**lists**  55:4 129:8

**little**  135:4
136:15 166:17

**lived**  95:15

**living**  30:24

**llc**  1:15,16 2:14
6:7 17:23 18:2
18:8,13 54:17

**local**  136:25

**located**  10:12
96:23 99:25

**location**  96:1
106:17 115:2,9
116:16 119:14
120:3 123:10
127:5,23 130:3
138:1,4

**locations**
109:14 125:1

127:22 128:4
128:10

**log**  61:7,12
63:6 64:9,20
66:25 68:17
84:25

**logs**  61:8,13
62:1,6 63:6,8
66:1,17 69:1
84:18 86:17
88:6 124:7,9
124:14

**long**  10:13
11:18 32:10
65:18 99:22

**longer**  37:11

**look**  17:17
18:12,17 75:24
79:19 91:12
92:24 98:4
117:9,12 125:9
172:24

**looked**  91:16

**looking**  39:18
76:17 82:4
94:16,17 142:8

**looks**  79:21
121:11 142:7
146:14 161:6

**lord**  3:5 8:5
9:11,11,16
16:9 17:21
21:13 27:17
28:11,14 33:1

39:11 41:8,19
42:10 43:3,15
44:8,16,20
45:5 46:2,15
47:19,25 48:13
49:6,8,11
50:12 53:3,19
54:5,9 59:2,11
59:21 60:3,7
60:17,22 61:5
63:16,23 67:3
67:8,15 69:4
69:16,24 70:3
70:18,21 73:2
76:1 77:9 78:3
80:1,13 81:20
83:20 84:19
85:17 86:18,25
87:10,17,24
88:7,20 89:14
90:9 95:20
96:10 97:6
98:11 99:2
100:14 102:15
103:3 104:23
106:4 108:24
112:11,25
114:6 119:18
120:22 121:16
122:4,9,13,24
123:16 124:4
124:15 125:3
127:4,12,25
128:11 129:15

131:7,20
133:11 135:10
136:9,17
137:10 138:15
139:10,21,25
140:8 141:4
142:14,19,23
143:2,14,25
145:6,19
146:18 148:3
151:18 152:2
152:10 153:10
154:6 155:7,11
155:14,19
158:19 159:10
160:3,14 161:6
161:10,13,20
161:24 167:6
168:2,20 170:3
170:9 172:9
173:6,8,12
177:24 178:10
178:22 179:1,6
179:10 180:3
180:12 182:9
184:1

**lowest**  179:24

**loy**  36:22 63:2
63:9 68:3
92:10

**lunch**  114:4

**lunches**  118:6

[m.b. - mean]

| m | | | |
|---|---|---|---|
| **m.b.** 1:9 | **majority** 45:12 | 33:25 35:5,11 | **marketing** |
| **m.d.** 35:21 | **make** 18:14 | 101:17,25 | 23:23 |
| **ma** 135:4,25 | 30:20,24 36:5 | 102:10 103:9 | **markets** 39:25 |
| 136:1 | 36:11 38:6,21 | 103:16 104:3,6 | **marking** |
| **maari** 36:22 | 39:17 44:11,13 | 106:23 111:17 | 160:21 |
| 63:2,9 68:3 | 58:20 65:12 | 139:4 | **mary** 124:24 |
| 92:10 | 76:18 77:2 | **manual** 96:25 | 125:21 142:4 |
| **made** 28:22 | 85:24 93:14 | 129:10 | **master's** |
| 30:10 32:18,24 | 106:17 115:6 | **manufacturers** | 180:22 |
| 32:25 33:3,3,6 | 149:9,10,12,14 | 1:17 | **materials** |
| 33:12 35:5 | 153:12 169:20 | **march** 147:24 | 118:19 165:2 |
| 38:4 42:2 46:4 | **makes** 114:2 | 148:11 | **matrix** 36:2 |
| 50:10,18 51:14 | **making** 28:3 | **marked** 4:11 | **matter** 8:19 |
| 51:25 52:5,12 | 29:14 33:25 | 6:1,23 44:6 | 75:22 83:1 |
| 52:15 80:10,16 | 38:8 39:20 | 54:3 70:8 | 91:20,25 92:21 |
| 85:10,11 86:10 | 46:13 94:21 | 97:18 141:12 | 93:5 |
| 89:17 103:6,9 | 177:11 | 146:2 154:21 | **mba** 180:22 |
| 105:12,12 | **manage** 173:1 | 160:23 164:3 | 181:7 |
| 109:3,4,4 | 173:18 176:16 | 169:10 | **mean** 14:19 |
| 120:21 130:6 | **management** | **market** 6:15 | 15:9,16 19:13 |
| 130:13 133:5,7 | 57:18 113:14 | 10:12 17:19 | 20:25 22:22 |
| 150:11,16,22 | 127:2,15 | 18:6,9,21,24 | 30:13 33:11 |
| 151:5,9,20 | **manager** 171:3 | 19:20 20:12,13 | 34:11 35:25 |
| 152:13,18 | 171:4 172:13 | 22:20 23:9,12 | 74:5,19 75:12 |
| 186:5 | 173:14,24 | 23:13,14,15,16 | 76:2 81:5 82:7 |
| **maintain** 61:11 | 176:13 178:7 | 23:22,23 24:2 | 110:16,19 |
| **maintained** | **manner** 7:2 | 24:13,18,25 | 111:8 113:10 |
| 124:9 | **mannuru** 23:24 | 25:13,15 31:8 | 113:19,23 |
| **major** 23:16 | 25:8 | 32:2,2,3,8 | 115:15 117:13 |
| 176:17 177:2 | **mansfield** | 49:23 53:15 | 118:25 123:22 |
| 177:15,22 | 19:23 24:5 | 76:25 85:19 | 135:19 136:3 |
| | 28:2,16 29:1 | 86:3 91:3 | 140:10 174:22 |
| | 29:15 30:4 | 136:25 162:8 | 177:1 |
| | 31:4,22 33:21 | 162:15 | |

**means** 123:23
**meant** 75:8
  156:24
**media** 8:16
  43:23 89:6
  114:16 154:17
**medical** 11:13
  22:7,8 23:14
  23:25 24:19,23
  25:6,9,11
  31:15,23 34:21
  35:20 36:10
  77:24 78:8
  99:11 105:8
  108:17,19
  118:18 136:1
  144:23 181:13
**medication**
  6:15 68:5
  117:23 164:23
**medications**
  14:10 15:13,14
  34:16 41:13,18
  63:5 64:22
  68:14 69:9
  86:1 98:24
  118:16 145:18
  148:14
**meet** 16:7
  73:11 95:6
**meeting** 6:5
  15:22 35:6
  54:16 55:17,18
  55:19 56:3,4,9

58:2,22 59:10
59:18 60:2
66:13,22 67:1
67:14 69:22
71:7,11,15,16
71:19,20 72:2
72:5,13,22,22
73:10,16 74:1
74:1 76:12
80:6 81:1
84:23 85:5
86:13 87:2,2
106:24 146:14
146:17 147:22
148:10,16,17
148:19 149:2
150:6 151:3
155:4 156:7,9
163:13,21
**meetings** 35:7
  55:13 56:14,19
  56:24 57:11,19
  57:23 58:11
  69:14,20 71:21
  72:17,24 73:3
  84:16 86:15,20
  88:5 163:16
**melanie** 147:16
  147:23 148:11
**member** 26:19
  31:2 32:15
  53:17 108:8
  140:6,16

**members** 6:6
  25:22 26:2,12
  26:19 31:6,8
  31:13,23 54:17
  162:24 163:5
  163:11
**memo** 98:7
  108:4 162:6,23
  167:20
**memorializat...**
  52:1
**memory** 64:15
  65:1,6,16,23
  71:22 72:4
  85:13 116:25
**mention** 166:20
  167:19
**mentioned**
  21:21 31:1
  32:7 38:14
  39:24 41:4
  56:12,21 63:10
  64:4 66:7
  81:14 83:2
  84:23 86:14
  94:15 95:14
  96:15 108:16
  111:6 112:8
  118:20 119:3
  120:13 121:2
  153:6 168:7
**message** 165:3
**messages** 13:24

**messaging**
  168:10
**messenger**
  85:15
**met** 15:21
  38:22 66:12,13
  85:6
**methodology**
  123:20
**metrics** 138:22
**michael** 2:12
  25:2
**mid** 11:14
**midatlantic**
  184:15
**middle** 174:9
**mike** 2:17 9:9
  9:25 21:17
  26:25 42:11
  44:10,21 49:12
  60:17 69:25
  82:3 83:22
  114:9 127:5,7
  128:14 152:6
  154:7 159:17
  161:2,11 162:1
  164:8 170:5
  173:11 181:1
**mind** 32:6
  90:14 174:15
**minnesota** 2:6
  47:9,12 149:6
  149:18,19
  150:13 151:13

**[minnesota - nonresponsive]** Page 27

151:21 152:22
183:2
**minor** 1:7,9,11
**minors** 1:4,6,7
**minute** 43:14
**minutes** 42:15
56:2,18 154:7
165:21
**missed** 60:17
**mn** 183:24
**model** 111:15
111:21 112:9
113:8,9
**modich** 3:13
9:18
**modification**
148:25
**modifications**
102:22 103:2,5
103:10
**modified**
102:24
**modifier**
150:23
**moment** 27:3
37:15 68:5,9
82:5 128:20
169:11
**monday** 45:20
147:17
**monitor** 132:4
**monitored** 95:6
96:25 120:15
132:1,3

**monitoring** 5:6
89:12 92:25
93:2,3,7,19
98:5,10 100:6
106:14 107:14
108:22 109:12
109:18,25
116:3 119:5,7
119:12 121:2,4
121:6 123:8
127:2,10,15,24
129:9,13,20
135:1 138:5
**months** 32:13
115:7,8
**morning** 8:6
9:25
**morris** 6:10
59:15,17 65:25
66:7,11,21
84:6,24 86:14
88:5 169:18
170:2,8,16
177:9
**move** 33:22
34:9 77:19
103:25 115:6
145:12
**moved** 106:17
**moving** 79:2,18
87:3 89:23
110:8 113:23
**multiple**
126:17,17

127:1,14 128:4
**mutually** 104:2

**n**

**name** 8:23 9:25
10:3 18:1
23:19 25:5,8
26:12 31:20
58:4 59:15
90:14 126:8
156:3,6 163:25
164:1 167:12
167:25 168:9
168:17
**named** 25:8
**names** 26:14
27:1 125:19
126:20,21
**national** 181:6
**nature** 104:22
**nd** 3:9 147:10
**necessarily** 7:3
20:17 110:19
144:21
**necessary** 19:6
29:25 33:15
40:23 76:21
87:6 92:6
118:17 123:21
170:25 175:19
186:6
**need** 17:12 49:2
64:21 65:11
70:4 73:10

77:18 79:17
82:8,20 96:21
110:24 115:21
140:20 143:10
147:18 148:3
150:22,24
171:21
**needed** 52:21
64:23 85:8
86:23 87:6
92:20 106:19
109:3,3,4
110:6,25
118:19 130:13
175:22 180:18
**needs** 172:17
173:24
**net** 57:8
**never** 60:15,20
**new** 23:24
26:10,16 52:23
94:5 130:23
167:17 169:7
174:10 175:18
**newborn** 66:7
66:11,18
**newer** 94:3
**newsletter**
167:19
**nicole** 37:9
**nine** 26:8 32:13
**nonresponsive**
57:16 61:1,17
145:1,14

151:23 170:16 171:6 173:21 176:10 177:19 178:21

**normally** 95:3

**north** 1:2 3:8 8:21 10:7 11:12 14:5 47:8,12 65:2 148:21 149:6 149:17,19 150:13 151:12 151:21 152:22

**northwest** 2:15

**notary** 2:6 183:24 186:13 186:19

**note** 3:17 7:1 8:9 130:23 184:10

**noted** 186:7

**noticed** 183:10

**notices** 171:15

**notification** 43:5 91:18

**notifications** 163:6 172:1

**november** 10:15 83:22

**number** 26:1,6 43:23 44:2,5,6 44:23 45:3 70:8,14 89:6 97:18 114:16

141:12,15 154:17 155:3 160:23 161:11 164:3 169:23

**numbering** 44:3

**numbers** 36:18 102:2 122:3

**nurse** 136:7,8 138:6

**nursing** 23:15 25:16 37:8,10 136:5

**o**

**o.k.** 1:5

**oath** 12:1,1 114:20

**ob** 53:14

**object** 16:9 21:13 27:17 28:11 33:1 39:11 41:8,19 43:3 46:2 47:20 48:13 50:12 53:3,19 59:2,11,21 60:3,7,22 61:5 63:16,23 67:15 69:4,16 70:3 73:2 77:9 78:3 80:1,13 81:20 83:20 84:19 85:17 86:18,25

87:10,17,24 88:7 89:14 90:9 95:20 96:10 97:6 98:11 99:2 100:14 102:15 103:3 104:23 106:4 108:24 112:11,25 119:18 120:22 121:16 122:4 122:24 123:16 124:4,15 125:3 127:25 128:11 129:15 131:7 131:20 133:11 135:10 136:9 136:17 137:10 138:15 139:10 139:21 141:4 143:14,25 145:6,19 146:18 151:18 152:2,10 153:10 155:7 158:19 159:10 160:3,14 167:6 168:2,20 170:3 170:9 172:9 177:24 178:10 180:3,12

**objecting** 124:19

**objection** 57:15 60:25 61:16 67:3 139:24 144:25 145:13 151:22 155:10 159:12 170:15 171:5 173:20 176:9 177:18 178:20

**objections** 9:4

**objective** 109:23

**observed** 50:9 50:20

**obtain** 27:15 88:13

**occasion** 68:22 163:18

**occasions** 171:23

**occupation** 10:10

**occur** 10:22

**occurred** 68:2 71:16 150:9 151:16,25 152:8 157:12

**occurring** 78:17

**offer** 29:22 81:11 152:18 156:16

**offering** 147:7

| | | | |
|---|---|---|---|
| **offers** 156:20 | 20:14,22 22:2 | 106:20,25 | **ones** 32:6 |
| **office** 114:22 | 22:9,15 23:5,8 | 107:10 108:13 | 110:18 129:23 |
| 114:23 115:1 | 23:17 24:8,12 | 108:20 109:8 | 133:5,7 156:17 |
| **officer** 10:11 | 24:18 25:5,10 | 114:6,22 115:1 | 164:13 |
| 17:19 18:21 | 25:16,19 26:11 | 115:6,8,19,23 | **ongoing** 21:11 |
| 20:1,16,21 | 26:23 27:21 | 116:13 117:16 | 21:23 |
| 23:9,14,15,23 | 28:25 30:3,8 | 118:8,11 | **ongoingly** |
| 23:25 24:7,9 | 32:7,14 34:10 | 121:20 126:20 | 110:24 |
| 24:19,23 25:6 | 35:4,10 37:1 | 126:25 128:9 | **open** 54:13 |
| 25:9,12,17 | 37:12,16 38:24 | 129:24 133:9 | 115:21,22 |
| 27:7 31:15,23 | 41:4,24 43:11 | 141:19 142:4 | 143:8 154:24 |
| 34:21 35:20 | 43:16 45:1,15 | 142:19,23 | **opening** 161:9 |
| 36:10 37:8,10 | 48:10,16,18,25 | 143:2 146:23 | **operating** |
| 51:4 85:19,24 | 49:5,7,11,20,24 | 147:5 150:10 | 10:11 17:12,19 |
| 108:17,19 | 50:5 51:9 52:3 | 150:19 155:3 | 18:20 20:1,15 |
| 174:11,11 | 52:18 54:10,14 | 155:15,23 | 20:21 23:8 |
| **officers** 23:11 | 55:4 56:8,17 | 156:4,11 157:8 | 24:7,9 27:7 |
| 23:16 | 58:8 59:8,24 | 158:22 159:20 | 57:9 85:19,24 |
| **offices** 115:3,11 | 62:14 64:4 | 159:23 160:8 | 89:23 110:9 |
| 115:15 | 65:18 69:12,22 | 161:17,24 | 111:8,21 112:2 |
| **oh** 21:2 22:1 | 72:13,24 73:25 | 162:15,23 | 112:20 113:8 |
| 70:21 115:17 | 74:5,13,17 | 163:9,13 | 113:24 174:10 |
| 122:25 155:1 | 75:6 79:23 | 164:15 165:14 | 174:11 |
| 161:8,22 173:7 | 80:10,24 83:5 | 165:19,21 | **operation** 36:4 |
| **okay** 10:16 | 83:9 84:5 85:4 | 166:3,10,17 | **operational** |
| 11:2,5,20 12:9 | 85:10,14,23 | 172:13 173:12 | 113:11 |
| 12:21,22 13:4 | 86:7,22 88:3 | 174:8 179:18 | **operations** |
| 13:16,21 14:3 | 88:11 89:20 | 179:21 180:23 | 18:24 19:10,14 |
| 14:15,23,25 | 90:17 93:5 | 181:1,8 | 21:3 37:9 |
| 15:2,12,19,22 | 94:9 96:5,15 | **omit** 47:7 | 57:14 73:12,13 |
| 16:1,7,13,16,19 | 97:4 98:7 | **once** 11:8 47:21 | 74:20,24 75:9 |
| 16:23 17:1,4,7 | 100:20 102:12 | 55:13 87:11 | 78:6,7,11,14,17 |
| 18:4,11,17,20 | 103:13,15,18 | **oncology** 22:24 | 78:24 82:8,9 |
| 19:9,22 20:2,7 | 104:8,13 | 34:20 147:15 | 82:20 83:3 |

**[operations - part]**

84:1 113:18,22 113:24 138:7 173:1,19 176:16

**opinions** 84:8

**opportunities** 22:14 34:25 90:2 91:12 99:14 165:11

**opportunity** 32:21 39:17 78:11 81:6,8 93:15 96:21 110:10 163:3 182:10

**option** 153:24 154:2 157:10

**options** 6:20 156:21 157:9 160:10

**order** 4:14,19 5:4,10,14,18 6:4,10,14,19 109:15 111:3 156:21 157:15 157:17,19

**ordered** 183:11

**organization** 19:16,17 23:24 30:12 31:20 36:13 37:11 51:17,19 89:23 90:3,23 91:2 92:3,15 111:17

112:16 175:18

**organizational** 24:11

**organizations** 134:1,7

**original** 3:17 6:22,22 106:11 183:10

**originally** 121:14

**outcome** 9:3

**outlined** 134:9

**outlook** 146:15

**outreach** 149:9 149:10

**outset** 48:2

**outside** 46:24 78:5,25 79:13 81:4 109:16 118:3,9 134:11 159:8

**overall** 143:5 172:13 173:25

**oversaw** 138:4

**oversee** 27:9 138:6,20

**overseeing** 140:13

**oversight** 18:23 19:10,18 46:9 46:11,20 57:13 60:9 90:19 91:6 106:15 109:19 116:4

117:11 118:23 119:1,16 120:6 120:18,21 139:8

**oversite** 138:20 140:19

**overview** 97:25 98:18,20 99:13 100:6 101:6 103:21

**own** 25:19 127:23 128:3 138:9

**owner** 172:25 173:16 176:15

**owners** 71:23 75:23 77:12

**ownership** 58:2 72:6 73:13 75:12,15,17,18 76:14,23 77:5 77:10

**p**

**p.m.** 141:25 166:18 182:18

**pa** 1:25

**packets** 55:17

**page** 2:20 4:1 5:1 6:1 45:2,13 55:1,1 70:19 102:3 106:10 107:11 109:10 121:9,10

122:23,24,25 123:7 127:6,9 130:21,22 134:17 142:13 146:23 147:13 164:16 169:19 169:22 172:14 176:13 185:4,7 185:10,13,16 185:19

**pages** 169:14 169:16

**paper** 131:24 132:6,13,17 133:9,15

**paragraph** 54:21 115:24

**pardon** 70:21

**parent** 1:4,5,6 1:7,8,11

**parenthetical** 140:2,12

**parents** 1:10

**part** 31:16 34:1 35:12,15 36:16 41:5 45:25 46:21,23 60:18 63:5 86:2 91:5 92:22 95:19 96:7 97:5 98:8 98:16 101:15 104:20 105:19 105:23 110:22 116:14,23

117:10,18
119:6 120:6,12
125:24 130:1
136:13 139:5
149:12 158:10
173:4
**partial** 2:13 3:6
3:15
**participant**
69:14
**participants**
8:12
**participate**
20:24 21:4,7
21:16 27:25
**participated**
102:21
**participating**
30:16
**particular** 29:8
29:10 38:20
75:5 92:20
108:8 113:20
129:12,19
178:17
**parties** 8:15
14:16 77:22
79:22 183:11
183:13,15
**party** 9:2 33:17
183:10
**past** 159:25
**patient** 90:22
94:20,22

107:14 117:20
117:22,25
118:1,16,17,19
119:10 120:2
120:15 147:7
149:24 150:1
**patients** 19:3
22:14 23:4
29:6,20,22
30:1,25 32:20
34:23 35:1
36:7,12 38:9
38:19,22 39:5
41:1 78:13
79:7 82:13,15
86:3 96:22
145:17,24
147:9,15,16
148:24 152:24
153:14,18,24
153:25 160:19
164:24 168:23
**pause** 25:1 68:5
82:1 114:4
177:13
**payer** 150:3
**payers** 33:17
152:23
**pdfs** 161:7
**peer** 113:14
**pending** 14:4
**people** 18:7
20:2,5,8 27:14
27:22 50:20

93:17 126:1,17
178:9
**percent** 49:18
52:20 176:21
**perform** 60:10
**performance**
170:1,7,13
171:16,17
178:16 179:4
179:15
**performed**
119:21
**performing**
59:25
**period** 151:16
152:1,9
**person** 24:15
24:19 26:24
31:18 32:15
58:3 63:22
65:22 84:11
87:22 88:4
108:3 124:25
132:16 134:14
136:4,6 156:1
**person's** 24:22
**personal** 81:15
135:19
**personally** 46:7
117:13
**personnel** 6:10
57:10 169:18
169:21

**persons** 183:15
**perspective**
42:13
**pertains** 14:23
**ph.d.** 26:18
**pharmaceutic...**
68:20 69:2
91:22
**pharmacist**
36:22,23,23
57:24 58:1
63:2 76:4
**pharmacists**
36:20 61:25
76:2,4 108:1
**pharmacy** 1:16
6:7 37:19
41:14,23 49:1
49:16,17 52:21
54:17 56:1
57:4,14 60:8
61:9,11,12,14
62:10,12,15,22
63:19 65:2,4
67:12,20,24
68:15 69:10
71:7,12,23
72:7,23 75:19
76:14 77:3,19
78:2,8,14
80:18 81:7,19
81:22,25 82:12
82:14,16,24
83:15 85:8

**[pharmacy - president]**

87:7,13 92:10
92:15 94:7
108:6,13 120:8
120:18 133:3
167:20 168:1
173:17 176:15
176:19,22
**phone**   152:15
**phrase**   15:5,12
81:3
**physician**   36:9
**physicians**
75:23 76:2
**pie**   121:11,14
122:3
**place**   8:15 36:7
65:19 87:12
151:12 167:19
**placing**   159:12
**plaintiffs**   1:13
2:11 8:18 9:10
10:1
**plan**   33:18
46:23 81:22
99:25 104:7
145:22 148:22
148:23 149:22
149:23 151:14
152:23 153:2
153:17
**platsen**   26:16
**please**   8:9 9:5
9:14 10:3
12:11,20 13:8

13:13,18 14:24
21:17 42:24
45:2 49:13
56:11 67:17
68:6,8 70:24
84:10 98:13
121:9 128:19
129:17 142:5
146:23 148:7
158:15 170:5
179:2
**point**   125:13
129:8 130:21
178:12,12
**policies**   109:18
116:4,14 127:1
127:14,19
128:6,9,23
129:1,2,5
134:19
**policy**   127:24
**pops**   169:12
**populated**
172:11
**portion**   107:22
**position**   17:18
22:18 24:4
52:8 72:6
134:24 151:7
**positions**   23:18
**possession**
56:17
**possible**   38:12
40:22 121:24

156:21 157:9
**posted**   165:15
**posting**   166:8
168:18
**potential**   14:10
15:4,6,11,14
27:10 29:5,9
34:2 37:21
39:19 64:21
65:14 86:1
98:22 99:14,15
166:6 177:4
**potentially**
82:22 99:14
157:5
**powerpoint**
104:22
**practice**   91:18
93:13 102:13
102:25 133:10
133:14,16,18
181:13
**practices**   41:12
108:21 109:15
109:25 132:1,4
134:8 138:5
**preferred**
150:1
**preliminary**
74:1
**preparation**
15:21 16:19
**prepare**   15:19
15:23

**preparing**   16:4
40:21
**prescriptions**
79:15
**present**   3:13
9:17 11:21
64:12 101:17
101:19 104:6
104:13
**presentation**
99:9 100:7
103:16,19
104:10,18
105:12,18
**presentations**
104:21
**presented**   12:6
30:22 34:12,14
55:19 68:13
98:18 102:10
105:14,16
106:22
**presenting**
101:24 103:20
104:3 105:2
**president**   10:21
11:3 19:25
20:10 22:16
23:13,21 24:1
24:6,12,16
25:15 26:21
32:2 51:4
53:15 76:25

**[presidents - providing]**

| | | | |
|---|---|---|---|
| **presidents** 20:11 | **proceeds** 11:22 | **program** 22:4 39:8,10 131:2 131:11,11 | **provide** 18:23 19:7,10 38:3 38:22 39:16 |
| **previous** 13:1 44:4 52:7,10 61:22 68:11 128:22 167:8 | **process** 17:11 28:17 30:2 34:1 35:12 36:17 37:18 38:10 46:8,10 | **programs** 22:20,22 39:14 | 40:11,17,20 51:21 57:13 79:7 81:25 82:21 85:21 |
| **previously** 6:1 6:23 12:24 21:25 52:22 54:3 146:1 154:21 168:8 169:10 | 46:21 61:8 62:18,19,23,25 65:12 75:22 85:9 87:11 90:15 95:10,16 96:7 102:6 | **project** 90:7,8 90:18 91:9 92:22 96:17,18 97:5 98:10,17 99:5 100:22 101:8,15 108:9 108:20 109:24 117:10,18 | 90:19 122:18 137:1 143:6 145:3,22 148:25 149:24 152:24 153:13 157:19 158:1 160:17 169:7 |
| **primarily** 35:15 | 105:24 109:18 112:21 113:4 | 120:7 130:1 142:6 | **provided** 19:4 19:5,5 22:11 |
| **primary** 22:25 34:3,6,9,10,11 34:13 99:10 101:20 105:3,5 105:7,10 137:2 | 113:22 116:4 116:15,23 126:14 129:1 157:17,20 160:5 177:3,5 | **projects** 21:10 21:22 **prompted** 79:23 | 33:14 39:20 41:25 42:2 68:19 82:12,23 86:2 93:9 99:4 99:7 100:23 |
| **prior** 10:19 22:15 50:14 56:3 69:14 103:6 112:5 | **processes** 112:3 112:22 134:19 **produce** 121:22 **produced** | **proper** 118:15 **properly** 110:20 **proposal** 105:3 | 117:11 120:5 120:12 122:15 125:17,19 126:21,22 132:15,20 |
| **private** 11:13 181:6 | 169:16 **product** 16:10 | 106:21 107:2 **proposals** | 134:25 136:19 137:7 152:25 |
| **privileged** 19:8 163:2 | 90:22 92:5,19 94:20,22 95:1 | 106:2,5,8 **proposed** | 153:6 170:23 **provider** 82:25 |
| **probably** 16:5 **problem** 86:9 175:11 | 95:2,3 96:2 117:22 120:15 **production** 4:9 | 145:11,12 **proposes** 157:8 **pros** 159:23 | **provides** 107:12 **providing** |
| **procedure** 3:19 **proceed** 9:15 **proceeding** 2:4 9:5 | **products** 107:15 117:21 117:24 135:2 | **protective** 4:14 4:19 5:4,10,14 5:18 6:4,10,14 6:19 | 28:19 29:1 |

**[providing - recall]**

40:16,25 41:1
41:5,7,16
46:21 67:12,20
82:16 91:6
126:18 142:7
144:6 145:9
153:17 168:22
**public** 2:6
183:24 186:19
**pull** 161:20
**purpose** 87:1,2
98:3,4 99:12
108:20
**pursuant** 3:18
**purview** 86:5
**pushed** 165:15
**put** 72:17 95:24
108:1 123:1
125:16 126:14
173:3,15
175:21

**q**

**quality** 8:10,11
19:4 38:16
39:3,4,8,9 40:5
40:10,25 108:5
108:9,11
111:24 133:4
135:13 136:19
137:3,12,21
138:20 139:12
139:14 140:2,4
140:10,13,18

140:21,23,25
141:2,8
**question** 12:9
12:20 16:11
21:17,22 25:1
28:13 29:13
42:24 47:23,24
48:1,7 49:13
56:10,11 60:18
61:3,19,22
62:20 66:15
67:17 68:6,8
68:11 70:24
74:23 84:10
98:13 102:24
124:2 125:25
128:13,18,22
129:17 132:22
140:9,15 141:1
143:11,16
144:10 148:3,6
148:9 152:5
158:2,14
159:17 166:21
166:25 167:8
169:18 173:23
177:21 179:3,9
179:14 180:10
**questions**
151:25 163:7
168:25 169:2
182:3,8
**quickly** 150:4

**quotations** 7:1
**quote** 7:4

**r**

**r** 185:3,3
**raised** 60:15,20
60:24 61:4,24
**range** 181:20
**ranges** 26:7
**rate** 183:11
**rather** 143:8
160:12
**rating** 172:17
173:14,14,24
176:13 178:8
179:18,23,24
**rationales**
153:7
**ravala** 124:24
**reach** 33:15
149:5,16 154:3
154:4 169:1
**reached** 151:8
153:15
**reaching** 33:16
36:6
**read** 7:2 44:13
44:14 45:5,6,7
61:18,21 68:8
68:10 71:8
73:14 107:16
109:21 115:24
115:25 118:12
123:12 127:17

128:18,21
135:6 137:4
138:25 143:13
144:5,18
147:20 151:1
156:11 166:23
167:22 182:10
183:17 184:9
186:5
**reading** 159:4
**reads** 45:18
71:5 107:12
109:10 116:1
118:12,13
123:8,9 126:25
130:5,22
134:18,22
136:24 138:20
146:25 147:6,8
147:13 157:10
159:24 176:14
**ready** 154:8
**realize** 12:23
**really** 13:15
169:19 172:22
**reason** 13:4,8
136:21 184:11
185:6,9,12,15
185:18,21
**recall** 10:23
29:1,13,14,17
33:19,24 34:7
35:8,10,13
37:15 41:24

42:5 46:4,12 46:17,20 48:17 48:18,24 49:24 50:8 51:1,14 51:16,20 52:2 52:15,17 55:16 56:2,6,16,24,25 57:6,8,11,12,16 57:18,21 58:4 58:5,10,14,16 58:18,25 59:3 59:5,7,12,14,17 59:22 60:4,11 62:22 63:18,21 64:7,10,16 65:5,18 66:3,9 66:10,12,16,19 67:9,11 69:17 69:19,21,22 71:24 73:16,20 73:24,25 74:4 74:4,21 75:8 75:10 76:17 79:13 80:15,16 80:24 81:2 84:2,16 85:10 86:11,15,20 87:19,21 88:1 88:9,11,16,17 89:17,20 90:4 92:22,23 94:3 94:11,14 101:10,11,16 103:7,9,11,15

103:18 104:20 104:25 105:2,4 105:15,22,25 106:23,25 107:3 116:19 116:21,22 121:18 125:17 141:7,10 143:22 147:22 148:9,16,17 150:4 155:20 156:7,10 162:11,14,19 162:21 163:12 163:15,21 178:1,14 179:20

**recalling** 156:9
**receipt** 184:17
**receive** 53:7,10 55:21 155:17 158:16 163:9
**received** 28:21 29:21 141:8 145:18 148:13 153:14 155:5 163:7 180:24 181:8,11
**receiving** 55:16 56:2 72:14 172:1
**recently** 58:12
**recipients** 74:2

**reciprocating** 177:12
**recognition** 140:12
**recognize** 156:6 164:1
**recognizing** 156:3
**recollection** 16:21 45:23 50:3,4 64:18 65:20 71:11 72:8 84:4,21 85:3 87:4 99:22 100:9 104:10,11,15 104:17 107:9 159:1 163:20 172:2
**recommend** 129:24
**recommendat...** 27:25 28:8,10 29:10,11 30:4 30:6,19,21,22 31:10,12 32:19 32:23,25 33:3 33:9,10,20,22 33:23 34:4,6,9 34:11,12,13,16 34:17,24 47:2 47:3,4 85:11 98:3 99:4,10 101:24 106:9

106:12 122:20 130:2 138:19 139:16 140:21
**recommendat...** 28:4,20,23,25 29:2,14,17,18 33:24 34:8 35:4 36:12 39:20 40:12 91:14 93:14 94:6 98:8,16 99:15,18 101:7 103:23 107:1,3 107:25 139:9 144:20
**recommended** 35:2 46:24 147:14 157:19 160:11
**recommending** 148:22
**record** 7:3 8:7 8:16 17:21 43:18,20,22 44:21 77:24 78:8 88:23 89:1,3,5 95:25 97:21 114:11 114:13,15 130:25 147:11 154:12,14,16 183:8
**recorded** 1:20 2:1 8:14,17

**recording** 8:10 8:14

**records** 18:18 56:18 95:18 97:4,9

**recruitment** 26:9

**reduces** 168:15

**refer** 14:19,21 18:7,15 31:7 136:19 139:11

**reference** 15:2 135:24 158:3

**referenced** 6:24 116:7 123:15 124:13 131:6 157:22 158:9 184:6

**referred** 18:9 21:19 22:24 32:4,15 93:1 127:20 136:1

**referring** 14:16 15:6,13 17:23 21:9 31:24 93:18 104:4 107:19 113:17

**refills** 82:16

**reflect** 103:1 175:25

**reflected** 7:2 57:7 100:13 101:1 104:8 110:13

**reflecting** 50:7 174:24

**reframe** 42:23

**refresh** 16:20 45:23 54:5 71:10

**refreshed** 161:4

**refrigerated** 96:21 135:3

**refrigerating** 110:17

**refrigeration** 89:11 90:21 91:12,21 92:24 94:25 95:5 98:4 106:14,18 109:6,12,17 110:6,11,16,25 110:25 111:3 116:2 118:13 118:23 119:1 119:10 120:2,4 120:14 138:8 142:6 144:8,20 144:22 157:12

**refrigerations** 98:23 144:4

**refrigerator** 5:5 98:9,17

**refrigerators** 118:4,15 127:3 127:16

**refund** 147:1,8 149:3 150:20 152:19

**refunding** 147:7,12,14

**refunds** 145:17 147:25 148:12 149:15 156:15 157:11,18 158:1

**regarding** 43:9 68:20 76:9 86:16 100:22 125:14 140:19 149:3 177:15 177:22

**regardless** 73:10

**region** 18:9,24

**regions** 39:25

**regular** 59:1

**regularly** 55:22 56:15,22,23 57:2 71:20

**regulations** 65:4 134:2 135:22

**regulatory** 42:21 43:1 45:16,20,25 46:5,22 95:7,9

**rein** 1:10

**rejected** 107:6

**relate** 82:19

**related** 9:1 22:24 58:21

**relative** 34:2 74:9 92:23,25 99:24 183:12 183:13

**releases** 166:21

**remain** 81:17 114:20

**remains** 107:15

**remember** 12:15,16 18:5 39:13 46:16 65:21 66:5 68:23 72:14 75:15 77:13 83:5 94:9 143:21

**remembering** 174:9

**remembrance** 96:3 97:11

**reminder** 79:20

**remote** 1:20 2:1 2:4 13:12,21 183:5

**remotely** 8:3 178:25

**remove** 147:11

**repeat** 21:16 25:2,3,3 26:25 49:13 98:13 127:12 148:6

**[repeat - restate]**

170:5
**repeated** 148:4
**rephrase** 56:10
67:16
**replace** 106:16
156:16
**replaced**
106:19 110:7
111:1 143:7,11
144:17 145:5
**replacement**
5:5 51:3,10
91:16 98:9
109:3 144:20
**report** 20:3
22:14 24:1,8
24:10,20 25:12
25:17 48:19
57:5,7 99:8
126:8,13,23
129:14,21
131:17 136:14
137:6 139:9
140:18,22,23
141:8 170:12
172:20
**reported** 1:24
183:5
**reporter** 2:5
8:1,24 9:14
13:9,15 61:18
61:20,21 68:7
68:9,10 88:22
128:17,20,21

**reporter's** 7:1
183:1
**reporting** 57:3
91:10 98:1
135:1 137:3
138:21,23,23
139:15 140:22
141:2
**reports** 24:13
25:18 123:10
123:14,20
124:3,12,22
125:2,14
170:17
**represent** 10:1
20:12 169:17
**representative**
9:18
**represented**
30:20
**representing**
8:25 49:18
**request** 29:23
52:12,16 53:1
71:15,18 72:22
73:5 74:7,8
78:22 80:5
89:17
**requested** 6:23
52:9 73:9
97:13 159:20
**requests** 4:9
**require** 77:20

**required** 28:23
28:24 135:2
145:10 171:10
171:12 186:13
**requirement**
131:25
**requirements**
43:5 131:1,5
131:14,18
132:7,11,18
**requires**
147:10 171:2
**research** 30:17
64:21 157:13
157:21 158:3,9
158:16,23
159:5,14,15,16
159:18,21
**reserved**
183:18
**resigning** 72:6
**resource** 18:15
18:18 105:19
**resources** 19:6
40:3,11 103:25
111:22 170:23
**respect** 139:8
178:23
**respectfully**
41:9
**respond** 65:15
67:7 122:12
133:20 140:20
166:19

**responded**
132:23 145:10
174:1,15 176:1
**responding**
174:19
**responds**
165:21 167:15
**response** 27:5
27:23 35:16
41:5 46:1 48:1
64:24 65:8
79:18,19
132:25 176:14
179:13
**responses**
153:5
**responsibilities**
19:1 20:9,14
20:17,20,22
21:11,20,24
22:18 35:16
**responsibility**
42:20,25 60:9
80:4 85:20,25
87:16,23 92:12
92:14 93:22
120:6 122:18
139:12
**responsive**
178:22,25
**rest** 112:23
172:23
**restate** 48:17

**result** 78:22
139:8
**retire** 57:25
**retired** 26:22
31:19 52:8
**retirement**
58:13 75:15
76:19
**retiring** 58:9
75:24 76:17
77:12
**retrieve** 123:20
**return** 184:13
184:16
**returning**
82:18
**revaccination**
149:4,15
152:19 153:19
160:17
**revaccinations**
147:25 148:13
**reveal** 136:14
**revenue** 57:8
146:25
**review** 6:19
13:23 16:1,20
17:13 22:13
41:10 56:12
89:11 90:20
100:18 101:18
102:10,20
117:19 123:24
134:3,8 148:23

148:25 165:20
170:13 184:7
**reviewed** 31:10
31:10 55:24
99:21,21
102:18 106:16
109:17 116:1
148:5 162:4
**reviewing**
82:15 145:11
148:2 155:1
161:25
**reviews** 134:1,6
**rheumatology**
34:20
**rich** 35:21
**right** 23:6
27:11,13,19,21
28:5 31:21
32:6 35:9,13
36:6,6,7,10,11
37:15 38:7
45:3 54:7,25
55:12 62:13,16
65:6,20 69:3
71:8 77:8,16
81:3,15 86:17
88:6 91:8,24
93:15 100:4
107:16 123:12
127:17 128:10
129:6 132:12
135:6 137:9
138:14 139:15

139:20 140:8
140:16 142:21
143:13,16
144:16 145:23
147:20 151:1,5
151:17 152:1,9
159:9 160:10
162:9 164:1,22
166:8,12,23
167:22 169:7
170:2,8 172:3
175:14 176:5
182:12 183:17
**ringing** 163:25
**river's** 10:6
**road** 2:15
**rob** 58:6 72:6
76:17 84:13
**robbins** 94:11
130:20
**role** 19:2 20:8
22:15,19 23:5
27:4,7,9,13,22
27:24 28:3
32:11 36:8
38:6 40:10
43:8 45:24
46:7 47:1
48:25 49:15
50:5 53:8,11
53:23 85:18,23
86:8 87:7,9
90:19 96:17,18
105:5 113:19

174:10
**roles** 20:18
**roll** 111:12
**rolling** 113:4
**room** 13:19,20
**rooms** 118:4
**row** 45:15
115:24 138:18
146:24
**rules** 3:19
**rummel** 3:6
9:16
**run** 150:24

**s**

**s** 1:24 2:4
183:24 185:3
**s.b.** 1:11
**s.k.** 1:4
**safe** 19:5 69:12
107:13
**safety** 39:4
**sandra** 163:24
**sanford** 11:12
**saw** 71:5,18
**saying** 13:16
17:22 124:12
128:2 165:22
**saylor** 52:11
**says** 150:20
155:11 159:23
164:22 167:16
**sbar** 5:5 98:1
99:24 100:3

102:5,14 103:1 104:6 116:11 142:5,15,22
**scale** 178:8,12 178:13
**scanned** 45:8
**schedule** 73:6
**scheduled** 1:23
**schneider** 1:5
**school** 181:5,5 181:6,10
**schools** 180:24
**scope** 58:22 101:16 110:22 117:19
**scott** 2:14 3:18
**screen** 8:13 44:10 49:2 82:2 142:3 173:9
**scroll** 44:12 107:10 141:22
**scrolled** 133:1 133:1
**se** 92:24
**seal** 183:19
**seats** 52:21
**second** 106:10 127:9 176:12
**section** 107:11
**see** 17:17 18:12 45:15,21 54:18 55:3 64:22 81:8 99:6

127:11,18 130:8 131:3 134:20 142:1 147:3 158:6 164:19 166:1 172:5,15,23 173:6,9 176:17 177:2,15,16,22
**seem** 169:5
**seemed** 169:6
**seen** 8:12 29:24 32:21
**selected** 85:15
**selection** 180:16
**semi** 129:10
**send** 13:23 71:20 72:25 148:24 162:23
**sends** 166:3
**senior** 10:21 11:2 20:10 22:16
**sense** 26:6 42:7 114:2 130:7,13
**sensitive** 41:18 91:21
**sent** 35:11 70:15 71:1 158:12 163:6 184:14
**sentence** 116:1 131:23 135:25 157:23

**sentences** 137:4 138:25
**separate** 17:9 94:19,25 101:1 112:17,21 113:25 140:9
**september** 172:4
**sequence** 161:11
**series** 35:7
**serve** 19:8 29:5 52:9,12,18 82:15 163:2
**served** 137:23
**service** 20:13 22:11,13,20,22 22:23 23:1 160:17
**services** 23:3 38:18,21 40:5 40:10,16 51:5 59:24 60:1,10 60:11 67:11,13 67:19,21,22 68:1,19 81:24 82:12 86:2 93:21 111:4,22 113:14,15 170:24 175:4
**serving** 53:8,11 168:23
**set** 116:8

**seventh** 45:2
**several** 70:16 157:9
**share** 44:9 149:21 165:12 165:22 173:9 175:14,24
**shared** 51:5 60:1,10 67:13 67:21,22,25 109:14 125:21 176:5
**shares** 58:2
**sharing** 149:20
**sheet** 184:11
**shelli** 1:5
**short** 43:13 79:22
**shortened** 25:7
**shorthand** 2:5
**shortly** 64:8
**show** 154:20 155:14 169:11
**showing** 146:1
**sic** 36:23 110:24 138:20 143:11
**side** 94:12,14
**sign** 182:10 183:17 184:12
**signature** 183:23
**signatures** 55:2

signed 184:19
significant
  76:20 177:17
similarly 1:12
  12:19
simple 179:9
simply 81:10
  146:20,20
  180:10
single 28:9 35:6
sit 56:7 80:21
site 95:24 96:5
  96:5,9
situated 1:12
situation 29:7
  37:21 38:20
  39:1 98:2
  101:23 130:4
  156:22
six 32:13 115:7
  115:8
smart 130:6
smartsense
  130:10,23
software 97:2
  130:23
sole 30:21
solely 30:19
  159:3 173:23
solution 38:12
  153:13
solutions 9:1
  184:23

somebody
  72:25
sorry 35:23
  37:5 42:16
  62:3 115:17
  123:1 142:14
  146:13 152:5
  156:5 159:17
  161:8,22 174:1
sort 18:25
  19:13 21:23
  134:11
sound 114:5
sounds 114:8
  134:10 154:10
  175:20
south 115:4,9
span 151:9
spanning
  156:17
speak 13:13
  15:23
specific 21:9
  22:1,3 29:14
  36:19 38:3
  41:24 46:12
  66:15 70:4
  74:13,21 79:1
  84:9 98:3
  131:11 156:9
  158:8 165:3
specifically
  22:19 71:24
  82:10 90:6

  104:19 110:16
  133:23
specify 14:24
  15:8
specimens
  118:17
speculate 12:19
speed 74:11
spent 16:4
ss 183:3
staff 19:4 38:19
  94:21 118:5,6
  136:4 168:22
  168:24
stand 103:13
  176:1,24
  179:13
standard 19:16
  21:2,3,3 39:16
  39:17 40:20
  41:12 57:3,4,7
  77:4 90:24
  98:1 102:13,17
  102:25 111:2
  113:12,13,22
  123:20 124:22
  157:10 159:25
  160:2,9
standardization
  90:3,21 110:23
  111:23,24
  123:18
standardize
  130:2

standardized
  119:13 123:24
  146:16
standardizing
  129:25 137:17
standards
  40:23 41:2,17
  95:7
standpoint
  17:16 78:24
  90:20 113:12
  147:15 153:2
stands 107:5
start 43:23
  78:2 114:16
  154:17 166:22
started 11:2
  17:5 22:16
  32:12 89:24
  112:5
starting 181:4
starts 45:13
  169:22
stat 164:24
  165:6,7,15
  166:8 168:18
state 2:6 9:5,6
  10:3 73:11,12
  74:6,20 75:9
  91:11,13 93:10
  93:19 94:8,16
  94:18 96:13
  97:14 109:2,6
  116:9 126:19

**[state - system]** Page 41

131:11 150:2
183:2
**stated** 32:18
63:17 79:16
97:11 99:25
101:22 103:22
104:12 109:5
158:25
**statement**
20:20 75:5
77:21 79:4,16
80:17 82:19
86:6 103:6
108:4 132:14
136:22 144:13
168:15 175:8
177:6,10
**states** 1:1 8:21
47:8 103:20
137:19 152:21
**stating** 59:17
132:13 151:11
**stay** 82:13
121:3
**staying** 38:8
**stead** 91:15
**stems** 159:3
**stenographic**
2:5
**step** 102:6
**steps** 91:5 99:6
99:23 100:2,11
100:25 102:1,2
104:5 105:21

119:24
**stipulate** 8:2
**stop** 179:2
**storage** 4:15
6:15 41:12,17
61:11 92:13
107:13 164:23
**store** 69:9 95:4
96:21 118:16
**stored** 14:11
34:17 63:5
68:15 96:3
117:1 120:9,10
120:17 122:17
144:23
**storing** 68:4,20
69:2,8 92:19
110:19 118:19
**street** 3:8 138:1
**strike** 62:4
**strive** 19:15,16
19:18 21:2
**structure** 24:11
138:24 146:14
**structures**
114:1 146:17
**sub** 34:8
**subgroup**
34:23
**subject** 4:14,19
5:4,10,14,18
6:3,9,14,19
15:14 41:25
69:13 76:22

83:1 91:20,25
92:21 93:5
103:24
**submitted**
176:8
**subscribed**
186:14
**subset** 105:9
**substantial**
183:16
**suggesting**
128:3 167:14
**suggests** 159:7
**suite** 2:15 3:8
**suited** 124:21
**summarize**
98:7,15
**summary** 65:7
**supervisor**
19:22
**supplement**
13:1
**supply** 111:4
113:14
**support** 23:3
40:4,5,7,10
105:20 111:4
111:22 113:13
137:2,20
170:24 175:4
**supported** 33:8
33:9,10,11,20
33:21,22 47:4
149:23 153:2,7

**supporting**
30:25
**sure** 13:8 17:8
30:24 36:5
38:7,8,21
39:18 42:16,19
43:15 44:22
61:20 76:18
77:2 88:20
94:21 106:17
153:12 154:9
162:3
**surrounding**
29:4
**suzanne** 23:22
25:17 37:7
147:6,17,23
148:11
**swear** 8:2 9:14
**sworn** 9:21
183:6 186:14
**system** 19:21
20:19,24,25
21:4,5,21 22:5
22:6,12 31:5,9
31:16 36:2
39:7,14,15,22
40:3,3 80:12
93:1 98:6
102:20 106:15
109:6,11,14
112:7 113:21
119:3,7 121:6
126:4 128:6,7

128:24 129:13
129:20 130:6,7
130:11 137:17
178:16 179:5,7
179:16
**systems** 40:7
89:12 90:20
94:1 108:22
109:18 111:11
111:12 112:22
116:3 123:9
127:10 129:9
129:22,25

**t**

**t** 185:3,3
**table** 36:11
38:7 40:13
146:24
**take** 8:15 13:7
13:9 43:13
49:4 56:8,14
58:20 91:5
119:24 169:11
181:1 182:9
**taken** 1:22 2:2
8:18 54:23
59:1 102:1
165:1
**talk** 13:16
134:14
**talked** 93:6
**talking** 140:13

**tara** 156:2
**team** 32:5
36:19 40:5,7
40:10 41:14,23
61:9,14 74:8
95:2 96:6
97:12,13
101:18,25
103:14 104:2,2
104:4 108:5,6
108:9,11,13
123:6 125:21
125:23 126:2
128:5 130:19
135:13 136:19
143:6 145:20
147:18 157:17
**teams** 40:4
95:22 126:15
146:15
**technologies**
93:24
**technology**
93:23
**tell** 48:3,25
49:15 97:12
148:18 183:6
**telling** 65:5
**temperature**
5:6 15:4,5,6,9
15:15 27:5
41:18 59:8,19
61:7,12,13
62:1 64:9,20

66:1,17,25
68:17 69:1
84:18,25 86:16
86:17 88:6
89:10 91:21
93:2 98:5,10
98:23 108:22
109:25 124:7,9
124:13 127:24
129:13,20
138:5 166:4
167:5
**temperatures**
63:7 91:19
93:3 130:25
**ten** 20:6 42:15
178:12 181:23
**tendency**
183:16
**tentative**
155:11,14
**term** 15:9 18:6
34:18 63:4
**terminating**
61:10
**terminology**
15:17 156:25
**terms** 19:14
22:21 26:7,9
40:16 81:12
134:6
**testified** 9:22
113:6 132:10
140:6 159:2

**testify** 14:3
**testifying** 11:23
12:2
**testimony**
150:10 183:8,8
184:9,17 186:8
**text** 13:24
**thank** 9:19 22:1
44:16 49:8,12
70:22 76:4
82:6 148:2
161:13,24
181:3 182:9,13
182:14
**thanks** 49:8
143:2
**thing** 166:19
**things** 77:7
81:10,12 92:14
94:2,15 118:6
144:18 165:12
175:21,23
176:4
**think** 25:2
65:16 76:1,20
122:10 126:22
127:4 142:17
165:3 167:24
168:17 170:4
182:4
**thinking** 88:21
132:21 144:11
148:1 152:4
174:5 179:12

**[third - transition]**

**third** 3:8 33:17 55:1 107:11
**thought** 42:11 132:23 142:23 167:1 174:1 175:20
**thousands** 156:18
**three** 36:24 40:1 55:8 106:9 108:7 120:19 125:19 126:1,20 129:8 144:6 151:10 151:16 152:1,8
**thursday** 1:22 2:2 183:5
**tim** 52:11
**time** 10:17 13:16 16:3 20:19,19,23 31:20 32:3,24 35:20 36:7 37:7,10 42:1,4 42:9,13 43:19 43:24 46:18 47:16 48:8,21 50:17 53:16 54:1 58:4,5 66:5 68:22 69:15 75:7,10 75:11,14 76:12 76:24,25 78:19 78:19 83:18

88:19 89:2,7 93:21 99:22 101:12 103:11 104:3 114:12 114:17 115:2 115:16 116:8 116:11 119:15 129:14,21,22 131:17 132:9 137:6 140:3,3 143:22 151:16 152:1,9 154:13 154:18 155:14 162:13,14,20 162:21,22 163:15,23 171:18,25 172:7,19,20 174:14 177:16 178:2 179:20 180:1 181:18 182:8,17 184:18
**timeframe** 184:8
**timely** 175:5,7 175:10
**times** 11:7 16:7 26:8
**timing** 68:24 88:21
**tissue** 90:23 92:13

**tissues** 117:24
**title** 10:16,19 10:20 19:24 20:16 24:22 25:14 39:13 50:11 51:6,8 135:9
**titled** 54:15 146:25
**today** 8:24 10:25 11:21 13:5,25 14:3 14:19 16:17 20:6 44:2 80:18,21 81:17 93:10 129:6 181:25
**today's** 15:20 15:24 182:16
**together** 35:22 36:5 37:22 38:2 74:8 80:8 90:25 108:1,7 123:1 125:16 126:15
**tom** 36:23
**tony** 92:10
**took** 20:15 87:11 151:12
**top** 54:18 121:12 142:12 161:21 172:3 172:14 173:25 176:12

**topic** 69:19 78:16 80:24 83:9 92:1 93:7 124:21 133:22 134:10 141:3 146:25 147:24 149:3 163:14
**topics** 56:23 73:17 74:3 76:9 141:3 155:20 156:8
**totality** 178:19
**towards** 79:2 113:23 172:3 172:14
**train** 42:11
**training** 134:25 135:5 136:11 136:15,24 137:1,7,18
**transactional** 153:1
**transcribe** 13:15
**transcribed** 183:8
**transcript** 3:17 6:22 182:11 183:18 184:6 184:19 186:5,8
**transferred** 121:5
**transition** 10:22 111:7

**[transition - upper]**                                                    Page 44

113:7
**transparency**
91:10
**transparent**
152:21 154:2
168:24 169:6
**treatment**
34:19
**trial** 12:7
**true** 183:8
186:8
**trust** 81:19,24
**truth** 183:7
**try** 161:5
**trying** 40:14
48:5 79:8
113:9
**turn** 45:1 54:25
121:9 146:23
176:12
**turning** 150:19
**two** 14:24 16:5
28:20 39:25,25
40:2 45:18
47:18 50:14
58:14,15 75:23
94:4 110:11,13
115:3,10,11,15
138:21 144:17
151:8 181:20
**type** 41:6
110:18 118:2
129:12,19

**typed** 172:25
**types** 57:21
58:25 113:15
129:9
**typing** 180:16
**tyrell** 1:9

**u**

**ultimate** 83:5
**ultimately** 30:8
86:4 106:2
**unanimous** 6:4
54:15
**unclear** 118:24
119:2,16
**uncovered**
109:13
**under** 11:25
17:14,14 55:4
59:25 67:13,21
81:22 92:9,11
92:14 93:22
98:22 99:6
104:6 105:21
106:9 109:9,9
111:15,20
112:17 114:20
119:5 127:9
138:19,19
139:3 140:2,4
140:19 156:12
157:3 172:13
173:13,24
176:13 178:7

**undergrad**
181:3,4,5
**underneath**
112:17
**understand**
11:20,25 12:5
12:11 14:20
15:8,16 27:10
29:6 52:25
74:9 113:9
114:20 121:24
135:24 182:5
**understanding**
14:8 15:3
37:20 40:9
65:17 74:11
80:8 85:13
98:25 100:1,12
104:15 106:20
117:16 122:2,8
135:8 156:23
160:2 165:5
**understood**
12:10 65:11
119:13
**unfinished**
171:11
**uniform** 113:22
**unilateral** 79:4
153:18
**unintelligible**
25:11 35:24
39:19 49:10
78:12 126:6

**unit** 8:17 94:24
96:1 110:16
119:10
**united** 1:1 8:20
**units** 93:4
106:14,19
109:18 110:6
110:17,25
116:3 118:13
118:18,20,23
119:1 120:13
120:14 143:7
143:10,19,24
144:16,21
145:4,10
**university**
115:4,9 138:1
**unwanted**
156:20,24
**update** 74:12
74:18 76:21
103:1 150:20
151:4
**updated** 28:15
77:7,15 99:24
100:3 102:5,14
106:24
**updates** 4:15
6:15 28:19
**updating**
146:20
**upper** 44:11
54:6,6,7

**[use - von]** Page 45

| | | | |
|---|---|---|---|
| **use** 15:4,9,12 | 156:13,16 | **vetter's** 37:24 | 10:1 16:12 |
| 15:17 18:7 | 157:12,16 | **vice** 10:21 11:2 | 17:24 21:18 |
| 63:4 94:21,21 | **valid** 110:17 | 19:25 20:10,11 | 27:18 28:18 |
| 118:1,5,15 | **value** 39:3 | 22:16 24:6 | 33:5 39:21 |
| 134:2 146:17 | **values** 29:6 | 51:4 | 41:15,21 42:14 |
| **used** 34:18 81:3 | 30:24 35:1 | **video** 1:20 2:1 | 42:18 43:6,12 |
| 95:6,19 97:2 | 38:9,14,15,16 | 8:14,17 | 43:16,25 44:17 |
| 106:1 118:4 | 38:17,23,25 | **videoconfere...** | 44:22,25 45:10 |
| 129:22 165:9 | **variation** | 1:21 2:1 8:3 | 46:6,19 47:22 |
| 165:10 184:19 | 110:18 118:14 | **videographer** | 48:5,9,15 |
| **uses** 78:8 | **variations** | 3:14 8:6,24 | 49:14 50:16 |
| **using** 13:25 | 110:21 | 9:13 43:17,21 | 53:6,22 54:11 |
| 29:6 78:2 | **vascular** 22:25 | 88:25 89:4 | 57:15,17 59:4 |
| 95:25 97:25 | **vast** 45:12 | 114:10,14 | 59:13,23 60:5 |
| 98:1 129:14,21 | **vendors** 92:25 | 154:11,15 | 60:14,19,25 |
| 178:16 179:5 | 110:21,23 | 182:15 | 61:2,16 62:2 |
| 179:15 | **venture** 176:25 | **views** 44:19 | 63:20 64:1 |
| **usually** 72:25 | **verbally** 13:9 | 54:20 70:13 | 67:5,10,18 |
| **utilization** | 52:16 89:18,19 | 71:4 97:23 | 68:7,16 69:11 |
| 113:13 | **verify** 184:9 | 142:2 146:5 | 69:18 70:1,6 |
| **utilize** 111:21 | **veritext** 9:1 | 155:1 161:19 | 70:10,20,25 |
| 111:22,23 | 184:14,23 | 162:4 164:10 | 73:7 76:5 |
| **utilized** 91:18 | **veritext.com.** | 169:25 | 77:14 78:15 |
| 117:20 | 184:15 | **virtually** 8:10 | 80:9,20 81:23 |
| **v** | **vernacular** | **visits** 150:21 | 83:24 84:22 |
| | 176:25 | **vogel** 3:7 | 85:22 86:21 |
| **v** 184:4 185:1 | **version** 99:1 | **vogellaw.com** | 87:8,14,20 |
| 186:1 | 121:23,25 | 3:10,11 184:2 | 88:2,10,18,24 |
| **vaccination** | **versus** 8:19 | **void** 157:14 | 89:8,16 90:13 |
| 147:11 | 14:4 147:1,25 | **voided** 156:14 | 96:4,14 97:15 |
| **vaccine** 4:15 | 149:3,15 | 156:19 | 97:20 98:14 |
| 147:1,2,7,8 | **vetter** 35:21 | **volume** 156:19 | 99:16 100:19 |
| **vaccines** 131:1 | 36:15 37:17,18 | **von** 2:12 4:5 | 102:23 103:8 |
| 132:7 147:9 | 108:18 166:12 | 8:4 9:9,10,24 | 105:1 106:7 |

109:7 112:19 113:5 114:3,18 119:23 121:8 121:19,21 122:1,6,21 123:2 124:1,11 124:18 125:8 127:8,13 128:8 128:15,17 129:4,18 131:12,21 133:17 135:14 136:12,20 137:13 138:17 139:13,23 140:5,14 141:6 141:14 142:17 142:21,25 143:3,15 144:9 144:25 145:2 145:13,15,25 146:22 148:8 151:22,24 152:3,14 153:22 154:9 154:19 155:9 155:12,15,16 155:22 158:21 159:13 160:7 160:20,25 161:12,16 162:2 164:5 167:10 168:6 169:4 170:6,15

170:18 171:5,7 172:12 173:20 173:22 176:9 176:11 177:18 177:20 178:3 178:11,20,24 179:2,8,11 180:9,19 182:7 182:12

**vote** 33:20 58:23

**votes** 58:21,25 59:5

**voting** 59:6

**vs** 1:14

**w**

**w.s.** 1:6

**waiting** 144:10 144:15

**walked** 91:2

**want** 12:25 13:7 42:10 44:8,15,20 47:7,16,20,23 51:23 55:23 56:5 57:20 59:18 66:2 68:21 70:18 73:19,21,22 75:20 76:6,13 79:6 80:7 87:12 88:15 100:16 101:3,9

102:7 103:12 116:17 125:12 167:2,3 168:8 169:6

**wanted** 74:15 74:18,25 77:2 77:6,15,19 78:2 79:5 83:2 113:25 119:8 123:19,23 149:5 153:12 169:5 177:6,8

**washington** 2:16

**way** 14:21 38:11 42:5,7 53:2 56:6 85:1 87:21 102:19 107:7 117:6 132:5 138:5 152:21 176:3

**ways** 82:21 91:17 111:12

**we've** 26:8 42:11 154:6

**website** 165:18

**welcome** 44:1 89:9 114:19

**went** 83:6 95:23 96:8 126:12,23 138:12 153:3

**west** 4:15 6:14 6:19 10:6,12

17:19 18:6,9 18:21,24 19:20 20:11,13 21:6 22:20 23:9,11 23:13,14,15,16 23:22,23 24:2 24:13,18,25 25:13,15 40:2 40:2 49:23 53:15 76:25 85:19 86:3 91:3 162:8,15

**whatsoever** 46:8 51:22 135:20 150:8

**wide** 89:12 109:11 126:4

**widely** 167:3

**william** 166:11

**window** 109:17 116:2,6,10

**wish** 156:15

**wished** 153:21

**witness** 3:4 4:3 8:2,13 9:14,21 21:15 28:12,15 33:2 39:12 41:9 42:16 43:4 44:14,24 45:7 46:3,17 48:8,14 49:5,7 49:10,12 50:13 53:4,20 54:7 54:10 59:3,12

**[witness - zoom]**

| | | | |
|---|---|---|---|
| 59:22 60:4,8 60:23 61:7,23 63:17,24 67:7 67:9,16 68:12 69:6,17 70:4 70:23 73:3 76:3 77:10 78:5 80:3,15 81:21 83:21 84:20 85:18 86:19 87:1,11 87:19 88:1,8 89:15 90:10 95:22 96:12 97:8 98:12 99:3 100:16 102:17 103:4 104:25 106:5 109:1 112:13 113:2 114:8 119:20 120:24 121:18 122:12 122:14,25 123:18 124:6 124:17 125:5 127:6 128:2,13 128:19,23 129:16 131:9 133:13 135:12 136:10,18 137:11 138:16 139:11 141:5 144:2 145:7,20 146:19 148:5 | 151:19 152:12 153:12 155:20 160:4,16 161:8 161:14,22,25 167:7 168:4,21 170:4,11 172:10 173:7 173:11,13 178:1 180:5,14 182:14 183:6,9 183:18,19 184:8,10,12,18 **witten** 36:22 108:14 124:24 133:4,20 164:17 **women's** 22:25 **wondering** 165:2 **words** 143:16 **work** 16:10 19:5,17 21:3 35:15,18 36:3 36:8,13 37:19 37:19,20,24 39:17 42:15 46:23 77:4 90:24 98:19 102:17 108:2 113:12,19,21 147:16 157:16 165:16 173:1 173:18 176:7 176:16 177:4 | **workday** 170:12,22,25 171:1,2,3,13 173:3 176:7,8 180:8,17 **worked** 21:10 35:19 36:16,19 37:2,13 51:11 **workflow** 157:11 160:1,2 160:9 **workflows** 157:19 **working** 36:5 80:8 96:16 108:7,9 164:23 176:6 177:5 **works** 43:13 114:4 171:1 **worry** 169:16 **wq** 150:24 **write** 107:22 142:4 143:5 166:20 **writing** 42:3 52:16 85:2 89:18 **written** 6:4 13:24 35:11 48:19 50:6 52:1 54:15 107:12 152:15 **wrong** 133:15 | **wrote** 74:5,19 125:13 155:23 175:21 <hr> **y** <hr> **yeah** 36:18 44:10 54:9 113:11 127:9 128:16 142:17 146:19 152:7 154:9 166:7 169:15 181:2 **year** 10:23,25 11:1 23:6 55:14 58:24 72:11 **years** 156:18 180:25 181:23 **yep** 84:1 **young** 3:14 8:23 <hr> **z** <hr> **zeltinger** 23:22 25:17 37:7 **zoom** 1:20 2:1 2:4 8:3 |

North Dakota Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

(e) Review by Deponent; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party made before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period. If the deposition is not signed by the deponent within 30 days after its submission to the deponent, the officer shall sign it and state on the record the fact of the waiver or of the illness or absence of the deponent or the fact of the refusal to sign together with the reason, if any, given therefor; and the

deposition may then be used as fully as though signed unless on a motion to suppress under Rule 32(d)(4) the court holds the reasons given for the refusal to sign require rejection of the deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.